Case No. 24-1058

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

Mary Ann Moreno,

     Plaintiff-Appellant,

v.

Circle K Stores, Inc.,

     Defendant-Appellee.

_____

On Appeal from the United States District Court for the District of Colorado
The Honorable Nina Y. Wang, U.S. District Judge
D.C. Case No. 1:22-cv-02327-NYW-STV

_____

## **APPENDIX – VOLUME II, PAGES 0214 - 0407**

Virginia Hill Butler
Iris Halpern
Matthew J. Cron
Rathod | Mohamedbhai LLC
2701 Lawrence Street, Suite 100
Denver, Colorado 80205
vb@rmlawyers.com
ih@rmlawyers.com
mc@rmlawyers.com
*Attorneys for Plaintiff-Appellant*

# TABLE OF CONTENTS

## VOLUME II

Doc. 61: Transcript of Proceedings Before the Honorable Scott T. Varholak.................................................................. 216

Doc. 64: Circle K's Motion for Summary Judgement ...................... 237

Doc. 64-1: Declaration of Craig Holmes...................................... 263

Doc. 64-2: Declaration of Nicholas Hankins ............................... 267

Doc. 64-3: Employee Guidebook ................................................ 270

Doc. 64-4: 5-Minute Rule ........................................................... 312

Doc. 64-5: Confront and Chase .................................................. 315

Doc. 64-6: Video Surveillance Footage ...................................... 317

Doc. 64-7: Video Surveillance Footage (Behind Counter).......... 318

Doc. 64-8: Video Surveillance Footage (Store View 1) ............. 319

Doc. 64-9: 9-1-1 Audio Recording ............................................. 320

Doc. 64-10: Rule 30(b)(6) Deposition Excerpts ......................... 321

Doc. 64-11: Moreno Deposition Excerpts.................................... 329

Doc. 64-12: Aamoud Deposition Excerpts................................... 370

Doc. 64-13: Holmes Deposition Excerpts .................................... 382

Doc. 64-14: Harvey Deposition Excerpts..................................... 391

Doc. 64-15: View Terminate Employee Event ............................ 397

Doc. 64-16: Declaration of Driss Aamoud................................... 400

Doc. 64-17: Declaration of Amy Harvey ..................................... 404

1

1                       UNITED STATES DISTRICT COURT
                           DISTRICT OF COLORADO
2

3    MARY ANN MORENO,              .    Case No. 22-cv-2327-NYW-STV
                                   .
4              Plaintiff,          .
                                   .
5    vs.                           .    Alfred A.  Arraj Courthouse
                                   .    901 19th Street
6    CIRCLE K STORES, INC.,        .    Denver, CO  80294
                                   .
7              Defendant.          .    July 6, 2023
                                   .    9:06 a.m.
8    .   .   .   .   .   .   .   .   .   .   .

9        **TRANSCRIPT OF PROCEEDINGS HELD BEFORE THE HONORABLE**
            **SCOTT T. VARHOLAK, UNITED STATES MAGISTRATE JUDGE**
10

     APPEARANCES:
11
     For the Plaintiff:            Rathod Mohamedbhai, LLC
12                                 By:  Virginia Hill Butler
                                   By:  Iris Halpern
13                                 2701 Lawrence Street
                                   Suite 100
14                                 Denver, CO  80205
                                   (303) 578-4400
15
     For the Defendant:            Littler Mendelson, P.C.
16                                 By:  Nicholas Hankins
                                   By:  Thomas Carroll*
17                                 1900 Sixteenth Street
                                   Suite 800
18                                 Denver, CO  80202
                                   (303) 362-2856
19
     Court Recorder:              Clerk's Office
20                                U.S.  District Court
                                  901 19th Street
21                                Denver, CO  80294

22   Transcription Service:       AB Litigation Services
                                  216 16th Street, Suite 600
23                                Denver, CO  80202
                                  (303) 296-0017
24   *Appearing by Phone

25   Proceedings recorded by electronic sound recording;
     transcript produced by transcription service.

2

 1             (Time noted:  9:06 a.m.)

 2             THE COURT CLERK:  All rise.  Court is in session.

 3             THE COURT:  Please be seated.  This is 22-cv-2327.

 4   Can I have entries of appearance please?

 5             MS. BUTLER:  Good morning, Your Honor.  Virginia

 6   Butler on behalf of Plaintiff, and with me at counsel table

 7   is Iris Halpern.

 8             THE COURT:  Good morning.

 9             MR. HANKINS:  And Nicholas Hankins on behalf of

10   Circle K, and Tom Carroll is joining us on the phone.

11             THE COURT:  And good morning.

12             MR. CARROLL:  Good morning, Your Honor.

13             THE COURT:  So we are here on Document Number 49.

14   This is the renewed motion for leave to amend to add

15   exemplary damages.  I'll take any further argument that

16   either side wishes to make.  In particular, I'd like the

17   parties to address, there's the Donez opinion, there's the

18   District Court opinion, which appears to have been the only

19   court to address the question of whether or not there may be

20   a public policy exception for an employee claiming self-

21   defense.  That then goes up to the Tenth Circuit and the

22   Tenth Circuit essentially doesn't decide that issue, leaves

23   that issue open.  That all occurred at the summary judgment

24   stage of the proceedings.

25             My question then is, why isn't it better to allow

1  the amendment to come in and then take up this issue on a

2  much more fulsome record where we've got, you know, detailed

3  facts, ideally undisputed, we don't know what that's going to

4  be, but have those facts come in, and then ultimately let

5  Judge Wang determine whether or not she agrees with the

6  District Court opinion in Donez or disagrees with the

7  District Court opinion in Donez?  Particularly given the fact

8  that the Tenth Circuit seemed to really want to leave that

9  question open.

10          So I throw that all out there, but I'll take any

11  further argument.  It's Plaintiff's motion to amend.  I'll

12  hear from Plaintiff first, and then I'll hear from Defendant.

13          MS. BUTLER:  Good morning, Your Honor.

14          And as I know Your Honor is familiar with all of

15  the background of the legal standard, I'm going to get right

16  into the argument on that.

17          THE COURT:  Yeah.  No, go ahead.

18          MS. BUTLER:  And I think what you just raised is

19  something Plaintiff was intending to bring up, is that

20  Defendant's response to her motion has both some substantive

21  aspects but it also raises a procedural issue where to decide

22  in this forum whether or not there is a substantive claim is

23  the improper forum to do so, because Plaintiff's motion is

24  not based on -- this is an argument Defendant brought up in

25  their response, Plaintiff's opportunity to rebut that

1   argument has been limited to a reply brief due a week later

2   because Your Honor wanted to decide this issue of exemplary

3   damages before summary judgment.  So whether or not there's a

4   claim here is a dispositive issue that Judge Wang will rule

5   on at the summary judgment stage, and the issue for this

6   hearing is to decide whether or not Plaintiff has made out a

7   prima fascia case of exemplary damages, presuming there is

8   indeed a claim.  In other words, if Ms. Moreno should be

9   allowed, like in most employment cases, to ask for exemplary

10  damages on her claim, not whether or not there is a claim.

11          And then to get into substantively the Donez

12  opinion a little bit.  As Your Honor noted, it's

13  distinguishable both on the grounds of the Tenth Circuit did

14  not decide the issue and did not affirm on the basis that

15  Judge Arguello decided that there was no claim.  And it also

16  exemplifies the cases where courts have been hostile to these

17  kinds of claims, which are employee-employee altercations

18  that escalate.  And understandably, courts are reluctant to

19  tell an employer that they're not allowed to have a zero-

20  tolerance policy between employees.  However, the case of Ms.

21  Moreno is different from that in that it's an aggressor of a

22  customer coming in and attacking Ms. Moreno, or what she

23  perceived as an attack on her.  And so in those sorts of

24  cases, like in Ray versus Walmart Stores (phonetic), the Utah

25  Supreme Court case that Plaintiff cited, in those types of

1  cases courts are much more sympathetic to recognizing that

2  there is indeed a claim in these types of circumstances,

3  whereas in the employee-employee circumstances courts have

4  been hostile because of the unique circumstances of those

5  cases.

6          And in Colorado, there is a right to self-defense.

7  As the Colorado courts have recognized, a person who

8  reasonably perceives an imminent use of unlawful physical

9  force is entitled to use force in defending himself or

10 herself without first retreating or seeking safety by means

11 of escape.  And that's People versus Monroe (phonetic), a

12 Colorado Court Appeals case from 2018.

13         And so for those reasons, with respect to self-

14 defense, Plaintiff would argue that that aspect is more

15 properly decided at summary judgment.  But given that

16 presuming there is a claim, she has indeed made out exemplary

17 damages on it for the reasons laid out in her motion.

18         And in her motion Plaintiff also relies on crimes

19 victims' rights statutes as a basis of her claim, and those

20 statutes make it unlawful for an individual to commit

21 retaliation or anticipatory retaliation towards a victim of a

22 witness of a crime, as well as prohibiting an employer from

23 disciplining or discharging a victim of a crime for

24 participation in a criminal process.  And what we've --

25         THE COURT:  But what facts do you have on that?  I

1  mean, I agree that on -- I agree that there is prima facie

2  evidence that she was terminated pursuant to a no exception

3  policy that you don't confront a -- that you don't confront

4  an assailant.  And I agree that the evidence could be seen as

5  her acting in self-defense as opposed to moving forward,

6  especially if you take her testimony as opposed to actively

7  attempting to harm.

8            MS. BUTLER:  Uh-huh.

9            THE COURT:  So on that component, which I think is

10  a complicated legal question, I agree I think you've

11  submitted prima facia evidence.  What evidence do you have

12  that she was terminated because she reported this to the

13  police or, you know, spoke out as a crime victim or anything

14  else?  In fact, I think her testimony was she doesn't believe

15  that to be the case.

16            MS. BUTLER:  Uh-huh.  So there is, Ms. Moreno has

17  submitted an errata indicating that she was confused by the

18  questions at the deposition and does indeed believe that she

19  was terminated because she reported the crime, but her

20  subjective belief is not the only evidence in this case, as

21  you've said.  There's deposition testimony from Amy Harvey

22  (phonetic), the HR manager, that she approved every

23  termination pursuant to this policy without exception.  And

24  Ms. Moreno's market manager, Duris Amood (phonetic), who had

25  been with the company for many, many years, similarly was

1    unaware of anyone not getting fired pursuant to this policy.

2           THE COURT:  Right.  No, I agree that on that

3    component.  So there's two arguments that you appear to be

4    making.  The one is, she was terminated because she acted in

5    self-defense, and I agree there's evidence on that, what you

6    just cited.  The second argument is she was terminated

7    because she reported the incident to the police, which I

8    think on a legal aspect is a clearer exemplary damage claim.

9           I mean, in other words, if there were evidence

10   that that Circle K said, hey, you know what?  This makes us

11   look bad every time, you know, every time we get robbed and

12   we have an employee come in and, you know, it makes us look

13   bad.  So you know what?  If you're going to report this,

14   you're gone.  On the legal aspect that to me seems like a

15   much clearer exempt (phonetic), but you don't have any facts

16   that support that claim.

17          The one that's much tougher legally is, you're

18   terminated even if you act in self-defense, you know, because

19   we have -- we don't want, we have this policy that we don't

20   want to encourage employees -- I mean, I'm sure they're going

21   to say, the reason we have this policy is if they want, you

22   know, a pack of cigarettes, just give them the pack of

23   cigarettes.  We don't want our employees hurt, and we're

24   doing this to help our employees.

25          MS. BUTLER:  Uh-huh.

8

1          THE COURT:  That's a much trickier legal

2    component.  Now, again, I'm not sure this is the stage to

3    raise it.  That, you have facts on.  I'm not seeing any facts

4    on what is the clearer legal thing which is, hey, we're

5    covering our own butt here, and so we're not, you know, we

6    don't want us to look bad.  We don't want any incidents

7    reported to the police.  Do you have any facts to support

8    that?

9          MS. BUTLER:  So Circle K systematically terminates

10   employees who report these attacks, and that has a chilling

11   effect on the employees.  If an employee knows that reporting

12   a crime, which is a way that, you know, we would argue

13   Colorado Revised Statute 24 point -- excuse me, 24-4.1-303

14   prohibits discipline or discharge for preparation of a

15   criminal proceeding.  Reporting the crime is the very

16   initiation of the criminal proceeding, and if employees are

17   going to get terminated for reporting crimes, then that would

18   have a chilling effect and would indeed be a violation of

19   that statute.

20          And these two individuals, Ms. Harvey and Mr.

21   Amood, testified to their knowledge, everyone being

22   terminated under this policy.  At the 30(b)6 deposition,

23   which took place the day before Ms. Moreno's reply brief was

24   due, we further learned that there are 43 people in the Rocky

25   Mountain Business Unit, which is six of the states around

1   here, who have been terminated under this policy from 2018 to

2   2021.  There are two individuals who were not terminated

3   pursuant to it.  In one of those cases there's no video

4   footage.  No one seems to know why that person wasn't

5   terminated.  We got very little information as to what the

6   circumstances were of that, and the second individual was not

7   terminated because their assistant manager had ordered them

8   to help restrain a shoplifter.

9          So this policy of terminating all individuals who

10  have contact with an attacker or aggressor is, essentially if

11  all of those employees are reporting those crimes and then

12  getting terminated, is a policy of terminating people who

13  report crimes.  And to do so is to let a widespread policy of

14  firing victims of crimes is, per se, a violation of the

15  Colorado Victims' Rights statutes, and to let employees

16  terminate employees that report crimes would be contrary to

17  these laws.

18         And so for those reasons, I do think that Ms.

19  Moreno has made out a violation of the crime victims'

20  statutes rights -- excuse me, the Crime Victims' Rights

21  statutes.

22         And the third aspect of her motion was that

23  ignorance of her rights under Colorado law is no defense to

24  Circle K, and Circle K has very little response to that

25  argument.  They instead focus on whether or not she has a

1   claim at all.  The don't chase and confront policy is the

2   same nationwide, and there's, you know, the Defendant admits

3   that it does not take into account Colorado's Victims' Rights

4   statutes when enforcing the don't chase and confront policy.

5   It's admitted to that.  And you know, laws vary around the

6   nation on these aspects and Circle K makes no effort to

7   tailor its policy to any of the local laws regarding crime

8   victims' rights or self-defense.

9            THE COURT:  Okay.

10           MS. BUTLER:  Thank you.

11           THE COURT:  Thank you.

12           I'll hear from Defendant.

13       (Brief pause)

14           THE COURT:  Go ahead.

15           MR. HANKINS:  Okay.  Sorry.  Good morning, Your

16   Honor.

17           So I want to touch on your main question first,

18   and then kind of respond to some of what was said previously.

19   And so you asked, you know, why don't we tee this up for

20   summary judgment, why don't we have Judge Wang decide whether

21   there is a self-defense exception to at-will employment.  And

22   our response is that to impose punitive damages on Circle K

23   the Court must find, or Plaintiff must establish as a prima

24   fascia evidence that Circle K willfully and wantonly

25   disregarded a right of Ms. Moreno.  And our argument is, is

1   that this right won't have existed until this case.  And the

2   only authority on this --

3              THE COURT:  Not necessarily.  I mean, there's

4   Colorado law that says that you can act in self-defense.

5              MR. HANKINS:  That's true.

6              THE COURT:  And arguably, this policy -- I mean,

7   let's take a, I think, clearer example than this case.

8              MR. HANKINS:  Sure.

9              THE COURT:  But let's take an example where a

10  gunman walks up to a cashier and says, give me all the money.

11  And the cashier does what Circle K asks, starts opening it

12  up, and the gunman makes a comment like, you know, I'm

13  telling you as soon as you get this, you're done.  I'm

14  blasting you away.  You can die quickly by handing this to me

15  now, or I'll make it as painful as possible.  Okay?  And the

16  cashier starts giving the money, and then there's a noise in

17  the back.  The gunman turns his head around and the cashier

18  knocks the gun out of the hand, dives for it.  Under this

19  policy, arguably, they should be terminated, and apparently

20  virtually every time they have been.  Why isn't that a

21  clearly established right to defend yourself under Colorado

22  law?

23             MR. HANKINS:  Your Honor, it is a clearly

24  established right.  It relieves them of criminal liability.

25  But to say that's a strong enough exception under this public

12

1  policy exception, which Colorado Courts have construed

2  narrowly, they haven't opened it up to a lot of things, I

3  don't think it's the same.

4         And, you know, in the Donez opinion Judge Arguello

5  she addresses these criminal statutes and says this isn't

6  enough to put employers on notice that they can't have

7  policies on self-defense.

8         THE COURT:  But the Tenth Circuit didn't want to

9  go that far.

10         MR. HANKINS:  That's true.  The Tenth Circuit

11 didn't want to go that far, but they also didn't say Judge

12 Arguello was wrong.  And I think here, I think the key here

13 is that it's notice, whether Circle K was on notice that this

14 was a public policy exception to at-will employment.

15         And I guess I would also emphasize that the only

16 authority up to this date is contrary authority, and that's

17 the Donez case.  So, you know, and that case was passed, or

18 set forth before Ms. Moreno's termination was set forth in

19 April of 2020.  Ms. Moreno was terminated in October of 2020.

20 So yeah, I guess that's what I would say.  They just were on

21 notice.  The only authority was contrary authority.

22         And I would like to also go to some of Plaintiff's

23 points on the self-defense and what evidence there is.  You

24 know, they are arguing that there is a systematic termination

25 of employees who report crimes to the police.  What the

13

1   evidence shows, however, is that, first, Amy Harvey wasn't

2   aware of an employee who wasn't terminated for -- wasn't

3   aware of any employees who were not terminated after

4   violating the chase and confront policy.  I don't think

5   that's the same as terminating employees systematically for

6   being victims of robberies.  I think you can imagine there

7   are plenty of cases in which an employee is a victim of a

8   robbery but does not chase or confront, does not violate the

9   policy, and does not get terminated.  And I don't think

10  there's any evidence that says if an employee does not

11  violate the chase and confront policy they are terminated

12  systematically.  I just don't think that evidence exists.

13          And similarly, Duris Amood said he wasn't aware of

14  any employees who were not terminated after they didn't touch

15  a robber.  And you know, similarly, I don't think that's the

16  same as systematically terminating employees.

17          And, you know, I'd also like to point out that the

18  facts of this case belie the argument that there's a chilling

19  effect on calling the police, because Ms. Moreno she

20  testified that she did know of the policy, but she still

21  called the police, you know, after she was robbed.  And so,

22  yeah.

23          THE COURT:  And my guess is she wishes she hadn't.

24          MR. HANKINS:  It's fair.  But she, but there

25  wasn't -- you know, my point is there wasn't a chilling

14

1    effect for calling the police.  She did call the police.

2              THE COURT:  Well, maybe not on her, but, you know,

3    the next person who comes down the line, you know, especially

4    now that they know that everybody who, you know, touches the

5    other -- an assailant, gets fired.  They might say, hey I

6    acted in self-defense.  I did what -- I had to do what I did.

7    I didn't care about the, you know, pack of cigarettes from

8    the store, or I didn't care about that, but I had to protect

9    myself.  But, man, I don't want to call the police because I

10   had to, you know, they were coming at me with a knife.  I had

11   to knock the knife.  Or the example I gave you, he had a gun

12   on me, I had to knock the gun out.  But as soon as I call the

13   police they're going to, they're going to see this footage

14   and I'm gone.

15             MR. HANKINS:  That's true, that could happen.  But

16   I think it's hypothetical and there's no evidence that's

17   actually happening.  There's no evidence that people are not

18   calling the police, that there are people who are getting

19   robbed and, you know, just choosing not to.  I don't think

20   that evidence exists in the record.

21             THE COURT:  Okay.  Anything further?

22             MR. HANKINS:  Nothing further.

23             THE COURT:  Okay.

24             MR. HANKINS:  Thank you, Your Honor.

25             THE COURT:  Okay.  Pursuant to Colorado law

1    requests for exemplary damages may not be included in any

2    initial claim for relief but, rather, may be asserted by

3    amendment to the pleadings only after the exchange of --

4    excuse me, exchange of initial disclosures and the plaintiff

5    establishes prima facia proof of a triable issue.  That's

6    Colorado Revised Statute 13-21-102 1.5(a).

7            In order to obtain exemplary damages a plaintiff

8    must prove that the injury complained of is attended by

9    circumstances of fraud, malice, or willful and wonton

10   conduct.  That's Colorado Revised Statute 13-21-102 1(a).

11           Pursuant to the statute willful and wonton conduct

12   means conduct purposefully committed which the actor must

13   have realized is dangerous, done heedlessly and recklessly

14   with regard to consequences, or of the rights and safety of

15   others, particularly to the plaintiff.  That's Colorado

16   Revised Statute 13-21-102 1(b).

17           Prima facia proof of a triable issue of exemplary

18   damages is established by showing a reasonable likelihood

19   that the issue will ultimately be submitted to the jury for

20   resolution.  And that is *Stamp v. Vail Corp.*, 172 P.3d 437, a

21   Colorado Supreme Court decision from 2007.

22           Such proof may be established through discovery by

23   evidentiary means by an offer -- or by an offer of proof.

24   Again, that's *Stamp*.

25           Prima facia evidence is evidence that unless

1  rebutted is sufficient to establish a fact.  That's *Stamp*

2  again.  And in *Stamp* the Supreme Court instructed that this

3  is, quote, "A lenient standard".

4          Here, Plaintiff essentially is making two

5  arguments.  Plaintiff is arguing first that the prima facia

6  showing of willful and wanton is demonstrated by the fact

7  that an individual even acting in self-defense who makes

8  contact with an attacker is nearly always terminated, and

9  Plaintiff has submitted prima fascia showing of that.

10 They've offered, one, her own testimony that she was

11 terminated for this and was acting in self-defense, police

12 reports indicating that it was in fact a robbery as opposed

13 to some sort of attack by Plaintiff, and then the deposition

14 testimony of two employees saying they're aware of no

15 circumstances in which somebody was not terminated when they

16 made some contact with the victim.  And then, arguably, by

17 offer of proof here today with the 30(b)6 testimony, I think

18 it was 41 out of 43 individuals who had any contact with an

19 assailant were terminated.  So certainly, Plaintiff has

20 offered a prima facia showing of that fact.

21          The difficult legal question with that fact is

22 does that fact constitute sufficient proof for exemplary

23 damages?  In Donez, at 2020 Westlaw 1914958, the District

24 Court opinion from Judge Arguello, the District Court said

25 no, that these type of policies, and it's *Donez v. Leprino*

1   *Foods, Inc.*, and again the District Court cite is 2020

2   Westlaw 1914958, held that these types of -- that the

3   existence of a public policy exception to the at-will

4   doctrine, there is no public policy exception to the at-will

5   doctrine for self-defense.  So even an individual acting in

6   self-defense can be terminated for acting in self-defense.

7           I didn't say that very well, but the parties know

8   what I'm referring to.

9           And so if that's the case, if Judge Arguello is

10  correct, the fact alone that Circle K terminated Plaintiff,

11  and indeed always terminates individuals who act in self-

12  defense, doesn't constitute a cause for exemplary damages.

13  But the Tenth Circuit, at 2022 Westlaw 500549, affirmed that

14  decision but not on those grounds, and the Tenth Circuit was

15  unwilling to go quite that far.

16          So the question then is, is now the appropriate

17  time to take up that question on the facts as proffered at a

18  motion, essentially a motion to dismiss stage, or a motion to

19  add this claim, and I don't think it is.  I think, rather,

20  such a unique question should be answered on the facts as

21  they are laid out through a proper summary judgment motion.

22          The reason for that is you could see the answer to

23  that question perhaps being a sliding scale.  Donez, for

24  example, involved an employee dispute with each other.  And

25  it could very well be that a court looks at that and says --

1    again, Donez the facts, I don't have the exact facts, but it

2    could be something where maybe one employee was taunting

3    another one, and then the second employee attacked the

4    plaintiff, and then the plaintiff acted in self-defense.

5    Well, in that scenario a court could say, that doesn't rise

6    to exemplary damages because you, even though you technically

7    acted in self-defense, you initiated the problem.

8            The other extreme is the hypothetical that I

9    provided where an individual had absolutely no choice but to

10   protect themselves from a third-party assailant, was not

11   involved in any way in initiating anything, and under those

12   facts a court could say there is a public policy exception to

13   the at-will doctrine.  And I think before that question is

14   decided in this case both sides should be entitled to present

15   what the undisputed facts are to allow Judge Wang to make

16   that determination.

17           But even if I'm wrong, I think that Plaintiff has

18   presented sufficient prima facia evidence considering the

19   *Stamp* court's caution to the courts that it is a lenient

20   standard to support their second theory.  And their second

21   theory is that the exemplary damages arise from the chilling

22   factor of an employee presenting or reporting conduct,

23   reporting a crime, to the police and the danger of being

24   terminated.

25           Now, I don't think Plaintiff has presented clear

1    facts at this point that the mere statement or the mere fact

2    that Plaintiff reported the crime led to the termination.

3            So take again what I think is a very clear legal

4    analysis, or in my view an easier legal analysis, which is,

5    let's take the facts, which I don't have on the record, of

6    Circle K saying we don't want to look bad as a company.  We

7    are trying to hire more and more employees.  We don't want to

8    make it look like our employees are ever in danger while

9    they're working here, and therefore, if you report a police

10   incident to -- a crime to the police, we're terminating you.

11   You're out.  Because we just don't want the police snooping

12   around our stores, we don't want records that Circle K is a

13   dangerous place to work, et cetera, et cetera.  I think

14   that's a clear case of exemplary damages, and at a minimum

15   depleted.

16           I don't have good facts on that.  I don't really

17   have any facts on that.  But could a reasonable jury, at

18   least at the plausibility of pleading stage, and at least

19   considering *Stamp's* lenient standard, take the facts that are

20   out there, which is that anytime somebody makes contact, even

21   in self-defense, with somebody and reports that they're

22   terminated could that potentially, given the lenient

23   standard, either lead a jury to infer that part of the reason

24   for that is because Circle K doesn't want this reported to

25   the police?  Or alternatively, that there's a chilling effect

1  of referring it because somebody who acted in self-defense is

2  worried that by reporting they're going to be terminated.

3  Given the lenient standard, I think there's sufficient proof

4  of that.  And so as a result, and again recognizing the

5  complex legal issues around this, and taking to heart the

6  *Stamp* court's admonition to trial courts that this is a

7  lenient standard at this stage, I will grant the renewed

8  motion for leave to amend to add exemplary damages.

9        I can find it here, but does Plaintiff know, did

10  you attach a clean version to your -- I see the redline, but

11  did you have a clean version, too?  I don't think so.

12        MS. BUTLER:  Your Honor, I believe we only

13  attached a redline version.

14        THE COURT:  Okay.

15        MS. BUTLER:  I can file a clean version today.

16        THE COURT:  Yeah.  I'll order Plaintiff by close

17  of business tomorrow to file a clean version of the proposed

18  amended complaint and will accept that clean version as the

19  newly operative complaint.

20        Anything further then that we can do here today?

21        MS. BUTLER:  Nothing from Plaintiff.

22        THE COURT:  All right.

23        MR. HANKINS:  And nothing from Defendant, Your

24  Honor.

25        THE COURT:  All right.  Thanks, everybody.  I

21

1  appreciate the briefing on this and look forward to seeing

2  how that plays out on summary judgment.

3                    (Time noted:  9:36 a.m.)

4                         * * * * *

5                         CERTIFICATE

6      I, RANDEL RAISON, certify that the foregoing is a

7  correct transcript from the official electronic sound

8  recording of the proceedings in the above-entitled matter, to

9  the best of my ability.

10

11

12  _____          July 21, 2023

13  Randel Raison

14

15

16

17

18

19

20

21

22

23

24

25

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Case No. 1:22-cv-02327-NYW-STV

MARY ANN MORENO,

        Plaintiff,

v.

CIRCLE K STORES, INC.,

        Defendants.

---

## CIRCLE K'S MOTION FOR SUMMARY JUDGMENT

---

Defendant Circle K Stores, Inc. moves under Federal Rule of Civil Procedure 56 and

D.C.COLO.LCivR 56.1 for summary judgment on all of Plaintiff Mary Ann Moreno's claims

and her prayer for punitive damages.

## I. INTRODUCTION

Circle K operates convenience stores. For the safety of its customers and its employees,

Circle K has a policy that instructs its employees not to confront, follow, pursue, track, chase, or

fight shoplifters. Or, as Moreno put it, "you give them whatever they want." Plainly, failure to

follow the policy increases the risk to employees and other customers that a dangerous situation

will become violent, harmful, or worse, and Circle K's Confront & Chase policy provides that

failure to follow the policy will result in immediate termination.

Moreno lost her job at Circle K because she violated the Confront & Chase policy when

she pushed a robber and otherwise engaged and confronted him. Now she claims wrongful

termination in violation of public policy and intentional infliction of emotional distress

("IIED")/outrageous conduct as a result of her termination. Circle K is entitled to summary

judgment because neither the law nor the undisputed material facts support her claims.

**First**, Moreno's self-defense theory of wrongful termination is not recognized under

Colorado law, as Judge Arguello held in *Donez v. Leprino Foods, Inc.*, No. 19-cv-00285-CMA-

NRN, 2020 WL 1914958, at *6-7 (D. Colo. Apr. 20, 2020). The plaintiff in that case attempted to

expand the recognized sources of public policy based on the exact same constitutional provisions

and statutes as Moreno, and the court granted summary judgment on the wrongful-discharge

claim. The same result is dispositive in this case—not to mention that the video evidence before

the Court plainly shows Moreno was ***not*** acting in self-defense and the decisionmakers honestly

believed she was not acting in self-defense. Likewise, there is ***no evidence*** that Moreno was

terminated because she was the victim of a crime or because she reported the crime, and so her

victims'-rights theory fails too.

**Second**, the bar for an IIED claim is extremely high. Caselaw is clear that termination of

employment is not outrageous conduct, nor even is wrongful termination in violation of an

employer's policies. Actionable conduct must be more than unreasonable, unkind, or unfair. It

must truly offend community notions of acceptable conduct and that is not the case here. Moreno

also lacks evidence that Circle K recklessly or intentionally caused her severe emotional distress.

Summary judgment is therefore appropriate on each of Moreno's claims and on her

request for punitive damages.

## II. STATEMENT OF UNDISPUTED MATERIAL FACTS[1]

**A.      Moreno's employment with Circle K.**

1.      Circle K operates a chain of convenience stores throughout the United States and internationally. Ex. A, Decl. of Craig Holmes ("Holmes Decl.") ¶ 3.

2.      Moreno began her employment with Circle K in October 2018, after her previous employer, CST Brands, was acquired by Circle K. Holmes Decl. ¶ 8.

3.      In light of her tenure with acquired companies, Circle K considered October 29, 2004, to be Moreno's date of continuous service. Ex. B, Decl. of Nicholas Hankins ("Hankins Decl.") ¶ 9 & Ex. 8 ("30(b)(6) Dep.") 99:10-100:4.

4.      Moreno's employment with Circle K was at will. Holmes Decl. ¶ 9.

**B.      Circle K's policies.**

5.      Circle K had a Confront & Chase policy applicable to Moreno during her employment. 30(b)(6) Dep 20:2-7; Hankins Decl. ¶ 10 & Ex. 9 ("Moreno Dep.") 50:4-51:11; Hankins Decl. ¶ 5 & Ex. 3 (policy); Holmes Decl. ¶ 6.

6.      Circle K's Confront & Chase policy says:

Do not confront follow, pursue, track, chase, fight or follow [inside and/or outside] any person[s] suspected of shoplifting products and/or cash from the site, beer runs or any other confrontational situation.
. . .
At no time do you stop, question or accuse a person(s) of theft.
. . .
***This policy is for your protection and for the safety of everyone!***
. . .
**FAILURE TO FOLLOW THE "DON'T CHASE or CONFRONT POLICY" WILL RESULT IN IMMEDIATE TERMINATION.**

---

[1] The following paragraphs are cited later in this motion as "SUMF ¶ __."

Hankins Decl. Ex. 3 (brackets and emphasis in original).

7.      The Confront & Chase policy instructs employees to call 9-1-1 immediately in the event of a theft. *Id.*

8.      The Confront & Chase policy has been in place for at least 20 years, through various company leadership. 30(b)(6) Dep. 21:11-22:8.

9.      The Confront & Chase policy was developed for the safety of Circle K's employees and customers; Circle K wants people to be cooperative and safe. 30(b)(6) Dep. at 22:9-18.

10.     Circle K's Performance Coaching policy provides that employees may be fired upon a first offense of certain serious policy violations or employee misconduct, including fighting, chasing, confrontation, or pursuit. Holmes Decl. ¶ 4; Hankins Decl. ¶ 3 & Ex. 1 (Circle K Employee Guidebook) 13.

11.     Circle K's Workplace Security policy provides that if any employee ever witnesses a shoplifting or robbery occur, the employee shall not chase or attempt to apprehend the suspect. Hankins Decl. Ex. 1 (Circle K Employee Guidebook) 16.

12.     Circle K's Robbery Prevention policy provides that in the event of a robbery, employees must cooperate with the robber's demands and must not resist or try to fight. *Id.* at 17.

13.     Circle K's Robbery Prevention policy provides that the first priority is the safety of everyone in the store, and during a robbery employees should not "fight, chase, confront or pursue the suspect." *Id.* at 17-18.

14.     Circle K's Disorderly Conduct / Insubordination / Verbal Abuse / Fighting policy provides, "Fighting or any physical action by one employee against another employee or non-

employees such as customers . . . on Company premises will not be tolerated. Such behavior is grounds for disciplinary action up to and including termination." *Id.* at 20.

15.     Circle K's Visitor and Vendor policy provides that non-customer such as family members are only allowed on company premises for the purpose of conducting business with Circle K. *Id.* at 32.

16.     Circle K's 5-Minute Rule provides that "[a]ll injuries, no matter how small, must be reported immediately to the Store Manager. In the event of a serious injury, robbery, fire, etc., call 9-1-1 and then the Store Manager." Holmes Decl. ¶ 5; Hankins Decl. ¶ 4 & Ex. 2 (5-Minute Rule).

17.     Circle K's 5-Minute Rule also provides a notification procedure for employees to report all emergency, safety, and/or security incidents that occur at the store within five minutes of the situation. *Id.*

## C.     Moreno was aware of Circle K's policies.

18.     Moreno agrees that Circle K has policies in place for the safety of its employees and customers. Moreno Dep. 42:3-7

19.     Moreno knew during her 16 years of employment that it was Circle K's policy that employees were prohibited from confronting a robber. Moreno Dep. 42:8-19; 49:1-16.

