Case No. 24-1058

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

Mary Ann Moreno,

     Plaintiff-Appellant,

v.

Circle K Stores, Inc.,

     Defendant-Appellee.

---

On Appeal from the United States District Court for the District of Colorado
The Honorable Nina Y. Wang, U.S. District Judge
D.C. Case No. 1:22-cv-02327-NYW-STV

---

## <u>APPENDIX – VOLUME III, PAGES 0408 - 0586</u>

Virginia Hill Butler
Iris Halpern
Matthew J. Cron
Rathod | Mohamedbhai LLC
2701 Lawrence Street, Suite 100
Denver, Colorado 80205
vb@rmlawyers.com
ih@rmlawyers.com
mc@rmlawyers.com
*Attorneys for Plaintiff-Appellant*

# TABLE OF CONTENTS

## VOLUME III

Doc. 65: Plaintiff's Motion for Partial Summary Judgement ............... 410

    Doc. 65-1: Rule 30(b)(6) Dep. Tr. ................................................. 425

    Doc. 65-2: Jorgensen Dep. Tr. ...................................................... 440

    Doc. 65-3: Circle K Surveillance Video (Reg. 1) ........................ 451

    Doc. 65-4: Police Report (Moreno 000315) ................................. 452

    Doc. 65-5: 911 Call ...................................................................... 454

    Doc. 65-6: Moreno Dep. Tr. ......................................................... 455

    Doc. 65-7: Aamoud Dep. Tr. ......................................................... 465

    Doc. 65-8: Holmes Dep. Tr. ......................................................... 476

    Doc. 65-9: RMBU Confront & Chase Terminations ................... 479

    Doc. 65-10: Harvey Dep. Tr. ........................................................ 483

    Doc. 65-11: Plaintiff's Third Supplemental Discovery Responses
.................................................................................................... 490

    Doc. 65-12: Circle K Supplemental Discovery Request ............. 512

    Doc. 65-13: Circle K Discovery Responses ................................ 524

    Doc. 65-14: Circle K Initial Disclosures ..................................... 530

    Doc. 65-15: Circle K Supplemental Disclsoures ........................ 535

Doc. 70: Defendant Circle K's Response to Plaintiff's Motion for
    Partial Summary Judgement ............................................... 539

    Doc. 70-1: Declaration of Nick Hankins ..................................... 554

    Doc. 70-2: Rule 30(b)(6) Excerpts ............................................... 557

    Doc. 70-3: Aamoud Depo. Excerpts ............................................ 561

    Doc. 70-4: Jorgensen Depo. Excerpts ......................................... 565

    Doc. 70-5: Moreno Depo. Excerpts .............................................. 572

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 22-cv-02327-NYW-STV

MARY ANN MORENO,

     Plaintiff,

v.

CIRCLE K STORES, INC.,

     Defendant.

---

### PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

---

Plaintiff Mary Ann Moreno is entitled to summary judgment on Defendant's affirmative defense of failure to mitigate. *See* ECF No. 59, *Answer to First Amended Complaint*, at 13, ¶ 7. Plaintiff's sixteen-year career with Circle K ended abruptly on October 8, 2020, when she was fired after attempting to defend herself from a robbery.

On October 4, 2020, the then-72-year-old Ms. Moreno was working alone, behind the counter as a cashier at Circle K. Tyler Wimmer displayed two knives and came around the counter, blocking Ms. Moreno in. Mr. Wimmer reached towards Ms. Moreno. Ms. Moreno raised her hands to defend herself and attempted to push Mr. Wimmer away. Mr. Wimmer ended up reaching past Ms. Moreno to steal a packet of cigarettes from behind the counter and exited the store. But Ms. Moreno's ordeal was far from over.

Mr. Wimmer was prosecuted by the District Attorney for his attack on Ms. Moreno, and she is officially a victim of a crime. However, after she reported the robbery to her supervisors, Circle K terminated her days later for a violation of its "Don't Chase or Confront" policy. Circle K maintains that Ms. Moreno "confronted" Mr. Wimmer when she attempted to protect herself.

Ms. Moreno sought and found work mere months later, despite the challenging labor market created by the Covid-19 pandemic.

Under Tenth Circuit precedent, an essential element that an employer must prove to establish a mitigation affirmative defense is that "there were suitable positions which the employee could have discovered and for which they were qualified." *Aguinaga v. United Food & Commercial Workers Int'l Union*, 993 F.2d 1463, 1474 (10th Cir. 1993). Circle K, however, has presented no evidence whatsoever on any element of this affirmative defense. Circle K has thus failed to create a triable issue of fact with respect to the mitigation defense, and Ms. Moreno is entitled to judgment as a matter of law on it.

## I.     STATEMENT OF UNDISPUTED MATERIAL FACTS

### Ms. Moreno's Employment at Circle K

1.     Ms. Moreno's hire date for Circle K was October 29, 2004. **Ex. 1**, *Rule 30(b)(6) Dep. Tr.*, at 99:10-19; 100:1-4.

2.     Circle K fired Ms. Moreno on October 8, 2020. **Ex. 2**, *Jorgensen Dep. Tr.*, at 120:4-5.

3.     Ms. Moreno worked at Circle K or its predecessor entities for almost sixteen years. **Ex. 1**, *Rule 30(b)(6) Dep. Tr.*, at 99:10-19.

4.     Ms. Moreno was a Customer Service Representative ("CSR"), which included tending the cash register. **Ex. 2**, *Jorgensen Dep. Tr.*, at 9:12-17.

5.     Ms. Moreno worked at the Circle K location at 9489 Sheridan Boulevard in Westminster, Colorado. ECF No. 56, *First Amended Complaint*, at 2, ¶ 9; ECF No. 59, *Answer to First Amended Complaint*, at 2, ¶ 9.

6.      Ms. Moreno worked the 2 p.m. to 10 p.m. shift. **Ex. 2**, *Jorgensen Dep. Tr.*, at 26:2-6; 41:21-23.

7.      Ms. Moreno frequently worked alone. **Ex. 2**, *Jorgensen Dep. Tr.*, at 27:1-4.

8.      Ms. Moreno was a good employee. **Ex. 2**, *Jorgensen Dep. Tr.*, at 45:25 to 46:11. Ms. Moreno was a dependable employee. *Id.* at 47:6-14.

9.      At the time of her termination, Ms. Moreno was making $14.05 per hour. ECF No. 56, *First Amended Complaint*, at 3, ¶ 19; ECF No. 59, *Answer to First Amended Complaint*, at 3-4, ¶ 19.

## The Armed Robbery on October 4, 2020

10.     On the night of October 4, 2020, Ms. Moreno was working alone at the Circle K located at 9489 Sheridan Boulevard. ECF No. 56, *First Amended Complaint*, at 4, ¶¶ 20-22; ECF No. 59, *Answer to First Amended Complaint*, at 4, ¶¶ 20-22.

11.     She was 72 years old at the time. *Id.*

12.     At approximately 6:55 p.m., while Ms. Moreno stood alone behind the front counter, a man (now known to be Tyler Darren Wimmer) walked into the store. **Ex. 3**, *Circle K Register 1 Surveillance Video ("Register 1")*, at 6:54.[1]

13.     At 6:54:30, Wimmer got in line at the cash register. *Id.* at 6:55. He approached the counter. *Id.* Wimmer set his things down on the counter and asked Ms. Moreno for a pack of cigarettes. *Id.*

14.     Wimmer had two large hunting knives. *See id.*; **Ex. 4**, *Police Report*, Moreno000315; **Ex. 5**, *911 Call*, at 00:15 to 2:05; 5:14 to 7:00; **Ex. 6**, *Moreno Dep. Tr.*, at 67:1.

---

[1] The video and audio exhibits referenced herein have been conventionally submitted to the Court.

15.     Ms. Moreno asked Wimmer which brand of cigarettes he would like, and then retrieved the cigarettes from the display case behind her. ECF No. 56, *First Amended Complaint*, 5 ¶ 29; ECF No. 59, *Answer to First Amended Complaint*, at 5, ¶ 29; *see also* **Ex. 3**, *Register 1*, at 6:55:18-6:55:56. As Ms. Moreno began to ring up Wimmer's apparent purchase, he told Ms. Moreno words to the effect of, "just give them to me for free." ECF No. 56, *First Amended Complaint*, at 5, ¶ 30; ECF No. 59, *Answer to First Amended Complaint*, at 5, ¶ 30; *see also* **Ex. 3**, *Register 1*, at 6:55:30.

16.     Ms. Moreno replied that she could not give him the cigarettes for free because she did not own the store and could lose her job. ECF No. 56, *First Amended Complaint*, at 5, ¶ 31; ECF No. 59, *Answer to First Amended Complaint*, at 5, ¶ 31; *see also* **Ex. 3**, *Register 1*, at 6:55:35-6:56:05.

17.     According to Ms. Moreno's market manager, it would have been a violation of company policy for Ms. Moreno to give Wimmer cigarettes at this point. **Ex. 7**, *Aamoud Dep. Tr.*, at 154:15 to 155:16.

18.     Wimmer then became visibly upset and began to leave the store. **Ex. 3**, *Register 1*, at 6:55:56-6:56:09:

19.     As he left, however, he abruptly changed directions and lurched back towards Ms. Moreno from the side and rear of the counter. *Id.* at 6:56:09-6:56:10.

20.      Ms. Moreno exclaimed to Wimmer, "Don't come back here!" ECF No. 56, *First Amended Complaint*, at 5, ¶ 34; ECF No. 59, *Answer to First Amended Complaint*, at 5, ¶ 34; *see also* **Ex. 3**, *Register 1*, at 6:56:08.

21.     Still, Wimmer proceeded towards Ms. Moreno and the display case containing the store's tobacco products. **Ex. 3**, *Register 1*, at 6:56:10-6:56:13.

4

22.     As Wimmer was blocking Ms. Moreno's only avenue of escape from the closed area behind the counter, she was unable to flee. *See id.*; *see also* **Ex. 6**, *Moreno Dep. Tr.*, at 70:4-7.

23.     Wimmer moved towards Ms. Moreno and was well within reaching distance of her, still holding the knives. **Ex. 3**, *Register 1*, at 6:56:10-6:56:13.

24.     Nearing closer to Ms. Moreno, Wimmer reached his arm out past her for a pack of cigarettes in the display case the two were standing directly adjacent to. *Id.* Ms. Moreno instinctively flinched and reached out towards Wimmer to push him away and protect herself and prevent him from coming closer toward her because she perceived him to be lunging towards her. *Id.* at 6:56:13-6:56:16; *see also* **Ex. 6**, *Moreno Dep. Tr.*, at 111:13-16; 124:5-18.

25.     After grabbing the cigarettes from the display case, Wimmer left the store. **Ex. 3**, *Register 1*, at 6:56:16-6:56:22.

26.     Just after Wimmer fled the store, a customer who had witnessed the robbery and Ms. Moreno called the police. *See generally* **Ex. 5**, *911 Call*.

27.     Ms. Moreno called her supervisor, Love Jorgensen, to report the robbery. **Ex. 2**, *Jorgensen Dep. Tr.*, at 88:12 to 89:6.

28.     When Ms. Jorgensen had not arrived at the store after an hour, Ms. Moreno called Driss Aamoud, Ms. Jorgensen's supervisor and the market manager for her store. **Ex. 3**, *Register 1*, at 8:10:05-8:11:26. Mr. Aamoud arrived at the store around 8:24 p.m. and Ms. Jorgensen arrived around 8:43 p.m. *Id.* at 8:24:37-8:24:50; 8:43:13.

**Termination**

29.     Mr. Aamoud reviewed the video footage of the robbery. **Ex. 7**, *Aamoud Dep. Tr.*, 109:23 to 110:2; 113:11-21.

30.     Mr. Aamoud concluded that Ms. Moreno had violated Circle K's "Don't Chase or Confront" policy. **Ex. 7**, *Aamoud Dep. Tr.*, 68:1-18.

31.     Mr. Aamoud discussed the video with his supervisor, Craig Holmes, and the human resources manager, Amy Harvey, and all three made the decision to terminate Ms. Moreno for allegedly violating the policy. *Id.* at 125:2 to 126:14; **Ex. 8**, *Holmes Dep. Tr.*, at 44:1-4.

32.     Circle K fired Ms. Moreno on October 8, 2020. **Ex. 2**, *Jorgensen Dep. Tr.*, at 120:4-5.

33.     The sole reason Circle K terminated Ms. Moreno was for her physical contact with Wimmer on October 4, 2020. **Ex. 1**, *Rule 30(b)(6) Dep. Tr.*, at 98:23 to 99:3.

34.     The District Attorney's Office prosecuted Wimmer for his attack on Ms. Moreno, making her officially a victim of a crime under state law. *See* ECF No. 57-1, *District Attorney Letter with Charges*.

35.     Between October 2018 and October 2021, Circle K terminated 43 individuals in the region Amy Harvey supported as an HR Manager for violations of its Don't Chase or Confront Policy. **Ex. 1**, *Rule 30(b)(6) Dep. Tr.*, at 77:7-10; 78:24 to 79:14; **Ex. 9**, *RMBU Confront/Chase Terminations* (listing 43 names).

36.     During the four years Ms. Harvey supported Colorado, New Mexico, Texas, Oklahoma, Kansas, and Missouri as an HR manager, 2017-2021, there were hundreds of robberies, including armed robberies. **Ex. 10**, *Harvey Dep. Tr.*, at 16:24 to 17:11; 33:2-34:7. Despite the high number of stores and employees she supported, Ms. Harvey has no recollection of ever retaining an employee who made contact with an assailant. *Id.* at 21:7-15; 35:3-7.

37.     Mr. Aamoud, Ms. Moreno's market manager, was unaware of any Circle K employee making physical contact with an attacker who was not fired. **Ex. 7**, *Aamoud Dep. Tr.* at 103:3-7.

### Dollar Tree Employment

38.     As of October 4, 2020, Plaintiff was earning approximately $14.05/ hour, and on average working 30-32 hours a week at Circle K. **Ex. 11**, *Plaintiff's Third Supplemental Discovery Responses*, at 10.

39.     Ms. Moreno started looking for a job shortly after she was fired. **Ex. 6**, *Moreno Dep. Tr.*, at 25:17-24.

40.     Ms. Moreno does not drive far distances. *Id.* at 27:8-13.

41.     Ms. Moreno's daughter helped her search for jobs and fill out job applications online because Ms. Moreno is not adept at using computers. *Id.* at 27:8 to 28:17

42.     Ms. Moreno applied for around ten jobs. *Id.* at 28:22-25. These included positions at Hallmark and Walmart. *Id.* at 28:3-8.

43.     Ms. Moreno did not hear back about her applications from any store besides Dollar Tree. *Id.* at 25:19-24. Ms. Moreno took the first job she received an offer of employment from after Circle K fired her. *Id.*

44.     Ms. Moreno started working at Dollar Tree as a CSR on January 17, 2021. **Ex. 11**, *Plaintiff's Third Supplemental Discovery Responses*, at 10; **Ex. 6**, *Moreno Dep. Tr.*, at 18:10-14.

45.     Her starting pay rate was $12.32 an hour. **Ex. 11**, *Plaintiff's Third Supplemental Discovery Responses*, at 10.

46.     After approximately 90 days, her pay rate increased to $12.47 an hour. *Id.*

47.     When she began working at Dollar Tree, Plaintiff was scheduled only two, five-hour shifts a week, for approximately 10 hours a week. *Id.*

48.     She worked a few more hours over the holidays in 2021, and occasionally picked up shifts for sick coworkers. *Id.*

49.     Plaintiff's hours vary between approximately 10 to 20 hours a week. *Id.*

50.     Around November 15, 2022, Ms. Moreno's pay rate increased to $15.75. *Id.*

### Mitigation Affirmative Defense

51.     Defendant asserts an affirmative defense of failure to mitigate. *See* ECF No. 59, *Answer to First Amended Complaint*, at 13, ¶ 7.

52.     During discovery, Ms. Moreno asked the following interrogatory:

INTERROGATORY NO. 2: Describe the factual basis for each Affirmative Defense found in your Answer to Plaintiff's Complaint.

**Ex. 12**, *Circle K's Supplemental Discovery Responses*, at 2.

53.     With respect to its failure to mitigate affirmative defense, Circle K responded:

The factual basis of this defense is Plaintiff's discovery responses, including answers to Interrogatory Nos. 4-7 and responses to Requests for Production Nos. 6-9. Discovery is ongoing.

**Ex. 12**, *Circle K's Supplemental Discovery Responses*, at 5.

54.     Defendant's Interrogatory No. 4 asked for a description of Ms. Moreno's damages. Defendant's Interrogatory No. 5 asked for the identity of any psychological counseling Ms. Moreno received in the past five years. Defendant's Interrogatory No. 6 asked for the identity of any employers Ms. Moreno worked for since October 4, 2020. Defendant's Interrogatory No. 7 asked for a description of Ms. Moreno's efforts to seek employment and income since October 4, 2020. *See* **Ex. 11**, *Plaintiff's Third Supplemental Discovery Responses*, at 9, 13-15, 17-18.

8

55.     Ms. Moreno's responses to Defendant's Interrogatories No. 4-7 addressed only those matters Defendant requested information and records about and nothing more, so are thus irrelevant to the elements of the failure to mitigate affirmative defense. *See id.* at 9-20.

56.     Ms. Moreno asked the following request for production ("RFP")

REQUEST FOR PRODUCTION NO. 8: Produce any documents establishing or showing the material factual basis for each Affirmative Defense found in your Answer to Plaintiff's Complaint.

**Ex. 13**, *Circle K's Discovery Responses*, at 11.

57.     Circle K responded with the following objection:

OBJECTION: Circle K objects to Request for Production No. 8 on the basis that it is an impermissible blockbuster request. Circle K further objects that the request lacks reasonable particularity. The request asks Circle K to describe the factual basis for each affirmative defense found in its Answer and is essentially limitless. Such blockbuster requests are routinely rejected by the courts as overly broad, unduly burdensome, and disproportionate to the needs of the case. As required by Rule 34(b), Circle K states that it is withholding documents on the basis of its objections, but given the vast breadth of the request, Circle K is not withholding any particular documents.

*Id.*

58.     Circle K did not produce any documents in response to Ms. Moreno's RFP seeking any documents evidencing the material factual basis for Defendant's affirmative defenses. **Ex. 13**, *Circle K's Discovery Responses*, at 11; *see generally* **Ex. 12**, *Circle K's Supplemental Discovery Responses*.

59.     None of the witnesses identified by Circle K under Rule 26(a)(1) are endorsed on subjects pertaining to Defendant's mitigation defense. **Ex. 14**, *Circle K's Initial Rule 26(a)(1) Disclosures*; **Ex. 15**, *Circle K's Supplemental Rule 26(a)(1) Disclosures*.

60.     No documents regarding other suitable positions were disclosed by Circle K under Rule 26(a)(1). *See generally* **Ex. 14**, *Circle K's Initial Rule 26(a)(1) Disclosures*; **Ex. 15**, *Circle K's Supplemental Rule 26(a)(1) Disclosures*.

61.     Circle K did not disclose any expert witnesses in this case. *See generally* **Ex. 14**, *Circle K's Initial Rule 26(a)(1) Disclosures*; **Ex. 15**, *Circle K's Supplemental Rule 26(a)(1) Disclosures*; ECF No. 26, *Scheduling Order*, at 10.

## II.     LEGAL STANDARD

Summary judgment is warranted on any claim, or any "part of" a claim, "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). "Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury." *Goodwin v. Nat'l Elec. Annuity Plan*, No. 20-cv-01044-WJM-STV, 2021 WL 4555988, at *2 (D. Colo. Aug. 26, 2021) (citations omitted). A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001). A dispute is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *First Nat'l Bank of Ariz. V. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

Once the movant has met "the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law,"

the burden shifts to the non-movant to "set forth specific facts that would be admissible in evidence from which a rational trier of fact could find for the nonmoving party." *Adler v. Wal-Mart Stores, Inc.*, 144 F. 3d 664, 670-71 (10th Cir. 1998).

## III.    ARGUMENT

Circle K has asserted a mitigation affirmative defense. *See* ECF No. 59, *Answer to First Amended Complaint*, at 13, ¶ 7. Ms. Moreno is entitled to summary judgment on this affirmative defense because Circle K has failed to produce any admissible evidence on an essential element of the affirmative defense. *See Mason v. Brigham Young Univ.*, No. 06-cv-826-TS, 2008 WL 312953, at *1 (D. Utah Feb. 1, 2008) (a plaintiff "may meet her initial burden of making a *prima facie* demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law simply by pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's affirmative defense") (citing *Adler*, 144 F.3d at 670-71 (citations and quotations omitted)).

In the Tenth Circuit, the burden is on the **employer** to establish its mitigation affirmative defense by a preponderance of the evidence, by showing that "(1) there were suitable positions which the claimants could have discovered and for which they were qualified, and (2) the claimants failed to use reasonable diligence in seeking such positions." *Aguinaga*, 993 F.2d at 1474 (citing *EEOC v. Sandia Corp.*, 639 F.2d 600, 627 (10th Cir. 1980)). The employer is "required to satisfy *both* prongs of the above two-part test." *Id.* (emphasis in original); *see also McClure v. Indep. Sch. Dist. No. 16*, 228 F.3d 1205, 1214 (10th Cir. 2000). As to the first element of the affirmative defense, "[t]he Tenth Circuit requires that employers prove not only the existence of suitable positions, but also the availability of those positions" and "some evidence that a plaintiff could obtain that position." *EEOC v. Beverage Distrs. Co., LLC*, No. 11-CV-02557-CMA-CBS, 2013

11

WL 6458735, at *3 & nn.5-6 (D. Colo. Dec. 9, 2013), *aff'd in part, rev'd in part*, 780 F.3d 1018 (10th Cir. 2015) (collecting cases).

Circle K has failed to produce **any** evidence to support its mitigation defense. It produced no evidence whatsoever in discovery about the existence and availability of any suitable positions which Ms. Moreno could have obtained in lieu of her Dollar Tree employment. *See Wilson v. Union Pac. R.R. Co.*, 56 F.3d 1226, 1232 (10th Cir. 1995) (holding that plaintiff's failure to seek employment did not justify a mitigation instruction because "the defendant must also show that appropriate jobs were available"); *EEOC v. W. Trading Co.*, 291 F.R.D. 615, 620 (D. Colo. 2013) (mitigation affirmative defense failed as a matter of law where no evidence was presented at trial of suitable positions). Not only did Circle K fail to disclose any evidence of suitable positions under Rule 26(a)(1), it also failed to provide any such evidence in response to Ms. Moreno's written discovery requests into the factual basis for its mitigation affirmative defense. *See* SUMF ¶¶ 51-61.

As its basis for a mitigation affirmative defense, Defendant pointed to Plaintiff's discovery responses. *See* **Ex. 12**, *Circle K's Supplemental Discovery Responses*, at 7. Plaintiff's discovery responses simply described the effort she put into finding another position after Circle K fired her; they do not obviate Defendant's burden to satisfy the elements of its own affirmative defense. Nothing in Plaintiff's discovery responses point to suitable positions that Ms. Moreno was qualified for but failed to use reasonable diligence to seek. *See* **Ex. 11**, *Plaintiff's Third Supplemental Discovery Responses*, at 9-20. Instead, Plaintiff's responses, as well as deposition testimony, detail Ms. Moreno's significant efforts to find another job after she was fired from the one she had for nearly sixteen years. *See* SUMF ¶¶ 51-61. Circle K additionally did not disclose any expert witness who could testify about any suitable positions. *See id*. "Because it failed this

prong of its burden, [Circle K] has failed its burden of proof and evidence that supports the second prong of the test—*i.e.*, the individual mitigation efforts of [Ms. Moreno]—are simply irrelevant." *Aguinaga*, 993 F.2d at 1474; *see also Hayes v. SkyWest Airlines, Inc.*, 12 F.4th 1186, 1210 n.15 (10th Cir. 2021).