20.     Moreno was aware during her employment that it was Circle K's policy that employees do not stop shoplifting. *Id.*

21.     Moreno was aware during her employment that she could face immediate termination if she violated policy about "what not to do during a robbery or shoplifting." *Id.* at 44:10-18.

22.     Moreno understands that Circle K's policy about what not to do during a robbery includes that, "You do what they ask, "you give them whatever they want," "You don't resist," "You do as they ask you," and you do not resist, fight, confront, chase, or attempt to apprehend the robber. *Id.* at 45:13-46:14.

23.     Moreno was familiar with the policies and information in Circle K's Employee Guidebook. *Id.* at 43:21-23; 49:1-16.

24.     Moreno was aware of the Circle K's 5-Minute Rule. *Id.* at 47:14-48:5.

**D.     October 4, 2020 robbery.**

25.     Moreno was employed by Circle K on October 4, 2020. Scheduling Order [Dkt. 26] § 4 (undisputed facts).

26.     On October 4, 2020, Moreno was working at a Circle K store located at 9489 Sheridan Boulevard in Westminster, Colorado. *Id.*

27.     On October 4, 2020, an individual later identified as Tyler Darren Wimmer committed a robbery at the Circle K store on Sheridan Boulevard while Moreno was working. Moreno Dep. 60:10-24.

28.     Wimmer entered the store carrying various items, including two knives. Hankins Decl. ¶ 6 & Exs. 4, 5, 6 (surveillance videos) at 6:54:40; Moreno Dep. 63:9-23, 66:1-21 (testifying video is accurate); Moreno Dep. 66:22-67:15.[2]

29.     Shortly after he arrived, Wimmer waited in line behind other customers. Hankins Decl. Exs. 4-6 at 6:54:34-6:56:25; Moreno Dep. 68:2-69:18.

---

[2] Hankins Declaration Exhibits 4-6 depict the events from multiple angles. Only Exhibit 6 has audio. Hankins Decl. ¶ 7.

30.     When Wimmer got to the front of the line, he asked for a pack of cigarettes. *Id.*

31.     After Moreno retrieved the cigarettes, Wimmer asked to have them for free. *Id.*

32.     Moreno replied that she could not give the cigarettes for free. *Id.*

33.     After Moreno refused to provide Wimmer a pack of cigarettes without payment, Wimmer proceeded to move behind the counter Moreno was standing behind. *Id.*

34.     Moreno told Wimmer, "Don't come back here." *Id.*

35.     Once he was behind the counter, Wimmer extended his left arm to reach for a pack of cigarettes from the display case located behind Moreno, holding the knives (among other things) in his right arm. Hankins Decl. Exs. 4-6 at 6:56:06-6:56:25.

36.     After Wimmer began extending his arm, Moreno made physical contact with Wimmer. *Id.* at 6:56:12-16.

37.     Eventually, Moreno pushed Wimmer away from her. *Id.* at 6:56:06-6:56:25; Moreno Dep. 68:2-69:18.

38.     Moreno also grabbed one of Wimmer's arms. *Id.*

39.     Wimmer may or may not have actually taken anything off the shelf and then he left the store. *Id.*

40.     Wimmer did not verbally threaten Moreno. Moreno Dep. 69:19-70:3, 125:4-5.

41.     Wimmer did not threaten Moreno with the knife. Hankins Decl. ¶ 8 & Ex. 7 (911 call at 7:20-7:33); *see also* Moreno Dep. 71:5-72:3 (verifying that everything said on the call was true).

**E.      Moreno calls the police and her managers and they all come to the store.**

42.      After Wimmer left, the next thing Moreno did was call the police. Moreno Dep. 73:5-12.

43.      Police officers arrived at the store approximately five minutes after Moreno called them. *Id.* at 73:11-17.

44.      Moreno called Store Manager Love Jorgensen soon after she called the police. *Id.* at 74:8-16.

45.      Jorgensen advised Moreno that it would take her at least 45 minutes to get to the store and to call the assistant manager. *Id.* at 74:13-20, 75:15-20.

46.      Next, Moreno called and left a message for "Amanda," her assistant manager. *Id.* at 72:16-17, 74:12-25.

47.      After the police left the store, Moreno called Market Manager Driss Aamoud to advise him of the theft, and Aamoud arrived at the store soon after Moreno advised him of the theft, "within like five minutes." Moreno Dep. 76:17-25, 79:6-10.

48.      Aamoud arrived at the store at approximately 8:24 p.m. Hankins Decl. ¶ 11 & Ex. 10 ("Aamoud Dep.") 111:3-13.

49.      Aamoud proceeded to the back office of the store to review the surveillance video of the incident with Wimmer. Moreno Dep. 76:19-25.

50.      Jorgensen arrived at the store after Aamoud. Moreno Dep. 76:1-8.

51.      After Jorgensen arrived, Aamoud and Jorgensen reviewed the surveillance video together. Aamoud Dep. 113:15-18.

52.     At approximately 8:56 p.m., Aamoud asked Moreno to take the remainder of her shift that night off. Aamoud Dep. 121:2-6, 123:9-14.

**F.     Circle K reviews the incident and terminates Moreno's employment for violation of the Confront & Chase policy.**

53.     On October 5, 2020, Aamoud, Regional Operations Director Craig Holmes, and Human Resources Manager Amy Harvey each reviewed the surveillance video. Aamoud Dep. 117:20-25; Hankins Decl. ¶ 12 & Ex. 11 ("Holmes Dep.") 7:20-24, 41:12-16, 42:11-23, 43:2-44:13; Harvey Dep. 73:13-18.

54.     Aamoud, Holmes, and Harvey, all agreed that Moreno had violated Circle K's Confront & Chase policy by making physical contact with Wimmer. Holmes Dep. 42:11-23, 43:2-44:13, 49:17-50:5; Aamoud Dep. 131:10-17, 133:6-7, 133:13-16; Harvey Dep. 71:11-19, 72:6-9, 75:6-12.

55.     Aamoud, Holmes, and Harvey jointly and collaboratively decided to terminate Moreno's employment. Holmes Dep. 43:24-44:5; 30(b)(6) Dep. 12:18-23.

56.     Moreno's employment with Circle K was terminated for her violation of Circle K's Confront & Chase policy. Holmes Decl. ¶ 10; Ex. C, Decl. of Driss Aamoud ("Aamoud Decl.") ¶ 4; Ex. D, Decl. of Amy Harvey ("Harvey Decl.") ¶ 6.

57.     Moreno violated the Confront & Chase policy by engaging and pulling Wimmer from his back. Holmes Decl. ¶ 11; Aamoud Decl. ¶ 6; Harvey Decl. ¶ 7; Hankins Decl. ¶ 14 & Ex. 14 (View Terminate Employee Event); Aamoud Dep. 136:15-137:2 (authenticating Exhibit 14).

58.     Holmes, Aamoud, and Harvey considered whether Moreno had acted in self-defense and determined that she had not. Holmes Dep. 49:13-50:11.

59.     Holmes, Aamoud, and Harvey honestly believed that Moreno had not acted in self-defense. Holmes Decl. ¶ 13; Aamoud Decl. ¶ 7; Harvey Decl. ¶ 8.

60.     Moreno admits her employment was terminated because she pushed Wimmer. Moreno Dep. 109:14-20.

61.     Aamoud called Moreno on or about October 6 or 7, 2020 to convey Circle K's decision to terminate her employment. Moreno Dep. 57:16-58:16; Aamoud Dep. 139:2-6; Holmes Decl. ¶ 12.

62.     When Aamoud advised Moreno of Circle K's decision, he told Moreno she was terminated and neither Moreno nor Aamoud said anything else after that. Moreno Dep. 90:11-91:5, 92:8-93:5.

63.     Aamoud did not tell Moreno she should not have reported the theft to him. Moreno Dep. 94:21-23; Aamoud Decl. ¶ 8.

64.     Aamoud did not tell Moreno that she was being terminated because she engaged in self-defense. Moreno Dep. 111:2-25; Aamoud Decl. ¶ 9.

65.     The termination phone call is the last time Moreno spoke to Aamoud. Moreno Dep. at 93:6-8

66.     Moreno did not talk to anyone else at Circle K about the termination of her employment, her employment, or the robbery. *Id.* at 93:9-22.

67.     Neither Aamoud nor anyone else at Circle K told Moreno that she should not have called the police or cooperated with the police. Moreno Dep. 93:25-94:9.

68.     No one at Circle K told Moreno that she should not cooperate in the criminal case against Wimmer. Moreno Dep. 94:10-20.

69.     Moreno does not believe she was terminated for reporting the robbery or calling the police, and has no evidence she was terminated for reporting the robbery or calling the police. Moreno Dep. 109:21-110:3, 112:1-18.

70.     Moreno does not believe that she was fired because she was the victim of a crime, and that she does not have any evidence that she was fired because she was the victim of a crime. Moreno Dep. 110:4–12.[3]

71.     Moreno's employment was terminated for violation of the Confront & Chase policy, not because she engaged in self-defense, not because she reported the robbery, not because she called the police, and not because she was the victim of a crime. Holmes Decl. ¶ 14; Aamoud Decl. ¶ 10; Harvey Decl. ¶ 9.

### III. ARGUMENT

Circle K is entitled to judgment as a matter of law on both of Moreno's claims. Her wrongful-discharge claim fails because Colorado does not have a clearly established public policy in favor of self-defense and because there is no evidence that Moreno was terminated because she was a victim of a crime or due to her assistance in a criminal investigation. Moreno's

---

[3] In her errata sheet, Moreno substantively changed her responses to testify that she does believe she was fired for being a victim of a crime and that she did have evidence she was fired for being a victim of a crime. Moreno Dep. at Errata Sheet. Moreno explained the reason for her change was that she misunderstood the question being asked of her. *Id.* The Court should disregard these substantive changes to Moreno's deposition testimony. *See Sinclair Wyo. Ref. Co. v. A & B Builders, Ltd.*, 989 F.3d 747, 784-86 (10th Cir. 2021) (holding that substantive changes to deposition testimony were properly excluded); *cf.*, *Nyborg v. State Farm Mut. Auto. Ins. Co.*, No. 20-cv-01918-RM-KLM, 2021 WL 5014498, at *3–4 (D. Colo. Oct. 28, 2021) (striking errata changes where the only reason provided was that the deponent misunderstood the question).

Even if the Court considers the errata testimony, Moreno's **beliefs** are not evidence of anything, and "[t]he way [she] was fired and what they said to [her]" does not create a genuine issue of fact that she was terminated because she was the victim of a crime.

IIED/outrageous-conduct claim fails because the undisputed material facts show that the circumstances of Moreno's termination are not extreme and outrageous as a matter of law.

**A.      Standard of review.**

Summary judgment should be granted when, as here, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Circle K need not disprove Moreno's claims; rather, Circle K may simply point out a lack of evidence for Moreno on an essential element of any of her claims. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (10th Cir. 1998). Once Circle K meets this initial burden, the burden then shifts to Moreno to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Moreno cannot "rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

**B.      Moreno's claim for wrongful discharge in violation of public policy fails.**

Moreno alleges that her termination violates a clearly expressed public policy and therefore constitutes wrongful termination under Colorado common law. The claim fails because she had not identified a sufficient legal and factual basis to support it.

Under Colorado law, either an employer or an employee can terminate an at-will employment relationship. *See Martin Marietta Corp. v. Lorenz*, 823 P.2d 100, 105 (Colo. 1992). The Colorado Supreme Court, however, has recognized a narrow public-policy exception to at-will employment, applying where an employee's termination stems from her exercising a job-related right. *See Charney v. United Airlines, Inc.*, No. 19-cv-01700-NYW, 2020 WL 6450445, at

*2 (D. Colo. Nov. 2, 2020) (citing *Crawford Rehab. Servs., Inc. v. Weissman*, 938 P.2d 540, 551-52 (Colo. 1997)). Wrongful discharge in violation of public policy is a narrow cause of action, and the Colorado Supreme Court has cautioned that "[n]ot all potential sources of public policy are of sufficient gravity to outweigh the precepts of at-will employment." *Crawford*, 938 P.2d at 553. It is Moreno's burden to establish that the public-policy exception applies. *Jaynes v. Centura Health Corp.*, 148 P.3d 241, 243 (Colo. App. 2006), *as modified on denial of reh'g* (June 29, 2006). To warrant an exception to at-will employment, the statutory, constitutional, or other provision giving rise to the public policy must "be sufficiently concrete to notify employers and employees of the behavior it requires." *Rocky Mountain Hosp. & Med. Serv. v. Mariani*, 916 P.2d 519, 524 (Colo. 1996). Whether a statutory or constitutional provision qualifies as a clear expression of public policy is a matter for judicial determination. *See id.* at 524-25.

This Court analyzes wrongful discharge in violation of public policy under the *McDonnel-Douglas* framework. *See Charney*, 2020 WL 6450445, at *11-13.[4] In the first place, Moreno must make a prima facie showing that (1) she was employed by Circle K, (2) she was discharged, and (3) she was discharged for exercising a job-related right or privilege to which she was entitled. *Id.* at *2. Only the third element is at issue here, and it requires Moreno to "demonstrate a causal connection between her termination and her exercise of a job-related right." *Id.* If Moreno meets her prima facie burden, Circle K has the exceedingly light burden of articulating a legitimate reason for her termination—which is satisfied here: violation of the

---

[4] As in the *Charney* and *Donez* cases, Moreno's claims would also fail under the totality-of-evidence inquiry. *Charney*, 2020 WL 6450445, at *13 n.22; *Donez*, 2020 WL 1914958, at *5 n.4.

Confront & Chase policy. In that case the burden shifts back to Moreno to show pretext. *Id.* at *13.

Whether it is a failure of Moreno's prima facie case or a lack of pretext, her claim fails on the law and on the facts and summary judgment is appropriate.

### 1.   Self-defense is not a clearly expressed public policy sufficient to support a wrongful-discharge claim.

Moreno's first theory of recovery is that Circle K wrongfully terminated her in violation of her right to self-defense. But self-defense has never been recognized as supporting a wrongful-discharge claim in Colorado and—in fact—the only court to have considered it rejected the argument. This Court should reject the theory too.

Judge Arguello addressed the same argument in *Donez v. Leprino Foods,* 2020 WL 1914958, at *6-7. In *Donez*, the plaintiff cited two provisions of the Colorado Constitution as well as Colorado Revised Statutes § 18-1-704 as establishing a public policy in favor of self-defense sufficient to create an exception to at-will employment. *Id.* at *6 n.6. The court granted summary judgment on the claim for wrongful discharge in violation of public policy on the basis of self-defense because the sources of authority were insufficiently specific to create an exception to at-will employment. *Id.* at *7. In its reasoning, the court recognized the Colorado Supreme Court's repeated emphasis that the public-policy exception may only be applied if employers are on notice of the purported public policy. *Id.* at *7. And because the plaintiff had cited criminal statutes and broadly worded constitutional provisions, the court held there was not a clearly expressed public policy warranting a self-defense exception to at-will employment. *Id.* The *Donez* decision also held that the plaintiff failed to make the necessary connection between

the public policies in question and his employment, "as the generally applicable constitutional provisions and criminal law are, at best, tenuously connected to his employment. *Id.*

Here, Moreno's Amended Complaint references the ***same sources of law*** as the plaintiff in *Donez* in support of the existence of a self-defense public-policy exception to at-will employment—i.e., Colo. Const. art. II, § 3, Colo. Const. art. III, § 13, and Colo. Rev. Stat. § 18-1-704. *Compare id.* at *6 n.6, *with* Am. Compl. [Dkt. 56] ¶¶ 96–99. Because the Colorado Supreme Court has only narrowly applied the public-policy exception to at-will employment and because there is not a clearly established policy in favor of self-defense under Colorado law, the Court should join Judge Arguello's well-reasoned analysis in *Donez* and reject Moreno's theory.

### 2. The undisputed facts show Moreno was NOT acting in self-defense and—at the very least—that is what the decisionmakers honestly believed.

Moreno's claim also fails as a matter of fact as to her self-defense theory. There is no dispute that Wimmer did not threaten Moreno with a knife and he did not verbally threaten her. SUMF ¶¶ 40, 41. And the video evidence before the Court plainly shows that Moreno stepped toward Wimmer as he approached her, pushed Wimmer away from her, then grabbed his arm and pulled him toward her when he reached for cigarettes; she plainly had a handful of his shirt and tugged on him as he began to walk away. Hankins Decl. Exs. 4-6. Circle K's decisionmakers reviewed the video evidence, and consistent with what it depicted, determined that Moreno had not acted in self-defense. SUMF ¶¶ 53, 58. And the decisionmakers honestly believed she was not acting in self-defense. SUMF ¶ 59.

Therefore, even if the Court disagrees with the *Donez* decision and recognizes self-defense as a sufficient basis for a public-policy claim like Moreno's, Circle K is entitled to summary judgment because Moreno was not defending herself but rather confronting the robber

and attempting to stop him from stealing cigarettes, which is precisely what Circle K's policy lawfully prohibits. Moreover, Circle K's decisionmakers honestly believed that Moreno had violated the policy, which precludes Moreno from raising any genuine issue of fact about pretext. As the Court recognized in *Charney*, the question is not whether the decision is wise, fair, or correct, but rather if the decisionmakers subjectively but honestly believed Moreno had engaged in misconduct, even if they were mistaken. *See Charney*, 2020 WL 6450445, at *15-16 (discussing authority).

### 3.     Moreno's victims'-rights theory fails as a matter of law and for lack of evidence.

As a separate basis for Moreno's wrongful-discharge claim, the Amended Complaint asserts that the claim is "is also simultaneously grounded in her rights as a victim and witness of a crime, including her rights to report a crime and to participate in the investigation and prosecution of the crime, free from retaliation by her employer or anyone else, in accordance with § 18-8-706, § 24-4.1-303, and other statutes, common law, and other sources of public policy as recognized by the courts." Am. Compl. ¶ 100.

This theory fails for two reasons. ***First***, the claim is barred as a matter of law because Colorado Revised Statutes § 24-4.1-303 provides a statutory remedy and the cited criminal statute does not produce an exception to at-will employment. Colorado law is clear that a wrongful-discharge claim is not available where the statute at issue provides a wrongful-discharge remedy. *Miles v. Martin Marietta Corp.*, 861 F. Supp. 73, 74 (D. Colo. 1994) (citing *Smith v. Colorado Interstate Gas Co.*, 777 F. Supp. 854, 858 (D. Colo. 1991)); *see also U.S. ex rel. Lovato v. Kindred Healthcare, Inc.*, No. 15-cv-02759-CMA-NYW, 2020 WL 9160872, at *23 (D. Colo. December 14, 2020), *report and recommendation adopted sub nom.*, *Colorado v.*

*Kindred Healthcare, Inc.*, No. 15-CV-02759-CMA, 2021 WL 1085423 (D. Colo. Mar. 22, 2021) (collecting cases). Relevant here, § 24-4.1-303(17) provides a remedy for violations of the statue Moreno relies on. Namely, anyone affected by a violation of § 24-4.1-303 may notify the Crime Victim Services Advisory Board, and if the Board determines the report has a basis in fact, the affected individual's report will ultimately be referred to the Colorado Attorney General, who will then be requested by the Governor to file suit to "enforce compliance." Colo. Rev. Stat. § 24-4.1-303(17). And, just as importantly, the statute explicitly says that a person "shall not be entitled to claim or to receive any damages or other financial redress for any failure to comply with this article." *Id.* Combined, Moreno's claim cannot be based on § 24-4.1-303.

Section 18-8-706 is insufficient too. That statute creates criminal liability for individuals who retaliate against a victim of a crime by threat, criminal harassment, or act of harm or injury. Colo. Rev. Stat. § 18-8-706(1). Just like the criminal statutes Moreno put forth in support of her self-defense theory, § 18-8-706 is insufficiently specific and too tenuously connected to employment to create an exception to at-will employment. *See Donez*, 2020 WL 1914958, at *7.

***Second***, on the facts, it is Moreno's burden to demonstrate a causal connection between her termination and any of these job-related rights. *Charney*, 2020 WL 6450445, at *2. Circle K is entitled to summary judgment for the additional reason that there is ***no evidence that Circle K terminated Moreno because she was the victim of a crime or because she reported the crime***. *See* SUMF ¶¶ 53-71.

**C.      Moreno's IIED/outrageous-conduct claim fails as a matter of law.**

Circle K is entitled to summary judgment on Moreno's IIED/outrageous-conduct claim because the undisputed material facts do not meet the extremely high bar for extreme and

outrageous conduct and there is no evidence Circle K recklessly or intentionally caused her severe emotional distress.

### 1.      Legal standards.

The elements of Moreno's claim are: (1) Circle K engaged in extreme and outrageous conduct, (2) recklessly or with the intent of causing Moreno severe emotional distress, and (3) causing Moreno severe emotional distress. *Archer v. Farmer Bros. Co.*, 70 P.3d 495, 498 (Colo. App. 2003). The tort "is extremely limited" *Katz v. City of Aurora*, 85 F. Supp. 2d 1012, 1021 (D. Colo. 2000), and the level of outrageousness necessary to establish the first element is "extremely high." *Archer*, 70 P.3d at 499. Indeed, "only conduct that is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and be regarded as atrocious, and utterly intolerable in a civilized community, will suffice." *Id.* Put differently, actionable conduct "must be more than unreasonable, unkind or unfair; it must truly offend community notions of acceptable conduct." *Grandchamp v. United Air Lines, Inc.*, 854 F.2d 381, 383 (10th Cir. 1988). The tort "contemplates an extreme level of independently ascertainable misconduct from which the ineluctable conclusion is the calculated or reckless infliction of severe mental suffering." *Katz*, 85 F. Supp. 2d at 1020 (cleaned up). Although the question of whether conduct is outrageous generally is for the jury, "it is first the responsibility of a court to determine whether reasonable persons could differ on the question." *Coors Brewing Co. v. Floyd*, 978 P.2d 663, 665-66 (Colo. 1999).

In the context of employment termination, it is well-settled that discharge from employment, without more, is not outrageous conduct. *Grandchamp*, 854 F.2d at 384. Therefore, the manner of discharge and the employer's conduct are critical to finding outrageous conduct.

*See Bellairs v. Coors Brewing Co.*, 907 F. Supp. 1448, 1459 (D. Colo. 1995). A mere allegation that Moreno was "dismissed or demoted wrongfully, summarily, or in violation of the employer's policies and procedures fails to state a claim for outrageous conduct." *Id.* (citing authority).

> **2.      The conduct surrounding Moreno's termination is not extreme and outrageous.**

While there are some cases that have found extreme and outrageous conduct in the context of employment termination, the facts here fall well short of the necessary threshold. For example, in *Archer v. Farmer Bros. Co.*, the defendant's vice president ordered the plaintiff's termination five days after the plaintiff suffered an apparent heart attack, of which the defendant was aware. 70 P.3d at 499. The employees tasked with terminating the plaintiff's employment entered the plaintiff's mother-in-law's home—uninvited—to find the plaintiff lying in bed half-naked and handed him termination papers. *Id.* at 499-500. The defendant did not inquire into the status of the plaintiff's health, evaluate the possible medical consequences of delivering the news while the plaintiff was recovering from a heart attack, or consider alternative means to deliver the news. *Id.* at 499. In fact, the plaintiff's doctor opined that the plaintiff's "health was in such a delicate condition that the termination incident could have triggered a fatal heart attack." *Id.* at 500. Accordingly, the court upheld the jury verdict, concluding that:

> a reasonable person could find that defendants' conduct—barging into a relative's home and, without any prior notice or other consideration, abruptly firing a twenty-two-year employee while he lay in bed, partially undressed, recuperating from what five days earlier had appeared to be a heart attack, and was, in any event, a serious heart condition—so far exceeded the bounds of decency as to be atrocious and utterly intolerable in a civilized community.

*Id.*

Similarly, in *Christen-Loper v. Bret's Electric, LLC*, 175 F. Supp. 3d 1213, 1216–18 (D. Colo. 2016), within the span of three months, the plaintiff was in a car accident requiring hospitalization, one of the plaintiff's family members threatened to kill themself, and the plaintiff experienced "an acute activation" of her bipolar disorder that required her to be placed on suicide watch. *Id.* at 1217. Despite being aware of these events and while plaintiff was still on suicide watch, her employer's attorney delivered a letter to the plaintiff's home informing her of her termination. *Id.* at 1218. The court denies the defendant's motion to dismiss, observing that "an average member of the community" could construe the defendant's actions "as an attempt to terminate plaintiff's employment when she was at her weakest and could not defend herself." *Id.* at 1226. *See also Kirk v. Smith*, 674 F. Supp. 803, 810 (D. Colo. 1987) (holding that defendant's conduct was sufficiently outrageous to survive summary judgment where supervisor defendant physically assaulted supervisor employee)); *Wing v. JMB Prop. Mgmt. Corp.*, 714 P.2d 916, 918 (Colo. App. 1987) (finding outrageous conduct where the plaintiff alleged that she was sexually assaulted and then ridiculed, threatened, humiliated, and fired after making complaints about the sexual assault).

Here, the undisputed facts fall well short of the extreme and outrageous conduct from *Archer*, *Christen-Loper*, *Kirk*, and *Wing*. Indeed, the facts here do not even equal the circumstances in which courts have held that an employer's conduct **was not** extreme and outrageous. For example, in *Coors Brewing Co. v. Floyd*, 978 P.2d 663 (Colo. 1999), the plaintiff alleged that he was employed by the defendant as an investigator to conduct surreptitious narcotics investigations of the defendant's other employees. *Id.* at 664. The plaintiff further alleged that the defendant was advised by its outside counsel that these investigations were

illegal and that defendant was laundering money to its outside counsel to "circumvent [its] internal policies and to conceal [its] disbursement of funds for the investigations." *Id.* Moreover, according to the plaintiff, the defendant later terminated the plaintiff to protect itself "from liability for [its] orchestration of the drug investigations and related money-laundering scheme." *Id.* at 666. Accepting as true that the defendant engaged in a criminal conspiracy regarding illegal drugs and money laundering and fired plaintiff to scapegoat him for those crimes, the Colorado Supreme Court held that no reasonable person could find that the defendant's actions rose to the high level of outrageousness required the caselaw. *Id.*

Similarly, in *Martensen v. Koch*, the plaintiff alleged that he had raised concerns over the legality of his employer's tax strategy. No. 13-cv-02411-REB-CBS, 2014 WL 3057172, at * 3 (D. Colo. July 7, 2014). After the defendant learned of the plaintiff's concerns, the defendant allegedly relocated the plaintiff from the United States to Singapore. *Id.* at *3. Shortly after the plaintiff was relocated to Singapore, the defendant required the plaintiff to attend a meeting at the defendant's ranch located in a remote part of Colorado. *Id.* at *4. At the defendant's ranch, the plaintiff asserted that he was subjected to several hours of interrogation related to the defendant's belief that the plaintiff was colluding with one of the defendant's competitors, and immediately after this interrogation, the plaintiff was provided termination papers and served with a lawsuit against him. *Id.* at *4. Plaintiff further claimed that immediately after being terminated, his personal belongings were searched, he was escorted by armed guards off the defendant's ranch, and flown home in the defendant's private jet against his will. *Id.* at *5. Nonetheless—despite all this—the court found that the defendant's conduct was ***not*** extreme or outrageous as a matter of law. *Id.* at *8.

In this case, Moreno alleged that Circle K engaged in extreme and outrageous conduct by: (1) terminating Moreno because she was the victim of multiple felonies in the workplace; (2) terminating her because she engaged in protected activity by defending herself from potentially severe bodily harm in the workplace; (3) terminating Moreno for reporting the robbery; (4) failing to come to her aid following the robbery or assign additional employees to the store; and (5) asking her daughter-in-law to leave the store. Am. Compl. ¶¶ 113–21.

Summary judgment is appropriate because Moreno cannot present **_any evidence_** that her employment with Circle K was terminated because she was the "victim of multiple felonies" or because she reported the theft committed by Wimmer to the police and to her supervisors. And, in fact, Moreno's managers did come to the store after she called them—with Aamoud arriving within five minutes of the call and Jorgensen coming despite being far away—and it was hardly extreme and outrageous for Aamoud to ask Moreno's daughter-in-law to leave the store after he arrived, consistent with Circle K's visitor policy. SUMF ¶¶ 15-17, 23-24, 44-45, 47-48, 50.

Moreover, the remainder of Moreno's allegations—even if taken as true—do not amount to conduct that a reasonable member of the community would consider atrocious, and utterly intolerable in a civilized community. Moreno was not terminated in the midst of a major health crisis or when she was otherwise at her most vulnerable, and Circle K did not physically or sexually assault Moreno. Instead, Circle K reviewed video evidence of the October 4, 2020 encounter, the decisionmakers considered if Moreno was acting in self-defense and honestly believed she was not, and Aamoud conveyed the termination decision over the phone in a short and unremarkable conversation. Moreno was aware of the Confront & Chase policy, she was aware that violations would result in immediate termination, and she simply believes she did not,

22

in fact, violate the policy. Moreno Dep. 110:22-23. But the Colorado Supreme Court has held that an employer's failure to follow its policies is **not** outrageous conduct. *Churchey v. Adolph Coors Co.*, 759 P.2d 1336, 1350-51 (Colo. 1988). Again, actionable conduct "must be more than unreasonable, unkind or unfair; it must truly offend community notions of acceptable conduct." *Grandchamp*, 854 F.2d at 383. The facts here simply do not rise to the necessary level to survive summary judgment.

### 3. There is no evidence that Circle K recklessly or intentionally caused severe emotional distress.

Likewise, Moreno there is no evidence that Circle K acted recklessly or with the intent to cause her severe emotional distress, which is also a necessary element of her claim, and therefore summary judgment is appropriate for that additional reason. *E.g.*, *Fisher v. Koopman*, No. 15-cv-0166-WJM-NYW, 2016 WL 8540859, at *10 (D. Colo. Aug. 1, 2016); *Chalepah v. Canon City*, No. 13-cv-02166-NYW-KLM, 2015 WL 5093200, at *10 (D. Colo. Aug. 31, 2015) (Wang, J.).

### D. Circle K is entitled to summary judgment on punitive damages.

If either of Moreno's claims survives summary judgment, summary judgment is appropriate on punitive damages. Moreno amended her complaint to add a claim for punitive damages under Colorado Revised Statutes § 13-21-102 on the basis of her self-defense and victims'-rights theories of wrongful discharge. *See generally* [Dkt. 49] 1, 8-14 (renewed motion).

A party may seek punitive damages under § 13-21-102 if the injury complained of is attended by circumstances of fraud, malice, or willful and wanton conduct. Colo. Rev. Stat. § 13-21-102(1)(a). Moreno does not assert that Circle K acted with fraud or malice; instead, she avers that Circle K willfully and wantonly ignored her rights. *See* [Dkt. 49] 8-12. Willful and wanton

conduct is conduct that is "purposefully committed which the actor must have realized as

dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and

safety of others, particularly the plaintiff." Colo. Rev. Stat. § 13-21-102(b).

When Circle K terminated Moreno's employment, the only authority on whether

Colorado law recognizes a self-defense exception to at-will employment was *Donez*, which held

that such an exception is not recognized. *Donez*, 2020 WL 1914958, at \*6-7. Circle K cannot be

liable for punitive damages where the underlying claim is premised on a theory that is novel or

otherwise poorly recognized. *Cf. Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 527 (1999);

*E.E.O.C. v. Flambeau, Inc.*, 846 F.3d 941 (7th Cir. 2017) (holding that employer was not liable

for punitive damages because the underlying violation was novel theory of discrimination).[5]

Circle K is similarly entitled to summary judgment on the victims'-rights theory of

liability and damages. Again, Moreno has not and cannot proffer any evidence that she was

terminated for being a victim of a crime or for reporting a crime to her supervisors or to the

police. Indeed, each of the decisionmakers to Moreno's termination have attested that Moreno

was terminated for the ***sole reason*** that she violated Circle K's Confront & Chase policy and

Moreno's allegations or subjective belief to the contrary are not enough. SUMF ¶¶ 53-71.

---

[5] While *Kolstad* addressed punitive damages under Title VII and *Flambeau* assessed punitive
damages under the ADA, the statutory authority for punitive damages under both acts is the
same. Under § 1981a(b)(1), punitive damages are available if a defendant discriminates "with
malice or with reckless indifference to the federally protected rights of an aggrieved individual."
42 U.S.C. § 1981a(b)(1). This standard is substantially similar to the willful-and-wanton standard
under § 13-21-102.

## IV. CONCLUSION

Moreno asks this Court to expand two narrowly drawn causes of action in her favor—splitting with a previous decision in this District to recognize a brand-new basis of public-policy wrongful discharge, and expanding IIED well beyond what Colorado law considers extreme and outrageous in the context of employment. But the law simply does not stretch that far. Moreno was at-will employee, subject to Circle K's lawful policies about how it expects employees to behave during a robbery. She was terminated because she violated that policy and the undisputed material facts before the Court demonstrate that Circle K is entitled to judgment as a matter of law.

WHEREFORE, Circle K asks that the Court grant summary judgment to it on all of Moreno's claims.

Respectfully submitted this 7th day of August, 2023.

*s/ Thomas W. Carroll*
Thomas W. Carroll
Nicholas Hankins
Littler Mendelson, P.C.
1900 Sixteenth Street, Suite 800
Denver, CO  80202
Telephone: 303.629.6200
Facsimile: 303.629.0200
Email: tcarroll@littler.com
        nhankins@littler.com

*Attorneys for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 7th day of August, 2023, I electronically filed the foregoing

**CIRCLE K'S MOTION FOR SUMMARY JUDGMENT** using the CM/ECF system, which

will send notification of such filing to the following:

Iris Halpern
Virginia Hill Butler
RATHOD | MOHAMEDBHAI LLC
2701 Lawrence Street, Suite 100
Denver, CO  80205
Telephone: (303) 578-4400
Fax: (303) 578-4401
ih@rmlawyers.com
vb@rmlawyers.com

*Attorneys for Plaintiff*

*s/ Joanna Fox*
Joanna Fox, Legal Secretary

4866-2677-1518.13

# EXHIBIT A TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## Declaration of Craig Holmes

# *Mary Ann Moreno v. Circle K Stores, Inc.* Case No. 1:22-cv-02327-NYW-STV

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Case No. 1:22-cv-02327-NYW-STV

MARY ANN MORENO,

      Plaintiff,

v.