In the District of Colorado, courts do not merely rubber stamp affirmative defenses. For example, in *Western Trading Company*, 291 F.R.D. 615, Judge Martinez granted the EEOC's motion for judgment as a matter of law regarding mitigation of damages. The court found that the only evidence presented at trial regarding other potential jobs was of jobs that were not comparable to the employee's former job with the defendant employer. *Id.* at 620. Accordingly, the court found that, as matter of law, the defendant failed to present sufficient evidence to support the jury reducing the backpay damages award. In *Western Trading Company*, the defendant presented evidence of other jobs, but it was still insufficient to warrant an affirmative defense of failure to mitigate.

In *Beverage Distributors Company*, 2013 WL 6458735, at *5, Judge Arguello also granted the EEOC's motion for judgment as a matter of law, finding that there was insufficient evidence for the jury to consider the employer's failure to mitigate defense. In that case, the employer presented expert testimony regarding Bureau of Labor Statistics showing 10,000 warehouse positions for the employee. *Id.* at *3. The court found that this was insufficient because the Tenth Circuit "requires that employers prove not a position's existence, but its availability." The expert's testimony on the existence of other positions without any testimony on the employee's ability to **obtain** such a position meant that the EEOC was entitled to judgment as a matter of law on the employer's failure to mitigate affirmative defense. *See id.* at *4 ("[G]iven the lack of testimony regarding the availability of these positions coupled with the

lack of evidence that Mr. Sungaila would qualify for such positions or that they were comparable to the Night Warehouse Loader position, discussed *infra*, the Court finds that inferring that the positions were open during the applicable timeframe is not reasonable.").

In *Western Trading Company* and *Beverage Distributors Company*, the employer presented some evidence of other jobs that may have been open to the employee, but the court found that it was insufficient to satisfy the affirmative defense of failure to mitigate. Here, Circle K has completely failed to present any evidence regarding Mr. Moreno's alleged failure to mitigate her damages. Summary judgment in Ms. Moreno's favor is therefore warranted on Circle K's mitigation affirmative defense because Circle K "did not present sufficient evidence to create a triable issue of fact as to whether [Ms. Moreno] failed to mitigate [her] damages." *Huntz v. Elder*, No. 16-cv-1321-DME-CBS, 2017 WL 3914261, at *3 (D. Colo. Sept. 7, 2017) (Ebel, J.); *Wilson v. Union Pac. R. Co.*, 56 F.3d 1226, 1232 (10th Cir.1995) ("Mr. Wilson's general failure to seek employment for eighteen months before trial does not alone suffice to justify a mitigation instruction; the defendant must also show that appropriate jobs were available.").

Respectfully Submitted: August 7, 2023

RATHOD | MOHAMEDBHAI LLC

*s/ Virginia Hill Butler*
Virginia Hill Butler
Iris Halpern
2701 Lawrence Street, Suite 100
Denver, CO 80205
T: (303) 578-4400
E: vb@rmlawyers.com
   ih@rmlawyers.com

ATTORNEYS FOR PLAINTIFF

14

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of August 2023, I electronically filed and served the

foregoing **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** using the

CM/ECF system, which will send notification of such filing to the following:


Thomas W. Carroll
Nicholas Hankins
LITLER MENDELSON, P.C.
1900 Sixteenth Street, Suite 800
Denver, CO 80202
Telephone: 303.629.6200
Fax: 303.629.6200
Email: tcarroll@littler.com
          nhankins@littler.com

*Attorneys for Defendant Circle K Stores, Inc.*


                                        s/ Virginia Hill Butler
                                        Virginia Hill Butler

# Exhibit 1
# Rule 30(b)(6) Dep. Tr.

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-02327-NYW-STV

_____

DEPOSITION OF SUSIE FERNANDEZ as          June 20, 2023
30(b)(6) Representative of
CIRCLE K STORES, INC.

_____

MARY ANN MORENO,

              Plaintiff,

vs.

CIRCLE K STORES, INC.,

              Defendant.

_____

        The deposition of SUSIE FERNANDEZ, taken
before Leeann Stellor, a Registered Merit Reporter,
Certified Realtime Reporter, and a Notary Public in
and for the County of Summit and the State of
Colorado, at 2701 Lawrence Street, Suite 100,
Denver, Colorado, on Tuesday, June 20, 2023, at the
hour of 10:03 a.m.



Page 77

1    list that we have.

2         Q.    Okay.  And were each of these individuals

3    fired?

4         A.    Yes.

5         Q.    Okay.  Were each of these individuals --

6    scratch that.  All right.  Let's move on to topic 5.

7                     Topic 5 is, "The identity of all

8    individuals who were terminated for Don't Chase or

9    Confront Policy violations in the region Amy Harvey

10   supported while she was a human resources manager."

11                    What did you do to prepare for

12   topic 5?

13        A.    I pulled all the terminations for the

14   time frame that were requested, used keywords for

15   what violation from our HRIS system.

16        Q.    What keywords did you use?

17        A.    "Chase," "confront," and I want to say

18   "assault."

19        Q.    On behalf of Circle K, what region did

20   Amy Harvey support as an HR manager?

21        A.    She supported Region 3, Region 4,

22   Region 5, Region 7, Region 8, and Region -- we had a

23   Region 9 for a portion of that time.

24        Q.    What states were in that region?

25        A.    Oklahoma, Kansas, Texas, New Mexico, and



Page 78

1    Colorado.

2         Q.    Okay.  Was Missouri in that region, in

3    those regions?

4         A.    I think we might have had one store

5    there.

6         Q.    And what years was Ms. Moreno -- excuse

7    me, Ms. Harvey the HR manager for those regions?

8                    MR. CARROLL:  I'll object that it's

9    outside the scope of the noticed topics.

10                   But please answer, if you're able.

11        A.    August of 2017 until her termination date

12   of, I think it was, October 21.

13        Q.    How many Circle K employees were

14   terminated for violations of the Don't Chase and

15   Confront Policy when Ms. Harvey was an HR manager

16   for the company?

17                   MR. CARROLL:  I object that that's

18   outside the scope of the noticed topics.

19                   Please answer, if you're able.

20                   Object to the form of the

21   question.

22        A.    I don't know the number.  I've turned it

23   in, I mean, produced all of it.

24        Q.    Well, then let's move on to this document

25   provided by counsel, that we will mark as



1    Exhibit 21.

2                    (Exhibit No. 21 was marked.)

3        Q.    Do you recognize Exhibit 21?

4        A.    Yes.

5        Q.    And what is it?

6        A.    It's the list of terminations from chase

7    and confront when Amy -- well, from October 2018 to

8    October '21.

9        Q.    Okay.  And do you know the circumstances

10   of each of these terminations?

11       A.    I know they were all chase and confront.

12   But each individual, I do not.

13       Q.    Did Ms. Harvey approve each of these

14   terminations?

15                    MR. CARROLL:  I'm going to object.

16   That's beyond the scope of the noticed topics.

17                    But please answer, if you know.

18       A.    I -- I don't know.

19       Q.    On behalf of Circle K, if Ms. Harvey

20   didn't approve of each of these terminations, then

21   who did?

22                    MR. CARROLL:  I object that that's

23   beyond the scope of the noticed topics.

24                    Please answer, if you can.

25       A.    It could have been the market manager and



Page 84

1    without human resources' involvement?

2            MR. CARROLL:  I object that the

3    question's outside the scope of the noticed topics.

4    I object to the form of the question.

5            But please answer, if you can.

6    A.    I -- I don't know.  I -- I know what the

7    system does today.  With upgrades and things, I

8    don't know if it's changed.  So I can't say with

9    100 percent certainty that it came through HR.

10   Q.    Okay.  Were you with the company at that

11   point in time?

12   A.    I was.  I was in a different position.

13   Q.    Okay.  As it currently stands, does every

14   termination require approval by human resources?

15           MR. CARROLL:  I object that that's

16   outside the scope of the noticed topics.

17           But please answer, if you can.

18   A.    For chase and confront?

19   Q.    Yes.

20   A.    Yes.

21   Q.    Okay.  We can move on to topic 6.

22           So topic 6 is, "The identity of

23   any employees in the region over which Amy Harvey

24   had responsibility who made physical contact with a

25   shoplifter, robber, attacker, or similar individual



Page 85

1    who was not terminated as a result of that contact,

2    including the circumstances surrounding the decision

3    not to terminate that employee."

4                    What did you do to prepare for

5    topic 6 as the Circle K designee?

6        A.    I pulled all the counseling, coaching

7    documentations for the time frame requested.

8        Q.    Could you elaborate on what that means?

9        A.    How we pull level terminations, we pull

10   that to see if there was disciplinary action that

11   did not lead to terminations came up.

12       Q.    Is that -- and what were the words you

13   used, "counseling" and "coaching."  Is that right?

14       A.    Yes.

15       Q.    Okay.  And so what does that mean, when

16   an employee has counseling and coaching?

17       A.    Where they're documented about a behavior

18   or something, an incident.

19       Q.    And how did you find these counseling and

20   coaching materials?

21       A.    I used keywords, but -- you know, I used

22   keywords when we did that.  I think we switched it

23   up a lot, just trying to find anything where

24   "physical" or, you know, "chase" and "confront" came

25   up in the comments or in the description of what the



Page 86

1    counseling was for.

2         Q.    Okay.  Do you remember exactly which

3    keywords you used?

4         A.    I think it was "chase," "confront."

5         Q.    Okay.  So on behalf of Circle K, how many

6    employees made physical contact with an individual

7    in the store that came up as a result of your

8    search?

9         A.    Two.

10        Q.    Okay.  And what are their names?

11        A.    Nathaniel Meyer.

12        Q.    Okay.  And who's the other individual?

13        A.    Jonathan Rosas (ph).

14        Q.    Okay.  And so just to backtrack.

15   Mr. Meyer and Mr. Rosas, are those two individuals

16   the only individuals that you have record of that

17   made physical contact with a person in a store and

18   were not terminated?

19        A.    Yes.

20             MR. CARROLL:  Objection.  Form.

21        Q.    Okay.  Can you -- let's start with

22   Mr. Meyer.  Can you describe the circumstances of

23   what happened in his scenario?

24        A.    This was --

25             MR. CARROLL:  One moment.  Are you



Page 87

1    asking about the decision not to terminate, or are

2    you asking for a broader set of circumstances?

3              MS. BUTLER:  The circumstances around

4    the decision not it terminate.

5              MR. CARROLL:  Okay.  Thanks.

6        A.    On this one, I contacted Loretta Cordova,

7    Amy Harvey, and Robert Sway and could not get a

8    definitive recollection from any of them on why they

9    decided not to terminate.

10       Q.    Okay.  And who was that third individual?

11       A.    Robert Sway.

12       Q.    And who is that?

13       A.    He was the HR director.

14       Q.    Okay.  And is there video footage of this

15   incident?

16       A.    I did not find video.

17       Q.    Is there a description of the incident?

18       A.    Yeah.  I think it was the employee came

19   out from behind the counter, told the person to

20   leave.  Had his phone, and he knocked the phone out

21   of his hand, is my recollection.  But I could be

22   talking about someone totally different too, but I

23   think that's what it was.  And I think that's when I

24   called Robert and Loretta, to see if they could shed

25   some light on it.



Page 88

1       Q.    So how do you know this information about
2   what happened?
3       A.    There was a description on the
4   termination.
5       Q.    Okay.  Do you know why there's no video
6   footage?
7       A.    I do not know.
8       Q.    Okay.  So how does Circle K know that
9   there was contact between Mr. Meyer, and I guess
10  we'll use the term, customer?
11              MR. CARROLL:  I'll object that this
12  is outside the scope of the noticed topics.
13                  But please answer, if you're able.
14      A.    I don't know what -- how they were
15  informed.
16      Q.    Was there any type of investigation into
17  the incident?
18      A.    I don't know.
19              MR. CARROLL:  Same objection.
20                  Please answer, if you can.
21      Q.    So is there any proof of any physical
22  contact between Mr. Meyer and any employee -- excuse
23  me, and any customer in the store?
24              MR. CARROLL:  Objection.  Form.  And
25  outside the scope of the noticed topics.



Page 89

 1                      But please answer, if you can.

 2          A.    I don't know.

 3          Q.    But there's no video footage?

 4          A.    No.

 5          Q.    Was there video footage at the time that

 6    was reviewed?

 7          A.    Loretta did not seem to have very good

 8    recollection of it when I spoke to her yesterday.

 9          Q.    And how about Ms. Harvey and Mr. Sway,

10    did they -- had they reviewed any video?

11          A.    Neither one of them had any recollection

12    of the incident at all.

13          Q.    And did any of the people involved in the

14    decision not to terminate Mr. Meyer know why that

15    decision was made?

16          A.    None of them really had recollection of

17    the incident at all.

18          Q.    Okay.  Let's talk about Jonathan Rosas

19    then.  Can you describe what happened for Mr. Rosas?

20          A.    This is one where there was an incident

21    in the store.  It was a shoplifting incident, I

22    believe.  And him and the assistant manager

23    contained the customer, I believe they said?  But I

24    know why -- we terminated one person.  We terminated

25    the assistant manager, but we did not terminate the



Page 90

1    other person based on that he was doing what his

2    superior told him to do.

3        Q.    Okay.  And is there any video footage of

4    this incident?

5        A.    We could not find any video of this.  I

6    know that Raj spoke to Freddy, who was the market

7    manager at the time, and asked him about why this

8    person was not terminated.

9        Q.    And excuse me, can you remind me the name

10   of that individual you just said?

11       A.    Freddy.

12       Q.    The other?

13       A.    Raj.

14       Q.    Yeah.  Raj?

15       A.    Hom Raj.  Sorry.

16       Q.    Hom Raj.  Did he speak to Freddy recently

17   in preparation for --

18       A.    Yes.

19       Q.    -- this deposition?

20       A.    Yes.

21       Q.    Okay.  And what did he speak with Freddy,

22   the market manager, about?

23       A.    Why this person was not terminated for a

24   chase and confront.

25       Q.    Okay.  And so on behalf of Circle K, is



Page 98

1  designee, was Ms. Moreno a better employee than

2  other CSRs?

3                MR. CARROLL:  Object to the form of

4  the question.

5       A.    We have 2,000 employees that work for me.

6  I don't know if I could say she was better than all

7  of them.

8       Q.    On behalf of Circle K, did Ms. Moreno's

9  performance as a CSR play any role in her

10 termination?

11      A.    I was not told that it did, so I would

12 say no.

13      Q.    On behalf of Circle K as a designee, was

14 her termination based solely on her actions on the

15 night of October 4th, 2020?

16      A.    Yes.

17      Q.    Okay.  So on behalf of Circle K, did her

18 performance as an employee have any role in her

19 termination?

20      A.    Just her actions on October 4th.

21      Q.    But setting --

22      A.    Not her performance.

23      Q.    Okay.  So on behalf of Circle K, is her

24 contact with the assailant on October 4th the only

25 reason for her termination?



Page 99

1           MR. CARROLL:  Object to the form of

2    the question.

3           A.    Yes.

4           Q.    We can move on now to topic 8.  We'll get

5    into that issue about her time with Circle K versus

6    other entities.

7                 So topic 8 is, "Ms. Moreno's

8    continuous service date of October 29th, 2004,

9    including what continuous service date means."

10                So what is Ms. Moreno's continuous

11   service date with Circle K?

12          A.    October 29, 2004.

13          Q.    So what does that mean?

14          A.    When Circle K bought the previous company

15   that her and I both worked for, they honored our

16   original hire date.  So like for benefits, you get a

17   certain amount of vacation for a certain amount of

18   years you worked.  So instead of losing that, they

19   honor that.

20          Q.    Okay.  So does that mean that the

21   original hire date reflected -- well, let me back

22   up.

23                What was the company that Circle K

24   acquired?

25          A.    CST Brands.



Page 100

1     Q.    So does that mean that her hire date

2  reflected in CST systems reflected a hire date of

3  October 29th, 2004?

4     A.    Yes.

5     Q.    Okay.  So did she have to apply for her

6  job again?

7     A.    No.

8     Q.    Was there any sort of changes that

9  impacted her daily life as a CSR, besides maybe some

10  branding changes?

11           MR. CARROLL:  I'm going to object

12  that that's outside the scope of the noticed topics.

13           But please answer, if you can.

14     A.    When Circle K bought CST, we kind of ran

15  the business as it was.

16     Q.    Okay.

17     A.    For a time.  And then we changed medical

18  providers, so I guess that could be a change.

19     Q.    Okay.  So when Circle K bought the stores

20  Ms. Moreno was working in, did she just come on to

21  the Circle K system as a standing employee?

22     A.    Yes.

23     Q.    And so this continuous service date, does

24  that mean, for instance, her pay and all of her

25  seniority and all of that continued, despite the



# Exhibit 2
# Jorgensen Dep. Tr.

Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT
OF COLORADO

Civil Action No. 1:22-cv-02327-NYW-STV

---------------------------------------------------------
DEPOSITION OF LOVE JORGENSEN                 May 1, 2023
---------------------------------------------------------
Plaintiff,
MARY ANN MORENO,

v.

Defendant,
CIRCLE K STORES, INC.

---------------------------------------------------------
APPEARANCES:

    RATHOD MOHAMEDBHAI, LLC
        By Virginia H. Butler, Esq.
            2701 Lawrence Street
            Suite 100
            Denver, Colorado  802025
              Appearing on behalf of Plaintiff.


    LITTLER MENDELSON, PC
        By Thomas W. Carroll, Esq.
            1900 16th Street
            Suite 800
            Denver, Colorado  80202
              Appearing on behalf of Defendant.
Also Present:

            Iris Halpern, Rathod Mohamedbhai, LLC

            Nicholas Hankins, Littler Mendelson, PC



Page 26

1   four or five employees.  -or CSRs.

2        Q     Okay.  And what -- what shifts would --

3   what are the typical hours for these locations?

4        A     Like morning shift is 6:00 to 2:00,

5   afternoon shift is 2:00 to 10:00, and graveyards are

6   10:00 to 6:00.

7        Q     So are each of these stores open 24/7

8   then?

9        A     A lot them are.

10       Q     Okay.  And is the -- the Sheridan Circle

11  K then, was that open 24/7?

12       A     It was supposed to be.

13       Q     Does that mean there are times when it

14  wasn't?

15       A     Yes.

16       Q     What -- when did that typically happen?

17       A     When we are understaffed.

18       Q     And, so, in -- did that happen -- what

19  sort of frequency did that happen within 2020?

20       A     2020, we were open 24 hours.

21       Q     Okay.  And I think we all probably know

22  this, but what types of services does Circle K

23  provide?

24       A     Fuel.  Soda.  Merchandise.  At the

25  Sheridan location there was a car wash.



Page 27

```
 1        Q     And, so, there would typically only be
 2  one CSR working -- providing all of these services
 3  and overseeing all of those; is that correct?
 4        A     Yes.
 5        Q     And what were the hours that a manager or
 6  assistant manager would work?
 7        A     The manager works from -- I'm just going
 8  to give you my hours.  I work a 10-hour day.
 9        Q     Okay.
10        A     So I go in at 4:00 and leave at 2:00.
11        Q     Is that 4:00 a.m.?
12        A     4:00 a.m.
13        Q     Okay.  Okay.  And I want to talk more
14  specifically then about the Sheridan location and
15  you -- at that time, in October of 2020, would have
16  been a manager in training; is that correct?
17        A     Yes.
18        Q     So all of my questions now are going to
19  be to focused on that time period.  So what were
20  your responsibilities then in -- in that position as
21  a manager in training?
22        A     Paperwork.  Payroll.  Ordering.  Audits.
23  Scheduling.
24        Q     Could you walk me through what an average
25  day looked like at that time?
```



Page 41

```
 1      Q     And who were the other two -- excuse
 2  me -- CSRs?
 3      A     I had -- I'm trying to think of who all I
 4  had.  I had Mary, I had Ramalda Perez [phonetic],
 5  and Christina.  She was gave yard.  I can't remember
 6  her last name.
 7      Q     And I'm going to ask some questions about
 8  Ms. Moreno now.  I'm going to switch gears a little
 9  bit.  How long have you known her?
10      A     Just the time I worked with her at Circle
11  K.
12      Q     And about how long was that?
13      A     It was about ten months or eight
14  months -- nine months --
15      Q     Okay.
16      A     -- from the time I started being the
17  manager there until --
18      Q     Okay.  And how much did you work with her
19  when you -- when you were both at the Sheridan
20  location?
21      A     When I was there, I left when she got
22  there work-wise.  So she would come in at 2:00 and I
23  already would have left -- would have been leaving
24  for the day.
25      Q     Okay.  So was there one CSR that you
```



Page 45

1    that you experience then, is that typical of other

2    convenience stores that you've worked at?

3         A    Yes.

4         Q    Okay.  Is it helpful to Circle K to have

5    employees stay in their positions for a little

6    while?

7         A    Yes.

8         Q    Why?

9         A    Because they know what they're doing.

10   They can help train new employees so we can send

11   them to other stores.  If they want to move up in

12   the company, they can move up in the company, have

13   somebody still fill that position.

14        Q    Mm-hmm.  Okay.  So there's value to

15   having an employee remain for a while?

16        A    Yes.

17        Q    Okay.  And did you feel that with

18   Ms. Moreno having been there for a while?

19        A    I don't understand the question.

20        Q    Did you feel like Ms. Moreno added value

21   with having -- with her experience beyond just what

22   you would expect of a CSR who had only been there

23   for a couple of months?

24        A    Yes.

25        Q    What did you think of Ms. Moreno's



Page 46

1   performance as an employee?

2       A     She was a good employee.

3       Q     What -- could you elaborate on that?

4   Compare -- let's just compare her to other employees

5   or something like that.

6       A     She did her job.  She knew what she was

7   doing.  I really didn't have to get out there about

8   her on anything.

9       Q     Okay.  What were some of her strengths as

10  a worker?

11      A     She cleaned.  She stocked.

12      Q     And I know you said you -- when you watch

13  the video of an employee's shift you're looking for

14  anything out of ordinary.  Did that happen with any

15  frequency when you were watching videos of

16  Ms. Moreno's shifts?

17      A     No.

18      Q     Was it -- were her videos -- did they

19  usually have less -- let me -- this is going to be a

20  double negative.

21           Did other employees' videos usually have

22  more out of the ordinary circumstances than

23  Ms. Moreno's when you watched them?

24      A     On grave yard shift there was more people

25  taking stuff, but that's due to the fact that it's



Page 47

```
 1    late at night and they think the CSR is not paying
 2    attention.
 3          Q     Okay.  So that wouldn't necessarily be
 4    the employee's fault?
 5          A     No.
 6          Q     Okay.  Was Ms. Moreno a dependable
 7    employee?
 8          A     She was pretty dependable.
 9          Q     Did she show up for her shifts on time?
10          A     Yes.
11          Q     And did she show up -- whenever you
12    scheduled her, did you feel confident that she would
13    show up for her shift?
14          A     Yes.
15          Q     Okay.  Did she have any performance
16    deficiencies?
17          A     (No verbal response.)
18          Q     Were there any things you had to talk to
19    Ms. Moreno about regarding her performance as a CSR?
20          A     No.  Not really.
21          Q     Okay.  You say "not really."  Does that
22    mean there may have been something?
23          A     The only thing that I could really think
24    of is her daughter being at the store frequently.
25          Q     Okay.
```



Page 88

 1      A      Her termination paperwork.

 2      Q      Okay.  Did anyone speak to you about

 3  that?