CIRCLE K STORES, INC.,

      Defendant.

---

### DECLARATION OF CRAIG HOLMES

---

I, Craig Holmes, declare as follows.

1.     I am over 18 years of age and competent to testify to the matters stated in this declaration. I make this declaration upon my personal knowledge, and if called upon to testify in this regard could do so both accurately and competently. This declaration is given voluntarily. I have not been promised any benefit, coerced, or threatened in any manner in exchange for the testimony in this declaration.

2.     I am currently employed as a Regional Operations Director by Circle K Stores, Inc. ("Circle K"), and am personally familiar with Mary Ann Moreno.

3.     Circle K operates a chain of convenience stores throughout the United States and internationally.

4.     I have reviewed Deposition Exhibit 1 in this case. Deposition Exhibit 1 is a true and correct copy of Circle K's Employee Guidebook applicable to Ms. Moreno during her employment.

5.      I have reviewed Deposition Exhibit 2 in this case. Deposition Exhibit 2 is a true and correct copy of Circle K's 5-Minute Rule Procedure applicable to Ms. Moreno during her employment.

6.      I have reviewed Deposition Exhibit 3 in this case. Deposition Exhibit 3 is a true and correct copy of Circle K's Confront & Chase policy applicable to Ms. Moreno during her employment.

7.      On October 4, 2020, I was employed as a Regional Operations Director by Circle K. At the time, my region included the Circle K store located at 9489 Sheridan Boulevard in Westminster, Colorado, which is the store where Ms. Moreno worked on October 4, 2020.

8.      Ms. Moreno began her employment with Circle K in October 2018, after her previous employer, CST Brands, was acquired by Circle K.

9.      Ms. Moreno's employment with Circle K was at will.

10.     Ms. Moreno's employment with Circle K was terminated for her violation of Circle K's Confront & Chase policy.

11.     Ms. Moreno violated the Confront & Chase policy by engaging and pulling a robber from his back on October 4, 2020.

12.     To the best of my recollection, the decision to terminate Ms. Moreno's employment was communicated to her on October 6, 2020.

13.     I reviewed the video-surveillance footage of the October 4, 2020 robbery at the time of Ms. Moreno's termination and I reviewed it again as part of this case. In making the

2

decision to terminate Ms. Moreno, I honestly believed that Ms. Moreno had not acted in self-defense.

14.     Ms. Moreno's employment was terminated for violating the Confront & Chase policy, not because she engaged in self-defense, not because she reported the robbery, not because she called the police, and not because she was the victim of a crime.

15.     I estimate that approximately 100 Circle K employees or more in my region report crimes to me or their supervisor each year. Of those employees, many of them also report the crime to the police or participate in police investigations. I am not aware of any employee who was terminated or disciplined for reporting a crime to me or their supervisor, for reporting a crime to the police, or for cooperating with a police investigation.

16.     I am not aware of any employee who was terminated or disciplined for being the victim of a crime.

According to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on: _____8 / 2 / 2023_____
                              Date                                                   Signature

4888-3149-1698.4

3

# EXHIBIT B TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## Declaration of Nicholas Hankins

## *Mary Ann Moreno v. Circle K Stores, Inc.* Case No. 1:22-cv-02327-NYW-STV

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Case No. 1:22-cv-02327-NYW-STV

MARY ANN MORENO,

        Plaintiff,

v.

CIRCLE K STORES, INC.,

        Defendant.

---

**DECLARATION OF NICHOLAS HANKINS**

---

I, Nicholas Hankins, declare as follows.

1.     I am an attorney at Littler Mendelson, P.C. and am counsel of record for Defendant Circle K Stores, Inc. ("Circle K") in this case.

2.     I make this declaration in support of the Circle K's Motion for Summary Judgment ("Motion").

3.     Attached as Exhibit 1 is a true and correct copy of Deposition Exhibit 1 from this case, Circle K's Employee Guidebook.

4.     Attached as Exhibit 2 is a true and correct copy of Deposition Exhibit 2 from this case, Circle K's 5-Minute Rule.

5.     Attached as Exhibit 3 is a true and correct copy of Deposition Exhibit 3 from this case, Circle K's Confront & Chase policy.

6.      Exhibits 4, 5, and 6, as cited in the Motion, are true and correct copies of Deposition Exhibits 4, 5, and 6, which are video-surveillance footage from October 4, 2020. Those exhibits will be submitted to the Court conventionally rather than through ECF.

7.      Exhibits 4-6 depict the events from multiple angles. Only Exhibit 4 has sound.

8.      Exhibit 7, as cited in the Motion, is a true and correct copy of Deposition Exhibit 7, a 911 audio recording from October 4, 2020. That exhibit will be submitted to the Court conventionally rather than through ECF.

9.      Attached as Exhibit 8 is a true and correct copy of excerpts from the Rule 30(b)(6) deposition of Susie Fernandez, as cited in the Motion.

10.     Attached as Exhibit 9 is a true and correct copy of excepts from the deposition of Mary Ann Moreno, as cited in the Motion.

11.     Attached as Exhibit 10 is a true and correct copy of excerpts from the deposition of Driss Aamoud, as cited in the Motion.

12.     Attached as Exhibit 11 is a true and correct copy of excerpts from the deposition of Craig Holmes, as cited in the Motion.

13.     Attached as Exhibit 12 is a true and correct copy of excerpts from the deposition of Amy Harvey, as cited in the Motion.

14.     Attached as Exhibit 14 is a true and correct copy of Deposition Exhibit 14 from this case, "View Terminate Employee Event."

According to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: August 7, 2023.                          *s/ Nicholas Hankins*

# EXHIBIT 1 TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## Employee Guidebook

## *Mary Ann Moreno v. Circle K Stores, Inc*. Case No. 1:22-cv-02327-NYW-STV



# Employee Guidebook

September 2020



EXHIBIT ___1___
WIT: *Moreno*
DATE: *4-12-23*
Carin Geist, RDR, CRR, CRC

Confidential

**Introduction**

Welcome to Circle K.
We look forward to Growing Together with you as part of our team!

This Guidebook ("Guidebook") has been provided to familiarize you with certain basic Company policies, practices, benefits, and guidelines. It is not meant to cover these matters in detail or all matters relating to your employment, nor is it intended to create a binding agreement or contract of employment between you and Circle K or a promise that Circle K must follow any specific procedures. This guidebook summarized what we can expect from you as an employee. You should take the time to read and understand this Guidebook, which supersedes all prior guidebooks. Feel free to ask for an explanation of anything you do not understand. Employment at Circle K is "at will" and may be terminated by you or the Company for any or no reason, at any time, with or without notice, consistent with applicable law.

The information found in this guidebook is merely a summary of many of the policies and procedures. The policies stated in this Guidebook are guidelines and, unless otherwise stated, are subject to change, suspension, variation or elimination at the sole discretion of the Company with or without notice, as are all other policies procedures, benefits, or other programs of the Company. The Circle K Family of Companies consists of a number of legal operating entities. For purposes of simplicity, the Circle K Family of Companies is referred to as "Circle K" or "Company" in this guidebook. For The Company also reserves the sole right to interpret, construe, and apply the guidebooks contents. In such situations, Circle K will use its discretion and take appropriate action. For more detailed information contact your direct supervisor, Market Manager, Director of Operations or Human Resources Department.

None of the policies or procedures in this guidebook are intended to, or will be interpreted to or administered as, interfering with, restraining, or coercing employees in the exercise of their rights under the National Labor Relations Act, including their right to engage in or not engage in protected concerted activities, or under other applicable laws.

"Employee" is in reference to all Circle K employees unless identified as a specific group.

2

## INDEX

### 4

401(k) PLAN                                                                          28

### 5

5 MINUTE RULE                                                                        15

### A

ALCOHOL / DRUGS                                                                      19
AMERICANS WITH DISABILITIES ACT (ADA)                                                 8
ANTI-MONEY LAUDERING COMPLIANCE (US PATRIOT ACT)                                     33
EMPLOYEE GUIDELINES RELATED TO FRAUD/ABUSE OF A REWARD                               14
EMPLOYEE PURCHASES                                                                   31
EMPLOYEE SUGGESTIONS                                                                 12
ATTENDANCE                                                                           19

### B

BENEFIT PROGRAM PARTICIPATION                                                        28

### C

CASH HANDLING PROCEDURES                                                             17
CELL PHONES                                                                          36
CLARIFICATION CLAUSE                                                                  2
COMPANY PROPERTY                                                                     35
CONFIDENTIALITY POLICY                                                               13
CONFLICT OF INTEREST                                                                 34

### D

DISORDERLY CONDUCT                                                                   20
DRESS CODE                                                                           21

### E

ELECTRONIC MEDIA POLICY                                                              37
EQUAL EMPLOYMENT OPPORTUNITY                                                          8

### F

FAMILY AND MEDICAL LEAVE                                                             24
FIGHTING                                                                             20
FOOD STAMP/SNAP EBT CARD PURCHASES                                                   33
FUNERAL LEAVE                                                                        29

### G

GUEST COMMENTS                                                   See GUEST COMMITMENT
GUEST COMMITMENT                                                                      8
GUEST COMPLAINTS - TAKING AND HANDLING                          See GUEST COMMITMENT

3

CircleK0000228

# H

HARASSMENT (Anti) POLICY                                         8
HOLIDAY PAY                                                     29

# I

INJURIES ON THE JOB                                            15
INSUBORDINATION                                                21

# J

JURY DUTY                                                      29

# L

LACTATION SUPPORT IN THE WORKPLACE                             28
LIGHT OF DAY POLICY                                             7
LOITERING                                                      32

# M

MILITARY LEAVE                                                 27
MINIMUM EMPLOYMENT AGE                                         14
MOONLIGHTING                                                   35

# N

NOTICE OF RESIGNATION                                          35

# O

OPEN DOOR POLICY/ISSUE RESOLUTION PROCEDURE                    11
OUTSIDE EMPLOYMENT                                             34
OVERTIME                                                       30

# P

PARKING                                                        19
PAY FOR TIME WORKED                                            30
PERFORMANCE COACHING                                           12
PERFORMANCE EVALUATIONS                                        29
PERSONAL TELEPHONE CALLS                                       34
PERSONNEL RECORD CHANGES                                       35
PREPARING THE DAILY BANK DEPOSIT                               19
PROMOTIONS                                                     30

# R

REASONABLE ACCOMMODATION                                        9
REFERENCE CHECKS                                               32
RELATIVES EMPLOYED BY THE COMPANY                              14
REPORTING PROCEDURES AND NON-RETALIATION POLICY                10
ROBBERY PREVENTION                                             16

Confidential

## S

SAFE WORK ENVIRONMENT ................................................... 14
SALE OF AGE RESTRICTED PRODUCTS .............................. 33
SAVINGS PLAN ..................................................................... 25
SICK DAYS/PERSONAL DAYS ............................................. 29
SIGNATURE PAGE ................................................................ 43
SMOKING .............................................................................. 18
SOLICITATION ...................................................................... 33
STOCK PURCHASE PLAN ..................................................... 28
STORE EXPECTATION FORM ............................................... 37

## T

TELEPHONE SCAMS .............................................................. 18
TELEPHONE USE .................................................................... 34
THEFT ..................................................................................... 20
TRANSFERS ............................................................................ 29
TUITION REIMBURSEMENT .................................................. 28

## U

UNIFORM AND IMAGE POLICY .............................................. 21

## V

VACATION POLICY ................................................................ 30
VERBAL ABUSE ..................................................................... 21
VISION STATEMENT ............................................................... 6
VISITOR AND VENDOR POLICY ............................................ 32

## W

WEAPONS STATEMENT ......................................................... 18
WORKPLACE SAFETY ........................................................... 16
WORKPLACE SECURITY ........................................................ 16
WORKPLACE VIOLENCE ....................................................... 10

Confidential



# *OUR DNA*

## ACT with PRIDE

Circle K is part of Alimentation Couche-Tard (ACT), our Canadian parent company.

### *We take pride in People, Results, Improvement, Development and Entrepreneurship*

|   |   |
|---|---|
| PEOPLE | make us stand out from our competitors. We take an interest in our customers and connect with them to create long-lasting relationships – every chance we get. |
| RESULTS | matter. Our stores and stations are our livelihood. The customer's experience we deliver is what generates value for our stakeholders. |
| IMPROVEMENT | drives us. We continuously seek to improve our processes and performance, working in teams to learn from each other and from the best. |
| DEVELOPMENT | is always looking ahead. We are hungry for growth, developing our business customer by customer, store by store and nation by nation. |
| ENTREPRENEURSHIP | means that we challenge ourselves every day to think like customers and act like owners. |

# *OUR ASPIRATION*

### *To become the World's Preferred Destination for Convenience and Fuel*

# *OUR EMPLOYEE VALUE PROPOSITION*

### *Growing Together*

6

CircleK0000231

## LIGHT OF DAY POLICY

The Company is committed to providing a workplace where everyone is treated with courtesy and respect and has established an expectation of behavior called the "Light of Day test" - it can serve as one golden rule for our behavior. The company's commitment and expectation regarding behavior also fully recognizes the value and need for providing each other with candid feedback, performance coaching and progressive discipline when necessary. Therefore, it is important to recognize that the following expectation for behavior is not intended to prevent difficult or critical communication from taking place. Rather, it is intended to serve to reinforce *how* we communicate and interact with one another.

Both the policy itself, as well as the spirit of the policy, should be interpreted to create an environment where expectations for performance, achievement of goals, and personal accountability for results delivered can be professionally addressed to ensure the Company's continued success.

Every employee in the Company is expected to comply with the expectations set forth in this policy. No one is exempt from this policy, and this policy will require annual acknowledgement.

## THE LIGHT OF DAY TEST

Apply this test to all your dealings with others. Simply ask yourself:

- *If your behavior was recorded and broadcast on the morning news, how would you feel?*
- *If your e-mail or note was published online or in your local newspaper, how would you feel about reading it?*
- *Would you be proud? Or would you feel like a jerk?*
- *What would others think of your behavior?*

*In general, how would you feel if someone treated you, a friend or loved one the way you treated a co-worker?*

**If you would not be proud of your behavior subjected to the "Light of Day test",
your behavior is not acceptable.**

**Communication procedure**

If you believe you or any other Employee is being subjected to behavior that violates the Company's Light of Day test of behavior, the process for communicating using our open door policy is as follows:

1. Discuss the issue with your immediate supervisor.
2. If you do not feel comfortable discussing with your immediate supervisor, you are encouraged to discuss with the next level supervisor.
3. If you are not comfortable discussing with either of those individuals, you may discuss your concerns with the Human Resources team in your division using the following number:

*Employees reporting within the Human Resources Departments may take their concerns to the Vice President of Operations if they feel uncomfortable going to the Director of Human Resources or the Human Resources Manager.

Your concerns will be taken seriously and assigned to an appropriate member of management for review. The review of facts will include gathering of information about the incident including, but not necessarily limited to, what was communicated, how it was communicated, and the context of what led to the communication – your willingness to participate in an open and honest conversation will be critical to an effective resolution.

No action will be taken against any Employee merely because he or she reports behavior believed to violate this policy. Violations of this policy will not be tolerated. The Company will make a determination based on all the facts and take appropriate action, which may include additional training, performance coaching, collaborative/assisted communication between the individuals involved or other steps or, in certain circumstances of unacceptable behavior, appropriate disciplinary action up to and including discharge.

7

CircleK0000232
Vol. II - 0277

**LET'S HANDLE ALL OF THIS THROUGH CUSTOMER SERVICE TRAINING**

## EQUAL EMPLOYMENT OPPORTUNITY POLICY

It is the Company's policy that, as required by law, equal employment opportunities be available to all persons without regard to race, color, gender, religion, sexual orientation, gender identity, age, national origin, disability, genetic information, veteran status or any other category protected by federal, state, or local law. This policy applies to Employees and applicants and to all phases of employment including hiring, promotion, demotion, treatment during employment, rates of pay or other forms of compensation, and discharge.

## AMERICANS WITH DISABILITIES ACT (ADA)

It is the policy of the Company to comply with the Americans with Disabilities Act (ADA), and all federal, state, and local laws concerning the employment of persons with disabilities. Furthermore, it is our Company policy not to discriminate against qualified individuals with disabilities in regard to application procedures, hiring, advancement, discharge, compensation, training and other terms, conditions and privileges of employment. Under the ADA, an "individual with disability" is defined as one who has a physical or mental impairment that substantially limits one or more of life's major activities, has a record of such impairment or is being regarded as having such an impairment. A "qualified individual with a disability" is an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the job. "Essential functions" refer to job tasks that are fundamental and not marginal to the performance of a job. "Reasonable accommodation" is any change or adjustment to a job or work environment that permits a qualified applicant or employee with a disability to participate in the job application process, to perform the essential functions of a job, or to enjoy benefits and privileges of employment equal to those enjoyed by employees without disabilities.

The Company is committed to reasonably accommodating qualified individuals with a disability, so they can perform the essential functions of a job unless doing so creates undue hardship. If an individual feels that he or she requires a reasonable accommodation to perform the essential functions of his or her job, the individual should make a request to his or her Human Resources Representative for your Division. As part of its commitment to make reasonable accommodations, the Company also wishes to participate in a timely, good faith, interactive process with the disabled applicant or employee to determine effective reasonable accommodations (if any) that can be made in response to a request for accommodation. The employee may suggest an appropriate accommodation; however, the choice of an appropriate accommodation will ultimately be made by the Company. The evaluation of a request for a reasonable accommodation will be made on a case-by-case basis because the nature and extent of a disabling condition and the requirements of the job will vary. By working together in good faith, the Company hopes to implement reasonable accommodations that are appropriate and consistent with its legal obligations. To the extent state or local laws provide additional rights to applicants or employees, the Company shall comply with such laws.

Employees must allow service animals in our stores. A disabled customer does not have to show any form of identification or certificate that the animal (most commonly a dog but could be other animals) is a service animal, nor does that animal have to be wearing a vest or harness. Employees on shift may ask if an animal is a service animal but CANNOT require special ID cards for the animal or ask about the person's disability. If told that it is a service animal or a service animal in training, no additional questions may be asked, including asking the customer what his/her disability is that requires the use of a service animal. If there is ever a doubt whether an animal is a service animal or not, it is the Company's policy to consider the animal's presence permissible

## ANTI-HARASSMENT and DISCRIMINATION POLICY

The Company is committed to providing all of its employees a professional and satisfactory work environment that is free of harassment or discrimination due to their age, race, gender, sexual orientation, national origin, pregnancy, disability, veteran status, color, religion, genetics, marital status or any other legally protected status.

## DEFINITIONS

### A. Harassment and Discrimination
Under the law, both harassment and discrimination are defined as conduct that is unwelcome and is purposefully imposed upon an employee due to his/her legally protected status as described above. This conduct can be verbal, non-verbal, physical and/or visual. Acts of harassment and discrimination are further defined as conduct that:

8

CircleK0000233
Vol. II - 0278

- Materially affects important (tangible) job benefits (such as wages, promotional opportunities, scheduling, etc.;
- Unreasonably interferes with an individual's work performance and/or;
- Creates an intimidating, hostile, or offensive working environment.

The Company will actively investigate all complaints of harassment and discrimination as defined above. Harassing or discriminatory acts directed at a person's protected status can be any of the following, along with others behaviors:

- Offensive remarks or jokes;
- Harassing e-mails, text messages, instant messaging, voice mails, phone calls and/or other forms of electronic communication;
- Verbal abuse or kidding that is considered unacceptable and unwelcome by the targeted individual;
- Displaying an intimidating, hostile, or offensive attitude because of an individual's protected status;
- Any unwelcome verbal or physical conduct which unreasonably interferes with an individual's performance and/or reduces personal productivity or safety during work time.

## B. Sexual Harassment

Sexual harassment is defined as unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature that directly involves a condition of employment (such as scheduling, wages, vacation requests, etc.), creates an intimidating, hostile or offensive work environment; or interferes with an individual's ability to person his/her job tasks satisfactorily.

The Company will actively investigate all complaints of sexual harassment upon learning that such conduct has allegedly occurred. Sexual harassment can be any of the following:

- Lewd or suggestive remarks or jokes;
- Unwanted touching, hugging or kissing, even if considered being playful by
- the offender;
- Harassing e-mails, text messages, instant messaging, voice mails, phone calls and/or any other forms of electronic communication;
- Verbal abuse or kidding that is sexually oriented and considered unacceptable by the targeted individual;
- Displaying an intimidating, hostile, or offensive attitude because of rejected sexually-oriented demands, requests, physical contacts or attentions;
- Any unwelcome verbal or physical conduct of a sexual nature which unreasonably interferes with an employee's performance, reduces personal productivity/ safety during work time or causes stress beyond the workplace.

## MANAGEMENT RESPONSIBILITIES

A. It is the responsibility of all levels of management to ensure that all employees understand that harassment, discrimination and sexual harassment will not be tolerated and that violations of this policy will result in disciplinary action, up to and including, termination of employment.

B. Immediate supervisors will ensure that all employees understand their right to a harassment-free work place.

C. Post this policy in the work place to inform employees of the procedure to follow for reporting violations.

D. Retaliation for filing a harassment or discrimination complaint is strictly prohibited and employees who report such incidents need not fear being retaliated against as a result of the report. All complaints will be investigated and resolved promptly and confidentially limiting such information only to those persons who have a need-to-know to remedy the situation.

## PROCEDURE

A. Any employee being harassed or discriminated against by another employee, guest, independent contractor or vendor in the work place must report such actions immediately to put the Company on notice that such behavior is taking (or has taken) place. Employees may use the complaint alternative with which they are most comfortable. Employees may report the violation to their immediate supervisor, any level of management or their Human Resources department. Once a complaint is

9

CircleK0000234

made, regardless of whether the employee wants any action taken, the Company must investigate. All reports of violation of this policy to management will be investigated promptly and thoroughly and to the fullest extent possible, shall be treated with strict confidentiality other than those persons who have a need-to-know.

B. Any level of management that is advised of an alleged violation of this policy should immediately inform the local Human Resources Director.

C. If an investigation confirms that corrective action is needed, an employee may be disciplined, up to and including immediate termination of employment.

D. Company does not consider conduct in violation of this policy to be within the course and scope of employment and does not sanction or condone such conduct on the part of any employee, including supervisory or management employees.

## WORKPLACE VIOLENCE

The safety and security of our Employees and those we serve are of the utmost importance. We will not tolerate threatening, intimidating, malicious, or violent behavior directed toward anyone on our property or during work time. **Every employee must involve management at the earliest notice of this type of behavior.**

To minimize the potential risk of personal injuries and to reduce the possibility of property damage if anyone is unhappy or disgruntled for whatever reason, the Company will take decisive, appropriate action in response to inappropriate behavior—including, but not limited to, heightened security, suspension and/or termination of a business relationship, reassignment of job duties, suspension or termination of employment, and/or criminal prosecution.

Immediately notify your Store Manager, Market Manager, immediate supervisor, or Human Resources of any possible violations of this policy or other threats to workplace security that you have experienced, witnessed, or otherwise become aware of. Examples include threatening, intimidating, malicious, or violent behavior that is or was job-related or has been or might be carried out on Company property or during working time. Employees must report this behavior regardless of the relationship between the individual who initiated the inappropriate behavior and the target of the behavior.

If you receive or overhear threatening communications from an employee or third party, report it to management immediately. Do not engage in either physical or verbal confrontation with a potentially violent individual. If you encounter someone who is threatening immediate harm to anyone, contact an emergency agency (such as 911) immediately. Then immediately report the concern to your Store Manager, Market Manager, immediate supervisor or Human Resources.

All reports of work-related threats will be kept confidential to the extent possible, investigated, responded to, and documented. In addition, acts of violence will be reported to the proper law enforcement authority for possible criminal prosecution. Employees must report and participate in an investigation of any suspected or actual cases of workplace violence.

To maintain the security and safety of all, if a court has entered a protective or restraining order, an injunction, or the like that either prevents or protects an employee from contact with a co-worker or any other individual likely to access the Company's premises, Employees must (1) immediately report the entry of the protective or restraining order, injunction, etc., to Human Resources and (2) provide a copy of the document.

All Employees are to maintain a safe and secure work environment and reduce the risk of threatening, intimidating, malicious, or violent behavior that may affect employees and those who interact with them by complying with the letter and spirit of this policy.

## REPORTING PROCEDURE AND NON-RETALIATION POLICY

If you believe you or any other Employee is being subjected to behavior that violates the Company's policies, you have a right and responsibility immediately to report the behavior to the Regional Director of Operations or to your Department Manager. If for any reason you do not feel comfortable reporting your concerns to the Regional Director of Operations or to your Department Manager, you may report your concerns directly to your Human Resources Department.

Supervisors who become aware of any potential violation of this policy must immediately report the potential violation to the Director of Human Resources or the Human Resources Manager. Failure to report potential violations will result in discipline up to and including discharge.

CircleK0000235
Vol. II - 0280

The Company prohibits retaliation against any individual who, in good faith, reports discrimination or harassment or participates in an investigation of such reports. We assure all Employees we will take action to investigate and resolve complaints. The Company is firm in its commitment to maintaining an environment free of discrimination, harassment, retaliation, and other inappropriate conduct.

Violations of these policies will not be tolerated and will result in appropriate disciplinary action up to and including discharge.

Please help us maintain a comfortable work environment free from discrimination, harassment, retaliation, and other inappropriate and offensive conduct.

## OPEN DOOR POLICY/ISSUE RESOLUTION PROCEDURE

In any business, there will be honest differences of opinion about working conditions, disciplinary action, rules, and other personnel issues. For Circle K and its Employees to succeed, all must be committed to open communication and continually seek opportunities to perform our jobs more efficiently and effectively. An open channel of communication is essential to a good work atmosphere and accomplishment, productivity, and customer satisfaction. This policy will assist Employees in addressing and resolving work-related issues in a positive and productive manner.

All Employees who have an unresolved work-related issue should approach resolution in the following manner:

1:   **Equal Employment Opportunity/Anti-Harassment Policy Issues**

If you have concerns related to discrimination, harassment, inappropriate behavior or comments based on race, color, sex, sexual orientation, gender identity, transgender status, pregnancy, age, religion, national origin, citizenship status, disability, military status, genetic information, or any protected category under federal, status, or local law, or retaliation, those concerns should be reported in accordance with the Reporting Procedure outlined previously.

2:   **Disciplinary Action Issues**

If you have concerns related to disciplinary action, take the following steps.

First, discuss your concern with your immediate supervisor, who, in most cases, will be able to resolve the situation.

If you feel the first step does not result in satisfactory resolution of your concerns, communicate your concerns to the next level of supervision or to Human Resources, who will review the disciplinary action and, if necessary, meet with the involved parties to attempt to bring about a mutual understanding or acceptable resolution. At the second step, your concern must be placed in writing, within ten (10) calendar days of the date the discipline was issued. State (1) the reason you disagree with the disciplinary action and (2) the facts supporting your reason, including names of others who have information related to the relevant facts and circumstances. In other words, your written statement should include the "who," "what," "where," "when," "how" and "how often." The next level of supervision or Human Resources will review and make a final determination.

3:   **Other Issues or Concerns**

If your work-related concern does not involve an issue under the Equal Employment Opportunity/Anti-Harassment Policy or disciplinary action, first discuss your concern with your immediate supervisor, who, in most cases, will be able to address your concern.

If you feel the first step does not result in satisfactory resolution, communicate your concerns to the next level of supervision who will review the concern and, if necessary, meet with involved parties to attempt to bring about a mutual understanding or acceptable resolution.

If the second step does not result in satisfactory resolution or you are uncomfortable addressing your concerns with your immediate supervisor and/or the next level of supervision, you may bring your concerns to the Human Resources Department. You can discuss with them steps taken, such as the names of the involved parties, dates of prior meetings or attempts to resolve the matter, and reasons given for lack of attention or resolution. In other words, your written statement should include the "who," "what," "where," "when," "how" and "how often." Your Human Resources Department will review the matter and, if necessary, meet with involved parties to address the concern.

If an employee believes he/she still has unresolved work related issues after following the above referenced procedures and such work-related issue is a covered claim under an applicable arbitration agreement, policy and/or program, he/she

11

will proceed in accordance with applicable arbitration agreement policy, and/or program and resolve the covered claim through binding arbitration. An agreement, policy, and/or program to arbitrate does not affect or limit an employee's right to file an administrative charge with or to seek other relief from local, state, or federal agencies such as the National Labor Relations Board, or the Equal Employment Opportunity Commission.

Do not keep issues or concerns to yourself. Use this policy so we can work together to address and resolve them. Circle K and all Employees will benefit from open and professional communication and commitment to resolution.

## EMPLOYEE SUGGESTIONS

In the United States, Circle K is the largest independent convenience store operator in terms of number of company-operated stores and believes that to maintain a competitive edge we must make progress every day. To improve operations, we listen and may implement good ideas and suggestions from our Employees. Suggestions on subjects such as safety and ways to save labor, money, energy, time, and materials are encouraged.

All suggestions should be directed to your immediate supervisor or your Market Manager.

## PERFORMANCE COACHING

Performance Coaching is a process based on the principle of communicating a series of management responses or actions, corrective in nature, whereby each step in the series results in a more severe penalty used to give an Employee an opportunity to improve his or her performance. The steps are taken by management to assist an employee in changing undesirable work behavior and conduct in his/her job performance to an acceptable level.

The intent of this process is to use the series of disciplinary actions as a means to assist and encourage employees to correct their conduct and to achieve satisfactory work performance. Particular circumstances may, in some cases, be exceptional or gross misconduct or otherwise give cause to "skip" a level in the series of Performance Coaching depending on the facts of the situation. In other words, the Company reserves the right based on the nature of the infraction or performance issue to take the appropriate level of disciplinary action/Performance Coaching and, depending on the facts of the situation, may skip any or all levels in the coaching/disciplinary process.

**PLEASE BE AWARE** that a combination of infractions (even if they are unrelated) could progress the discipline process.
For example: An employee may be given a verbal warning for tardiness, a written warning for not completing assigned job duties, and be discharged for being tardy again.

Generally, most rule violations, misconduct and poor job performance fall into the following discipline matrix.

| Violation | Minor Offense | Major Offense | Dismissal Offense |
|---|---|---|---|
| 1st Offense | Performance Coaching | Written Warning up to Discharge | Up to Discharge |
| 2nd Offense | Verbal Warning Up to Written Warning | Written Warning Up to Discharge | Up to Discharge |
| 3rd Offense | Written Warning Up to Discharge | Up to Discharge | Up to Discharge |
| 4th Offense | Written Warning Up to Discharge | Up to Discharge | Up to Discharge |

12

Confidential

The matrix is a tool designed to help maintain fair and consistent standards. It is not designed to replace sound reason and judgment. There may be additional circumstances or factors that may weigh more heavily than others, depending on the particular facts of each incident.

<u>Immediate Discharge and Administrative Leave</u>

For certain serious policy violations or employee misconduct, Circle K may find it necessary to discharge an employee for a first offense. Examples of serious violations and employee misconduct include, <u>but are not limited to</u>:

- Serious disregard for safety rules or practices;
- Falsification of time records, employment applications, or other Company documents/records;
- Work performance resulting in customer complaints;
- Abuse, misuse, or destruction of Company tools, equipment, vehicles, or property;
- Fighting, chasing, confrontation, or pursuit
- Insubordination
- Violation of the drug/alcohol policy;
- Carrying or storing firearms or weapons on Company property unless explicitly permitted under federal, state, or local law;
- Violating the EEO/anti-harassment policies or otherwise engaging in discriminatory, harassing, or retaliatory behavior in violation of the Company's policies;
- Threatening another employee or customer (verbal, written, electronic or physical);
- Mishandling of Company assets or theft; leaving the premises with unauthorized packages;
- Failure to remain alert while on duty;
- Disclosing confidential information in violation of the Company's Confidentiality Policy;
- Violation of the Sale of Age Restricted Products Policy (a.k.a.: Sales to Minors Policy);
- Violation of the Food Stamp/SNAP EBT card Purchases Policy;
- Unacceptable cash shortage or unsecure store cash (approved areas: register, safe or in process of being counted);
- Failure of a mystery shop or restricted sales mystery shop measuring our expectations;
- "Borrowing" or taking company cash, merchandise, or property;
- Disabling, tampering with, or modifying any Company equipment or security systems;
- Violation of banking procedures;
- Violation of Cash Handling Policy;
- Excessive variances on the shift analysis
- Violation of the Rewards Policy

If an employee is accused of committing an offense for which they could be immediately discharged, they may be placed on investigative suspension while the facts and circumstances of the offense are determined. This suspension will be with or without pay, depending on the outcome of the investigation. Employees have the option to maintain benefit coverage while on investigation suspension. To do so, employees must pay their portion of the benefit premium. **Employees' failure to pay benefit premiums could result in cancellation of benefit coverage. Contact the Benefits Department for additional information.**

Prior to terminating employment, a skip level policy will be followed. This involves communication to the next level of management prior to an employee being discharged.

Contact your Human Resources Department for further information concerning this policy.

## CONFIDENTIALITY POLICY

Employees are expected to maintain the confidentiality of certain information acquired as a result of their job. This information includes, but is not limited to:

- Personnel and medical information;
- Customer and vendor information;
- Financial, accounting, legal and other information about the finances and operations of our business;
- Business plans and proprietary information; and
- Company videotaping.

13

The definition of "confidential" or "proprietary" information as used throughout this Guidebook and this Confidentiality Policy does not include information regarding working conditions or other terms and conditions of employment to the extent disclosure or communication of such information is protected by the National Labor Relations Act or other applicable laws, nor does it prohibit employees from reporting compliance concerns with governmental agencies or otherwise participating in governmental investigations or inquiries.

## MINIMUM EMPLOYMENT AGE

To provide a safe work environment and comply with state and federal child labor laws, Circle K has placed strict restrictions on the hiring of minors to work in our stores. Specifically:

- The employment ages for our foodservice locations differ depending on state laws. Contact your Human Resources Department with any questions.
- Individuals aged 16 and 17 may only be employed to work in stores that do not sell alcoholic beverages. Contact your Market Manager or Human Resources Department to confirm ability to hire based on state laws.
- Employees operating store registers and handling alcoholic beverages (stocking) must be at least the city and/or state-required legal age to sell and handle alcoholic beverages.