 4              MR. CARROLL:  Objection.  Ms. Jorgensen,

 5  I would just remind you not to reveal any sort of

 6  attorney-client communications.

 7      A      I read it on the termination paper.

 8      Q      Okay.  Was the termination paperwork the

 9  first time you learned that Ms. Moreno was fired?

10      A      Mr. Aamoud said he was going to terminate

11  her.

12      Q      Okay.  We'll talk about that a little bit

13  more later, but I want to talk about everything you

14  remember about the night of October 4th when

15  Ms. Moreno was attacked while at work.  Let's just

16  start broadly.  Can you tell me everything that you

17  remember from that night?

18              MR. CARROLL:  Object to the form of the

19  question.

20      A      Ms. Moreno called me.

21      Q      Okay.  Around when?

22      A      I can't remember the exact time.

23      Q      Just a ballpark is fine.

24      A      I think it was about 6:30.

25      Q      Okay.



Page 89

1      A      Informed me somebody stole a pack of

2   cigarettes.  I asked her to call the assistant

3   manager, Amanda, because it was going to take me a

4   little while to get to the store.  And the next

5   phone call I got was from Mr. Aamoud asking me to

6   come to the store.

7      Q      And about how long after you spoke with

8   Ms. Moreno did Mr. Aamoud call you?

9      A      I do not remember what time, but I

10  arrived at the store about 7:50.

11     Q      About how far away from the store --

12  scratch that.  About how long did it take you to get

13  to the store?

14     A      About 25 minutes.

15     Q      Okay.  Did you head into the store

16  directly after you spoke with Ms. Moreno?

17     A      No.

18     Q      Why -- why or why not?

19     A      I asked her to call Ms. Smith to see if

20  she could go to the store.

21     Q      Okay.  Why did you do that?

22     A      Because I was at home in bed --

23     Q      Okay.

24     A      -- and I lived in Aurora at the time.

25     Q      Okay.  And did Ms. Moreno -- was she able



Page 120

1    October 7th.

2         Q     Okay.  And what day was the robbery?

3         A     October 4th.

4         Q     Okay.  And what day was Ms. Moreno fired?

5         A     October 8th was her termination day.

6         Q     Okay.  Do you know when the news was

7    communicated to Ms. Moreno that she was going to be

8    fired?

9         A     I do not know when it was communicated.

10        Q     Okay.  So Driss told you that she was

11   going to be fired.  Do you know if that was before

12   or after she learned the news?

13        A     I am not aware if it was before or after.

14        Q     Okay.  And what did he tell you in this

15   conversation?

16        A     Well, prior to that conversation on the

17   5th, Driss did call me and told me to have Mary just

18   get a hold of him directly --

19        Q     Okay.

20        A     -- instead of me being the go-between --

21   the go-between between the whole situation.

22        Q     Okay.

23        A     She called me and I told her she needed

24   to get a hold of Driss.

25        Q     Okay.  And what day did that happen?



# Exhibit 3
# Circle K Surveillance Video (Register 1) Conventionally Submitted

# Exhibit 4
# Police Report,
# Moreno 000315

| Narrative |
| --- |

On 10/04/2020 at 1856 hours, I responded to 9489 Sheridan Blvd. (Circle K) in reference to a Robbery in progress. The above address is in the City of Westminster, County of Jefferson, and State of Colorado.

Prior to arriving on scene dispatch advised a man with a five to six inch knife in his hand was inside the Circle K waiving the knife around. Dispatch described the male as a white male in his 30s of average build, wearing a straw cowboy style hat, gray shirt, and dark colored shirt.

I arrived on scene and contacted the victim and reporting party, a 72-year old clerk at the store, Mary Ann Moreno ▮▮▮▮▮▮▮▮ and she told me the following:

A male, later identified as Tyler Wimmer (DOB: 09/10/1985), entered the store through the north entrance with a hunting knife in his right hand and a second knife in plastic packaging. Mary Ann gestured to show the hunting knife was roughly six inches in size and was up, pointed forward. Mary Ann said the male started demanding cigarettes from her. Mary Ann asked for his ID and Tyler said no and came around the counter, stopping with roughly a foot of space between the two.

Mary Ann advised Tyler had the knife in his right hand and used his left and to grab a package of Camel brand cigarettes. Mary Ann said she took several steps away from Tyler and did not see exactly what he took from behind the register. Mary Ann said Tyler exited the store through the north entrance and she called 911.

Mary Ann recognized Tyler as a regular customer but did not know him by name. Mary Ann said Tyler is normally polite to her but stated today he "looked different." Mary Ann said Tyler did not smell like alcohol, but she believed he may have been under the influence of drugs.

Mary Ann was visibly shaking as she spoke with me and repeated "I'm so scared" several times. Mary Ann said she has been working as a clerk for 17 years and never been so scared. Mary Ann stated she was in fear for her life when Tyler came behind the counter with the knife in his hand and thought he was going to stab her.

Tyler was located by officers outside of the store. Officers instructed Tyler to "Stop police" and he began running southbound in the northbound lanes of Sheridan Blvd. Tyler ran back into the parking lot near a Qdoba, reached into his waistband and took a knife out. Tyler threw the knife at officers and continued running. Tyler ran at a high rate of speed at a marked patrol vehicle and was given verbal commands to get on the ground and that he was under arrest. Tyler was taken to the ground and placed in custody. See supplemental reports for details.

Mary Ann did not have access to the store's video surveillance system. Mary Ann advised her store Assistant Manager, Amanda Smith (720-808-8045) and Manager, Love Jorgenson (720-923-9252) could access the video surveillance system to collect footage. Mary Ann said the Manager, Love, would be in next on 10/05/2020 at 0500 hours and leaves at 1100 hours. Mary Ann did not know when the Assistant Manager, Amanda, would be in next but said she called to notify her.

I attempted to make contact with the Assistant Manager, Amanda, but was unable to reach her by phone.

I spoke with a witness who was in the store, Larry Wagner ▮▮▮▮▮▮▮▮, who told me the following:

Larry was in the store and saw a white man in a straw hat (later identified as Tyler) enter the store with a five to six inch knife in his hand. Larry

---

**Report: r_lw1ni.frx**          Printed by: (22161) LAROCHE, GEENA MICHELLE   at 10/5/2020 11:59          **Page 5 of 17**

# Exhibit 5
# 911 Call
# Conventionally Submitted

# Exhibit 6
# Moreno Dep. Tr.

                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-02327-NYW-STV
_____

DEPOSITION OF:  MARY ANN MORENO - April 12, 2023
_____

MARY ANN MORENO,

Plaintiff,

v.

CIRCLE K STORES, INC.,

Defendant.

_____

                    PURSUANT TO NOTICE, the deposition of
MARY ANN MORENO was taken on behalf of the Defendant at
1900 16th Street, Suite 800, Denver, Colorado 80202, on
April 12, 2023, at 9:16 a.m., before Carin C. Geist,
Registered Diplomate Reporter and Notary Public within
Colorado.

Mary Ann Moreno
April 12, 2023

```
 1          Q.   That was one of those times that I don't
 2  mean to interrupt.  Were you finished with your answer?
 3          A.   I'm sorry?
 4          Q.   I was just apologizing for interrupting
 5  and asking if you had finished.
 6          A.   Oh, yes, I'm sorry.
 7          Q.   So just to be clear, you hadn't seen the
 8  surveillance video about October 4, 2020, until last
 9  week, and even then, it didn't quite work?
10          A.   No.
11          Q.   Okay.  Do you understand that in a lawsuit
12  like this one, you're required to disclose documents
13  that you have that you might use to support your
14  claims?
15          MS. HALPERN:  Object to form.
16          A.   The only document -- well, it's -- it's a
17  written letter that I wrote the night it happened in
18  detail, but I didn't bring it with me, but my lawyers
19  have a copy of it, I think.
20          MS. HALPERN:  We produced it.
21          Q.   (BY MR. CARROLL)  I do too.  Let me ask
22  you -- let me ask it this way:  Circle K asked, through
23  your lawyers, for various documents related to this
24  case.  To the best of your knowledge, have you produced
25  the documents that you have that might be relevant to
```

Mary Ann Moreno
April 12, 2023

1          Q.   So inventory was, like, one particular

2     week you worked a little bit more?

3          A.   For the year, yeah.

4          Q.   I used to work retail myself.  I know that

5     inventory was always kind of a big, I don't know, black

6     spot on the calendar.

7          A.   Yes.

8          Q.   And sort of all hands on deck.

9               I'd like to spend a little time talking

10    about the period of time between the end of your

11    employment at Circle K and when you started your job at

12    Dollar Tree.

13         A.   Okay.

14         Q.   So October of 2020 until January of 2021.

15    Right?

16         A.   Yes.

17         Q.   Ms. Moreno, what were you doing during

18    that period of time, if anything, to find a new job?

19         A.   Looking for a job.  I applied at several

20    places.  I mean, I would get on my computer, or my

21    daughter would get on the computer because I don't know

22    how to use a computer, and she would help me through

23    them and -- but I never got calls.  Dollar Tree was the

24    only one that ever called me.

25         Q.   I'm going to ask a few follow-up

Mary Ann Moreno
April 12, 2023

1  said that her daughter was helping her.

2              MR. CARROLL:  Fair enough.

3        Q.  (BY MR. CARROLL)  Let me be very clear

4  here, and we'll separate things out between you and

5  your daughter, okay?  Let me start with you.  Did you

6  do anything after your employment with Circle K

7  ended -- well, let me phrase it differently.

8              What did you do in order to find a new

9  job?  And we'll talk about your daughter in a minute.

10       A.   I don't think -- I didn't go out, you

11  know, personally because I don't drive that much, and I

12  have a fear of driving, so I really didn't go out.

13  That's why we -- my daughter helped me on the computer.

14       Q.   Okay.  I'll come back to your daughter.

15  Let me just focus still on you for a little while.  I

16  understand you didn't go out.  Did you maybe look at

17  the want ads in the newspaper, for example?

18       A.   Did they still have newspapers?  I don't

19  know.  No, I didn't.

20       Q.   Okay.  And did you maybe, like, go

21  anywhere on the internet and find out, you know, who's

22  trying to hire right now, who's posting a job?

23       A.   Well, my daughter did.  I didn't.

24       Q.   All right.  So let's go back to your

25  daughter, then, or move to your daughter.  To your

Mary Ann Moreno
April 12, 2023

1  knowledge, what did your daughter do to help you find a

2  job after your Circle K employment ended?

3       A.   She got on the computer and pulled up a

4  bunch of businesses or -- I've always worked retail

5  since I was 17, so that's the type of job I was looking

6  for, or even just a customer rep.  So she would pull up

7  all these businesses, you know, like Hallmark, Walmart,

8  never restaurants, and that's how she would do it.

9       Q.   And am I correct that she would submit an

10 application on your behalf?

11      A.   Well, I would sit there with her and give

12 her all the information, yes.  And then she would type

13 it in or however they do in their computers.

14      Q.   Together, the two of you would complete

15 the information on the computer and then submit an

16 application?

17      A.   Yes.

18      Q.   Okay.  Were you looking for a full-time

19 job or a part-time job?

20      A.   Full-time.  And, actually, at that time, I

21 was looking for whatever I could get at that time.

22      Q.   Understanding that it was your daughter

23 who did a lot of this, as you sit here today, ma'am, do

24 you have any idea how many jobs you applied for?

25      A.   Oh, my God, no.  Maybe ten or more.  I

Mary Ann Moreno
April 12, 2023

1          A.    Two hunting knives.

2          Q.    As well as other things, right?

3          A.    Not that I noticed.

4          Q.    The only things he had with him were two

5    knives?

6          A.    Yes.  That's what I saw because he walked

7    in like this with them and threw them on the counter or

8    set them down on the counter.

9          Q.    So that --

10         A.    One was in its package, and the other one

11   was out of the package.  There was no package on them.

12         Q.    So your testimony is the only things he

13   had were two knives, one in the package and one

14   outside?

15         A.    Yes.

16         Q.    Okay.

17               MS. HALPERN:  Can I ask you a quick

18   question?  Are you going to ask questions about the

19   video footage?

20               MR. CARROLL:  I haven't decided.

21               MS. HALPERN:  Okay.  Could we take it

22   down, then, at least?

23               MR. CARROLL:  Sure.

24               MS. HALPERN:  It's just kind of confusing.

25   Go ahead.

Mary Ann Moreno
April 12, 2023

1          Q.   (BY MR. CARROLL)  How -- and did

2    Mr. Wimmer threaten you?

3          A.   No.

4          Q.   Did you ever consider running away from

5    him?

6          A.   Where could I run?  I was back in a

7    corner.  Behind me was a window.

8          Q.   So --

9          A.   Or to the --

10         Q.   Is that no, you did not consider running

11   away?

12         A.   No, no.

13         Q.   Okay.  At some point you spoke to a 911

14   operator; is that right?

15         A.   I did.  I called -- I picked up the phone

16   and called the police.

17              MR. CARROLL:  Okay.  Let me switch back

18   here.  So for the record, Deposition Exhibit 7 is going

19   to be an audio file.  It's been produced and

20   Bates-labeled as Moreno 346.  I think it makes sense

21   for the entire document to be the exhibit.  Whoops.

22   But as counsel knows, this recording has two different

23   phone calls in a single file.

24              (Exhibit 7 was provided to the reporter

25   electronically after the conclusion of the deposition.)

Mary Ann Moreno
April 12, 2023

```
 1          A.    No.
 2          Q.    (BY MR. CARROLL)  Did anyone ever tell you
 3   that you were being terminated because you engaged in
 4   self-defense?
 5               MS. HALPERN:  Object to form.
 6          A.    Yes.  I'm going to say yes to that
 7   question.
 8          Q.    (BY MR. CARROLL)  Who?
 9          A.    Driss.
10          Q.    What did he say?
11          A.    Do you know what you did, Mary?
12   Repeatedly and repeatedly and repeatedly, when I didn't
13   do anything wrong.  I was defending myself.  I had no
14   idea what this gentleman or this kid was going to do
15   when he came around.  Somebody comes at you, you're
16   going to react.
17          Q.    Did Driss Aamoud say to you, you are being
18   terminated for self-defense?
19          A.    He didn't say in those words, no.
20          Q.    Did he ever say the words "self-defense"?
21          A.    Not that I can recall, no.
22          Q.    In fact, if I recall your testimony
23   correctly, from your perspective, he never told you at
24   all why you were being terminated, right?
25          A.    No.
```

Mary Ann Moreno
April 12, 2023

```
 1              MS. HALPERN:  I just have a couple
 2   follow-up questions.
 3                     EXAMINATION
 4   BY MS. HALPERN:
 5         Q.  So, Ms. Moreno, do you remember when
 6   Mr. Carroll was asking you if -- if Mr. Wimmer
 7   threatened you on the night of October 4?  Do you
 8   recall when he was asking you about that?
 9         A.   Not personally, but I felt my life in
10   danger.  I was afraid for my life.  Like I said, you
11   know, somebody comes at you, you're not going to
12   flinch.  You're going to try to self-defense -- you
13   know, defend yourself against somebody.
14              Just knowing that he had those knives, I
15   had no idea what he was capable of; and he was weird
16   anyway, the way he was acting.  So, I mean, what was I
17   supposed to do?  Fight for my life.  I wasn't going to
18   let him attack me.
19         Q.  And when Mr. Carroll asked if Mr. Wimmer
20   threatened you, did you think he was referring to
21   verbal threats?
22         A.   No.
23         Q.  Did you think Mr. Carroll, not Mr. Wimmer.
24   The attorney.
25         A.   Oh, I'm sorry.
```

# Exhibit 7
# Aamoud Dep. Tr.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Case No. 1:22-cv-02327-NYW-STV

_____

MARY ANN MORENO,

Plaintiff,

v.

CIRCLE K STORES, INC.,

Defendant.

_____

DEPOSITION OF DRISS AAMOUD

May 18, 2023

_____

PURSUANT TO NOTICE, the above-entitled deposition was taken on behalf of the Plaintiff at 2701 Lawrence Street, Denver, Colorado 80205, on May 18, 2023, at 10:00 a.m., before Karen S. Fogle, Registered Professional Reporter and Notary Public within Colorado.

MAGNA LEGAL SERVICES

(866) 624-6221

magnals.com



Page 68

1          Q.  What do you believe Ms. Moreno did that

2     violated the policy?

3          A.  Several things.  Argumentative, getting in

4     the way of the robber, denying the robber's request,

5     pointing the finger at the robber, pulling the robber

6     from his shirt to get him out of not taking the

7     cigarettes.

8          Q.  When you say pointing the finger at the

9     robber, do you mean literally or metaphorically?

10         A.  Literally.

11         Q.  When she literally pointed her finger at

12    him?

13         A.  Correct.  In a threatening way.

14         Q.  Are there any other things Ms. Moreno did

15    that you think violated the chase and confront policy?

16         A.  These are the things, threatening,

17    confronting, pulling, pushing, denying, argumentative

18    so --

19         Q.  So do you believe then that Ms. Moreno

20    violated the policy before she had physical contact

21    with the robber?

22         A.  Absolutely.

23         Q.  I'm going to give you a document that has

24    been marked in a previous deposition as Exhibit 3.

25    Have you seen this document before?



Page 103

1          Q.   Correct.

2          A.   You can repeat it.

3          Q.   Has there ever been an employee at Circle K

4    that you're aware of who had physical contact with an

5    attacker who was not fired?

6               MR. HANKINS:   Object to form.

7          A.   No.

8          Q.   (BY MS. BUTLER)   I also want to talk about

9    these videos you talked about reviewing where the

10   employee was -- robberies where the employee was

11   screaming or crying and backing away from the attacker.

12   Do you remember that?

13         A.   Yes.

14         Q.   When you were talking about that, that

15   didn't refer to any videos you reviewed at Circle K;

16   correct?

17         A.   Can you ask the question again?

18         Q.   I asked you how many armed robberies there

19   were at Circle K and you said there had been two.

20   Before that you had talked about watching videos where

21   employees had been upset and crying and screaming

22   and -- not beer run robberies, just robberies -- and so

23   I'm trying to see -- those videos you're talking about,

24   those aren't videos while you were working as a manager

25   at Circle K?



Page 109

1          Q.  Do you remember what Mr. Holmes said to you

2     on the phone?

3          A.  No.

4          Q.  Did Mr. Holmes do anything at that point?

5          A.  He was going to report it to his boss as

6     part of the five-minute rule.  I'm just stating that's

7     the rule.

8          Q.  Did you have any other conversations with

9     Mr. Holmes that night?

10          A.  After.

11          Q.  We can put that aside for now.  Then in

12     this period of time when you're on the way to the store

13     or around then, did you speak with anyone besides

14     Ms. Jorgensen and Mr. Holmes?

15          A.  No, I don't think so.

16          Q.  Did you contact anyone in HR or anything?

17          A.  I don't remember.

18          Q.  What was the first thing you did when you

19     got to the store?

20          A.  I made sure that Mary was okay and if she

21     needs anything or whatever while I'm there and show

22     support, in general.

23          Q.  I'm going to pull up a video with some

24     footage.  After you asked Mary what happened and made

25     sure she was okay, what did you do next?



Page 110

1          A.   I believe I went to look at the video in

2     the back office.

3          Q.   Why was that your next step?

4          A.   To get a better view because usually

5     information you hear -- from my experience firsthand, I

6     wanted to get a view of what I see because I have to

7     report what I actually saw.

8          Q.   What did you see when you watched the

9     surveillance video footage?

10         A.   I saw a person come and ask for cigarettes,

11    if I remember.  But he didn't have an I.D.  Mary

12    refused to sell the sale.  He asked her to give him

13    cigarettes anyway.  She refused.  And I believe he

14    asked her -- he told her that he was going to grab them

15    himself.  And I think she told him no, you're not, I'm

16    going to call the police.

17              As he proceeded to go around the counter,

18    she pointed the finger at him and got in his way and

19    then stopped blocking him.  And he proceeded to go

20    where he needed -- the cigarette rack -- and he got

21    cigarettes and she pulled him -- he had a box in his

22    hand, and she pulled him from the back of his shirt.

23         Q.   When you were in the back watching the

24    surveillance footage, did you talk to anyone about

25    this?  Were you on the phone with anyone or was it just



Page 113

1          Q.   I'm talking in generals here, not this

2     specific instance.

3          A.   No.

4          Q.   So if an employee said there was a robbery,

5     you would assume there was a robbery?

6          A.   Right.

7          Q.   If an employee said there was a knife,

8     would you typically assume that they were telling the

9     truth about that?

10         A.   Absolutely.

11         Q.   So after this conversation at 8:26 p.m.,

12    you go back to the office and watch the video.  And

13    then what do you do after you had finished reviewing

14    the video?

15             MR. HANKINS:  Object to form.

16         A.   One of the things I did was bring Love --

17    the manager -- by the time she got there and we're

18    looking at the video together.  And the other thing was

19    bring Mary back and show her the video and she said, "I

20    know.  I screwed up.  I wasn't supposed to do that."

21    That I remember.

22         Q.   (BY MS. BUTLER)  Let's break that down a

23    little bit.  I'm going to fast forward the video now to

24    8:37 p.m.  By this point have you finished reviewing

25    the footage?



Page 125

1   week later?

2         A.   No.   It was within the same week.   I don't

3   remember the exact date.

4         Q.   What sort of investigation typically

5   happens in a situation like this?

6         A.   I review the video and then communicate

7   with my boss.   And then he might review the video also

8   and then HR -- Amy -- she would do her own -- and then

9   she does the necessary investigation.   And she does it.

10  And then we meet to make a decision.

11        Q.   You say Amy Harvey would have already

12  known, what do you mean by that?

13             MR. HANKINS:   Object to form.

14        A.   I didn't say that.

15        Q.   (BY MS. BUTLER)   I must have misheard.

16  What did you mean about Ms. Harvey?

17        A.   She would make her own investigation and

18  she would review the video and then she would

19  communicate back to us what should happen and what

20  should commence.

21        Q.   How long do you remember this -- is that

22  the whole extent of the investigation?

23        A.   I would say so.

24        Q.   So it primarily consists of reviewing video

25  footage; is that accurate?



Page 126

1          A.  I can't speak for Amy.  I don't know what

2     else she does but I think so.

3          Q.  Did you talk to anyone as part of any

4     investigation?

5          A.  I don't remember.

6          Q.  Do you remember talking to Ms. Moreno about

7     any investigation?

8          A.  I don't remember.

9          Q.  So you don't remember any conversations you

10    may or may not have had about Ms. Moreno's termination?

11         A.  I don't remember the conversation.

12         Q.  Do you remember anyone you talked to about

13    it?

14         A.  No.  I remember telling my bosses.  That's

15    what I remember.

16         Q.  Apart from your boss, do you remember if

17    you told HR about recommending the termination or

18    whether or not your boss told HR?

19              MR. HANKINS:  Object to form.

20         A.  I don't remember.

21         Q.  (BY MS. BUTLER)  Did you talk to anyone

22    besides Mr. Holmes and Ms. Harvey about Ms. Moreno's

23    termination?

24              MR. HANKINS:  Object to form.

25         A.  I don't remember.



Page 154

1           A.   It would have made it worse.

2           Q.   (BY MS. BUTLER)   Why is that?

3           A.   She put herself -- her own safety at risk

4   on company property.

5           Q.   Do you think Ms. Moreno was trying to

6   confront the robber when he came behind the counter?

7           A.   Yes.

8           Q.   Why do you think that?

9           A.   With her actions.

10          Q.   What are those actions that make you think

11  that?