If a 16 or 17 year old is employed, the minor's supervisor must ensure that all state and federal child labor law provisions are complied with (including limitations on starting/ending times, maximum hours allowed per day, posting, work permits and record keeping requirements, and others). Contact your Market Manager or Human Resources Department for the child labor law provisions of your state.

## RELATIVES EMPLOYED BY THE COMPANY

It is understood the Company may, from time to time, employ two (2) or more persons who are related to each other. Except for the officers, no other employee shall work with, or under the supervision of, another person who is a relative of the employee. In the event two (2) or more employees who are relatives are determined to be working with each other or under the supervision of a relative (e.g. relatives working at the same store), then all such employees may be subject to reassignment, transfer, or discharge at the Company's sole discretion. For the purposes of this policy a "relative" is any person related to the employee by blood, marriage, or adoption in the following degrees:

| | | | |
|---|---|---|---|
| * Parent | * Child | * Sibling | * Legal Guardian |
| * First Cousin | * Grandparent | * Grandchild | |
| * Niece | * Nephew | * Uncle | |
| * Aunt | * Spouse | * Live-in and/or personal relationships | |

"Relative" also includes in-laws and step-relatives for these same degrees.

This policy shall apply without regard to gender and without regard to sexual orientation of the participants in a relationship of the kind describe. If you become aware of such a situation, you must report it to Human Resources. Contact your Human Resources Department if you need additional information on this policy.

## SAFE WORK ENVIRONMENT

Circle K provides and maintains safe working conditions and follows operating practices that will safeguard the health and safety of all employees and our guests.

Accident prevention and efficient operations go hand-in-hand. Every level of management has a primary responsibility for the safety and well-being of all employees and our guests. All employees have the responsibility to themselves and their fellow workers to follow all safety rules and to maintain Circle K's property and equipment for safe operation at all times.

We are concerned for the health and safety of every employee and guest and will strive to make the workplace accident free.

14

## 5 MINUTE RULE

Employees must call **911** immediately to report any robbery, fight, shooting, accident or other emergency situation where an employee or customer needs emergency assistance.

Follow the 5 Minute Rule contact sheet posted in the store for all incidents listed below. If the Store Manager is called and does not call back in 5 minutes, then contact the Market Manager. If the Market Manager does not call back in 5 minutes, then contact the Back-Up Market Manager. If they do not call back in 5 minutes, call the Regional Director of Operations and so forth, until verbal contact is made (Follow the chain of command in the order listed). Remember, these numbers are to be used for **emergencies only**.

The 5 Minute Rule must be followed for every incident listed below:
- Employee or Customer accidents and injuries
- Assaults
- Robberies
- Fuel spills greater than five gallons
- Fuel spills that flow off site, enter storm drain, water way, or soil
- Property damage
- Business disruptions (construction, water/electricity problems, etc.)
- Media
- Federal/State agency inspections
- Passed or Failed liquor/cigarette sting
- Failed in stock audit
- Received Notice of Violation or Notice to Comply from Federal/State Agencies or Local Health Departments
- Any unsafe or hazardous condition or activity

The above items are only a few of the things to which the 5 Minute Rule applies. If there are any other disturbances, police involvement or events on or adjacent to the property of an unusual nature the 5 Minute Rule is to be followed – no matter how large or small. If an emergency occurs, handle the immediate situation first, follow the 5 Minute Rule guidelines and call each person listed on the 5 Minute Rule Contact sheet to inform them of the emergency. For additional details, reference the 5 minute rule matrix for your Store.

## INJURIES ON THE JOB

Regardless of the severity or nature, all work-related injuries and illnesses as well as near misses must be reported to your Store Manager, Market Manager or immediate supervisor immediately.

An incident report must be completed via the RINs system for all incident/illness. Any Employee who sustains or contributes to a work-related accident or injury will be required to submit to a post-accident drug test, unless prohibited by law. The Store Manager, and Market Manager or your immediate supervisor also must be contacted immediately.

## WORKPLACE SAFETY

In the interest of everyone's health and safety, certain safety rules must be observed. We must all work safely to avoid injury to ourselves, our co-workers, our vendors, and our customers.

- 2 Foot Rule – Prevent slips and falls. Nothing should be stacked, stored or staged lower than 2 ft. This includes low stacks of product, empty trash, boxes and equipment.
- 5 Foot Rule – Prevent strains and sprains. Nothing should be stacked higher than 5 ft. This includes milk crates, soda shells, BIB's, any and all product. A stepstool must be used to access product stored on shelving higher than 5 ft.
- Absolutely no horseplay is allowed.
- To avoid slips and falls, move carefully in cooler and freezer areas - floors may be wet.
- To avoid serious cuts or injuries, use the protective shield guard, wear slicer safety gloves and use designated slicer brush when cleaning or sharpening the slicer.
- To avoid electrical shock, all equipment is to be turned off and unplugged while being cleaned or repaired.
- To avoid back injury, seek help in lifting large or heavy objects - lift with your legs, not your back. Use the two-wheeled dolly or milk dolly to transport loads. Lighten the load whenever possible.

15

CircleK0000240
Vol. II - 0285

- Outside work/activities may not be conducted during late night hours (e.g.: emptying trash, sweeping the parking lot and cleaning the gas pumps, etc.).
- Keep a separate waste receptacle specifically labeled for broken glass and discarded tins.
- Make all reasonable attempts to remove litter, snow, oil spills, etc. immediately from walkways, ramps, parking areas and fueling areas.
- Store sharp knives, safety cutters and carton openers in a designated area where blades and sharp points can be easily identified.
- To avoid fire and/or electrical shock, do not use extension cords.
- To avoid fire, store papers in cool, well ventilated areas.
- Report an unsafe condition to your store manager/Market Manager immediately.
- Mop up spills immediately.
- Use the "wet floor" warning cone to remind customers and employees when the floor is wet.
- Always report any injury immediately to your store's Manager and Market Manager – follow the 5 Minute Rule!
- All employees will be subject to operational audits at any time during their shift. If during one of these audits a drawer is found to be short or over by more than $2.00, a warning may be issued. A second offense may result in immediate discharge. Any discrepancy over $10.00 may result in dismissal without prior warning.
- At no time will any cash be left outside the safe or register. Cash register operating funds must be kept to a minimum and may not exceed stated policy at any time. Safe drops will be made at regular intervals. The employee also must fill out the drop section of the shift report. The register must be locked when unattended. The safe must be kept locked at all times.
- Always use appropriate tools, ladders, stools, etc. Never use milk crates or other items instead of a ladder or stool.
- For additional safety information, refer to you Division training materials. Duty to Warn Guideline: Any employee who hears of a threat or implied threat being made to a company facility or employee must report that information to his/her Market Manager, Department Manager, or Regional Director of Operations immediately.

**NOTE:** For the safety and security of our employees and customers as well as for the protection of company assets, stores may be equipped with audio/video surveillance and alarms. Tampering with, disabling or altering any security or surveillance device, camera or alarm may result in disciplinary action, which could result in termination of employment. This may include but is not limited to the unplugging of any recording device, cameras or alarm, moving, covering or altering the image or view of a camera, and physically destroying or disabling any camera, recording device or alarm.

## WORKPLACE SECURITY

The following areas outline recommendations and strategies for a safe and secure workplace. However, exercising good judgment, common sense, and planning can prevent most situations and inconveniences from occurring.

- Report strange and suspicious behavior on the part of other employees.
- To protect their safety, do not reveal any employee's home address and/or phone number. This information should only be given by the Human Resources Department.
- Report harassing phone calls or confrontations to your supervisor immediately.
- Do not carry excessive cash to work.
- Place wallets, purses, and tote bags in non-visible areas, away from the work area.
- Do not leave valuables visible in your vehicle while parked.
- Be aware of your surroundings when walking to and from the store. Always have your keys ready before you leave the building.
- If you ever witness a shoplifting or a robbery, do not chase or attempt to apprehend the suspect.

Cash in your register drawer is your responsibility; therefore, you should not allow a non-management employee access to your cash register drawer and you must keep cash register pin numbers/passwords confidential and not share them.

## ROBBERY PREVENTION

Store employees can reduce the risk of robbery by being constantly alert. Following are ways to make the store less attractive to robbery:

- Greet every customer as they enter the store.
- Second registers should not be used for money storage, only registers in use during a shift should have money in them.
- If a register is not actively being used on a shift (such as single coverage on overnight shift), it should be left open with

16

CircleK0000241
Vol. II - 0286

the drawer propped up and visible to show that it is empty. Some register versions will not allow the drawer to be left open; in that case the register must be empty and not used for storing cash or follow your specific BU practice if applicable

- Keep the back door locked and secured.
- Keep the front windows (security window) clear of displays and signs that block the view of the sales counter.
- Make sure all of the outside lights are on after dark.
- Call the police and report a suspicious person or activity.
- Trash removal and parking lot cleaning should be done during daylight hours.
- Stay inside the store during late night hours.

Robbery Prevention

- $20, $50, and $100 bills are to be dropped immediately.
- Do not hide money in envelopes, under the counter, under the drawer tray or anywhere else.
- Always lock the register when leaving the counter area.
- Drops should be made in full view of customers as needed to maintain proper cash levels.
- Money must never be on register shelf.
- Rolled coins must not be stored in register.

➢ Coin box - (Shift cash fund) – IF APPLICABLE
   o Must be locked at all times.
   o Change fund amounts cannot be changed without Market Manager and/or Director approval.

➢ Store Safe
   o Only Store Managers and Assistant Managers have keys to the safe.
   o Safe must never be left unlocked
   o Deposit must be locked in safe until taken to bank - Deposit must **NEVER** be left unattended.

**Note:** **All stores with coin dispensers must follow the above cash guidelines along with the guidelines for the coin dispenser. (Contact Store Manager for coin dispenser guidelines)**

Protection of Company Assets

Every employee has a responsibility to help protect the Company's assets. The following are guidelines to help reduce the risk of loss:

- Always ask for identification before allowing access to someone to conduct repairs or service. Call your Store Manager and/or Market Manager if you have any questions or concerns before allowing access.
- No store assets including cash may be given to anyone without authorization. There are **no** situations where employees, customers or maintenance companies may be given cash for an emergency or any other situations.
- Cash must be secured in the register, in the store safe or in the bank. Cash must **never** be kept / placed in a file cabinet, counter, desk drawer, or unauthorized area.
- Never discuss cash handling, store security systems, or banking procedures with anyone outside the store. Alert your supervisor if anyone asks questions about banking or security procedures.

If A Robbery Occurs

The first priority is the safety of everyone in the store. During a robbery store employees should follow these guidelines:

- Do not panic. Stay calm and listen to the robber's instructions.
- Cooperate with the robber's demands but **don't leave the store. Do not resist or try to fight**.
- Keep your hands in view. Do not make any quick movements. **Let the robber know if there is another employee in the backroom or cooler, so the robber is not surprised if someone comes out of those areas.**
- Observe the robber's physical description but try not to stare. Try to remember the following:

   o Robber's height, build, eye color and hair color.

17

- o   Note any scars, marks, tattoos, or piercings and location of each.
- o   Listen to tone of voice, statement or mannerisms.
- o   Note the type and color of clothing.
- o   Note type and color of any vehicle used and direction of travel.
- o   **Do not fight, chase, confront or pursue the suspect. Never try to use a weapon.**
- o   **Do not leave the store with the robber**.

The Robbery Prevention and Cash Handling Procedures Policy is necessary for the safety of all store employees. Failure to comply with this policy may result in disciplinary action, which could result in termination of employment.

## TELEPHONE SCAMS

**No transactions are to be made over the phone.** There are many types of fraud schemes you may be asked to conduct over the phone.  Be polite, but never comply with phone requests for any type of transaction. For technical problems or updates on any machine, a real representative will already have administrative passwords and will never need to ask for yours or ask you to process a transaction to see if the terminal is working. Never run a credit card over the phone for any type of transaction. All sales must be made at store level and the customer must be present at the time of purchase. For this type of fraud, they may resort to tactics such as claiming to have a disability or ask you to run the card and someone else will pick up the product later. This is a scam. If you are ever in doubt, call your Manager. **Even if you are given the Manager, Market Manager or Director's name or told you will be charged a fine for not completing, this is a scam. **Never complete any type of transaction over the phone.**

Failure to comply with the Telephone Scams Policy will subject the employee to disciplinary action, up to and including discharge.

## SMOKING/SMOKELESS TOBACCO

There is no smoking/smokeless tobacco, including the use of electronic cigarettes, in Circle K stores. Smoking only is allowed outside the store on company property as permitted by federal, state, and local law. Employees must follow these guidelines when smoking:

- Employees must never leave lit cigarettes in windowsills or on outside displays.
- Employees must stop smoking and return to the store as soon as a customer enters the property.
- Cigarettes must be extinguished in a proper container and never tossed on ground or parking lot.

This policy does not prohibit smoking or tobacco use outside during work hours. If not on break, employees who go outside to smoke are expected to perform outside job duties while doing so (e.g.: clean the lot, empty and pick-up trash, etc.). No smoking is permitted around the gasoline islands or during fuel deliveries. Time taken to smoke should be infrequent, and employees cannot allow smoking to interfere with their ability to accomplish their required job responsibilities. Abuse of time spent smoking will result in a loss of smoking or disciplinary action up to and including discharge.

## WEAPONS STATEMENT

No Circle K employee on Company time, on Company business, in Company vehicles or on Company property is permitted to possess or keep any type of weapon unless explicitly permitted under federal, state, or local law. Circle K's property includes store premises, store buildings, division and regional offices, Company-owned parking lots and garages and Company vehicles.

Statistics show that a store employee is more likely to sustain an injury when they attempt to defend themselves or prevent a crime by the use of force.

The use of force to prevent a crime is outside the scope of employment and may subject an employee to substantial personal liability. Accordingly, unless explicitly permitted under federal, state, or local law, any employee possessing or keeping any weapon on Company property will be subject to disciplinary action up to and including discharge.

"Weapons" include, but are not limited to, guns, rifles, clubs, mace, knives, razors, stun guns, numchucks or everyday objects used as weapons.

18

## ATTENDANCE

Employees who determine they will be tardy or absent from work (including leaving work early) on a particular day(s) must notify their immediate supervisor at least 7 days in advance if the absence/tardiness is foreseeable. If an absence or tardiness is not foreseeable, employees must notify their supervisor no later than 4 hours before the start of their shift, unless state laws dictates otherwise or at their earliest opportunity in emergency situations where that is not possible, .

Employees not on an approved Leave of Absence must notify their immediate supervisor daily to report their continuing absence or tardiness. Employees must speak directly with their immediate supervisor (text messaging is not an approved method of notifying your immediate supervisor, unless allowed by local law) every day they will be absent or tardy unless on an approved leave of absence.

Unexcused tardiness, absence taken without proper notice, or repetitive absences taken with proper notice will subject the employee to disciplinary action. Employees who fail to give notice to their immediate supervisor for an absence of 3 consecutive scheduled workdays will be assumed to have abandoned their position with the Company unless the absence is protected by federal, state, or local law.

Absences due to the following reasons are considered excused and are not used as a basis for discipline:
- Jury duty;
- Time off because of a subpoena or other Court-ordered obligation in a legal proceeding;
- FMLA leave;
- Absences due to a work-related injury (supported by medical documentation);
- Bereavement, military, personal, or medical leave; or
- Pre-scheduled vacation or other paid time off.

## EMPLOYEE PARKING

The parking spaces in front of our stores are reserved for our guests. Store employees and other employees visiting stores for business reasons are to park in other available spaces. Third shift employees may park closer to the store as long as visibility into the store is not blocked or limited.

Disabled parking spaces are designated for use by individuals who have disabled parking tags or permits. Employees with such tags or permits may park in those spaces. It is generally a violation of local ordinance for untagged vehicles to park in these spaces. At no time should employees park or block gas islands in an attempt to control gas drive offs.

## ALCOHOL / DRUGS

Consumption of or being under the influence of alcohol or illegal drugs by an employee on company premises during working hours or while performing Company duties is prohibited. Consumption of or being under the influence of alcohol or illegal drugs by an employee in a Company leased vehicle at any time is prohibited. Any drug or alcohol use that results in impairment of the employee during working hours is also prohibited. These prohibitions include prescription drugs possessed or used in a manner inconsistent with the prescription and the abuse of over-the-counter medications. In addition, the personal possession, sale, negotiation for sale, or transfer of alcohol, illegal drugs, prescription drugs, or drug paraphernalia on Circle K's premises is prohibited. Violation of these policies will result in disciplinary action up to and including discharge.

Employees who are taking a legally prescribed medication that could impact workplace safety must notify their immediate supervisor. Effects from the medication are typically noted as warnings and limitations on the medicine container label or the package insert or are explained by a physician or pharmacist, but the Employee is responsible for investigating any potential impact on workplace safety medications potentially could have. Depending on the circumstances, accommodations may be made, including but not limited to temporary reassignment, duty restriction, or time off.

Any Employee who sustains or contributes to a work-related accident, injury, or near miss will be required to submit to a post-accident drug and alcohol test unless prohibited by law.

Employees testing positive on a screen for illegal drugs will be discharged. Employees who switch, tamper with, or attempt to switch or tamper with any screening test or sample will be discharged. Employees who refuse to submit to a lawful drug or alcohol test as required by Company policy or cooperate with any of these procedures will face disciplinary action up to and including discharge.

Any employee who violates this policy will be subject to appropriate disciplinary action up to and including discharge. Any employee having knowledge of others violating this policy must report it to their immediate supervisor or Regional Director of Operations.

19

CircleK0000244

## THEFT

Theft of Circle K's property or that of other employees, vendors, or customers will not be tolerated and may lead to criminal prosecution. Employees should not attempt to remove any article of Circle K's property, including but not limited to documents, equipment, etc. without proper advance authorization. Any employee violating this policy will be subject to disciplinary action up to and including discharge.

Any employee having knowledge of the violation of this policy must contact their immediate supervisor or their Regional Director of Operations.

## DISORDERLY CONDUCT / INSUBORDINATION / VERBAL ABUSE / FIGHTING

Fighting or any physical action by one employee against other employees or non-employees such as customers, contractors, and/or vendors on Company premises will not be tolerated. Such behavior is grounds for disciplinary action up to and including termination.

Insubordination (refusing to follow direction from superior) is grounds for disciplinary action up to and including discharge. Threatening harm to customers or other employees, or using abusive or profane language in violation of the Company's Anti-Harassment Policy, also are grounds for disciplinary action up to and including discharge.

Any employee who engages in rowdiness, throwing of objects, or similar disorderly conduct subjects himself/herself and others to potential dangers and disrupts the workplace. Such behavior is grounds for disciplinary action up to and including discharge.

**[The Rest of This Page is Intentionally Left Blank]**

20

CircleK0000245
Vol. II - 0290

Uniform And Image Policy

## REGULAR STORE

# What are you wearing? Let's MAKE IT EASY.

## First Impression

Your Circle K uniform is a tool to help you look smart, professional and appealing when meeting customers. Wearing the uniform appropriately and projecting a trustworthy image of cleanliness and competence are particularly important when it comes to successfully promoting and delivering our fast and friendly service.

### Cover Me!
Polo and "Oxford" shirts are the most visible elements of your Circle K uniform. They may be worn "un-tucked", but only if they are long enough. No skin should be exposed around your middle, even when you are bending or stretching.

### Face Mask
We want you to stay healthy. Face masks are an acceptable part of your Circle K Uniform Circle K Uniform. You have the option to wear a face mask provided by the company or you may elect to wear a face mask with solid colors or patterns only. Face masks with lettering are not allowed. Team logoed face masks may be allowed at BU discretion.

### Your Pants - you choose!
You must ensure your pants or shorts are a solid plain black or khaki color.  Black and Blue denim jeans are acceptable only if they are not all "washed out".  Shorts must be black or khaki color, not be too short and should be fingertip length when your arms are placed by your side. Pants and shorts that have too low a waistline, that have holes or that are too baggy are not allowed.





### On Your Feet!
We want you to be on the go, looking after your customers all day - so safety and comfort are at the top of the list when it comes to your footwear. Choose black, dark gray or dark blue shoes that are supportive and comfortable. They must be clean, with solid soles. Any laces must always be securely tied. Never wear open-toed footwear at work.

### Who Are You?
Your name badge must be worn and visible at all times (except during short periods when you may be wearing task- or weather-related coats or coveralls).



### You're Beautiful, Naturally
We want our customers to focus on you, not on your hair, cosmetics, tattoos or piercings.

### Keep it Clean
Both you and your uniform need to be fresh and clean, every day. Before working with food, make sure you know and follow all the relevant hygiene and food safety requirements - and always, always wash your hands! Your hair should be clean, neat and tidy. In food preparation areas your hair should be securely clipped, tied or bound back if it is long.
Your fingernails must be kept clean and trimmed. In food preparation areas nails must be without polish, artificial nails (including acrylics, gels and silks) and false eyelashes are not allowed.
Your perfume or cologne shouldn't be too strong or bring tears to anyone's eyes!



### Bling is Not the Thing!
The only jewelry you can wear at work is a plain wedding band or engagement ring and with these you must use one-time gloves at all times in the food preparation zone. Other rings, bracelet or necklaces and so on must be left at home



### Tattoos, Piercings = OK!
Your tattoos can say a lot about you and are permitted, so long as they don't use inappropriate language or make offensive statements. They must not be on your face. The only visible piercings we can allow are small, discreet earrings, nose and tongue studs (not rings - and those only if they do not conflict with your local food safety rules or regulations.



Complying with these standards is the least you can do. You must always comply with all locally applicable food safety and hygiene rules, regulations, statutes, bye-laws, measures, standards, acts, bills, ordinances, prescriptions, decrees, edicts, precepts, injunctions, judgements, dictates, proclamations or other legislation. We celebrate diversity, religious attire can be worn according to local practice and regulation.

21



*Take it easy*

CircleK0000246
Vol. II - 0291

**FOODSERVICE STORES**

# What are you wearing? Let's MAKE IT EASY.

## First Impressions

Your Circle K uniform is a tool to help you look smart, professional and appealing when meeting customers. Wearing the uniform appropriately and projecting a trustworthy image of cleanliness and competence are particularly important when it comes to successfully promoting and delivering our fast and friendly service.

### Cover Me!

Polo and "Oxford" shirts are the most visible elements of your Circle K uniform. They may be worn "un-tucked", but only if they are long enough. No skin should be exposed around your middle, even when you are bending or stretching. In food preparation areas you must at all times wear the provided apron and caps.

### Face Mask

We want you to stay healthy. Face masks are an acceptable part of your Circle K Uniform Circle K Uniform. You have the option to wear a face mask provided by the company or you may elect to wear a face mask with solid colors or patterns only. Face masks with lettering are not allowed. Team logoed face masks may be allowed at BU discretion.

### Your Pants - you choose!

You must ensure your pants or shorts are a solid plain black or khaki color. Black and Blue denim jeans are acceptable only if they are not all "washed out". Shorts must be black or khaki color, not be too short and should be fingertip length when your arms are placed by your side. Pants and shorts that have too low a waistline, that have holes or that are too baggy are not allowed.



  



### On Your Feet!

We want you to be on the go, looking after your customers all day - so safety and comfort are at the top of the list when it comes to your footwear. Choose black, dark gray or dark blue shoes that are supportive and comfortable. They must be clean, with solid soles. Any laces must always be securely tied. Never wear open-toed footwear at work.

### Who Are You?

Your name badge must be worn and visible at all times (except during short periods when you may be wearing task- or weather-related coats or coveralls).



### You're Beautiful, Naturally

We want our customers to focus on you, not on your hair, cosmetics, tattoos or piercings.

### Keep it Clean

Both you and your uniform need to be fresh and clean, every day. Before working with food, make sure you know and follow all the relevant hygiene and food safety requirements - and always, always wash your hands! Your hair should be clean, neat and tidy. In food preparation areas your hair should be securely clipped, tied or bound back if it is long.

Your fingernails must be kept clean and trimmed. In food preparation areas nails must be without polish, artificial nails (including acrylics, gels and silks) and false eyelashes are not allowed.
Your perfume or cologne shouldn't be too strong or bring tears to anyone's eyes!



### Bling is Not the Thing!

The only jewelry you can wear at work is a plain wedding band or engagement ring and with these you must use one-time gloves at all times in the food preparation zone. Other rings, bracelet or necklaces and so on must be left at home



### Tattoos, Piercings = OK!

Your tattoos can say a lot about you and are permitted, so long as they don't use inappropriate language or make offensive statements. They must not be on your face. The only visible piercings we can allow are small, discreet earrings, nose and tongue studs (not rings - and those only if they do not conflict with your local food safety rules or regulations.



Complying with these standards is the least you can do. You must always comply with all locally-applicable food safety and hygiene rules, regulations, statutes, bye-laws, measures, standards, acts, bills, ordinances, prescriptions, decrees, edicts, precepts, injunctions, judgements, dictates, proclamations or other legislation. We celebrate diversity, religious attire can be worn according to local practice and regulation.



*Take it easy*

QSR Employees ONLY: Must follow the approved QSR Franchise uniform and image policies and applicable health and sanitation requirements. Food handler's gloves must be worn, following health and sanitation requirements.

Uniform Violations and Personal Image Violations: Any employee who does not meet all of the requirements listed above will be subject to performance coaching up to and including discharge.

For additional and/or specific Uniform and Image policy information, please contact your Store Manager or Market Manager.

The Division VP and/or Director of Operations must approve any alterations and/or exceptions to the Uniform and Image Policy. The Company is committed to providing reasonable accommodation for disabilities and religious beliefs unless doing so creates undue hardship, so if you need accommodation or exceptions to this policy please submit a written request to Human Resources.

### Support Staff in our Store Support Centers

We want employees to maintain a neat and clean appearance that is appropriate for the workplace setting and for the work being performed. Dress for Your Day allows employees to have options and flexibility. Dress for the Day means dress appropriately for your daily work environment. That means you can wear more casual attire depending on your responsibilities and interactions for the day, while still projecting a positive and professional image.

If you have to an important meeting, or the office has executive level guests, you may want to dress in business attire. If you're catching up on things at the office and working away at your desk, maybe jeans or business-casual attire would be more comfortable. The choice is yours.

### Examples of Acceptable Attire:
- Casual and dress blouses, all fabrics except sheer
- Casual, dress or golf shirts and sweaters
- Casual dresses and skirts of appropriate length
  - Must at least be at fingertip in length when arms are placed by your side
- Loafers, flats, dress shoes, dress sandals, boots, dress heels
- Dockers style, khakis, corduroy, jeans, dressy capris, dress pants (must be clean and free of rips, tears and fraying; may not be excessively tight or revealing)
- Athletic shoes (with no holes) may be worn on Fridays

### Examples of Unacceptable Attire:
- Hats or caps
- Athletic, yoga, leggings or workout attire of any type
- Sweatshirts, theme shirts, sports teams, and logoed shirts (non - Circle K)
- Bare shoulders or midriffs, sheer fabrics, tank-style tops
- Beach flip-flops (rubber), slippers, athletic shoes (athletic shoes are allowed on Friday)
- Short or revealing items like sundresses
- Sweatpants, shorts, overalls
- Extreme hair color and/or hairstyles are not acceptable
- Visible body piercing and facial tattoos are not acceptable

Any support staff members who does not meet all of the requirements listed above will be subject to performance coaching by their immediate supervisor.

23

CircleK0000248
Vol. II - 0293

## FAMILY AND MEDICAL LEAVE

The Family Medical Leave Act (FMLA) is a federal law which entitles eligible employees to take up to twelve (12) weeks of unpaid, job-protected leave within a 12-month period for specified family and medical reasons. Family Care and Medical Leaves are without pay.

### I.   EMPLOYEE ELIGIBILITY

To be eligible for FMLA benefits, an employee must have:
- A qualifying event;
- Worked for a covered employer for a total of twelve (12) months;
- Worked at least one thousand two hundred fifty (1,250) hours during the twelve (12) months immediately preceding the leave request; and;
- Worked at a location in the United States where at least fifty (50) employees are employed by the employer within seventy-five (75) miles.

### II.   LEAVE ENTITLEMENT

A covered employee is eligible for up to a total of twelve (12) work weeks of unpaid Family Medical Leave during a 12-month period for the following reasons:

- Birth of a child-or placement of a child for adoption or foster care;
- To bond with a child (leave must be taken within 1 year of the child's birth or placement);
- To care for the employee's spouse, child under 18 years old or 18 and over that is incapable of self care, or parent with a serious health condition (this does not include in-laws);
- The employee's own qualifying serious health condition that makes the employee unable to perform his/her job; or
- Because of any qualifying exigency arising out of the fact that the employee's spouse, son (of any age), daughter (of any age) or parent, defined as a covered military member, is on active duty (or has been notified of an impending call or order to active duty) in the National Guard or Reserves or is a retired member of the Armed Forces or Reserves and has been notified of an impending call or order to active duty in support of a contingency operation (See Military Leave policy #4.10 for additional details).

**Military Caregiver Leave:** A qualifying employee may also me entitled to 26 weeks of unpaid leave to care for a covered service member during a single 12-month period. A covered service member is: (1) a current member of the Armed Forces, including a member of the National Guard or Reserves, who is undergoing medical treatment, recuperation or therapy, is otherwise in outpatient status, or is otherwise on the temporary disability retired list, for a serious injury or illness; or (2) a veteran who was discharged or released under conditions other than dishonorable at any time during the five-year period prior to the first date the eligible employee takes FMLA leave to care for the covered veteran, who is undergoing medical treatment, recuperation, or therapy for a serious injury or illness. (See Military Leave policy #4.10 for more details).

When both spouses are employed by the same employer, they are limited in the amount of family leave they may take for the birth of a child, child bonding, placement for adoption or foster care, or to care for a parent who has a serious health condition to a combined total of twelve (12) weeks (or twenty-six weeks if leave to care for a covered service member with a serious injury or illness is also used). Leave for the birth of a child, child bonding, placement for adoption or foster care, must conclude within twelve (12) months of the birth or placement.

**Intermittent Leave:** Under some circumstances, employees may take FMLA leave intermittently in separate blocks of time for a single qualifying reason or on a reduced leave schedule. When leave is needed for planned medical treatment, the employee must make a reasonable effort to schedule treatment so as not disrupt the employer's business operations. If the FMLA leave is for the birth, adoption or foster placement of a child, use of intermittent or reduced schedule leave requires the employer's approval. The Company retains the discretion to temporarily transfer the employee to an alternative position, with equivalent pay and benefits, that better accommodates the employee's leave schedule.

Employees taking intermittent leave must follow the Company's standard call-in procedures absent unusual circumstances. In addition, employees taking intermittent leave must report each full or partial leave day to Human Resources on a daily basis and within 24 hours of taking leave.

24

CircleK0000249
Vol. II - 0294

Any vacation, sick leave, paid time off (PTO) or any other type of paid leave will run concurrently with FMLA leave. All such payments will be coordinated with any state disability, company disability, Workers' Compensation or other wage reimbursement benefits for which the employee may be eligible. At no time shall an employee receive a greater total payment than the employee's regular salary.

**Leave Year:** The leave year within which an eligible employee may take his or her FMLA-protected leave is a rolling calendar year (i.e., the 12-month period beginning on the date the employee first takes leave for any of the reasons set forth previously rolling backwards twelve months).

**Serious Health Condition:** A serious health condition is defined under FMLA as an illness, injury, impairment, or physical or mental condition that involves 1) either an overnight stay in a medical care facility; or 2) continuing treatment by a health care provider for a condition that either prevents the employee from performing the essential functions of the employee's job.

## III.    MAINTENANCE OF HEALTH BENEFITS

During FMLA leave, the Company will maintain the employee's health coverage under any group health plan on the same terms as if the employee had continued to be actively working. However, the employee remains responsible for his or her share of any premiums for those health benefits as if actively working. Failure to pay such premiums during the leave may result in the loss of health coverage during the FMLA leave of absence. In some instances, if an employee fails to return to work following an approved FMLA leave, the employer, at its discretion, may seek to recover that portion of health care premiums that had been paid to maintain health coverage for the employee. When the employee fails to return to work following his/her FMLA leave, the company's obligation to maintain group health benefits ends subject to applicable Consolidated Omnibus Budget Reconciliation Act (COBRA) rights.

## IV.    JOB RESTORATION

Upon return from FMLA leave, employees will be restored to their original or equivalent positions with equivalent pay, benefits, and other employment terms, unless they would no longer have been employed in such a position had they not taken such leave, such as store closure or elimination of that position. Use of FMLA leave cannot result in the loss of any employment benefit that accrued prior to the start of an employee's leave; however, employees will not accrue benefits (such as vacation time) or seniority during FMLA leave. An employee has no greater right to restoration or to other benefits and conditions of employment than if the employee had been continuously employed.

If an employee needs additional leave beyond the expiration of his/her job protected FMLA LOA, the employee will need to provide an updated medical certification, so the Company can determine whether it can provide any additional leave.

## V.    NOTICE AND CERTIFICATION

**NOTICE:** If the leave is foreseeable, the employee must provide at least thirty (30) days advance notice. If circumstances prevent the employee from providing the thirty (30) days advance notice, then the employee should provide as much notice as possible and generally must comply with the Company's normal call-in procedures. FMLA leave can be initiated through the Time Off/Request Leave feature of Workday or by contacting the Circle K Employee Service Center at HRSOLVE or (877) 477-6583. Employees must complete the Family Medical Leave Application and provide sufficient information for Circle K to reasonably determine whether the FMLA may apply to the leave request. Depending on the situation, such information may include that the employee is incapacitated and is unable to perform the essential functions of his/her job, and/or that the employee or employee's qualifying family member is under the continuing care of a health care provider. Other types of documentation may include documents necessary to establish a relationship between the employee and his/her family member or other sufficient documentation for a request for Military Exigent or Caregiver leave.

If an employee fails to give the required notice for foreseeable leave without reasonable excuse, the employee may be denied the taking of leave until the employee provides adequate notice of need for the leave.

Once the Company becomes aware that an employee's need for leave is for a reason that may qualify under FMLA, the Company will notify the employee if he or she is eligible for FMLA leave and, if eligible, will also provide a notice of rights and responsibilities under the FMLA.

**CERTIFICATION:** Circle K requires that an employee's request for leave due to a serious health condition affecting the employee or a covered family member be supported by the Certification of Health Care Provider form. See Section VII below.