12          A.   Argumentative, threatening to call the

13  police, getting in his way, obstructing his way to the

14  cigarette rack, and pulling him.

15          Q.   I want to talk about the robber, Tyler

16  Wimmer, and the cigarettes.  First of all, we touched

17  on it earlier but there is this initial moment where

18  Mr. Wimmer comes up to the counter and asks for the

19  cigarettes; right?

20               MR. HANKINS:  Object to form.

21          A.   Yes.

22          Q.   (BY MS. BUTLER)   What happens then?

23          A.   She asks for I.D., I believe.  And then he

24  didn't have an I.D.  She refused the sale.  And then he

25  tells her to give him cigarettes anyways.



Page 155

1          Q.  So at that point should Ms. Moreno have

2     given him the cigarettes?

3          A.  No.

4          Q.  So would it have been a company policy

5     violation for her --

6          A.  No.

7          Q.  Could you explain that?

8          A.  She refused the sale because there was no

9     I.D.

10         Q.  Would it have been a company policy

11    violation for her to have given him those cigarettes

12    without showing an I.D.?

13         A.  Correct.

14         Q.  So by refusing the sale she abided by

15    policy?

16         A.  Correct.

17         Q.  In so doing she obviously angered

18    Mr. Wimmer; is that correct?

19             MR. HANKINS:  Object to form.

20         A.  I don't know.

21         Q.  (BY MS. BUTLER)  You talked about how

22    Mr. Wimmer comes around the counter -- what happens

23    next after Ms. Moreno refuses the sale?

24         A.  Can we play the video?

25         Q.  I'm going to ask you the questions.  What



# Exhibit 8
# Holmes Dep. Tr.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-02327-NYW-STV

_____

MARY ANN MORENO,

            Plaintiff,

    v.

CIRCLE K STORES, INC.,

            Defendant.

_____

        Pursuant to Notice and pursuant to Rule 30 of the Federal Rules of Civil Procedure, the deposition of CRAIG HOLMES, was taken on behalf of the Plaintiff by counsel from the offices Rathod Mohamedbhai of at 10:00 a.m. MST on June 22, 2023 and reported by Ruth Collins of MAGNA LEGAL SERVICES (866) 624-6221.



Page 44

1          A.    So the HR manager, Amy Harvey, the market

2     manager, Driss Aamoud both agreed and collaborated that

3     the policy on confront had been breached.  And I agreed

4     with both their opinions.  So collaboratively the three

5     of us agreed to separate.

6          Q.    Was that the first time you spoke with Amy

7     Harvey about Ms. Moreno's termination?

8          A.    I spoke with Amy Monday morning.  And then the

9     three of us convened Monday afternoon, after I had

10    spoken with Driss again.  We had probably two to three

11    conversations.

12         Q.    Were they are all on Monday?

13         A.    Yes.

14         Q.    Did you meet in person, or was this over the

15    phone?

16         A.    Myself and Ms. Harvey met in person, and on

17    the phone.  And Driss was on the phone.

18         Q.    Did you and Ms. Harvey work in the same

19    location?

20         A.    Yes.

21         Q.    Where was that?  The lights just went out on

22    your --

23         A.    That's because I haven't moved.  If I wave my

24    arm, we are good.

25               I am sorry.  I got lost after waving my arm.



# Exhibit 9
# RMBU Confront/ Chase Terminations

RMBU
Confront/Chase Terminations
Oct. 1, 2018-Oct. 24, 2021

| Worker | Location | Termination Date |
|---|---|---|
| Samuel Price (798357) | Store 2703949 Oklahoma City OK | 19-Dec-2018 |
| Walter Catalano (284244) | Store 2705317 Albuquerque NM | 28-Dec-2018 |
| Seth Medina (287336) | Store 2721602 Hugoton KS | 04-Jan-2019 |
| Kathryn Hutchison (2121062) | Store 2741285 Alamogordo NM | 09-Feb-2019 |
| Jonathan Delgado (283129) | Store 2706001 Las Cruces NM | 22-Feb-2019 |
| Jonathon Banks (292510) | Store 2721628 Lawrence KS | 01-Apr-2019 |
| Estephania Rincon (3010145) | Store 2703970 Oklahoma City OK | 19-Apr-2019 |
| Christopher Harrison (On Leave) (809079) | Store 2709848 Colorado Springs CO | 29-May-2019 |
| Zachary Feehan (On Leave) (3038298) | Store 2703956 Oklahoma City OK | 19-Jun-2019 |
| Howard Wynd (On Leave) (856262) | Store 2703977 Oklahoma City OK | 30-Aug-2019 |
| Douglas Stephens (3068852) | Store 2741235 Albuquerque NM | 11-Sep-2019 |
| Toriana Biglow (3069352) | Store 2703980 Oklahoma City OK | 12-Sep-2019 |
| David Durham (On Leave) (3050341) | Store 2703996 Oklahoma City OK | 16-Sep-2019 |
| Jade Harrington (3006794) | Store 2703985 Oklahoma City OK | 06-Oct-2019 |
| Kristie Mott (3037980) | Store 2704019 Okmulgee OK | 06-Nov-2019 |
| Samuel Urista (919647) | Store 2706098 El Paso TX | 18-Nov-2019 |
| Ryan Stagray (On Leave) (3037847) | Store 2740692 Colorado Springs CO | 10-Dec-2019 |



RMBU
Confront/Chase Terminations
Oct. 1, 2018-Oct. 24, 2021

| Worker | Location | Termination Date |
|---|---|---|
| Jose M Guerrero Jr (3071741) | Store 2741748 El Paso TX | 27-Dec-2019 |
| Dena Olsen (309874) | Store 2709844 Thornton CO | 19-Mar-2020 |
| Donald Haworth (175062) | Store 2703992 Moore OK | 10-Apr-2020 |
| Chadwick Hayes (3021651) | Store 2708942 Albuquerque NM | 13-Apr-2020 |
| Reginald Haygood (3015523) | Store 2706282 Albuquerque NM | 05-May-2020 |
| Bianehi Hernandez (3075543) | Store 2706282 Albuquerque NM | 05-May-2020 |
| Georgina Lujan (3106672) | Store 2701418 El Paso TX | 04-Jun-2020 |
| Monique Long (3104788) | Store 2703996 Oklahoma City OK | 10-Jun-2020 |
| NaQuan Hopkins (3108942) | Store 2703996 Oklahoma City OK | 10-Jun-2020 |
| Benjamin Hammack (On Leave) (3063042) | Store 2703949 Oklahoma City OK | 12-Jun-2020 |
| Allen Lafleur (On Leave) (3092680) | Store 2703959 Oklahoma City OK | 16-Jun-2020 |
| Elisa Hall (3049213) | Store 2741270 El Paso TX | 16-Jun-2020 |
| Angel Vera Jr (298169) | Store 2706112 El Paso TX | 02-Sep-2020 |
| Martin Portillo (234094) | Store 2706307 El Paso TX | 11-Sep-2020 |
| Daniel Duarte (878289) | Store 2703985 Oklahoma City OK | 16-Oct-2020 |
| Doug Walker (On Leave) (3145192) | Store 2744116 Grand Junction CO | 22-Oct-2020 |
| Rita Colvin (On Leave) (3153483) | Store 2709866 Boulder CO | 11-Jan-2021 |
| LaTasha Smith (3053547) | Store 2708940 Albuquerque NM | 09-Mar-2021 |

RMBU
Confront/Chase Terminations
Oct. 1, 2018-Oct. 24, 2021

| Worker | Location | Termination Date |
|---|---|---|
| Darco Robles (3182663) | Store 2700213 El Paso TX | 13-Apr-2021 |
| Jose Salcido (3094842) | Store 2708516 El Paso TX | 03-May-2021 |
| Anthony sanchez (On Leave) (3092874) | Store 2703290 Denver CO | 24-Aug-2021 |
| Adrianna Medina (3212629) | Store 2708940 Albuquerque NM | 07-Sep-2021 |
| quratul khan (On Leave) (3024418) | Store 2741119 Denver CO | 16-Sep-2021 |
| Terry Tafelmeyer (On Leave) (2196134) | Store 2744086 Denver CO | 15-Oct-2021 |
| Andy Molina (3216279) | Store 2741264 El Paso TX | 16-Oct-2021 |
| Bridget Williams (On Leave) (3044949) | Store 2740696 Aurora CO | 19-Oct-2021 |

# Exhibit 10
# Harvey Dep. Tr.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO


Civil Action No. 1:22-cv-02327-NYW-STV

_____

VIDEOCONFERENCE DEPOSITION OF              May 5, 2023

AMY HARVEY

_____

MARY ANN MORENO,

          Plaintiff,

vs.

CIRCLE K. STORES, INC.,

          Defendant.

_____


      The deposition of AMY HARVEY, taken before

Leeann Stellor, a Registered Merit Reporter,

Certified Realtime Reporter, and a Notary Public in

and for the County of Summit and the State of

Colorado, via Zoom videoconference, on Friday,

May 5, 2023, at the hour of 10:04 a.m.



Page 17

1      A.    Yes.

2      Q.    Were there any other job titles that

3  you've held at Circle K?

4      A.    Just the two.

5      Q.    And what was the -- what were your

6  primary job duties as an HR manager at Circle K?

7      A.    I supported, roughly, 423 stores in six

8  states.

9      Q.    Which six states?

10     A.    Colorado, New Mexico, Texas, Oklahoma,

11 Kansas, and Missouri.

12     Q.    And what do you mean by support?  What

13 kind of support did you provide?

14     A.    Answered questions regarding HRIS

15 systems, did investigations, did approvals as far as

16 corrective actions, terminations, helped with

17 on-boarding, helped with training.  I pretty much

18 did everything.

19     Q.    Sounds like a busy job.  What was your

20 salary when you were an HR manager, and did that

21 change over time?

22     A.    I believe $92,000, roughly.

23     Q.    And did that remain the same from 2017

24 through roughly 2021?

25     A.    Usually a 3 percent increase every year.



Page 21

1    HR guidance, meaning can you give me a call because

2    I'm quitting because of this or this or this.  You

3    know, whatever that may be.

4        Q.    Okay.  So your role was more about making

5    sure that there was proper documentation?

6        A.    Yes.

7        Q.    Did you ever override a termination?

8        A.    I don't recall.

9        Q.    Would that be something you could have

10   done --

11       A.    I could have.

12       Q.    -- in your role as HR manager?

13       A.    I could have if it was appropriate.

14       Q.    But you don't recall ever doing so?

15       A.    I don't recall.

16       Q.    Any other kind of role in terminations,

17   other than making sure that there was, you know,

18   sufficient documentation in the system?

19       A.    When I -- I could do investigations and

20   direct the store manager or market manager before a

21   termination due to the outcome of the investigation.

22       Q.    Do you recall ever doing that?

23       A.    Yes.

24       Q.    Can you tell me about that a little bit?

25       A.    A lot of them were, whether it was a



Page 33

1    some stores that you oversaw?

2         A.    Yeah, I would say a couple times a week.

3         Q.    So there were robberies somewhere in your

4    six-state region a couple times a week?

5         A.    Yeah, and sometimes more.

6         Q.    That's quite a bit.

7         A.    Absolutely.

8         Q.    Yeah.  So would you say there was -- I

9    mean, ballpark figure, I guess you were there from

10   2017 to 2021.  How many robberies do you think took

11   place in the territory that you supported?

12        A.    Hundreds.

13        Q.    And how many of those would you say were

14   armed robberies?

15        A.    Maybe half.

16        Q.    So hundreds of armed robberies as well?

17        A.    Yeah.

18        Q.    It's probably a little bit sensitive, but

19   has anybody been injured, while you were the HR

20   manager, on your territory due to an arm robbery?

21        A.    Yes.

22        Q.    Has anyone died?

23        A.    Yes.

24        Q.    How often would you say there were

25   injuries due to armed robberies in your territory



Page 34

1   while you were an HR manager at Circle K?

2          A.     Maybe a couple hundred.

3          Q.     And while I -- I don't need names and I

4   don't want to pry, how many deaths occurred when you

5   were the HR manager at Circle K due to armed

6   robberies in your territory?

7          A.     Maybe 30.

8          Q.     Wow.  Okay.  So this is a pretty

9   dangerous job, it seems like.

10         A.     Sure.

11         Q.     And how many employees have you

12  terminated -- or did you approve the terminations of

13  at Circle K for violating either the robbery policy

14  or confront and chase policy?

15         A.     Probably close to a hundred.

16         Q.     Was there ever a time while you were HR

17  manager at Circle K when an armed robbery -- well,

18  scratch that.  I'm trying to think of a way to

19  phrase this.

20                       Was there ever a time where you

21  found that a termination of an employee who had

22  experienced an armed robbery was not sufficiently

23  documented?

24                 MR. CARROLL:  I object to the form of

25  the question.



Page 35

1          MS. HALPERN:  That probably wasn't

2     amazing.  I can try a third time.

3          Q.    Okay.  So in your role approving

4     terminations, was there ever a time where you

5     disagreed with a termination of an employee who

6     experienced an armed robbery?

7          A.    I don't believe so.

8          Q.    And did you review video footage in each

9     and every single one of those hundred or so

10    terminations?

11         A.    Not every one, no.

12         Q.    So in your mind, do you distinguish

13    between the robbery policy and the confront and

14    chase policy?

15         A.    Yes.

16         Q.    Okay.  Could you tell me about, you know,

17    what distinguishes them?

18         A.    Because the robbery policy doesn't

19    necessarily have to include a confront and chase if

20    the employee does not confront or chase the person.

21    So if they comply with the robber and, you know,

22    follow the policy of, you know, contacting the

23    police when it happens and then following the

24    five-minute rule, not having too much money in their

25    cash register, and they just do everything that the



# Exhibit 11
# Plaintiff's Third Supplemental Discovery Responses

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Case No. 22-cv-02327-NYW-STV

MARY ANN MORENO,

Plaintiff,

v.

CIRCLE K STORES, INC.,

Defendant.

---

## THIRD SUPPLEMENTAL RESPONSES TO CIRCLE K'S FIRST SET OF DISCOVERY REQUESTS TO PLAINTIFF

---

Plaintiff Mary Ann Moreno, by and through counsel, Rathod | Mohamedbhai LLC, and pursuant to Fed. R. Civ. P. 26, 33, and 34 responds to Defendant's First Set of Written Discovery. Plaintiff reserves the right to amend and supplement her answers as new information becomes available to her throughout the course of discovery.

## <u>GENERAL OBJECTIONS</u>

The following General Objections are applicable to, and hereby incorporated by reference, into each of Plaintiff's responses to the discovery requests.

1.      Definition of "You" or "Your." Plaintiff objections to Defendant's definition of "you" or "your" in that it is overboard, encroaches on the attorney-client privilege and work product doctrines, and renders all of the discovery requests confusing, ambiguous, overbroad, and nonsensical. Plaintiff is a human individual. She does not have "agents" acting on her behalf and requesting that her attorneys attest to answers to discovery under oath including divulging all of their information, beliefs, thoughts, and mental impressions inherently encroaches upon attorney- client and work

1

**INTERROGATORY NO. 4:** Identify and fully describe any and all types of damages or injuries of any kind or nature that You allege You have suffered and are seeking relief from or compensation for in this case, and with respect to each, identify and describe the following:

    a.    the specific type of injury alleged;

    b.    the specific type of damages incurred (e.g., lost income, compensatory damages);

    c.    the amount of recovery sought for any specific type of injury or damages alleged;

    d.    the method and precise math used to compute each item of damages (including the attorney fee rate(s) You will be claiming if You are requesting attorneys' fees); and

    e.    any and all documents supporting Your claim for damages.

**RESPONSE TO INTERROGATORY NO. 4:** Plaintiff objects to this interrogatory on the basis of Defendant's definition of the word "you" which includes, but is not limited to, Plaintiff's attorneys. The damages sought are Plaintiff's damages, and no one else's.

Plaintiff objects to this interrogatory to the extent that it implies that damages cannot be supplemented or amended before trial. Plaintiff's damages are ongoing and will be supplemented throughout this litigation and before the first day of trial, and in addition to her equitable and compensatory, non-economic damages, her costs and fees will continue to accrue.

Plaintiff also objects to the extent that Defendant seeks an exact calculation for emotional distress and punitive damages. Generally, non-economic, compensatory damages such as those for emotional distress are "personal and difficult to quantify and because compensatory damages for emotional distress are typically considered a fact issue for the jury, emotional distress damages are not subject to the kind of calculation contemplated by Rule 26(a)(1)(A)(iii)." *Anderson v. UPS, Inc.*, 09-2526- KHV-DJW, 2010 WL 4822564, *10 & n.33 (D. Kan. Nov. 22, 2010); *Beard v. Flying J., Inc.*, 116 F. Supp. 2d 1077, 1095 (S.D. Iowa 2000). Likewise, exemplary damages pursuant to

C.R.S. § 13-21-102 cannot be calculated at this time, although Plaintiff intends to pursue them. Under C.R.S., exemplary damages are warranted liquidated damages in the amount of twice actual damages on showing of "circumstances of fraud, malice, or willful and wanton conduct." C.R.S. § 13-21-102(1)(a). Furthermore, a court may increase such an award to a sum "not to exceed three times the amount of actual damages" upon a showing of continued or repeated misconduct. C.R.S. § 13-21-102(3). These sums, therefore, may only be determined after trial.

Plaintiff objects to the extent that Defendant requests "any and all documents supporting Your claim for damages." Such a request, when including the attorneys of the case, necessarily infringes on protected work product in that Defendant asks the Plaintiff and her attorneys to identify documents they believe "support" her requests for damages. Moreover, requesting "any and all documents" supporting Plaintiff's claims for damages "would require plaintiff to provide the equivalent of a narrative or otherwise detailed account of her entire case in chief," which is improper and unduly burdensome. *Hilt v. SFC Inc.*, 170 F.R.D. 182, 186 (D. Kan. 1997).

Subject to and without waiving her objections, Plaintiff states the following with respect to her damages. At the time she was violently attacked, that date being October 4, 2020, Plaintiff was earning approximately $14.05/ hour, and on average working 30-32 hours a week. Plaintiff's paystubs and IRS W-2s are produced herewith in response to Defendant's following requests for production of documents (*see* Moreno 000058-59, Moreno 000074-75, and Moreno 000086-000105, Moreno 000115, and Moreno 000130). Defendant fired her two days later. Plaintiff found replacement work at a Dollar Tree near her house on January 17, 2021. Her starting pay rate was $12.32 an hour. After approximately 90 days, her pay rate increased to $12.47 an hour. When she began working at Dollar Tree, Plaintiff was scheduled only two, five-hour shifts a week, for approximately 10 hours a week. She worked a few more hours over the holidays in 2021, and

10

occasionally picked up shifts for sick coworkers. The most she worked, however, was 20 hours a week. Currently, Plaintiffs hours vary from between 10-20 hours a week. About a month ago, her wage rate was increased to $15.75 an hour. Plaintiff is in the process of procuring documentation to establish her total wages earned at Dollar Tree to date and will produce them shortly. Plaintiff roughly estimates her damages as the following: Approximately 15 weeks of unemployment at 32 hours a week for damages of $6,744. An additional 100 weeks of mitigation at Dollar Tree wages (13 weeks at $12.32, 83 weeks at $12.47, and 4 weeks at $15.75) working on average 15 hours a week for a total of $26,088. In other words, $44,960 minus $2,402, $15,525, and $945, Plaintiff's mitigation earnings. In addition, it is presumed that Plaintiff's wage rate at Circle K, had she remained employed, would have increased. Further discovery must be done before a more complete calculation can be provided. Back and front pay damages are ongoing.

Additionally, Plaintiff claims non-economic damages. As a result of her attack and her termination, she struggles with anxiety, fear, nervousness, agitation, and lack of energy. She has sought therapy and attended therapy for the first time in her life for almost all of 2021. These symptoms are attributable to her experience at Circle K, including her violent assault, and the callousness and spite by which Circle K terminated her after she had worked there for nearly 16 years. Plaintiff has signed a HIPAA release and is in the process of obtaining her therapy records. Relevant therapy records will be produced shortly. She also refers Defendant to Moreno 000106-109, Moreno 000111-112. Plaintiff clarifies that she is not producing documents she believes "support" her claims but will provide documents showing a material basis for her damage claims including applicable medical records.

Plaintiff further states that she reserves the right to seek the maximum allowed for non-economic damages and exemplary damages at trial, which currently stands according to the

Colorado Secretary of State's adjusted limitations under C.R.S. § 13-21-102.5 at $642,180 and $1,284,370 respectively.

Finally, Plaintiff seeks pre- and post-judgment interest according to the most recent Colorado rate of 8% (https://banking.colorado.gov/public-notices/interest-rates-set-by-the-bank-commissioner) and a tax offset to mitigate against the penalty a one time payment of an award of such a size would give rise to (*see generally E.E.O.C. v. Beverage Distributors Co., LLC*, 780 F.3d 1018, 1023-24 (10th Cir. 2015) (describing the applicability of a tax offset in employment cases). The tax offset cannot be determined at this time because it is contingent on the jury's award. Plaintiff intends to seek costs and fees to the greatest extent possible.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 4:** Subject to and without waiving her objections, Plaintiff states that she is not currently withholding any information pertaining to her damages, but that she is not in possession, custody, or control of certain documentation, both with respect to medical records, payroll records, and the criminal proceedings that support her damages, and she is in the process of obtaining those to the maximum extent possible and will produce responsive documents as they are obtained.

**SECOND SUPPLEMANTAL RESPONSE TO INTERROGATORY NO. 4:** Plaintiff claims non-economic damages and clarifies that some of the descriptions of her earlier emotional distress came from other witnesses' observations of her such as her previously disclosed family members. Specifically, Plaintiff states that she is angry at the way Circle K fired her, and feels it is plainly wrong. Plaintiff further clarifies that as a result of her termination, she struggled with the anxiety and fear of losing her home, and cried frequently as a result, with her daughters needing to comfort her and assure her that they would take care of her and not let her lose her home. Plaintiff also further clarifies that she was nervous about bumping into Tyler Darren Wimmer in a store, like

the Walmart near her, when he was first released from jail because he had a girlfriend and baby living nearby. This nervousness eventually ceased given that he was soon incarcerated again. Plaintiff states that she suffered briefly from nightmares after the attack and was distraught and shaken up after the attack. Plaintiff further states that she does not like working near the cash register nearest to the door of her new job at Dollar Tree because of the attack and asks to work the cash registers further from the door as a result. Plaintiff further states that she missed her customers terribly, some of whom she was very close to, and that after working for her entire adult life, she felt like her whole life had changed and she felt empty following her termination. Plaintiff states that work is very important to her and is the only time she substantially gets out of the house on a weekly basis. She is otherwise a homebody. Plaintiff continues to work even at the age of 75 because she finds working so important and meaningful to her life.

Plaintiff was prescribed therapy by her victim's right advocate and the D.A.'s office. The D.A.'s office qualified her for in excess of the usual number of sessions. Her therapy sessions as a result of the attack and her termination were the first counseling sessions she had attended in her life. They lasted for much of 2021 but were ultimately not helpful. Her symptoms are attributable to her experience at Circle K, including her violent assault, and the callousness and spite by which Circle K terminated her after she had worked there for nearly 16 years. Plaintiff has signed a HIPAA release and has produced all relevant medical and therapy records.

**INTERROGATORY NO. 5:** If You are seeking emotional-distress damages in this case, identify all treatment or counseling You have received in the last five years for any physical, psychological, emotional, or mental condition or illness, identify the treatment or counseling provider, and state the dates of such treatment or counseling, the reasons for seeking treatment or counseling, the diagnosis made, and the treatment prescribed, if any. If You are not seeking emotional-distress

damages, affirmatively state so.