Certification must be provided within fifteen (15) calendar days of the date of request. Failure to provide this certification may result in delay or denial of FMLA until such certification is provided. A certification must be completed by a health care provider and include

25

the start date of employee's disability, the probable duration of disability and medical facts supporting the employee's inability to perform the essential duties of his/her position.

The Company may require, at its expense, that an employee obtain a second opinion from a healthcare provider designated by the Company. If there is a conflict between the medical opinions, the Company may also require a third opinion by a healthcare provider, designated jointly by the Company and the Employee and paid for by the Company. The opinion provided by the third healthcare provider will be final.

Employees may also be required to provide recertification from their healthcare provider, at employee expense, (including for intermittent leave) on a reasonable basis, but no more frequently than every thirty (30) days, or the minimum duration of their incapacity or treatment, whichever is greater. The Company may also require recertification in less than 30 days if:

1.   The employee requests an extension of leave;
2.   The circumstances of the original certification change significantly; or
3.   The Company receives information that casts doubt upon the continuing validity of the most recent certification.

**Incomplete Certifications/Authentication:** If the certification is incomplete, the Company will notify employee in writing regarding what additional information is required. The employee will have seven (7) days from the time s/he receives the request to provide a complete certification. Should the employee fail to provide a complete and sufficient certification, the Company may delay or deny the requested FMLA leave. The Company may also contact the employee's healthcare provider to clarify or authenticate a medical certification.

**Return to Work:** Employees returning from a FMLA leave due to their own serious health condition will be required to provide a Certification of Employee's Fitness for Duty form at the end of the FMLA leave. See Section VII, Procedures below.

For further clarification of FMLA an employee should contact the Circle K Employee Service Center, see Section VII below or contact his/her local Human Resource Manager.

## VI.   PROCEDURES

The following steps should be taken to initiate a leave of absence under the Family Medical Leave Act (FMLA):

1.   Request a leave at least thirty (30) days in advance, or as soon as possible, online by logging into workday at www.workday.circlek.com and select the 'request a leave' button under the time off applet. To login to workday you will need your employee ID number. If you do not have access to the internet, you can request an application for FMLA by calling HRSOLVE at 1-877-477-6583 (HRSOLVE).
2.   Complete and return the Family Medical Leave Application, which must include the Certification of Health Care Provider form. These forms can be uploaded to workday, faxed or sent electronically as an email attachment to your LOA Specialist.

Activities while on an approved Leave:

1.   An employee (or a designated individual) is expected to stay in contact with his/her LOA Specialist by providing updates on the need for continued leave, whenever appropriate.
2.   If an employee's leave is extended beyond his/her initial expected return to work date, the employee (or a designated individual) must provide an updated Certification of Health Care Provider form.
3.   Request a Certification of Employee's Fitness for Duty form once the medical provider has released the employee to return to work.
4.   An employee must continue to pay his/her portion of benefit premiums while on approved leave of absence or the employee's benefits will be cancelled for non-payment.

Regardless of the leave policy being used, an employee who submits false information to the Company (whether orally or in writing) to obtain or continue any leave of absence-whether FMLA or other leave, provided by the Company, may be subject to disciplinary action, up to and including termination.

Employees on any leave of absence, except Military Leave (See 4.10), may not work for another employer or provide services to another individual or Company during the leave of absence period. Employees on any type of leave of absence are further prohibited from acting in a manner inconsistent with their need or justification for leave. A violation of this provision may subject the employee to disciplinary action, up to and including termination.

26

## Military Leave

### POLICY

A military leave of absence will be granted to employees who are absent from work because of duty in the U.S. uniformed services in accordance with the Uniformed Services Employment and Reemployment Rights Act (USERRA). Advance notice of military service is required, unless military necessity prevents such notice, or it is otherwise impossible or unreasonable.

In addition, under certain conditions, an eligible military family member may also be eligible for a Leave of Absence under the Family and Medical Leave Act.

### ELIGIBILITY

o Military Active Duty - Employees who voluntarily enlist for active military service for a single enlistment will be granted military leave for a maximum of five (5) years, except as provided under USERRA. Upon completion of the military service, the employee must be restored to his/her previous position and benefits s/he would have attained if s/he had not been absent due to military service or, in some cases, a comparable position, provided the employee:
- received an honorable discharge;
- applies for reinstatement no later than the applicable time period after completion of service; and
- is still qualified to perform pre-service duties with "reasonable efforts" made by the Company to qualify the employee. "Reasonable efforts" means actions, including training, that do not cause undue hardship to the Company.

o Military Reserve or Call-up Duty - Employees who are called to duty for training or emergency service in any of the branches of the Reserve Forces or the National Guard are eligible for military leave. Upon completion of the training or emergency service, the employee will be restored to his/her previous position or a comparable position in accordance with USERRA and any applicable state statute.
- Upon presentation of satisfactory military pay verification data, employees will be paid the difference between their normal base compensation and the pay (excluding expense pay) received while on military duty for up to:
  - fifteen (15) working days for training assignments; and
  - sixty (60) working days during emergency service.
- The decision whether the employee is entitled to pay will be determined at the time the leave is requested from the HR Employee Service Center based on a comparison of
  - the military pay the employee will receive based on rank; and
  - the amount the employee would receive from his/her salary.

o Military Family Leave
- Exigency Leave – Eligible employees who are the spouse, parent, son or daughter of an active military member may take up to twelve (12) workweeks of unpaid leave for any qualifying exigency arising out of the fact the individual is a member of the Armed Forces (including National Guard or Reserves) on covered active duty or notified of an impending call or order to active duty.
- Caregiver Leave – Eligible employees may take up to twenty-six (26) workweeks of unpaid leave to care for a spouse, son (of any age), daughter (of any age), parent, or next of kin who is a current member of the Armed Forces (including a member of the National Guard or Reserves) and who is undergoing medical treatment, recuperation, or therapy, is otherwise in outpatient status, or is otherwise on the temporary disability retired list, for a serious illness or injury.

Employees should contact the Circle K Benefits Department and reference the Company's FMLA Policy for more details regarding Military Family Leave.

### PROCEDURES

- Employees who require military leave must provide advance notice for all military duty as far as in advance as is reasonable under the circumstances, unless military necessity prevents such notice, or it is otherwise impossible or unreasonable. Where

27

CircleK0000252
Vol. II - 0297

feasible, the Company requires Employees to present appropriate military orders.

- Except as otherwise provided herein, military leave is unpaid. Employees are able (but are not required) to use accrued vacation or annual leave while performing military duty. Vacation, sick leave, and holiday benefits will continue to accrue during a military leave of absence, in accordance with Company policies.
- Continuation of health insurance benefits for up to 24 months, is available as required by USERRA based on the length of the leave and subject to the terms, conditions and limitations of the applicable plans for which the employee is otherwise eligible. Contact the HR Employee Service Center at 1- 888-HR-SOLVE for detailed information.
- Employees on military leave for up to thirty (30) days are required to return to work for the first regularly scheduled shift after the end of service, allowing reasonable travel time. Employees from leave must provide documentation of their military service.
- Employees on military leave for thirty-one (31) days or more, but less than 181 days, must submit an application for reemployment within 14 days after release from service.
- Employees on military leave for 181 days or more, must submit an application for reemployment no later than ninety (90) days after from service.
- Employees returning from military leave will be placed in the position they would have attained had they remained continuously employed or a comparable one depending on the length of military service in accordance with USERRA. They will be treated as though they were continuously employed for purposes of determining benefits based on length of service.
- Contact the HR Employee Service Center at 1-888-HR-SOLVE for more information or questions about military leave.

## LACTATION SUPPORT IN THE WORKPLACE

The Company supports nursing mothers and complies with all applicable laws regarding lactation support in the workplace. Should you need assistance in this regard, contact your HR Department for your Division.

## BENEFIT PROGRAM PARTICIPATION

The Company provides a group health insurance plan. An eligible employee may apply for group health insurance after meeting the service requirements specified in the Plan. For more information about eligibility and other benefits issues, contact the Benefits Department at 888 – HRSOLVE, hrsolve@circlek.com, or review in Workday

### 401(k) PLAN

Circle K offers a 401(k) plan that allows employees to save money on a tax-deferred basis (subject to the provisions of current law such as federal and state income tax laws). Employee contributions will be made through automatic payroll deduction. For more information, contact the Benefits Department at 888 – HRSOLVE, hrsolve@circlek.com, or review in Workday

### STOCK PURCHASE PLAN

Circle K offers a Stock Purchase Plan to Store Managers, QSR Supervisors, and MITs. For more information, contact the Benefits Department at hrsolve@circlek.com or review in Workday

### EMPLOYEE SAVINGS PLAN

Circle K offers the benefit of an Employee Savings Plan. For additional information contact the Payroll Department at payroll@circlek.com or review in Workday

### TUITION REIMBURSEMENT

Circle K offers a tuition reimbursement benefit. Courses eligible for reimbursement must be business related, related to existing job responsibilities, or required for a job related degree program. Courses fully covered by scholarships, grants, G.I. Bills, or other programs are not reimbursable. Courses partially covered by scholarships, grants, G.I. Bills, or other programs are reimbursable only for the amount not covered. Please contact the Benefits Department or review in Workday.

28

CircleK0000253

## JURY DUTY

Employees who must miss work to serve on a jury must notify their immediate supervisor immediately. A statement from the Clerk of Courts or similar evidence of Jury Duty is required to account for this type of absence and in order to be eligible for paid time off work. Pay while on jury duty will be regular weekly wages, minus amounts received for jury pay, and this benefit is limited to a maximum of four (4) weeks total pay per calendar year. Proof of jury service and amounts paid must be provided. Jury duty pay does not count as time worked for the purpose of computing overtime. For more specific information, contact HRSOLVE at hrsolve@circlek.com or 1-888-HRSOLVE or your Market Manager/immediate Supervisor.

## MILITARY LEAVE

The Company complies with the Uniform Services Employment and Reemployment Rights Act (USERRA) and applicable state law pertaining to military leave. Employees who are required to fulfill military obligations in any branch of the Armed Forces of the United States or in state military service will be given the necessary time off and reinstated in accordance with applicable law. Accrued vacation may be used for this leave if the employee chooses. Military orders should be presented to Human Resources and arrangements for leave made as early as possible before departure. No attempt is made in this policy to cover all possible situations and circumstances that may arise in connection with the military service of an employee. Therefore, as military leave situations arise, employees should contact the Benefits Department at 877-324-7968 option 7 for complete details regarding their military leave rights.

Employees do not accrue vacation or sick days while on a military leave of absence status.

## BEREAVEMENT LEAVE

In the case of a death in the immediate family, employees will be granted a maximum of three days with pay if scheduled to work, following the death for the emergency. "Immediate family" includes current spouse, domestic partner, children, father, mother, brothers, sisters, grandparents, and grandchildren. Immediate family also includes current in-laws and step-relatives for these same degrees.  Pay is based on normal scheduled hours per day and regular hourly rates. The Company may require appropriate documentation of the need for bereavement leave.

If you desire to take an extended bereavement leave of absence without pay in excess of 3 days, you must request it through your Market Manager/immediate supervisor. For more information, contact HRSOLVE at hrsolve@circlek.com or 1-888-HRSOLVE or your Market Manager/immediate Supervisor.

## HOLIDAY PAY

Circle K recognizes six paid holidays. Hourly employees who actually work the following holiday hours will be paid 1-1/2 times their normal hourly rate for holiday hours worked.

| | |
|---|---|
| Memorial Day | Thanksgiving Day |
| Independence Day (4th of July) | Christmas |
| Labor Day | New Year's |

Store Managers, MITs and QSR Supervisors will receive the above holidays off with pay provided their store is properly staffed to maintain excellent customer service.

## SICK DAYS / PERSONAL DAYS

Store Managers, QSR Supervisors, MITs are entitled to a maximum of seven (7) paid sick/personal days in a calendar year. New Store Managers, QSR Supervisors and MIT's will be eligible for one personal/sick day for every 45 days of active employment up to 7 total in the year. State and Local laws may allow for differing amounts of accruing of paid sick time and will take precedence. Once an employee resigns/is given a discharge notice, they are no longer eligible to use paid sick/personal days, unless required by law.

If an eligible employee must be absent, they must notify their Market Manager at least 7 days in advance if the absence is foreseeable.  If an absence is not foreseeable, they must notify their Market Manager at least 4 hours before the start of their workday, unless state laws dictates otherwise.

29

CircleK0000254

If an eligible employee uses more than 3 consecutive days for an illness, the employee may be required to furnish a return to work statement from his or her attending physician in order to return to work.

Sick/personal time is not intended to create additional or extended vacation time. Sick/personal days do not accumulate from year to year, unless required by local laws. Sick/personal day pay will not be paid in lieu of time off or upon ending of employment, unless state laws dictates otherwise.

## VACATION

Circle K recognizes the importance of vacation time in providing the opportunity for rest, recreation and personal activities and it provides annual paid vacations to eligible employees. See the benefits guide of vacation policy for details, which can be found on InnerCircle.

## PERFORMANCE EVALUATIONS / STEP LEVEL PAY INCREASES / PROMOTIONS / TRANSFERS

All store employees will have ongoing conversations with their supervisor to provide feedback on their skills, strengths and development/training needs and to ensure that there is a good understanding of our business objectives. The goal of these conversations is to ensure that employees' initial experience with the company is as positive as possible and to provide a comfortable, open forum to discuss any open issues and answer questions.

These performance conversations will take place at 30, 60, and 90 days as well as throughout each employee's employment.

Customer Service Representatives, QSR Customer Service Representatives and Assistant Store Managers will be eligible for increases in their base hourly rate of pay at the following intervals provided that they have successfully completed all of their required training:
1. 90 days after they are initially hired
2. At their 1 year anniversary
3. Every 900 hours worked thereafter, as close as possible to this threshold of hours being met.

Store Managers, QSR Supervisors, and all Non Store Employees Annual performance reviews for Store Managers and all Non-Store Employees will be conducted in June every year at which time employees will be eligible for an increase in compensation.

Circle K encourages promotions from within – supporting our Growing Together EVP. In order to be eligible to apply for an open position, you must be an employee in good standing and meet the requirements for the position you desire (employee's job performance and coaching and discipline history will be taken into consideration and could disqualify an employee from promotion). An interested employee must notify their immediate supervisor of their interest in an open position.

## OVERTIME

Occasionally, employees will be required to work overtime due to business demands. However, no hourly employee is authorized to work overtime without permission from their immediate supervisor.

All non-exempt employees (QSR Supervisors, QSR Leads, Assistant Managers, Store Managers, and Customer Service Employees) who work in excess of 40 hours per week will be paid at an overtime rate of one-and-one-half (1½) times their normal hourly rate for all time worked in excess of 40 hours, unless otherwise provided by state law. Some states have special overtime rules regarding the number of hours worked per day or the number of days worked in a row. Contact your Human Resources Department for your Division if you have questions regarding the rules for your state. Jury duty, time on leave, sick/personal time, vacation time, and other paid time off will not count as hours worked for the purpose of calculating overtime. Only hours actually worked will be counted for overtime calculation purposes.

## PAY FOR TIME WORKED

Each hourly-paid employee must use the official time keeping system to record hours worked that is used to generate payroll checks. Therefore, it must be completed entirely and accurately.

All hourly employees must:

- Maintain an accurate record of all time worked through the approved timekeeping method.

30

CircleK0000255

- "Clock in" by entering their employee number on the cash register/back office computer at the precise moment they begin their workday and "clock out" by again entering their employee number on the cash register/back office computer at the precise moment they complete their job duties at the end of the work day.
- Notify the manager of their store immediately if there is a problem with their time record (e.g.: if the employee forgets to clock in or out, etc.).
- Any employee who forgets/is unable to clock in or out must leave a note regarding this issue for their store's manager as soon as possible.
- Record their clock-in and clock-out times on the Hours Log for every shift and sign the Log at the end of their scheduled workweek.
- Utilize the cash register Clock-in/Clock-out only for their own time record (it is not permissible for one Employee to clock in or out for another Employee or alter another Employee's time records).
- Unless otherwise provided by law, because of the nature of our business, paid breaks are taken as time permits on Circle K property. If a non-exempt (hourly) employee needs to leave Circle K property, the employee must (1) get advance approval for the specific break from the on-site manager; (2) clock-in and out for the break; (3) be on that approved break for at least 30 minutes; (4) not work or otherwise conduct any work-related business while on this break. Such extended breaks, which will be approved only on an occasional basis, will be UNPAID. Further, such breaks will not be approved for a lunch break or to extend a lunch break. Some states have special rules regarding meals and rest periods. Contact your Human Resources Department for your Division if you have questions regarding the rules for your state.

"Volunteer" time is not permissible - you must record all time worked. This includes any activities conducted on behalf of Circle K. No one is authorized to change this policy. If you have any information that this policy is not being followed, contact your Market Manager, immediate supervisor or Human Resources. Falsification of a time record is cause for disciplinary action up to and including termination of employment.

If, after reviewing their paycheck, an employee discovers they have been paid incorrectly (either overpaid or underpaid), they must contact the Payroll Department immediately. Failure to report an overpayment or incorrect payment is grounds for disciplinary action up to and including discharge.

## EMPLOYEE PURCHASES

All merchandise must be paid for at the established retail price, including sales tax, if applicable, at the time it is being purchased. There are to be no unauthorized employee discounts or IOUs of any kind. All merchandise including food and drinks must be paid for prior to consumption. All purchases made on current shift must be consumed on same day or taken home at the end of the shift. No purchases can be left in the store to be consumed on a later date.

Purchase of items to be used/consumed in the store:

When two employees are on duty, the co-worker MUST ring the employee's purchase prior to consumption. Two receipts must be printed; one attached to the product and one attached to the completed Consumption Log.

When only one employee is on duty, the employee must ring up their own purchase prior to consumption. Two receipts must be printed; one attached to the product and one attached to the completed Consumption Log.

All purchases made on a current shift must be consumed on the same day or taken home at the end of the shift. No purchases can be left in the store to be consumed on a later date.

Purchase of items to be used/consumed at home:

The "take home" purchases must be made after clocking-out and must be rung-up by the on-coming shift employee and handled as any other customer transaction. Items should be bagged and a receipt given to the purchaser.

When one employee is on duty and is working the last shift before the store is closing for the day, the purchase must be the last transaction on the journal tape. The receipt must be attached to the product or bag prior to leaving the store through a front door.

Purchase, sale, or gift of outdated or damaged merchandise:

Damaged or outdated merchandise may not be purchased, given to, or taken home by employees as Health Department laws prohibit this. Outdated, damaged, or spoiled merchandise must be accounted for and disposed of in a manner that renders it unusable or unfit for human consumption. The disposal should be recorded according to Company policy.

31

Purchase of lottery tickets and money orders by employees:

An employee is prohibited from purchasing or playing lottery/lotto games or purchasing money orders while on duty. These purchases can be made before or after the purchasing employee's shift while off duty and must be rung up by another employee except where prohibited by law.

Remember: Neither employee nor customers may order/purchase lottery tickets by telephone.

Purchase of refills on coffee, fountain and frozen beverage:

Circle K offers free refills for certain beverages ONLY to those employees in uniform while on duty – CONTACT YOUR STORE MANAGER FOR A LIST OF THESE APPROVED BEVERAGES. Two receipts must be printed; one attached to the product and one attached to the completed Consumption Log.

Free refills must be accounted for on the appropriate cash register key/PLU. Employees not clocked in to work are required to purchase drinks as any other customer does.

Rental of pre-recorded videos or video equipment:

Employees may rent videos or video equipment from their store, but only if they use their own rental card and rent the videos or equipment from another employee. The borrowing of videotapes or video equipment without paying for them is prohibited.

Any violation of this policy will be viewed as a mishandling of Company assets and may be grounds for disciplinary action up to and including immediate discharge.

## VISITOR AND VENDOR POLICY

Non-employees are only allowed on Company premises for the purpose of conducting business with the Company. All customers, vendors, friends, relatives and non-employee visitors who stay in the store longer than necessary to complete their business and make any purchases desired should be courteously advised of this policy and asked to leave. Employees who have completed their shifts and clocked out are not permitted to remain in work areas or otherwise disturb employees who are still on duty in the performance of their work. Similarly, employees may not enter or be in their work area earlier than 10 minutes prior to the start of their scheduled shift, and may not begin working until they have clocked in.

Under no circumstance may employees have friends or relatives come to work with them. Furthermore, employees may not have friends or relatives assist them in performing their job duties. Non-employees and off-duty employees are not permitted behind the counter at any time.

Vendors are important to our business. They must, however, remember that customers are our highest priority. Vendor check-ins should occur only when they do not inconvenience customers. Vendors are not permitted to be in the back stock areas unattended. Vendors are expected to be courteous to all of our employees and customers. Any failure by a vendor to treat Circle K's customers and employees in such a manner must be reported according to the Anti-Harassment Policy.

## REFERENCE CHECKS

Completing Reference Checks on Job Applicants

Store Managers will verify information listed on a job applicant's application. Misrepresentation or omission of facts on an application will be grounds for not hiring an applicant or will result in disciplinary action up to and including discharge.

Providing Reference Information on Present/Former Employees

All employment/income verifications must be sent through "The Work Number", a third party company Circle K works with to better serve the needs of those requesting verification of employment/income. The Work Number contact information: 1-800-367-5690, Employer Code – 11795 (Macs Division) or 10465 (Circle K). You may not respond to employment reference inquiries on your own.

32

Please keep in mind that there is no such thing as making a comment "off the record."

## SOLICITATION

Solicitations seeking contributions, payments, funds or for any other reason or distributions of printed matter are not permitted on Circle K's property at any time by persons not employed at Circle K. Solicitation by any Company employees of any other employees for any purpose (e.g., for money, goods or services or to contribute to, join, or support any endeavor or project) while either the employee(s) doing the soliciting or the employee(s) being solicited is on working time is prohibited. Distribution or circulation of literature and any printed material by employees is not permitted during working time or in working areas at any time.

Non-employees are prohibited from soliciting or distributing literature on Company property at any time.

"Working time" refers to that portion of any work day during which the employee soliciting, and/or the employee being solicited is supposed to be performing any job duties. It does not include unpaid periods of time, such as meal or break periods.

"Working areas" refers to any areas of Company property where work is performed.

"Company property" includes all buildings, facilities, premises, or any areas where the Company has exclusory interests.

## LOITERING

To ensure and uphold our high standard of customer service and to preserve safety and privacy, employees must refrain from receiving visitors while on duty. Quality customer service, safety, and the work environment are compromised by loitering customers, visitors, friends, relatives, and off-duty employees, and as such are not permitted. Furthermore, non-employees and off-duty employees are not permitted behind the counter at any time.

## SALE OF AGE RESTRICTED PRODUCTS

Circle K is deeply committed to enforcing the laws and Company policies that control the sale of age – restricted products (e.g. alcoholic beverages, cigarettes, tobacco products and adult magazines) to persons who are under legal age. Each employee has a responsibility to familiarize himself/herself with the state and local laws governing their store. Failure to comply with these policies may result in immediate discharge and prosecution under state and federal laws. See your Division policy for additional details.

## FOOD STAMP/SNAP EBT CARD PURCHASES

As a convenience to our customers, Circle K accepts Food Stamps/SNAP (Supplemental Nutrition Assistance Program) EBT Cards for some purchases at our authorized locations. Customers are able to use their SNAP EBT Cards as two different "Methods of Payment" (MOP): EBT FD ST or EBT CASH (Cash Benefits). Unlike cash, Food Stamps/ SNAP EBT Cards cannot be used to purchase all items that Circle K sells in our stores, including but not limited to warm food. Food Stamps/SNAP EBT Cards may never be redeemed for cash, even at face value. Sales made using the Food Stamp/SNAP EBT Card must be refunded to the SNAP EBT Card account. If you have any questions regarding what is or is not covered, contact your Store Manager or Market Manager. Employees violating these rules and Company requirements will be subject to disciplinary action up to and including discharge.

## ANTI-MONEY LAUNDERING COMPLIANCE (US PATRIOT ACT)

It is the policy of Circle K to follow all laws related to Money Laundering. Money Laundering is an attempt to conceal or disguise the nature, location, source, ownership or control of illegally obtained money. Money laundering occurs when someone places proceeds of illegal activity into the financial system including hiding the source or purpose of money gained from or intended for illegal purposes. Money laundering does not refer only to proceeds of illegal drug sales. It includes funds that result from virtually any type of criminal activity.

The Anti-Money Laundering Law (AML) directly relates to the sale of money orders and gift cards at our stores.

Gift Card Sales
- Circle K has a strict gift card purchase cut off of **$1,000** to one person in one day.

33

Money Order Sales
- Circle K has a strict money order purchase cut off of **$2,500**. This means that you cannot sell more than **$2,500** in money orders to one customer in one day. **Note**: Circle K **only** accepts cash for money order purchases.

Suspicious Activity

Suspicious activity involves transactions that appear to be unusual or do not have any legitimate purpose. The Suspicious Activity Report (SAR-MSB) must be filed whenever one or more transactions that add up to $2,000 or more are conducted or attempted at your store involving one of our products (money orders or gift cards) **AND** you know or suspect:

- The money comes from illegal activity or is intended to conceal illegal activity.
- The transaction is intended to evade a cash transaction reporting or recordkeeping law.
- The transaction makes no business sense or does not seem to be for legal purposes.

Reporting Suspicious Activity

The law requires Circle K to report any suspicious money order purchases or gift card purchase activity. If you sell a money order in the amount of **$2,000** or more to one person in one day or over a period of days that appears to be of suspicious nature you must fill out the "Suspicious Activity Report" (SAR-MSB) and contact your Store Manager or Market Manager within 24 hours. The SAR-MSB report must be completed **without** the customer's knowledge and should include details of the sale (e.g., customer's clothing, car, or other information that might be important).

**Note**: The SAR-MSB report and AML Log is located under your store register drawer.

Failure to comply with this company policy may result in disciplinary action up to and including discharge.

## CONFLICT OF INTEREST

To ensure Circle K is held in the highest regard and further promote the distinguished standards for which our employees are known, Circle K has put into place a formalized conflict of interest policy. This will help us act with integrity and objectivity in our business dealings and avoid participation in situations in which there are conflicts of interest. Employees are required to complete Circle K's CBT Code of Conduct Module. A "conflict of interest" does not include activities protected by the National Labor Relations Act and other laws.

## OUTSIDE EMPLOYMENT / MOONLIGHTING

Employees may pursue outside employment that does not interfere with their job at Circle K, create an actual or potential conflict of interest (e.g.: working for a rival convenience store as a member of management), or negatively affect the Company's interests or reputation. Exceptions must be approved by the Director of Operations.

If an employee accepts outside employment, employment with Circle K should remain the employee's primary responsibility. Outside employment is not an excuse for poor job performance, absenteeism, tardiness, or refusal to work overtime.

## TELEPHONE USE / PERSONAL TELEPHONE CALLS / CELL PHONES

All employees must practice good telephone etiquette when using the store phone. Identify the store where you are working in a pleasant and helpful voice. The Store Manager may approve a specific greeting for the store. Be courteous and professional. Answer incoming calls promptly. Personal telephone calls and use of electronic messaging devices (including text messaging) should occur only while on breaks or clocked-out. Tell your family and friends not to call or text you during working hours except in an emergency. If you have a customer in line, politely answer the phone and ask the caller to hold while you take care of the customer in line. Telephone lines should be kept open for business, so keep all calls as short as possible. Only business long distance calls are allowed (where service is available). When using a Company phone for business reasons, employees must avoid long distance charges whenever possible (e.g.: call an alternate toll-free number). Employees are not to accept collect calls from anyone except their supervisor. Supervisors must only place collect calls in emergency situations. No personal phone calls with a fee are allowed.

Employees are prohibited from using personal cell phones during work time. During work time cell phones should be turned off or have the ringer silenced. The use of wireless ear pieces is also prohibited. Under no circumstance is a personal cell phone call to be taken in the checkout area or on the sales floor whether customers are present or not. Only during a telephone outage and in an emergency are

34

CircleK0000259
Vol. II - 0304

personal cell phones allowed. Employees are prohibited from using Personal Music Players during work time. During work time Personal Music Players should be turned off. Under no circumstance is a Personal Music Player to be used in the checkout area or on the sales floor whether customers are present or not. Personal Headsets are also restricted during work time. Personal Music Players include but are not limited to: radios, tape players, CD players, iPods, MP3 players, cell phones, or similar devices.

**NOTE**: Never engage in a personal call or use electronic messaging devices while waiting on a customer.

## COMPANY PROPERTY

Care for Company Property

Employees are expected to exercise care in the use of Company property and to use such property only for authorized business purposes. Negligence in the care and use of Company property will be grounds for disciplinary action up to and including discharge.

Circle K's equipment and property, including files, store paperwork, and tools are provided for work purposes only and may not be removed from the premises without written authorization from the employee's supervisor. Unauthorized removal of Circle K's equipment and property will be treated as a mishandling of Company assets will result in disciplinary action up to and including discharge.

In the interest of preventing and investigating violations of the Company Property Policy, Circle K reserves the right to inspect the contents of computerized files, desks, storage cabinets, lockers and employee work areas at any time, and to use video surveillance as it deems necessary except where prohibited by law. There is no general or specific expectation of privacy in the workplace, either on Company premises or while on duty. Assume what you do while on duty or on Company premises is not private.

Return of Company Property

Circle K's property must be kept in good condition and returned to the Company upon the Company's request or upon the employee leaving the Company.

## PERSONNEL RECORD CHANGES

If, during the course of employment, changes occur in your personal information (e.g., name, home address, home/cell telephone number, marital status, status affecting your legal right to work in the United States, emergency contact, voluntary payroll deductions, number of dependents, beneficiary designee), please update your information via Workday immediately.

## NOTICE OF RESIGNATION

Circle K asks all employees who plan to resign from the Company to provide two weeks' written notice of this intent to their immediate supervisor.  However, Circle K may choose to accept the resignation immediately at its sole discretion.

Once an employee gives notice of their resignation, either verbal or written, they will no longer be eligible to use paid sick or personal time.

Any employee who terminates their employment, either voluntarily or involuntarily, forfeits any fringe benefits that are unused or unpaid, including, but not limited to, bonuses, sick days, and personal days (unless modified by state law or agreement, if any). All earned but unused vacation time will be paid at the employee's then current regular rate of pay.

## ELECTRONIC MEDIA POLICY

It is the policy of Couche-Tard, Inc, Mac's Convenience Stores Inc., Circle K Stores Inc., and Mac's Convenience Stores LLC (collectively referred to in the singular as "Circle K" or the Company") to operate on a philosophy that coworkers and others should be treated with respect at all times, including on all forms of electronic media. Electronic media includes, but is not limited to, social networking websites (e.g., Facebook, Twitter, LinkedIn, Instagram, Snapchat etc.), chat rooms, message boards, mailing lists, and web logs ("blogs").

This policy does not, in any manner, prohibit employees from discussing among themselves or others- wages, benefits, and other terms and conditions of employment or workplace matters of mutual concern that are protected by the National Labor Relations Act (NLRA).

Electronic media usage should be guarded and used appropriately. While we support our employees' use of electronic media as a vehicle

35

CircleK0000260

for social and business networking, employees are prohibited from expressing personal opinions that are maliciously false, which would adversely affect the Company and its management, employees, vendors, customers or members, either by name or by implication, using electronic media. Content placed on electronic media regarding the Company or its management, employees, vendors, customers or members must be free of any impression that the views expressed are anything more than personal opinion; in other words, such content must make clear that it does not represent the views of the Company. In addition, content placed on electronic media must not violate the Company's policies, which prohibit posting of confidential or non-confidential company information and or displaying pictures and or comments about coworkers, supervisors, or the Company that are discriminatory, violent, vulgar, obscene, threatening, intimidating, harassing, slanderous or similarly unlawful and/or violate the Company's Equal Employment Opportunity, Anti-Harassment, Confidential Information, Outside Employment, Workplace Violence, and Conduct Policies.

Examples of such conduct includes offensive posts meant to intentionally harm someone's reputation or posts that could contribute to a hostile work environment on the basis of race, color, gender, religion, sexual orientation, gender identity, age, national origin, disability, genetic information, veteran status or any other category protected by federal, state, or local law or Company policy. Employees must not post any information on or through electronic media that the Company considers to be confidential, including but not limited to trade secrets, proprietary information, and all other non-public information and data of or about the Company and its business. Trade secrets, proprietary information and non-public information and data about the Company includes information regarding the development of systems, processes, products or services, know-how, and technology. Moreover, employees' use of electronic media should not interfere with work commitments or performance.

Although not specifically prohibited, it is recommended that supervisors use caution when initiating online friendships ("friending") on social network sites with other employees who they supervise, as there may be times when a public post or comment could be misinterpreted as adversely affecting that subordinates terms and conditions of employment. The Company prohibits retaliation in any form whatsoever against any employee who declines or ignores a "friend", "connection" or "follow" request from a manager, supervisor or employee to whom they directly report.

Employees learning of electronic media that is inconsistent with the requirements of this Policy must immediately notify Human Resources. Violations of this electronic media policy may result in disciplinary action up to and including termination.

Confidential



# STORE EXPECTATION REVIEW
## "EXPECTATIONS OF EMPLOYEES"

Welcome to our Family. Starting a new job is an important event. We want you to feel at home and become part of our team. Our employees are crucial to the success of our operations. It is our goal to provide our employees a rewarding employment opportunity. For that reason, there are several policies and procedures that you will be asked to learn and agree to follow as a condition of your at-will employment with the Company. All employees are expected to understand their personal role in maintaining a safe working environment and profitable business. Constant application of safe practices and common sense by each employee is necessary. We believe all accidents are preventable. This is the cornerstone of our safety effort.

Listed below are some (but not all) things the Company wants you to know before beginning your employment. PLEASE READ EACH PARAGRAPH – you will acknowledge that you have had an opportunity to read and fully understand these policies and procedures and that you agree to follow them.

1.  The Company has standards to maintain a work environment that is free from hazards and unsafe working conditions in order to prevent injuries to its employees and others. I agree to comply with the safety and health standards that apply to my work duties and location. I understand that prevention of occupational illnesses and injuries is a responsibility that everyone must share. My safety, and that of my co-workers and customers, is of primary importance and my help in keeping our work areas safe and clean is an essential part of my job. I understand that while working my shift there will be a video and/or audio recording of some or all of the store's operations that will include my own activities while at work (except where prohibited by federal, state, or local law).