**RESPONSE TO INTERROGATORY NO. 5:** Plaintiff objects to this interrogatory on the basis of the general objection above to the definition of the word "you" and "your." This interrogatory is a perfect example of the problematic definition of "you" and "your" which generally includes the Plaintiff's attorneys, creating confusion, conflict, and ambiguity in this discovery request. The medical history of Plaintiff's attorneys is completely irrelevant to this case.

Plaintiff further objects to this interrogatory because the information sought is protected by the psychotherapist-patient privilege and interferes with Plaintiff's statutorily recognized privacy interest in one's medical care and medical records as well as the doctor- patient privilege C.R.S. 13-90-107(1)(d). *See Jaffee v. Redmon*, 518 U.S. 1 (1996 (recognizing psychotherapist-patient privilege); Health Insurance Portability and Accountability Act (HIPAA), 110 Stat. 1936, 104 P.L. 191, § 1177 (1996).

Subject to and without waiving her objections, Plaintiff states that other than for after her attack and termination from Circle K, she has not seen a psychologist in the last five years, and in fact, has never before gone to therapy. She did receive approximately a year of therapy sessions after the attack and end of her employment from Sherri Wand, A New Direction Counseling Center, PC, 8471 Turnpike Dr., Suite 110, Westminster, CO 80031. Plaintiff received therapy approximately once a week for much of 2021, although she does not recall the exact dates of each session. Plaintiff is obtaining her medical file to refresh her recollection. Plaintiff is not aware of any formal or official medical diagnosis but will check in her file. Plaintiff, immediately after the attack briefly saw a local family physician, Dr. Jeff Hilburn of Rocky Mountain Primary Care Partners in Health, 3520 W. 92nd Ave. Suite 104, Westminster, CO 80031 although did not seek routine care from him. She is unaware of any formal diagnosis. Plaintiff further states she is not

taking any medications to manage her emotional distress.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5:** Subject to and without waiving her objections, Plaintiff states she is not withholding any responsive information to this discovery request based on her objections at this time.

**SECOND SUPPLEMENTAL RESPONSE TO INTERRGOATORY NO. 5:** Notwithstanding documents produced by her medical provider stating to the contrary, Plaintiff maintains that she has never received a diagnosis of depression or anxiety or any other formal diagnosis of a similar nature and does not have personal first-hand knowledge of her medical providers' internal notes. She has no history of such medical conditions, and nor does her ancestral family as far as she is aware or her children.

**INTERROGATORY NO. 6:** Identify all employers other than Circle K for which You have worked since October 4, 2020, stating for each the name and present or last-known address and phone number of the employer; the dates You were employed by that employer; Your position with that employer; the earnings (if from self-employment, both gross and net), compensation, and other benefits You received during such employment; if separated from employment, the reasons therefore; and any disciplinary action, including termination from employment, to which the employer subjected You. This interrogatory includes any period of self-employment.

For purposes of this interrogatory, "benefits" means a payment made or an entitlement available to You in accordance with a wage agreement or any other employer-directed or employer-sponsored program, an insurance policy, or a public-assistance program.

**RESPONSE TO INTERROGATORY NO. 6:** Plaintiff objects to this interrogatory on the basis of the general objection above to the definition of the word "you" and "your." This interrogatory is a perfect example of the problematic definition of "you" and "your" which generally includes

the Plaintiff's attorneys, creating confusion, conflict, and ambiguity in this discovery request. The employment history of Plaintiff's attorneys is completely irrelevant to this case.

Plaintiff further objects on the basis of burden to the extent that this interrogatory seeks information that is duplicative of an interrogatory above, making it unduly burdensome to respond.

Plaintiff also objects to this interrogatory to the extent it seeks information about "public assistance" based on the collateral source rule. The collateral source rule states that compensation from third parties whether insurance, friends, or social safety net payments are not to be considered by a jury. "Under the common law collateral source rule, making the injured plaintiff whole is solely the tortfeasor's responsibility. Any third-party benefits or gifts obtained by the injured plaintiff accrue solely to the plaintiff's benefit and are not deducted from the amount of the tortfeasor's liability.  These third-party sources are 'collateral' and are irrelevant in fixing the amount of the tortfeasor's liability." *Volunteers of Am. Colorado Branch v. Gardenswartz*, 242 P.3d 1080, 1082–83 (Colo. 2010); *Wal-Mart Stores, Inc. v. Crossgrove*, 276 P.3d 562, 566 (2012) (confirming that insurance payments in to injured plaintiff were subject to collateral source rule); *EEOC v. Sandia Corp.* 639 F.2d 600, 624 (10th Cir. 1980) ("A number of district courts have followed this reasoning and have refused to offset unemployment benefits on the basis that such benefits are collateral to back wages and are awarded by the state in furtherance of a separate social policy").

Subject to and without waiving her objections, Plaintiff states that she accepted subsequent employment on January 17, 2021, at Dollar Tree. She continues to work there, and has worked for no other employer since the end of her employment with Circle K. Her pay history and hours are described in response to Interrogatory No. 4. Her starting pay rate was $12.32 an hour. After approximately 90 days, her pay rate increased to $12.47 an hour. When she began working at

Dollar Tree, Plaintiff was scheduled only two, five-hour shifts a week, for approximately 10 hours a week. She worked a few more hours over the holidays in 2021, and occasionally picked up shifts for sick coworkers. The most she worked, however, was 20 hours a week. Currently, Plaintiffs hours vary from between 10-20 hours a week. About a month ago, her wage rate was increased to $15.75 an hour. Plaintiff is in the process of procuring documentation to establish her total wages earned at Dollar Tree to date and will produce them shortly. In addition, Plaintiff states that she has enrolled in supplemental insurance at Dollar Tree covering her dental and vision. The Dollar Tree she works at is close to her home. The address is 6795 W. 88th Ave. Suite B, Westminster, CO 80031.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 6:** Subject to and without waiving her objections, Plaintiff states that she is withholding information about public benefits such as Medicare and Social Security Act retirement benefits but is otherwise not withholding any responsive information to this discovery request based on her objections at this time. All information about her subsequent employment and earnings from work have been provided. She has not been disciplined at any time or terminated by Dollar Tree.

**<u>INTERROGATORY NO. 7:</u>** Identify and fully describe any efforts that You have made to seek employment or other means of income from October 4, 2020, to the present. In so doing, identify all companies, persons, or other entities with or through whom You have applied, inquired about, or sought employment, including employment agencies, other personnel-placement services, or Your personal or professional contacts, by specifying for each the name of the company, person, or other entity from whom or through whom You sought employment or income; the date(s) of each application, inquiry, or search; the name(s) of the person(s) to whom You addressed Your application, with whom You interviewed, or who performed employment search services on Your

17

behalf; the job or business relationship sought; the results(s) of each such application and the reason for the result (e.g., offered a position but declined it for a certain reason); and the amount and nature of compensation and benefits of any job or business relationship offered or for which You applied (e.g., whether such compensation was based on an hourly or salary pay schedule, commission structure or other basis).

For purposes of this interrogatory, "benefits" means a payment made or an entitlement available to You in accordance with a wage agreement or any other employer-directed or employer-sponsored program, an insurance policy, or a public-assistance program.

**RESPONSE TO INTERROGATORY NO. 7:** Plaintiff objects to this interrogatory on the basis of the general objection above to the definition of the word "you" and "your." This interrogatory is a perfect example of the problematic definition of "you" and "your" which generally includes the Plaintiff's attorneys, creating confusion, conflict, and ambiguity in this discovery request. The job search efforts of Plaintiff's attorneys is completely irrelevant to this case.

Plaintiff further objects to this Interrogatory  on grounds that it is vague  and ambiguous. It is unclear what Defendant means by "income." Only income from subsequent work is relevant in the context of employment law cases. Hence, to the extent that Defendant seeks information other than about subsequent work income, such discovery is irrelevant, overbroad, and not proportionate to the needs of the parties, while also implicating a privacy interest that Plaintiff has not waived. In other words, in the context of employment cases, only earnings from subsequent work in the form of mitigation information is relevant for purposes of calculating damages. Collateral sources are excluded from a jury's consideration. *See, e.g.*, *EEOC v. Sandia Corp.* 639 F.2d 600, 624 (10th Cir. 1980) ("A number of district courts have followed this reasoning and have refused to offset unemployment benefits on the basis that such benefits are collateral to back

wages and are awarded by the state in furtherance of a separate social policy"). A jury may also not consider other sources of income in determining actual damages. *See Combe v. Cinemark USA, Inc.*, 2009 WL 2578853, *5-6 (D. Utah Aug. 18, 2009) (where there is adequate verification of income from work available, other income information is not discoverable on a claim of emotional distress); *Bagnall v. Freeman Decorating Co.*, 196 F.R.D. 329, 333 (N.D. Ill. 2000) (information into other sources of income, including stocks, bonds, dividends, and profits from business ownership is irrelevant).

Plaintiff further objects on the basis of burden to the extent that this interrogatory seeks information that is duplicative of an interrogatory above, making it unduly burdensome to respond.

Subject to and without waiving her objections, Plaintiff states that her family helped her apply for jobs at local retail establishments in the area. She cannot drive far, but she applied for work at stores near her including a Hallmark Store, Walmart, Home Depot, and Lowe's. She applied for several other jobs she does not recall at this time as well. She applied for these jobs online using the companies' digital portals. She does not have a record personally of these job search efforts. Plaintiff states that her family, particularly Olivia Verela Roan, helped her apply for these jobs online because she does not use the internet frequently. She does not recall the names of the individuals to which her applications were sent to. Plaintiff further confirms that she did not receive any callbacks or interviews until the call back from Dollar Tree. Dollar Tree was the first company to extend her a job offer after her termination from Circle K. She accepted that job offer, and her wages and benefits are described in response to the preceding interrogatory.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 7:** Subject to and without waiving her objections, Plaintiff states she applied for unemployment after her termination from Circle K but found replacement employment before receiving benefits. Plaintiff further

states that she is withholding information about public benefits such as Medicare and Social Security Act retirement benefits but is otherwise not withholding any responsive information to this discovery request based on her objections at this time. All information about subsequent employment earnings has been provided. Plaintiff's public entitlements pre-existed her termination.

**INTERROGATORY NO. 8:** State the amount of all compensation, income, and benefits You have received or expect to receive since October 4, 2020, and the sources of the same.

For purposes of this interrogatory, "benefits" means a payment made or an entitlement available to You in accordance with a wage agreement or any other employer-directed or employer-sponsored program, an insurance policy, or a public-assistance program.

**RESPONSE TO INTERROGATORY NO. 8:** Plaintiff objects to this interrogatory on the basis of the general objection above to the definition of the word "you" and "your." This interrogatory is a perfect example of the problematic definition of "you" and "your" which generally includes the Plaintiff's attorneys, creating confusion, conflict, and ambiguity in this discovery request. The income of Plaintiff's attorneys is completely irrelevant to this case.

Plaintiff further objects to this Interrogatory on grounds that it is vague and ambiguous. It is unclear what Defendant means by "income." Only income from subsequent work is relevant in the context of employment law cases. Hence, to the extent that Defendant seeks information other than about subsequent work income, such discovery is irrelevant, overbroad, and not proportionate to the needs of the parties, while also implicating a privacy interest that Plaintiff has not waived. In other words, in the context of employment cases, only earnings from subsequent work in the form of mitigation information is relevant for purposes of calculating damages. Collateral sources are excluded from a jury's consideration. *See, e.g.*, *EEOC v. Sandia Corp.* 639

**FIRST SUPPLEMENTAL RESPONSE TO REQUEST FOR PRODUCTION NO. 5:**

Subject to and without waiving her objections, Plaintiff states that to the extent she is interpreting this request for production accurately, she is not knowingly withholding any responsive documents, communications, or tangible things at this time, although given the ambiguity of the request she may very well have responsive documents or communications that she does not realize fall within the scope of this request. Based on her objections, she declines to respond to this request for production of documents in the future unless it is significantly clarified and narrowed.

**REQUEST FOR PRODUCTION NO. 6:** To the extent You did not produce them already, produce all documents, electronically stored information, and tangible things that evidence, refer to, support, or refute Your claim for damages, including but not limited to documents on which You base any computation Your alleged damages and documents bearing on the nature and extent of injuries suffered.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 6:** Plaintiff objects to this request on the grounds that Defendant seeks "all documents…that support, or refute" Plaintiff's claims for damages, which necessarily infringes upon the near universal protection provided for an attorney's opinion work product. *Frontier Ref., Inc. v. Gorman-Rupp Co.*, 136 F.3d 695, 704 n.12 (10th Cir. 1998) ("Some courts have held that opinion work product is absolutely protected…"). Similarly, Plaintiff objects to Defendant's use of the word "all." Requesting Plaintiff to produce "all" documents and communications supporting Plaintiff's claims for damages "would require plaintiff to provide the equivalent of a narrative or otherwise detailed account of her entire case in chief," which is improper and unduly burdensome. *Hilt v. SFC Inc.*, 170 F.R.D. 182, 186 (D. Kan. 1997).

Subject to and without waiving her objections, Plaintiff refers Defendant to Moreno

000001-22, Moreno 000029, Moreno 000058-59, Moreno 000074-75, and Moreno 000086-000105, Moreno 000115, and Moreno 000130. Plaintiff further states that she is obtaining documentation of her mitigation earnings and agrees to produce those shortly. Plaintiff further refers Defendant to Moreno 000106-109, Moreno 000111-112 for some of her medical records, and further confirms that she has signed a release and is obtaining her medical records, of which relevant and responsive records shall be produced shortly. Due the nature of her objections, Plaintiff declines to produce all documents that "refute or support" her claims for damages but agrees to produce records that "refer to" the material basis for her backpay and non-economic, compensatory damages as they continue to become available to her.

**FIRST SUPPLEMENTAL RESPONSE TO REQUEST FOR PRODUCTION NO. 6:** Subject to and without waiving her objections, Plaintiff states that she is not currently withholding any information pertaining to her damages, but that she is not in possession, custody, or control of certain documentation, both with respect to medical records, payroll records, and the criminal proceedings that support her damages, and she is in the process of obtaining those to the maximum extent possible and will produce responsive documents as they are obtained.

**REQUEST FOR PRODUCTION NO. 7:** To the extent You did not produce them already, produce all documents, electronically stored information, and tangible things that relate to Your attempts to mitigate Your damages or obtain employment, including, but not limited to, copies of resumes, employment applications, letters to prospective employers, and correspondence between Yourself and any employment agencies, recruiters, or headhunters.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 7:** Plaintiff objects to this request to the extent it calls for documents, electronically stored information, and tangible things that are not in her possession, custody, or control.

Subject to and without waiving her objections, Plaintiff states that she is not aware of such documents or records in her possession, custody, or control. As described in response to Interrogatory No. 7, she had family members help her apply for positions with local retail establishments in her neighborhood online. She is unaware of any copies of her applications once they've been submitted.

**REQUEST FOR PRODUCTION NO. 8:** To the extent You did not produce them already, produce Your tax returns, including schedules and supporting documentation (such as W-2 and 1099 forms) for the years 2020 to the present.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 8:** Plaintiff objects to this request on the basis of the general objection above to the definition of the word "you" and "your." This request is a perfect example of the problematic definition of "you" and "your" which generally includes the Plaintiff's attorneys, creating confusion, conflict, and ambiguity in this discovery request. Defendant's definition of "you" and "your" makes this request for production nonsensical, since Plaintiff's attorneys tax returns are irrelevant to this litigation.

Plaintiff further objects to this request on grounds that it seeks documents about income other than income earned from subsequent work. Only income from subsequent work is relevant in the context of employment law cases. Hence, to the extent that Defendant seeks information other than about subsequent work income, such discovery is irrelevant, overbroad, and not proportionate to the needs of the parties, while also implicating a privacy interest that Plaintiff has not waived. In other words, in the context of employment cases, only earnings from subsequent work in the form of mitigation information is relevant for purposes of calculating damages. Collateral sources are excluded from a jury's consideration. *See, e.g.*, *EEOC v. Sandia Corp.* 639 F.2d 600, 624 (10th Cir. 1980) ("A number of district courts have followed this reasoning and have refused to offset

34

unemployment benefits on the basis that such benefits are collateral to back wages and are awarded by the state in furtherance of a separate social policy"). A jury may also not consider other sources of income in determining actual damages. *See Combe v. Cinemark USA, Inc.*, 2009 WL 2578853, *5-6 (D. Utah Aug. 18, 2009) (where there is adequate verification of income from work available, other income information is not discoverable on a claim of emotional distress); *Bagnall v. Freeman Decorating Co.*, 196 F.R.D. 329, 333 (N.D. Ill. 2000) (information into other sources of income, including stocks, bonds, dividends, and profits from business ownership is irrelevant). With respect to unfettered access to tax returns, courts have found such requests an invasion of privacy and overbroad for the reasons described above, and allowed plaintiffs to submit either partial or redacted returns showing only the underlying wage records and income from work, with the other sources of income redacted. *See, e.g., Hilt v. SFC Inc.*, 170 F.R.D. 182, 189 (D. Kan. 1997) (redacted returns were appropriate); *McDaniel v. Allstate Insurance Company*, 2018 WL 2926482, *2-3 (D. Kan. June 11, 2018) (partial returns not revealing spouse's income or income from previous jobs appropriate).

Subject to and without waiving her objections, Plaintiff states that she will produce paystubs and W-2 information from Dollar Tree shortly, and refers Defendant to Moreno 000058 for her 2020 W-2 from Circle K. All other forms of income, including her tax returns, are not relevant and will be withheld based on Plaintiff's objections.

**REQUEST FOR PRODUCTION NO. 9:** To the extent You did not produce them already, produce all documents, electronically stored information, and tangible things, that reflect or show income or compensation (including salary, wages, bonuses, benefits, dividends, equity, unemployment compensation, and any other thing of value) received by You from October 4, 2020 to the present.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 9:** Plaintiff objects to this request on the basis of the general objection above to the definition of the word "you" and "your." This request is a perfect example of the problematic definition of "you" and "your" which generally includes the Plaintiff's attorneys, creating confusion, conflict, and ambiguity in this discovery request. Defendant's definition of "you" and "your" makes this request for production nonsensical, since the income of Plaintiff's attorneys is irrelevant to this litigation.

Plaintiff further objects to this request on grounds that it seeks documents about income other than income earned from subsequent work. Only income from subsequent work is relevant in the context of employment law cases. Hence, to the extent that Defendant seeks information other than about subsequent work income, such discovery is irrelevant, overbroad, and not proportionate to the needs of the parties, while also implicating a privacy interest that Plaintiff has not waived. In other words, in the context of employment cases, only earnings from subsequent work in the form of mitigation information is relevant for purposes of calculating damages. Collateral sources are excluded from a jury's consideration. *See, e.g.*, *EEOC v. Sandia Corp.* 639 F.2d 600, 624 (10th Cir. 1980) ("A number of district courts have followed this reasoning and have refused to offset unemployment benefits on the basis that such benefits are collateral to back wages and are awarded by the state in furtherance of a separate social policy"). A jury may also not consider other sources of income in determining actual damages. *See Combe v. Cinemark USA, Inc.*, 2009 WL 2578853, *5-6 (D. Utah Aug. 18, 2009) (where there is adequate verification of income from work available, other income information is not discoverable on a claim of emotional distress); *Bagnall v. Freeman Decorating Co.*, 196 F.R.D. 329, 333 (N.D. Ill. 2000) (information into other sources of income, including stocks, bonds, dividends, and profits from business ownership is irrelevant).

Subject to and without waiving her objections, Plaintiff states that she is obtaining

her payroll information from Dollar Tree, which is the only employment she has had subsequent to her termination from Circle K. She agrees to produce such information and her W-2s from 2020 to present from Dollar Tree shortly. Plaintiff declines to produce financial records of other income or public benefits given their lack of apparent relevance.

**FIRST SUPPLEMENTAL RESPONSE TO REQUEST FOR PRODUCTION NO. 9:** Plaintiff refers Defendant to her 2022 W2 from Dollar Tree at MORENO 000825 which was previously produced as part of Plaintiff's disclosure obligations.

**REQUEST FOR PRODUCTION NO. 10:** To the extent You did not produce them already, produce all documents, electronically stored information, and tangible things reflecting communications between You and anyone else relating to Your claims against Circle K.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 10:** Plaintiff objects to this request on the basis of the general objection above to the definition of the word "you" and "your." This request is a perfect example of the problematic definition of "you" and "your" which generally includes the Plaintiff's attorneys, creating confusion, conflict, and ambiguity in this discovery request. Plaintiff's attorneys' communications between themselves and "anyone else" is not evidence and are not subject to discovery pursuant to the protections of attorney work product. Such a request necessarily encroaches on attorney work-product doctrine protections. *Frontier Ref., Inc. v. Gorman-Rupp Co.*, 136 F.3d 695, 704 n.12 (10th Cir. 1998) ("Some courts have held that opinion work product is absolutely protected…"). In a similar vein, Plaintiff's communications with her attorneys about her "claims against Circle K" are not discoverable due to attorney client privilege.

Plaintiff further objects to this request in accordance with her objection to use of the word "related to." Here Defendant requests all documents relating to the claims in this matter. It is

of Plaintiff's disclosure obligations. No further records exist.

**REQUEST FOR PRODUCTION NO. 19:** To the extent You have not produced it already, produce the Victim Impact Statement You submitted in the Jefferson County case, *The People of the State of Colorado v. Wimmer, Tyler Darren*, Case No. 2020CR003359.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 19:** Plaintiff objects to this request to the extent it seeks documents that are not in her possession, custody, or control.

Subject to and without waiving her objections, Plaintiff states that she is not sure that she completed such a statement but believes she might have. She provided significant information to the District Attorney's Office. She has, as of yet, been unable to obtain a copy of her file because the prosecution of Tyler Darren Wimmer is ongoing, but she will continue to try to gain her file from the District Attorneys' Office and agrees to produce her Victim Impact Statement to Defendant as soon as it becomes available to her.

**FIRST SUPPLEMENTAL RESPONSE TO REQUEST NO. 19:** Plaintiff corrects the record that no such Victim Impact Statement exists as far as she is aware.

Dated: June 29, 2023.

*/s/Iris Halpern*
Iris Halpern
Rathod | Mohamedbhai LLC
2701 Lawrence St., Suite 100
Denver, Colorado 80205
Phone: (303) 578-4400
Email: ih@rmlawyers.com

*Attorney for Plaintiff Mary Ann Moreno*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 29, 2023, I served the foregoing via email to the following:

Thomas W. Carroll
Nicholas Hankins
Littler Mendelson, P.C.
1900 Sixteenth Street, Suite 800
Denver, CO  80202
Telephone: 303.629.6200
Facsimile: 303.629.0200
Email: tcarroll@littler.com
nhankins@littler.com

*Attorneys for Defendant Circle K Stores, Inc.*

*/s/ Iris Halpern*
Iris Halpern

# Exhibit 12
# Circle K Supplemental Discovery Responses

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:22-cv-02327-NYW-STV

MARY ANN MORENO,

     Plaintiff,

v.

CIRCLE K STORES, INC.,

     Defendant.

---

### CIRCLE K'S SUPPLEMENTED OBJECTIONS, ANSWERS, AND RESPONSES TO PLAINTIFF 'S FIRST SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION

---

Defendant Circle K Stores, Inc. ("Circle K") provides the following supplemental objections, answers, and responses to Plaintiff's first set of interrogatories and requests for production, served on December 16, 2022 ("Requests").