2.  For my safety, and that of others, I agree not to fight, confront, chase, or pursue persons committing crimes on store property and understand such behavior is extremely dangerous and could result in severe injury. I understand that robberies and related crimes are possible at my store and accept that risk. In addition, I understand that it is the Company policy that I will work INSIDE the store during late night hour unless there is a safety or other emergency that requires my attention.

3.  I understand I am required to immediately report all accidents, incidents, near misses, occupational injuries or illness, unsafe practices or conditions, and violations of workplace safety to my store's Manager, Market Manager, or immediate supervisor.

4.  I understand that I must follow all safety rules and procedures. Additionally, I understand that causing or failing to report an unsafe work condition is a violation of workplace safety.

5.  I understand that I am an "at-will" employee and agree that no employment contract (actual or implied) has been entered into between the Company and me. Employment with the Company is not a fixed term or definite period and may be discharged with or without reason or cause, at any time, with or without notice, by either myself or the Company.

6.  I understand no unauthorized persons, including members of my family, are allowed behind the sales counter or in the cashier area. I have been provided with the Company's Visitor and Vendor Policy.

7.  I acknowledge that certain confidential or proprietary information (as described in the Company's Confidentiality Policy and otherwise) may come to my attention during the course of my employment with the Company. I agree that I will not use any of this information for my direct or indirect personal gain or benefit or that of any third party, which conflicts with or injures the interest of the Company and/or its affiliates. The obligation will extend beyond the term of my employment with the Company. "Confidential" or "proprietary" information does not include information concerning employment terms or working conditions to the extent that communication of such or other information is protected by the National Labor Relations Act, and this policy does not prohibit me from reporting compliance concerns with governmental agencies or otherwise participating in governmental investigations or inquiries.

8.  It is important for my safety and that of others that NO weapons (even those who possess a license to carry a concealed weapon) or dangerous objects are brought into the work area at any time unless federal, state, or local law explicitly permits otherwise. Bringing in such a weapon could result in disciplinary action up to and including immediate discharge.

9.  I understand that I am expected to report any inappropriate, suspicious or unethical behavior to a member of management. This obligation is not intended to include reports of concerted activity as defined by the National Labor Relations Act. If I have a problem or learn that a violation of company policies or law has occurred, I must contact my supervisor and/or the Human Resources Department.

37

CircleK0000262
Vol. II - 0307

10. It is important that we treat one another with mutual respect and welcome cultural diversity and physical differences. I understand that threatening, intimidating, harassing or coercing any employee or supervisor, profane, abusive, vulgar or insulting remarks to or about another employee are unacceptable behavior and may result in disciplinary action up to and including discharge consistent with the Company's Anti-Harassment Policy. I understand the company has a clear EEO policy that confirms its commitment to provide a workplace free of inappropriate treatment of an Employee because of race, color, sex, sexual orientation, gender identity, transgender status, pregnancy, religion, age, national origin, citizenship status, disability, military status, genetic information, and any other category protected under federal, state, or local law. I understand that I must make known any violations using the Company reporting procedure. The Company has a no retaliation policy to protect individuals who report possible EEO violations.

11. I understand the Company has an Anti-Harassment Policy, including sexual harassment. No form of harassment will be tolerated, and any form of threatening, intimidating, harassing, or coercing behavior toward any employee or supervisor, or profane, abusive, vulgar or insulting remarks to or about another employee are unacceptable and may result in disciplinary action up to and including discharge consistent with these policies. I understand that I must make known any violations using the Company reporting procedure. I further understand that I am encouraged to contact management any time my working conditions become so unpleasant or intolerable that I believe my only alternative is to resign from my position. I understand that the Company wants to know about any complaints or concerns that I or others may have. These issues may be brought to the attention of my immediate supervisor, the Human Resources Director, or any other member of management.

12. The "Open Door Policy/Issue Resolution Procedure" is the Company's way to allow employees to have their complaints heard and investigated thoroughly and, to the greatest extent possible, confidentially, without fear or risk of retaliation. To reach this goal in bringing problems "out in the open" and to reach a fair solution as quickly as possible, I agree to: Discuss the problem with my immediate supervisor first. If the problem continues to exist or my supervisor is the cause of my concern, I will contact the next level supervisor to assist in bringing about a resolution. The Market Manager, Regional Director of Operations, or Human Resources Director or Manager may investigate the matter.

13. I understand that after following the Company's "Open Door Policy/Issue Resolution Procedures," if I believe I still have an unresolved work-related issue and such work-related issue is a covered claim under an applicable arbitration agreement, policy, and/or program, I will proceed in accordance with the applicable arbitration agreement, policy, and/or program and resolve the covered claim through binding arbitration. An agreement, policy, and/or program to arbitrate does not affect or limit an Associate's right to file an administrative charge with or to seek other relief from local, state or federal agencies such as the National Labor Relations Board or the Equal Employment Opportunity Commission.

14. I understand the Company will provide reasonable accommodations to qualified individuals with disabilities, unless doing so would pose an undue hardship. I understand the Company also will accommodate an employee's sincerely held religious beliefs of which it is aware when such religious beliefs conflict with the Company's policies, practices, or procedures, unless doing so would pose an undue hardship. If I need accommodation, I will contact Human Resources.

15. There may be instances when I am asked to assist in an investigation that is being conducted on behalf of the Company. As an employee, I agree I will fully cooperate and provide whatever facts I know regarding the investigation. This does not prohibit behavior, actions, or disclosures protected under the National Labor Relations Act or other applicable laws.

16. As a Company employee and a person who handles the store's cash and inventory, I am expected to be careful and accurate with both while on duty. If I do not follow cash handling and inventory policies and procedures I will be disciplined up to and including discharge.

17. Borrowing money from company funds, embezzlement, IOU's or personal checks with non-sufficient funds is cause for disciplinary action up to and including immediate discharge.

18. There may be times when I am asked to provide personal information about a current or former employee (e.g., home address, phone, or work schedule). I understand that such confidential information cannot be given by me. Instead I will tell the person asking for the information that he or she must contact Human Resources. This requirement is governed by the Company's Confidentiality Policy.

Likewise, if someone from the media calls or visits my area, I will tell him/her I cannot provide answers on behalf of the Company and I will obtain their information and provide to Market Manager. If I receive legal documents (such as from a government agency or court) at the store, I agree to contact my supervisor immediately or the Human Resources Department.

38

If there is a request from an outside agency, investigator, or any person for documents of any kind, you must notify your Market Manager and/or Regional Director of Operations immediately. This policy does not prevent disclosures or conduct protected by the National Labor Relations Act or prohibit me from reporting compliance concerns with governmental agencies or otherwise participating in governmental investigations or inquiries.

19. To project a positive image to our customers, I am expected to follow basic rules of good grooming and personal cleanliness. My personal clothing can be comfortable, but should be the type that shows I am a professional businessperson. I will be provided with a shirt and a nametag that I agree to wear at all times while on duty. Also, my appearance is improved 100% by smiling. Being courteous, friendly and attentive to our customers is an important part of my job. A positive attitude is essential.

20. I agree to follow the Company's established dress code.

21. So long as it is not inconsistent with local, state and federal law, I understand smoking, including the use of electronic cigarettes, is permitted in designated areas only.

22. Company policy prohibits employees from being at work under the influence of alcohol or unauthorized, prohibited, illegal or controlled substances, and from having certain detectable levels of such substances present in their system. I acknowledge that company policy also provides that employees may not consume, use, manufacture, dispense, possess, distribute, promote, purchase, sell, transport, conceal, transfer or store such substances and/or substance-related paraphernalia. I understand and agree that the Company reserves the right to require that I submit to a drug/alcohol test upon request except where prohibited by law.

    22a. I acknowledge that I may be required to submit to a post-accident drug test should I be injured while performing job duties or if I contribute to a work-related accident or injury except where prohibited by law.

    22b. I acknowledge that failure to cooperate in the screening or testing process, as well as tampering with my urine and/or blood sample, may result in disciplinary action up to and including immediate discharge.

23. I acknowledge that gambling, including but not limited to, playing Lottery/Lotto or "scratch off" tickets while on duty or on Company property is strictly prohibited.

24. To keep our stores properly staffed and running smoothly, the Company expects me to arrive to work as scheduled and on time. It is my responsibility to contact my immediate supervisor on occasions when I expect to be late or absent. Poor attendance and chronic tardiness disrupt the efficiency of the store. I understand that regular attendance is an essential function of my job, and that failure to report to work on a timely basis may result in disciplinary action up to and including discharge.

    Except when on leave or other period of pre-approved absence, if I do not report to work or personally contact my immediate supervisor for more than 3 days (72hrs), I will be considered to have abandoned my employment with the Company.

25. All computer and telephone systems (e-mail, Internet, Voice-Mail, fax machines, computer files or other information storage systems, etc.) are the Company's property and are intended for the Company business use. I understand that I should not expect privacy or ownership with regard to any Company equipment/systems and that information on these systems may be monitored, recorded, and retrieved by authorized management, with or without my knowledge, consent or advance notification.

26. I agree not to solicit or sell items not related to the business of the Company while on the job. Further, I agree not to work for another company whose business competes with the interests of the Company unless I inform and receive prior approval from my supervisor.

27. The Federal Fair Labor Standards Act (FLSA) requires each hourly (non-exempt) employee to be paid for all hours he/she actually works. In addition, any non-exempt/hourly employees will be paid overtime for all hours worked in excess of forty (40) hours per week and as required by law. I must honestly and accurately record all time I worked and cannot record or change anyone else's time records. If I am a non-exempt/hourly employee and someone asks me to work and not record my time, I must not do so and must contact the Human Resources Department immediately.

28. Under certain circumstances, if I am convicted of a felony or misdemeanor during my employment with the Company, or in the event I failed to disclose an earlier conviction when hired, it may result in disciplinary action up to and including discharge. I agree that background verification can be updated at any time by the Company.

29. I may be eligible to take a Leave of Absence if certain situations arise. The Company complies with the Family and Medical Leave Act of 1993 (FMLA) and applicable state laws. There are documents that must be completed before a Leave of Absence will be granted.

39

CircleK0000264
Vol. II - 0309

It is my responsibility to notify the Company of my need to take a Leave of Absence and ask the local Benefits Department for the necessary forms should a Leave of Absence become necessary. It is also my responsibility to return the completed documents in a timely manner. Contact the Benefits Department at hrsolve@circlek.com or 888-HRSOLVE or find information in Workday

30.  I understand falsification of Company records and documents I provide the Company is grounds for disciplinary action up to and including discharge.

31.  I agree to become familiar with the policies and procedures within this Guidebook and other policies as applicable. The Company considers policies and procedures important to the efficient operations of its business. In the event a violation occurs, or poor performance exists, I understand that I may receive performance coaching that describes the problem and ways to correct or improve the behavior and/or disciplinary action up to and including discharge.

32.  I have been notified that I am required by law to allow any animal (such as dogs) into our stores if the customer tells me the animal is a service animal consistent with the Americans With Disabilities Act Title III (28 C.F.R. Part 36). I understand that:
- The animal does not have to have any specific vest or harness to be considered a service animal.
- Once the customer tells me the animal is a service animal (even if the animal appears to be a pet), I must allow the animal access.
- State health laws do not affect the customer's right to bring in his/her service animal.
- I cannot ask the customer what his/her disability is that requires the use of the service animal.
- The customer and his/her service animal may go into any area that the general public has access.
- If I have any questions regarding the service animal and/or the customer's conduct, I am to contact my immediate supervisor, Market Manager or Regional Director of Operations.
- Failure to allow service animals access in our store may result in disciplinary action up to and including discharge.

33.  I hereby confirm having been informed of and received the Code of Conduct and Ethics via Workday during my onboarding that applies to all Couche-Tard/Mac's/Circle K employees which is posted on the store's communication board located in the backroom of the premises.

34.  Merchandise purchased from a vendor must be charged on a charge ticket and not purchased for cash unless otherwise authorized. No free merchandise is to be requested or received from salespeople. No exchange of merchandise or bottles for saleable merchandise with vendors is permitted. A credit slip for returned merchandise must be received.

35.  Employees may not deviate from the established retail prices and/or may not purchase directly from vendors for themselves or customers.

36.  It is expected that the store will remain clean, stocked, and well faced at all times. In the absence of your store's manager, a list will be left for review by the employees and any assignment not completed must include a written explanation.

37.  Where required by law, employees handling food must notify their immediate supervisor whenever diagnosed by a healthcare provider as being ill with any disease that can be transmitted through food or person-to-person by casual contact. For a detailed copy of this policy, please contact your Store Manager or Human Resources

38.  I understand the Anti-Money Laundering Laws and that Circle K has a mandatory maximum of $2,500 per day per customer for money order purchases and $1,000 per day per customer for gift card purchases. All money orders must be purchased in person and with cash.

39.  I understand a Robbery may occur at any time and accept that risk. I understand I should stay calm and listen to the robber's instructions and will not fight, confront, pursue or chase the robber placing myself, other employees, or any customers in harm's way.

40.  I understand that all purchases must be paid for prior to consumption and 2 receipts must be attached to: 1 to the product and 1 to the completed Consumption Log. I am aware that giving unauthorized discounts, not fully charging for products, allowing products to be removed from the store without paying or taking money from a customer or employee without ringing it into the register is considered a direct violation of company policy and will result in disciplinary action up to and including discharge.

41.  I understand that no transactions of any type may be made over the phone even if I am given a Manager's, Market Manager's, or Director's name, including identifying themselves as Circle K's IT Department or any employee of Circle K, or told I will be charged a fine for not completing. The customer must be present in the store at the time of all transactions.

40

CircleK0000265

42. Circle K employees are prohibited from accepting tips, monetary or otherwise, from customers or using/accepting customer rewards. Employees may not accept any form of tip from a customer including but not limited to the following:

- Money
- Merchandise paid for by the customer
- Lottery tickets

If a customer offers an employee a tip, monetary or otherwise, the employee should tell the customer that they are not permitted to accept tips because our goal is to provide excellent service to all customers.

43. It is Circle K's policy to treat all guests with respect. A courteous smile and a pleasant attitude should be displayed to all guests and they should be served promptly and efficiently. Provide our guests with Circle K's GUEST Commitment. Unacceptable guest service will result in coaching and disciplinary action up to and including discharge.

44. I understand that I may not have or obtain a rewards card that is not registered in my name and that at no time can I harvest points or gain rewards from a customer's purchase. I also understand that I may only use my rewards card or tag during a legitimate sale made by and paid for by me. I am aware that violation of this policy/procedure may result in disciplinary action up to and including termination.

45. I understand that the above listed expectations are examples of conduct I agree to follow, and certain other behavior, inconsistent with these general guidelines, may result in disciplinary action up to and including discharge.

[End]

41

Confidential

# EXHIBIT 2 TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## 5-Minute Rule

# *Mary Ann Moreno v. Circle K Stores, Inc.* Case No. 1:22-cv-02327-NYW-STV

## Circle K Rocky Mountain Division
### 5-MINUTE RULE PROCEDURE

*All injuries, no matter how small, must be reported immediately to the Store Manager. In the event of a serious injury, robbery, fire, etc., call 9-1-1 and then the Store Manager.*

#### WHAT IS THE 5-MINUTE RULE?
The 5-MINUTE RULE is the recommended notification procedure for employees to report all emergency, safety and/or security incidents which occur at the store within 5–minutes of the situation. This procedure should be followed and adhered to by all employees.

#### Store Employees Should:
- Call and speak directly with the Store Manager to report all emergency, safety and/or security incidents within 5-MINUTES of the incident.
- If the call is automatically transferred to voicemail, you should leave a message and are advised to call back within 5-minutes to inform the Store Manager about the incident.
- In the event that you cannot reach a Store Manager, you should contact the Market Manager informing them of the specifics of the incident.
- If you are unable to contact the Market Manager within the recommended 5-minute timeframe, you should continue calling the next level of management listed below until a member of management has been notified.
  1. Store Manager
  2. Market Manager
  3. Backup Market Manager
  4. Regional Operations Director
  5. Division Vice President

Leaving a text or voice message is not a substitution for speaking directly with the appropriate member of management.

#### Store Managers Should:
- Follow the same logic described above and report the incident within 5-minutes to the Market Manager.
- In the event that you cannot reach the Market Manager you should contact the Regional Director of Operations informing them of the specifics of the incident.

#### IT IS IMPERATIVE THAT CONTACT IS MADE TO THE APPROPRIATE LEVEL OF MANAGEMENT WITHIN 5-MINUTES OF AN INCIDENT OCCURRING

#### EXAMPLES OF INCIDENTS (but not limited to) THAT SHOULD BE REPORTED UNDER THE 5-MINUTE RULE:

- Critical Injury
- Robbery and/or Assault
- Natural Disaster – Fire, Tornado, Hurricane, etc.
- Any Employee requiring medical treatment and/or transport
- Any Customer requiring medical treatment and/or transport
- Car Accident in the parking lot
- Gas spill more than 5 gallons

- State, City, or County inspection
- Property Damage to our Facility
- Loss of Power/Water
- Media on the premise
- Interruption in business
- Fuel spill flows into drain/soil/water
- Liquor/Cigarette Sting
- ANYTIME the Police and/or Fire Dept. are contacted for assistance





EXHIBIT 2
WIT: Moreno
DATE: 4-12-23
Carin Geist, RDR, CRR, CRC

Confidential

CircleK0000168

CircleK0000169

# EXHIBIT 3 TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## Confront & Chase Policy

# *Mary Ann Moreno v. Circle K Stores, Inc.* Case No. 1:22-cv-02327-NYW-STV

# *CONFRONT & CHASE POLICY*
## We want you to always have a safe and enjoyable working experience with Circle K and especially during any special events and holiday weekends.

### So please remember the
## "<u>Don't Chase or Confront Policy</u>"

**Do not confront follow, pursue, track, chase, fight or follow [inside and/or outside] any person[s] suspected of shoplifting products and/or cash from the site, beer runs or any other confrontational situation.**

If you observe theft at the site, wait until the person(s) leave the site and call the police immediately. Remember to try to obtain as much information about the person(s) as possible while maintaining a safe position behind the sales counter. Do not go outside after the person(s), if there is any reason you need to go outside for you are to wait at least 5 minutes and have called the police department and verbally spoke to the Store Manager or Market Manager.

At no time do you come from behind the counter, go to or out the doors to attempt to get additional information. If you can safely obtain information from where you are standing that will be sufficient. Stay where you are or go to a safer area in the back of the store. Do not approach the front doors or go out them. Call 9-1-1 immediately.

At no time do you stop, question or accuse a person(s) of theft.

At no time do you get into a verbal altercation with any customer and/or person(s) you suspect of theft. At no time are you to go outside after dark! Sun down to sun up!

### *<u>This policy is for your protection and for the safety of everyone</u>!*

If you have any questions or issues, please refer to the 5-Minute Rule of communication or your MM. **Never talk to the media** or answer any questions on the immediate situation or any others.
### <u>FAILURE TO FOLLOW THE "DON'T CHASE or CONFRONT POLICY" WILL RESULT IN IMMEDIATE TERMINATION</u>



EXHIBIT __3__
WIT: _Moreno_
DATE: _4-12-23_
Carin Geist, RDR, CRR, CRC



CircleK0000267

# EXHIBIT 4 TO
# DEFENDANT'S MOTION FOR
# SUMMARY JUDGMENT


# VIDEO-SURVEILLANCE FOOTAGE
# FROM OCTOBER 4, 2020
# (Register 1)


***Mary Ann Moreno v. Circle K Stores, Inc.***
## Case No. 1:22-cv-02327-NYW-STV

# EXHIBIT 5 TO
# DEFENDANT'S MOTION FOR
# SUMMARY JUDGMENT


# VIDEO-SURVEILLANCE FOOTAGE
# FROM OCTOBER 4, 2020
# (Behind Counter)


# *Mary Ann Moreno v. Circle K Stores, Inc.*
# Case No. 1:22-cv-02327-NYW-STV

# EXHIBIT 6 TO
# DEFENDANT'S MOTION FOR
# SUMMARY JUDGMENT

# VIDEO-SURVEILLANCE FOOTAGE
# FROM OCTOBER 4, 2020
# (Store View 1)

# *Mary Ann Moreno v. Circle K Stores, Inc.*
# Case No. 1:22-cv-02327-NYW-STV

# EXHIBIT 7 TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

# 9-1-1 AUDIO RECORDING FROM OCTOBER 4, 2020

# *Mary Ann Moreno v. Circle K Stores, Inc.* Case No. 1:22-cv-02327-NYW-STV

# EXHIBIT 8 TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## Rule 30(b)(6) Deposition Excerpts

# *Mary Ann Moreno v. Circle K Stores, Inc.* Case No. 1:22-cv-02327-NYW-STV

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-02327-NYW-STV

_____

DEPOSITION OF SUSIE FERNANDEZ as          June 20, 2023
30(b)(6) Representative of
CIRCLE K STORES, INC.

_____

MARY ANN MORENO,

          Plaintiff,

vs.

CIRCLE K STORES, INC.,

          Defendant.


_____


          The deposition of SUSIE FERNANDEZ, taken
before Leeann Stellor, a Registered Merit Reporter,
Certified Realtime Reporter, and a Notary Public in
and for the County of Summit and the State of
Colorado, at 2701 Lawrence Street, Suite 100,
Denver, Colorado, on Tuesday, June 20, 2023, at the
hour of 10:03 a.m.



Page 12

1   made the decision to terminate Mary Ann Moreno.

2        Q.    And just to clarify.  What is Mr. Holmes'

3   title?

4        A.    He's a regional operations director.

5        Q.    And what --

6        A.    Or regional director of operations.

7        Q.    What is his position in relation to

8   Mr. Aamoud?

9        A.    That's his -- at that time that was his

10  direct supervisor.

11       Q.    Mr. Holmes was Mr. Aamoud's supervisor?

12       A.    Yes.

13       Q.    In preparation for topic 1, did you talk

14  to anyone besides Mr. Aamoud and Mr. Holmes?

15       A.    I did not.

16       Q.    Did you speak with Amy Harvey?

17       A.    I did not.

18       Q.    On behalf of Circle K, can you tell me

19  who made the decision to terminate Ms. Moreno?

20       A.    It was a collaboration of Amy Harvey,

21  Craig Holmes, and Driss Aamoud.  Driss, of course,

22  reporting it, and them reviewing it, and them making

23  that decision.

24       Q.    Okay.  And what was the role of each of

25  these persons?



Page 20

1   victims' rights statutes."

2                And I have a document here that's

3   been previously marked as Exhibit 3.  Do you

4   recognize this document?

5        A.    Yes, ma'am.

6        Q.    And what is it?

7        A.    It's our Confront and Chase Policy.

8        Q.    Okay.  And what did you do to prepare for

9   topic 2, as the designee of Circle K?

10       A.    I asked some of the questions of -- to

11  try to find out through our legal team and through

12  our global team, Mark Novak, if we can find out when

13  the policy was developed.

14       Q.    Okay.

15       A.    Circle K is a company of acquisitions, so

16  lots of different people.

17       Q.    Okay.  Did you speak to anyone besides

18  Mark Novak in looking for answers to these

19  questions?

20       A.    No.  I did see a chain of e-mails where

21  he had other people on copy, but no.

22       Q.    Okay.  So all of the information you have

23  came from Mark Novak for topic 2; is that correct?

24       A.    Yes.

25       Q.    And remind me, what is his role?



Page 21

1        A.     He's an SVP.

2        Q.     Oh, right, a senior vice president of

3    human resources?

4        A.     Yes.

5        Q.     Okay.  Did you review any documents in

6    preparation for this topic?

7        A.     I reviewed the policy.

8        Q.     Is this the policy that was in place in

9    2020?

10       A.     Yes, ma'am.

11       Q.     Okay.  When was the Don't Chase and

12   Confront Policy developed?

13       A.     You know, Circle K's had many

14   acquisitions.  We know that it's been in place for

15   at least 20 years.

16       Q.     Okay.

17       A.     But -- so we don't have an exact.  You

18   know, it's kind of a standard in our -- in our

19   business, and so we don't know exactly when it was.

20   But it has been in place at Circle K for at least

21   20 years.

22       Q.     Okay.  And I'm hearing you say that there

23   were a number of acquisitions.  So does that mean

24   the policy may have come from a subsidiary that got

25   acquired, or what do you mean by that?



Page 22

1        A.    I think -- I've been a part of six
2   acquisitions, and we've all had very -- we've all
3   had this policy.
4        Q.    Okay.  But so as a designee of Circle K,
5   all you know is that it's been in place for at least
6   20 years?
7        A.    At least 20 years, and through various
8   leaderships.
9        Q.    Okay.  On behalf of Circle K, could you
10  please tell us why the Don't Chase and Confront
11  Policy was developed?
12       A.    Really for the safety of our employees
13  and our customers.  We want people to be cooperative
14  and be safe.
15       Q.    And how does this policy promote that?
16       A.    To be non-resistant.  Somebody, you know,
17  threatens -- you know, robs you, just be
18  cooperative.
19       Q.    Okay.  And is it Circle K's position that
20  being cooperative -- what is Circle K's position
21  about how being cooperative improves safety?
22                MR. CARROLL:  I object that this is
23  outside the scope of the noticed topics.
24                But please answer, if you can.
25       A.    Cooperating to get them out of the store



Page 99

```
 1                  MR. CARROLL:  Object to the form of
 2      the question.
 3           A.    Yes.
 4           Q.    We can move on now to topic 8.  We'll get
 5      into that issue about her time with Circle K versus
 6      other entities.
 7                       So topic 8 is, "Ms. Moreno's
 8      continuous service date of October 29th, 2004,
 9      including what continuous service date means."
10                       So what is Ms. Moreno's continuous
11      service date with Circle K?
12           A.    October 29, 2004.
13           Q.    So what does that mean?
14           A.    When Circle K bought the previous company
15      that her and I both worked for, they honored our
16      original hire date.  So like for benefits, you get a
17      certain amount of vacation for a certain amount of
18      years you worked.  So instead of losing that, they
19      honor that.
20           Q.    Okay.  So does that mean that the
21      original hire date reflected -- well, let me back
22      up.
23                       What was the company that Circle K
24      acquired?
25           A.    CST Brands.
```



Page 100

1    Q.    So does that mean that her hire date

2    reflected in CST systems reflected a hire date of

3    October 29th, 2004?

4    A.    Yes.

5    Q.    Okay.  So did she have to apply for her

6    job again?

7    A.    No.

8    Q.    Was there any sort of changes that

9    impacted her daily life as a CSR, besides maybe some

10   branding changes?

11            MR. CARROLL:  I'm going to object

12   that that's outside the scope of the noticed topics.

13            But please answer, if you can.

14   A.    When Circle K bought CST, we kind of ran

15   the business as it was.

16   Q.    Okay.

17   A.    For a time.  And then we changed medical

18   providers, so I guess that could be a change.

19   Q.    Okay.  So when Circle K bought the stores

20   Ms. Moreno was working in, did she just come on to

21   the Circle K system as a standing employee?

22   A.    Yes.

23   Q.    And so this continuous service date, does

24   that mean, for instance, her pay and all of her

25   seniority and all of that continued, despite the



# EXHIBIT 9 TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**Moreno Deposition Excerpts**

*Mary Ann Moreno v. Circle K Stores, Inc.*
## Case No. 1:22-cv-02327-NYW-STV

                IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-02327-NYW-STV
_____

DEPOSITION OF:  MARY ANN MORENO - April 12, 2023
_____

MARY ANN MORENO,

Plaintiff,

v.

CIRCLE K STORES, INC.,

Defendant.

_____

          PURSUANT TO NOTICE, the deposition of
MARY ANN MORENO was taken on behalf of the Defendant at
1900 16th Street, Suite 800, Denver, Colorado 80202, on
April 12, 2023, at 9:16 a.m., before Carin C. Geist,
Registered Diplomate Reporter and Notary Public within
Colorado.

Mary Ann Moreno
April 12, 2023

```
 1          A.   You know when you go to bed, your mind
 2   wanders?
 3          Q.   I do.  Okay.  Ms. Moreno, do you agree
 4   with me that Circle K has policies in place for the --
 5          A.   Yes.
 6          Q.   -- safety of its employees and customers?
 7          A.   Yes.
 8          Q.   Isn't it true that Circle K's policies
 9   prohibited their employees from confronting a robber?
10          A.   Yes.
11          Q.   And you were aware of that policy during
12   your employment, right?
13          A.   I was -- I never read it, per se, but I
14   always -- you know, it was fed into our brains.  You do
15   not chase a customer.  You do not stop them from
16   shoplifting, whatever.  So I knew all that.
17          Q.   And you knew that there could be
18   consequences for violating that policy, right?
19          A.   Yes.
20               MR. CARROLL:  I don't know about you,
21   Iris, I don't think that I've distributed exhibits at a
22   deposition for three years.
23               MS. HALPERN:  Oh, we've had a couple
24   in-person ones, so . . .
25               (Deposition Exhibit 1 was marked.)
```

1        Q.   (BY MR. CARROLL)  Ms. Moreno, the court

2    reporter has just handed you an exhibit or a document

3    that's been marked as Exhibit 1.  Please take all the

4    time you might need to look it over.  My question is if

5    you recognize this.

6        A.   I know one was given to me when I started

7    in 2004.  And I do remember reading a lot of it.  I

8    don't remember reading about cell phones on here.  It

9    has cell phones.  I don't think I even owned a cell

10   phone at that time.  Yeah, it looks okay.  I don't

11   remember every single one, but --

12       Q.   Okay.  But you were aware that during your

13   employment, Circle K had an Employee Guidebook, for

14   starters?

15       A.   Yes.

16       Q.   Yes.  Did you receive a copy of Circle K's

17   Employee Guidebook during your employment?

18       A.   Yes, I think I did.

19       Q.   Did you read it?

20       A.   I used to read it occasionally, yes.

21       Q.   Were you familiar with the information and

22   policies the Circle K Employee Guidebook provided?

23       A.   Yes.

24       Q.   During your employment with Circle K, were

25   you aware that certain serious policy violations might

Mary Ann Moreno
April 12, 2023

1    result in immediate termination?

2         A.    Such as?

3         Q.    Well, we'll get there.  My first question

4    is just a little bit more broad.  I'll ask it again.

5    Were you aware during your time working at Circle K

6    that at least some policy violations might be so

7    serious that immediate termination would result?

8              MS. HALPERN:   Object to form.

9         A.    Yes.

10        Q.    (BY MR. CARROLL)  So, in fact, I'll ask

11   you, to your knowledge, what are the types of policy

12   violations at Circle K that could result in immediate

13   termination?

14        A.    Discrimination, what -- what not to do

15   during a robbery or shoplifting.  Pretty much that.

16   Not follow customers out the door if they're

17   shoplifting or -- robberies.  I was never robbed there,

18   so -- or on 92nd, anyway.

19        Q.    I think from here on out, we can probably

20   focus on 94th and Sheridan.  I'll let you know if

21   I'm -- if there's something further back, but I

22   think --

23        A.    Yeah.  I was pretty familiar with the

24   policies; and to my knowledge, I always followed the

25   policies.

Mary Ann Moreno
April 12, 2023

1          Q.   What about the five-minute rule?  Were you

2    familiar with that?

3          A.   I have -- had heard about it.  What about

4    it?

5          Q.   Well, my first question is if you were

6    familiar with it.

7          A.   Yes.

8          Q.   What was the five-minute rule?

9          A.   I don't remember.

10          Q.   But it sounds familiar?

11          A.   Uh-huh.  That was years ago.  You can't

12    expect me to remember.

13          Q.   When we were talking about things that

14    might lead to immediate discharge, you talked about

15    what not to do during a robbery.  What's your

16    understanding of Circle K's policies about what not to

17    do during a robbery?

18          A.   Well, you didn't -- one thing they told

19    me -- well, which I always knew.  Like I said, I've

20    been a cashier for -- all my life, practically.  You

21    don't stare them in the face.  You do what they ask.

22    If they -- if it's the money, you give them whatever

23    they want.  You don't follow them out the door.

24          Q.   You don't resist, right?

25               MS. HALPERN:  Object to form.

Mary Ann Moreno
April 12, 2023

 1           A.   No, you don't.  You don't resist.  You do
 2    as they ask you.

 3           Q.   (BY MR. CARROLL)  You don't fight the
 4    robber, right?

 5           A.   No.

 6           Q.   You don't confront the robber, right?

 7           A.   No.

 8                MS. HALPERN:  Object to form.

 9           Q.   (BY MR. CARROLL)  You do not chase the
10    robber, right?

11           A.   No.  You would be crazy to.

12           Q.   You don't attempt to apprehend the robber,
13    right?

14           A.   No.

15           Q.   During the time that you were working at
16    the 94th and Sheridan location for Circle K, were you
17    familiar with Circle K's visitor and vendor policy?

18           A.    Well, you know, the vendors I knew pretty
19    well.  So I knew who the vendors were.  What was the
20    other one?

21           Q.   Visitors.  Let me ask it differently.  To
22    your knowledge --

23           A.   I mean, customers would come in and want
24    to talk to me, or they'd carry on conversations with
25    me.  I couldn't be rude, you know.  I mean, they were

Mary Ann Moreno
April 12, 2023

1   my regulars.  I had a lot of regular customers there

2   that would come in and just wanted to chitchat

3   sometimes, you know.  But if I was busy, they knew that

4   I had to take care of my customers.

5          Q.   Were you allowed to have visitors?

6          A.   Not that I know of.

7          Q.   Okay.

8          A.   I mean, they never said to me that I

9   wasn't allowed to have a visitor.

10         Q.   But --

11         A.   Like, for instance, if -- well, they

12  weren't visitors, they were customers, so . . .

13              (Deposition Exhibit 2 was marked.)

14         Q.   Ms. Moreno, I've handed you -- the court

15  reporter has handed you a document marked as Deposition

16  Exhibit 2.  Earlier I had asked you some questions

17  about the five-minute rule.  And you said it sounded

18  familiar, but you didn't recall it at the moment.  I'd

19  ask that you take just a moment to review -- or as much

20  time as you need, really, to review Exhibit 2.  Let me

21  know when you've had a chance to look it over, and then

22  I'll ask you some questions.

23         A.   I understand now what you mean by the

24  five-minute rule.  I do remember that.