### PRELIMINARY STATEMENT AND GENERAL OBJECTIONS

Circle K objects to certain of the Requests' instructions and definitions to the extent they impose obligations beyond the Federal Rules of Civil Procedure. The following objections apply to all of the Requests.

1.     Circle K objects to Instruction No. 5 because it exceeds what is required under Federal Rule of Civil Procedure 26(b)(5). Circle K will comply with Rule 26(b)(5).

2.     Circle K objects to Instruction No. 6 to the extent it exceeds the requirements of Federal Rule of Civil Procedure 34. Circle K will comply with Rule 34.

3.      Circle K objects to Instruction No. 7 to the extent it exceeds the requirements of Federal Rules of Civil Procedure 33 and 34. Circle K will comply with Rules 33 and 34.

4.      Circle K objects to Definition No. 6 as vague and ambiguous because it purports to redefine common words that do not need definition and it asks Circle K to apply multiple meanings to various words. Circle K will interpret the Requests without regard to Definition No. 6.

## SPECIFIC OBJECTIONS AND ANSWERS TO INTERROGATORIES

**INTERROGATORY NO. 2:** Describe the factual basis for each Affirmative Defense found in your Answer to Plaintiff's Complaint.

**OBJECTION:** Circle K objects to Interrogatory No. 2 on the basis that it is an impermissible blockbuster request. Circle K further objects that the request lacks reasonable particularity. The request asks Circle K to describe the factual basis for each affirmative defense found in its Answer and is essentially limitless. Such blockbuster requests are routinely rejected by the courts as overly broad, unduly burdensome, and disproportionate to the needs of the case.

**ANSWER (SUPPLEMENTED):** After conferral between counsel, Circle K provides the following answer. The factual basis of Circle K's defenses and affirmative defenses as pleaded in its Answer are described below. Circle K has answered with respect to each of the 11 defenses and affirmative defenses in its Answer and does not, by way of this interrogatory answer, take on the burden of proof for any defense that is not an affirmative defense under the law. Discovery is ongoing.

| Defenses and Affirmative Defenses | Factual Basis |
|---|---|
| 1.      Circle K's actions regarding Moreno's terms and conditions of employment were based on legitimate business reasons and were taken in accordance with applicable law. | The factual basis of this defense is that Plaintiff was terminated due to her violation of Circle K's lawful Confront & Chase policy. Plaintiff was an at-will employee and the decision to terminate her for violation of a lawful policy is a legitimate business reason and in accordance with the law. Circle K did not terminate her in violation of public policy or for any other unlawful reason. |
| 2.      Moreno was an at-will employee whose employment could be terminated at any time for any reason. | The factual basis of this defense is that Plaintiff was an at-will employee whose employment could be terminated at any time for any reason. Plaintiff did not have any agreement that altered her at-will status. |
| 3.      Circle K's actions regarding Moreno's terms and conditions of employment were made in good faith and without malice, | The factual basis of this defense is that Plaintiff was terminated due to her violation of Circle K's lawful Confront & Chase policy. Plaintiff was an at-will employee and the decision to terminate her for violation of a |

3

| deliberate indifference, bad faith, or reckless disregard of any of Moreno's legal rights. | lawful policy is a legitimate business reason and in accordance with the law. Circle K did not terminate her in violation of public policy or for any other unlawful reason. Testimony will show that Circle K's actions were made in good faith and without malice, deliberate indifference, bad faith, or reckless disregard of any of Plaintiff's legal rights. |
|---|---|
| 4.      Circle K has complied with all applicable laws. | The factual basis of this defense is that Plaintiff was terminated due to her violation of Circle K's lawful Confront & Chase policy. Plaintiff was an at-will employee and the decision to terminate her for violation of a lawful policy is a legitimate business reason and in accordance with the law. Circle K did not terminate her in violation of public policy or for any other unlawful reason, and Circle K complied with all applicable laws. In this case, the applicable law is the common law governing Plaintiff's claims for relief. |

| | |
|---|---|
| 5. Any damages Moreno sustained were caused or contributed to by her own actions or the actions of others over whom Circle K had no control. | The factual basis of this defense is that if Plaintiff suffered damages, it was not Circle K's fault. Therefore they must have been caused by either a third party over whom Circle K had no control, or Plaintiff's own actions, such as her violation of the Confront & Chase Policy. |
| 6. Moreno's alleged damages, if any, are limited or restricted, in whole or in part, by statute and applicable law. | The factual basis for this defense is that Plaintiff's alleged damages, if any, are limited or restricted, in whole or in part, by statute and applicable law, such as Colorado Revised Statutes §§ 13-21-102, 13-21-102.5. |
| 7. If Moreno was damaged in any amount, she has failed to mitigate her damages and, therefore, is barred from recovery, or any award of damages must be proportionately diminished. | The factual basis of this defense is Plaintiff's discovery responses, including answers to Interrogatory Nos. 4-7 and responses to Requests for Production Nos. 6-9. Discovery is ongoing. |

| | |
|---|---|
| 8.      Any damages alleged by Moreno may be subject to offset by subsequent income she received. | The factual basis of this defense is that alleged backpay damages are subject to offset by subsequent income Plaintiff received, as described in Plaintiff's discovery responses, including answers to Interrogatory Nos. 4-7 and responses to Requests for Production Nos. 6-9. Discovery is ongoing. |
| 9.      There is no basis upon which Moreno is entitled to recovery of punitive or exemplary damages against Circle K. | The factual basis of this defense is that Plaintiff was terminated due to her violation of Circle K's lawful Confront & Chase policy. Plaintiff was an at-will employee and the decision to terminate her for violation of a lawful policy is a legitimate business reason and in accordance with the law. Circle K's decision to terminate her employment is not attended by circumstances of fraud, malice, or willful and wanton conduct sufficient for punitive or exemplary damages under Colorado Revised Statutes § 13-21-102. |

| | |
|---|---|
| 10.      There is no basis upon which Moreno is entitled to recovery of attorneys' fees against Circle K. | The factual basis of this defenses is that Plaintiff brings two common-law claims for relief. Under the American Rule, each litigant pays its own attorneys' fees, win or lose, unless a statute or contract provides otherwise and there is no such statute or contract applicable in this case. |
| 11.      Circle K cannot fully anticipate all additional and affirmative defense that may be applicable to this action and, therefore, reserves the right to assert any and all additional or affirmative defense that may become applicable based on information learned during the course of this litigation, including discovery, trial, or otherwise. | Though unenumerated as a defense, this is a reservation of rights. Nevertheless, the factual basis is that discovery is ongoing and Circle K may come to learn of additional applicable defenses or affirmative defenses in the future. |

**SPECIFIC OBJECTIONS AND RESPONSES TO REQUESTS FOR PRODUCTION**

**REQUEST FOR PRODUCTION NO. 3:** Produce the complete personnel files, including any records relating to complaints, investigations, and discipline that might be maintained separately, for Mary Ann Moreno, Dris[s] Aamoud, and Love Jorgenson.

**OBJECTION:** Circle K objects to Request for Production No. 3 as irrelevant, overbroad, unduly burdensome, and disproportionate to the needs of the case as it pertains to Mr. Aamoud and Ms. Jorgenson. Circle K further objects to this request because it seeks sensitive, private information from non-parties that is not subject to disclosure. *See Denver Policemen's Protective Ass'n v. Lichtenstein*, 660 F.2d 432, 435 (10th Cir. 1981); *Martinelli v. Dist. Court*, 199 Colo. 163, 173 (1980). The contents of non-party's personnel files has no bearing on the issues, claims, or defenses in this case. As required by Rule 34(b), Circle K states that it is withholding Mr. Aamoud's and Ms. Jorgenson's personnel files on the basis of its objections.

**RESPONSE:** Circle K provides the following response, which falls outside the scope of its objection. Plaintiff's personnel file is being produced.

**SUPPLEMENTAL RESPONSE:** After conferral between counsel, Circle K agrees to produce portions of Mr. Aamoud's and Ms. Jorgenson's personnel files that do not implicate irrelevant, private matters. Specifically, Circle K will produce their entire personnel files except for personal, private documents related to benefits and benefit elections, retirement savings, contact/emergency-contact information, vaccinations, and leaves of absence. Those non-party, personal documents have no bearing on the issues, claims, or defenses in this case.

Dated this 24th day of March, 2023.

AS TO OBJECTIONS AND RESPONSES TO REQUESTS FOR PRODUCTION:

*s/ Thomas W. Carroll*
Thomas W. Carroll
Nicholas Hankins
Littler Mendelson, P.C.
1900 Sixteenth Street, Suite 800
Denver, CO  80202
Telephone: 303.629.6200

Facsimile: 303.629.0200
Email: tcarroll@littler.com
        nhankins@littler.com

*Attorneys for Defendant*

## VERIFICATION

I, Sue Fernandez, am employed by Circle K Stores, Inc. ("Circle K") as Human Resources Director and am authorized to verify interrogatory answers on behalf Circle K. I have reviewed Circle K's answer to Plaintiff's Interrogatory No. 2. The answer was prepared with the assistance of employees and representatives of Circle K upon whom I relied, and it is based on the records and information still in existence, presented, or recollected and thus far discovered in the course of reasonable investigation. Subject to these limitations, the answer is true to the best of my knowledge, information, and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Signed this 24th day of March, 2023.

_____
Sue Fernandez

**CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of March, 2023, I served the foregoing **CIRCLE K'S SUPPLEMENTED OBJECTIONS, ANSWERS, AND RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION** to the following:

Nicholas A. Lutz
Iris Halpern
RATHOD | MOHAMEDBHAI LLC
2701 Lawrence Street, Suite 100
Denver, CO  80205
Telephone: (303) 578-4400
Fax: (303) 578-4401
nl@rmlawyers.com
ih@rmlawyers.com

*Attorneys for Plaintiff*

*s/ Thomas W. Carroll*
Thomas W. Carroll

4878-3494-8438.2

# Exhibit 13
# Circle K's Discovery Responses

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:22-cv-02327-NYW-STV

MARY ANN MORENO,

     Plaintiff,

v.

CIRCLE K STORES, INC.,

     Defendant.

---

**CIRCLE K'S OBJECTIONS, ANSWERS, AND RESPONSES TO PLAINTIFF 'S FIRST
SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION**

---

Defendant Circle K Stores, Inc. ("Circle K") provides the following objections, answers, and responses to Plaintiff's first set of interrogatories and requests for production, served on December 16, 2022 ("Requests").

**PRELIMINARY STATEMENT AND GENERAL OBJECTIONS**

Circle K objects to certain of the Requests' instructions and definitions to the extent they impose obligations beyond the Federal Rules of Civil Procedure. The following objections apply to all of the Requests.

1.     Circle K objects to Instruction No. 5 because it exceeds what is required under Federal Rule of Civil Procedure 26(b)(5). Circle K will comply with Rule 26(b)(5).

2.     Circle K objects to Instruction No. 6 to the extent it exceeds the requirements of Federal Rule of Civil Procedure 34. Circle K will comply with Rule 34.

Circle K would like to confer with Plaintiff about appropriate custodians, time periods, and other limitations to appropriately narrow this request.

**REQUEST FOR PRODUCTION NO. 8:** Produce any documents establishing or showing the material factual basis for each Affirmative Defense found in your Answer to Plaintiff's Complaint.

**OBJECTION:** Circle K objects to Request for Production No. 8 on the basis that it is an impermissible blockbuster request. Circle K further objects that the request lacks reasonable particularity. The request asks Circle K to describe the factual basis for each affirmative defense found in its Answer and is essentially limitless. Such blockbuster requests are routinely rejected by the courts as overly broad, unduly burdensome, and disproportionate to the needs of the case. As required by Rule 34(b), Circle K states that it is withholding documents on the basis of its objections, but given the vast breadth of the request, Circle K is not withholding any particular documents.

**REQUEST FOR PRODUCTION NO. 9:** Produce all interview notes and statements identified or described in response to Interrogatory No. 3.

**OBJECTION:** Circle K objects to Request for Production No. 9 on the basis of attorney-client privilege and the work-product doctrine. Counsel of record conducted interviews with witnesses in anticipation of litigation. Some of the interviews are memorialized in attorney notes and some are not. The contents of those attorney notes are privileged, work product, and not discoverable. Even the identity of the witnesses counsel of record chose to interview would reveal and invade counsel's mental impressions of the case. Circle K is not providing a privilege log because doing so would be tantamount to revealing counsel's mental impressions, theories,

11

and work product and there is no colorable argument that counsel's interviews are discoverable. There are no documents or other records memorializing interviews and statements that are not privileged or work product.

**RESPONSE:** Circle K provides the following response, which falls outside the scope of its objections. The Westminster Police Department interviewed witnesses and took statements and Circle K is producing those documents. There are no other non-privileged interviews or statements in Circle K's possession, custody, or control.

Dated this 17th day of January, 2022.

AS TO OBJECTIONS AND RESPONSES TO REQUESTS FOR PRODUCTION:

*s/ Thomas W. Carroll*

Thomas W. Carroll
Nicholas Hankins
Littler Mendelson, P.C.
1900 Sixteenth Street, Suite 800
Denver, CO  80202
Telephone: 303.629.6200
Facsimile: 303.629.0200
Email: tcarroll@littler.com
           nhankins@littler.com

*Attorneys for Defendant*

## VERIFICATION

I, Sue Fernandez, am employed by Circle K Stores, Inc. ("Circle K") as Human Resources Director and am authorized to verify interrogatory answers on behalf Circle K. I have reviewed Circle K's answers to Plaintiff's Interrogatory Nos. 1 and 3-9. The answers were prepared with the assistance of employees and representatives of Circle K upon whom I relied, and they are based on the records and information still in existence, presented, or recollected and thus far discovered in the course of reasonable investigation. Subject to these limitations, the answers are true to the best of my knowledge, information, and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Signed this **17** day of January, 2023.

_____

Sue Fernandez

13

**CERTIFICATE OF SERVICE**

I hereby certify that on this 17th day of January, 2023, I served the foregoing **CIRCLE K'S OBJECTIONS, ANSWERS, AND RESPONSES TO PLAINTIFF 'S FIRST SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION** to the following:

Nicholas A. Lutz
Iris Halpern
RATHOD | MOHAMEDBHAI LLC
2701 Lawrence Street, Suite 100
Denver, CO  80205
Telephone: (303) 578-4400
Fax: (303) 578-4401
nl@rmlawyers.com
ih@rmlawyers.com

*Attorneys for Plaintiff*

*s/ Thomas W. Carroll*

Thomas W. Carroll

4863-6744-5573.8

14

# Exhibit 14
# Circle K's Initial Disclosures

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Case No. 22-cv-02327-STV

MARY ANN MORENO,

        Plaintiff,

v.

CIRCLE K STORES, INC.,

        Defendant.

---

**CIRCLE K'S INITIAL RULE 26(a)(1) DISCLOSURES**

---

Defendant, Circle K Stores, Inc. ("Circle K") makes the following initial disclosures under Federal Rule of Civil Procedure 26(a)(1).

**PRELIMINARY STATEMENT**

The following disclosures are based upon information reasonably available to Circle K as of the date of these disclosures. By making these disclosures, Circle K does not represent that it is identifying every witness, document, or tangible thing, relevant to this action. Circle K does not waive any objections to the production of any document or tangible thing on any permissible basis, or any objections to the admissibility of any information or document at trial.

**DISCLOSURES**

**A.**     **Witnesses.**

The following is a list of witnesses likely to have discoverable information that Circle K may use to support its claims or defenses unless the use would be solely for impeachment.

1.      Plaintiff, Mary Ann Moreno. Plaintiff is likely to have information about her claims, the allegations in the Complaint and Jury Demand ("Complaint"), Circle K's defenses thereto, her employment and separation from Circle K, and other matters relevant to this litigation.

2.      Driss Aamoud, C/O Littler Mendelson, P.C.  Mr. Aamoud is the Market Manager who oversaw the store Plaintiff worked in. Mr. Aamoud is likely to have information about Plaintiff's claims, the allegations in the Complaint, Circle K's defenses thereto, Plaintiff's separation from employment, and other matters relevant to this litigation.

3.      Love Jorgensen, C/O Littler Mendelson, P.C.  Ms. Jorgensen was the manager of the store Plaintiff worked at. Ms. Jorgensen is likely to have information about Plaintiff's claims, the allegations in the Complaint, Circle K's defenses thereto, Plaintiff's separation from employment, and other matters relevant to this litigation.

4.      Any person identified or disclosed by Plaintiff in this case.

5.      Any person necessary to produce, identify, or authenticate any document.

6.      Any witness needed for rebuttal or impeachment.

7.      Any person identified in any document produced by any party in this matter.

**B.      Documents.**

The following is a list, together with a description by category, of all documents, electronically stored information, and tangible things in Circle K's possession, custody, or control that Circle K may use to support its claims or defenses, unless the use would be solely for impeachment.

1.      Circle K's Employee Guidebook dated September 2020.

2.      CST Brands, Inc. 2015 Employee Handbook.

3.      Circle K Rocky Mountain Division 5-Minute Rule Procedure.

4.      Confront & Chase Policy.

5.      Plaintiff's final pay rate and pay slips for the pay period from October 26, 2018 to November 5, 2020.

6.      Plaintiff's Absence Requests.

7.      Documents contained in Plaintiff's personnel file.

8.      Performance-coaching documents.

9.      Job description for Customer Service Representative.

10.     Surveillance video of the incident that lead to Plaintiff's separation.

11.     Declaration of Bonnie Moreno.

12.     Declaration of Oliver Verela Roan.

Circle K will produce documents in its possession, custody, and control upon entry of a suitable protective order governing confidential information.

**C.      Damages.**

Although Circle K does not seek damages at this time, it may seek an award of reasonable attorneys' fees and costs incurred in defending against this lawsuit as allowed by applicable law.

**D.      Insurance.**

Not applicable.

Dated: October 11, 2022.

*s/ Thomas W. Carroll*
_____
Thomas W. Carroll
Nicholas Hankins
Littler Mendelson, P.C.
1900 Sixteenth Street, Suite 800
Denver, CO  80202
Telephone: 303.629.6200
Facsimile: 303.629.0200
Email: tcarroll@littler.com
     nhankins@littler.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on the 11th day of October, 2022, I served the foregoing **CIRCLE K'S INITIAL RULE 26(a)(1) DISCLOSURES** via email to the following:

Nicholas A. Lutz
Iris Halpern
RATHOD | MOHAMEDBHAI LLC
2701 Lawrence Street, Suite 100
Denver, CO  80205
Telephone: (303) 578-4400
Fax: (303) 578-4401
nl@rmlawyers.com
ih@rmlawyers.com

*Attorneys for Plaintiff*

*s/ Thomas W. Carroll*
_____
Thomas W. Carroll

4858-7163-2435.2

# Exhibit 15
# Circle K's Supplemental Disclosures

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Case No. 22-cv-02327-NWY-STV

MARY ANN MORENO,

       Plaintiff,

v.

CIRCLE K STORES, INC.,

       Defendant.

---

**CIRCLE K'S SUPPLEMENTAL RULE 26(a)(1) DISCLOSURES**

---

Defendant, Circle K Stores, Inc. ("Circle K") makes the following supplemental disclosures under Federal Rules of Civil Procedure 26(a)(1) and 26(e).

**PRELIMINARY STATEMENT**

The following disclosures are based upon information reasonably available to Circle K as of the date of these disclosures. By making these disclosures, Circle K does not represent that it is identifying every witness, document, or tangible thing, relevant to this action. Circle K does not waive any objections to the production of any document or tangible thing on any permissible basis, or any objections to the admissibility of any information or document at trial.

**DISCLOSURES**

**A.      Witnesses.**

The following is a list of witnesses likely to have discoverable information that Circle K may use to support its claims or defenses unless the use would be solely for impeachment.

8.      Pat Bresnahan, C/O Littler Mendelson, P.C.  Mr. Bresnahan is the former Loss Prevention Manager who oversaw loss prevention for the store Plaintiff worked in. Mr. Bresnahan is likely to have information about Plaintiff's claims, the allegations in the Complaint, Circle K's defenses thereto, Plaintiff's separation from employment, and other matters relevant to this litigation.

9.      Amy Harvey, C/O Littler Mendelson, P.C.  Ms. Harvey is the former Human Resources Manager who oversaw human resources for the store Plaintiff worked in. Ms. Harvey is likely to have information about Plaintiff's claims, the allegations in the Complaint, Circle K's defenses thereto, Plaintiff's separation from employment, and other matters relevant to this litigation.

10.     Craig Holmes, C/O Littler Mendelson, P.C.  Mr. Holmes is the Regional Operations Director who oversaw the store Plaintiff worked in. Mr. Holmes is likely to have information about Plaintiff's claims, the allegations in the Complaint, Circle K's defenses thereto, Plaintiff's separation from employment, and other matters relevant to this litigation.

Dated: May 9, 2023.

*s/ Thomas W. Carroll*
Thomas W. Carroll
Nicholas Hankins
Littler Mendelson, P.C.
1900 Sixteenth Street, Suite 800
Denver, CO  80202
Telephone: 303.629.6200
Facsimile: 303.629.0200
Email: tcarroll@littler.com
        nhankins@littler.com

*Attorneys for Defendants*

Vol. III - 0537

**CERTIFICATE OF SERVICE**

I hereby certify that on the 9th day of May, 2023, I served the foregoing **CIRCLE K'S**

**SUPPLEMENTAL RULE 26(a)(1) DISCLOSURES** via email to the following:

Iris Halpern
Virginia Butler
RATHOD | MOHAMEDBHAI LLC
2701 Lawrence Street, Suite 100
Denver, CO  80205
Telephone: (303) 578-4400
Fax: (303) 578-4401
ih@rmlawyers.com
vb@rmlawyers.com

*Attorneys for Plaintiff*

*s/ Thomas W. Carroll*
Thomas W. Carroll

NG-W5IGAN8A-4880-4933-8466v1

3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Case No. 1:22-cv-02327-NYW-STV

MARY ANN MORENO,

           Plaintiff,

v.

CIRCLE K STORES, INC.,

           Defendants.

---

**CIRCLE K'S RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

Defendant Circle K Stores, Inc ("Circle K") responds to Plaintiff, Mary Ann Moreno's, Motion for Partial Summary Judgment [Dkt. 65] ("Motion") as follows.

**I. INTRODUCTION**

Moreno seeks summary judgment on Circle K's failure-to-mitigate affirmative defense, contending that Circle K cannot produce evidence on an essential element of the defense. The Motion relies on federal law for the proposition that Circle K must prove that other suitable positions existed that Moreno was qualified for. But Colorado substantive law governs this diversity case with only state-law causes of action. And, in contrast to federal law, Colorado law **does not** require Circle K to establish the existence of alternative suitable positions. Instead, Circle K must only prove that Moreno failed to seek employment that was "substantially similar" to her job at Circle K and that doing so would have been reasonable. As explained below, and based on Moreno's own testimony, genuine issues of material fact exist about whether her Dollar

Tree position is substantially similar to her Circle K job and whether it would have been reasonable for Moreno to either ask for additional hours at Dollar Tree or seek alternative employment.

Additionally, the Motion only seeks summary judgment on Circle K's defense with respect to economic damages on Moreno's wrongful-termination claim, but ***not*** with respect to her outrageous-conduct claim and failure to mitigate her alleged emotional distress. Genuine issues of material fact exist about whether Moreno failed to take reasonable steps to mitigate her alleged emotional-distress damages.

With no argument at all as to emotional distress and genuine issues of material fact when the correct legal standard is applied, Moreno is not entitled to summary judgment and the Motion should be denied.