25         Q.   Okay.  What was the five-minute rule?

Mary Ann Moreno
April 12, 2023

1       A.   If there was a robbery or an incident

2   or -- that I had -- well, first of all, I would call

3   management.  Then I would have to go in the back

4   computer and file a report or fill out a report.  But I

5   never had to do that.

6       Q.   Never?

7       A.   Not that I can recall.  Now, I know I was

8   supposed to contact the store manager.  I didn't know

9   that I had to contact the market manager, the backup --

10  if I couldn't get ahold of the manager maybe, yes.  I

11  would have to do that.  Leaving texts, voices, I never

12  had to do that.  I don't -- like I said, I don't think

13  I owned a cell phone at that time.  I knew that.  So

14  yeah, I recall that now.

15      Q.   Exhibit 1, I asked you some questions

16  about earlier, is the Circle K Employee Guidebook.  Did

17  CST Brands or Valero also have an employee handbook

18  like this during your employment?

19      A.   Well, I thought that was the one.  That

20  was the only one that I was given when I first started.

21  So at that time it must have been Valero.

22      Q.   Is it your testimony that the only time

23  that you ever received a copy of an employee handbook

24  was when you started in 2004?

25      A.   Yes.

Mary Ann Moreno
April 12, 2023

1          Q.   But there's -- it's also true that

2    throughout your employment at the convenience store, it

3    was -- I think you used the word fed to you not to

4    confront robbers, right?

5          A.   Well, I had read it in the handbook, okay,

6    when I started; but then after that, I didn't read it

7    over and over, what I was supposed to do, you know.  It

8    was just in your mind, you know.  And really, I think

9    only maybe one time I was asked, did I know what to do

10   in case of a robbery, you know, but that's all.

11         Q.   So you didn't read it over and over again

12   because you knew it, right?

13         A.   Right.

14         Q.   Throughout your employment at the

15   convenience store.

16         A.   The whole 16 years.

17         Q.   Okay.  Now, separate and apart from the

18   employee handbook or guidebook, isn't it true there was

19   a separate standalone Confront & Chase Policy?

20              MS. HALPERN:   Object to form.

21         A.   I don't --

22         Q.   (BY MR. CARROLL)  Does that sound familiar

23   to you?

24         A.   No.

25         Q.   If you saw a copy of a Confront & Chase

Mary Ann Moreno
April 12, 2023

```
 1    Policy, might that refresh your recollection as to

 2    whether you'd seen it?

 3              A.    Maybe.

 4                    (Deposition Exhibit 3 was marked.)

 5              Q.    Ms. Moreno, the court reporter has handed

 6    you Deposition Exhibit 3.  Like we did last time,

 7    please take a moment or as long as you'd like -- I keep

 8    saying that, as long as you'd like to look over

 9    Exhibit 3.  Let me know when you've had a chance to

10    review it, and then I'll ask you some questions.

11                    (Deponent reviewed the document.)

12              Q.    Have you had a chance to look over

13    Deposition Exhibit 3?

14              A.    Yes.

15              Q.    Does this refresh your recollection as to

16    whether Circle K had a separate Confront & Chase

17    Policy?

18                    MS. HALPERN:   Object to form.

19              A.    I never received one.

20              Q.    (BY MR. CARROLL)  Okay.  Have you --

21    sitting here today, have you read Deposition Exhibit 3,

22    the Confront & Chase Policy?

23              A.    Yes.

24              Q.    Do you agree with me that it accurately

25    reflects what Circle K's policy was?
```

Mary Ann Moreno
April 12, 2023

1              MS. HALPERN:  Object to form.

2         A.   Yes.

3         Q.   (BY MR. CARROLL)  Is there anything about

4   Deposition Exhibit 3 that you think is inaccurate?

5              MS. HALPERN:  Object to form.

6         A.   No.

7         Q.   (BY MR. CARROLL)  In other words, this is

8   consistent with what had been fed to you for those 16

9   years about what you're supposed to do in the event of

10  a robbery, right?

11        A.   Yes.

12        Q.   Ms. Moreno, I'd like to go back to 2019

13  for just a couple questions.  And so this is, you know,

14  approximately a year before your employment ended.  Is

15  it correct that you'd gotten a verbal warning because

16  you didn't plus-sell to a mystery shopper?

17             MS. HALPERN:  Object to form.

18        A.   Not that I can recall.

19        Q.   (BY MR. CARROLL)  Okay.  Do you know --

20  what does it --

21        A.   They never have -- in all the time that I

22  worked on 94th and Sheridan, I don't ever remember

23  getting a -- anything as far as something like that.  I

24  don't remember.  If I did, they never gave me a copy of

25  it or --

Mary Ann Moreno
April 12, 2023

```
 1          A.   Yes.  And my daughter was sitting there

 2   listening to it; and she finally said, well, Driss, you

 3   want her to admit that she did wrong.  And he said,

 4   Mary, call me back when you're alone, and hung up on

 5   me.  I never heard anything after that.

 6          Q.   How did you learn that you were no longer

 7   a Circle K employee?

 8          A.   Well, that same day.  No.  The next day I

 9   called him back.  I think it was the next day I called

10   him, and that's when he told me, we decided to

11   terminate you.

12          Q.   So when you say you never heard anything

13   again, in fact, you talked to him the next day?

14          A.   Yeah.  I had to have talked to him the

15   next day to know I had been fired.

16          Q.   Okay.  So we're definitely going to talk

17   about these conversations.  I hope we might start by

18   seeing if we can get a bit of a time line.  So October

19   4 was a Sunday.  Okay?  So it all happens on Sunday,

20   October 4.  You just testified that you called Love the

21   next morning, Monday, the 5th.  And then you called

22   Driss on Monday, the 5th.

23          A.   The same day.

24          Q.   Okay.  Was that conversation with Driss

25   the one on speakerphone with your daughter or --
```

Mary Ann Moreno
April 12, 2023

 1          A.   No.

 2          Q.   Not yet.  Okay.  So one conversation with

 3   Driss on Monday, the 5th.  When's the next time that

 4   you talked to him?

 5          A.   I think it was the day after.

 6          Q.   Okay.  And that would have been the

 7   conversation where your daughter was on speakerphone?

 8          A.   I think so.

 9          Q.   Tuesday, the 6th?

10          A.   I think so.

11          Q.   And the next day --

12          A.   Is when he terminated me.

13          Q.   Okay.

14          A.   Or was -- yeah.  It was all within, I

15   think, three days, four days that all this was going

16   on.

17          Q.   Okay.  Let me just kind of see if I can't

18   sketch out the rest of the time line here, and maybe

19   we'll take a break and get into some detail about

20   October 4th itself.

21          A.   I don't want to take a break.  I want to

22   get it over with.

23          Q.   I understand.  When did you first contact

24   a lawyer about your claims in this case?

25          A.   The lawyers?

Mary Ann Moreno
April 12, 2023

```
 1              MR. CARROLL:  Okay.  Well, I'd like to go
 2   ahead and take a short break, so let's go off the
 3   record.
 4              (Recess taken, 10:34 a.m. to 10:46 a.m.)
 5              MR. CARROLL:  Let's go back on the record.
 6         Q.  (BY MR. CARROLL)  Ms. Moreno, we're back
 7   from a short break.  Do you understand that you're
 8   still under oath?
 9         A.  Yes.
10         Q.  Okay.  So on October 4 of 2020, there was
11   a robbery at the 94th and Sheridan store while you were
12   working, right?
13         A.  Correct.
14         Q.  What shift were you working that day?
15         A.  The 2:00 to 10:00 shift.
16         Q.  P.M.?
17         A.  Yes.
18         Q.  Were you the only employee scheduled to
19   work during your shift?
20         A.  Yes.
21         Q.  We talked about this earlier, but just to
22   reset the stage, the individual who committed the
23   robbery was Tyler Wimmer, right?
24         A.  Yes.
25         Q.  Okay.  Before this night, had you ever met
```

Mary Ann Moreno
April 12, 2023

1          A.    Yes, I can see it, but I can't hear it.

2          Q.    I'll turn it up a little bit more.

3          A.    It's understanding it.  It's kind of

4     mumbled.

5          Q.    Oh, okay.  Got it.  But it's loud enough?

6          A.    Yes.

7          Q.    Here we go again.

8                (Exhibit 4 video clip played.)

9          Q.    All right, Ms. Moreno.  We have just

10    watched together, with audio, Exhibit 4, which is this

11    clip from the Register 1 camera.  Just a few questions

12    for you about it.  First of all, to confirm, is this

13    the first time here today that you've actually seen

14    this video footage?

15         A.    Yes.

16         Q.    Okay.  Does Exhibit 4, this clip that we

17    just watched, accurately show what happened during that

18    couple-minute stretch?

19                MS. HALPERN:  Object to form.

20         A.    I'm pretty sure, yes.

21         Q.    (BY MR. CARROLL)  Pretty sure.  Is there

22    something about that video clip that you think --

23         A.    No.

24         Q.    -- might be wrong?

25         A.    You know, when he walked in and laid the

Mary Ann Moreno
April 12, 2023

1          Q.   Okay.  Exhibit 5 here, the clip of the

2    Behind Counter camera, does that accurately depict the

3    events that it's showing?

4               MS. HALPERN:   Object to form.

5          A.   Yes.

6          Q.   (BY MR. CARROLL)  Okay.  And then the last

7    one here that I'd like to do along the same lines is

8    Deposition Exhibit 6, which is a video clip from the

9    Store View 1 camera from 6:54 and 57 seconds until 6:56

10   and 24 seconds.  Again, this is video only, no audio.

11   Here we go.

12              (Exhibit 6 video clip played.)

13         Q.   All right, Ms. Moreno.  We've finished

14   viewing Exhibit 6 here.  Same question.  Does this

15   accurately depict the events that it's showing?

16              MS. HALPERN:   Object to form.

17         A.   I'm sorry?

18         Q.   (BY MR. CARROLL)  Does this accurately

19   depict what it's showing?

20              MS. HALPERN:   Same objection.

21         A.   Yes, I guess.

22         Q.   (BY MR. CARROLL)  Okay.  So let me just

23   ask you a few questions about the robbery itself.  So

24   when Mr. Wimmer came into the store, he was holding

25   several things, right?

Mary Ann Moreno
April 12, 2023

1          A.    Two hunting knives.

2          Q.    As well as other things, right?

3          A.    Not that I noticed.

4          Q.    The only things he had with him were two

5    knives?

6          A.    Yes.   That's what I saw because he walked

7    in like this with them and threw them on the counter or

8    set them down on the counter.

9          Q.    So that --

10          A.    One was in its package, and the other one

11   was out of the package.   There was no package on them.

12          Q.    So your testimony is the only things he

13   had were two knives, one in the package and one

14   outside?

15          A.    Yes.

16          Q.    Okay.

17                MS. HALPERN:   Can I ask you a quick

18   question?   Are you going to ask questions about the

19   video footage?

20                MR. CARROLL:   I haven't decided.

21                MS. HALPERN:   Okay.   Could we take it

22   down, then, at least?

23                MR. CARROLL:   Sure.

24                MS. HALPERN:   It's just kind of confusing.

25   Go ahead.

Mary Ann Moreno
April 12, 2023

```
 1              MR. CARROLL:  Ta-da.
 2         Q.   (BY MR. CARROLL)  Ms. Moreno, shortly
 3    after Mr. Wimmer arrived in the store, he waited in
 4    line behind some other customers, right?
 5         A.   It was a customer with his daughter.
 6         Q.   Okay.  When he got to the front of the
 7    line, Mr. Wimmer asked for a pack of cigarettes, right?
 8         A.   Yes.
 9         Q.   After you retrieved them, he asked to have
10    them for free, right?
11         A.   Yes.
12         Q.   And you replied that you couldn't give
13    them for free, right?
14         A.   Well, his -- he asked for the pack of
15    cigarettes, and I said -- that's when I grabbed the
16    cigarettes, and I asked for his ID, and he couldn't --
17    he opened his wallet.  I didn't see anything when he
18    opened it.  And he said, well, you have to give them to
19    me.  The other girls give them to me.  Okay?  I said, I
20    can't do that.  I would lose my job.
21         Q.   And, eventually, he proceeds to move
22    behind the counter toward you, right?
23         A.   Well, he headed out -- he started towards
24    the north door, and I thought he was leaving.  And I
25    kind of relaxed, and then he started to come towards
```

Mary Ann Moreno
April 12, 2023

1    the south door; and since our fountain drinks are right

2    there, I assumed he was going to try to get a fountain

3    drink, when all of a sudden he's right there by me.  It

4    was like (indicating).

5          Q.   And you told him, don't come back here,

6    right?

7          A.   Correct.

8          Q.   Eventually, you pushed him away from you,

9    right?

10         A.   Yes, I did.

11         Q.   You also grabbed one of his arms, right?

12         A.   Yes, I did.

13         Q.   Did Mr. Wimmer actually take anything off

14    the shelf?

15         A.   To be honest, I'm not sure if he grabbed

16    something.  He might have.

17         Q.   Okay.  And then he left, right?

18         A.   Then he darted out the north door, yes.

19         Q.   Mr. Wimmer did not threaten you, did he?

20              MS. HALPERN:  Object to form.

21         A.   No.

22         Q.   (BY MR. CARROLL)  Do you -- do you have an

23    understanding of what the word "threaten" means?

24              MS. HALPERN:  Object to form.

25         A.   Yes.  I understand what it means.

Mary Ann Moreno
April 12, 2023

```
 1          Q.   (BY MR. CARROLL)  How -- and did
 2   Mr. Wimmer threaten you?
 3          A.   No.
 4          Q.   Did you ever consider running away from
 5   him?
 6          A.   Where could I run?  I was back in a
 7   corner.  Behind me was a window.
 8          Q.   So --
 9          A.   Or to the --
10          Q.   Is that no, you did not consider running
11   away?
12          A.   No, no.
13          Q.   Okay.  At some point you spoke to a 911
14   operator; is that right?
15          A.   I did.  I called -- I picked up the phone
16   and called the police.
17               MR. CARROLL:  Okay.  Let me switch back
18   here.  So for the record, Deposition Exhibit 7 is going
19   to be an audio file.  It's been produced and
20   Bates-labeled as Moreno 346.  I think it makes sense
21   for the entire document to be the exhibit.  Whoops.
22   But as counsel knows, this recording has two different
23   phone calls in a single file.
24               (Exhibit 7 was provided to the reporter
25   electronically after the conclusion of the deposition.)
```

Mary Ann Moreno
April 12, 2023

1              MR. CARROLL:  So for the record, what I'm

2    going to do is fast-forward or slide ahead to the

3    five-minute-and-ten-second mark, and we'll pick up

4    there.

5           Q.   (BY MR. CARROLL)  So, Ms. Moreno, this is

6    Deposition Exhibit 7.  It's an audio recording that

7    we're going to listen to here together.  I'm starting

8    at 5 minutes and 10 seconds.  Just so you know what

9    you're getting into, it looks like it lasts about 3

10   minutes and 38 seconds.  I'd like to listen to it

11   together and then ask you a couple questions, okay?

12          A.   Okay.

13               (Exhibit 7 audio recording was played.)

14          Q.   I'm going to pause real quickly here at

15   5:26.  Is this your voice we're hearing on the tape,

16   Ms. Moreno?

17          A.   Sounds like me.

18          Q.   Okay.  Let's continue.  Can you hear okay?

19          A.   Uh-huh.

20               (Exhibit 7 audio recording was played.)

21          Q.   All right, Ms. Moreno.  We just finished

22   listening to this audio file.  Is that an accurate

23   recording of your conversation with the 911 operator on

24   October 4, 2020?

25          A.   That I can recall, yes.

Mary Ann Moreno
April 12, 2023

1      Q.   When you were speaking with the 911

2    operator that night, were you telling the truth?

3      A.   Yes.

4      Q.   Okay.  So let's go maybe back in time a

5    little bit and back inside.  After Mr. Wimmer left the

6    store, what was the next thing that you did?

7      A.   I guess -- I think I went back in the

8    store, and in between customers, I'm guess -- guessing

9    because I don't really remember exactly; but I think

10   customers were coming in because they see a cop car and

11   they want to come in and find out what's going on.  So

12   I think I was waiting on customers as they were coming

13   in.

14             But one of the officers was a female

15   officer.  She stayed with me for a while, and they

16   tried to call the assistant, and the assistant didn't

17   respond.

18      Q.   Let me sort of jump in with a few

19   questions to clarify.  You said you went back in the

20   store.  Is that to say that you left the store?

21      A.   Well, I walked out when I was with the

22   police to see what direction he went.

23      Q.   I see.  You followed Mr. Wimmer out?

24             MS. HALPERN:  Object to form.

25      A.   No.  He was already gone for a while.

Mary Ann Moreno
April 12, 2023

```
 1          Q.   (BY MR. CARROLL)  But close --
 2          A.   I was on the phone with the police inside
 3    the store when he left.  He was gone already for, like,
 4    three, four, five minutes.
 5          Q.   Okay.  Well, I asked what was the next
 6    thing that you did, and you said you came back in.  So
 7    it sounds like -- and, again, we're starting at --
 8    we're back inside now after the robbery, and so
 9    Mr. Wimmer left.  And my question is, what did you do
10    next?
11          A.   I picked up the phone and called the
12    police.
13          Q.   Okay.  So the first thing you did was call
14    the police.  How long did it take them to arrive?
15          A.   It seemed to me like they were there
16    quick.  I don't know.  Three minutes, four minutes
17    maybe, five minutes.  I don't know.
18          Q.   And it was as you're on the phone with 911
19    that you walk outside?
20               MS. HALPERN:  Object to form.
21          A.   I was on the phone with the police when I
22    walked outside, because when they asked me what
23    direction he went, I said I didn't see which direction
24    he went, so I walked outside to see, and that's when
25    the customer -- one of my customers was standing out
```

Mary Ann Moreno
April 12, 2023

```
 1   there, and he said, I saw the whole thing.  He says, I
 2   called the police.  And he said he went north.
 3              Q.   (BY MR. CARROLL)  And you were on --
 4              A.   That's what the customer told me.
 5              Q.   And you were on the phone while the
 6   customer said that to you?
 7              A.   With the police, yes.
 8              Q.   So the first thing you did when Mr. Wimmer
 9   left was call the police, and we just listened to that
10   phone call, right?
11              A.   Right.
12              Q.   What happened next?
13              A.   Let's see.  I walked back in the store,
14   and I was -- I'm sure I was waiting on customers.  And
15   then -- oh, I walked back in the store, called Love.  I
16   think that's what I did.  I called her, and I said,
17   Love, I've just been robbed.  And she said, they take
18   any money?  And I said, no.  And she said, well, it
19   will take me 45 minutes to get there.  She said, call
20   the assistant.  I said, okay.
21              So I called -- why am -- I cannot remember
22   their names, and I worked with them for so long.
23   Amanda.  I called Amanda.  It went to a recording, but
24   I left a message.  Then I tried -- I think I tried
25   calling her a couple times -- again.  No response
```

Mary Ann Moreno
April 12, 2023

```
 1   again.  Then one of the officers -- they were already

 2   there.  One of the officers said, let me try to call

 3   her, and they tried to call her, and the same thing, no

 4   response.

 5         Q.   Call whom?  Amanda?

 6         A.   I'm sorry?

 7         Q.   The officers tried to call whom?  Amanda?

 8         A.   Amanda.

 9         Q.   Okay.  Please continue.

10         A.   Because Love told me to call Amanda.  And

11   that -- at that same time I was -- the officer was

12   asking me to fill out a report, and I was trying to

13   fill out the report and wait on customers and, you

14   know, back and forth.

15         Q.   Okay.  Let me ask you a few questions

16   about that sequence of events.  In your conversation on

17   the phone with Love Jorgensen, I understand it's your

18   testimony she said it would take her 45 minutes to get

19   there.

20         A.   Yes.

21         Q.   But she was on her way, right?

22         A.   I don't know.  She just said, it will take

23   me 45 minutes to get there.  Call Amanda.

24         Q.   Well, Love did come to the store, right?

25         A.   After I called Driss.
```

Mary Ann Moreno
April 12, 2023

1        Q.   We'll get our order of operations, but for

2  now I just want to be very clear.  Love did come to the

3  store, right?

4        A.   She did come to the store.

5        Q.   How long did that take?

6        A.   It was after 7:00.  I'm don't know exactly

7  what time, but Driss was already there.  Driss was in

8  the office when she walked in.

9        Q.   Okay.  What time did Driss arrive?

10       A.   Well, I was waiting on customers and

11  stuff.  I thought to myself, she's not showing up.  I

12  can't get ahold of Amanda, so the next person to call

13  is Driss.

14       Q.   Let me pause for just one second.  Did you

15  ever speak to Amanda, ever get ahold of her?

16       A.   No.

17       Q.   Okay.  We don't need to spend any more

18  time with that.  So you called Driss?

19       A.   So I called Driss, and I told Driss what

20  happened.  He said, I'll be there.  I mean, he was

21  there, like, within five minutes.  I don't know where

22  he was at but he was quick.  And he walked in, and he

23  said -- asked me what happened, and I was telling him

24  what happened, and he says, well, I'll go look at the

25  video.

Mary Ann Moreno
April 12, 2023

1  looking at the clock.  They were there a while, and I

2  was nervous and, you know, trying to fill out a report

3  and wait on customers at the same time and couldn't get

4  any response from my superiors.  I can't remember the

5  exact times.  I'm sorry.

6      Q.   Were the police still there when Driss

7  arrived?

8      A.   No.

9      Q.   The police had gone?

10     A.   Yes, they had left.

11          My coffee's cold.

12          MS. HALPERN:  Do you need a break to get

13  new coffee?

14          THE DEPONENT:  (Deponent shook her head.)

15     Q.   (BY MR. CARROLL)  So eventually or at some

16  point, Driss Aamoud arrives at the store, right?

17     A.   Yes.

18     Q.   And you said it was pretty quickly after

19  you'd called him?

20     A.   Yes.  I'm not sure if he said -- I

21  almost -- I'm kind of like remembering that he said,

22  I'm just around the corner or at another store or

23  something.  I -- something to that effect because he

24  was there quick.  I didn't even expect him that quick.

25     Q.   Tell me about your conversations with

Mary Ann Moreno
April 12, 2023

```
 1   said, Mary, call me when you're by yourself.
 2           Q.   Okay.  So was that the first time he
 3   became aware that there was someone else in the room
 4   with you during that conversation?
 5           A.   I think so.
 6           Q.   Okay.  How quickly did you call him back
 7   when he said, call me when you're alone?
 8           A.   I think I called him the next day.
 9           Q.   Next day, okay.
10           A.   And that's when he terminated me.
11           Q.   All right.  So it was after the
12   speakerphone conversation, you call him the next day,
13   and that's the conversation where you learn that you'd
14   been terminated from Circle K.
15           A.   Yes.
16           Q.   Tell me about that phone call.
17           A.   I called to ask him, am I going to be able
18   to return back to work?  Not those exact words, but to
19   that.  He said, we decided to terminate you, and hung
20   up.
21           Q.   He decided -- I mean, there must be more
22   to it than that, or is your testimony that he said --
23           A.   Because he kept asking -- I'm sorry.
24           Q.   Let's not talk over each other.  You're
25   not testifying that he said, we decided to terminate
```

Mary Ann Moreno
April 12, 2023

1    you, click.  I mean, surely there was more to it than

2    that, right?

3            A.   He didn't say anything after that.  I

4    remember him telling me that, and I said, okay.  What

5    could I do?  What could I say?

6            Q.   Was there anyone else on the line for that

7    phone call?

8            A.   No.

9            Q.   Did you ever speak with someone from

10   Circle K named Amy Harvey?

11           A.   Amy Harvey.  The reason I called Amy

12   Harvey at Circle K was to get my W-2 and reason for

13   being terminated.  She never returned my calls.  I

14   called two or three times, left messages, no response

15   from Amy.  I think that was her name.  Is she kind of

16   like the boss of the Circle K's or something?  That's

17   what I was told.

18           Q.   Well, as usual, unfortunately, I can't

19   answer those questions for you, as we sit here today.

20           A.   It was the corporate office.

21           Q.   Her name rings a bell to you, at least?

22           A.   Yeah.

23           Q.   Why were you looking for your W-2 and

24   reason for termination?

25           A.   Because I knew I was terminated.  I wanted

Mary Ann Moreno
April 12, 2023

1   my W-2, and I wanted an explanation as to why I was

2   terminated.

3           Q.    Okay.  But you never actually spoke to

4   her?

5           A.    Well, no.  I didn't even know she was in

6   town.  I thought I was calling somewhere in Texas

7   somewhere, Arizona someplace.

8           Q.    So let's just focus on this termination

9   conversation.  Your recollection is that you started

10  the phone call to Driss, right?  You called him?

11          A.    Yes.

12          Q.    And asked, you know, when am I returning

13  to work?  What's going on?  Something to that effect.

14          A.    (Deponent nodded head up and down.)

15          Q.    Yes?

16          A.    Yes.

17          Q.    And he said, we've decided to terminate

18  your employment?

19          A.    Yes.

20          Q.    And that essentially was the end of the

21  conversation?

22          A.    Yes.  He didn't say anything else after

23  that.

24          Q.    He didn't say anything else?  No?

25          A.    No.

Mary Ann Moreno
April 12, 2023

1          Q.    Okay.

2          A.    Not that I can recall.  I mean, you know,

3    there was so much going on at that time and, you

4    know -- but I'm pretty sure that he had nothing to say

5    after that.

6          Q.    Is that the last time you spoke to Driss

7    Aamoud?

8          A.    Yes.

9          Q.    Did you talk to anyone else at Circle K

10   about the termination of your employment?

11         A.    No.

12         Q.    Since your employment has been terminated,

13   other than these phone calls -- well, this phone call

14   with Driss, have you talked to any other Circle K

15   employees about anything?

16         A.    Not about my termination, no.

17         Q.    Have you talked to them about your

18   employment?

19         A.    No.

20         Q.    Have you talked to any Circle K employees

21   about the robbery?

22         A.    No.

23         Q.    Okay.

24         A.    I don't even go in that store.

25         Q.    Did Driss Aamoud ever tell you that you

Mary Ann Moreno
April 12, 2023

1  should not have called the police in response to the

2  robbery?

3          A.   No.

4          Q.   Did anybody ever tell you, you shouldn't

5  have called the police?

6          A.   No.  That's what you're supposed to do.

7          Q.   Did anyone ever tell you not to cooperate

8  with the police?

9          A.   No.

10          Q.   Did anyone ever tell you not to cooperate

11  with the criminal suit against Mr. Wimmer?

12          A.   I'm sorry, what?

13          Q.   Did anyone ever tell you not to cooperate

14  with the criminal case --

15          A.   No.

16          Q.   -- against Mr. Wimmer?  No?

17          A.   (Deponent shook head from side to side.)

18          Q.   I see you shaking your head, but it won't

19  come through.  Is that a no?

20          A.   No, I'm sorry.  I thought you heard me.

21          Q.   Did Driss Aamoud ever tell you that you

22  should not have reported the theft to him?

23          A.   No.

24          Q.   Ms. Moreno, do you consider the 94th and

25  Sheridan store to be in a relatively high-crime area?

Mary Ann Moreno
April 12, 2023

1          A.    Yes.

2          Q.    (BY MR. CARROLL)  Okay.  Now, it's your

3    position that that's not the real reason you were

4    fired; is that right?

5          A.    No.

6          Q.    Okay.  Well, so let's make sure we've got

7    this right.  So you said you don't think you violated

8    the policy, correct?

9          A.    No.

10         Q.    You don't think that.  But do you agree

11   with me that that was the reason you were fired?

12               MS. HALPERN:  Object to form.

13         A.    I don't really know.

14         Q.    (BY MR. CARROLL)  I can ask it a different

15   way.  Why do you think your employment ended?

16         A.    Why do I think I was --

17         Q.    Fired.

18         A.    -- fired?  Because I pushed --

19               MS. HALPERN:  Object to form.

20         A.    -- the assailant.

21         Q.    (BY MR. CARROLL)  Okay.  Do you think that

22   you were fired because you called the police?

23         A.    No.

24               MS. HALPERN:  Object to form.

25         Q.    (BY MR. CARROLL)  Do you have any evidence

Mary Ann Moreno
April 12, 2023

1    that you were fired because you called the police?

2                MS. HALPERN:   Object to form.

3         A.   No.

4         Q.   (BY MR. CARROLL)  Do you think that you

5    were fired because you were the victim of a crime?

6                MS. HALPERN:   Object to form.

7         A.   No.

8         Q.   (BY MR. CARROLL)  Do you have any evidence

9    that you were fired because you're the victim of a

10   crime?

11               MS. HALPERN:   Object to form.

12        A.   No.

13        Q.   (BY MR. CARROLL)  Do you believe that you

14   were fired for exercising your right to self-defense?

15               MS. HALPERN:   Object to form.

16        A.   I'm sorry, repeat that?

17        Q.   (BY MR. CARROLL)  Sure.  Do you believe

18   that you were terminated for exercising your right to

19   self-defense?

20        A.   Yes.

21        Q.   What makes you believe that?

22        A.   Because I don't think I violated the

23   rules.

24        Q.   Anything else?

25               MS. HALPERN:   Object to form.

Mary Ann Moreno
April 12, 2023

```
 1              A.    No.

 2              Q.    (BY MR. CARROLL)   Did anyone ever tell you

 3    that you were being terminated because you engaged in

 4    self-defense?

 5                    MS. HALPERN:   Object to form.

 6              A.    Yes.   I'm going to say yes to that

 7    question.

 8              Q.    (BY MR. CARROLL)   Who?

 9              A.    Driss.

10              Q.    What did he say?

11              A.    Do you know what you did, Mary?

12    Repeatedly and repeatedly and repeatedly, when I didn't

13    do anything wrong.   I was defending myself.   I had no

14    idea what this gentleman or this kid was going to do

15    when he came around.   Somebody comes at you, you're

16    going to react.

17              Q.    Did Driss Aamoud say to you, you are being

18    terminated for self-defense?

19              A.    He didn't say in those words, no.

20              Q.    Did he ever say the words "self-defense"?

21              A.    Not that I can recall, no.

22              Q.    In fact, if I recall your testimony

23    correctly, from your perspective, he never told you at

24    all why you were being terminated, right?

25              A.    No.
```

Mary Ann Moreno
April 12, 2023

1          Q.    Okay.  Do you believe that you were

2     terminated for reporting an act of criminal violence

3     against you?

4                MS. HALPERN:  Object to form.

5          A.    Repeat that again?

6          Q.    (BY MR. CARROLL)  Sure.  Do you believe

7     that you were terminated for reporting the act of

8     criminal violence against you?

9          A.    No.

10         Q.    Do you believe that you were terminated

11    for reporting the attack to the police?

12         A.    No.

13         Q.    Do you have any evidence that you were

14    terminated -- or let me start over.

15              Do you have any reason to believe that you

16    were terminated because you reported the robbery?

17               MS. HALPERN:  Object to form.

18         A.    No.

19         Q.    (BY MR. CARROLL)  Ms. Moreno, to your

20    knowledge, has Bonnie Moreno spoken with anybody at

21    Circle K -- well, let me lay some foundation for that,

22    first of all.  So Bonnie Moreno was in the store the

23    night of the robbery, right?

24         A.    She came in after my daughter called her,

25    yes.

Mary Ann Moreno
April 12, 2023

1        Q.   Were you referring to verbal threats?  Did

2  Mr. Wimmer verbally threaten you?

3        A.   Okay.  Say that again.

4        Q.   Did Mr. Wimmer verbally threaten you?

5        A.   No.

6        Q.   But did you feel threatened by him, by

7  Mr. Wimmer?

8        A.   Yes.

9        Q.   Okay.  And can you -- did a doctor ever

10  tell you that you'd been diagnosed with depression?

11        A.   No.

12        Q.   Could you describe kind of what -- do you

13  recall when Mr. Carroll was asking you about kind of

14  whether you'd been triggered after your termination

15  from Circle K?  Do you remember him asking you those

16  questions?

17        A.   Yes.

18        Q.   Could you describe kind of your emotions

19  after you were attacked and fired, in the weeks and

20  months afterwards?

21        A.   You know, to be honest with you, I wasn't

22  feeling -- sure, the robbery happened.  I was okay.  I

23  had my life.  But being fired from a job that you've

24  been on for 16 years and been -- I mean, I was there

25  anytime they called me, which was often.  I did my job.

Mary Ann Moreno
April 12, 2023

1    Errata Sheet

2       See attached typed changes included herewith.

3    NAME OF CASE: MARY ANN MORENO vs CIRCLE K STORES

4    DATE OF DEPOSITION: 04/12/2023

5    NAME OF WITNESS: Mary Ann Moreno

6    Reason Codes:

7        1. To clarify the record.

8        2. To conform to the facts.

9        3. To correct transcription errors.

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   Page _____ Line _____ Reason _____

23   From _____ to _____

24

25                    _Mary Ann Moreno_

Errata Sheet

Page 97          Line 2          Reason Clarification. I was confused by the question. If the word "revenge" means "retaliation" than the answer is "Yes," however if it means general animosity than the answer remains "No."

From No. to Yes.

Page 98          Line 17                    Reason Clarification. The question before states Olivia, it was Bonnie. The red handwriting is Bonnie's except the corrections I made in blue.

Page 99          Line 2-4                   Reason Clarification. The question before states Olivia, it was Bonnie. The red handwriting is Bonnie's except the corrections I made in blue.

Page 110          Line 7          Reason Correction. I was confused by the question. I do believe I was fired because I was a victim of a crime and acted in self-defense. They prosecuted my attacker.

From No. to Yes.

Page 110          Line 12                   Reason Correction. I was confused by the question. I do believe I was fired because I was a victim of a crime and acted in self-defense. They prosecuted my attacker.

From No. to Yes. The way I was fired and what they said to me.

Page 119          Line 7          Reason Clarification. I was not paralyzed by depression of fear, but I was worried.

From No. to No. But I was angry at Circle K for terminating me and treating me this way and I was very scared and worried about how I was going to make it without a job. I was scared I'd lose my house. I cried often, and my daughters tried to comfort me by promising me that they would make things work so I shouldn't worry and I would not lose my house. I also missed my customers, and I felt lost, because I'd been more or less working since 16. It was like my whole life suddenly changed. It felt empty. It is really important to me to work. I am still working at 75.