## II. RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS[1]

1.      Admitted.

2.      Denied. Market Manager Driss Aamoud called Moreno on or about October 6 or 7, 2020 to convey Circle K's decision to terminate her employment. Circle K's Mot. for Summ. J. ("Circle K's MSJ") Ex. 9 [Dkt. 64-11] 57:16-58:16 (Moreno Deposition Excerpts); Circle K's MSJ Ex. 10 [Dkt. 64-12] 139:2-6 (Aamoud Deposition Excerpts); Circle K's MSJ Ex. A [Dkt. 64-1] ¶ 12 (Declaration of Craig Holmes). On October 8, 2020, Moreno's termination was finalized in Circle K's internal records. Circle K's MSJ Ex. 10 [Dkt. 64-12] 139:1-9 (Aamoud Deposition Excerpts).

3.      Admitted.

---

[1] The following paragraphs are cited later in this motion as "SUMF ¶ __."

4.      Admitted.

5.      Admitted.

6.      Admitted.

7.      Admitted.

8.      Admitted in part and denied in part. Circle K denies the first sentence. While Moreno was an overall satisfactory employee, Moreno twice received verbal counseling for her performance. Ex. A – Decl. of Nicholas Hankins ("Hankins Decl.") ¶ 3 & Ex. 1 ("30(b)(6) Dep.") 94:7-9, 97:2-5. Circle K admits the second sentence.

9.      Admitted.

10.      Admitted.

11.      Admitted.

12.      Admitted.

13.      Admitted.

14.      Admitted in part and denied in part. Circle K admits that Wimmer had two knives. Mot. Ex. 4 (Police Report, Moreno 000315). Wimmer had one five-to-six-inch knife and another knife that was in plastic packaging. *Id.*

15.      Admitted.

16.      Admitted.

17.      Admitted in part and denied in part because the statement is incomplete. Circle K admits that Aamoud, Moreno's Market Manager, said that it would have been a violation of Circle K policy to have given Wimmer a pack of cigarettes without him showing identification. Mot. Ex. 7 [Dkt. 65-7] 154:15-155:16 (Aamoud Dep. Tr.).

18.     Admitted in part and denied in part. Circle K admits that Wimmer began to leave

the store, but the video-surveillance evidence does not reflect that Wimmer became visibly upset.

Circle K's MSJ Exs. 4-6 [Dkts. 64-6 to 64-8] at 6:55:57-6:56:08 (Video-Surveillance Footage

From October 4, 2020).

19.     Denied. The video-surveillance evidence does not reflect that Wimmer "abruptly

changed directions" or "lurched" toward Moreno. *Id.* at 6:55:57-6:56:17.

20.     Admitted.

21.     Admitted.

22.     Denied. Moreno approached Wimmer instead of stepping back, despite having

approximately 10 feet of space behind her and away from the cigarettes. Hankins Decl. ¶ 4 & Ex.

2 ("Aamoud Dep.") 70:16-71:5; Hankins Decl. ¶ 5 & Ex. 3 ("Jorgensen Dep.") 70:19-20, 71:17-

18, 71:24-25, 72:22-74:23; Circle K's MSJ Ex. 11 [Dkt. 64-13] 42:13-17, 50:1-5 (Holmes

Deposition Excerpts).

23.     Admitted in part and denied in part. Wimmer continued to move toward Moreno

and the cigarette case and he was within reaching distance, but the video-surveillance evidence

shows that the knives were tucked under his right arm. Circle K's MSJ Exs. 4-6 [Dkts. 64-6 to

64-8] at 6:56:10-16 (Video-Surveillance Footage From October 4, 2020).

24.     Admitted in part and denied in part. Circle K admits the first sentence. Circle K

denies the second sentence. Once Wimmer was behind the counter, Wimmer extended his left

arm to reach for a pack of cigarettes from the display case located behind Moreno, holding the

knives (among other things) in his right arm. *Id.* at 6:56:06-6:56:25. After Wimmer began

extending his arm, Moreno made physical contact with Wimmer. *Id.* at 6:56:12-16. Eventually,

Moreno pushed Wimmer away from her. *Id.* at 6:56:06-6:56:25. Moreno also grabbed one of Wimmer's arms. *Id.*

25.     Admitted.

26.     Admitted in part and denied in part. Circle K admits that a Circle K customer and Moreno called the police. Circle K denies that the Circle K customer witnessed the robbery. *Id.* at 6:54:55-6:56:20; Circle K's MSJ Ex. 7 [Dkt. 64-9] at 00:00-5:10.

27.     Admitted.

28.     Admitted in part and denied in part. Circle K denies the first sentence. The evidence does not support that Moreno called Aamoud because Jorgensen had not arrived at the store after an hour. Mot. Ex. 3 [Dkt. 65-3] at 8:10:05-8:11:26 (Circle K Surveillance Video (Register 1)). Circle K admits the second sentence.

29.     Admitted.

30.     Admitted in part and denied in part. Circle K admits that prior to Moreno's termination from Circle K, Aamoud believed that Moreno violated Circle K's "Don't Chase or Confront" policy. Circle K denies the implication that Aamoud concluded that Moreno violated Circle K's "Don't Chase or Confront" policy immediately after he reviewed video footage of the robbery on October 4, 2020. Mot. Ex. 7 [Dkt. 65-7] 68:1-18 (Aamoud Dep. Tr.).

31.     Admitted.

32.     Denied. Market Manager Driss Aamoud called Moreno on or about October 6 or 7, 2020 to convey Circle K's decision to terminate her employment. Circle K's Mot. for Summ. J. ("Circle K's MSJ") Ex. 9 [Dkt. 64-11] 57:16-58:16 (Moreno Deposition Excerpts); Circle K's MSJ Ex. 10 [Dkt. 64-12] 139:2-6 (Aamoud Deposition Excerpts); Circle K's MSJ Ex. A [Dkt.

Vol. III - 0543

64-1] ¶ 12 (Declaration of Craig Holmes). On October 8, 2020, Moreno's termination was finalized in Circle K's internal records. Circle K's MSJ Ex. 10 [Dkt. 64-12] 139:1-9 (Aamoud Deposition Excerpts).

33.     Admitted in part and denied in part. Circle K admits that the reason for Moreno's termination was her contact with Wimmer on October 4, 2020 and states that Moreno's employment was terminated for violation of the Confront & Chase policy, not because she engaged in self-defense, not because she reported the robbery, not because she called the police, and not because she was a victim of a crime. Circle K's MSJ Ex. A [Dkt. 64-1] ¶ 14 (Declaration of Craig Holmes); Circle K's MSJ Ex. C [Dkt. 64-16] ¶ 10 (Declaration of Driss Aamoud); Circle K's MSJ Ex. D [Dkt. 64-17] ¶ 9 (Declaration of Amy Harvey).

34.     Admitted.

35.     Admitted.

36.     Admitted in part and denied in part. Circle K admits the first sentence. Circle K denies the second sentence. Harvey testified that during her employment at Circle K she did not believe she ever disagreed with a termination of an employee who experienced an armed robbery. Mot. Ex. 10 [Dkt. 65-10] 35:3-7 (Harvey Dep. Tr.). Harvey did not testify that she had no recollection of ever retaining an employee who made contact with an assailant. *Id.*

37.     Admitted.

38.     Admitted.

39.     Denied. Moreno did not look for a new position. Her daughter looked for new positions on her behalf. Hankins Decl. ¶ 6 & Ex. 4 ("Moreno Dep.") 27:8-29:2.

40.     Admitted.

Vol. III - 0544

41.     Admitted.

42.     Admitted in part and denied in part. Circle K denies the first sentence. Moreno does not remember how many positions she applied for. Moreno Dep 28:22-25. Circle K admits the second sentence.

43.     Admitted.

44.     Admitted.

45.     Admitted.

46.     Admitted.

47.     Admitted.

48.     Admitted.

49.     Admitted.

50.     Admitted.

51.     Admitted.

52.     Admitted.

53.     Admitted.

54.     Admitted.

55.     Admitted in part and denied in part. Circle K admits that Moreno responded to Circle K's Interrogatory Nos. 4 through 7. Circle K denies that Moreno's responses to Circle K's Interrogatory Nos. 4 through 7 are irrelevant to the elements of the failure-to-mitigate affirmative defense.

56.     Admitted.

57.     Admitted.

58.     Admitted.

59.     Denied. Circle K disclosed Moreno herself as to her claims, the allegations in the complaint, and Circle K's defenses thereto (among other things). Mot. Ex. 14 at 2 (Circle K's Initial Disclosures).

60.     Admitted.

61.     Admitted.

## III. STATEMENT OF ADDITIONAL DISPUTED FACTS[2]

**A.      Economic damages.**

62.     After her employment ended with Circle K, Moreno only applied for positions near her place of residence. Mot. Ex. 11 [Dkt. 65-11] at 18-20 (Plaintiff's Third Supplemental Discovery Responses); Moreno Dep. 30:14-17.

63.     Moreno did not apply for positions at companies she knew to be hiring and instead applied at companies she thought might be hiring. Moreno Dep. 26:12-22.

64.     Moreno only applied for retail positions. *Id.* at 28:3-8.

65.     Moreno only applied for positions online. *Id.* at 28:3-17.

66.     Moreno does not remember how many positions she applied for. *Id.* at 28:22-25.

67.     Moreno has not applied for any other position since she began her employment with Dollar Tree. *Id.* at 22:7-10.

68.     In her employment with Dollar Tree, Moreno initially worked about 10 hours per week, but began working about 15 hours a week after she requested to do so. Mot. Ex. 11 [Dkt. 65-11] at 15-18 (Plaintiff's Third Supplemental Discovery Responses); Moreno Dep. 22:11-17.

---

[2] The following paragraphs are cited later in this motion as "SADF ¶ __."

69.     Moreno would prefer to work approximately 32 hours a week at Dollar Tree. Moreno Dep. 22:23-25.

70.     Since asking to work 15 hours a week, Moreno has not asked her manager at Dollar Tree for any more hours. *Id.* at 24:2-4.

71.     While Moreno believes that all employees that share her position as a customer service representative at Dollar Tree work part-time, Moreno does not know whether any other customer service representative works more than 15 hours a week. *Id.* at 23:10-24:1.

72.     Moreno worked additional hours on occasion, such as during the holidays, assisting in taking inventory, and covering shifts for coworkers. *Id.* at 24:21-25; Mot. Ex. 11 [Dkt. 65-11] at 15-18 (Plaintiff's Third Supplemental Discovery Responses).

**B.     Emotional distress.**

73.     Moreno does not take any medication for anxiety or depression. Moreno Dep. 117:25-118:1, 122:18-123:5.

74.     Moreno attended therapy sessions with Sherri Wand after the October 4, 2020 robbery. *Id.* 118:2-12.

75.     Moreno stopped attending therapy sessions with Wand over one year ago. *Id.* at 118:11-14.

76.     Moreno is on Dollar Tree's health plan and has been on that plan since she began working there. *Id.* at 21:16-22.

77.     Moreno does not currently see any other healthcare provider for emotional or mental-health issues. *Id.* at 118:15-18.

## IV. ARGUMENT

**A.     Colorado law governs failure to mitigate in this diversity case.**

This is a diversity case with two claims under Colorado law: wrongful discharge in violation of public policy and intentional infliction of emotional distress/outrageous conduct. In diversity cases, the *Erie* doctrine instructs that federal courts must apply state substantive law and federal procedural law. *Racher v. Westlake Nursing Home Ltd. P'ship*, 871 F.3d 1152, 1162 (10th Cir. 2017) (citing *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996)). Moreno's claims themselves are unquestionably substantive law governed by Colorado law, and so are "the applicable burdens, defenses, and limitations." *Racher*, 871 F.3d at 1164-65 (citing *Ragan v. Merchs. Transfer & Warehouse Co.*, 337 U.S. 530, 533 (1949)). Therefore, Circle K's failure-to-mitigate defense is governed by Colorado law, not federal law.

Under Colorado law, in wrongful-termination cases, a defendant establishes failure to mitigate by showing (1) the plaintiff failed to seek other employment that was substantially similar to the position she had held with the defendant; and (2) seeking other similar employment would have been reasonable under all the circumstances. CJI-Civ. 4th 31:8 (2023); CJI-Civ. 4th 31:15 (2023) (applying 31:8 to tort claims).[3] "Generally, the question of what constitutes reasonable effort in mitigation of damages is a question of fact to be determined by the trier of fact." *Fair v. Red Lion Inn*, 943 P.2d 431, 437 (Colo. 1997). Colorado law, therefore, does ***not*** require Circle K to prove the existence of other suitable positions to establish its failure-to-

---

[3] While Colorado courts (and therefore this Court) are not bound by the Colorado model jury instructions, Colorado courts do find the model instructions persuasive. *See People v. Ross*, 482 P.3d 452, 456 (Colo. App. 2019); *see also Wade v. Olinger Life Ins. Co.*, 560 P.2d 446, 452 n.7 (Colo. 1977).

mitigate defense with respect to Moreno's wrongful-termination claim and what is reasonable should be decided by the jury.

Failure to mitigate is likewise an affirmative defense to an outrageous-conduct claim under Colorado law. *See* CJI-Civ. 4th 23:1 (2023). In this setting, Moreno has the duty to take reasonable steps under the circumstances to mitigate or minimize her damages. *See* CJI-Civ. 4th 5:2 (2023); CJI-Civ. 4th 23:1 (2023) (providing that Instruction 5:2 should be given in outrageous-conduct cases). "Damages, if any, caused by plaintiff's failure to take such reasonable steps cannot be awarded to the plaintiff." CJI-Civ. 4th 5:2 (2023).

**B.     Moreno's own testimony demonstrates a genuine issue of fact on her failure to mitigate.**

Genuine issues of material fact exist regarding whether Moreno failed to seek other substantially similar employment, and whether seeking other such employment would have been reasonable under the circumstances.

First, there is a genuine dispute of material fact about whether Moreno obtained employment that was "substantially similar" to her position with Circle K. *See* CJI-Civ. 4th 31:8 (2023). While the jobs themselves are similar (cashiers in retail businesses) the record shows that Moreno works far fewer hours with Dollar Tree than she did with Circle K. SUMF ¶¶ 38, 49. Indeed, Moreno works about half as many hours for Dollar Tree than she did for Circle K. *Id.* Moreno testified that she let her daughter conduct a job search for her, that she applied at places she thought might be hiring instead of places she knew to be hiring, that she took the first offer she got (stopping her job search), and that the first offer came with markedly fewer hours per week than her Circle K job. That is enough evidence to raise a genuine issue of fact as to whether Moreno failed to seek substantially similar employment.

Second, there is also a genuine dispute of material fact on whether seeking similar employment at Dollar Tree—by way of comparable hours per week—would have been reasonable under the circumstances. CJI-Civ. 4th 31:8 (2023). When Moreno first started at Dollar Tree, she only worked 10 hours per week. SUMF ¶ 47. But her weekly hours went up to 15 after she asked her manager for more hours. SADF ¶ 68. Despite her stated desire to work approximately 32 hours a week, and despite the fact that her only other request for more hours was approved, Moreno admits she has not made *any* effort to request additional hours from her manager at Dollar Tree. SADF ¶¶ 69-70. Moreno also has not made *any* effort to seek employment alternative to her Dollar Tree position since she began working there. SADF ¶ 67.

In other words, Moreno's own testimony shows that she was content to take the first job that came along and she has been content to work far fewer hours than she worked a Circle K, without even asking for more. Moreno's testimony is competent evidence Circle K may use to prove its defense under Colorado law and her admissions raise a genuine issue of fact about whether Moreno failed to mitigate her damages.

**C.**     **Moreno's Motion does not address failure to mitigate her alleged emotional-distress damages.**

In addition to her wrongful-termination claim, Moreno also alleged intentional infliction of emotional distress/outrageous conduct. First Am. Compl. [Dkt. 56] ¶¶ 111-24. Circle K's failure-to-mitigate affirmative defense applies to both claims and covers all applicable forms of alleged damages. Answer to First Am. Compl. [Dkt. 59] 13 ¶ 7 ("If Moreno was damaged in any amount, she has failed to mitigate her damages, and therefore, is barred from recovery, or any award of damages must be proportionately diminished."). Colorado law recognizes failure to mitigate as an affirmative defense to an outrageous-conduct claim. CJI-Civ. 4th 5:2, 23:1 (2023).

And Colorado recognizes a plaintiff may fail to mitigate damages by not obtaining appropriate therapeutic or medical care. *Winkler v. Rocky Mountain Conference of United Methodist Church*, 923 P.2d 152, 160 (Colo. App. 1995) (affirming jury instruction on failure to mitigate). Because Moreno's Motion does not address Circle K's failure-to-mitigate defense with respect to Moreno's outrageous-conduct claim or emotional distress, those portions of the defense must proceed to trial.

Irrespective of whether Moreno has specifically sought summary judgment on failure to mitigate with respect to her emotional distress and outrageous-conduct claim, genuine issues of material fact preclude summary judgment on this defense. Moreno claims that because of Circle K's alleged outrageous conduct, Moreno experienced "severe anxiety, depression, and isolation" as well as "significant injures, damages, and losses to be determined at trial." First Am. Compl. [Dkt. 56] ¶¶ 123-24. Failure to mitigate will apply if she failed to take reasonable steps to minimize those damages.  CJI-Civ. 4th 5:2 (2023).

There are genuine issues of material fact about whether Moreno has taken reasonable steps to mitigate her alleged emotional-distress damages. Moreno has had health insurance through Dollar Tree since she started working there. SADF ¶ 76. And yet, since ceasing her therapy sessions with Wand over a year ago, Moreno has not seen a healthcare provider for her mental health. *Id.* ¶ 77. Moreover, Moreno does not currently take any medication for anxiety or depression. *Id.* ¶ 73. That testimony alone creates a genuine issue of material fact on whether Moreno failed to take reasonable steps to minimize her alleged emotional distress and summary judgment is not warranted.

## V. CONCLUSION

Properly applying Colorado law to this diversity case, Circle K is not required to establish that alternative suitable positions existed. And genuine issues of material fact preclude a grant of summary judgment in Moreno's favor. Moreno's position with Dollar Tree is not substantially similar to her former position with Circle K and Moreno testified that she has not even asked for more hours—except for when she asked to go from 10 to 15 and it was approved—or to seek employment alternative to Dollar Tree. That is enough evidence for Circle K's defense to proceed past summary judgment. Moreover, the Court should deny the Motion with respect respect to Moreno's outrageous-conduct claim and alleged emotional distress because Moreno has not sought dismissal of that defense, and because genuine issues of material fact exist on whether Moreno has taken reasonable steps to mitigate the damages she claims were caused by Circle K's alleged outrageous conduct. Combined, the Motion should be denied in its entirety.

Respectfully submitted this 25th day of August, 2023.

*s/ Thomas W. Carroll*
Thomas W. Carroll
Nicholas Hankins
Littler Mendelson, P.C.
1900 Sixteenth Street, Suite 800
Denver, CO  80202
Telephone: 303.629.6200
Facsimile: 303.629.0200
Email: tcarroll@littler.com
        nhankins@littler.com

*Attorneys for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 25th day of August, 2023, I electronically filed the foregoing

**CIRCLE K'S RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY**

**JUDGMENT** using the CM/ECF system, which will send notification of such filing to the

following:

Iris Halpern
Virginia Hill Butler
RATHOD | MOHAMEDBHAI LLC
2701 Lawrence Street, Suite 100
Denver, CO  80205
Telephone: (303) 578-4400
Fax: (303) 578-4401
ih@rmlawyers.com
vb@rmlawyers.com

*Attorneys for Plaintiff*

*s/ Valerie Gremillion*
Valerie Gremillion, Legal Secretary

4813-8251-6684.1 / 999991-1052

Vol. III - 0553

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Case No. 1:22-cv-02327-NYW-STV

MARY ANN MORENO,

        Plaintiff,

v.

CIRCLE K STORES, INC.,

        Defendant.

---

## DECLARATION OF NICHOLAS HANKINS

---

I, Nicholas Hankins, declare as follows.

1.      I am an attorney at Littler Mendelson, P.C. and am counsel of record for Defendant Circle K Stores, Inc. ("Circle K") in this case.

2.      I make this declaration in support of Circle K's Response to Plaintiff's Motion for Partial Summary Judgment ("Response").

3.      Attached as Exhibit 1 is a true and correct copy of excerpts from the Rule 30(b)(6) deposition of Susie Fernandez, as cited in the Response.

4.      Attached as Exhibit 2 is a true and correct copy of excerpts from the deposition of Driss Aamoud, as cited in the Response.

5.      Attached as Exhibit 3 is a true and correct copy of excerpts from the deposition of Love Jorgensen, as cited in the Response.

6.      Attached as Exhibit 4 is a true and correct copy of excerpts from the deposition of Mary Ann Moreno, as cited in the Response.

According to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: August 25, 2023.                    *s/ Nicholas Hankins*

4888-7339-3018.1

2

# EXHIBIT 1 TO DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## Rule 30(b)(6) Deposition Excerpts

## *Mary Ann Moreno v. Circle K Stores, Inc.* Case No. 1:22-cv-02327-NYW-STV

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-02327-NYW-STV

_____

DEPOSITION OF SUSIE FERNANDEZ as        June 20, 2023
30(b)(6) Representative of
CIRCLE K STORES, INC.

_____

MARY ANN MORENO,

              Plaintiff,

vs.

CIRCLE K STORES, INC.,

              Defendant.


_____


      The deposition of SUSIE FERNANDEZ, taken
before Leeann Stellor, a Registered Merit Reporter,
Certified Realtime Reporter, and a Notary Public in
and for the County of Summit and the State of
Colorado, at 2701 Lawrence Street, Suite 100,
Denver, Colorado, on Tuesday, June 20, 2023, at the
hour of 10:03 a.m.



Page 94

1      A.     Circle K, or from her initial hire date

2  with the -- one of the -- with the original company

3  she worked for?

4      Q.     Well, I guess we can put that aside until

5  we get to that next.

6      A.     Okay.

7      Q.     On behalf of Circle K, did Ms. Moreno

8  have any performance issues?

9      A.     She had two verbal counselings.

10     Q.     Could you describe those for --

11     A.     I'm sorry, they were written counselings.

12  One written and one verbal.

13     Q.     And could you describe those, please?

14     A.     The written one was for violation of the

15  age-restricted sales.

16     Q.     What was the product?

17     A.     It does not say what the actual product

18  was.  It had to have been an age-restricted sales

19  product.

20     Q.     And what was the verbal counseling?

21     A.     Not plus selling a mystery shopper.

22     Q.     And please describe what plus selling is.

23     A.     If someone comes in and buys a Coke, and

24  you ask them if they want a hot dog.

25     Q.     Okay.  Would these two -- are there any

Page 97

1        Q.    Was Ms. Moreno a good employee?

2        A.    She was satisfactory.  She was never -- I

3    never heard she was not a good employee.

4        Q.    Did she ever have attendance issues?

5        A.    Not that was told to me.

6        Q.    Is attendance a frequent issue for CSRs

7    at Circle K?

8        A.    It can be.

9        Q.    Is it helpful for Circle K when employees

10   are on time and have good attendance?

11       A.    It is.

12       Q.    Was Ms. Moreno a trustworthy employee?

13       A.    I have not heard that she was not.

14       Q.    So on behalf of Circle K as the designee,

15   was she a dependable employee?

16       A.    I was never told she was not, so I would

17   say she was dependable.

18       Q.    On behalf of Circle K, did Ms. Moreno

19   perform her job satisfactorily?

20       A.    She was a satisfactory employee.

21       Q.    On behalf of Circle K, was Ms. Moreno a

22   better employee than most CSRs?