Page 119          Line 24                   Reason Clarification. I did not have an anxiety attack. I was originally concerned I'd see him in the stores around me, because he had a girlfriend and baby living not far from my house.

From No. to No. I did not suffer an anxiety attack. But initially, after I heard he had been released, I was worried I might bump into him in a store like the Walmart near us. I was worried because he has a girlfriend and baby living in the neighborhood. I was just worried that I might see him at a store, though I wasn't generally nervous just being in my home because I had a restraining order. And when I started working at Family Dollar, I also asked to be put in the cash-registers farther away from the door because I didn't like being so close to the door.

Page 120          Line 17                    Reason Clarification. See above explanation.

From <u>No.</u> to <u>I was not afraid to be out in public generally. But initially, after I heard he had been released, I was worried I might bump into him in a store like the Walmart near us. I double checked with the D.A. to make sure I still had the restraining order in place. I was just anxious and worried that I might see him at a store.</u>

# EXHIBIT 10 TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## Aamoud Deposition Excerpts

# *Mary Ann Moreno v. Circle K Stores, Inc.* Case No. 1:22-cv-02327-NYW-STV

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Case No. 1:22-cv-02327-NYW-STV

------------------------------------------------------------

MARY ANN MORENO,

Plaintiff,

v.

CIRCLE K STORES, INC.,

Defendant.

------------------------------------------------------------

DEPOSITION OF DRISS AAMOUD

May 18, 2023

------------------------------------------------------------

PURSUANT TO NOTICE, the above-entitled
deposition was taken on behalf of the Plaintiff at
2701 Lawrence Street, Denver, Colorado 80205, on
May 18, 2023, at 10:00 a.m., before Karen S. Fogle,
Registered Professional Reporter and Notary Public
within Colorado.

MAGNA LEGAL SERVICES

(866) 624-6221

magnals.com



Page 111

1    you?

2         A.  I don't remember.

3         Q.  The footage is now loaded.  This has been

4    previously marked as Exhibit 11 during Ms. Jorgensen's

5    deposition.  At 8:24:08 seconds I will start playing

6    the video.  And the sound is up as loud as it can go.

7    Some of the audio is hard to hear but we'll try to hear

8    what we can.

9              (Video playing.)

10        A.  This is after the incident?

11        Q.  Correct.  This is 8:24:48.  Do you

12   recognize who just walked in the store?

13        A.  Me.

14        Q.  I will play at 48 seconds.  And I will keep

15   playing for about a minute or two.

16             (Video playing.)

17        Q.  (BY MS. BUTLER)  Do you remember this

18   conversation you had with Ms. Moreno?

19        A.  I remember talking to her, yeah.

20        Q.  Do you remember what Ms. Moreno was saying

21   to you generally in this conversation?

22        A.  I don't remember exactly what she said.  I

23   asked her what happened again.  She is telling me her

24   side of what happened.

25             MS. BUTLER:  Off the record.



Page 113

1          Q.  I'm talking in generals here, not this

2    specific instance.

3          A.  No.

4          Q.  So if an employee said there was a robbery,

5    you would assume there was a robbery?

6          A.  Right.

7          Q.  If an employee said there was a knife,

8    would you typically assume that they were telling the

9    truth about that?

10         A.  Absolutely.

11         Q.  So after this conversation at 8:26 p.m.,

12   you go back to the office and watch the video.  And

13   then what do you do after you had finished reviewing

14   the video?

15            MR. HANKINS:   Object to form.

16         A.  One of the things I did was bring Love --

17   the manager -- by the time she got there and we're

18   looking at the video together.  And the other thing was

19   bring Mary back and show her the video and she said, "I

20   know.  I screwed up.  I wasn't supposed to do that."

21   That I remember.

22         Q.  (BY MS. BUTLER)  Let's break that down a

23   little bit.  I'm going to fast forward the video now to

24   8:37 p.m.  By this point have you finished reviewing

25   the footage?



Page 117

1    what happened if you knew there was a knife?

2         A.   No.

3         Q.   Why not?

4         A.   It would have made it worse.

5         Q.   What do you mean by that?

6         A.   It would have made it worse because you're

7    putting yourself with a person with a knife and you're

8    still confronting him.  So that's even worse.

9         Q.   At this point had you determined in your

10   own mind that Ms. Moreno violated the don't chase or

11   confront policy?

12            MR. HANKINS:  Object to form.

13        A.   I'm not sure.

14        Q.   (BY MS. BUTLER)  Do you remember when you

15   first made your own internal decision in your mind that

16   she violated the policy?

17        A.   Probably after reviewing more video.

18        Q.   Was it that same night?

19        A.   I don't remember.

20        Q.   So after you have this conversation around

21   8:40 with Ms. Moreno and her daughter-in-law.  It

22   sounded like you said you reviewed the video a second

23   time.  You went to the office to do that; is that

24   correct?

25        A.   Probably from my laptop the next day.



Page 121

1          A.  I can't hear anything.

2          Q.  (BY MS. BUTLER)  I'm pausing the video now

3     at 8:56:29.  After you and Ms. Moreno return to the

4     cash register after reviewing the footage, did

5     Ms. Moreno leave the store?

6          A.  Yes.

7          Q.  Did you have a conversation with

8     Ms. Jorgensen after Ms. Moreno left?

9          A.  I probably did.

10         Q.  Do you remember any of that conversation?

11         A.  No.

12         Q.  Do you remember if you discussed the

13    robbery or something different?

14         A.  I don't know.  I know I talked -- she was

15    telling me -- I think I told her I don't have any shoes

16    on and I showed her --

17         Q.  So now that we have sort of gone through

18    the whole time period you were at the store, I want to

19    make sure we have gone through every conversation you

20    had at that point.  We talked about the ones we saw on

21    camera.  You got there and you spoke with Ms. Moreno --

22    correct -- and then you went to go view the footage; is

23    that right?

24         A.  Right.

25         Q.  You came back to the cash register and



Page 123

1    called Mr. Holmes but you're not quite sure?

2              A.  I'm thinking I did to leave him a follow-up.

3              Q.  Are there any other conversations you had

4    that night about the robbery?

5              A.  I'm not sure.  I don't think so.

6              Q.  Did you talk to anyone in HR or

7    corporate -- we could say -- apart from Mr. Holmes?

8              A.  I don't remember.

9              Q.  Did you at any point relieve Ms. Moreno

10   from the cash register?

11             A.  Yes.  That is normal procedure after a

12   robbery.  We don't want the employee to continue

13   working for that day.  I asked Love to find who was

14   going to cover the rest of the shift.

15             Q.  Would you accept my representation that the

16   robbery happened at 6:56 p.m.?

17             MR. HANKINS:  Object to form.

18             A.  After I reviewed the video, yes.

19             Q.  (BY MS. BUTLER)  By the time Ms. Jorgensen

20   got there about how much later do you think that was?

21             A.  I don't remember.

22             Q.  It's safe to say that between the robbery

23   and when Ms. Jorgensen arrived Ms. Moreno still had to

24   attend the cash register; is that right?

25             A.  She didn't have to.



Page 131

1  sure if you're talking about how a termination

2  typically happens or how Ms. Moreno's happened.  I want

3  to really focus on for Ms. Moreno's termination -- this

4  period of time after October 4 -- what were those

5  conversations you had?  Did you speak to Mr. Holmes?

6          A.  Yes, I had.

7          Q.  Do you remember when you spoke to

8  Mr. Holmes?

9          A.  No.

10          Q.  What did you talk to Mr. Holmes about?

11          A.  About the incident and what I think of the

12  incident.

13          Q.  What did you tell him?

14          A.  There is a clear violation of our don't

15  chase or confront policy.  And then he said -- if I

16  remember -- he said he will get back to me after

17  discussing it with HR.

18          Q.  At that point did Mr. Holmes review the

19  video himself?

20          A.  I don't know.

21          Q.  At that point do you know if HR ever

22  reviewed the video himself?

23          A.  I don't know.

24          Q.  Did you have any communication with HR?

25          A.  I don't remember.



Page 133

1    phone call?

2           A.  I don't think so.

3           Q.  Did Mr. Holmes tell you that he had spoken

4    with Ms. Harvey?

5           A.  I don't remember.

6           Q.  What did Mr. Holmes tell you?

7           A.  That we need to proceed with termination.

8           Q.  At that point had Mr. Holmes reviewed the

9    video?

10          A.  I don't know.

11          Q.  Did he say that he had spoken to Ms. Harvey?

12          A.  I don't know.

13          Q.  So at some point you recommended to

14   Mr. Holmes to terminate Ms. Moreno; is that correct?

15              MR. HANKINS:   Object to form.

16          A.  I think so.

17          Q.  (BY MS. BUTLER)  And once Mr. Holmes and

18   Ms. Harvey agreed with you, then the termination was

19   okay; is that right?

20              MR. HANKINS:  Object to form.

21          A.  I'm sorry.  Can you repeat?

22          Q.  (BY MS. BUTLER)  When did the termination

23   get finalized?

24          A.  What do you mean by finalized?

25          Q.  Let me rephrase.  You made a



Page 136

1   incident.  We have all the conversations we talked

2   about on October 4.  You talked to Ms. Moreno at some

3   point to tell her not to report for work.  You talked

4   to Mr. Holmes at some point about the termination and

5   he approved the termination.  And then you told

6   Ms. Moreno that she was terminated.  Are there any

7   other conversations that took place about the

8   termination or the robbery that we haven't covered?

9               MR. HANKINS:  Object to form.

10              A.  I don't remember.

11              Q.  (BY MS. BUTLER)  Take your time.  Please

12   think about it.  Any other conversations?

13              A.  I don't remember.  I really don't.

14              (Deposition Exhibit 14 was marked.)

15              Q.  I have a document here.  This will be

16   Exhibit 14.  Do you see at the bottom right where it

17   says Circle K 000158?

18              A.  First page?  Yes.

19              Q.  The next page says 159?

20              A.  Yes.

21              Q.  Do you recognize this document?

22              A.  Yes.

23              Q.  What is it?

24              A.  Termination.

25              Q.  Is this what your Workday software



Page 137

1    generates when an employee is terminated?

2            A.  Yes.

3            Q.  I'd like a little bit of help understanding

4    some of these dates on it.  If you see on the first

5    page, the very first entry is termination, and it says

6    "Status, step, completed on 10/8/2020."  And the person

7    is Love Jorgensen.  Do you see that?

8            A.  Yes.

9            Q.  If you go further up the page, it says

10   "Termination date."  Under termination date it says

11   "10/5/2020."  Do you know why there would be a

12   difference between those two dates?

13           A.  With the termination date and what's the

14   other date?

15           Q.  The very first line of the termination

16   matrix -- for lack of a better word -- it says

17   completed on October 8, 2020.  Do you know what would

18   account for the difference between those two dates?

19           A.  Again, this is what I think is sometimes we

20   tell the employees don't report to work until we get

21   back to you so it gives us time to investigate and all

22   that.  If that investigation leads to nontermination,

23   we'll go back and pay the employee for that time that

24   they were off.  We will pay them for that.  In this

25   case we proceeded with the termination at a later date



Page 139

1          A.   That's when we submitted the paperwork.

2          Q.   Do you remember -- did you tell Ms. Moreno

3   she was fired on the 5th or the 8th?

4          A.   I think before the 8th I told her.  I don't

5   remember.  It was after the 5th but not on the 8th.

6   Before that.

7          Q.   The 8th is the day the paperwork got

8   finalized?

9          A.   Yes.

10          Q.   Do you see a column that says comment?

11          A.   Yes.

12          Q.   It says "Driss Aamoud: Employee was

13   engaging and pulling a burglar from his back, putting

14   her safety at risk.  It is a violation of the company

15   policy."

16          A.   Correct.

17          Q.   Is that an accurate representation of why

18   you recommended her termination?

19          A.   Yes.

20          Q.   Is this what you told your supervisors?

21          A.   Yes.  Along with other things.

22          Q.   Is this -- do you believe this is why

23   Ms. Moreno was terminated?

24          A.   Correct.

25          Q.   What are these other things that you told



# EXHIBIT 11 TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## Holmes Deposition Excerpts

## *Mary Ann Moreno v. Circle K Stores, Inc.* Case No. 1:22-cv-02327-NYW-STV

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-02327-NYW-STV

_____

MARY ANN MORENO,

              Plaintiff,

     v.

CIRCLE K STORES, INC.,

              Defendant.

_____


        Pursuant to Notice and pursuant to Rule 30 of the Federal Rules of Civil Procedure, the deposition of CRAIG HOLMES, was taken on behalf of the Plaintiff by counsel from the offices Rathod Mohamedbhai of at 10:00 a.m. MST on June 22, 2023 and reported by Ruth Collins of MAGNA LEGAL SERVICES (866) 624-6221.



Vol. II - 0383

Page 7

1       Q.   Okay.  Anything else that you reviewed?

2       A.   No.

3       Q.   When did you meet with the attorneys?

4       A.   Yesterday.

5       Q.   For how long?

6       A.   Approximately two hours.

7       Q.   Okay.  And let me just ask you a little bit

8   about your kind of work history and education levels.

9   What's your highest level of education?

10      A.   I have some college.

11      Q.   Where did you go to college?

12      A.   Texas Tech.

13      Q.   What were you taking course work on?

14      A.   History.

15      Q.   And am I to understand that you didn't

16  complete your degree?

17      A.   No.

18      Q.   Where do you work now?

19      A.   Circle K.

20      Q.   What's your position at Circle K?

21      A.   Regional operations director.

22      Q.   How long have you been a regional operations

23  director?

24      A.   24 years.

25      Q.   For Circle K?



Page 41

1    verbiage.

2         Q.    Okay.  Was not attacked with a weapon?

3         A.    Correct.

4         Q.    And did he describe this conversation with

5    Ms. Moreno to you after he left the store?

6         A.    I am sure he did, but I don't remember the

7    exact conversation.

8         Q.    And did you discuss the video footage that he

9    reviewed with Mr. Aamoud after he left the store the

10   night Ms. Moreno was attacked?

11        A.    Not that night.

12        Q.    And when did you form the opinion that

13   Ms. Moreno should have given her assailant the

14   cigarettes?

15             MR. HANKINS: Object to form.

16        A.    Monday, when I reviewed the video myself.

17        Q.    (By Ms. Halpern) Did Mr. Aamoud say that Ms.

18   Moreno should have handed her assailant the cigarettes?

19             MR. HANKINS: Object to form.

20        A.    Yes.  Per our policy, yes.

21        Q.    (By Ms. Halpern) What do you recall him saying

22   about that to you?

23        A.    She should not have resisted and should have

24   just complied with the request.

25        Q.    And was that on the evening that Ms. Moreno



Page 42

1  was attacked, or at a later date that you discussed the

2  cigarettes?

3       A.   It was on Monday when we reviewed the case.

4       Q.   Did you speak with Mr. Aamoud in between the

5  time period when he called you on the night of the

6  attack and on Monday when you reviewed the video

7  footage?

8       A.   Well, as I stated earlier, I talked to him

9  twice that night, but I did not discuss the case with

10 him again until Monday morning.

11      Q.   Okay.  Tell me everything you recall about

12 discussing the case with Mr. Aamoud on Monday morning.

13      A.   It was after I reviewed the video.  And my

14 determination was similar to his, and that the employee

15 should have just complied, given the cigarettes, taken a

16 step back, instead of taking a step towards the

17 assailant.

18      Q.   And what did Mr. Aamoud on Monday morning tell

19 you about that?

20      A.   Well, he was of the same opinion.

21      Q.   And what did you remember saying to Mr.

22 Aamoud?

23      A.   I was of the same opinion.

24      Q.   Well, I am just asking what the conversation

25 content was like, not whether you agreed with each



Page 43

1   other.  What do you recall talking to him about?

2       A.   The conversation was about what I already

3   described.  The suspect came around the counter and

4   reached for cigarettes, and the employee in question

5   grabbed him.  It wasn't that he was coming directly at

6   her.

7       Q.   And do you recall Mr. Aamoud on the Monday

8   morning specifically saying that Ms. Moreno should have

9   given the assailant the cigarettes?

10          MR. HANKINS:  Object to form.

11      A.   I don't recall if that was the exact

12  conversation, but that was the same opinion we both had.

13  I'd rather lose $12 worth of cigarettes rather than have

14  an employee hurt.

15      Q.   (By Ms. Halpern) And do you recall saying that

16  to Mr. Aamoud?  I am just trying to figure out what you

17  guys spoke about.

18      A.   Yes.  I said I wished she'd have given

19  cigarettes.

20      Q.   What else do you remember from that

21  conversation on Monday?

22      A.   That we had a similar opinion that she should

23  not have confronted the suspect.

24      Q.   And who made the decision to terminate

25  Ms. Moreno?



Page 44

1    A.    So the HR manager, Amy Harvey, the market

2    manager, Driss Aamoud both agreed and collaborated that

3    the policy on confront had been breached.  And I agreed

4    with both their opinions.  So collaboratively the three

5    of us agreed to separate.

6    Q.    Was that the first time you spoke with Amy

7    Harvey about Ms. Moreno's termination?

8    A.    I spoke with Amy Monday morning.  And then the

9    three of us convened Monday afternoon, after I had

10   spoken with Driss again.  We had probably two to three

11   conversations.

12   Q.    Were they are all on Monday?

13   A.    Yes.

14   Q.    Did you meet in person, or was this over the

15   phone?

16   A.    Myself and Ms. Harvey met in person, and on

17   the phone.  And Driss was on the phone.

18   Q.    Did you and Ms. Harvey work in the same

19   location?

20   A.    Yes.

21   Q.    Where was that?  The lights just went out on

22   your --

23   A.    That's because I haven't moved.  If I wave my

24   arm, we are good.

25         I am sorry.  I got lost after waving my arm.



Page 49

```
 1        Q.   (By Ms. Halpern)   What did he say did not
 2   match?
 3        A.   Her story.
 4        Q.   What about her story did not match?   Did he
 5   say?
 6        A.   That she was attacked.
 7        Q.   Did he say he thought that was Ms. Moreno was
 8   lying?
 9        A.   No.
10        Q.   How did -- so what exactly did he say about
11   the mismatch?
12        A.   That the video evidence didn't match.
13        Q.   And on your conversations Monday, did anyone
14   discuss with Ms. Harvey and Mr. Aamoud, did anyone
15   discuss self defense?
16        A.   Yes.
17        Q.   Okay.  Please tell me about that.  What do you
18   remember about that discussion?
19        A.   It was in the context of did she violate the
20   confront and chase policy, or did she act in
21   self-defense.
22        Q.   And who said what?
23        A.   All three of us discussed it, so it was a
24   collaborative thought process.  I can't tell you exactly
25   who said what, but the gist of the conversation would be
```



Page 50

1    when she pivoted and grabbed him, she should have just

2    taken a step back.  There was a lot of room from

3    register 1 to register 2.  And had she just taken a step

4    back, and let him have the cigarettes, we wouldn't be

5    here today.

6        Q.   Do you recall who said something to that

7    effect during your conversations that Monday?

8        A.   I think all three of us.

9        Q.   All three of you said that?

10       A.   Maybe not exact, but that was the gist of the

11   conversation is she did not attempt to de-escalate.

12       Q.   That Monday after the -- that Monday when the

13   three of you met, first of all, did any other Circle K

14   policies come up as part of the discussion other than

15   the chase and confront policy?

16       A.   No.

17       Q.   Did anyone discuss calling of the police?

18       A.   Yes.

19       Q.   Tell me what you recall about that.

20       A.   That took place Sunday evening on the 4th.

21       Q.   What do you recall about that?

22       A.   That the police were contacted and asked to

23   investigate, and, you know, hopefully apprehend the

24   suspect.

25       A.   By whom?



# EXHIBIT 12 TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## Harvey Deposition Excerpts

# *Mary Ann Moreno v. Circle K Stores, Inc.* Case No. 1:22-cv-02327-NYW-STV

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-02327-NYW-STV

_____

VIDEOCONFERENCE DEPOSITION OF          May 5, 2023

AMY HARVEY

_____

MARY ANN MORENO,

          Plaintiff,

vs.

CIRCLE K. STORES, INC.,

          Defendant.

_____


        The deposition of AMY HARVEY, taken before

Leeann Stellor, a Registered Merit Reporter,

Certified Realtime Reporter, and a Notary Public in

and for the County of Summit and the State of

Colorado, via Zoom videoconference, on Friday,

May 5, 2023, at the hour of 10:04 a.m.



Page 71

1      Q.    And did you review the video before you

2   spoke to Driss or after?

3      A.    I don't recall.

4      Q.    And you recall approving Ms. Moreno's

5   termination?

6      A.    Yes.

7      Q.    And I think you testified earlier that

8   you have approved every termination.  Your role is

9   mostly to make sure there's proper documentation?

10      A.    Correct.

11      Q.    All right.  Why was Ms. Moreno

12   terminated?

13      A.    Are you asking why was she terminated or

14   why --

15      Q.    Yes.  Why?

16      A.    For the confront and chase policy.

17      Q.    For a violation of the confront and chase

18   policy?

19      A.    Yes.

20      Q.    Did you have any other information about

21   Ms. Moreno's career at Circle K at the time you

22   approved her termination?

23      A.    I had access to prior counselings and her

24   bio as far as her profile in the HRIS system, but it

25   did not -- it didn't matter in the one instance that



Page 72

1    we were looking at at that time.

2        Q.    So were any -- was any other -- was any

3    other facts of her employment considered by you at

4    the time you approved the termination?

5        A.    No.

6        Q.    The sole and only reason Ms. Moreno was

7    terminated is for allegedly violating the confront

8    and chase policy?

9        A.    Correct.

10       Q.    And do you recall that Ms. Moreno was a

11   long-term employee at Circle K?

12       A.    I don't recall.

13       Q.    Was there a lot of turnover for store

14   employees at Circle K?

15       A.    Yes.

16       Q.    How would you describe the turnover

17   rates?

18       A.    The turnover rate was over 200 while I

19   was there.

20       Q.    Over 200 employees left?

21       A.    Every year.

22       Q.    Every year?

23       A.    It was a -- the turnover percent was over

24   200 percent turnover.

25       Q.    And that's in your whole region?



Page 73

1          A.     Yes.

2          Q.     And what do you recall -- well, I think I

3     asked you this, but now I can't remember.

4                 Do you remember seeing the video

5     footage first or speaking with Mr. Aamoud first,

6     Driss Aamoud --

7          A.     I don't recall.

8          Q.     -- the order?

9          A.     Which one, which order it was in.

10         Q.     Okay.  So tell me all the conversations

11    you recall having with Mr. Aamoud about Ms. Moreno's

12    termination.

13         A.     It would have been that time anyway,

14    after I had reviewed the call and every -- or the

15    video and had a conversation, I would have told him,

16    you know, based on the video review, we have come to

17    a consensus that we need to terminate based on the

18    confront and chase.

19         Q.     Can I just ask, because you used the word

20    "would."

21                Do you remember the actual

22    conversation, or you're assuming that's what you

23    would have said?

24         A.     It is the conversation that I always had

25    with market managers when there -- when it was these



Page 75

1    think that the individual who attacked Ms. Moreno

2    had a knife?

3         A.    I -- I knew nothing about a knife.

4         Q.    You knew nothing about a knife?

5         A.    No.

6         Q.    Okay.  What do you recall when you saw

7    the video footage?

8         A.    I recalled that the guy was asking for

9    cigarettes and he ended up coming around the

10   counter, and she grabbed him instead of backing up

11   out of the way.  And as soon as she touched him,

12   that was violation of the policy.

13        Q.    Do you remember where she was standing in

14   the video footage?

15        A.    In front of the register.

16        Q.    Do you recall how much space she had to

17   maneuver behind -- behind the counter?

18        A.    Yeah.  The whole other register area for

19   register 1 or 2, whichever one it was, she had that

20   whole other area to be able to step back into.

21        Q.    What else do you recall about the video

22   footage?

23        A.    That the guy, after he went to go and

24   grab the cigarettes -- whether or not he got them or

25   not, I don't recall at this time -- ended up just



# EXHIBIT 14 TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## View Terminate Employee Event

## *Mary Ann Moreno v. Circle K Stores, Inc.* Case No. 1:22-cv-02327-NYW-STV



View Terminate Employee Event: Terminate: Mary Moreno (Terminated) (2066904)

02:27 PM
09/12/2022
Page 1 of 2

Terminate: Mary Moreno (Terminated) (2066904)
For: Mary Moreno (Terminated) (2066904)
Overall Process: Terminate: Mary Moreno (Terminated) (2066904)
Overall Status: Successfully Completed

## Event Details
### Reason

Primary Reason

USA Involuntary > Violation of Company Policy
Secondary Reasons

### Details

Termination Date
10/05/2020
Last Day of Work
10/04/2020
Pay Through Date
10/05/2020

## Eligibility

Eligible for Rehire
No

## Process
### Process History

| Process | Step | Status | Completed On | Due Date | Person (Up to 5) | All Persons | Comment |
|---|---|---|---|---|---|---|---|
| Termination | Termination | | | | | | |
| Termination | Review Employee Termination | Step Completed | 10/08/2020 11:52:42 AM | | Love Jorgensen (157161) | 1 | |
| Termination | Review Employee Termination | Not Required | | | | 0 | |
| | | Approved | 10/08/2020 07:26:04 PM | | Driss Aamoud (2031088) | 1 | Driss Aamoud: Employee was engaging and pulling a burglar from his back,putting her safety at risk.it is a violation of a company policy. |
| Termination | Approval by HR Partner (Intersection) | Not Required | | | | 0 | |
| Termination | Approval by HR Partner (Store) | Not Required | | | | 0 | |
| Termination | Approval by HR Partner (Store) | Not Required | | | | 0 | |
| Termination | Assign Roles to Worker | Not Required | | | | 0 | |

Confidential

EXHIBIT
14

Vol. II - 0398
CircleK0000158



View Terminate Employee Event: Terminate: Mary Moreno
(Terminated) (2066904)

02:27 PM
09/12/2022
Page 2 of 2

| Process | Step | Status | Completed On | Due Date | Person (Up to 5) | All Persons | Comment |
|---|---|---|---|---|---|---|---|
| Termination | Review Documents | Not Required | | | | 0 | |
| Termination | Remove Worker from Talent | Completed | 10/08/2020 07:26:04 PM | 10/09/2020 | Driss Aamoud (2031088) | 1 | |
| Termination | Integration: INT031-HCM-Okta-RTS-Cloud Connect-Outbound | Not Required | | | | 0 | |
| Termination | To Do: Review Future Dated OTP | Not Required | | | | 0 | |
| Termination | Request One-Time Payment | Not Required | | | | 0 | |
| Termination | Review Termination Information | Not Required | | | | 0 | |
| Termination | Service: Remove User-Based Security Groups | Step Completed | 10/08/2020 07:26:04 PM | | Workday Service | 1 | |
| Termination | Service: Adjust Time Off Balances | Step Completed | 10/08/2020 07:26:04 PM | | Workday Service | 1 | |
| Termination | Integration: INT072-HCM-Ivanti-HEAT-Terminations-Studio-Outbound | Not Required | | | | 0 | |
| Change Benefits for Life Event | Change Benefits for Life Event | Automatic Complete | 10/08/2020 07:26:04 PM | 10/08/2020 | | 0 | |
| Change Benefits for Life Event | Review Documents | Not Required | | 10/08/2020 | | 0 | |
| Change Benefits for Life Event | Review Documents | Not Required | | 10/08/2020 | | 0 | |
| Change Benefits for Life Event | Review Documents | Not Required | | 10/08/2020 | | 0 | |
| Change Benefits for Life Event | Review Documents | Not Required | | 10/08/2020 | | 0 | |
| Change Benefits for Life Event | Review Documents | Not Required | | 10/08/2020 | | 0 | |
| Change Benefits for Life Event | Review Documents | Not Required | | 10/08/2020 | | 0 | |
| Change Benefits for Life Event | Approval by Benefits Partner (Local) | Not Required | | 10/08/2020 | | 0 | |
| Change Benefits for Life Event | Approval by Benefits Service Center | Not Required | | 10/08/2020 | | 0 | |
| Change Benefits for Life Event | To Do: Change My Contact Information | Not Required | | 10/08/2020 | | 0 | |
| Change Benefits for Life Event | To Do: Life Insurance Claim Form | Not Required | | 10/08/2020 | | 0 | |
| Change Benefits for Life Event | Review COBRA Eligibility | Not Required | | 10/08/2020 | | 0 | |
| Change Benefits for Life Event | To Do: Change My Federal Tax Elections | Not Required | | 10/08/2020 | | 0 | |
| Termination | To Do: Review Future Dated OTP | Not Required | | | | 0 | |
| Termination | Review Documents | Not Required | | | | 0 | |
| Termination | Complete Questionnaire | Not Required | | | | 0 | |
| Termination | Integration: INT080-Mass Cancel BP for Terminated Workers | Completed | 10/08/2020 07:27:26 PM | | INT080-Mass Cancel BP for Terminated Workers | 1 | |
| Termination | Manage Business Processes for Worker | Submitted | 10/12/2020 08:01:35 AM | 10/08/2020 | Love Jorgensen (157161) | 1 | |

Confidential

Vol. II - 0399

CircleK0000159

# EXHIBIT C TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## Declaration of Driss Aamoud

## *Mary Ann Moreno v. Circle K Stores, Inc.* Case No. 1:22-cv-02327-NYW-STV

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Case No. 1:22-cv-02327-NYW-STV

MARY ANN MORENO,

       Plaintiff,

v.

CIRCLE K STORES, INC.,

       Defendant.

---

## DECLARATION OF DRISS AAMOUD

---

I, Driss Aamoud, declare as follows.

1.  I am over 18 years of age and competent to testify to the matters stated in this declaration. I make this declaration upon my personal knowledge, and if called upon to testify in this regard could do so both accurately and competently. This declaration is given voluntarily. I have not been promised any benefit, coerced, or threatened in any manner in exchange for the testimony in this declaration.

2.  I am currently employed with Circle K Stores, Inc. ("Circle K"), and am personally familiar with Mary Ann Moreno. As of August 7, 2023, my title is Category Manager.

3.  On October 4, 2020, I was employed as a Market Manager with Circle K and I reported to Craig Holmes. At the time, my market included the Circle K store located at 9489 Sheridan Boulevard in Westminster, Colorado, which is the store where Ms. Moreno worked on October 4, 2020.

4.      Ms. Moreno's employment with Circle K was terminated for her violation of Circle K's Confront & Chase policy.

5.      The decision to terminate Ms. Moreno's employment with Circle K was made jointly and collaboratively by myself, Mr. Holmes, and the Human Resources Manager, Amy Harvey.

6.      Ms. Moreno violated the Confront & Chase policy by engaging and pulling a robber from his back on October 4, 2020.

7.      I honestly believe that Ms. Moreno did not act in self-defense.

8.      I did not tell Ms. Moreno that she should not have reported the theft to me.

9.      I did not tell Ms. Moreno that she was being terminated because she engaged in self-defense.

10.      Ms. Moreno's employment was terminated for violating the Confront & Chase policy, not because she engaged in self-defense, not because she reported the robbery, not because she called the police, and not because she was the victim of a crime.

11.      During my employment with Circle K as Market Manager, I estimate approximately 50 Circle K employees in my market reported crimes to me or their supervisor per year. I am not aware of any employee who was terminated or disciplined for reporting a crime to me or their supervisor.

12.      During my employment with Circle K as Market Manager, I estimate dozens of Circle K employees in my market reported crimes to the police or cooperated with police investigations per year. I am not aware of any employee who was terminated or disciplined for reporting a crime to the police or cooperating with a police investigation.

2

13.     During my employment with Circle K as Market Manager, I estimate three

Circle K employees in my market were the victim of a crime at work per year. I am not aware

of any employee who was terminated or disciplined for being the victim of a crime.

According to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is

true and correct.

Executed on: ___8_/_07_/_2o23_____          _____
                        Date                                    Signature

4861-1227-1474.3

3

# EXHIBIT D TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## Declaration of Amy Harvey

# *Mary Ann Moreno v. Circle K Stores, Inc.* Case No. 1:22-cv-02327-NYW-STV

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Case No. 1:22-cv-02327-NYW-STV

MARY ANN MORENO,

           Plaintiff,

v.

CIRCLE K STORES, INC.,

           Defendant.

## DECLARATION OF AMY HARVEY

I, Amy Harvey, declare as follows.

1.      I am over 18 years of age and competent to testify to the matters stated in this declaration. I make this declaration upon my personal knowledge, and if called upon to testify in this regard could do so both accurately and competently. This declaration is given voluntarily. I have not been promised any benefit, coerced, or threatened in any manner in exchange for the testimony in this declaration.

2.      I am currently employed by the State of Colorado.

3.      I was employed as a Human Resources Manager by Circle K Stores, Inc. from August 24, 2017 to October 24, 2021.

4.      On October 4, 2020, in my capacity as Human Resources Manager, I supported the Circle K store located at 9489 Sheridan Boulevard in Westminster, Colorado, which is where Mary Ann Moreno was working at the time.

5.      I participated in and agreed with the decision to termination Ms. Moreno's employment.

6.      Ms. Moreno's employment with Circle K was terminated for her violation of Circle K's Confront & Chase policy.

7.      Ms. Moreno violated the Confront & Chase policy by engaging and pulling a robber from his back on October 4, 2020.

8.      I honestly believe that Ms. Moreno did not act in self-defense.

9.      Ms. Moreno's employment was terminated for violating the Confront & Chase policy, not because she engaged in self-defense, not because she reported the robbery, not because she called the police, and not because she was the victim of a crime.

10.      During my time as Human Resources Manager for Circle K, I estimate there were approximately 450 Circle K employees in my region who reported crimes to me or their supervisor and who were not terminated. I am not aware of any employee who was terminated or disciplined for reporting a crime to me or their supervisor.

11.      During my time as Human Resources Manager for Circle K, I estimate there were approximately 500 Circle K employees in my region who reported crimes to the police or cooperate with police investigations and who were not terminated. I am not aware of any employee who was terminated or disciplined for reporting a crime to the police or cooperating with a police investigation.

12.      During my time as Human Resources Manager for Circle K, I estimate there were approximately 80  Circle K employees in my region who were the victim of a crime at

2

work and who were not terminated. I am not aware of any employee who was terminated or

disciplined for being the victim of a crime.

According to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is

true and correct.

Executed on: _____     Aug, 4, 2023 _____
              Date                                    Signature

4860-6390-6162.5

3