23       A.    In my conversation with Driss, he never

24   said she was better or worse than another CSR.

25       Q.    But on behalf of Circle K, though, as the



# EXHIBIT 2 TO DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## Aamoud Deposition Excerpts

## *Mary Ann Moreno v. Circle K Stores, Inc.* Case No. 1:22-cv-02327-NYW-STV

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Case No. 1:22-cv-02327-NYW-STV

_____

MARY ANN MORENO,

Plaintiff,

v.

CIRCLE K STORES, INC.,

Defendant.

_____

DEPOSITION OF DRISS AAMOUD

May 18, 2023

_____

PURSUANT TO NOTICE, the above-entitled deposition was taken on behalf of the Plaintiff at 2701 Lawrence Street, Denver, Colorado 80205, on May 18, 2023, at 10:00 a.m., before Karen S. Fogle, Registered Professional Reporter and Notary Public within Colorado.

MAGNA LEGAL SERVICES

(866) 624-6221

magnals.com



Page 70

1    yourself and then, when you're done, I'd like to --

2    since we have the physical policy in front of us, I

3    would like to look at the words and have you point out

4    what you think Ms. Moreno did that violated the

5    provisions.  So can you take a minute to read it to

6    yourself.  Ready?

7              A.  Yes.

8              Q.  Can you point to me the parts of this

9    policy that you think Ms. Moreno violated?

10             A.  Maintain a safe position behind the

11   counter.

12             Q.  When we go through this, let's talk about

13   what she did that violated it.  How did she violate the

14   requirement to maintain a safe position behind the

15   sales counter?

16             A.  I believe sales counter is at least

17   10 feet, so she was getting in the way of the customer

18   instead of just retreating behind the counter to a safe

19   place and then stay there and let him do what he wants.

20   She actually got in his way.  She did not maintain a

21   safe distance.

22             Q.  She stayed behind the counter but

23   because she --

24             A.  She did not stay.  She reached out to the

25   customer in his way.



Page  71

 1          Q.  All of this is taking place behind the
 2  counter?
 3          A.  Correct.
 4          Q.  She is behind the counter, but you're
 5  saying by not backing up further --
 6          A.  Maintaining a safe distance.  There is
 7  plenty of space.  May I proceed?
 8          Q.  Please.
 9          A.  At no time do you stop or accuse the person
10  of theft.
11          Q.  How did she violate this?
12          A.  She told him.  She pointed and threatened
13  him and she tried to stop him from going down the
14  counter.  She threatened him while pointing the finger
15  at him and, again, standing in his way.  The other one,
16  "At no time do you get into a verbal altercation with
17  any customer and/or person you suspect of theft."  She
18  did all that.
19          Q.  Just so I'm clear, in Ms. Moreno's
20  interaction with the robber, first, he came up to the
21  sales counter and asked for cigarettes; correct?
22              MR. HANKINS:  Object to form.
23          A.  Correct.
24          Q.  (BY MS. BUTLER)  And she refused the sale;
25  is that right?



# EXHIBIT 3 TO DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## Jorgensen Deposition Excerpts

## *Mary Ann Moreno v. Circle K Stores, Inc.* Case No. 1:22-cv-02327-NYW-STV

Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT
OF COLORADO

Civil Action No. 1:22-cv-02327-NYW-STV

_____
DEPOSITION OF LOVE JORGENSEN          May 1, 2023
_____
Plaintiff,
MARY ANN MORENO,

v.

Defendant,
CIRCLE K STORES, INC.

_____
APPEARANCES:
    RATHOD MOHAMEDBHAI, LLC
        By Virginia H. Butler, Esq.
           2701 Lawrence Street
           Suite 100
           Denver, Colorado  802025
             Appearing on behalf of Plaintiff.

    LITTLER MENDELSON, PC
        By Thomas W. Carroll, Esq.
           1900 16th Street
           Suite 800
           Denver, Colorado  80202
             Appearing on behalf of Defendant.
Also Present:

            Iris Halpern, Rathod Mohamedbhai, LLC

            Nicholas Hankins, Littler Mendelson, PC



Page 70

```
 1        A      Yes.

 2        Q      Okay.  Could you please take a minute and

 3   just read it to yourself to refresh how -- how it --

 4   what it says.  Have you finished reading?

 5        A      Yes.

 6        Q      Okay.  Having read the policy, could you

 7   point -- what part of the policy do you think

 8   Ms. Moreno violated?

 9        A      She confronted him.

10        Q      Okay.  Could you point -- point me to

11   that -- where you're looking, please?

12        A      Right up to -- on the top it says do not

13   confront.

14        Q      Okay.  So you believe that she confronted

15   the -- who we now know to be Mr. Wimmer?

16        A      Yes.

17        Q      Okay.  What do you -- what did she do

18   that confronted him?

19        A      She stepped up to him when he was

20   grabbing the cigarettes.

21        Q      Okay.  Okay.  Are there any other parts

22   of the policy that you believe she violated?

23        A      Well, it's the same -- same thing on the

24   top.  Do not fight.  She was pretty much pushing him

25   back so that's pretty much fighting.
```



Page 71

```
 1        Q       Okay.  So can you describe to me a little

 2    bit more what you think -- what she did that

 3    violated the fighting -- the do not fight portion?

 4        A       She put her hand on him.

 5        Q       Okay.  Are there any other portions of

 6    this policy that you believe Ms. Moreno violated?

 7    And feel free to look through it again.

 8        A       She didn't maintain the safe position

 9    behind the counter.  She could have backed up.

10        Q       And where are you looking for that?

11        A       "Remember to observe [sic] as much

12    information about the persons as possible while

13    maintaining safe" -- "maintaining a safe position

14    behind the counter" -- "sales counter."

15        Q       Okay.  And, so, what did Ms. Moreno do

16    that violated this?

17        A       She was stepping up towards him instead

18    of backing away from him.

19        Q       Okay.  And, so, did she at any point come

20    out from behind the sales counter?

21        A       No.

22        Q       Okay.  But you still believe that she

23    violated this portion of the policy?

24        A       She could have backed up instead of going

25    towards him.
```



Page 72

```
 1        Q    Okay.  And we'll get into this in more

 2   detail later, but just so we're all on the same

 3   page, the way the sales counter at the Sheridan

 4   Circle K location is is it fair to say that

 5   immediately behind -- when Ms. Moreno was standing

 6   at the cash register there was a wall directly

 7   behind her that contained cigarettes, the counter in

 8   front of her, and then more counter to her right so

 9   that there was only one entrance in and out from

10   behind the counter?

11        A    Yes.

12        Q    Okay.  So are you saying then you believe

13   that she should have backed up further into -- let's

14   call it the U that the counter made as opposed to

15   stemming forward?

16        A    Yes.

17        Q    Okay.  So in that position she would be

18   backed up against the edge of the counter; is that

19   true?

20        A    No.  No.

21        Q    Okay.  Could you explain to me?

22        A    The way the store sits -- especially that

23   store -- is you've got a counter here and then over

24   here you've got another counter --

25             MS. HALPERN:   It might help if you draw
```



Vol. III - 0569

Page 73

1   it because I don't think your hand motions are going

2   to be showing on the record.  So she can give you a

3   piece of paper and just make it an exhibit.

4             THE DEPONENT:  I'm not sure my exact

5   measurements are going to be correct.

6             MS. HALPERN:  We will not hold you to

7   that.

8             MS. BUTLER:  So then I think to be

9   chronological with the previous deposition, this

10  would be Exhibit 10.

11            MR. CARROLL:  I agree.

12       Q     (BY MS. BUTLER)  Okay.  So I'll make

13  photocopies of this once we're done.

14       A     Like I said, my measurements aren't going

15  to be exact.  Here's the entrance.

16       Q     Okay.

17       A     Well, right here would be the entrance so

18  the register would be a little bit over here more.

19       Q     And that's register one --

20       A     Register one is here.

21       Q     Okay.

22       A     And we have another register for over

23  here.

24       Q     Register two?

25       A     Yeah.



Page 74

1      Q      Okay.

2      A      So she could have backed up this way to

3   get away from him from over here.

4      Q      Okay.  So are you saying she could have

5   backed up from register one --

6      A      Over to register two.

7      Q      Over to register -- okay.

8      A      Yeah.

9      Q      And, so, you believe that she didn't

10  maintain a safe position behind the counter because

11  she did not back up from register one to register

12  two?

13     A      I wouldn't put it like that, but she

14  could have backed up.

15     Q      Okay.  How would you put it then?

16     A      She -- to get away from him, she could

17  have backed up --

18     Q      Okay.

19     A      -- and not put her hands on him --

20     Q      Okay.

21     A      -- and try to push him.

22     Q      Okay.  Okay.  Then going back to the

23  policy --

24            MR. CARROLL:  Should we go ahead and mark

25  it as Exhibit 10?



# EXHIBIT 4 TO DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## Moreno Deposition Excerpts

## *Mary Ann Moreno v. Circle K Stores, Inc.* Case No. 1:22-cv-02327-NYW-STV

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-02327-NYW-STV
_____

DEPOSITION OF:  MARY ANN MORENO - April 12, 2023
_____

MARY ANN MORENO,

Plaintiff,

v.

CIRCLE K STORES, INC.,

Defendant.

_____

PURSUANT TO NOTICE, the deposition of
MARY ANN MORENO was taken on behalf of the Defendant at
1900 16th Street, Suite 800, Denver, Colorado 80202, on
April 12, 2023, at 9:16 a.m., before Carin C. Geist,
Registered Diplomate Reporter and Notary Public within
Colorado.

Mary Ann Moreno
April 12, 2023

1          A.    Yes.

2          Q.    What benefits are you eligible for?

3          A.    Medical, dental, vision.

4          Q.    Anything else?

5          A.    No.

6          Q.    Do you --

7          A.    Not that I know of.

8          Q.    Fair enough.  Do you participate in

9    medical, dental, and vision benefits with Dollar Tree?

10         A.    I have.

11         Q.    Is that to say that sometimes you've been

12   on their benefits, and sometimes you haven't been?

13         A.    I've always been on their benefits, but I

14   don't use them.  Like, I'm a healthy person, so I don't

15   need to use them sometimes.

16         Q.    Good.  Thank you for clarifying.  I used

17   the word "participate."  What I might have said is,

18   like, are you on the healthcare plan through Dollar

19   Tree?

20         A.    Yes.

21         Q.    Okay.  And you have been the whole time?

22         A.    Yes.

23         Q.    Have you ever filed any complaints or

24   charges of discrimination against Dollar Tree?

25         A.    No.

Mary Ann Moreno
April 12, 2023

1      Q.   Do you have any complaints about your

2   employment with Dollar Tree that -- you know, that you

3   haven't raised?

4      A.   No.

5           MS. HALPERN:   I'm going to object to form.

6   Go ahead.

7      Q.   (BY MR. CARROLL)  Since you started

8   working for Dollar Tree in January of 2021, have you

9   looked for any other jobs?

10      A.   No.

11      Q.   How many hours per week are you currently

12   working at Dollar Tree?

13      A.   It varies.  Sometimes it's 13.  Sometimes

14   it's 14.  Sometimes it's 15.  And when I say "15," it's

15   because when I spoke to my manager, I asked him if he

16   could give me 15 hours a week, because I can't make it

17   without more hours, financially.

18      Q.   So let me ask a few follow-up questions

19   about that.  How many hours would you like to be

20   working currently at Dollar Tree?

21      A.   Well, I would like to be working 32 hours

22   a week.  That would really help.

23      Q.   Have you told Dollar Tree that you'd like

24   to be working 32 hours a week?

25      A.   No.  Only because every position at Dollar

Mary Ann Moreno
April 12, 2023

```
 1   Tree is part-time.

 2           Q.   Every position?

 3           A.   As -- yes, as far as I know.

 4           Q.   The manager is part-time?

 5           A.   I don't think so.

 6           Q.   Okay.  So not every position.

 7           A.   Well, I'm saying just the cashiers, the

 8   customer service representatives; but as far as

 9   management, I don't know.

10           Q.   Okay.  How is it that you know that all of

11   the cashier positions are part-time?

12           A.   Because my manager tells me that they're

13   only allowed so many hours, so they have to give

14   everybody, you know, four or five hours.  Some only

15   work one day that I know of.  I don't know why, but she

16   only works one day a week.  And the others, I don't

17   know.  They have a high turnover.  So right now, they

18   hired two new people, so I don't know what hours

19   they're getting.

20           Q.   So they might be working more; they might

21   less -- they might not?

22                MS. HALPERN:  Object to form.

23           A.   I don't know.  I don't ask them.

24           Q.   (BY MR. CARROLL)  Don't ask the other

25   employees how many hours they have?
```

Mary Ann Moreno
April 12, 2023

 1          A.   No.

 2          Q.   So have you or haven't you asked Dollar

 3   Tree, I would like more hours?

 4          A.   No.

 5          Q.   No.  When you applied for the job, was it

 6   posted as full-time or part-time?

 7          A.   You know, I don't remember that.  I was

 8   just happy to get a job at that time.

 9          Q.   So far, ma'am, we've been talking about

10   how much you're currently working.  And if I heard you

11   correctly, it's 13 to 15 hours a week, right?

12          A.   Yes.

13          Q.   Has that been the same throughout your

14   time at Dollar Tree over the past two years?

15          A.   Yeah.  I think so.

16          Q.   Put differently --

17          A.   More or less.

18          Q.   More or less.  Put differently, are there

19   times in your two years of employment where you've

20   worked more than 15 hours a week or maybe less than 13?

21          A.   I think one time I worked -- I don't know.

22   I don't remember how many hours, but they were doing

23   inventory, and they asked me to come in to help.  But I

24   don't remember the hours.  I mean, I'd have to go back

25   to check stubs, which I have.

Mary Ann Moreno
April 12, 2023

1  questions, as you might expect.  You said you were

2  looking for jobs.  You said you applied for jobs.  What

3  did you do to look for jobs?

4          A.   Well, I would -- when it would come up,

5  like, for instance, Walmart, I want to say.  It would

6  come up.  It would ask me questions like my birthday,

7  my name, my experiences.  I don't think it asked me for

8  wages.

9          Q.   Sounds like you're describing, like, the

10  application for Walmart for --

11          A.   Yeah, it was an application.

12          Q.   You said it would come up.  My question is

13  kind of going back a step or two, which is, how did you

14  find out about that opportunity in the first place?

15          A.   Because Walmart's always hiring.  They're

16  always hiring people or -- and, really, I didn't know

17  if any of these jobs were hiring, but I took a chance.

18          Q.   So is it the case that you weren't looking

19  for jobs that were hiring, but rather, applying at

20  places that you thought might be hiring?

21               MS. HALPERN:  Object to form.

22          A.   Yes.

23               MR. CARROLL:  What's the objection?

24               MS. HALPERN:  I mean, she just said they

25  were going online and looking on the internet, and she

Mary Ann Moreno
April 12, 2023

1    said that her daughter was helping her.

2              MR. CARROLL:  Fair enough.

3         Q.  (BY MR. CARROLL)  Let me be very clear

4    here, and we'll separate things out between you and

5    your daughter, okay?  Let me start with you.  Did you

6    do anything after your employment with Circle K

7    ended -- well, let me phrase it differently.

8              What did you do in order to find a new

9    job?  And we'll talk about your daughter in a minute.

10             A.  I don't think -- I didn't go out, you

11   know, personally because I don't drive that much, and I

12   have a fear of driving, so I really didn't go out.

13   That's why we -- my daughter helped me on the computer.

14             Q.  Okay.  I'll come back to your daughter.

15   Let me just focus still on you for a little while.  I

16   understand you didn't go out.  Did you maybe look at

17   the want ads in the newspaper, for example?

18             A.  Did they still have newspapers?  I don't

19   know.  No, I didn't.

20             Q.  Okay.  And did you maybe, like, go

21   anywhere on the internet and find out, you know, who's

22   trying to hire right now, who's posting a job?

23             A.  Well, my daughter did.  I didn't.

24             Q.  All right.  So let's go back to your

25   daughter, then, or move to your daughter.  To your

Mary Ann Moreno
April 12, 2023

 1  knowledge, what did your daughter do to help you find a

 2  job after your Circle K employment ended?

 3          A.   She got on the computer and pulled up a

 4  bunch of businesses or -- I've always worked retail

 5  since I was 17, so that's the type of job I was looking

 6  for, or even just a customer rep.  So she would pull up

 7  all these businesses, you know, like Hallmark, Walmart,

 8  never restaurants, and that's how she would do it.

 9          Q.   And am I correct that she would submit an

10  application on your behalf?

11          A.   Well, I would sit there with her and give

12  her all the information, yes.  And then she would type

13  it in or however they do in their computers.

14          Q.   Together, the two of you would complete

15  the information on the computer and then submit an

16  application?

17          A.   Yes.

18          Q.   Okay.  Were you looking for a full-time

19  job or a part-time job?

20          A.   Full-time.  And, actually, at that time, I

21  was looking for whatever I could get at that time.

22          Q.   Understanding that it was your daughter

23  who did a lot of this, as you sit here today, ma'am, do

24  you have any idea how many jobs you applied for?

25          A.   Oh, my God, no.  Maybe ten or more.  I

Mary Ann Moreno
April 12, 2023

1    know we went into her computer a couple of times.  I

2    don't remember the number, no.

3            Q.    Did you interview at Dollar Tree?

4            A.    Yes.

5            Q.    Did you interview anywhere else?

6            A.    No.

7            Q.    Did anyone else offer you an interview?

8            A.    No.

9            Q.    Did I hear you correctly that, I think you

10   said something along the lines of, we went in a couple

11   times.  How often were you and your daughter working on

12   this process?  Was it --

13           A.    I think at least once a week, if I

14   remember right.

15           Q.    Okay.  You testified that -- about your

16   driving.  Let me make sure I understand it correctly.

17   Is it that you don't drive, ma'am, or you're just

18   limited in the amount that you drive?

19           A.    I limit my driving because I have a fear

20   of driving.  Let me explain.  When my granddaughter was

21   born, I got a really bad fear of driving.  I don't know

22   why.  So I didn't try to drive.  Like, I don't get on

23   the highways.  If I go somewhere, like to Walmart, I

24   take side roads.  And Walmart's around my block.  My

25   job is, like, 5 miles from my home, so it's a straight

Mary Ann Moreno
April 12, 2023

1   shot down 92nd.  It takes me at the most three, four

2   minutes to get there.  So I go to work.  I come home.

3   I don't go anywhere.  If I do, my daughter drives.

4           Q.   So in light of this limitation on your

5   driving, did that limit the places that you were

6   applying for another job somehow?

7           A.   No, not really.

8           Q.   So despite your own limitations on

9   driving, you looked for a job really anywhere?  I guess

10  you tell me.  Was there, like, a geographic area where

11  you were looking for jobs?

12          A.   Yeah.  I would say so.

13          Q.   What was it?

14          A.   The geographic area, you know, I live in

15  Westminster.  There's a lot of businesses around me, a

16  lot of stores.  So it was mostly around Westminster,

17  Thornton, that I can recall.

18          Q.   Okay.  Do you drive at night?

19          A.   I have to, yes.

20          Q.   I just wasn't sure if that was one of

21  the -- your limitations on driving.

22          A.   Well, I don't like to drive at night

23  because I have astigmatism, and the lights blind me.

24  So like I said, my job is straight down 92nd.  I live

25  on 92nd.  I go straight down 92nd and back home.  So

Mary Ann Moreno
April 12, 2023

1   educated person, so maybe I was just trying to rewrite

2   it more professionally.  I'm just going to say it that

3   way.  Better wording or something to that effect.

4          Q.   (BY MR. CARROLL)  Having had the chance to

5   think about Exhibit 9 a little bit over the break, I

6   mean, do you have any idea, like, where this came from?

7   I might note, for example, it sort of feels like it

8   picks up on --

9          A.   It looks like my writing, though.  Maybe I

10  was -- like I said, maybe I was trying to rewrite it

11  more professionally?  I really -- it's been 2 1/2

12  years.  I don't remember.

13         Q.   Okay.  Thank you.  So before the break, we

14  were talking about, you know, how you feel like you've

15  been harmed by Circle K's actions.  I'm looking at one

16  of your interrogatory answers here that we received

17  from your lawyer that says, "As a result of her attack

18  and her termination, she struggles with anxiety, fear,

19  nervousness, agitation, and lack of energy."  Is that

20  your position, ma'am?  You're suffering from anxiety,

21  fear, nervousness, agitation, and lack of energy?

22         A.   I'm trying to remember.  I probably was

23  nervous over the robbery and stuff afterwards.  I don't

24  remember.  But I might have had some anxiety.  I get

25  anxiety all the time.  I don't know.  But I don't take

Mary Ann Moreno
April 12, 2023

1    meds.

2            Q.    You had some therapy sessions with Sherri

3    Wand, right?

4            A.    Yes.

5            Q.    Is it true that those were all paid for by

6    someone else?

7            A.    They were paid by Jefferson County, I'm

8    assuming.

9            Q.    You didn't pay for them?

10           A.    No.

11           Q.    When's the last time you met with

12   Ms. Wand?

13           A.    Oh, my God, I don't know.  It's been --

14   might be a year now.  I'm not sure.

15           Q.    Are you seeing any other health-care

16   providers right now for any sort of emotional or mental

17   issues?

18           A.    No, no.

19           Q.    Since your termination from Circle K in

20   October of 2020, have you had any significant health

21   issues?  Sounds like you're pretty healthy.

22           A.    Just COVID, the two weeks I was sick, and

23   that was it.

24           Q.    I was going to say, just one bout of COVID

25   is better than many of us could say.

Mary Ann Moreno
April 12, 2023

1  putting 478 pages of medical records in front of you.

2  I don't think that's the best use of anybody's time.

3  Let me just ask you a couple particular questions --

4          A.   Okay.

5          Q.   -- and see if you have a recollection of

6  it, as you sit here today.  Did you tell your doctors

7  that you had anxiety and panic attacks after your

8  husband died?

9          A.   I probably did.  I don't remember.  I was

10  going through a hard time at that time.

11          Q.   Okay.

12          A.   I was afraid of how I was going to make it

13  without him, you know, what I could do.  It was hard.

14  But I don't remember telling them I had anxiety over

15  it.  I was afraid of, you know, not knowing what my

16  future was going to be; but I don't remember telling

17  them I had anxiety.

18          Q.   Okay.  Is it true that at one point in

19  time, approximately 2015, you were prescribed with

20  citalopram, a depression medication?

21          A.   A what?

22          Q.   A depression --

23          A.   Lorazepam?

24          Q.   Citalopram.

25          A.   Lorazepam is what it is.

Mary Ann Moreno
April 12, 2023

1          Q.    Okay.

2          A.    I think I was.  As a matter of fact, I

3   still have the bottle at home.

4          Q.    Got it.

5          A.    I haven't taken them.

6          Q.    I understand.  Would you say that you have

7   a history of depression?

8          A.    No.

9          Q.    So if your medical notes said that you had

10  a history of depression, you would disagree with that?

11         A.    I disagree with it because doctors can put

12  whatever they want on there, you know.

13         Q.    Okay.  Ms. Moreno, is there anything you

14  personally think is important about your lawsuit

15  against Circle K that you haven't testified about so

16  far today?

17         A.    Yes, that I was treated unfairly.  I don't

18  think I should have been fired for self-defense.  If

19  somebody comes at you, you're not going to sit there

20  like this (indicating) and let them attack you.  You're

21  going to fight for your life.  I don't feel that I

22  violated the policy.

23              MR. CARROLL:  Okay.  Thanks very much,

24  Ms. Moreno.  Those are all the questions that I have

25  for you here today.