Case No. 24-1058

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

Mary Ann Moreno,

     Plaintiff-Appellant,

v.

Circle K Stores, Inc.,

     Defendant-Appellee.

_____

On Appeal from the United States District Court for the District of Colorado
The Honorable Nina Y. Wang, U.S. District Judge
D.C. Case No. 1:22-cv-02327-NYW-STV

_____

### APPENDIX – VOLUME IV, PAGES 0587 - 0803

Virginia Hill Butler
Iris Halpern
Matthew J. Cron
Rathod | Mohamedbhai LLC
2701 Lawrence Street, Suite 100
Denver, Colorado 80205
vb@rmlawyers.com
ih@rmlawyers.com
mc@rmlawyers.com
*Attorneys for Plaintiff-Appellant*

# TABLE OF CONTENTS

## VOLUME IV

Doc. 72: Plaintiff's Response to Circle K's Motion for Summary Judgement ........................................................................ 589

Doc. 72-1: Rule 30(b)(6) Dep. Tr. ................................................. 615

Doc. 72-2: Jorgensen Dep. Tr. ...................................................... 632

Doc. 72-3: Register 1 ...................................................................... 640

Doc. 72-4: Moreno Dep. Tr. ........................................................... 641

Doc. 72-5: Harvey Dep. Tr. ........................................................... 658

Doc. 72-6: Aamoud Dep. Tr. .......................................................... 673

Doc. 72-7: Circle K's Written Discovery ...................................... 688

Doc. 72-8: Moreno Errata ............................................................... 696

Doc. 72-9: Police Report (Moreno 000315) ................................. 700

Doc. 72-10: 911 Call ....................................................................... 702

Doc. 72-11: Declaration of Bonnie Moreno ................................. 703

Doc. 72-12: Declaration of Olivia Verela Roan .......................... 710

Doc. 72-13: Holmes Dep. Tr. ......................................................... 715

Doc. 72-14: RMBU Confront & Chase Terminations ................. 723

Doc. 77: Plaintiff's Reply in Support of Her Motion for Partial Summary Judgement ........................................................... 727

Doc. 77-1: Moreno Dep. Tr. ........................................................... 741

Doc. 77-2: Wand Notes (Placeholder) ........................................... 756

Doc. 78: RESTRICTED DOCUMENT [77-2] .................................. 757

Doc. 79: Reply in Support of Circle K's Motion for Summary Judgement ........................................................................ 758

Doc. 83: Order Granting MSJ ........................................................... 771

Doc. 84: Final Judgement ................................................................. 800

Doc. 86: Notice of Appeal ................................................................ 802

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 22-cv-02327-NYW-STV

MARY ANN MORENO,

      Plaintiff,

v.

CIRCLE K STORES, INC.,

      Defendant.

---

## PLAINTIFF'S RESPONSE TO CIRCLE K'S MOTION FOR SUMMARY JUDGMENT

---

The Court should deny Circle K's motion for summary judgment in each respect. Plaintiff's sixteen-year career with Circle K ended abruptly on October 8, 2020, when she was fired after attempting to defend herself from a robbery.

Defendant Circle K asks this Court to rule that under no circumstances, anywhere in Colorado, can an employee defend herself or others even minimally in the face of a violent attack, without a right to keep her job. Similarly, Defendant seeks to win a stamp of approval for a corporate practice that dissuades employees who are victims of crimes from reporting those crimes given the inevitability of their termination should they do so.

The Court should deny Circle K's Motion for Summary Judgment, ECF No. 64, in each respect. First, the evidence shows that Circle K terminated Ms. Moreno because she acted in self-defense and/or was a victim of a crime. Second, Circle K engaged in outrageous conduct when it terminated such a long-term employee for acting in self-defense and being a crime victim. And third, Ms. Moreno should be permitted to ask the jury for exemplary damages because Circle K's conduct was willful and wanton.

## I.   STATEMENT OF FACTS

### A. Response to Defendant's Statement of Undisputed Material Facts ("RSUMF")[1]

**RSUMF 1-5:** Admitted.

**RSUMF 6:** Disputed. The Confront and Chase Policy states:

***CONFRONT & CHASE POLICY***
**We want you to always have a safe and enjoyable working experience with Circle K and especially during any special events and holiday weekends.**
**So please remember the**
**"<u>Don't Chase or Confront Policy</u>"**

**Do not confront follow, pursue, track, chase, fight or follow [inside and/or outside] any person[s] suspected of shoplifting products and/or cash from the site, beer runs or any other confrontational situation.**

If you observe theft at the site, wait until the person(s) leave the site and call the police immediately. Remember to try to obtain as much information about the person(s) as possible while maintaining a safe position behind the sales counter. Do not go outside after the person(s), if there is any reason you need to go outside for you are to wait at least 5 minutes and have called the police department and verbally spoke to the Store Manager or Market Manager.

At no time do you come from behind the counter, go to or out the doors to attempt to get additional information. If you can safely obtain information from where you are standing that will be sufficient. Stay where you are or go to a safer area in the back of the store. Do not approach the front doors or go out them. Call 9-1-1 immediately.

At no time do you stop, question or accuse a person(s) of theft.

At no time do you get into a verbal altercation with any customer and/or person(s) you suspect of theft. At no time are you to go outside after dark! Sun down to sun up!

***<u>This policy is for your protection and the safety of everyone!</u>***

If you have any questions or issues, please refer to the 5-Minute Rule of communication or your MM. **<u>Never talk to the media</u>** or answer any questions on the immediate situation or any others.
**<u>FAILURE TO FOLLOW THE "DON'T CHASE or CONFRONT POLICY" WILL RESULT IN IMMEDIATE TERMINATION</u>**

*See Confront & Chase Policy*, ECF No. 64-5 (emphases and brackets in original).

---

[1] Defendant submits three declarations from fact witnesses executed after their depositions and the close of discovery and shortly before the filing of Defendant's motion for summary judgment. *Compare Minute Order*, ECF No. 35 (extending discovery cutoff until June 22, 2023), *with Holmes Decl.*, ECF No. 64-1 (executed August 3, 2023); *Aamoud Decl.*, ECF No. 64-16 (executed August 7, 2023), *Harvey Decl.*, ECF No. 64-17 (executed August 4, 2023). The Court should strike these belated attempts to contradict prior sworn testimony. Defendant was allowed the usual month to review and correct testimony after the depositions but did not do so. Rather, these declarations seem to be a belated, self-serving attempt to create an issue of disputed fact when there is none. *Stuckens v. SAGE Dining Servs., Inc.*, 2023 WL 2945861, at *3 (10th Cir. Apr. 14, 2023) (unpublished) (upholding district court decision to disregard declaration intended to create sham fact issue).

**RSUMF 7-8:** Admitted.

**RSUMF 9:** Disputed. Circle K does not know when the policy was developed or by whom. *See* **Ex. 1**, *Rule 30(b)(6) Dep. Tr.*, at 21:11-21; 23:12-14. It is unknown whether Circle K conducted any studies to show that the policy promotes employee safety. *Id.* at 23:3-5. The policy contains a provision instructing employees to never contact the media, which is to protect Circle K's reputation. **Ex. 2**, *Jorgensen Dep. Tr.*, at 78:20-79:14.

**RSUMF 10:** Admitted.

**RSUMF 11:** Disputed. The policy states, "[i]f you ever witness a shoplifting or robbery, do not chase or attempt to apprehend the suspect." *Circle K Employee Handbook*, ECF No. 64-3 at 17.

**RSUMF 12:** Disputed. The policy states, "During a robbery store employees should follow these guidelines: . . . Cooperate with the robber's demands but **don't leave the store. Do not resist or try to fight**." *Id.* at 18 (emphasis in original).

**RSUMF: 13-32:** Admitted.

**RSUMF 33:** Disputed. Wimmer continued to engage with Ms. Moreno verbally after she told him she could not give him free cigarettes. *See* **Ex. 3**, *Register 1*, at 6:55:33-6:55:54.[2] He then walked away before walking back again saying, "just give me it." *Id.* at 6:55:58-6:56:07.

**RSUMF 34:** Admitted.

**RSUMF 35:** Disputed. The surveillance footage shows Wimmer walking behind the counter and walking towards Ms. Moreno while holding two knives, among other items. *Id.* at 6:56:07-6:56:13. As Wimmer continued to walk towards Ms. Moreno, she put her hands in front of herself to protect herself because Ms. Moreno did not know what Wimmer's intent was and thought he was coming towards her to attack her with the knives. *Id.* at 6:56:10-6:56:15; **Ex. 4**, *Moreno Dep. Tr.* at 124:10-18 ("I was afraid for my life. Like I said, you know, somebody

---

[2] This exhibit was conventionally submitted to the Court at ECF No. 65-3.

comes at you, you're not going to flinch. You're going to try to self-defense – you know, defend yourself against somebody. Just knowing that he had those knives, I had no idea what he was capable of; and he was weird anyway, the way he was acting. So, I mean, what was I supposed to do? Fight for my life. I wasn't going to let him attack me."); *Id.* at 125:6-9 ("Q. But did you feel threatened by him, by Mr. Wimmer? A. Yes."). Wimmer continued to push towards Ms. Moreno while she had her hands raised to protect herself. **Ex. 3**, *Register 1*, at 6:56:10-6:56:16. Eventually Wimmer turned and left. *Id.* at 6:56:16-23.

**RSUMF 36-38:** Disputed. *See* RSUMF ¶ 35.

**RSUMF 39:** Admitted that Wimmer may or may not have stolen any merchandise. Disputed that he immediately left the store. *See* RSUMF ¶ 35.

**RSUMF 40:** Disputed. The surveillance footage shows Wimmer walking behind the counter and coming towards Ms. Moreno while holding two knives. *See* **Ex. 3**, *Register 1*, at 6:56:07-6:56:13. As a result, Ms. Moreno felt threatened and like her life was in danger. **Ex. 4,** *Moreno Dep. Tr.* at 124:9-18 ("I felt my life was in danger. I was afraid for my life. . . . Just knowing that he had those knives, I had no idea what he was capable of[.]."; *id.* at 125:4-8 ("Q. Did Mr. Wimmer verbally threaten you? A. No. Q. But did you feel threatened by him, by Mr. Wimmer? A. Yes.").

**RSUMF 41:** Disputed. *See* RSUMF ¶ 40.

**RSUMF 42-51:** Admitted.

**RSUMF 52:** Disputed. Ms. Moreno was finally permitted to end her shift nearly two hours after she had been robbed at knife-point. **Ex. 3**, *Register 1*, at 6:54-56, 8:53:34-43.

**RSUMF 53-55:** Admitted.

**RSUMF 56:** Disputed. The sole stated reason Circle K terminated Ms. Moreno was for her physical contact with Wimmer on October 4, 2020. **Ex. 1**, *Rule 30(b)(6) Dep. Tr.*, at 98:23-99:3.

4

Ms. Moreno acted in self-defense and does not believe she violated the policy. **Ex. 4**, *Moreno Dep. Tr.* at 123:17-22. The surveillance video footage shows Ms. Moreno acting in self-defense, not confronting a robber. **Ex. 3**, *Register 1*, at 6:56:07-17. Ms. Moreno was terminated for reporting a crime and acting in self-defense.

**RSUMF 57**: Disputed. Ms. Moreno did not violate the policy. *See* RSUMF ¶ 56.

**RSUMF 58:** Disputed. Ms. Harvey had no memory of whether or not she considered self-defense. *See* RSUMF ¶ 56; **Ex. 5**, *Harvey Dep. Tr.* at 77:24 to 78:12 (Q. Did anyone at all in this conversation talk about the possibility of self-defense? Did that phrase ever come up? A. I don't know. Q. It may have? It may not have? A. It may have. It may not have. I don't know. We had many conversations regarding videos that we had watched on instances like this, so I don't remember this specific instance.").

**RSUMF 59:** Disputed. When she was a multi-unit Store Manager, Ms. Harvey never received any training on what physical self-defense was permissible under the policy. *Id.* at 39:13-17. Ms. Harvey did not know if the policy permitted an employee to act in self-defense if the employee thought a robber was about to physically touch the employee. *Id.* at 40:17-19. Mr. Aamoud did not recall any training on when physical self-defense was appropriate under the policy. **Ex. 6**, *Aamoud Dep. Tr.* at 53:10-14. Mr. Aamoud did not remember if he considered whether he was violating Ms. Moreno's right to self-defense or under Colorado victim's rights laws when he recommended her termination. *Id.* at 141:5-17. Mr. Aamoud also did not know if the policy complied with state law. *Id.* at 101:13-20. The policy is the same in each state where Circle K operates. **Ex. 7**, *Circle K's Written Discovery Responses*, at 2.

**RSUMF 60:** Disputed. The sole stated reason Circle K terminated Ms. Moreno was for her physical contact with Wimmer on October 4, 2020. **Ex. 1**, *Rule 30(b)(6) Dep. Tr.*, at 98:23 to 99:3.  Ms. Moreno believes she was terminated because she was a victim of a crime and acted in

self-defense. **Ex. 8**, *Moreno Errata*, at 2.

**RSUMF 61-63:** Admitted.

**RSUMF 64:** Disputed. Mr. Aamoud's questioning of Ms. Moreno the night of the robbery and after indicated to her that she was being terminated because she engaged in self-defense. **Ex. 4**, *Moreno Dep. Tr.* at 55:14-56:10; 111:2-19; RSUMF ¶ 56.

**RSUMF 65-68:** Admitted.

**RSUMF 69:** Disputed. Ms. Moreno corrected portions of the testimony cited by Defendant because she was confused by the question. **Ex. 8**, *Moreno Errata*, at 2. Ms. Moreno believes she was fired because she was the victim of a crime and acted in self-defense. *Id.* Additionally, her testimony throughout her deposition described this belief. **Ex. 4**, *Moreno Dep. Tr.*, at 55:14-56:10; 110:13-111:19; 123:17-22; 124:5-18.

**RSUMF 70:** Disputed. Ms. Moreno believes she was fired because she was a victim of a crime and acted in self-defense. **Ex. 8**, *Moreno Errata*, at 2.

**RSUMF 71:** Disputed. *See* RSUMF ¶¶ 56, 58, 59.

### B. Plaintiff's Statement of Additional Disputed Facts ("SADF")

### Circle K Employment

**SADF** 1: Ms. Moreno's hire date for Circle K was October 29, 2004. **Ex. 1**, *Rule 30(b)(6) Dep. Tr.*, at 99:10-19; 100:1-4.

### The Armed Robbery on October 4, 2020

**SADF 2:** On the night of October 4, 2020, Ms. Moreno was working alone at the Circle K located at 9489 Sheridan Boulevard. ECF No. 56, *First Am. Complt.* at 4, ¶¶ 20-22; ECF No. 59, *Answer to First Am. Complt.*, at 4, ¶¶ 20-22.

**SADF 3:** She was 72 years old at the time. *Id.*

**SADF 4:** At approximately 6:54 p.m., while Ms. Moreno stood alone behind the front counter, a

man (now known to be Tyler Darren Wimmer) walked into the store. **Ex. 3**, *Register 1*, at 6:54.

**SADF 5:** At 6:54:30, Wimmer got in line at the cash register. *Id.* at 6:55. He approached the counter. *Id.* Wimmer set his things down on the counter and asked Ms. Moreno for a pack of cigarettes. *Id.*

**SADF 6:** Wimmer had two large hunting knives. *See id.*; **Ex. 9**, *Police Report*, Moreno000315; **Ex. 10**, *911 Call*, at 00:15 to 2:05; 5:14 to 7:00[3]; **Ex. 4**, *Moreno Dep. Tr.*, at 67:1.

**SADF 7:** Ms. Moreno asked Wimmer which brand of cigarettes he would like, and then retrieved the cigarettes from the display case behind her. ECF No. 56 at 5 ¶ 29; ECF No. 59 at 5, ¶ 29; *see also* **Ex. 3**, *Register 1*, at 6:55:18-6:55:56. As Ms. Moreno began to ring up Wimmer's apparent purchase, he told Ms. Moreno words to the effect of, "just give them to me for free." ECF No. 56 at 5, ¶ 30; ECF No. 59 at 5, ¶ 30; *see also* **Ex. 3**, *Register 1*, at 6:55:30.

**SADF 8:** Ms. Moreno replied that she could not give him the cigarettes for free because she did not own the store and could lose her job. ECF No. 56 at 5, ¶ 31; ECF No. 59 at 5, ¶ 31; *see also* **Ex. 3**, *Register 1*, at 6:55:35-6:56:05.

**SADF 9:** According to Ms. Moreno's Market Manager, Driss Aamoud, and the Human Resources Manager for the area encompassing Ms. Moreno's store, Amy Harvey, it would have been a violation of company policy for Ms. Moreno to give Wimmer cigarettes at this point. **Ex. 6**, *Aamoud Dep. Tr.*, at 154:15 to 155:16; **Ex. 5**, *Harvey Dep. Tr.*, at 46:4-15; 75:6-13.

**SADF 10:** Wimmer then became visibly agitated and began to leave the store. **Ex. 3**, *Register 1*, at 6:55:56-6:56:09:

**SADF 11:** As he left, however, he abruptly changed directions and lurched back towards Ms. Moreno from the side and rear of the counter. *Id.* at 6:56:09-6:56:10.

**SADF 12:** Ms. Moreno exclaimed to Wimmer, "Don't come back here!" ECF No. 56 at 5, ¶ 34;

---

[3] The 911 call audio has been conventionally submitted to the Court at ECF No. 65-5.

ECF No. 59 at 5, ¶ 34; *see also* **Ex. 3**, *Register 1*, at 6:56:08.

**SADF 13:** Because Wimmer was blocking Ms. Moreno's only avenue of escape from the closed area behind the counter, she was unable to flee. *Id.*; *see also* **Ex. 4**, *Moreno Dep. Tr.*, at 70:4-7.

**SADF 14:** Still, Wimmer proceeded towards Ms. Moreno and the display case containing the store's tobacco products. **Ex. 3**, *Register 1*, at 6:56:10-6:56:13.

**SADF 15:** Wimmer moved towards Ms. Moreno and was well within reaching distance of her, still holding the knives. *Id.* at 6:56:10-6:56:13.

**SADF 16:** Nearing closer to Ms. Moreno, Wimmer reached his arm out past her for a pack of cigarettes in the display case the two were standing directly adjacent to. *Id.* Ms. Moreno instinctively flinched and reached out towards Wimmer to push him away and protect herself and prevent him from coming closer toward her because she perceived him to be lunging towards her. *Id.* at 6:56:13-6:56:16; *see also* **Ex. 4**, *Moreno Dep. Tr.*, at 111:13-16; 124:5-18.

**SADF 17:** Ms. Moreno acted in self-defense. **Ex. 3**, *Register 1.* at 6:56:13-6:56:16; *see also* **Ex. 4**, *Moreno Dep. Tr.*, at 111:13-16; 123:17-22; 124:5-18.

**SADF 18:** After grabbing the cigarettes from the display case, Wimmer left the store. **Ex. 3**, *Register 1*, at 6:56:16-6:56:22.

**SADF 19:** Just after Wimmer fled the store, a customer who had witnessed the robbery and Ms. Moreno called the police. *See generally* **Ex. 10**, *911 Call.*

**SADF 20:** Ms. Moreno called her supervisor, Love Jorgensen, to report the robbery. **Ex. 2**, *Jorgensen Dep. Tr.*, at 88:12 to 89:6.

**SADF 21:** When Ms. Jorgensen had not arrived at the store after an hour, Ms. Moreno called Driss Aamoud, Ms. Jorgensen's supervisor and the Market Manager for her store. **Ex. 3**, *Register 1*, at 8:10:05-8:11:26.

**SADF 22:** Mr. Aamoud arrived at the store around 8:24 p.m. and Ms. Jorgensen arrived around

8:43 p.m. *Id.* at 8:24:37-8:24:50; 8:43:13.

**SADF 23:** Ms. Moreno's daughter-in-law, Bonnie Moreno, came to the store after the robbery to provide support to Ms. Moreno. **Ex. 4**, *Moreno Dep. Tr.*, at 77:16-78:7; **Ex. 3**, *Register 1*, at 8:05:10 (Bonnie Moreno appears in a grey/blue shirt, glasses, and mask). Mr. Aamoud would not let Bonnie Moreno stay with her mother-in-law, but forced Bonnie Moreno to leave the store and wait for hours in the car. **Ex. 4**, *Moreno Dep. Tr.* at 80:1-19; 84:5-10; **Ex. 3**, *Register 1*, at 8:41:18-8:42:47; **Ex. 11**, *Bonnie Moreno Decl.* at 2-4; **Ex. 12**, *Olivia Roan Decl.* at 2-3.

**Termination**

**SADF 24:** Mr. Aamoud reviewed the video footage of the robbery. **Ex. 6**, *Aamoud Dep. Tr.*, 109:23 to 110:2; 113:11-21.

**SADF 25:** Mr. Aamoud states that he concluded that Ms. Moreno had violated Circle K's "Don't Chase or Confront" policy. *Id.* 68:1-18.

**SADF 26:** Mr. Aamoud discussed the video with his supervisor, Craig Holmes, and the Human Resources Manager, Amy Harvey, and all three made the decision to terminate Ms. Moreno for allegedly violating the policy. *Id.* at 125:2 to 126:14; **Ex. 13**, *Holmes Dep. Tr.*, at 44:1-4.

**SADF 27:** Circle K fired Ms. Moreno on October 8, 2020. **Ex. 2**, *Jorgensen Dep.*, at 120:4-5.

**SADF 28:** The sole stated reason Circle K terminated Ms. Moreno was for her physical contact with Wimmer on October 4, 2020. **Ex. 1**, *Rule 30(b)(6) Dep. Tr.*, at 98:23 to 99:3.

**SADF 29:** The District Attorney's Office prosecuted Wimmer for his attack on Ms. Moreno, officially recognizing her as a victim of a violent crime under state law. *See* ECF No. 57-1, *District Attorney Letter with Charges*.

**SADF 30:** Between October 2018 and October 2021, Circle K terminated 43 individuals in the region Amy Harvey supported as a Human Resources Manager for violations of its Don't Chase or Confront Policy. **Ex. 1**, *Rule 30(b)(6) Dep. Tr.*, at 77:7-10; 78:24 to 79:14; **Ex. 14**, *RMBU*

9

*Confront/Chase Terminations* (listing 43 names).

**SADF 31:** During the same period of time in the same region, there was only one employee who made documented physical contact with a robber or similar individual who was not terminated as a result of that contact. **Ex. 1**, *Rule 30(b)(6) Dep. Tr.*, at 84:22 to 85:3; 86:14-19.

**SADF 32:** This individual was not terminated because he was directed by his assistant manager to contain a shoplifter. *Id.* at 89:18 to 90:2. The assistant manager was terminated. *Id.*

**SADF 33:** Circle K identified another potential individual as an employee who made physical contact with an attacker who was not terminated as a result of the contact. *Id.* at 84:22-85:3; 86:14-19. However, there was no video footage of the incident and no one who was involved from Circle K had any recollection of what took place, why the person was not terminated, or if contact actually occurred. *Id.* at 87:3-89:17.

**SADF 34:** During the four years Ms. Harvey supported Colorado, New Mexico, Texas, Oklahoma, Kansas, and Missouri as a Human Resources Manager, 2017-2021, there were hundreds of robberies, including armed robberies. **Ex. 5**, *Harvey Dep. Tr.*, at 16:24 to 17:11; 33:2-34:7. Despite the high number of stores and employees she supported, Ms. Harvey does not recollect ever retaining an employee who made contact with an assailant. *Id.* at 21:7-15; 35:3-7.

**SADF 35:** Mr. Aamoud, Ms. Moreno's Market Manager, was unaware of any Circle K employee making physical contact with an attacker who was not fired. **Ex. 6**, *Aamoud Dep. Tr.* at 103:3-7.

**SADF 36:** Mr. Holmes, a Regional Operations Director at Circle K, is unaware of any employee who was the victim of a crime who made physical contact with a robber or customer and was retained by Circle K. **Ex. 13**, *Holmes Dep. Tr.*, at 37:20-23; 57:21-58:12.

**SADF 37:** Circle K's Chase or Confront Policy is the same in each state it operates in and does not vary based on changes in state law regarding self-defense or victim's rights law. **Ex. 7**, *Circle K's Written Discovery Responses*, at 2-5.

**SADF 38:** Circle K does not take any Colorado laws regarding use of force in self-defense or victim's rights statues into account when enforcing the policy. *Id.* at 4-5.

**SADF 39:** Ms. Moreno sought out therapy as a result of the attack. **Ex. 4**, *Moreno Dep. Tr.*, at 118:2-4. Ms. Moreno was worried after her termination and was scared she might lose her house. **Ex. 8**, *Moreno Errata*, at 2. She was concerned about how she would survive without a job. *Id.* She cried often. *Id.*

## II.   LEGAL STANDARD

Summary judgment is only warranted on any claim, or any "part of" a claim, "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury." *Goodwin v. Nat'l Elec. Annuity Plan*, No. 20-CV-01044-WJM-STV, 2021 WL 4555988, at *2 (D. Colo. Aug. 26, 2021) (citations omitted). The evidence must be viewed "in the light most favorable to . . . the nonmoving party." *Est. of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014). As the Tenth Circuit has cautioned, summary judgment is "[n]ot a replacement for the trial as the preferred means for resolving disputes." *Walton v. Powell*, 821 F.3d 1204, 1212 (10th Cir. 2016).

## III.   ARGUMENT

### A.  Circle K Terminated Ms. Moreno in Violation of Public Policy

Colorado's courts have long recognized a "public policy exception" to the at-will employment doctrine. *Martin Marietta Corp. v. Lorenz*, 823 P.2d 100, 107 (Colo. 1992). The underlying rationale for the exception is to "prohibit an employer from placing an employee in the position of keeping a job only by performing an illegal act, forsaking a public duty, or foregoing a job-related right or privilege." *Id*. Claims that fall within the exception "involv[e] . . . actions which

11

strike at the heart of a citizen's social rights, duties, and responsibilities; and actions by an employer which lead to an outrageous result clearly inconsistent with a stated public policy." *Hoyt v. Target Stores*, 981 P.2d 188, 191 (Colo. App. 1998).

Expressions of public policy may be found in statutes, common law, and state constitutions. *Rocky Mountain Hosp. & Medical Serv. v. Mariani*, 916 P.2d 519, 525 (Colo. 1996) (canvassing sources of public policy including ethical codes, statutes, and administrative regulations); *Slaughter v. John Elway Dodge Sw./AutoNation*, 107 P.3d 1165, 1169 (Colo. App. 2005) (considering Colorado's Constitution as a source of public policy); *Bonidy v. Vail Valley Ctr. for Aesthetic Dentistry, P.C.*, 186 P.3d 80, 84 (Colo. App. 2008) (Wage Orders sufficient to form basis of public policy exemption, the violation thereof of which may support exemplary damages in wrongful discharge claim).

An at-will employee may establish a case for wrongful discharge under the public-policy exception if the employee: (1) presents evidence that the employer prohibited the employee from performing a public duty or exercising an important job-related right or privilege; (2) that the action directed by the employer would violate a specific statute relating to the public health, safety, or welfare, or would undermine a clearly expressed public policy relating to the employee's basic responsibility as a citizen or the employee's right or privilege as a worker; and, (3) that the employee was terminated as the result of not heeding the employer. *Martin Marietta*, 823 P.2d at 109.

### 1.  Employee Self-Defense is an Exception to At-Will Employment

The complaint identifies the right to self-defense, codified at Colo. Rev. Stat. § 18-1-704, as a right that Circle K violated by terminating Ms. Moreno after she was robbed at knifepoint. *Id.* Circle K recklessly disregarded this right when it terminated Ms. Moreno.

Colorado public policy recognizes the essential right to self-defense. For example, Article

II, § 3 of the Colorado Constitution states that, "[a]ll persons have certain natural, essential and inalienable rights, among which may be reckoned the right of enjoying and **defending** their lives and liberties . . . and of seeking and obtaining their safety and happiness." Colo. Const. art. II, § 3 (emphasis added). Additionally, under Colorado law, a person shall not be held criminally liable for using physical force against another person "in order to defend himself or a third person from what he reasonably believes to be the use or imminent use of unlawful physical force by that other person." Colo. Rev. Stat. § 18-1-704. Further, "[a] person who reasonably perceives an imminent use of unlawful physical force is entitled to use force in defending himself or herself without first retreating, or seeking safety by means of escape." *People v. Monroe*, 474 P.3d 113, 116 (Colo. App. 2018) (internal quotation marks omitted). Such a person "does not have to consider whether a reasonable person in the situation would opt to retreat to safety rather than resorting to physical force to defend against unlawful force." *People v. Toler*, 9 P.3d 341, 347 (Colo. 2000).

The Colorado Supreme Court has not decided the issue of whether the right to self-defense, in circumstances where a customer-facing employee perceives a customer to be attacking them out of the blue and by no fault of their own, is a source of public policy that can sustain an exception to the at-will employment doctrine. In light of the clear public policy favoring self-defense in such situations, however, the Colorado Supreme Court is likely to recognize such an exception. Caselaw from other jurisdictions shows that courts confronted with similar circumstances to those experienced by Ms. Moreno recognize an exception to the at-will employment doctrine.

*Ray v. Wal-Mart Stores, Inc.*, 359 P.3d 614, 635-36 (Utah 2015), is highly instructive. Initially, at the federal district court level, the employer requested summary judgment on the claims of several employees that they were fired in violation of their rights to self-defense after they wrested a gun from a shoplifting customer. *Ray v. Wal-Mart Stores, Inc.*, No. 11-cv-00104, 2013 WL 5572731, at *1 (D. Utah Oct. 9, 2013). The employer argued, as Circle K does here, that Utah

courts did not recognize a public policy exception to the at-will employment doctrine based on a right to self-defense, and that one court, in fact, had explicitly declined to recognize such an exception, albeit in a coworker violence situation. *Id*. at *7-8. Notwithstanding the earlier state court decision, the federal district court in *Ray* declined to dismiss the lawsuit, instead distinguishing the factual circumstances and certifying the question to the Utah Supreme Court. In so doing, the court opined on differences between a voluntary dispute between coworkers and a random, potentially lethal assault by a stranger:

> The court declines Wal–Mart's invitation because there are factual differences that distinguish the facts in this case from the *Davis* case. Most importantly, the plaintiff in *Davis* was fired after she threw a piece of PVC pipe and injured a co-worker during an altercation… Here, the court is squarely faced with the self-defense question. If the court were to follow Judge Stewart's ruling in *Davis*, all of the Plaintiffs' remaining claims would necessarily be dismissed. While this result may be correct, the court is disinclined to bar the Plaintiffs from any relief without conducting a searching inquiry to determine whether the right to self defense constitutes a clear and substantial public policy under Utah law that could serve as an exception to the at-will employment doctrine. The court does not interpret the Plaintiffs' argument as a request to create a new exception to the presumption of at-will employment in Utah. Instead, the Plaintiffs have asked the court to decide whether the right to self-defense is the type of policy that would fit into the narrow public policy exception that the Utah Supreme Court has already created. As a result, the test the court must apply is not whether there is a Utah case that has recognized self-defense as the type of public policy that deserves protection in the employment context. Rather, the court must predict how Utah courts would rule if presented with this question.

*Id*. at *8. After certifying the question, the Utah Supreme Court did indeed recognize a narrow exception to the at-will employment doctrine for "pure" self-defense cases, explaining that,

> We conclude that an individual's right of self-defense outweighs an employer's interest in regulating its workforce and property through de-escalation and nonconfrontation policies. Thus, this factor weighs in favor of recognizing the state policy supporting this important right as the kind of clear and substantial public policy that qualifies as an exception to the at-will employment doctrine. And because the other two factors also support recognition of such an exception, we answer the certified question in the affirmative—an employee may maintain a wrongful termination claim against an employer where the employee is fired for engaging in self-defense, but only if the employee faced an imminent threat of serious bodily harm under circumstances where he or she was unable to safely withdraw.

*Ray*, 359 P.3d at 635-36. Other courts have found similarly. *See, e.g., Feliciano v. 7-Eleven, Inc.*, 210 W. Va. 740, 749-50 (W. Va. Sup. Ct. 2001) ("[W]e hold that when an at will employee has been discharged from his/her employment based upon his/her exercise of self-defense in response to lethal imminent danger, such right of self-defense constitutes a substantial public policy exception to the at will employment doctrine and will sustain a cause of action for wrongful discharge."); *see also Gardner v. Loomis Armored Inc*., 128 Wash. 2d 931, 944 (Wash. 1996) ("Society places the highest priority on the protection of human life. This fundamental public policy is clearly evidenced by countless statutes and judicial decisions.").

Defendant relies almost entirely on the unpublished federal decision *Donez v. Leprino Foods*, No. 19-cv-00285-CMA-NRN, 2020 WL 1914958 (D. Colo. Apr. 20, 2020), for its argument that self-defense is not a source of public policy for an exception to the at-will doctrine. *See Def. MSJ*, ECF No. 64 at 14. In *Donez*, two co-workers entered into a physical altercation that left one of them in the hospital, the exact details of which were "heavily disputed." 2020 WL 1914958, at *1. After the employer terminated both employees under a zero tolerance for workplace violence policy, one of the employees sued for wrongful discharge based on exercising the right to self-defense. *Id.* The district court found that the right to self-defense under those circumstances did not warrant an exception to the at-will doctrine. *Id.* at *6-7. Later, *Donez* was affirmed by the Tenth Circuit, but on entirely unrelated grounds. *See Donez v. Leprino Foods, Inc.*, 2022 WL 500549, at *5-6 (10th Cir. 2022) (unpublished). The Tenth Circuit specifically noted that, "[t]he Colorado Supreme Court has not recognized a job-related right to self-defense. We need not predict whether it would do so here because Mr. Donez has not established that Leprino knew he claimed self-defense when it decided to fire him. His wrongful termination claim therefore fails." *Id.* at *5.

Moreover, the facts of *Donez* are easily distinguishable from Ms. Moreno's circumstances.

*Donez* involved an employee dispute that resulted in the termination of both employees. 2022 WL 500549, at *5. Understandably, courts have generally been unwilling to recognize a public policy exception when employees have engaged in mutually escalating tensions with coworkers, but then attempt to excuse their own misconduct as a matter of self-defense. *See, e.g., Escalante v. Wilson's Art Studio, Inc.*, 135 Cal. Rptr. 2d 187, *191-92 (Cal. App. 2003) (although California law includes the right not to retreat, employee did not enjoy a public policy exception to the at-will doctrine when he chose to "turn and rush back towards [his coworker] rather than continuing his retreat . . . [although] . . . if an employee were backed into a corner by his attacker, with no means of escape, we might agree that the general policy favoring the preservation of human life would prevent his employer from firing him for fighting back in self-defense. Public policy might not allow an employee to bargain away his right to self-protection in those circumstances."). That is not what happened here. To the contrary, Ms. Moreno, working a public-facing and by all means fairly dangerous job, with little control of who walked into her store, played no part in inviting or escalating the attack against her.

Instead, Defendant asks the Court, in essence, to grant carte blanche approval for companies to terminate their employees for defending themselves at work from armed attackers, no matter the circumstances. Colorado has unfortunately experienced a tremendous amount of workplace violence, from the Club Q shooting in Colorado Springs to the King Soopers shooting in Boulder. When two patrons at Club Q tackled and disarmed the shooter who killed five people at the club, they were praised by the Colorado Springs Chief of Police and Governor Jared Polis as "hero[s]" and "brave individuals."[4] Under Circle K's arguments, an employee could get fired for taking the same lifesaving actions.

---

[4] *Club Q "heroic customers" subdued gunman and saved lives, officials say*, NBC NEWS (Nov. 20, 2022), https://www.nbcnews.com/news/us-news/club-q-heroic-customers-subdued-gunman-saved-lives-officials-say-rcna58064.

Ms. Moreno did not know what Wimmer intended to do when he trapped her behind the store counter while holding two hunting knives, although she reasonably believed that he might attack her. As such, she had the right to defend herself from his attack without the fear of losing her job. Circle K asks the Court to strip an employee of the essential right to protect herself when she clocks into work every day. That request should be flatly denied. In the alternative, the Court should certify this question to the Colorado Supreme Court to decide this important question of Colorado law.

### 2.   Ms. Moreno was Acting in Self-Defense

Defendant argues that, even if self-defense can support a wrongful discharge claim, Ms. Moreno was not acting in self-defense. *See Def. MSJ*, ECF No. 64 at 15-16. This is a quintessential factual dispute that must be resolved by the jury.

As the basis for this argument, Defendant cites declarations from the individuals who terminated Ms. Moreno stating that they honestly believed she was not acting in self-defense. *See id.* That may be true on their part, although Ms. Harvey had no recollection of ever discussing self-defense when collaborating to terminate Ms. Moreno. *See* RSUMF ¶ 58. However, the relevant question is whether an objectively reasonable jury might conclude Ms. Moreno was acting in self-defense. And there is no dispute of fact that **Ms. Moreno** believed in good faith that she was acting in self-defense in the face of an imminent armed attack. *See* SADF ¶¶ 17; *see also Walton*, 821 F.3d at 1212 (summary judgment is "[n]ot a replacement for the trial as the preferred means for resolving disputes.").

### 3.   Circle K Violated Public Policy When It Terminated Ms. Moreno for Being the Victim of a Crime

Another basis for her termination in violation of public policy is that Ms. Moreno's rights as a victim of a crime were violated. For example, Colo. Rev. Stat. § 18-8-706 makes it unlawful for an individual to commit retaliation or anticipatory retaliation toward a victim or witness of

crime. Colo. Rev. Stat. § 24-4.1-303 states that "[a]n employer may not discharge or discipline any victim . . . for participating in the preparation of a criminal proceeding."

The reporting of a crime is an essential part of a criminal proceeding. Defendant does not appear to dispute that if a company terminates an individual for reporting that he or she is a victim or a crime, calling the police, or engaging in any other rights or advocacy after victimization, then it would be a violation of public policy to terminate the employee. *See Def. MSJ*, ECF No. 64 at 16-17. Instead, Defendant argues that Ms. Moreno's victims' rights claim fails for lack of evidence. *Id.* However, Ms. Moreno has adduced more than sufficient evidence for the issue to be submitted to the jury.

  i.  **Defendant Terminated Ms. Moreno Because She Was a Crime Victim**

Defendant argues that Ms. Moreno has not presented evidence that she was terminated for exercising her rights to participate in the criminal process and report a crime. *See id.* at 17. Defendant unduly focuses on Ms. Moreno's answer to one question in a deposition, which she later corrected. *See* RSUMF ¶ 69. To the contrary, there is ample evidence that Defendant terminated Ms. Moreno for reporting being a victim of a crime to her employer and the police. SADF ¶¶ 30-36. Indeed, Defendant's conduct shows that it **systematically** fires employees who report crimes. *Id.* Between 2018 and 2021 in Colorado, New Mexico, Texas, Oklahoma, Kansas, and Missouri, Circle K terminated 43 individuals for violations of its Don't Chase or Confront Policy. *Id.* There was only one confirmed case of an employee who made physical contact with a shoplifter, robber, attacker, or similar individual who was not terminated as a result of that contact. *Id.* Neither Ms. Harvey nor Mr. Holmes knew of any employees who were not terminated after they made physical contact with a robber and reported it. *Id.*

Likewise, Defendant has admitted that the "Don't Chase or Confront Policy" is the same policy in place in each state that Defendant operates; Defendant's implementation of the "Don't

Chase or Confront Policy" does not vary in the relevant region based on differences in state law regarding self-defense or victim's rights laws; and Defendant does not take into account Colorado's victim's rights statutes when enforcing the "Don't Chase or Confront Policy." SADF ¶¶ 37-38. Further, the policy contains a provision instructing employees not to talk to the media, which is to protect Circle K's reputation. RSUMF ¶¶ 6, 9.

Judge Varholak considered this argument at the hearing on Plaintiff's Renewed Motion for Leave to Amend the Complaint to Seek Exemplary Damages, ECF No. 49, 53, and permitted Ms. Moreno to add a claim for exemplary damages. *See Hearing Transcript*, ECF No. 61 at 19-20. Judge Varholak stated that, considering that anytime and employee makes contacts with an attacker, even in self-defense, they are terminated, a jury could infer that Circle K terminated employees to keep them from reporting crimes and that there is a chilling effect on reporting crimes. *See id.* at 19:17 to 20:4. The subjective state of mind of the three individuals who decided to terminate Ms. Moreno is irrelevant when they received no training on compliance with state laws regarding self-defense or victim's rights and were unaware if they were complying with the law when they chose to terminate Ms. Moreno pursuant to the "Don't Chase or Confront Policy." The chilling effect of this policy on employee reporting of crimes is directly contrary to the aims of Colorado statutes protecting crime victim's rights. Evidence of Defendant's systemic termination of employees who report crimes is sufficient to create a material dispute over whether Defendant violated Ms. Moreno's rights to report a crime and participate in the criminal process.

Defendant submits that its agents did not intend to fire her because she was a victim of a crime, *see Def. MSJ*, ECF No. 64 at 16-17, but that is not the issue. Circle K is a company with a policy that inherently does this by how the policy is constructed and implemented across the company, and as applied to Ms. Moreno. This is separate and apart from the state of mind of any individual supervisor or manager when implementing the company's directives.

19

ii.     **Ms. Moreno May Rely on Colo. Rev. Stat. § 24-4.1-303**

Defendant argues that Colo. Rev. Stat. § 24-4.1-303 provides a statutory remedy which precludes it use as a basis for a wrongful discharge claim. *See Def. MSJ*, ECF No. 64 at 16. The cases Defendant cites, however, are distinguishable from Colo. Rev. Stat. § 24-4.1-303. In *Miles v. Martin Marietta Corp.*, 861 F. Supp. 73, 74 (D. Colo. 1994), the court held that a plaintiff who had filed a retaliatory discharge claim with the Occupational Safety and Health Administration could not also bring a claim for wrongful discharge in violation of public policy. The court held that "a separate public policy wrongful discharge claim is not available where the statute at issue provides a wrongful discharge remedy." *Id.* In contrast, Colo. Rev. Stat. § 24-4.1-303(17) does not provide a specific wrongful discharge remedy; it empowers the attorney general to file suit to enforce compliance with Colo. Rev. Stat. § 24-4.1-303.[5] The additional case cited by Defendant is also distinguishable. *See U.S. ex rel. Lovato v. Kindred Healthcare, Inc.*, No. 15-cv-02759-CMA-NYW, 2020 WL 9160872, at *23 (D. Colo. December 14, 2020) (stating that where a plaintiff pleads a retaliation claim based on a federal statute, a wrongful discharge claim is duplicative), *report and recommendation adopted sub nom., Colorado v. Kindred Healthcare, Inc.*, No. 15-CV-02759-CMA, 2021 WL 1085423 (D. Colo. Mar. 22, 2021) (stating that "no public policy exception to the at-will employment doctrine exists where a statutory **wrongful discharge** remedy applies." (emphasis added)). Ms. Moreno can use Colo. Rev. Stat. § 24-4.1-303 as a basis for wrongful discharge in violation of public policy. Moreover, Colo. Rev. Stat. § 24-4.1-303 is

---

[5] Colo. Rev. Stat. § 24-4.1-303(17) states: "Any affected person, except as provided in subsection (16) of this section, may enforce compliance with this article by notifying the crime victim services advisory board created in section 24-4.1-117.3 (1) of any noncompliance with this article. The crime victim services advisory board shall review any report of noncompliance, and, if the board determines that the report of noncompliance has a basis in fact and cannot be resolved, the board shall refer the report of noncompliance to the governor, who shall request that the attorney general file suit to enforce compliance with this article. A person, corporation, or other legal entity shall not be entitled to claim or to receive any damages or other financial redress for any failure to comply with this article."

20

but one statute expressing Colorado's public policy of precluding retaliation against crime victims.

### B. Circle K Exhibited Outrageous Conduct in Terminating Ms. Moreno

Circle K's conduct in terminating Ms. Moreno from her nearly 16-year position after she was robbed at knifepoint was outrageous. In Colorado, "it is . . . clear that an employer is not shielded from employee claims of outrageous conduct." *Grandchamp v. United Air Lines, Inc.*, 854 F.2d 381, 385 (10th Cir. 1988). "The elements of outrageous conduct are: (1) the defendant(s) engaged in extreme and outrageous conduct, (2) recklessly or with the intent of causing the plaintiff severe emotional distress, and (3) causing the plaintiff severe emotional distress." *Archer v. Farmer Bros. Co.*, 70 P.3d 495, 499 (Colo. App. 2002), aff'd, 90 P.3d 228 (Colo. 2004).

There is no question here that Circle K engaged in outrageous conduct. "[I]t is the totality of conduct that must be evaluated to determine whether outrageous conduct has occurred." *Kirk v. Smith*, 674 F. Supp. 803, 811 (D. Colo. 1987) (quoting *Zalnis v. Thoroughbred Datsun Car Co.*, 645 P.2d 292 (Colo. App. 1982)). Many of Defendant's own cases support this supposition.

In *Archer*, which Defendant relies on, the plaintiff had been placed under investigation for workplace misconduct by his employer. *Id*. at 500. During the same time, the plaintiff suffered a heart attack and took a leave of absence from work in order to recuperate. *Id*. at 499. Five days later, the defendant company's Vice President ordered plaintiff's termination and instructed one of his subordinates to deliver the news to the plaintiff at home, where he was recuperating from his recent cardiac episode. *Id*. The defendants drove to plaintiff's house where, "u[]pon entering the spare bedroom, they found Archer lying in bed, not fully clothed. Without asking Archer whether he was fit to discuss work matters or when he intended to return to work, they peremptorily announced that they had his termination papers, which they needed him to initial." *Id*. Needless to say, the plaintiff was deeply upset by the incident, which could have triggered medical complications. *Id*. Under these circumstances, the Colorado Court of Appeals determined that the

defendants' termination of the plaintiff "so far exceeded the bounds of decency as to be atrocious and utterly intolerable in a civilized community." *Id*.

Ms. Moreno's case bears substantial similarity. She was the victim of multiple crimes, and her safety was threatened at knife point while she was at work. Like the plaintiff in *Archer*, this event left Ms. Moreno in a state of heightened vulnerability of which her Circle K managers were aware. Moreover, the evidence shows that Circle K terminated Ms. Moreno pursuant to a systematic policy of terminating employees who are victims of workplace violence. *See supra*, Section III.A.3.

Defendant also cites *Christen-Loper v. Bret's Electric, LLC*, 175 F. Supp. 3d 1213, 1216–18 (D. Colo. 2016), *Kirk v. Smith*, 674 F. Supp. 803, 810 (D. Colo. 1987), and *Wing v. JMB Prop. Mgmt. Corp*., 714 P.2d 916, 918 (Colo. App. 1987), in support of its position. *Def. MSJ*, ECF No. 64 at 20. However, each of these cases in fact support Ms. Moreno's claim.

In *Christen-Loper*, the court denied the defendant's motion to dismiss the plaintiff's intentional infliction of emotion distress claim where

> it can be construed and reasonably inferred from plaintiff's allegations that, while plaintiff was lying in a hospital bed after suffering a severe bi-polar episode and under a suicide watch, defendant, knowing of plaintiff's compromised circumstances, took the opportunity to terminate plaintiff's employment because it was upset with her for taking time off from work to visit her doctor.

175 F. Supp. 3d at 1226. Similarly, Circle K terminated Ms. Moreno days after she was the victim of a distressing armed robbery, knowing that she was worried about losing her job.

In *Kirk*, the court noted that "[t]he question of whether certain conduct is sufficiently outrageous is ordinarily a question for the jury." 674 F. Supp. at 810 (citing *Meiter v. Cavanaugh*, 580 P.2d 399, 401 (1978)). The court denied the defendant school principal and district superintendent's motion for summary judgment where the plaintiff, a teacher, alleged retaliation, harassment, and that the superintendent had physically assaulted her. *Id*. at 811. The court noted

22

that "conduct, otherwise permissible, may become extreme and outrageous if it is an abuse by the actor of a position in which he has actual or apparent authority over the other, or the power to affect the other's interests." *id.* at 811-12 (quoting *Zalnis*, 645 P.2d at 294), and found persuasive the fact that the principal and superintendent in *Kirk* were in positions of authority over the plaintiff. Additionally, the principal in *Kirk* was not alleged to have physically assaulted the plaintiff but the court nonetheless denied the motion for summary judgment with respect to him as well. *See id.* Here, Ms. Moreno also suffered a physical altercation. While Circle K was not the aggressor, Circle K abused its position of power to terminate Ms. Moreno for being robbed at knife-point. In *Wing*, the Colorado Court of Appeals reversed the district court's dismissal of the plaintiff's claim for outrageous conduct based on being ridiculed, threatened, humiliated, and subject to sexual harassment.[6] 714 P.2d at 918.

Defendant additionally cites *Coors Brewing Co. v. Floyd*, 978 P.2d 663 (Colo. 1999), and *Martensen v. Koch*, No. 13-cv-02411-REB-CBS, 2014 WL 3057172, at * 3 (D. Colo. July 7, 2014), in support of its argument. *See Def. MSJ*, ECF No. 64 at 20-21. Neither of these cases concern the termination of an employee after their physical safety was threatened; *Archer*, *Christen-Loper*, and especially *Kirk*, do, and in all those cases the court rejected the defendants' arguments.

Ms. Moreno has presented sufficient evidence for a jury to decide whether terminating a long-time employee, especially a 72-year-old woman, for having been the victim of a violent crime while on the job is plainly outrageous so "as to be atrocious and utterly intolerable in a civilized community." *Archer*, 70 P.3d at 499.

---

[6] The court also held that the allegations in the plaintiff's outrageous conduct claim were sufficient to support a claim for punitive damages. *Wing*, 714 P.2d at 919.

### C.  Ms. Moreno Should be Permitted to Ask the Jury for Exemplary Damages

Under Colo. Rev. Stat. § 13-21-102(1)(a), a jury may award exemplary damages if "the injury complained of is attended by circumstances of fraud, malice, or willful and wanton conduct." The Colorado Supreme Court has defined "willful and wanton conduct" to mean "conduct purposefully committed which the actor must have realized was done heedlessly and recklessly without regard to consequences or the rights of the plaintiff." *Coors v. Sec. Life of Denver Ins. Co.*, 112 P.3d 59, 66 (Colo. 2005) (citing *Frick v. Abell*, 602 P.2d 852, 854 (Colo. 1979)). Stated differently, "[w]here the defendant is conscious of his conduct and the existing conditions and knew or should have known that injury would result, the statutory requirements of C.R.S. § 13-21-102 are met." *Id*. (internal citation omitted).

On July 6, 2023, Judge Varholak granted Ms. Moreno's motion to amend the complaint to seek exemplary damages. *See Courtroom Minutes*, ECF No. 54. Defendant argues that the Court should dismiss Ms. Moreno's claim for exemplary damages based on self-defense because *Donez* was the only authority when it terminated Ms. Moreno. *See Def. MSJ*, ECF No. 64 at 24. However, Ms. Moreno's claim is based on the long-standing Colorado public policy of the right to self-defense when attacked by no fault of one's own. Moreover, Defendant's ignorance of Ms. Moreno's right to self-defense is no defense at all here, just as in any other employment law setting. *See Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 581 (2010) (stating that the Supreme Court has "long recognized the common maxim, familiar to all minds, that ignorance of the law will not excuse any person, either civilly or criminally." (internal quotation marks omitted)).

Defendant additionally argues that its violation of Ms. Moreno's rights as a crime victim cannot support exemplary damages, arguing that Ms. Moreno has no evidence she was terminated for being a crime victim. *See Def. MSJ*, ECF No. 64 at 24. First, this does not dispute that the crime

victim's rights can indeed support a claim for wrongful termination in violation of public policy. Second, Ms. Moreno has presented evidence that Circle K terminated her pursuant to a systematic policy of terminating employees who are victims of workplace violence. *See supra*, Section III.A.3. Additionally, Circle K admits that the policy is the same in every state it operates, SADF ¶ 37, necessarily contravening the rights of employees in Utah and West Virginia, where the courts have already recognized an employee's right to protect themselves. *See supra*, Section III.A.1. Circle K's willful and wanton conduct creates a chilling effect on employees who have been victims of crimes who are worried that they might lose their job if they report it. A company policy of firing victims of crimes is conduct where "the defendant is conscious of his conduct and the existing conditions and knew or should have known that injury would result," *Coors*, 112 P.3d at 66, and thus the statutory requirements of C.R.S. § 13-21-102 are met.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant's motion in its entirety and permit her to bring her claims before a jury. In the alternative, the Court should certify the question of whether the right to self-defense when an employee perceives an attack from a customer is an exception to the at-will employment doctrine.

Respectfully Submitted: August 28, 2023

RATHOD | MOHAMEDBHAI LLC

*s/ Virginia Hill Butler*
Virginia Hill Butler
Iris Halpern
2701 Lawrence Street, Suite 100
Denver, CO 80205
T: (303) 578-4400
E: vb@rmlawyers.com
    ih@rmlawyers.com

ATTORNEYS FOR PLAINTIFF

**CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of August 2023, I electronically filed and served the

foregoing **PLAINTIFF'S RESPONSE TO CIRCLE K'S MOTION FOR SUMMARY**

**JUDGMENT** using the CM/ECF system, which will send notification of such filing to the

following:

      Thomas W. Carroll
      Nicholas Hankins
      LITLER MENDELSON, P.C.
      1900 Sixteenth Street, Suite 800
      Denver, CO 80202
      Telephone: 303.629.6200
      Fax: 303.629.6200
      Email: tcarroll@littler.com
             nhankins@littler.com

*Attorneys for Defendant Circle K Stores, Inc.*

                           s/ *Virginia Hill Butler*
                           Virginia Hill Butler

# Exhibit 1

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-02327-NYW-STV

_____

DEPOSITION OF SUSIE FERNANDEZ as        June 20, 2023
30(b)(6) Representative of
CIRCLE K STORES, INC.

_____

MARY ANN MORENO,

            Plaintiff,

vs.

CIRCLE K STORES, INC.,

            Defendant.


_____


        The deposition of SUSIE FERNANDEZ, taken
before Leeann Stellor, a Registered Merit Reporter,
Certified Realtime Reporter, and a Notary Public in
and for the County of Summit and the State of
Colorado, at 2701 Lawrence Street, Suite 100,
Denver, Colorado, on Tuesday, June 20, 2023, at the
hour of 10:03 a.m.



Page 21

1       A.      He's an SVP.

2       Q.      Oh, right, a senior vice president of

3  human resources?

4       A.      Yes.

5       Q.      Okay.  Did you review any documents in

6  preparation for this topic?

7       A.      I reviewed the policy.

8       Q.      Is this the policy that was in place in

9  2020?

10      A.      Yes, ma'am.

11      Q.      Okay.  When was the Don't Chase and

12 Confront Policy developed?

13      A.      You know, Circle K's had many

14 acquisitions.  We know that it's been in place for

15 at least 20 years.

16      Q.      Okay.

17      A.      But -- so we don't have an exact.  You

18 know, it's kind of a standard in our -- in our

19 business, and so we don't know exactly when it was.

20 But it has been in place at Circle K for at least

21 20 years.

22      Q.      Okay.  And I'm hearing you say that there

23 were a number of acquisitions.  So does that mean

24 the policy may have come from a subsidiary that got

25 acquired, or what do you mean by that?



Page 23

1    or get them out of a situation quicker, so to be

2    safe.

3        Q.    Okay.  Did Circle K conduct any studies

4    or data in designing or revising the policy?

5        A.    Not that I know of.

6        Q.    On behalf of Circle K, who participated

7    in developing the policy?

8        A.    We're a company of many acquisitions.  It

9    was -- I could not give that answer.  You know, we

10   asked, and, you know, various leadership teams

11   throughout the acquisitions.

12       Q.    So as the Circle K designee, do you know

13   any information about who developed the policy?

14       A.    No, ma'am.

15       Q.    Do you know if Circle K consulted with

16   any attorneys in developing the policy?

17       A.    I do not know.

18       Q.    Has the policy changed since it was

19   developed?

20       A.    The intent of the policy hasn't changed.

21   There may have been verbiage changed, but the intent

22   has remained intact.

23       Q.    Okay.  What changes have taken place in

24   the past six years?

25       A.    I don't think there were any changes to



1    list that we have.

2         Q.    Okay.  And were each of these individuals

3    fired?

4         A.    Yes.

5         Q.    Okay.  Were each of these individuals --

6    scratch that.  All right.  Let's move on to topic 5.

7               Topic 5 is, "The identity of all

8    individuals who were terminated for Don't Chase or

9    Confront Policy violations in the region Amy Harvey

10   supported while she was a human resources manager."

11              What did you do to prepare for

12   topic 5?

13        A.    I pulled all the terminations for the

14   time frame that were requested, used keywords for

15   what violation from our HRIS system.

16        Q.    What keywords did you use?

17        A.    "Chase," "confront," and I want to say

18   "assault."

19        Q.    On behalf of Circle K, what region did

20   Amy Harvey support as an HR manager?

21        A.    She supported Region 3, Region 4,

22   Region 5, Region 7, Region 8, and Region -- we had a

23   Region 9 for a portion of that time.

24        Q.    What states were in that region?

25        A.    Oklahoma, Kansas, Texas, New Mexico, and



Page 78

1    Colorado.

2        Q.    Okay.   Was Missouri in that region, in

3    those regions?

4        A.    I think we might have had one store

5    there.

6        Q.    And what years was Ms. Moreno -- excuse

7    me, Ms. Harvey the HR manager for those regions?

8                MR. CARROLL:  I'll object that it's

9    outside the scope of the noticed topics.

10                But please answer, if you're able.

11        A.    August of 2017 until her termination date

12    of, I think it was, October 21.

13        Q.    How many Circle K employees were

14    terminated for violations of the Don't Chase and

15    Confront Policy when Ms. Harvey was an HR manager

16    for the company?

17                MR. CARROLL:  I object that that's

18    outside the scope of the noticed topics.

19                Please answer, if you're able.

20                Object to the form of the

21    question.

22        A.    I don't know the number.  I've turned it

23    in, I mean, produced all of it.

24        Q.    Well, then let's move on to this document

25    provided by counsel, that we will mark as



Page 79

 1    Exhibit 21.

 2                      (Exhibit No. 21 was marked.)

 3         Q.    Do you recognize Exhibit 21?

 4         A.    Yes.

 5         Q.    And what is it?

 6         A.    It's the list of terminations from chase

 7    and confront when Amy -- well, from October 2018 to

 8    October '21.

 9         Q.    Okay.  And do you know the circumstances

10    of each of these terminations?

11         A.    I know they were all chase and confront.

12    But each individual, I do not.

13         Q.    Did Ms. Harvey approve each of these

14    terminations?

15                      MR. CARROLL:  I'm going to object.

16    That's beyond the scope of the noticed topics.

17                      But please answer, if you know.

18         A.    I -- I don't know.

19         Q.    On behalf of Circle K, if Ms. Harvey

20    didn't approve of each of these terminations, then

21    who did?

22                      MR. CARROLL:  I object that that's

23    beyond the scope of the noticed topics.

24                      Please answer, if you can.

25         A.    It could have been the market manager and



Page 84

1    without human resources' involvement?

2                    MR. CARROLL:  I object that the

3    question's outside the scope of the noticed topics.

4    I object to the form of the question.

5                    But please answer, if you can.

6    A.    I -- I don't know.  I -- I know what the

7    system does today.  With upgrades and things, I

8    don't know if it's changed.  So I can't say with

9    100 percent certainty that it came through HR.

10   Q.    Okay.  Were you with the company at that

11   point in time?

12   A.    I was.  I was in a different position.

13   Q.    Okay.  As it currently stands, does every

14   termination require approval by human resources?

15                   MR. CARROLL:  I object that that's

16   outside the scope of the noticed topics.

17                   But please answer, if you can.

18   A.    For chase and confront?

19   Q.    Yes.

20   A.    Yes.

21   Q.    Okay.  We can move on to topic 6.

22                   So topic 6 is, "The identity of

23   any employees in the region over which Amy Harvey

24   had responsibility who made physical contact with a

25   shoplifter, robber, attacker, or similar individual



Page 85

1  who was not terminated as a result of that contact,

2  including the circumstances surrounding the decision

3  not to terminate that employee."

4                    What did you do to prepare for

5  topic 6 as the Circle K designee?

6      A.    I pulled all the counseling, coaching

7  documentations for the time frame requested.

8      Q.    Could you elaborate on what that means?

9      A.    How we pull level terminations, we pull

10  that to see if there was disciplinary action that

11  did not lead to terminations came up.

12     Q.    Is that -- and what were the words you

13  used, "counseling" and "coaching."  Is that right?

14     A.    Yes.

15     Q.    Okay.  And so what does that mean, when

16  an employee has counseling and coaching?

17     A.    Where they're documented about a behavior

18  or something, an incident.

19     Q.    And how did you find these counseling and

20  coaching materials?

21     A.    I used keywords, but -- you know, I used

22  keywords when we did that.  I think we switched it

23  up a lot, just trying to find anything where

24  "physical" or, you know, "chase" and "confront" came

25  up in the comments or in the description of what the



Page 86

1    counseling was for.

2         Q.    Okay.  Do you remember exactly which

3    keywords you used?

4         A.    I think it was "chase," "confront."

5         Q.    Okay.  So on behalf of Circle K, how many

6    employees made physical contact with an individual

7    in the store that came up as a result of your

8    search?

9         A.    Two.

10        Q.    Okay.  And what are their names?

11        A.    Nathaniel Meyer.

12        Q.    Okay.  And who's the other individual?

13        A.    Jonathan Rosas (ph).

14        Q.    Okay.  And so just to backtrack.

15   Mr. Meyer and Mr. Rosas, are those two individuals

16   the only individuals that you have record of that

17   made physical contact with a person in a store and

18   were not terminated?

19        A.    Yes.

20              MR. CARROLL:  Objection.  Form.

21        Q.    Okay.  Can you -- let's start with

22   Mr. Meyer.  Can you describe the circumstances of

23   what happened in his scenario?

24        A.    This was --

25              MR. CARROLL:  One moment.  Are you



Page 87

1    asking about the decision not to terminate, or are

2    you asking for a broader set of circumstances?

3                    MS. BUTLER:  The circumstances around

4    the decision not it terminate.

5                    MR. CARROLL:  Okay.  Thanks.

6         A.    On this one, I contacted Loretta Cordova,

7    Amy Harvey, and Robert Sway and could not get a

8    definitive recollection from any of them on why they

9    decided not to terminate.

10        Q.    Okay.  And who was that third individual?

11        A.    Robert Sway.

12        Q.    And who is that?

13        A.    He was the HR director.

14        Q.    Okay.  And is there video footage of this

15    incident?

16        A.    I did not find video.

17        Q.    Is there a description of the incident?

18        A.    Yeah.  I think it was the employee came

19    out from behind the counter, told the person to

20    leave.  Had his phone, and he knocked the phone out

21    of his hand, is my recollection.  But I could be

22    talking about someone totally different too, but I

23    think that's what it was.  And I think that's when I

24    called Robert and Loretta, to see if they could shed

25    some light on it.



Page 89

1                     But please answer, if you can.

2          A.    I don't know.

3          Q.    But there's no video footage?

4          A.    No.

5          Q.    Was there video footage at the time that

6     was reviewed?

7          A.    Loretta did not seem to have very good

8     recollection of it when I spoke to her yesterday.

9          Q.    And how about Ms. Harvey and Mr. Sway,

10    did they -- had they reviewed any video?

11         A.    Neither one of them had any recollection

12    of the incident at all.

13         Q.    And did any of the people involved in the

14    decision not to terminate Mr. Meyer know why that

15    decision was made?

16         A.    None of them really had recollection of

17    the incident at all.

18         Q.    Okay.  Let's talk about Jonathan Rosas

19    then.  Can you describe what happened for Mr. Rosas?

20         A.    This is one where there was an incident

21    in the store.  It was a shoplifting incident, I

22    believe.  And him and the assistant manager

23    contained the customer, I believe they said?  But I

24    know why -- we terminated one person.  We terminated

25    the assistant manager, but we did not terminate the



Page 90

1   other person based on that he was doing what his

2   superior told him to do.

3        Q.    Okay.  And is there any video footage of

4   this incident?

5        A.    We could not find any video of this.  I

6   know that Raj spoke to Freddy, who was the market

7   manager at the time, and asked him about why this

8   person was not terminated.

9        Q.    And excuse me, can you remind me the name

10  of that individual you just said?

11       A.    Freddy.

12       Q.    The other?

13       A.    Raj.

14       Q.    Yeah.  Raj?

15       A.    Hom Raj.  Sorry.

16       Q.    Hom Raj.  Did he speak to Freddy recently

17  in preparation for --

18       A.    Yes.

19       Q.    -- this deposition?

20       A.    Yes.

21       Q.    Okay.  And what did he speak with Freddy,

22  the market manager, about?

23       A.    Why this person was not terminated for a

24  chase and confront.

25       Q.    Okay.  And so on behalf of Circle K, is



Page 98

1   designee, was Ms. Moreno a better employee than

2   other CSRs?

3           MR. CARROLL:  Object to the form of

4   the question.

5       A.   We have 2,000 employees that work for me.

6   I don't know if I could say she was better than all

7   of them.

8       Q.   On behalf of Circle K, did Ms. Moreno's

9   performance as a CSR play any role in her

10  termination?

11      A.   I was not told that it did, so I would

12  say no.

13      Q.   On behalf of Circle K as a designee, was

14  her termination based solely on her actions on the

15  night of October 4th, 2020?

16      A.   Yes.

17      Q.   Okay.  So on behalf of Circle K, did her

18  performance as an employee have any role in her

19  termination?

20      A.   Just her actions on October 4th.

21      Q.   But setting --

22      A.   Not her performance.

23      Q.   Okay.  So on behalf of Circle K, is her

24  contact with the assailant on October 4th the only

25  reason for her termination?



Page 99

1              MR. CARROLL:   Object to the form of

2     the question.

3         A.    Yes.

4         Q.    We can move on now to topic 8.  We'll get

5     into that issue about her time with Circle K versus

6     other entities.

7                   So topic 8 is, "Ms. Moreno's

8     continuous service date of October 29th, 2004,

9     including what continuous service date means."

10                  So what is Ms. Moreno's continuous

11    service date with Circle K?

12        A.    October 29, 2004.

13        Q.    So what does that mean?

14        A.    When Circle K bought the previous company

15    that her and I both worked for, they honored our

16    original hire date.  So like for benefits, you get a

17    certain amount of vacation for a certain amount of

18    years you worked.  So instead of losing that, they

19    honor that.

20        Q.    Okay.  So does that mean that the

21    original hire date reflected -- well, let me back

22    up.

23                  What was the company that Circle K

24    acquired?

25        A.    CST Brands.



Page 100

1      Q.    So does that mean that her hire date
2   reflected in CST systems reflected a hire date of
3   October 29th, 2004?
4      A.    Yes.
5      Q.    Okay.  So did she have to apply for her
6   job again?
7      A.    No.
8      Q.    Was there any sort of changes that
9   impacted her daily life as a CSR, besides maybe some
10  branding changes?
11               MR. CARROLL:  I'm going to object
12  that that's outside the scope of the noticed topics.
13               But please answer, if you can.
14     A.    When Circle K bought CST, we kind of ran
15  the business as it was.
16     Q.    Okay.
17     A.    For a time.  And then we changed medical
18  providers, so I guess that could be a change.
19     Q.    Okay.  So when Circle K bought the stores
20  Ms. Moreno was working in, did she just come on to
21  the Circle K system as a standing employee?
22     A.    Yes.
23     Q.    And so this continuous service date, does
24  that mean, for instance, her pay and all of her
25  seniority and all of that continued, despite the



Page 114

1                    REPORTER'S CERTIFICATE

2              I, LEEANN L. STELLOR, Registered Merit

3    Reporter and Certified Realtime Reporter within

4    Colorado, ID 200401669, appointed to take the

5    deposition of SUSIE FERNANDEZ, do hereby certify that

6    before the deposition she was duly sworn by me to

7    testify to the truth; that the deposition was taken by

8    me then reduced to typewritten form herein; that the

9    foregoing is a true transcript of the questions asked,

10   testimony given and proceedings had.

11

12             I further certify that I am not related to

13   any party herein or their Counsel, and have no interest

14   in the result of this litigation.

15

16             In witness hereof I have hereunto set my

17   hand this 3rd day of July, 2023.

18

19                    _Leeann L. Stellor_

                      Leeann L. Stellor

20                    Registered Merit Reporter

                      Certified Realtime Reporter

21                    and Notary Public

22

23   My commission expires June 8, 2024

24

25



# **Exhibit 2**

Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT
OF COLORADO


Civil Action No. 1:22-cv-02327-NYW-STV

_____
DEPOSITION OF LOVE JORGENSEN            May 1, 2023
_____
Plaintiff,
MARY ANN MORENO,


v.


Defendant,
CIRCLE K STORES, INC.

_____
APPEARANCES:
    RATHOD MOHAMEDBHAI, LLC
        By Virginia H. Butler, Esq.
            2701 Lawrence Street
            Suite 100
            Denver, Colorado  802025
              Appearing on behalf of Plaintiff.


    LITTLER MENDELSON, PC
        By Thomas W. Carroll, Esq.
            1900 16th Street
            Suite 800
            Denver, Colorado  80202
              Appearing on behalf of Defendant.
Also Present:


            Iris Halpern, Rathod Mohamedbhai, LLC


            Nicholas Hankins, Littler Mendelson, PC



Page 78

```
1    question.

2         A    I -- when I viewed the video when I got

3    there, I did not see no knife.

4         Q    Okay.

5         A    She did not tell me when she called me

6    that he had a knife, just that he stole a pack of

7    cigarettes.

8         Q    Okay.  Then taking away -- we can talk

9    about the knife later.  Did you feel bad for her

10   that she got robbed in general?

11        A    Yes.

12        Q    Okay.  And -- but you still think she

13   deserved to be fired?

14        A    Because of the company violation -- the

15   violation of policy.

16        Q    Okay.  Even though you're not aware of

17   any circumstances in any of your stores where

18   someone has been fired under that policy?

19        A    No.

20        Q    Okay.  Okay.  And, so, looking back at

21   the policy, the second paragraph at the bottom, do

22   you see this part where it says in bold and

23   underlined "never talk to the media"?

24        A    Yes.

25        Q    Do you know why that's there?
```



Page 79

1      A     So that not a whole lot of people know

2   what happened at a certain location.

3      Q     Okay.  Why would that be part of the

4   policy?

5            MR. CARROLL:  Objection to form.

6      Q     Sorry.  In your understanding, why would

7   that be part of the policy?

8      A     In case something really bad happened,

9   not -- it couldn't be let out to the media.

10     Q     Okay.  And why wouldn't the company want

11  the media to know if something really bad happened

12  in your understanding?

13     A     So there's no bad reputation on Circle

14  K --

15     Q     Okay.

16     A     -- or the employer or employees.

17     Q     Do you ever remember this particular

18  portion about the media coming up in your trainings?

19     A     Yes.

20     Q     Do you remember what the trainings said

21  about that?

22     A     Not right off the top of my head, no.

23     Q     You can take a minute to think.

24     A     Like I said, it's been a while so some of

25  it is just blank.



Page 88

1          A       Her termination paperwork.

2          Q       Okay.  Did anyone speak to you about

3     that?

4                  MR. CARROLL:  Objection.  Ms. Jorgensen,

5     I would just remind you not to reveal any sort of

6     attorney-client communications.

7          A       I read it on the termination paper.

8          Q       Okay.  Was the termination paperwork the

9     first time you learned that Ms. Moreno was fired?

10         A       Mr. Aamoud said he was going to terminate

11    her.

12         Q       Okay.  We'll talk about that a little bit

13    more later, but I want to talk about everything you

14    remember about the night of October 4th when

15    Ms. Moreno was attacked while at work.  Let's just

16    start broadly.  Can you tell me everything that you

17    remember from that night?

18                 MR. CARROLL:  Object to the form of the

19    question.

20         A       Ms. Moreno called me.

21         Q       Okay.  Around when?

22         A       I can't remember the exact time.

23         Q       Just a ballpark is fine.

24         A       I think it was about 6:30.

25         Q       Okay.



Page 89

1    A    Informed me somebody stole a pack of

2  cigarettes.  I asked her to call the assistant

3  manager, Amanda, because it was going to take me a

4  little while to get to the store.  And the next

5  phone call I got was from Mr. Aamoud asking me to

6  come to the store.

7    Q    And about how long after you spoke with

8  Ms. Moreno did Mr. Aamoud call you?

9    A    I do not remember what time, but I

10  arrived at the store about 7:50.

11    Q    About how far away from the store --

12  scratch that.  About how long did it take you to get

13  to the store?

14    A    About 25 minutes.

15    Q    Okay.  Did you head into the store

16  directly after you spoke with Ms. Moreno?

17    A    No.

18    Q    Why -- why or why not?

19    A    I asked her to call Ms. Smith to see if

20  she could go to the store.

21    Q    Okay.  Why did you do that?

22    A    Because I was at home in bed --

23    Q    Okay.

24    A    -- and I lived in Aurora at the time.

25    Q    Okay.  And did Ms. Moreno -- was she able



Page 120

1   October 7th.

2        Q     Okay.  And what day was the robbery?

3        A     October 4th.

4        Q     Okay.  And what day was Ms. Moreno fired?

5        A     October 8th was her termination day.

6        Q     Okay.  Do you know when the news was

7   communicated to Ms. Moreno that she was going to be

8   fired?

9        A     I do not know when it was communicated.

10       Q     Okay.  So Driss told you that she was

11  going to be fired.  Do you know if that was before

12  or after she learned the news?

13       A     I am not aware if it was before or after.

14       Q     Okay.  And what did he tell you in this

15  conversation?

16       A     Well, prior to that conversation on the

17  5th, Driss did call me and told me to have Mary just

18  get a hold of him directly --

19       Q     Okay.

20       A     -- instead of me being the go-between --

21  the go-between between the whole situation.

22       Q     Okay.

23       A     She called me and I told her she needed

24  to get a hold of Driss.

25       Q     Okay.  And what day did that happen?



Page 179

1  STATE OF COLORADO)
                   ) ss.      REPORTER'S CERTIFICATE
2  COUNTY OF DENVER )

3

4         I, Marcus K. Boyer, do hereby certify that
5  I am a Shorthand Reporter and Notary Public within
6  and for the State of Colorado; that previous to the
7  commencement of the examination, the deponent was
8  duly sworn to testify to the truth.
9         I further certify that this deposition was
10  taken in shorthand by me at the time and place
11  herein set forth, that it was thereafter reduced to
12  typewritten form, and that the foregoing constitutes
13  a true and correct transcript.
14         I further certify that I am not related
15  to, employed by, nor of counsel for any of the
16  parties or attorneys herein, nor otherwise
17  interested in the result of the within action.
18         In witness whereof, I have affixed my
19  signature this 16th day of May, 2023.
20         My commission expires April 30, 2027.
21
          *Marcus K. Boyer*
22
          Marcus K. Boyer

23

24

25



# Exhibit 3 Register 1 (Conventionally Submitted at ECF No. 65-3)

# Exhibit 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-02327-NYW-STV
_____

DEPOSITION OF:  MARY ANN MORENO - April 12, 2023
_____

MARY ANN MORENO,

Plaintiff,

v.

CIRCLE K STORES, INC.,

Defendant.

_____

          PURSUANT TO NOTICE, the deposition of
MARY ANN MORENO was taken on behalf of the Defendant at
1900 16th Street, Suite 800, Denver, Colorado 80202, on
April 12, 2023, at 9:16 a.m., before Carin C. Geist,
Registered Diplomate Reporter and Notary Public within
Colorado.

Mary Ann Moreno
April 12, 2023

```
 1              It was constantly busy because we had two
 2    doors, north and south.  So when one wasn't coming in,
 3    this other one was coming in.  But there was nothing I
 4    could do about it.  I mean, I needed my job, and I
 5    wanted my job, so I did what I had to do.
 6         Q.   Let me go back and repeat my question.
 7    There was a lot there, and I think in some ways you
 8    answered it along the way, but I'd just like to be
 9    clear so I frankly know what it is we need to visit
10    about here today.  My question is, as to your lawsuit
11    here against Circle K, are you complaining about
12    anything that happened before October 4 of 2020?
13         A.   No.
14         Q.   Okay.  So the robbery was on October 4.
15    When were you notified that your employment would be
16    terminated?
17         A.   You know, I was really upset at the time
18    because I got fired.  So I remember I went home that
19    night after Love showed up.  I went home.  First thing
20    I did is I wrote everything down in detail.  And then I
21    think it was the next day, and I'm not positive, but I
22    think it was the next day, I called the store for my
23    schedule, and Love answered the phone.  And I said, I'm
24    calling to see what my schedule is.  And she said, have
25    you talked to Driss?  And I said, no.  And she said,
```

Mary Ann Moreno
April 12, 2023

```
1   well, you need to call him.  And we hung up.
2               I then -- I think I did call him that same
3   day, and I asked him when I could go back to work.  And
4   he said, well, he says, do you know what you did?  No.
5   He said, do you know what you did wrong?  And I said,
6   no.  And he kept repeating it.  And I kept saying, I
7   didn't do anything wrong, Driss.  I defended myself.
8   But he kept insisting on that.  And he said, well, I'll
9   call you back, or I'll call you tomorrow, something
10  like that.
11          Q.   Okay.
12          A.   And I said, okay.  So I waited, and
13  then -- I waited for him to call me.  He never called.
14  I waited a couple days.  He never called me.  So I
15  called him, and I asked him again, when can I go back
16  to work, Driss?  And, again, he would say, do you know
17  what you did wrong, Mary?  And I said, Driss, I did
18  nothing wrong.  And it -- he kept asking that.  And I
19  would repeat, I did nothing wrong, Driss.  And he kept
20  asking and asking the same thing.  Finally, I was on
21  speakerphone, okay?  And --
22          Q.   I'm sorry to interrupt you.  Your side was
23  on speakerphone or his side was on speakerphone?
24          A.   I don't know if his was.
25          Q.   But you were using a speakerphone?
```

Mary Ann Moreno
April 12, 2023

1          A.    Two hunting knives.

2          Q.    As well as other things, right?

3          A.    Not that I noticed.

4          Q.    The only things he had with him were two

5    knives?

6          A.    Yes.  That's what I saw because he walked

7    in like this with them and threw them on the counter or

8    set them down on the counter.

9          Q.    So that --

10         A.    One was in its package, and the other one

11   was out of the package.  There was no package on them.

12         Q.    So your testimony is the only things he

13   had were two knives, one in the package and one

14   outside?

15         A.    Yes.

16         Q.    Okay.

17              MS. HALPERN:  Can I ask you a quick

18   question?  Are you going to ask questions about the

19   video footage?

20              MR. CARROLL:  I haven't decided.

21              MS. HALPERN:  Okay.  Could we take it

22   down, then, at least?

23              MR. CARROLL:  Sure.

24              MS. HALPERN:  It's just kind of confusing.

25   Go ahead.

Mary Ann Moreno
April 12, 2023

1        Q.   (BY MR. CARROLL)  How -- and did

2   Mr. Wimmer threaten you?

3        A.   No.

4        Q.   Did you ever consider running away from

5   him?

6        A.   Where could I run?  I was back in a

7   corner.  Behind me was a window.

8        Q.   So --

9        A.   Or to the --

10        Q.   Is that no, you did not consider running

11   away?

12        A.   No, no.

13        Q.   Okay.  At some point you spoke to a 911

14   operator; is that right?

15        A.   I did.  I called -- I picked up the phone

16   and called the police.

17             MR. CARROLL:  Okay.  Let me switch back

18   here.  So for the record, Deposition Exhibit 7 is going

19   to be an audio file.  It's been produced and

20   Bates-labeled as Moreno 346.  I think it makes sense

21   for the entire document to be the exhibit.  Whoops.

22   But as counsel knows, this recording has two different

23   phone calls in a single file.

24             (Exhibit 7 was provided to the reporter

25   electronically after the conclusion of the deposition.)

Mary Ann Moreno
April 12, 2023

```
 1          Q.   Let me stop you for a moment.  Tell me
 2   about your conversation on the phone with Driss.  What
 3   did you say and what did he say?
 4          A.   I think I told him that I had been robbed,
 5   and that I called Love, and I couldn't get a response
 6   from any of them.  So I don't know if he called her or
 7   not, you know --
 8          Q.   Okay.
 9          A.   -- that I can recall.  I don't -- you
10   know.
11          Q.   Did -- I obviously wasn't there, but I
12   mean, was it a short conversation?  Like, he said, I'm
13   on my way?
14          A.   I was like, Driss, I got robbed.  And I'm
15   pretty sure he said, I'll be right there.
16          Q.   Okay.  We've got 911, Amanda, Love, and
17   Driss.  Did you call anybody else?
18          A.   I think I called my daughter.  I think I
19   called my daughter after that.  I don't remember
20   exactly when I called her, but I remember calling her.
21          Q.   And that --
22          A.   She was in Granby at the time.
23          Q.   That's Olivia.  She was in Granby.  Now,
24   eventually Bonnie Moreno came to the store as well,
25   right?
```

Mary Ann Moreno
April 12, 2023

```
 1            A.    Yes, my daughter-in-law.

 2            Q.    Did you call her?

 3            A.    No.

 4            Q.    Somebody else told her about this?

 5            A.    Uh-huh.

 6            Q.    And she came?

 7            A.    I think my daughter called her.

 8            Q.    Okay.  So other than 911 and Driss and

 9  Love and Amanda and your daughter, did you call anybody

10  else?

11            A.    No.

12            Q.    Okay.  And am I correct that you spoke to

13  Driss on the phone once, and you spoke to Love on the

14  phone once?

15            A.    Yes.

16            Q.    Yes, okay.  How long did the police stay

17  in the store?

18            A.    Oh, gosh, I don't remember how long.  They

19  were there a while, though.  I think there was, like,

20  maybe three male officers or two male officers and one

21  female officer that was over by me.  But they were

22  there, I'm going to say, a good ten minutes, maybe.

23            Q.    I'm sorry, that the police were there for

24  ten minutes?

25            A.    About ten minutes, yeah.  I mean, I wasn't
```

Mary Ann Moreno
April 12, 2023

1    Driss Aamoud there at the store that night after he

2    arrived.

3            A.   After I left?

4            Q.   After he arrived.

5            A.   He asked me to explain what happened, and

6    I told him, and that's when he went in the office to

7    look at the video, and then -- well, before that,

8    before he went back there, I told him what happened.

9    And at that time he told -- I think he told my

10   daughter-in-law that she had to leave.  And she said,

11   I'm not going to leave my mother-in-law alone.  She's,

12   you know, nervous.

13           And he said something to the fact that he

14   couldn't be responsible or the company couldn't be

15   responsible for her, I guess, you know, if anything

16   happened.  But I thought to myself while he's telling

17   her this, well, it's already happened.  And she said,

18   okay, I'll wait outside.  And I think that's when he

19   went back to the back office to look at the video.

20           Q.   Okay.  What else do you remember about

21   your conversations with Driss that night in the store?

22           A.   When he came out to tell me that he

23   couldn't see anything, I said, well, there was a knife.

24   And I said -- and I walked back there with him, and he

25   pulled up just like the portion when I, you know,

Mary Ann Moreno
April 12, 2023

```
 1          A.   I'm not sure.  I think after I told him,
 2   am I fired, and he said, I have to get ahold of loss
 3   prevention, I'm not sure if he said, I'll call you.  I
 4   know I didn't tell him I'd call him.
 5          Q.   Okay.  Was your daughter-in-law Bonnie
 6   still waiting outside the store when you left?
 7          A.   Yes.  She was waiting because she wanted
 8   to follow me home.
 9          Q.   Did she follow you home?
10          A.   Yes.  I just live around the block.
11          Q.   So we've looked at video, and I've asked
12   you some questions about the robbery itself and the
13   aftermath of the robbery and the people that you called
14   and who came and when you left.  Is there anything
15   about the robbery itself that we haven't talked about
16   or that you think is important?
17               MS. HALPERN:  Object to form.
18          A.   No.
19          Q.   (BY MR. CARROLL)  I just don't always ask
20   the right questions, you know; and before we move on to
21   other things, I want to give you the opportunity.  Is
22   there something about what happened here between the
23   start of the robbery and the time that you left that
24   you haven't had the opportunity to sort of describe
25   here?
```

Mary Ann Moreno
April 12, 2023

1 that you were fired because you called the police?

2        MS. HALPERN:  Object to form.

3    A.   No.

4    Q.   (BY MR. CARROLL)  Do you think that you

5 were fired because you were the victim of a crime?

6        MS. HALPERN:  Object to form.

7    A.   No.

8    Q.   (BY MR. CARROLL)  Do you have any evidence

9 that you were fired because you're the victim of a

10 crime?

11       MS. HALPERN:  Object to form.

12   A.   No.

13   Q.   (BY MR. CARROLL)  Do you believe that you

14 were fired for exercising your right to self-defense?

15       MS. HALPERN:  Object to form.

16   A.   I'm sorry, repeat that?

17   Q.   (BY MR. CARROLL)  Sure.  Do you believe

18 that you were terminated for exercising your right to

19 self-defense?

20   A.   Yes.

21   Q.   What makes you believe that?

22   A.   Because I don't think I violated the

23 rules.

24   Q.   Anything else?

25       MS. HALPERN:  Object to form.

Mary Ann Moreno
April 12, 2023

```
 1           A.   No.

 2           Q.   (BY MR. CARROLL)  Did anyone ever tell you

 3    that you were being terminated because you engaged in

 4    self-defense?

 5                MS. HALPERN:  Object to form.

 6           A.   Yes.  I'm going to say yes to that

 7    question.

 8           Q.   (BY MR. CARROLL)  Who?

 9           A.   Driss.

10           Q.   What did he say?

11           A.   Do you know what you did, Mary?

12    Repeatedly and repeatedly and repeatedly, when I didn't

13    do anything wrong.  I was defending myself.  I had no

14    idea what this gentleman or this kid was going to do

15    when he came around.  Somebody comes at you, you're

16    going to react.

17           Q.   Did Driss Aamoud say to you, you are being

18    terminated for self-defense?

19           A.   He didn't say in those words, no.

20           Q.   Did he ever say the words "self-defense"?

21           A.   Not that I can recall, no.

22           Q.   In fact, if I recall your testimony

23    correctly, from your perspective, he never told you at

24    all why you were being terminated, right?

25           A.   No.
```

Mary Ann Moreno
April 12, 2023

 1   meds.

 2        Q.   You had some therapy sessions with Sherri

 3   Wand, right?

 4        A.   Yes.

 5        Q.   Is it true that those were all paid for by

 6   someone else?

 7        A.   They were paid by Jefferson County, I'm

 8   assuming.

 9        Q.   You didn't pay for them?

10        A.   No.

11        Q.   When's the last time you met with

12   Ms. Wand?

13        A.   Oh, my God, I don't know.  It's been --

14   might be a year now.  I'm not sure.

15        Q.   Are you seeing any other health-care

16   providers right now for any sort of emotional or mental

17   issues?

18        A.   No, no.

19        Q.   Since your termination from Circle K in

20   October of 2020, have you had any significant health

21   issues?  Sounds like you're pretty healthy.

22        A.   Just COVID, the two weeks I was sick, and

23   that was it.

24        Q.   I was going to say, just one bout of COVID

25   is better than many of us could say.

Mary Ann Moreno
April 12, 2023

```
 1        Q.   Okay.

 2        A.   I think I was.  As a matter of fact, I

 3   still have the bottle at home.

 4        Q.   Got it.

 5        A.   I haven't taken them.

 6        Q.   I understand.  Would you say that you have

 7   a history of depression?

 8        A.   No.

 9        Q.   So if your medical notes said that you had

10   a history of depression, you would disagree with that?

11        A.   I disagree with it because doctors can put

12   whatever they want on there, you know.

13        Q.   Okay.  Ms. Moreno, is there anything you

14   personally think is important about your lawsuit

15   against Circle K that you haven't testified about so

16   far today?

17        A.   Yes, that I was treated unfairly.  I don't

18   think I should have been fired for self-defense.  If

19   somebody comes at you, you're not going to sit there

20   like this (indicating) and let them attack you.  You're

21   going to fight for your life.  I don't feel that I

22   violated the policy.

23             MR. CARROLL:  Okay.  Thanks very much,

24   Ms. Moreno.  Those are all the questions that I have

25   for you here today.
```

Mary Ann Moreno
April 12, 2023

```
 1              MS. HALPERN:  I just have a couple
 2   follow-up questions.
 3                      EXAMINATION
 4   BY MS. HALPERN:
 5         Q.  So, Ms. Moreno, do you remember when
 6   Mr. Carroll was asking you if -- if Mr. Wimmer
 7   threatened you on the night of October 4?  Do you
 8   recall when he was asking you about that?
 9         A.   Not personally, but I felt my life in
10   danger.  I was afraid for my life.  Like I said, you
11   know, somebody comes at you, you're not going to
12   flinch.  You're going to try to self-defense -- you
13   know, defend yourself against somebody.
14              Just knowing that he had those knives, I
15   had no idea what he was capable of; and he was weird
16   anyway, the way he was acting.  So, I mean, what was I
17   supposed to do?  Fight for my life.  I wasn't going to
18   let him attack me.
19         Q.  And when Mr. Carroll asked if Mr. Wimmer
20   threatened you, did you think he was referring to
21   verbal threats?
22         A.   No.
23         Q.  Did you think Mr. Carroll, not Mr. Wimmer.
24   The attorney.
25         A.   Oh, I'm sorry.
```

Mary Ann Moreno
April 12, 2023

```
 1          Q.    Were you referring to verbal threats?  Did
 2   Mr. Wimmer verbally threaten you?
 3          A.    Okay.  Say that again.
 4          Q.    Did Mr. Wimmer verbally threaten you?
 5          A.    No.
 6          Q.    But did you feel threatened by him, by
 7   Mr. Wimmer?
 8          A.    Yes.
 9          Q.    Okay.  And can you -- did a doctor ever
10   tell you that you'd been diagnosed with depression?
11          A.    No.
12          Q.    Could you describe kind of what -- do you
13   recall when Mr. Carroll was asking you about kind of
14   whether you'd been triggered after your termination
15   from Circle K?  Do you remember him asking you those
16   questions?
17          A.    Yes.
18          Q.    Could you describe kind of your emotions
19   after you were attacked and fired, in the weeks and
20   months afterwards?
21          A.    You know, to be honest with you, I wasn't
22   feeling -- sure, the robbery happened.  I was okay.  I
23   had my life.  But being fired from a job that you've
24   been on for 16 years and been -- I mean, I was there
25   anytime they called me, which was often.  I did my job.
```

Mary Ann Moreno
April 12, 2023

1                    REPORTER'S CERTIFICATE

2    STATE OF COLORADO          )
                                )   ss.
3    CITY AND COUNTY OF DENVER  )

4         I, CARIN C. GEIST, Registered Diplomate Reporter,
     Certified Realtime Reporter, and Notary Public
5    ID 20054034523, State of Colorado, do hereby certify
     that previous to the commencement of the examination,
6    the said MARY ANN MORENO was duly sworn or affirmed by
     me to testify to the truth in relation to the matters
7    in controversy between the parties hereto; that the
     said deposition was taken in machine shorthand by me at
8    the time and place aforesaid and was thereafter reduced
     to typewritten form; that the foregoing is a true
9    transcript of the questions asked, testimony given, and
     proceedings had.

10
          I further certify that I am not employed by,
11   related to, nor of counsel for any of the parties
     herein, nor otherwise interested in the outcome of this
12   litigation.

13        IN WITNESS WHEREOF, I have affixed my signature
     this _____ day of _____, 2023.
14
          My commission expires September 15, 2025.
15

16   __X__ Reading and Signing was requested.

17   _____ Reading and Signing was waived.

18   _____ Reading and Signing is not required.

19

20                      *Carin C. Geist*

21                      _____
                        Carin C. Geist
22                      Registered Diplomate Reporter
                        Certified Realtime Reporter
23

24

25

# **Exhibit 5**

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO


Civil Action No. 1:22-cv-02327-NYW-STV

_____

VIDEOCONFERENCE DEPOSITION OF            May 5, 2023

AMY HARVEY

_____

MARY ANN MORENO,

            Plaintiff,

vs.

CIRCLE K. STORES, INC.,

            Defendant.

_____


        The deposition of AMY HARVEY, taken before

Leeann Stellor, a Registered Merit Reporter,

Certified Realtime Reporter, and a Notary Public in

and for the County of Summit and the State of

Colorado, via Zoom videoconference, on Friday,

May 5, 2023, at the hour of 10:04 a.m.



Page 16

1      A.     I was a multi-unit manager.

2      Q.     At?

3      A.     At Stripes Convenient Stores in Texas.

4      Q.     And if you could walk me through your job

5   history at Circle K, your job progression, that

6   would be much appreciated.

7      A.     I started as a multi-unit manager in west

8   Kansas.  I was there for a year before promoted into

9   HR manager of August of '17.

10      Q.     And what happened when you were promoted

11   to HR manager?  Did you get relocated?

12      A.     Yes.

13      Q.     Where?

14      A.     To Colorado.

15      Q.     And why is that?

16      A.     Because I lived in Kansas before that.

17      Q.     Right.  So you didn't want to be in

18   Kansas?

19      A.     Well, it would have been a long drive to

20   the corporate office every day.

21      Q.     So they moved you because the corporate

22   office is here in Colorado?

23      A.     Correct.

24      Q.     Okay.  And so you became an HR manager in

25   approximately 2017?



Page 17

1      A.    Yes.

2      Q.    Were there any other job titles that

3   you've held at Circle K?

4      A.    Just the two.

5      Q.    And what was the -- what were your

6   primary job duties as an HR manager at Circle K?

7      A.    I supported, roughly, 423 stores in six

8   states.

9      Q.    Which six states?

10     A.    Colorado, New Mexico, Texas, Oklahoma,

11  Kansas, and Missouri.

12     Q.    And what do you mean by support?  What

13  kind of support did you provide?

14     A.    Answered questions regarding HRIS

15  systems, did investigations, did approvals as far as

16  corrective actions, terminations, helped with

17  on-boarding, helped with training.  I pretty much

18  did everything.

19     Q.    Sounds like a busy job.  What was your

20  salary when you were an HR manager, and did that

21  change over time?

22     A.    I believe $92,000, roughly.

23     Q.    And did that remain the same from 2017

24  through roughly 2021?

25     A.    Usually a 3 percent increase every year.



Page 21

1   HR guidance, meaning can you give me a call because

2   I'm quitting because of this or this or this.  You

3   know, whatever that may be.

4        Q.    Okay.  So your role was more about making

5   sure that there was proper documentation?

6        A.    Yes.

7        Q.    Did you ever override a termination?

8        A.    I don't recall.

9        Q.    Would that be something you could have

10  done --

11       A.    I could have.

12       Q.    -- in your role as HR manager?

13       A.    I could have if it was appropriate.

14       Q.    But you don't recall ever doing so?

15       A.    I don't recall.

16       Q.    Any other kind of role in terminations,

17  other than making sure that there was, you know,

18  sufficient documentation in the system?

19       A.    When I -- I could do investigations and

20  direct the store manager or market manager before a

21  termination due to the outcome of the investigation.

22       Q.    Do you recall ever doing that?

23       A.    Yes.

24       Q.    Can you tell me about that a little bit?

25       A.    A lot of them were, whether it was a



Page 33

1    some stores that you oversaw?

2         A.    Yeah, I would say a couple times a week.

3         Q.    So there were robberies somewhere in your

4    six-state region a couple times a week?

5         A.    Yeah, and sometimes more.

6         Q.    That's quite a bit.

7         A.    Absolutely.

8         Q.    Yeah.  So would you say there was -- I

9    mean, ballpark figure, I guess you were there from

10   2017 to 2021.  How many robberies do you think took

11   place in the territory that you supported?

12        A.    Hundreds.

13        Q.    And how many of those would you say were

14   armed robberies?

15        A.    Maybe half.

16        Q.    So hundreds of armed robberies as well?

17        A.    Yeah.

18        Q.    It's probably a little bit sensitive, but

19   has anybody been injured, while you were the HR

20   manager, on your territory due to an arm robbery?

21        A.    Yes.

22        Q.    Has anyone died?

23        A.    Yes.

24        Q.    How often would you say there were

25   injuries due to armed robberies in your territory



Page 34

1    while you were an HR manager at Circle K?

2         A.    Maybe a couple hundred.

3         Q.    And while I -- I don't need names and I

4    don't want to pry, how many deaths occurred when you

5    were the HR manager at Circle K due to armed

6    robberies in your territory?

7         A.    Maybe 30.

8         Q.    Wow.  Okay.  So this is a pretty

9    dangerous job, it seems like.

10        A.    Sure.

11        Q.    And how many employees have you

12   terminated -- or did you approve the terminations of

13   at Circle K for violating either the robbery policy

14   or confront and chase policy?

15        A.    Probably close to a hundred.

16        Q.    Was there ever a time while you were HR

17   manager at Circle K when an armed robbery -- well,

18   scratch that.  I'm trying to think of a way to

19   phrase this.

20              Was there ever a time where you

21   found that a termination of an employee who had

22   experienced an armed robbery was not sufficiently

23   documented?

24              MR. CARROLL:  I object to the form of

25   the question.



Page 35

1          MS. HALPERN:  That probably wasn't

2    amazing.  I can try a third time.

3          Q.    Okay.  So in your role approving

4    terminations, was there ever a time where you

5    disagreed with a termination of an employee who

6    experienced an armed robbery?

7          A.    I don't believe so.

8          Q.    And did you review video footage in each

9    and every single one of those hundred or so

10    terminations?

11          A.    Not every one, no.

12          Q.    So in your mind, do you distinguish

13    between the robbery policy and the confront and

14    chase policy?

15          A.    Yes.

16          Q.    Okay.  Could you tell me about, you know,

17    what distinguishes them?

18          A.    Because the robbery policy doesn't

19    necessarily have to include a confront and chase if

20    the employee does not confront or chase the person.

21    So if they comply with the robber and, you know,

22    follow the policy of, you know, contacting the

23    police when it happens and then following the

24    five-minute rule, not having too much money in their

25    cash register, and they just do everything that the



Page 39

1     Q.    Were employees -- were you trained at all

2  in your role as HR manager on kind of when

3  self-defense is appropriate under the confront and

4  chase policy?

5     A.    I don't recall.

6     Q.    You don't recall being trained on that?

7     A.    No.

8     Q.    Do you know if employees were trained at

9  all on when self-defense was acceptable under the

10  confront and chase policy?

11     A.    I don't know.  That wasn't my area to

12  train for that.

13     Q.    Did you receive any training when you

14  were a multi-unit store manager on when it was

15  appropriate to engage in self-defense under the

16  confront and chase policy?

17     A.    No.

18     Q.    Do you know if employees were ever told

19  that they were not -- that they were prohibited from

20  telling a robber to leave them alone if they were

21  being robbed?

22     A.    No.

23     Q.    Do you know if employees were trained at

24  all as to when physical self-defense was appropriate

25  or not under the confront and chase policy?



Page 40

1      A.     No.

2      Q.     Are there any circumstances where you

3  think physical self-defense would have been

4  appropriate under the confront and chase policy?

5      A.     I don't know.  It would depend on the

6  particular situation.

7      Q.     Yeah, I think that's what I'm asking.  Is

8  there any situation where you, as the HR manager,

9  would have thought it was appropriate for there to

10 be physical self-defense under the confront and

11 chase policy?

12     A.     In my head, yes.

13     Q.     Could you describe that for us, please?

14     A.     If the robber or attacker actually

15 physically touched them first, they can, you know,

16 push back to get away from that robber or person.

17     Q.     What if they thought the robber was about

18 to physically touch or attack them?

19     A.     I don't know.  I mean, I don't know.

20     Q.     What if like the attacker lunged at them

21 and they thought they were about to be attacked,

22 could they push back under the confront and chase

23 policy?

24     A.     I believe so.

25     Q.     Does the confront and chase policy, in



Page 46

1    manager on whether or not to call the police.

2    Usually it was not and we would just write that off

3    so that it was accounted for for inventory purposes.

4        Q.    Okay.  And what if an employee -- you

5    know, I don't want to refer to them as customers

6    when they're robbing the store.  But what if an

7    individual walks in the store and, you know, demands

8    a pack of cigarettes and does not want to show their

9    ID, what is the employee supposed to do?

10       A.    Refuse sale.

11       Q.    Okay.  What if an individual walks into a

12   Circle K store and says, "Give me a pack of

13   cigarettes, but I don't want to pay for it."  What

14   is the employee supposed to do?

15       A.    Refuse the sale.

16       Q.    Okay.  And what if a individual walks

17   into the store and, you know, the employee is, let's

18   say, behind the counter, by the cash register

19   counter.  The individual is not close by, but says,

20   you know, "I'm going to hold this store up.  I'm

21   going to hold up the store."

22       A.    They wait for direction.  If they can,

23   they push the emergency button to the silent alarm.

24       Q.    So is there an emergency button?  Can you

25   tell me about that?



Page 75

1    think that the individual who attacked Ms. Moreno

2    had a knife?

3         A.    I -- I knew nothing about a knife.

4         Q.    You knew nothing about a knife?

5         A.    No.

6         Q.    Okay.  What do you recall when you saw

7    the video footage?

8         A.    I recalled that the guy was asking for

9    cigarettes and he ended up coming around the

10   counter, and she grabbed him instead of backing up

11   out of the way.  And as soon as she touched him,

12   that was violation of the policy.

13        Q.    Do you remember where she was standing in

14   the video footage?

15        A.    In front of the register.

16        Q.    Do you recall how much space she had to

17   maneuver behind -- behind the counter?

18        A.    Yeah.  The whole other register area for

19   register 1 or 2, whichever one it was, she had that

20   whole other area to be able to step back into.

21        Q.    What else do you recall about the video

22   footage?

23        A.    That the guy, after he went to go and

24   grab the cigarettes -- whether or not he got them or

25   not, I don't recall at this time -- ended up just



Page 77

1   was his last name?

2          A.     Robert Sway?

3          Q.     Sway.   Sorry.

4                        What did Mr. Sway say?

5          A.     I believe we -- I believe, I don't know

6   for sure.   I believe that we just talked about our

7   vision of what we saw during the video, which we did

8   for all of the videos that all of us would talk

9   about, to come up with the right direction and if

10  any policies had been violated.   So I don't know

11  directly what he had said during our conversation,

12  but the outcome of that conversation was that we

13  agreed that she should be terminated due to the code

14  of conduct -- or not code of conduct, but the

15  confront and chase policy.

16         Q.     And what role did Patrick Bresnahan, I

17  believe you said his name was, for loss prevention,

18  what role did he have?

19         A.     He also watched the video, and he was a

20  third party to that conversation.

21         Q.     Do you recall what he said?

22         A.     Not individually.   Just the outcome from

23  that conversation was to terminate.

24         Q.     Did anyone at all in this conversation

25  talk about the possibility of self-defense?   Did



Page 78

1    that phrase ever come up?

2         A.    I don't know.

3         Q.    It may have?  It may not have?

4         A.    It may have.  It may not have.  I don't

5    know.  We had many conversations regarding videos

6    that we had watched on instances like this, so I

7    don't remember this specific instance.

8         Q.    So is this a situation where you're

9    assuming that that's the conversation you would have

10   had because that's the one you typically had, but

11   you don't have a specific memory?

12        A.    Correct.

13        Q.    Did you discuss the video footage with

14   anyone else?

15        A.    Not that I recall.

16        Q.    Did you interview any store employees at

17   the Circle K store where Mary Ann Moreno worked?

18        A.    No, not that I recall.

19        Q.    Did you do anything else to investigate,

20   other than review the video footage?

21        A.    Every time there was a robbery, I would

22   get notified if any money was taken, what

23   merchandise was taken, so that it could be added to

24   whatever report was out there that I would report to

25   my director.



Page 93

1                     REPORTER'S CERTIFICATE

2              I, LEEANN L. STELLOR, Registered Merit

3    Reporter and Certified Realtime Reporter within

4    Colorado, ID 200401669, appointed to take the

5    deposition of AMY HARVEY, do hereby certify that before

6    the deposition she was duly sworn by me to testify to

7    the truth; that the deposition was taken by me then

8    reduced to typewritten form herein; that the foregoing

9    is a true transcript of the questions asked, testimony

10   given and proceedings had.

11

12             I further certify that I am not related to

13   any party herein or their Counsel, and have no interest

14   in the result of this litigation.

15

16             In witness hereof I have hereunto set my

17   hand this 15th day of May, 2023.

18

19                        _____
                          Leeann L. Stellor
                          Registered Merit Reporter
20                        Certified Realtime Reporter
21                        and Notary Public

22

23   My commission expires June 8, 2024

24

25



# Exhibit 6

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Case No. 1:22-cv-02327-NYW-STV

_____

MARY ANN MORENO,

Plaintiff,

v.

CIRCLE K STORES, INC.,

Defendant.

_____

DEPOSITION OF DRISS AAMOUD

May 18, 2023

_____

PURSUANT TO NOTICE, the above-entitled
deposition was taken on behalf of the Plaintiff at
2701 Lawrence Street, Denver, Colorado 80205, on
May 18, 2023, at 10:00 a.m., before Karen S. Fogle,
Registered Professional Reporter and Notary Public
within Colorado.

MAGNA LEGAL SERVICES

(866) 624-6221

magnals.com



Page 53

1    priority for them at that specific time and not to put

2    their physical safety at any risk regardless of loss,

3    regardless of whether it's cash or merchandise, so you

4    have to comply a hundred percent.

5            Q.  So you're talking about these -- when you

6    say regardless of the laws, what do you mean by that?

7            A.  I don't think -- I said the loss.

8    Regardless of the loss of the merchandise whether it's

9    cash or --

10           Q.  Thank you for the clarification.  Did you

11   get any training on self defense as part of any of

12   these trainings you received on the chase and confront

13   policy?

14           A.  I'm not sure.  I really don't.

15           Q.  Did you ever get any sort of guidance on

16   when it was okay to confront an attacker?

17           A.  The policy is very clear.  You are not to

18   confront, chase, push, pull, threaten a robber -- and

19   for the employee to seek the safest place in a store.

20   And it's usually behind the sales counter and let the

21   robbers do what they want.

22           Q.  What does it mean to confront a robber?

23           A.  To confront them is to get in their way of

24   whatever they want to do.

25           Q.  Maybe my use of the word confront was a



Page 68

1          Q.   What do you believe Ms. Moreno did that

2    violated the policy?

3          A.   Several things.  Argumentative, getting in

4    the way of the robber, denying the robber's request,

5    pointing the finger at the robber, pulling the robber

6    from his shirt to get him out of not taking the

7    cigarettes.

8          Q.   When you say pointing the finger at the

9    robber, do you mean literally or metaphorically?

10         A.   Literally.

11         Q.   When she literally pointed her finger at

12   him?

13         A.   Correct.  In a threatening way.

14         Q.   Are there any other things Ms. Moreno did

15   that you think violated the chase and confront policy?

16         A.   These are the things, threatening,

17   confronting, pulling, pushing, denying, argumentative

18   so --

19         Q.   So do you believe then that Ms. Moreno

20   violated the policy before she had physical contact

21   with the robber?

22         A.   Absolutely.

23         Q.   I'm going to give you a document that has

24   been marked in a previous deposition as Exhibit 3.

25   Have you seen this document before?



Page 101

1  on the chase or confront policy and how it complied

2  with state law.  I want to ask you that question again

3  and I want to know specifically what trainings you

4  received and what they said about how that policy

5  complies with state law.  Can you answer that for me?

6          A.  I don't remember.  I don't really know.

7          Q.  Before you had said there were all of these

8  trainings and all of these things, and I kept asking

9  for specifics and you said I had trainings but now

10 you're saying you don't know?

11         A.  I guess from your answer I assume you mean

12 by all laws.  For example, age-restricted laws --

13         Q.  I was asking specifics.  And I was asking

14 specifics about chase and confront policy and self

15 defense laws and victim's rights laws?

16         A.  I don't remember.

17         Q.  So it's fair to say that you don't know how

18 this chase and confront policy complies with state law

19 then?

20         A.  Correct.

21         Q.  So that's the case even though you

22 recommended people for termination for violating this

23 policy; is that right?

24         A.  Yes.

25         Q.  So you don't know if Circle K tried to



Page 103

1          Q.   Correct.

2          A.   You can repeat it.

3          Q.   Has there ever been an employee at Circle K

4    that you're aware of who had physical contact with an

5    attacker who was not fired?

6               MR. HANKINS:   Object to form.

7          A.   No.

8          Q.   (BY MS. BUTLER)   I also want to talk about

9    these videos you talked about reviewing where the

10   employee was -- robberies where the employee was

11   screaming or crying and backing away from the attacker.

12   Do you remember that?

13         A.   Yes.

14         Q.   When you were talking about that, that

15   didn't refer to any videos you reviewed at Circle K;

16   correct?

17         A.   Can you ask the question again?

18         Q.   I asked you how many armed robberies there

19   were at Circle K and you said there had been two.

20   Before that you had talked about watching videos where

21   employees had been upset and crying and screaming

22   and -- not beer run robberies, just robberies -- and so

23   I'm trying to see -- those videos you're talking about,

24   those aren't videos while you were working as a manager

25   at Circle K?



Page 109

1        Q.  Do you remember what Mr. Holmes said to you

2   on the phone?

3        A.  No.

4        Q.  Did Mr. Holmes do anything at that point?

5        A.  He was going to report it to his boss as

6   part of the five-minute rule.  I'm just stating that's

7   the rule.

8        Q.  Did you have any other conversations with

9   Mr. Holmes that night?

10       A.  After.

11       Q.  We can put that aside for now.  Then in

12  this period of time when you're on the way to the store

13  or around then, did you speak with anyone besides

14  Ms. Jorgensen and Mr. Holmes?

15       A.  No, I don't think so.

16       Q.  Did you contact anyone in HR or anything?

17       A.  I don't remember.

18       Q.  What was the first thing you did when you

19  got to the store?

20       A.  I made sure that Mary was okay and if she

21  needs anything or whatever while I'm there and show

22  support, in general.

23       Q.  I'm going to pull up a video with some

24  footage.  After you asked Mary what happened and made

25  sure she was okay, what did you do next?



Page 110

1          A.  I believe I went to look at the video in

2     the back office.

3          Q.  Why was that your next step?

4          A.  To get a better view because usually

5     information you hear -- from my experience firsthand, I

6     wanted to get a view of what I see because I have to

7     report what I actually saw.

8          Q.  What did you see when you watched the

9     surveillance video footage?

10          A.  I saw a person come and ask for cigarettes,

11     if I remember.  But he didn't have an I.D.  Mary

12     refused to sell the sale.  He asked her to give him

13     cigarettes anyway.  She refused.  And I believe he

14     asked her -- he told her that he was going to grab them

15     himself.  And I think she told him no, you're not, I'm

16     going to call the police.

17                As he proceeded to go around the counter,

18     she pointed the finger at him and got in his way and

19     then stopped blocking him.  And he proceeded to go

20     where he needed -- the cigarette rack -- and he got

21     cigarettes and she pulled him -- he had a box in his

22     hand, and she pulled him from the back of his shirt.

23          Q.  When you were in the back watching the

24     surveillance footage, did you talk to anyone about

25     this?  Were you on the phone with anyone or was it just



Page 113

```
 1          Q.  I'm talking in generals here, not this

 2   specific instance.

 3          A.  No.

 4          Q.  So if an employee said there was a robbery,

 5   you would assume there was a robbery?

 6          A.  Right.

 7          Q.  If an employee said there was a knife,

 8   would you typically assume that they were telling the

 9   truth about that?

10          A.  Absolutely.

11          Q.  So after this conversation at 8:26 p.m.,

12   you go back to the office and watch the video.  And

13   then what do you do after you had finished reviewing

14   the video?

15          MR. HANKINS:  Object to form.

16          A.  One of the things I did was bring Love --

17   the manager -- by the time she got there and we're

18   looking at the video together.  And the other thing was

19   bring Mary back and show her the video and she said, "I

20   know.  I screwed up.  I wasn't supposed to do that."

21   That I remember.

22          Q.  (BY MS. BUTLER)  Let's break that down a

23   little bit.  I'm going to fast forward the video now to

24   8:37 p.m.  By this point have you finished reviewing

25   the footage?
```



Page 125

1   week later?

2          A.   No.  It was within the same week.  I don't

3   remember the exact date.

4          Q.   What sort of investigation typically

5   happens in a situation like this?

6          A.   I review the video and then communicate

7   with my boss.  And then he might review the video also

8   and then HR -- Amy -- she would do her own -- and then

9   she does the necessary investigation.  And she does it.

10  And then we meet to make a decision.

11         Q.   You say Amy Harvey would have already

12  known, what do you mean by that?

13              MR. HANKINS:  Object to form.

14         A.   I didn't say that.

15         Q.   (BY MS. BUTLER)  I must have misheard.

16  What did you mean about Ms. Harvey?

17         A.   She would make her own investigation and

18  she would review the video and then she would

19  communicate back to us what should happen and what

20  should commence.

21         Q.   How long do you remember this -- is that

22  the whole extent of the investigation?

23         A.   I would say so.

24         Q.   So it primarily consists of reviewing video

25  footage; is that accurate?



```
                                                      Page 126
 1              A.   I can't speak for Amy.  I don't know what
 2      else she does but I think so.
 3              Q.   Did you talk to anyone as part of any
 4      investigation?
 5              A.   I don't remember.
 6              Q.   Do you remember talking to Ms. Moreno about
 7      any investigation?
 8              A.   I don't remember.
 9              Q.   So you don't remember any conversations you
10      may or may not have had about Ms. Moreno's termination?
11              A.   I don't remember the conversation.
12              Q.   Do you remember anyone you talked to about
13      it?
14              A.   No.  I remember telling my bosses.  That's
15      what I remember.
16              Q.   Apart from your boss, do you remember if
17      you told HR about recommending the termination or
18      whether or not your boss told HR?
19              MR. HANKINS:  Object to form.
20              A.   I don't remember.
21              Q.   (BY MS. BUTLER)  Did you talk to anyone
22      besides Mr. Holmes and Ms. Harvey about Ms. Moreno's
23      termination?
24              MR. HANKINS:  Object to form.
25              A.   I don't remember.
```



Page 141

1   would be harder on a person to get fired after having

2   the job for 16 years versus having it for a week?

3              MR. HANKINS:  Object to form.

4         A.   No.

5         Q.   (BY MS. BUTLER)  Did you consider that you

6   might be violating Ms. Moreno's rights to self defense

7   under crime victim's rights when you fired --

8   recommended her termination?

9              MR. HANKINS:  Object to form.

10        A.   I'm not sure.

11        Q.   (BY MS. BUTLER)  You're not sure if you

12  considered these things?

13        A.   Correct.

14        Q.   How can you not be sure of that?

15        A.   I'm not sure if it crossed my mind.

16        Q.   You don't remember thinking about it?

17        A.   I don't remember.

18        Q.   Do you think that Circle K can ignore these

19  rights?

20             MR. HANKINS:  Object to form.

21        A.   I don't.

22        Q.   (BY MS. BUTLER)  You don't know if Circle K

23  can ignore rights that its employees have?

24             MR. HANKINS:  Object to form.

25        A.   I don't know.



Page 154

1          A.   It would have made it worse.

2          Q.   (BY MS. BUTLER)   Why is that?

3          A.   She put herself -- her own safety at risk

4     on company property.

5          Q.   Do you think Ms. Moreno was trying to

6     confront the robber when he came behind the counter?

7          A.   Yes.

8          Q.   Why do you think that?

9          A.   With her actions.

10          Q.   What are those actions that make you think

11     that?

12          A.   Argumentative, threatening to call the

13     police, getting in his way, obstructing his way to the

14     cigarette rack, and pulling him.

15          Q.   I want to talk about the robber, Tyler

16     Wimmer, and the cigarettes.  First of all, we touched

17     on it earlier but there is this initial moment where

18     Mr. Wimmer comes up to the counter and asks for the

19     cigarettes; right?

20          MR. HANKINS:  Object to form.

21          A.   Yes.

22          Q.   (BY MS. BUTLER)   What happens then?

23          A.   She asks for I.D., I believe.  And then he

24     didn't have an I.D.  She refused the sale.  And then he

25     tells her to give him cigarettes anyways.



```
                                                    Page 155
 1          Q.  So at that point should Ms. Moreno have
 2   given him the cigarettes?
 3          A.  No.
 4          Q.  So would it have been a company policy
 5   violation for her --
 6          A.  No.
 7          Q.  Could you explain that?
 8          A.  She refused the sale because there was no
 9   I.D.
10          Q.  Would it have been a company policy
11   violation for her to have given him those cigarettes
12   without showing an I.D.?
13          A.  Correct.
14          Q.  So by refusing the sale she abided by
15   policy?
16          A.  Correct.
17          Q.  In so doing she obviously angered
18   Mr. Wimmer; is that correct?
19              MR. HANKINS:  Object to form.
20          A.  I don't know.
21          Q.  (BY MS. BUTLER)  You talked about how
22   Mr. Wimmer comes around the counter -- what happens
23   next after Ms. Moreno refuses the sale?
24          A.  Can we play the video?
25          Q.  I'm going to ask you the questions.  What
```



Page 169

1                    REPORTER'S CERTIFICATE

2

3          I, KAREN S. FOGLE, Registered Professional

4    Reporter and Notary Public, State of Colorado, do

5    hereby certify that previous to the commencement of the

6    examination, the deponent was duly sworn by me to

7    testify to the truth in relation to the matters in

8    controversy between the parties hereto; that the said

9    deposition was taken in machine shorthand by me at the

10   time and place aforesaid and was thereafter reduced to

11   typewritten form; that the foregoing is a true

12   transcript of the questions asked, testimony given, and

13   proceedings had.

14          I further certify that I am not related to,

15   employed by, nor of counsel for any of the parties

16   herein, nor otherwise interested in the outcome of this

17   litigation.

18          IN WITNESS WHEREOF, I have affixed my signature

19   this 23rd day of May, 2023.

20          My commission expires January 25, 2025.

21

22

                         _____
                                 *Karen S. Fogle*
23                            Karen S. Fogle, RPR

24

25



# Exhibit 7

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:22-cv-02327-NYW-STV

MARY ANN MORENO,

     Plaintiff,

v.

CIRCLE K STORES, INC.,

     Defendant.

---

**CIRCLE K STORES, INC.'S OBJECTIONS AND ANSWERS TO PLAINTIFF'S FIRST**
**SET OF REQUESTS FOR ADMISSION TO DEFENDANT**

---

Defendant Circle K Stores, Inc. ("Circle K") provides the following objections and answers to Plaintiff's first set of requests for admission, served on May 23, 2023 ("Requests").

**PRELIMINARY STATEMENT AND GENERAL OBJECTIONS**

Circle K objects to certain of the Requests' instructions and definitions to the extent they impose obligations beyond the Federal Rules of Civil Procedure. The following objections apply to all of the Requests.

1.     Circle K objects to Instruction Nos. 1 and 2 as inconsistent with the requirements of Rule 36. Circle K will comply with Rule 36.

**REQUESTS FOR ADMISSION**

**REQUEST FOR ADMISSION NO. 1:** Admit that every Circle K employee in the relevant region who made physical contact with a shoplifter, robber, attacker, or other similar person

during the relevant time period was terminated pursuant to the "Don't Chase or Confront Policy."

      **ANSWER:** Denied.

**REQUEST FOR ADMISSION NO. 2:** Admit that in the relevant region during the relevant time period Defendant did not retain any employee who made physical contact with a shoplifter, robber, attacker, or other similar person, regardless of the circumstances surrounding that contact.

      **OBJECTION:** Circle K objects to Request for Admission No. 2 as ambiguous with respect to "did not retain." It is unclear if it "retain" means that the employee still works for Circle K to this day, or whether it is addressed solely to the immediate aftermath of such physical contact. Circle K interprets the request as asking about the immediate aftermath, not in perpetuity.

      **ANSWER:** Circle K provides the following answer, based on its interpretation of the ambiguous request. Circle K denies that it did not retain, in the immediate aftermath of such contact, any employee who made physical contact with a shoplifter, robber, attacker, or other similar person, regardless of the circumstances surrounding that contact.

**REQUEST FOR ADMISSION NO. 3:** Admit that the "Don't Chase or Confront Policy" is the same policy in place in each state that Defendant operates.

      **ANSWER:** Admitted.

**REQUEST FOR ADMISSION NO. 4:** Admit that Defendant implements the "Don't Chase or Confront Policy" identically in each state in the relevant region.

**OBJECTION:** Circle K objects to Request for Admission No. 4 as vague with respect to the meaning of "implements." It is unclear what the term refers to and there are any number of variations from circumstance to circumstance that may or may not fit within Plaintiff's meaning of "implements." Circle K further objects that the request is disproportionate to the needs of the case to the extent the meaning of "implements" would require Circle K to investigate individual instances of policy compliance.

**ANSWER:** Circle K provides the following answer, which falls outside the scope of its proportionality objection, and in light of its vagueness objection. Because the request is vague, and after reasonable inquiry, Circle K does not have knowledge or information sufficient to answer the request because the information it knows or can readily obtain is insufficient to enable it to admit or deny. Circle K does admit that the "Don't Chase or Confront Policy" is the same policy in place in each state that Circle K operates and Circle K expects it to be implemented the same in each state in which it operates.

**REQUEST FOR ADMISSION NO. 5:** Admit that Defendant's implementation of the "Don't Chase or Confront Policy" does not vary in the relevant region based on differences in state law regarding self-defense or victim's rights laws.

**ANSWER:** Admitted. Circle K affirmatively states that it considers self-defense when enforcing the policy.

**REQUEST FOR ADMISSION NO. 6:** Admit that Defendant did not take into account Colorado's victim's rights statutes when promulgating the "Don't Chase or Confront Policy."

**ANSWER:** After reasonable inquiry, Circle K does not have knowledge or information sufficient to answer the request because the information it knows or can readily obtain is

3

insufficient to enable it to admit or deny. Specifically, the policy was implemented years ago, and across multiple acquired companies, and after reasonable investigation Circle K cannot ascertain what the original promulgators did or did not consider.

**REQUEST FOR ADMISSION NO. 7:** Admit that Defendant does not take into account Colorado's victim's rights statutes when enforcing the "Don't Chase or Confront Policy."

> **ANSWER:** Admitted.

**REQUEST FOR ADMISSION NO. 8:** Admit that Defendant did not take into account any state-specific victim's rights statutes anywhere in the country when promulgating the "Don't Chase or Confront Policy."

> **ANSWER:** After reasonable inquiry, Circle K does not have knowledge or information sufficient to answer the request because the information it knows or can readily obtain is insufficient to enable it to admit or deny. Specifically, the policy was implemented years ago, and across multiple acquired companies, and after reasonable investigation Circle K cannot ascertain what the original promulgators did or did not consider.

**REQUEST FOR ADMISSION NO. 9:** Admit that Defendant does not take into account any state-specific victim's rights statutes anywhere in the country when enforcing the "Don't Chase or Confront Policy."

> **ANSWER:** Admitted.

**REQUEST FOR ADMISSION NO. 10:** Admit that Defendant did not take into account any Colorado state laws regarding use of force in self-defense when promulgating the "Don't Chase or Confront Policy."

**ANSWER:** After reasonable inquiry, Circle K does not have knowledge or information sufficient to answer the request because the information it knows or can readily obtain is insufficient to enable it to admit or deny. Specifically, the policy was implemented years ago, and across multiple acquired companies, and after reasonable investigation Circle K cannot ascertain what the original promulgators did or did not consider. Circle K affirmatively states that it considers self-defense when enforcing the policy.

**REQUEST FOR ADMISSION NO. 11:** Admit that Defendant does not take into account any Colorado state laws regarding use of force in self-defense when enforcing the "Don't Chase or Confront Policy."

**ANSWER:** Admitted. Circle K affirmatively states that it considers self-defense when enforcing the policy.

**REQUEST FOR ADMISSION NO. 12:** Admit that Defendant did not take into account any state-specific laws regarding use of force in self-defense anywhere in the country when promulgating the "Don't Chase or Confront Policy."

**ANSWER:** After reasonable inquiry, Circle K does not have knowledge or information sufficient to answer the request because the information it knows or can readily obtain is insufficient to enable it to admit or deny. Specifically, the policy was implemented years ago, and across multiple acquired companies, and after reasonable investigation Circle K cannot ascertain what the original promulgators did or did not consider. Circle K affirmatively states that it considers self-defense when enforcing the policy.

**REQUEST FOR ADMISSION NO. 13:** Admit that Defendant does not take into account any state-specific laws regarding use of force in self-defense anywhere in the country when enforcing the "Don't Chase or Confront Policy."

**ANSWER:** Admitted. Circle K affirmatively states that it considers self-defense when enforcing the policy.

**REQUEST FOR ADMISSION NO. 14:** Admit that Defendant provided no training to employees in the relevant region during the relevant time period on when physical contact is actually permitted under the "Don't Chase or Confront Policy."

**ANSWER:** Admitted in part and denied in part. Circle K admits that its training does not specifically address when physical contact is permitted under the Don't Chase or Confront Policy. But Circle's policy and training does describe what is prohibited and therefore Circle K denies that it provides no training whatsoever about when physical contact is or is not permitted.

**REQUEST FOR ADMISSION NO. 15:** Admit that Defendant provided no training to employees in the relevant region during the relevant time period on when use of force is actually permitted under the "Don't Chase or Confront Policy."

**ANSWER:** Admitted in part and denied in part. Circle K admits that its training does not specifically address when use of force is permitted under the Don't Chase or Confront Policy. But Circle's policy and training does describe what is prohibited and therefore Circle K denies that it provides no training whatsoever about when use or force is or is not permitted.

Dated this 22nd day of June, 2022.

*s/ Thomas W. Carroll*
Thomas W. Carroll
Nicholas Hankins
Littler Mendelson, P.C.

1900 Sixteenth Street, Suite 800
Denver, CO  80202
Telephone: 303.629.6200
Facsimile: 303.629.0200
Email: tcarroll@littler.com
        nhankins@littler.com

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of June, 2023, I served the foregoing **CIRCLE K**

**STORES, INC.'S OBJECTIONS AND ANSWERS TO PLAINTIFF'S FIRST SET OF**

**REQUESTS FOR ADMISSION TO DEFENDANT** to the following:

Nicholas A. Lutz
Iris Halpern
RATHOD | MOHAMEDBHAI LLC
2701 Lawrence Street, Suite 100
Denver, CO  80205
Telephone: (303) 578-4400
Fax: (303) 578-4401
nl@rmlawyers.com
ih@rmlawyers.com

*Attorneys for Plaintiff*

*s/ Thomas W. Carroll*
Thomas W. Carroll

4862-6055-5366.2

# Exhibit 8

Mary Ann Moreno
April 12, 2023

```
1    Errata Sheet

2        See attached typed changes included herewith.

3    NAME OF CASE: MARY ANN MORENO vs CIRCLE K STORES

4    DATE OF DEPOSITION: 04/12/2023

5    NAME OF WITNESS: Mary Ann Moreno

6    Reason Codes:

7        1. To clarify the record.

8        2. To conform to the facts.

9        3. To correct transcription errors.

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   Page _____ Line _____ Reason _____

23   From _____ to _____

24

25                              Mary Ann Moreno
```

Errata Sheet

Page 97        Line 2        Reason Clarification. I was confused by the question. If the word "revenge" means "retaliation" than the answer is "Yes," however if it means general animosity than the answer remains "No."

From No. to Yes.

Page 98        Line 17        Reason Clarification. The question before states Olivia, it was Bonnie. The red handwriting is Bonnie's except the corrections I made in blue.

Page 99        Line 2-4        Reason Clarification. The question before states Olivia, it was Bonnie. The red handwriting is Bonnie's except the corrections I made in blue.

Page 110        Line 7        Reason Correction. I was confused by the question. I do believe I was fired because I was a victim of a crime and acted in self-defense. They prosecuted my attacker.

From No. to Yes.

Page 110        Line 12        Reason Correction. I was confused by the question. I do believe I was fired because I was a victim of a crime and acted in self-defense. They prosecuted my attacker.

From No. to Yes. The way I was fired and what they said to me.

Page 119        Line 7        Reason Clarification. I was not paralyzed by depression of fear, but I was worried.

From No. to No. But I was angry at Circle K for terminating me and treating me this way and I was very scared and worried about how I was going to make it without a job. I was scared I'd lose my house. I cried often, and my daughters tried to comfort me by promising me that they would make things work so I shouldn't worry and I would not lose my house. I also missed my customers, and I felt lost, because I'd been more or less working since 16. It was like my whole life suddenly changed. It felt empty. It is really important to me to work. I am still working at 75.

Page 119        Line 24        Reason Clarification. I did not have an anxiety attack. I was originally concerned I'd see him in the stores around me, because he had a girlfriend and baby living not far from my house.

From No. to No. I did not suffer an anxiety attack. But initially, after I heard he had been released, I was worried I might bump into him in a store like the Walmart near us. I was worried because he has a girlfriend and baby living in the neighborhood. I was just worried that I might see him at a store, though I wasn't generally nervous just being in my home because I had a restraining order. And when I started working at Family Dollar, I also asked to be put in the cash-registers farther away from the door because I didn't like being so close to the door.

Page 120        Line 17        Reason Clarification. See above explanation.

From <u>No.</u> to <u>I was not afraid to be out in public generally. But initially, after I heard he had been released, I was worried I might bump into him in a store like the Walmart near us. I double checked with the D.A. to make sure I still had the restraining order in place. I was just anxious and worried that I might see him at a store.</u>

# Exhibit 9

| Narrative |
| --- |

On 10/04/2020 at 1856 hours, I responded to 9489 Sheridan Blvd. (Circle K) in reference to a Robbery in progress. The above address is in the City of Westminster, County of Jefferson, and State of Colorado.

Prior to arriving on scene dispatch advised a man with a five to six inch knife in his hand was inside the Circle K waiving the knife around. Dispatch described the male as a white male in his 30s of average build, wearing a straw cowboy style hat, gray shirt, and dark colored shirt.

I arrived on scene and contacted the victim and reporting party, a 72-year old clerk at the store, Mary Ann Moreno ▮▮▮▮▮▮▮ and she told me the following:

A male, later identified as Tyler Wimmer (DOB: 09/10/1985), entered the store through the north entrance with a hunting knife in his right hand and a second knife in plastic packaging. Mary Ann gestured to show the hunting knife was roughly six inches in size and was up, pointed forward. Mary Ann said the male started demanding cigarettes from her. Mary Ann asked for his ID and Tyler said no and came around the counter, stopping with roughly a foot of space between the two.

Mary Ann advised Tyler had the knife in his right hand and used his left and to grab a package of Camel brand cigarettes. Mary Ann said she took several steps away from Tyler and did not see exactly what he took from behind the register. Mary Ann said Tyler exited the store through the north entrance and she called 911.

Mary Ann recognized Tyler as a regular customer but did not know him by name. Mary Ann said Tyler is normally polite to her but stated today he "looked different." Mary Ann said Tyler did not smell like alcohol, but she believed he may have been under the influence of drugs.

Mary Ann was visibly shaking as she spoke with me and repeated "I'm so scared" several times. Mary Ann said she has been working as a clerk for 17 years and never been so scared. Mary Ann stated she was in fear for her life when Tyler came behind the counter with the knife in his hand and thought he was going to stab her.

Tyler was located by officers outside of the store. Officers instructed Tyler to "Stop police" and he began running southbound in the northbound lanes of Sheridan Blvd. Tyler ran back into the parking lot near a Qdoba, reached into his waistband and took a knife out. Tyler threw the knife at officers and continued running. Tyler ran at a high rate of speed at a marked patrol vehicle and was given verbal commands to get on the ground and that he was under arrest. Tyler was taken to the ground and placed in custody. See supplemental reports for details.

Mary Ann did not have access to the store's video surveillance system. Mary Ann advised her store Assistant Manager, Amanda Smith (720-808-8045) and Manager, Love Jorgenson (720-923-9252) could access the video surveillance system to collect footage. Mary Ann said the Manager, Love, would be in next on 10/05/2020 at 0500 hours and leaves at 1100 hours. Mary Ann did not know when the Assistant Manager, Amanda, would be in next but said she called to notify her.

I attempted to make contact with the Assistant Manager, Amanda, but was unable to reach her by phone.

I spoke with a witness who was in the store, Larry Wagner ▮▮▮▮▮▮▮, who told me the following:

Larry was in the store and saw a white man in a straw hat (later identified as Tyler) enter the store with a five to six inch knife in his hand. Larry

| Report: r_lw1ni.frx | Printed by: (22161) LAROCHE, GEENA MICHELLE    at 10/5/2020 11:59 | Page 5 of 17 |
| --- | --- | --- |

# Exhibit 10
# 911 Call
# (Conventionally Submitted at ECF No. 65-5)

# Exhibit 11

DocuSign Envelope ID: C6EA1E9F-7B0F-4940-97D5-09ECDF38C603

---

### DECLARATION OF BONNIE MORENO

---

I, Bonnie Moreno, swear that the following is true and correct to the best of my knowledge and information:

1.      I am over the age of 18 and am otherwise competent to testify.  I make the following statements based upon my personal knowledge, and if called upon to testify as to them, I could and would do so truthfully and competently.

2.      This declaration is made voluntarily. I understand that it may be used in a lawsuit.  I have not been promised any benefit, coerced, or threatened in any way that would change my testimony.

3.      Before signing this declaration, I was provided an opportunity to change and correct it.  I have made all changes necessary to make this declaration a true statement describing my own experiences.

4.      I am Mary Ann Moreno's daughter-in-law and I'm married to her son, Brandon Moreno. I lived across the street from the Moreno family growing up and have known Ms. Moreno and my husband for most of my life.

5.      For as long as I can remember, Mary Ann has worked in retail. Even as a child, I recognized that she was a notoriously hard worker. I have always admired my mother-in-law for her drive, strength, and confidence. She never allowed others to push her around.

6.      Throughout the time she worked at Circle K, Mary Ann was loved by her customers and always went the extra mile. Whenever I stopped by the Circle K while Mary Ann was working, it was obvious that she was adored by her customers. Many of her regular customers only came into the store when they knew that she was working.

DocuSign Envelope ID: C6EA1E9F-7B0F-4940-97D5-09ECDF38C603

7.      My mother-in-law made a lot of sacrifices for Circle K and often missed family events like holidays and birthdays to go to work. She was extremely dependable and was there for Circle K every time they needed her. Anytime a co-worker didn't show up for work, management knew they could call on Mary Ann to cover the shift.

8.      She essentially had all the responsibilities of a manager; however, she did not benefit from any additional respect or perks. Despite this, I never heard her whine or complain about her job the entire time she worked there.

9.      Notably, despite the significant length of time that she worked for Circle K, my mother-in-law was never written up or disciplined.

10.     Before the incident on October 4, 2020, I had never witnessed an instance of my mother-in-law being fearful or exhibiting signs of mental illness. Rather, she had always been admirably confident and emotionally stable. She was our family's rock. Since the attack occurred, she is not the same person. It is as though all her strength and confidence evaporated into thin air.

11.     On the night of the incident, my mother-in-law called me to tell me that the Circle K had just been robbed. She said that after the assailant threatened her with a knife, she pushed him and the knife away in self-defense.

12.     I could tell right away that she was very upset and shaken up from the attack, so I immediately left my home to be with her at the Circle K and provide comfort because it was clear that none of her managers or coworkers were going to show up.

13.     When I arrived at Circle K just after the police had departed, my mother-in-law was in an unrecognizable state of shock. She was crying, shaking profusely, and was very fearful and anxious. I could tell that she was disoriented and struggling to concentrate because she wasn't making sense and she kept repeating herself to me and the customers.

DocuSign Envelope ID: C6EA1E9F-7B0F-4940-97D5-09ECDF38C603

14.      Despite being traumatized and terrified, with nobody from Circle K there to support her or cover her shift, my mother-in-law had no choice but to continue assisting customers with their purchases and fulfilling her other responsibilities.

15.      She was so visibly distraught and affected that even the customers were concerned for her well-being and kept asking if she was alright. Some patrons even insisted on helping her with bagging customers' purchases and her other duties. It was obvious to everyone at the store that Mary Ann was not in a state where she should be working.

16.      Even though my mother-in-law was always there when Circle K managers needed her help, they were not there for her when her life was threatened at work. When she called at least three Circle K managers for assistance, they refused to provide her immediate help and did not even demonstrate any concern for her wellbeing. The first manager she called said they were "too far away to come help" and told her to call someone else. The next manager she called didn't answer.  This pattern continued until the main store manager, whose name I do not know, finally agreed to help.

17.      Well aware that the situation was urgent, this manager still took a very long time to get to the store. When he finally arrived wearing plain clothes, he did not even bother to ask if Mary Ann was okay. Instead, he aggressively beelined toward her and started demanding that she answer questions about the robbery.

18.      From the moment he arrived, I could tell that the manager was angry. He did not show any concern or empathy toward Mary Ann; rather, his concern was entirely regarding the sanctity of the store. Immediately he wanted to know, "What did he take?" with respect to any inventory being stolen by the assailant.

DocuSign Envelope ID: C6EA1E9F-7B0F-4940-97D5-09ECDF38C603

19.     The manager went to the back of the store to look at the security footage and stated that he did not see anything that showed a robbery occurred. My mother-in-law clarified with him what time the robbery had happened at, because she thought he may have been looking at the wrong part of the footage. He then went back to review the footage again and returned to tell Mary Ann that he did not see a knife on the surveillance footage. This really upset her because she had just defended herself from the knife, and it triggered her anxiety further.

20.     When he saw me, the manager aggressively asked, "Who are you?" When I told him that I was my mother-in-law's daughter, he insisted that I leave the store because Circle K "couldn't protect me" if another robbery were to occur.

21.     I explained to the manager that my mother-in-law was traumatized, and I did not want to leave her alone. If I was not safe being in the store, she surely was not safe being alone there either.

22.     Even when I told him I did not care if Circle K protected me, the manager continued to rudely insist that I leave the store.

23.     After another female manager showed up to accompany my mother for the rest of her shift, I agreed to leave. However, given how shaken up and disoriented she was, I did not think it would be safe for Mary Ann to drive herself home, so I went to a nearby Walmart parking lot and waited for her shift to be done.

24.     My mother-in-law's trauma was worsened when she was terminated from her job a week later. It was as if she was robbed for a second time, but this time Circle K was the assailant. She was cut off from her the income, health insurance, and the pension she had been adamantly contributing to for 16 years. Circle K stole her community, routine, and sense of self by firing her.

DocuSign Envelope ID: C6EA1E9F-7B0F-4940-97D5-09ECDF38C603

25.     My mother-in-law explained to me that according to Circle K, she was fired for pushing the attacker away. I was shocked to hear that Circle K was penalizing my mother-in-law for protecting herself and other customers in such a life-threatening situation.

26.     After she was fired, my mother-in-law became a shell of her past self.  She immediately became very depressed and anxious and isolated herself from others. To this day, she still has not recovered.

27.     My mother-in-law was once lively and bright but is now overcome with constant fear. She is no longer confident and bold and is afraid of going out in public. When she does leave the house, she is always looking over her shoulder and is extremely apprehensive of strangers.

28.     Our whole family has noticed this change in my mother-in-law, and it has been very difficult for us to witness. My son has asked me multiple times what is wrong with my mother-in-law and checks in with her to see if she is okay constantly when he is around her.

29.     Mary Ann has had to seek therapy because the incident and termination of her employment at Circle K has affected her mental health so severely. I believe my mother-in-law will need to receive counseling for the rest of her life as a result.

30.     It took Mary Ann a long time to feel like she could return to work. She now works at the Dollar Tree part-time because she is not able to work a full-time position while dealing with the ongoing effects of her trauma. She is only able to work when another person is in the building with her. Being back in a retail environment is very uncomfortable and triggering for her.

31.     The developing criminal justice process has caused Mary Ann to spiral every time she receives an update about the case or is asked to retell the story of what happened to her. When the assailant was released from jail, she was extremely upset and had a panic attack.

DocuSign Envelope ID: C6EA1E9F-7B0F-4940-97D5-09ECDF38C603

32.     It has been more than a year since the attack occurred, and the trauma continues to debilitate my mother-in-law today. I fear that she may never recover.

33.     I, Bonnie Moreno, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 and the laws of the State of Colorado that the preceding is true and correct, based on my personal knowledge.

Executed on the _22nd_ day of November 2021.

DocuSigned by:

Bonnie Moreno
0DF27EACCB684FA...

Bonnie Moreno

# Exhibit 12

DocuSign Envelope ID: 604883DB-7711-441E-9457-6B9FA663F5BC

---

## DECLARATION OF OLIVIA VERELA ROAN

---

I, Olivia Verela Roan, swear that the following is true and correct to the best of my knowledge and information:

1.   I am over the age of 18 and am otherwise competent to testify. I make the following statements based upon my personal knowledge, and if called upon to testify as to them, I could and would do so truthfully and competently.

2.   This declaration is made voluntarily. I understand that it may be used in a lawsuit. I have not been promised any benefit, coerced, or threatened in any way that would change my testimony.

3.   Before signing this declaration, I was provided an opportunity to change and correct it. I have made all changes necessary to make this declaration a true statement describing my own experiences.

4.   I am Mary Ann Moreno's daughter. My mother and I have lived together the majority of my life, and have lived in the same house for the last ten years of her time as an employee of Circle K.

5.   My mother has worked as a cashier in retail most of her life and is without a doubt the hardest worker I know. Since I was a child, I have admired my mother for her resilience, confidence, and unparalleled work ethic.

6.   Throughout the time she worked for Circle K, my mother was dependable and went above and beyond to ensure that every customer received the best possible quality service.

7.   On a regular basis, she removed all of the merchandise from the store's fixtures in order to clean the shelves, checked for missing labels, and removed damaged or expired goods. When

DocuSign Envelope ID: 604883DB-7711-441E-9457-6B9FA663F5BC

it snowed, my 72-year-old mother shoveled the sidewalks around the store, and when an employee didn't show up for work, even on holidays or her birthday, she covered the shift without question. Even when circumstances were difficult for her, my mother would still put supporting Circle K first. After my father died, my mother came back to work full-time very shortly after his death.

8.   However, when my mother would request time off because she was sick, the managers of Circle K would give her a hard time. Because Circle K made their employees feel guilty for taking time off, she often went to work while sick. One time she went to work while she had walking pneumonia.

9.   Even though her extra efforts were rarely acknowledged, my mother never complained. When I asked her why she worked so hard, she told me, "If I don't do it, nobody else will."

10. My mother was steadfast and remained energetic and outgoing toward customers. Whenever I stopped by the Circle K while my mother was working, the customers knew her by name and praised her for being good at her job.

11. I never saw my mom show any fear or sign of mental illness until October 4, 2020, when she was robbed at knife point while working at Circle K.

12. I was in Granby, Colorado with my children on October 4, 2020, when my mother called and told me that she had just been held at knife point and robbed while working at the Circle K.

13. Fearing for her life, she said that she had pushed the man away to protect herself when he came towards her with the knife.

14. From the tone of her voice, it was obvious that my mother was scared and shaken up; however, she continued to comfort and assist customers while she waited for the police to arrive.

DocuSign Envelope ID: 604883DB-7711-441E-9457-6B9FA663F5BC

15. Even though she had just been traumatized and threatened, my mother was required to wait several more hours until a manager showed up to relieve her. I was shocked that she was expected to keep the store open and finish her shift while the person who had attempted to stab her was still at large.

16. My mother insisted that my family and I stay in Granby when I stated that we would drive to Denver that night to be with her. She feared for our safety while driving in the mountains at night.

17. When we made it back to Denver, my mom was extremely distraught. She had a look of fear in her eyes, was visibly nervous, and shaking.

18. When Circle K terminated my mother a week after the robbery, she was further traumatized by the abrupt loss of the income, community, and routine she had established during her 16-year career.

19. After she was fired, my mother became isolated and depressed. Over a year later, she is still deeply depressed. She is no longer the same person she was before the robbery and her termination from Circle K.

20. My once energetic and optimistic mother is now paralyzed by anxiety and depression. She used to be confident and fearless but now she rarely leaves the house and is afraid of strangers, especially men.

21. Everyone in my family has had to change the way they behave when my mother is around because she is triggered by loud noises and sudden movements.

22. She has completely lost her sense of personal safety and was unable to return to work for several months. She now works at the Dollar Tree but can only go to work so long as another employee is in the building with her.

DocuSign Envelope ID: 604883DB-7711-441E-9457-6B9FA663F5BC

23. The ongoing criminal justice process has been a nightmare. She is triggered each time she receives an update from the District Attorney, and she had an anxiety attack when her assailant was released from custody.

24. My mother has had to seek counseling because her mental health has been affected so severely by the attack and termination of her employment at Circle K.

25. Even though more than a year has passed, the psychological effects of the robbery and her sudden termination have not yet begun to fade.

I, Olivia Verela Roan, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 and the laws of the State of Colorado that the preceding is true and correct, based on my personal knowledge.

Executed on the <u>9</u> of November 2021.

DocuSigned by:

*Olivia Verela Roan*

1350AFC3BC1A4CA...

Olivia Verela Roan

# Exhibit 13

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-02327-NYW-STV

_____

MARY ANN MORENO,

                 Plaintiff,

      v.

CIRCLE K STORES, INC.,

                 Defendant.

_____


          Pursuant to Notice and pursuant to Rule 30 of

the Federal Rules of Civil Procedure, the deposition of

CRAIG HOLMES, was taken on behalf of the Plaintiff by

counsel from the offices Rathod Mohamedbhai of at 10:00

a.m. MST on June 22, 2023 and reported by Ruth Collins

of MAGNA LEGAL SERVICES (866) 624-6221.



Page 23

1      Q.    If a human resources manager makes a

2  recommendation -- let me rephrase that.

3      A.    If a human resources manager makes a

4  recommendation for disciplinary action or termination of

5  a store manager or up within our system, yes.

6      Q.    And if it's below the store manager level you

7  don't have to be involved in approving it?

8      A.    Correct.

9      Q.    And do you as a regional operations director

10  help draft any policies at all at Circle K?

11      A.    No.

12      Q.    All right.  Can you describe -- I am going to

13  switch topics really quickly to talk a little bit more

14  about the confront and chase policy.

15          Did you review the confront and chase policy

16  with the attorneys in preparation for this deposition?

17      A.    Yes.

18      Q.    And what is Circle K's chase and confront

19  policy?

20      A.    Do you have a copy of the policy?  You can

21  refer to it as written.

22      Q.    I do.  I am trying to think.  I typically

23  would like to just share it, but just really quickly,

24  let's go off the record really quickly.

25          (Off record.)



Page 37

1    policy before?

2          A.    Yes.

3          Q.    What -- you did not have a role?

4          A.    I did have a role.

5          Q.    Okay.  So how -- let's just talk about your

6    entire time as a operations director.  How many times do

7    you think you have been consulted on a termination for a

8    violation of a confront and chase policy approximately?

9          A.    Maybe 20.

10         Q.    Okay.  And have you -- and you have already

11   said you've never disagreed about the termination

12   recommendation while at Valero or Circle K, is that

13   correct?

14         A.    Correct.

15               MR. HANKINS:  Object for form.

16         Q.    (By Ms. Halpern) And was there ever a time

17   when an employee at Circle K violated the confront and

18   chase policy and they were not terminated?

19         A.    No.

20         Q.    And was there ever a time that you were

21   involved in where an employee made physical contact with

22   a robber and was not terminated?

23         A.    No.

24         Q.    No matter what the circumstances of that

25   contact?



Page 44

1      A.   So the HR manager, Amy Harvey, the market

2   manager, Driss Aamoud both agreed and collaborated that

3   the policy on confront had been breached.  And I agreed

4   with both their opinions.  So collaboratively the three

5   of us agreed to separate.

6      Q.   Was that the first time you spoke with Amy

7   Harvey about Ms. Moreno's termination?

8      A.   I spoke with Amy Monday morning.  And then the

9   three of us convened Monday afternoon, after I had

10  spoken with Driss again.  We had probably two to three

11  conversations.

12     Q.   Were they are all on Monday?

13     A.   Yes.

14     Q.   Did you meet in person, or was this over the

15  phone?

16     A.   Myself and Ms. Harvey met in person, and on

17  the phone.  And Driss was on the phone.

18     Q.   Did you and Ms. Harvey work in the same

19  location?

20     A.   Yes.

21     Q.   Where was that?  The lights just went out on

22  your --

23     A.   That's because I haven't moved.  If I wave my

24  arm, we are good.

25          I am sorry.  I got lost after waving my arm.



Page 57

1    effect at Circle K?

2        A.   There is a written policy that states, light

3    of day.  You respect the people you work with.  It's

4    just a core value.

5        Q.   And so a coworker dispute that turned

6    physical, would be investigated under that policy?

7        A.   Yes.  It wouldn't necessarily be considered a

8    confront and chase, because confront and chase is

9    exterior.  You are talking about an interior issue.

10       Q.   And just a little bit more about kind of your

11   history at Circle K and what you recall about other

12   incidents, has an employee who has been a victim of a

13   crime, are you aware of -- scratch that.

14            Are you aware of any employees -- I think

15   probably already asked this -- are you aware of any

16   employees making physical contact, no matter what the

17   situation, with a, you know, a customer or a robber that

18   wasn't terminated after reporting it to the company

19   employees?

20            MR. HANKINS: Object to form.

21       Q.   (By Ms. Halpern) I will break that down.

22   After reporting it to the police.  Well, I will rephrase

23   the question now.

24            Okay.  Mr. Holmes, are you aware of any

25   employee who reportedly has been the victim of a crime



Page 58

1    to the police who made physical contact with a robber or

2    customer that was retained by Circle K?

3         A.   No.

4         Q.   And the same question, but who reported the

5    crime to the company, any employee retained?

6         A.   I do not know.  If they didn't report it to

7    the company, how would I know?

8         Q.   Oh, I said if they reported to the company.

9         A.   No.  I am not aware.

10        Q.   They have all been terminated?

11             MR. HANKINS:  Object to form.

12        A.   That I am aware of.

13        Q.   (By Ms. Halpern) Have you described to me all

14   of the training you have received on Circle K's chase

15   and confront policy?

16        A.   Yes.

17        Q.   All of the -- well, let me back up one

18   question.

19             So in the 20 or so instances that you are

20   recalling, did you always look at video footage before

21   making the determination that an employee should be

22   terminated for violating the chase and confront policy?

23        A.   Yes.

24        Q.   Okay.  And are you aware of any reasons why

25   Circle K would, you know, preserve some video footage



Page 63

```
1                  C-E-R-T-I-F-I-C-A-T-E

2    STATE OF COLORADO

3    COUNTY OF GUNNISON

4              I, Ruth E. Collins, Certified Shorthand

5         Reporter within and for the State of Colorado,

6         certify that the above-named witness was sworn,

7         that the deposition of CRAIG HOLMES was

8         taken in machine shorthand and thereafter

9         transcribed;

10             That it is true and correct;

11             And that it was taken on June 22,

12        2023 in Gunnison County, State of Colorado

13        pursuant to Notice and Agreement by ZOOM

14        teleconference, and that said witness has

15        requested to read and sign the deposition

16        transcript;

17             That I am not an attorney

18         for nor relative of any of said parties or

19         otherwise interested in the event of said action.

20             IN WITNESS WHEREOF, I have hereunto

21        set my hand and official seal this 25th day of

22        June, 2023.

23        _____
                    Ruth E. Collins
24                  Ruth E. Collins, CSR RPR

25
```



# Exhibit 14

RMBU
Confront/Chase Terminations
Oct. 1, 2018-Oct. 24, 2021

| Worker | Location | Termination Date |
|---|---|---|
| Samuel Price (798357) | Store 2703949 Oklahoma City OK | 19-Dec-2018 |
| Walter Catalano (284244) | Store 2705317 Albuquerque NM | 28-Dec-2018 |
| Seth Medina (287336) | Store 2721602 Hugoton KS | 04-Jan-2019 |
| Kathryn Hutchison (2121062) | Store 2741285 Alamogordo NM | 09-Feb-2019 |
| Jonathan Delgado (283129) | Store 2706001 Las Cruces NM | 22-Feb-2019 |
| Jonathon Banks (292510) | Store 2721628 Lawrence KS | 01-Apr-2019 |
| Estephania Rincon (3010145) | Store 2703970 Oklahoma City OK | 19-Apr-2019 |
| Christopher Harrison (On Leave) (809079) | Store 2709848 Colorado Springs CO | 29-May-2019 |
| Zachary Feehan (On Leave) (3038298) | Store 2703956 Oklahoma City OK | 19-Jun-2019 |
| Howard Wynd (On Leave) (856262) | Store 2703977 Oklahoma City OK | 30-Aug-2019 |
| Douglas Stephens (3068852) | Store 2741235 Albuquerque NM | 11-Sep-2019 |
| Toriana Biglow (3069352) | Store 2703980 Oklahoma City OK | 12-Sep-2019 |
| David Durham (On Leave) (3050341) | Store 2703996 Oklahoma City OK | 16-Sep-2019 |
| Jade Harrington (3006794) | Store 2703985 Oklahoma City OK | 06-Oct-2019 |
| Kristie Mott (3037980) | Store 2704019 Okmulgee OK | 06-Nov-2019 |
| Samuel Urista (919647) | Store 2706098 El Paso TX | 18-Nov-2019 |
| Ryan Stagray (On Leave) (3037847) | Store 2740692 Colorado Springs CO | 10-Dec-2019 |

EXHIBIT

SF

21

6-20-23

PENGAD 800-631-6989

RMBU
Confront/Chase Terminations
Oct. 1, 2018-Oct. 24, 2021

| Worker | Location | Termination Date |
|---|---|---|
| Jose M Guerrero Jr (3071741) | Store 2741748 El Paso TX | 27-Dec-2019 |
| Dena Olsen (309874) | Store 2709844 Thornton CO | 19-Mar-2020 |
| Donald Haworth (175062) | Store 2703992 Moore OK | 10-Apr-2020 |
| Chadwick Hayes (3021651) | Store 2708942 Albuquerque NM | 13-Apr-2020 |
| Reginald Haygood (3015523) | Store 2706282 Albuquerque NM | 05-May-2020 |
| Bianehi Hernandez (3075543) | Store 2706282 Albuquerque NM | 05-May-2020 |
| Georgina Lujan (3106672) | Store 2701418 El Paso TX | 04-Jun-2020 |
| Monique Long (3104788) | Store 2703996 Oklahoma City OK | 10-Jun-2020 |
| NaQuan Hopkins (3108942) | Store 2703996 Oklahoma City OK | 10-Jun-2020 |
| Benjamin Hammack (On Leave) (3063042) | Store 2703949 Oklahoma City OK | 12-Jun-2020 |
| Allen Lafleur (On Leave) (3092680) | Store 2703959 Oklahoma City OK | 16-Jun-2020 |
| Elisa Hall (3049213) | Store 2741270 El Paso TX | 16-Jun-2020 |
| Angel Vera Jr (298169) | Store 2706112 El Paso TX | 02-Sep-2020 |
| Martin Portillo (234094) | Store 2706307 El Paso TX | 11-Sep-2020 |
| Daniel Duarte (878289) | Store 2703985 Oklahoma City OK | 16-Oct-2020 |
| Doug Walker (On Leave) (3145192) | Store 2744116 Grand Junction CO | 22-Oct-2020 |
| Rita Colvin (On Leave) (3153483) | Store 2709866 Boulder CO | 11-Jan-2021 |
| LaTasha Smith (3053547) | Store 2708940 Albuquerque NM | 09-Mar-2021 |

RMBU
Confront/Chase Terminations
Oct. 1, 2018-Oct. 24, 2021

| Worker | Location | Termination Date |
|---|---|---|
| Darco Robles (3182663) | Store 2700213 El Paso TX | 13-Apr-2021 |
| Jose Salcido (3094842) | Store 2708516 El Paso TX | 03-May-2021 |
| Anthony sanchez (On Leave) (3092874) | Store 2703290 Denver CO | 24-Aug-2021 |
| Adrianna Medina (3212629) | Store 2708940 Albuquerque NM | 07-Sep-2021 |
| quratul khan (On Leave) (3024418) | Store 2741119 Denver CO | 16-Sep-2021 |
| Terry Tafelmeyer (On Leave) (2196134) | Store 2744086 Denver CO | 15-Oct-2021 |
| Andy Molina (3216279) | Store 2741264 El Paso TX | 16-Oct-2021 |
| Bridget Williams (On Leave) (3044949) | Store 2740696 Aurora CO | 19-Oct-2021 |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 22-cv-02327-NYW-STV

MARY ANN MORENO,

     Plaintiff,

v.

CIRCLE K STORES, INC.,

     Defendant.

---

## PLAINTIFF'S REPLY IN SUPPORT OF HER MOTION FOR PARTIAL SUMMARY JUDGMENT

---

Defendant Circle K's response to Plaintiff Mary Ann Moreno's motion for summary judgment on Defendant's failure to mitigate defense neglects to raise any genuine dispute of material fact. Indeed, despite failure to mitigate being Defendant's burden to prove at trial, Defendant points to **no** evidence it adduced during discovery to support the defense. Despite the pandemic, Ms. Moreno started seeking other employment immediately after Circle K fired her. Ms. Moreno accepted the first job offer she received, obtaining an essentially identical position to the one she had with Circle K – a convenience store clerk. Furthermore, with respect to her emotional distress, Ms. Moreno participated in almost a year of therapy. Given the paucity of evidence produced by Defendant to support its burden at trial, the Court should grant Ms. Moreno's motion for partial summary judgment with respect to Defendant's failure to mitigate affirmative defense.

## I.    STATEMENT OF FACTS

### A. Plaintiff's Reply Concerning Undisputed Facts ("RCUF")

Defendant admits to 44 of Plaintiff's statements of undisputed material fact. Defendant denies or denies in part the remaining 19 of Plaintiff's statements of undisputed material fact.

Within the latter category, many of Defendant's denials are not true denials, but only add additional information that does not dispute Plaintiff's facts. Plaintiff provides a reply to certain of Defendant's disputes below, focusing on those true disputes that are relevant to her further arguments below:

**RCUF 17**: Defendant's denial does not dispute that Mr. Aamoud stated that Ms. Moreno abided by Circle K policy by refusing the sale of cigarettes to Wimmer.

**RCUF 22**: Defendant's denial does not negate that the video footage shows Ms. Moreno trapped on three sides with Wimmer blocking her exit, supporting her deposition testimony that she did not run because she had nowhere to run to escape. *See Register 1*, ECF No. 65-3 at 6:56:10-6:56:13; *Moreno Dep. Tr.*, ECF No. 65-6 at 70:4-7.

**RCUF 24**: Defendant's denial does not negate that the video footage supports Ms. Moreno's deposition testimony that she was afraid for her life and defending herself. *See Register 1*, ECF No. 65-3 at 6:56:16-6:56:22; *Moreno Dep. Tr.*, ECF No. 65-6 at 111:13-16; 124:5-18.

**RCUF 28**: When Ms. Jorgensen did not arrive at the store for over an hour and Ms. Moreno could not get in contact with Amanda, whom Ms. Jorgensen had told Ms. Moreno to try calling, Ms. Moreno called Mr. Aamoud. *See* **Ex. 1**, *Moreno Dep. Tr.*, at 74:13-76:13.

**RCUF 33**: Defendant's denial does not dispute that Circle K's sole stated reason for terminating Ms. Moreno was for her contact with Wimmer on October 4, 2020. *See Rule 30(b)(6) Dep. Tr.*, ECF No. 65-1 at 98:23 to 99:3.

**RCUF 39:** Defendant's denial does not dispute that Ms. Moreno enlisted her daughter's help so that she could more effectively search for a job starting right after she was fired. *See Moreno Dep. Tr.*, ECF No. 65-6 at 27:8 to 28:17; *Circle K's Response to Plaintiff's Motion for Partial Summary Judgment* (hereinafter *"Response"*), ECF No. 70 at 7, ¶ 41.

**RCUF 42**: Defendant's denial does not dispute that Ms. Moreno did not remember exactly how many positions she applied for, but it was "[m]aybe ten or more." *Moreno Dep. Tr.*, ECF No. 65-6 at 28:22-25.

**RCUF 55**: Defendant's denial does not dispute that Ms. Moreno's responses to Defendant's Interrogatories No. 4-7 are **not** evidence produced **by Defendant** to prove its affirmative defenses.

**RCUF 59**: Defendant's general statement that Ms. Moreno "is likely to have information about her claims, the allegations in the Complaint and Jury Demand ("Complaint"), [and] Circle K's defenses thereto," *see Circle K's Initial Disclosures*, ECF No. 65-14 at 2, is insufficient to endorse her as a witness regarding Defendant's failure to mitigate affirmative defense.

### B. Plaintiff's Response Concerning Disputed Facts ("RCDF")

**RCDF 62**: Admitted with clarification. Ms. Moreno has a fear of driving and does not drive far distances. *Moreno Dep. Tr.*, ECF No. 65-6 at 27:8-13. She lives very close to the Circle K store where she worked. **Ex. 1**, *Moreno Dep. Tr.* at 84:5-10. Ms. Moreno lives in an area with many businesses around her that do not require far driving distances to get to. *Id.* at 29:19 to 30:17. Ms. Moreno has been working in the retail business since she was 17 years old and does not have a high level of education. *Id.* at 28:3-8; 116:24 to 117:1.

**RCDF 63**: Denied. Ms. Moreno applied to stores like Walmart that are "always hiring." *Id.* at 25:17-27:2. She applied for jobs by completing online applications on the company websites. *Id.*

**RCDF 64**: Admitted.

**RCDF 65**: Admitted with clarification. Ms. Moreno has been working in the retail business since she was 17 years old and does not have a high level of education. *Id.* at 28:3-8; 116:24 to 117:1. Ms. Moreno does not read very well. *Id.* at 100:10. Ms. Moreno has no technological proficiency: she has a cellphone in case of emergency but does not know how to use it well, does not send text messages, and does not know how to use email. *Id.* at 19:5-12.

3

**RCDF 66**: Denied. Ms. Moreno stated in her deposition that she did not remember exactly how many positions she applied for, but it was "[m]aybe ten or more." *Moreno Dep. Tr.*, ECF No. 65-6 at 27:8-13.

**RCDF 67-73**: Admitted.

**RCDF 74**: Admitted with clarification. Ms. Moreno discussed the negative effects of both the robbery and getting fired with her therapist. *See* **Ex. 2**, *Wand Notes*, at 1-2.

**RCDF 75**: Admitted in part and denied in part as incomplete. Ms. Moreno received approximately a year of therapy session approximately once a week for much of 2021. *See Plaintiff's Third Supplemental Discovery Responses*, ECF No. 65-11 at 14. These sessions were prescribed by her victim's rights advocate and the District Attorney's office. *Id*. Ultimately, she stopped because it was not helpful. *Id.* They were the first counseling sessions she attended in her life. *Id.*

**RCDF 76**: Admitted.

**RCDF 77**: Admitted with clarification. Ms. Moreno stopped attending therapy because it was not helpful. *Id.*

## II.   ARGUMENT

### A. The Court Should Strike Defendant's Affirmative Defense of Failure to Mitigate Economic Damages

#### 1. *Legal Standard*

To establish a failure to mitigate defense under Colorado law, "[i]t is the defendant's duty to prove the employee did not use reasonable diligence in seeking comparable alternative employment when requesting the court not award back pay for any period." *Bonidy v. Vail Valley Ctr. for Aesthetic Dentistry, P.C.*, 232 P.3d 277, 284 (Colo. App. 2010). "Mitigation or failure to mitigate is an affirmative defense that may be raised by the defendant and the **defendant bears the burden of proving the defense**." *Fair v. Red Lion Inn*, 943 P.2d 431, 437 (Colo. 1997) (emphasis added). At

4

the summary judgment stage, Ms. Moreno "may meet her initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law simply by pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's affirmative defense." *Mason v. Brigham Young Univ.*, No. 06-cv-826-TS, 2008 WL 312953, at *1 (D. Utah Feb. 1, 2008) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F. 3d 664, 670-71 (10th Cir. 1998) (citations and quotations omitted)).

As Colorado courts have recognized in the context of employment litigation, "the defense of failure to mitigate damages **will not be presented to the jury unless the trial court determines there is sufficient evidence to support it**." *Fair*, 943 P.2d at 437 (emphasis added). Courts recognize this principle in contexts outside of employment as well. *See Hildyard v. W. Fasteners, Inc.*, 522 P.2d 596, 600 (Colo. App. 1974) (affirming trial court finding that there was insufficient evidence of failure to mitigate damages to warrant submission of issue to the jury when plaintiff declined to undergo surgery that offered "only a possibility of cure"); *Burt v. Beautiful Savior Lutheran Church of Broomfield*, 809 P.2d 1064, 1068 (Colo. App. 1990) (affirming trial court ruling that instruction on mitigation of damages was not appropriate where plaintiff did not make repairs at first instance because there was no indication that the plaintiff could have taken precautions to prevent the damage or that he was financially able to make the initial repairs).

Ms. Moreno moved for summary judgment because Defendant failed to put forth any evidence of other positions Ms. Moreno was qualified for and could have discovered but failed to find and apply for. *See Plaintiff's Motion for Partial Summary Judgment* (hereinafter, "*Motion*"), ECF No. 65 at 11-14. In response, Circle K argues that it is not required to put forth any evidence of an essential element of its defense, arguing that Colorado law does not require any evidence of other positions. *See Response*, ECF No. 70 at 10-11. Circle K is incorrect.

### 2.  *Each of Defendant's Arguments Fails*

#### i.   **The Colorado Standard Mirrors the Federal Standard**

Defendant's central argument implies that the case law and standards Plaintiff invokes in her

analysis come from federal law, not state law, and are thus not persuasive or controlling. *Response*,

ECF No. 70 at 10-11. However, although purporting to reject Plaintiff's statement of law,

Defendant cites to no caselaw from state court stating what it believes the legal standard *should be*.

Defendant simply states that Colorado law does not require Circle K to prove the existence of other

suitable positions to establish its failure to mitigate defense, without any legal source citation. *Id.* at

11. That absence is telling, given that the state and federal standards for failure to mitigate, at least

in the employment setting, are virtually identical. *See Bonidy*, 232 P.3d at 284. Just like federal law,

under Colorado law, "[i]t is the defendant's duty to prove the employee did not use reasonable

diligence in seeking comparable alternative employment when requesting the court not award back

pay for any period." *Id.*; *cf. Jolley Potter Ranches Energy Co., LLC v. TEP Rocky Mtn. LLC*, 2020

WL 12597901, at *4 n.3 (D. Colo. Nov. 12, 2020) ("Colorado courts, like federal courts, generally

place the burden of proving affirmative defenses on the party raising them.").

The federal standard for the failure to mitigate defense can be found in *EEOC v. Sandia*

*Corp.*, 639 F.2d 600, 627 (10th Cir. 1980), where the court stated that "the employer has the burden

of showing that the discriminatee did not exercise reasonable diligence in mitigating damages

caused by the employer's illegal action." (quoting *United States v. Lee Way Motor Freight, Inc*.,

625 F.2d 918, 937 (10th Cir. 1979). The *Sandia* court then went on to explain that, under this

standard, the "defendant must establish (1) that the damage suffered by plaintiff could have been

avoided, i.e. that there were suitable positions available which plaintiff could have discovered and

for which he was qualified; and (2) that plaintiff failed to use reasonable care and diligence in

seeking such a position." *Id.* (quotation omitted)*.*

The Colorado standard mirrors this federal standard. Colorado requires the Defendant to prove that an employee "did not use reasonable diligence in seeking **comparable alternative employment**." *Bonidy*, 323 P.3d at 284 (emphasis added). Colorado thus requires the Defendant to make a showing regarding the existence of "comparable alternative employment." Defendant makes no argument that this "comparable alternative employment" differs in any way from the "suitable positions" *Sandia* requires the defendant to show.

The caselaw in failure to mitigate employment damages is more developed in the federal context, leading Colorado courts to find federal caselaw persuasive. For instance, the Colorado Supreme Court in *Fair*, 943 P.3d at 439-40, found persuasive *Giandonato v. Sybron Corp.*, 804 F.2d 120 (10th Cir. 1986), a federal case brought under the Age Discrimination in Employment Act. The *Fair* court specifically recognized the similarities between the Colorado and federal duty to mitigate stating that, "[a]lthough *Giandonato* involved a statutory duty to mitigate and such a statutory duty does not exist here, **we still find *Giandonato* compelling because our Colorado precedent recognizes a similar affirmative duty to mitigate or minimize damages**." *Fair*, 943 P.2d at 430 n.9 (emphasis added). The *Fair* court additionally looked to an Equal Employment Opportunity Commission case, *Ford Motor Co. v. EEOC*, 458 U.S. 219 (1982), noting that though "[t]here are no similarly controlling Colorado statutes [to the one the Supreme Court construed in *Ford Motor Co.*,] we find the principles announced in *Ford Motor Co*. persuasive."

"It is [Circle K's] duty to prove [that Ms. Moreno] did not use reasonable diligence in seeking comparable alternative employment when requesting the court not award back pay for any period." *Bonidy*, 232 P.3d at 284. It is Defendant's obligation to put forth **any** evidence of "comparable alternative employment" that Ms. Moreno could have applied for but did not. Defendant has not done so and does not argue that it has. *See Response*, ECF No. 70 at 10-11. Instead, Defendant argues it has no obligation to put forth evidence of other positions Ms. Moreno

failed to apply for. *Id.* This, however, ignores the requirements under Colorado law and the persuasive value Colorado courts place on federal case law in this context.

### ii.   Ms. Moreno Made More Than Sufficient Efforts to Mitigate Economic Damages

The Court should dismiss Defendant's failure to mitigate affirmative defense on the basis that Defendant has not put forth any evidence of other suitable positions that Ms. Moreno failed to seek out. However, if the Court looks at Ms. Moreno's efforts to secure employment after she was fired, doing so provides an additional basis to dismiss Defendant's affirmative defense. Ms. Moreno made tremendous efforts to secure another job as a 72-year-old woman, with little education, limited reading proficiency, no computer skills, and with geographic limitations, all in the middle of the COVID-19 pandemic after suddenly losing her sixteen-year position at Circle K.

Ms. Moreno started looking for a job shortly after she was fired. *See* SUMF ¶ 39.[1] Ms. Moreno's daughter helped her search for jobs and fill out job applications because Ms. Moreno is not adept at using the computer. SUMF ¶ 41. Because of her fear of driving, Ms. Moreno does not drive far distances. SUMF ¶ 40; RCDF ¶ 62. Ms. Moreno does not know how many jobs she applied for, but thought it was upwards of ten. SUMF ¶ 42; RCUF ¶ 42. This included positions at Walmart and Hallmark. *Id.* Ms. Moreno did not hear back from any store besides Dollar Tree, and she took the first offer of employment she received after being fired from Circle K. SUMF ¶ 43. Defendant concedes that the two positions are "similar." *Response*, at 11. She started working at Dollar Tree on January 17, 2021. SUMF ¶ 44. This is only a little more than three months after she was fired.

Defendant appears to take issue with Ms. Moreno seeking the help of her daughter with her

---

[1] Plaintiff cites her statements of undisputed material fact from her motion for partial summary judgment, ECF No. 65, as "SUMF ¶ __"

applications. *See Response*, ECF No. 70 at 11. However, it is undisputed that Ms. Moreno is not adept at using the internet and computers and needed help with using those important tools to look for work. Ms. Moreno can hardly be faulted for seeking assistance from someone more technologically sophisticated in order to achieve the ultimate goal of obtaining subsequent employment more effectively. To the contrary, such actions by Ms. Moreno show significant effort to search for and obtain replacement employment.

Defendant attempts to disparage Ms. Moreno for being "content to take the first job that came along." *Response*, ECF No. 70 at 12. Contrary to Defendant's assertion, this demonstrates how quickly Ms. Moreno attempted to reenter the work force.

The Dollar Tree job came with fewer hours, but Ms. Moreno has been able to increase them some. Ms. Moreno understands that all of the other employees with her similar position are part-time as well. *See Response*, ECF No. 70 at 9, ¶ 71. Ms. Moreno has taken the opportunity to work additional hours when they are available, such as holidays, inventory, and covering co-worker's shifts. *Id.*, ¶ 72. Ms. Moreno has diligently sought to increase her hours when it is possible for her to do so. *See id.*

### iii.     Mere Speculation by Defendant Fails to Satisfy its Burden of Proof

It is undisputed that Ms. Moreno sought and found similar employment only months after she was fired. Ms. Moreno has met her threshold burden to make reasonable efforts to secure employment, as required by state and federal case law. To argue that Ms. Moreno is not entitled to back pay, Defendant bears the burden of proving that these efforts were insufficient. Defendant points to no jobs that were open that Ms. Moreno could have applied for but failed to, that are suitable to her skills and education levels, and within the geography she can work. Given its lack of effort to do so, Defendant fails to meet its burden. Mere speculation on Defendant's part that there

may have been other jobs available that she failed to apply for is insufficient.

**B. Defendant's Failure to Mitigate Defense Fails With Respect to Emotional-Distress**

Defendant's response brief asserts that, "[b]ecause Moreno's Motion does not address Circle K's failure to mitigate defense with respect to Moreno's outrageous-conduct claim or emotional distress, those portions of the defense must proceed to trial." *Response*, ECF No. 70 at 13. This argument fails for three reasons: (1) Defendant never provided notice of this affirmative defense with respect to outrageous conduct and emotional distress damages until now, and so should be estopped from pursuing it; (2) Ms. Moreno has no duty to mitigate her emotional distress; (3) despite having no duty to do so, the undisputed evidence shows that Ms. Moreno did, in fact, make significant efforts to mitigate her emotional distress.

When asked during discovery to provide the factual basis for it affirmative defense of failure to mitigate, Defendant stated that "[t]he factual basis of this defense is Plaintiff's discovery responses, including answers to Interrogatory Nos. 4-7 and responses to Requests for Production Nos. 6-9. Discovery is ongoing." SUMF ¶¶ 51-53. Defendant's Interrogatory No. 4 asked for a description of Ms. Moreno's damages. SUMF ¶ 54. Defendant's Interrogatory No. 5 asked for the identity of any psychological counseling Ms. Moreno received in the past five years. *Id.* Defendant's Interrogatory No. 6 asked for the identity of any employers Ms. Moreno worked for since October 4, 2020. *Id.* Defendant's Interrogatory No. 7 asked for a description of Ms. Moreno's efforts to seek employment and income since October 4, 2020. *Id.*

Defendant's bare invocation of Ms. Moreno's discovery responses did not give Ms. Moreno notice that Defendant intended to assert that she failed to mitigate her emotional distress damages. *Cherry Creek Mortgage, LLC v. Jarboe*, 2022 WL 18456041, at *2 (D. Colo. Nov. 10, 2022) ("affirmative defenses which are so vague that they do not provide sufficient notice of the nature of the defenses are improper."). Defendant produced no evidence or even description of its own with

10

respect to these affirmative defenses, SUMF ¶ 58, and instead simply pointed to Ms. Moreno's own interrogatories and productions, which focused on her efforts to mitigate her economic damages. SUMF ¶ 55.

Second, Ms. Moreno has no duty to mitigate her emotional distress damages. Defendant cites *Winkler v. Rocky Mountain Conference of United Methodist Church*, 923 P.2d 152, 160 (Colo. App. 1995). *Response*, ECF No. 70 at 13. In *Winkler*, the plaintiff, a church parishioner, brought suit against a pastor and the Rocky Mountain Conference of the United Methodist Church ("Conference"), which appointed the pastor, due to inappropriate sexual behavior by the pastor. 923 P.2d at 155. The Conference argued that the jury should have been instructed that the plaintiff had a duty to mitigate her damages by reporting the pastor's conduct earlier and by continuing to have contact with the pastor without requesting that he stop the offensive conduct. *Id.* at 160. The court upheld the trial court's refusal to submit these instructions to the jury, stating, "[m]oreover, the jury was instructed that it could consider whether Winkler failed to mitigate damages by not promptly obtaining appropriate therapeutic or medical care. We conclude that this instruction adequately set forth the extent of Winkler's duty to mitigate or minimize her damages in this case." *Id.* The *Winkler* court's *dicta* is not persuasive in light of Colorado caselaw on the duty to mitigate.

In *Dare v. Sobule*, 674 P.2d 960, 962 (Colo. 1984), the court considered whether a motorcyclist's failure to wear a helmet could be admissible. The court held that "evidence of a plaintiff's failure to wear a protective helmet is inadmissible to show negligence on the part of the plaintiff or to mitigate damages." The court noted that the General Assembly had not mandated the use of protective helmets and the court declined to impose the standard. *Id.* at 963. So too here – Defendant has not pointed to any statutory duty of Ms. Moreno to seek out therapy to mitigate her emotional distress damages. *See also Hildyard,* 522 P.2d at 600 (affirming trial court refusal to submit affirmative defense of failure to mitigate to the jury because "Plaintiff's obligation to seek a

cure for his injuries does not require him to submit to surgery which involves substantial hazards or which offers only a possibility of cure.").

The *Dare* court additionally noted that allowing the defense would lead to a battle of the experts as to what injuries would have or have not been avoided if the plaintiff was wearing a helmet. *Id.* That reasoning is particularly persuasive for emotional distress damages, which would result in experts battling over what percent of a plaintiff's emotional distress could have been reduced by more therapy. Moreover, Defendant has not endorsed any experts in this case, *Motion*, ECF No. 65 at 10, ¶ 61; *Response*, ECF No. 70 at 8, ¶ 61, leaving it with no basis to argue how further therapy or medication could have reduced Ms. Moreno's emotional distress.

Finally, to the extent she needed to, Ms. Moreno **did** mitigate her emotional distress. She received nearly a year of therapy session approximately once a week for much of 2021, wherein she discussed the negative effects the robbery and termination had on her. RCDF ¶¶ 74-75. These sessions were prescribed by her victim's rights advocate and the District Attorney's office. *Id*. Ultimately, she stopped because it was not helpful. *Id.* These therapy sessions were the first counseling sessions she attended in her life. *Id.* Ms. Moreno sought out therapy but, when it was ineffective, ended it. The failure to continue a course of care that is not helpful cannot be considered a failure to mitigate, and Defendant has put on no evidence that her failure to continue therapy would have lessened her emotional distress rather than exacerbated it, which is what the evidence currently on record shows.

## III.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant her motion for partial summary judgment and strike Defendant's affirmative defense of failure to mitigate.

Respectfully Submitted: September 8, 2023

RATHOD | MOHAMEDBHAI LLC

*s/ Virginia Hill Butler*
Virginia Hill Butler
Iris Halpern
2701 Lawrence Street, Suite 100
Denver, CO 80205
T: (303) 578-4400
E: vb@rmlawyers.com
   ih@rmlawyers.com

ATTORNEYS FOR PLAINTIFF

**CERTIFICATE OF SERVICE**

I hereby certify that on this 8th day of September 2023, I electronically filed and served the foregoing **PLAINTIFF'S REPLY IN SUPPORT OF HER MOTION FOR PARTIAL SUMMARY JUDGMENT** using the CM/ECF system, which will send notification of such filing to the following:


Thomas W. Carroll
Nicholas Hankins
LITLER MENDELSON, P.C.
1900 Sixteenth Street, Suite 800
Denver, CO 80202
Telephone: 303.629.6200
Fax: 303.629.6200
Email: tcarroll@littler.com
        nhankins@littler.com

*Attorneys for Defendant Circle K Stores, Inc.*


s/ *Virginia Hill Butler*
Virginia Hill Butler

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-02327-NYW-STV
_____

DEPOSITION OF:  MARY ANN MORENO - April 12, 2023
_____

MARY ANN MORENO,

Plaintiff,

v.

CIRCLE K STORES, INC.,

Defendant.

_____

        PURSUANT TO NOTICE, the deposition of
MARY ANN MORENO was taken on behalf of the Defendant at
1900 16th Street, Suite 800, Denver, Colorado 80202, on
April 12, 2023, at 9:16 a.m., before Carin C. Geist,
Registered Diplomate Reporter and Notary Public within
Colorado.

Mary Ann Moreno
April 12, 2023

1   your claims here?

2           A.    Yes.

3           Q.    Ms. Moreno, did you ever e-mail with

4   anybody about your termination from Circle K?

5           A.    No.  I don't even know how to use my cell

6   phone.

7           Q.    So is that to say --

8           A.    No.

9           Q.    -- you don't know how to e-mail or --

10          A.    I don't know how to e-mail.  I don't know

11  how to text.  I just use it for emergency reasons and

12  only because my daughter insisted on it.

13          Q.    Just a couple more questions in this neck

14  of the woods, ma'am.  Are there any documents out there

15  that you think might relate to your lawsuit here, but

16  you haven't been able to find them?

17              MS. HALPERN:  Object to form.

18          A.    No.

19          Q.    (BY MR. CARROLL)  Okay.  And are there any

20  documents that you have related to this lawsuit or your

21  employment, but you decided not to provide them?

22          A.    No.

23          Q.    Ms. Moreno, are you currently employed?

24          A.    Yes.

25          Q.    Where do you work right now?

Mary Ann Moreno
April 12, 2023

1          Q.   So inventory was, like, one particular

2    week you worked a little bit more?

3          A.   For the year, yeah.

4          Q.   I used to work retail myself.  I know that

5    inventory was always kind of a big, I don't know, black

6    spot on the calendar.

7          A.   Yes.

8          Q.   And sort of all hands on deck.

9               I'd like to spend a little time talking

10   about the period of time between the end of your

11   employment at Circle K and when you started your job at

12   Dollar Tree.

13         A.   Okay.

14         Q.   So October of 2020 until January of 2021.

15   Right?

16         A.   Yes.

17         Q.   Ms. Moreno, what were you doing during

18   that period of time, if anything, to find a new job?

19         A.   Looking for a job.  I applied at several

20   places.  I mean, I would get on my computer, or my

21   daughter would get on the computer because I don't know

22   how to use a computer, and she would help me through

23   them and -- but I never got calls.  Dollar Tree was the

24   only one that ever called me.

25         Q.   I'm going to ask a few follow-up

Mary Ann Moreno
April 12, 2023

 1  questions, as you might expect.  You said you were

 2  looking for jobs.  You said you applied for jobs.  What

 3  did you do to look for jobs?

 4          A.   Well, I would -- when it would come up,

 5  like, for instance, Walmart, I want to say.  It would

 6  come up.  It would ask me questions like my birthday,

 7  my name, my experiences.  I don't think it asked me for

 8  wages.

 9          Q.   Sounds like you're describing, like, the

10  application for Walmart for --

11          A.   Yeah, it was an application.

12          Q.   You said it would come up.  My question is

13  kind of going back a step or two, which is, how did you

14  find out about that opportunity in the first place?

15          A.   Because Walmart's always hiring.  They're

16  always hiring people or -- and, really, I didn't know

17  if any of these jobs were hiring, but I took a chance.

18          Q.   So is it the case that you weren't looking

19  for jobs that were hiring, but rather, applying at

20  places that you thought might be hiring?

21              MS. HALPERN:  Object to form.

22          A.   Yes.

23              MR. CARROLL:  What's the objection?

24              MS. HALPERN:  I mean, she just said they

25  were going online and looking on the internet, and she

Mary Ann Moreno
April 12, 2023

```
1   said that her daughter was helping her.

2              MR. CARROLL:  Fair enough.

3         Q.   (BY MR. CARROLL)  Let me be very clear

4   here, and we'll separate things out between you and

5   your daughter, okay?  Let me start with you.  Did you

6   do anything after your employment with Circle K

7   ended -- well, let me phrase it differently.

8              What did you do in order to find a new

9   job?  And we'll talk about your daughter in a minute.

10        A.   I don't think -- I didn't go out, you

11  know, personally because I don't drive that much, and I

12  have a fear of driving, so I really didn't go out.

13  That's why we -- my daughter helped me on the computer.

14        Q.   Okay.  I'll come back to your daughter.

15  Let me just focus still on you for a little while.  I

16  understand you didn't go out.  Did you maybe look at

17  the want ads in the newspaper, for example?

18        A.   Did they still have newspapers?  I don't

19  know.  No, I didn't.

20        Q.   Okay.  And did you maybe, like, go

21  anywhere on the internet and find out, you know, who's

22  trying to hire right now, who's posting a job?

23        A.   Well, my daughter did.  I didn't.

24        Q.   All right.  So let's go back to your

25  daughter, then, or move to your daughter.  To your
```

Mary Ann Moreno
April 12, 2023

1  knowledge, what did your daughter do to help you find a

2  job after your Circle K employment ended?

3          A.    She got on the computer and pulled up a

4  bunch of businesses or -- I've always worked retail

5  since I was 17, so that's the type of job I was looking

6  for, or even just a customer rep.  So she would pull up

7  all these businesses, you know, like Hallmark, Walmart,

8  never restaurants, and that's how she would do it.

9          Q.    And am I correct that she would submit an

10 application on your behalf?

11         A.    Well, I would sit there with her and give

12 her all the information, yes.  And then she would type

13 it in or however they do in their computers.

14         Q.    Together, the two of you would complete

15 the information on the computer and then submit an

16 application?

17         A.    Yes.

18         Q.    Okay.  Were you looking for a full-time

19 job or a part-time job?

20         A.    Full-time.  And, actually, at that time, I

21 was looking for whatever I could get at that time.

22         Q.    Understanding that it was your daughter

23 who did a lot of this, as you sit here today, ma'am, do

24 you have any idea how many jobs you applied for?

25         A.    Oh, my God, no.  Maybe ten or more.  I

Mary Ann Moreno
April 12, 2023

```
 1   know we went into her computer a couple of times.  I
 2   don't remember the number, no.
 3            Q.   Did you interview at Dollar Tree?
 4            A.   Yes.
 5            Q.   Did you interview anywhere else?
 6            A.   No.
 7            Q.   Did anyone else offer you an interview?
 8            A.   No.
 9            Q.   Did I hear you correctly that, I think you
10   said something along the lines of, we went in a couple
11   times.  How often were you and your daughter working on
12   this process?  Was it --
13            A.   I think at least once a week, if I
14   remember right.
15            Q.   Okay.  You testified that -- about your
16   driving.  Let me make sure I understand it correctly.
17   Is it that you don't drive, ma'am, or you're just
18   limited in the amount that you drive?
19            A.   I limit my driving because I have a fear
20   of driving.  Let me explain.  When my granddaughter was
21   born, I got a really bad fear of driving.  I don't know
22   why.  So I didn't try to drive.  Like, I don't get on
23   the highways.  If I go somewhere, like to Walmart, I
24   take side roads.  And Walmart's around my block.  My
25   job is, like, 5 miles from my home, so it's a straight
```

Mary Ann Moreno
April 12, 2023

1   shot down 92nd.  It takes me at the most three, four

2   minutes to get there.  So I go to work.  I come home.

3   I don't go anywhere.  If I do, my daughter drives.

4          Q.   So in light of this limitation on your

5   driving, did that limit the places that you were

6   applying for another job somehow?

7          A.   No, not really.

8          Q.   So despite your own limitations on

9   driving, you looked for a job really anywhere?  I guess

10  you tell me.  Was there, like, a geographic area where

11  you were looking for jobs?

12         A.   Yeah.  I would say so.

13         Q.   What was it?

14         A.   The geographic area, you know, I live in

15  Westminster.  There's a lot of businesses around me, a

16  lot of stores.  So it was mostly around Westminster,

17  Thornton, that I can recall.

18         Q.   Okay.  Do you drive at night?

19         A.   I have to, yes.

20         Q.   I just wasn't sure if that was one of

21  the -- your limitations on driving.

22         A.   Well, I don't like to drive at night

23  because I have astigmatism, and the lights blind me.

24  So like I said, my job is straight down 92nd.  I live

25  on 92nd.  I go straight down 92nd and back home.  So

Mary Ann Moreno
April 12, 2023

```
 1   there, and he said, I saw the whole thing.  He says, I
 2   called the police.  And he said he went north.
 3            Q.   (BY MR. CARROLL)  And you were on --
 4            A.   That's what the customer told me.
 5            Q.   And you were on the phone while the
 6   customer said that to you?
 7            A.   With the police, yes.
 8            Q.   So the first thing you did when Mr. Wimmer
 9   left was call the police, and we just listened to that
10   phone call, right?
11            A.   Right.
12            Q.   What happened next?
13            A.   Let's see.  I walked back in the store,
14   and I was -- I'm sure I was waiting on customers.  And
15   then -- oh, I walked back in the store, called Love.  I
16   think that's what I did.  I called her, and I said,
17   Love, I've just been robbed.  And she said, they take
18   any money?  And I said, no.  And she said, well, it
19   will take me 45 minutes to get there.  She said, call
20   the assistant.  I said, okay.
21            So I called -- why am -- I cannot remember
22   their names, and I worked with them for so long.
23   Amanda.  I called Amanda.  It went to a recording, but
24   I left a message.  Then I tried -- I think I tried
25   calling her a couple times -- again.  No response
```

Mary Ann Moreno
April 12, 2023

```
1   again.  Then one of the officers -- they were already

2   there.  One of the officers said, let me try to call

3   her, and they tried to call her, and the same thing, no

4   response.

5           Q.   Call whom?  Amanda?

6           A.   I'm sorry?

7           Q.   The officers tried to call whom?  Amanda?

8           A.   Amanda.

9           Q.   Okay.  Please continue.

10          A.   Because Love told me to call Amanda.  And

11   that -- at that same time I was -- the officer was

12   asking me to fill out a report, and I was trying to

13   fill out the report and wait on customers and, you

14   know, back and forth.

15          Q.   Okay.  Let me ask you a few questions

16   about that sequence of events.  In your conversation on

17   the phone with Love Jorgensen, I understand it's your

18   testimony she said it would take her 45 minutes to get

19   there.

20          A.   Yes.

21          Q.   But she was on her way, right?

22          A.   I don't know.  She just said, it will take

23   me 45 minutes to get there.  Call Amanda.

24          Q.   Well, Love did come to the store, right?

25          A.   After I called Driss.
```

Mary Ann Moreno
April 12, 2023

```
 1        A.   I'm not sure.  I think after I told him,

 2   am I fired, and he said, I have to get ahold of loss

 3   prevention, I'm not sure if he said, I'll call you.  I

 4   know I didn't tell him I'd call him.

 5        Q.   Okay.  Was your daughter-in-law Bonnie

 6   still waiting outside the store when you left?

 7        A.   Yes.  She was waiting because she wanted

 8   to follow me home.

 9        Q.   Did she follow you home?

10        A.   Yes.  I just live around the block.

11        Q.   So we've looked at video, and I've asked

12   you some questions about the robbery itself and the

13   aftermath of the robbery and the people that you called

14   and who came and when you left.  Is there anything

15   about the robbery itself that we haven't talked about

16   or that you think is important?

17             MS. HALPERN:  Object to form.

18        A.   No.

19        Q.   (BY MR. CARROLL)  I just don't always ask

20   the right questions, you know; and before we move on to

21   other things, I want to give you the opportunity.  Is

22   there something about what happened here between the

23   start of the robbery and the time that you left that

24   you haven't had the opportunity to sort of describe

25   here?
```

Mary Ann Moreno
April 12, 2023

```
 1          A.    "He reached behind me, grabbed something
 2    and then left."  I don't know why it's crossed out, but
 3    that's exactly what happened.
 4          Q.    The blue pen, was it -- you crossed it out
 5    for some reason, right?
 6          A.    I don't know if I crossed it out or she
 7    did, or I might have, yes.  It's blue, so most likely
 8    was me.  But I don't know why it's crossed out.
 9          Q.    Okay.  What about those last --
10          A.    I'm not a very good reader, sorry.
11          Q.    That's all right.  We've got plenty of
12    time.  Last few lines on the first page of Exhibit 8
13    beginning with, "The police showed up."  Now, these are
14    crossed out in the red pen.  Do you have any idea why
15    this is crossed out?
16          A.    Jeez, clumsy.  Let me see.  I don't know.
17    I don't know why it's crossed out in red.  Maybe I
18    asked her to cross it out and restart it somewhere
19    else --
20          Q.    Okay.
21          A.    -- on the paperwork, on the --
22          Q.    Okay.  Just one more question here on
23    Exhibit 8, and I'm on the third page.
24          A.    Third page.
25          Q.    Yeah.  It says "Moreno 170" down at the
```

Mary Ann Moreno
April 12, 2023

```
 1          A.   No, no, because I'm a healthy person.  I
 2   don't even go to the doctor if I have a cold.  Pay them
 3   $190, no way.
 4               I'm getting a headache.
 5               MS. HALPERN:  So you need a break?
 6               MR. CARROLL:  Yeah.  I'm getting close.
 7   I'm not quite there yet.  I can -- why don't we go off
 8   the record for a moment.
 9               (Recess taken, 12:13 p.m. to 12:23 p.m.)
10               MR. CARROLL:  We're back on the record.
11          Q.   (BY MR. CARROLL)  Ms. Moreno, do you
12   understand you're still under oath?
13          A.   Yes.
14          Q.   Your attorney mentioned something to me
15   over the break off the record.
16               MR. CARROLL:  And Iris, I'll turn it over
17   to you to provide something.
18               MS. HALPERN:  Yeah, I just want to clarify
19   that Exhibit 9 is not anything that was written for the
20   attorneys or nothing about us, you know, documenting a
21   conversation that we had with Ms. Moreno and then
22   producing it.  So this was -- it's kind of independent
23   and didn't have anything to do with us.
24               THE DEPONENT:  Maybe I was trying to
25   reword it more professionally because I'm not really an
```

Mary Ann Moreno
April 12, 2023

 1  educated person, so maybe I was just trying to rewrite

 2  it more professionally.  I'm just going to say it that

 3  way.  Better wording or something to that effect.

 4        Q.   (BY MR. CARROLL)  Having had the chance to

 5  think about Exhibit 9 a little bit over the break, I

 6  mean, do you have any idea, like, where this came from?

 7  I might note, for example, it sort of feels like it

 8  picks up on --

 9        A.   It looks like my writing, though.  Maybe I

10  was -- like I said, maybe I was trying to rewrite it

11  more professionally?  I really -- it's been 2 1/2

12  years.  I don't remember.

13        Q.   Okay.  Thank you.  So before the break, we

14  were talking about, you know, how you feel like you've

15  been harmed by Circle K's actions.  I'm looking at one

16  of your interrogatory answers here that we received

17  from your lawyer that says, "As a result of her attack

18  and her termination, she struggles with anxiety, fear,

19  nervousness, agitation, and lack of energy."  Is that

20  your position, ma'am?  You're suffering from anxiety,

21  fear, nervousness, agitation, and lack of energy?

22        A.   I'm trying to remember.  I probably was

23  nervous over the robbery and stuff afterwards.  I don't

24  remember.  But I might have had some anxiety.  I get

25  anxiety all the time.  I don't know.  But I don't take

Mary Ann Moreno
April 12, 2023

```
 1                    REPORTER'S CERTIFICATE

 2   STATE OF COLORADO          )
                                )  ss.
 3   CITY AND COUNTY OF DENVER )

 4        I, CARIN C. GEIST, Registered Diplomate Reporter,
     Certified Realtime Reporter, and Notary Public
 5   ID 20054034523, State of Colorado, do hereby certify
     that previous to the commencement of the examination,
 6   the said MARY ANN MORENO was duly sworn or affirmed by
     me to testify to the truth in relation to the matters
 7   in controversy between the parties hereto; that the
     said deposition was taken in machine shorthand by me at
 8   the time and place aforesaid and was thereafter reduced
     to typewritten form; that the foregoing is a true
 9   transcript of the questions asked, testimony given, and
     proceedings had.
10
          I further certify that I am not employed by,
11   related to, nor of counsel for any of the parties
     herein, nor otherwise interested in the outcome of this
12   litigation.

13        IN WITNESS WHEREOF, I have affixed my signature
     this _____ day of _____, 2023.
14
          My commission expires September 15, 2025.
15

16   __X__ Reading and Signing was requested.

17   _____ Reading and Signing was waived.

18   _____ Reading and Signing is not required.

19

20                         Carin C. Geist

21                    _____
                      Carin C. Geist
22                    Registered Diplomate Reporter
                      Certified Realtime Reporter
23

24

25
```

# Exhibit 2
# Wand Notes
# (Placeholder)

**ECF No. 78**
**FILED UNDER SEAL**
**IN VOLUME V**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Case No. 1:22-cv-02327-NYW-STV

MARY ANN MORENO,

               Plaintiff,

v.

CIRCLE K STORES, INC.,

               Defendants.

---

**REPLY IN SUPPORT OF CIRCLE K'S MOTION FOR SUMMARY JUDGMENT**

---

Defendant Circle K Stores, Inc ("Circle K") replies to Plaintiff's response [Dkt. 72] ("Response") to Circle K's Motion for Summary Judgment [Dkt. 64] ("Motion").

## I.     INTRODUCTION

One judge in this district has already held that there is not a self-defense exception to at-will employment under Colorado law and this Court should hold the same. Moreover, Moreno has not and cannot propound any evidence that she was terminated because she was a victim of a crime or because she reported a crime. And on the record before the Court, Circle K's conduct does not constitute outrageous conduct as a matter of law. Accordingly, the Court should grant Circle K's Motion.

## II.     REPLY CONCERNING UNDISPUTED FACTS

Circle K stands by the Statement of Undisputed Material Facts in its Motion. First of all, the Court should not strike the declarations Circle K submitted in support of its Motion. Despite

the unsupported assertion in Moreno's Response (and unlike her errata sheet), Circle K's

declarations **do not** contradict the declarants' deposition testimony and Moreno has not identified

any contradiction or basis to strike them. It is proper for Circle K to support the Motion with

declarations that do not contradict prior testimony. Fed. R. Civ. P. 56(c)(1)(A).[1]

As to specific facts, many of Moreno's responses raise immaterial factual issues or add

immaterial caveats to Circle K's statement. *E.g.*, Resp. ¶¶ 6, 9, 11, 12, 33, 52, 64. Other

responses are contradicted by the video evidence. *E.g.*, *id.* at ¶¶ 35-39. Moreover, several of

Moreno's responses (*e.g.*, *id.* at ¶¶ 60, 69-70) rely exclusively on her substantive revisions to her

deposition testimony, which should be disregarded for the reasons set forth in Circle K's Motion.

Mot. 11 n.3. Where Moreno does attempt to raise issues of material fact, her responses are

deficient. Circle K specifically addresses Moreno's responses as follows:

40-41.  Moreno's denials do not meet the substance of Circle K's statements. Circle K

cited Moreno's deposition testimony and 911 call to support its statements of fact, and whether

Moreno felt threatened does not raise a genuine issue of fact as to whether Wimmer verbally

threatened her or threatened her with the knife, which he did not.

56-57.  Moreno's denials do not raise a genuine dispute of fact. Moreno does not have

evidence that she was terminated for any reason other than violating Circle K's Confront and

Chase policy. Further, Moreno's belief regarding the reason she was terminated does not create a

---

[1] The authority cited by Moreno, *Stuckens v. SAGE Dining Servs., Inc.*, No. 22-1171, 2023 WL 2945861, at *3 (10th Cir. Apr. 14, 2023), is inapposite. There, the court held that a declaration contradicting the declarant's prior deposition testimony was an impermissible attempt to create a sham fact issue to **survive** a motion for summary judgment, which is not the case here. *Id.*

2

fact issue. And finally, Moreno's assertion that she "was terminated for reporting a crime and acting in self-defense" is not supported by any citation to the evidence.

58.     Moreno's denial does not raise a genuine dispute of fact. Circle K cited unrebutted testimony from Craig Holmes that the decisionmakers considered whether Moreno acted in self-defense and determined she had not. Amy Harvey testified that she may have considered self-defense but did not remember. Resp. Ex. 5 [Dkt. 72-5] at 77:24-78:12 (Harvey Dep.). Harvey's testimony is consistent with Circle K's statement and it remains undisputed that the decisionmakers considered whether Moreno acted in self-defense.

59.     Moreno's denials with respect to trainings and the applicability of Circle K's Confront and Chase policy between states do not meet the substance of Circle K's statement. Moreno's denial with respect to Driss Aamoud's testimony does not raise a genuine dispute of fact. Aamoud's testimony is consistent with the Circle K's statement and it remains undisputed that the decisionmakers considered whether Moreno acted in self-defense. Resp. Ex. 6 [Dkt. 72-6] 141:5-17 (Aamoud Dep. 141:5-17).

71.     Moreno's denial does not raise a genuine dispute of fact for the reasons set forth in ¶¶ 56, 58, and 59 above.

## III.     RESPONSE CONCERNING ADDITIONAL DISPUTED FACTS

Moreno's additional 39 Additional Disputed Facts do not foreclose summary judgment as further described in the argument section below. As to the statements themselves, Circle K does not dispute Moreno's Statement of Additional Disputed Facts ¶¶ 1-5, 7-8, 12, 14, 18, 20, 22, 24, 26, 29-30, 32, 35, 37-38. Circle K specifically addresses the remainder as follows:

6.     Admitted in part and denied in part. Circle K admits that Wimmer had two knives. Pl's Mot. Partial Summ. J. ("Moreno's MSJ") Ex. 4 [Dkt. 65-4] (Police Report, Moreno 000315). Wimmer had one five- to six-inch knife and another knife that was in plastic packaging. *Id.*

9.     Admitted in part and denied in part because the statement is incomplete. Circle K admits that Aamoud, Moreno's Market Manager, said that it would have been a violation of Circle K policy to have given Wimmer a pack of cigarettes without him showing identification. Moreno's MSJ Ex. 7 [Dkt. 65-7] 154:15-155:16 (Aamoud Dep.).

10.     Admitted in part and denied in part. Circle K admits that Wimmer began to leave the store, but the video-surveillance evidence does not reflect that Wimmer became visibly agitated. Mot. Exs. 4-6 [Dkts. 64-6 to 64-8] at 6:55:57-6:56:08.

11.     Denied. The video-surveillance evidence does not reflect that Wimmer "abruptly changed directions" or "lurched" toward Moreno. *Id.* at 6:55:57-6:56:17.

13.     Denied. Moreno approached Wimmer instead of stepping back, despite having approximately 10 feet of space behind her and away from the cigarettes. Circle K's Resp. Pl's Mot. Partial Summ. J. Ex. 2 [Dkt. 70-3] 70:16-71:5 (Aamoud Dep.); Circle K's Resp. Pl's Mot. Partial Summ. J. Ex. 3 [Dkt. 70-4] 70:19-20, 71:17-18, 71:24-25, 72:22-74:2 (Jorgensen Dep.); Moreno's MSJ Ex. 11 [Dkt. 64-13] 42:13-17, 50:1-5 (Holmes Dep.).

15.     Admitted in part and denied in part. Wimmer continued to move toward Moreno and the cigarette case and he was within reaching distance, but the video-surveillance evidence shows that the knives were tucked under his right arm. Mot. Exs. 4-6 at 6:56:10-16.

16.     Admitted in part and denied in part. Circle K admits the first sentence. Circle K denies the second sentence. Once Wimmer was behind the counter, Wimmer extended his left

arm to reach for a pack of cigarettes from the display case located behind Moreno, holding the knives (among other things) in his right arm. *Id.* at 6:56:06-6:56:25. After Wimmer began extending his arm, Moreno made physical contact with Wimmer. *Id.* at 6:56:12-16. Eventually, Moreno pushed Wimmer away from her. *Id.* at 6:56:06-6:56:25. Moreno also grabbed one of Wimmer's arms. *Id.*

17. Denied. The surveillance video evidence does not support that Moreno acted in self-defense. *Id.* at 6:54:34-6:56:25; *see also* Mot. 6-7 ¶¶ 26-41.

19. Admitted in part and denied in part. Circle K admits that a Circle K customer and Moreno called the police. Circle K denies that the Circle K customer witnessed the robbery. *Id.* at 6:54:55-6:56:20; Moreno's MSJ Ex. 7 [Dkt. 64-9] at 00:00-5:10.

21. Admitted in part and denied in part. Circle K denies the first sentence. The evidence does not support that Moreno called Aamoud because Jorgensen had not arrived at the store after an hour. Moreno's MSJ Ex. 3 [Dkt. 65-3] at 8:10:05-8:11:26 (Circle K Surveillance Video (Register 1)).

23. Admitted in part and denied in part. Circle K admits the first sentence. Circle K admits that Aamoud asked Moreno's daughter-in-law to leave the store, but denies that Aamoud forced Moreno's daughter-in-law to wait in her car "for hours." Moreno's daughter-in-law left the store at approximately 8:43 and Moreno left the store at approximately 8:55. *Id.* at 8:43:02-8:43:16, 8:55:04-8:55:14.

25. Admitted in part and denied in part. Circle K admits that before Circle K terminated Moreno, Aamoud believed that Moreno violated Circle K's "Don't Chase or Confront" policy. Circle K denies the implication that Aamoud concluded that Moreno violated

Circle K's "Don't Chase or Confront" policy immediately after he reviewed video footage of the robbery on October 4, 2020. Moreno's MSJ Ex. 7 [Dkt. 65-7] 68:1-18 (Aamoud Dep.).

27.     Denied. Aamoud called Moreno on or about October 6 or 7, 2020 to convey Circle K's decision to terminate her employment. Mot. Ex. 9 at 57:16-58:16 (Moreno Dep.); Mot. Ex. 10 at 139:2-6 (Aamoud Dep.); Mot. Ex. A ¶ 12 (Holmes Decl.). On October 8, 2020, Moreno's termination was finalized in Circle K's internal records. Mot. Ex. 10 at 139:1-9 (Aamoud Dep.).

28.     Admitted in part and denied in part. Circle K admits that the reason for Moreno's termination was her contact with Wimmer on October 4, 2020 and states that Moreno's employment was terminated for violation of the Confront & Chase policy, not because she engaged in self-defense, not because she reported the robbery, not because she called the police, and not because she was a victim of a crime. Mot. Ex. A ¶ 14 (Holmes Decl.); Mot. Ex. C ¶ 10 (Aamoud Decl.); Mot. Ex. D ¶ 9 (Harvey Decl.).

31.     Denied. Circle K's 30(b)(6) witness, Sue Fernandez, testified that there were two individuals who made documented physical contact with a person in a Circle K store that were not terminated. Resp. Ex. 1 [Dkt. 72-1] 84:22-85:3, 86:5-19 (30(b)(6) Dep.).

33.     Admitted in part and denied in part. Circle K admits the first sentence. Circle K admits that footage of the incident referenced in Paragraph 33 does not exist, but Circle K's 30(b)(6) witness testified as to the known details of the incident and confirmed that the incident took place. *Id.* at 87:3-25, 89:1-17.

34.     Admitted in part and denied in part. Circle K admits the first sentence. Circle K denies the second sentence. Harvey testified that during her Circle K employment she did not

believe she ever disagreed with a termination of an employee who experienced an armed

robbery. Resp. Ex. 5 [Dkt. 72-5] 21:7-15, 35:3-7 (Harvey Dep.). Harvey did not testify that she

had no recollection of ever retaining an employee who made contact with an assailant. *Id.*

     39.   Admitted in part and denied in part. Circle K admits the first sentence. Circle K

denies the remaining sentences because Moreno relies on the substantive changes to her

deposition testimony in her errata sheet, which should be disregarded. Mot. 11 n.3.

## IV.   ARGUMENT

### A.   Any genuine issues of disputed fact are immaterial.

     Between Circle K's and Moreno's statements of fact, there are undoubtedly points in

dispute, but they do not form a basis to deny Circle K's Motion. First, as discussed above, the

purported fact issues Moreno raises oftentimes are not genuine or supported by the evidence.

Second, even where a dispute is genuine—such as with Circle K's responses to Moreno's

additional disputed facts above—the disputes are not material. The core issues before the Court

are questions of law (such as self-defense as the basis for a wrongful-discharge claim and

whether Circle K engaged in extreme and outrageous conduct) or questions of a *lack* of facts

(such as Moreno's alleged termination for being the victim of a crime) and none of the disputed

facts are essential to the proper disposition of the claims. In other words, the essential, material

facts remain undisputed and summary judgment is appropriate.

### B.   There is no self-defense exception to at-will employment under Colorado law and Moreno did not act in self-defense.

     Moreno argues that the Colorado Supreme Court would likely adopt a self-defense

exception to at-will employment because three other states' supreme courts have done so and

because the *Donez* case is distinguishable on the facts. As to *Donez*, Moreno's argument is beside

the point. Circle K relies on that decision for the legal holding that self-defense is not sufficient

to support a wrongful-discharge claim in Colorado, based on the exact same statutes and sources

Moreno cites. Differences in the underlying facts are immaterial to that question of law.

The non-Colorado cases Moreno cites do not rescue her claim either. Just like in the

*Donez* decision, Moreno has not articulated how those cases comport with the restrictive

precedent **in Colorado**. *See Donez v. Leprino Foods, Inc.*, No. 19-CV-00285-CMA-NRN, 2020

WL 1914958, at *7 (D. Colo. Apr. 20, 2020).[2] Plus—in a reflection of the fact they are applying

other states' laws—the cases Moreno cites are distinguishable on the law.

First, *Ray v. Wal-Mart Stores, Inc.*, 359 P.3d 614 (Utah 2015), is not persuasive as to

Colorado law. Utah and Colorado employ entirely different tests to determine whether a public

policy warrants an exception to at-will employment. Under Colorado law, the test is whether a

public policy is "sufficiently concrete to notify employers and employees of the behavior it

requires." *Rocky Mountain Hosp. & Med. Serv. v. Mariani*, 916 P.2d 519, 524 (Colo. 1996). Utah

courts, in contrast, consider three factors:

> (1) whether the policy at issue is reflected in authoritative sources of state public
> policy, (2) whether the policy affects the public generally as opposed to the private
> interests of the employee and the employer, and (3) whether countervailing policies
> outweigh the policy at issue.

*Ray*, 359 P.3d at 620. Absent from Utah's test is any consideration of specificity and notice—

both of which the *Donez* court found lacking as to the purported bases of public policy here.

---

[2] The *Donez* court specifically considered and found unpersuasive two of the three cases Moreno
relies on: *Ray* and *Feliciano*. Resp. 16; *Donez*, 2020 WL 1914958, at *7.

Second, *Feliciano v. 7-Eleven, Inc.*, 559 S.E.2d 713 (W. Va. 2001), is unpersuasive too. Notably, that court held that West Virginia's constitutional and legislative authority were insufficient to support a self-defense exception. *Id.* at 718-19. Instead, the *Feliciano* court relied on West Virginia's "jurisprudential history." *Id.* at 719-24. Sources of public policy under Colorado law, however, are principally derived from statutory and constitutional provisions, and only in "limited circumstances," do courts consider "other sources of public policy such as administrative regulations and professional ethical codes." *Mariani*, 916 P.2d at 525. Indeed, the Colorado Supreme Court has observed that "[t]he General Assembly is the branch of government charged with creating public policies, and the courts may only recognize and enforce such policies." *Crawford Rehabilitation Servs., Inc. v. Weisman*, 938 P.2d 540, 553 (Colo. 1997). In other words, Colorado is not West Virginia and public policy is not derived from the courts in Colorado.

Third, *Gardner v. Loomis Armored Inc.*, 913 P.2d 377, 379 (Wash. 1996), is entirely inapplicable to the question at issue here. The question the *Gardner* court answered was:

> Does it violate the public policy in the State of Washington to discharge an at-will employee for violating a company rule in order to go to the assistance of a citizen held hostage at the scene of a crime, and/or who is in danger of serious physical injury and/or death?

That is just not the issue here.

Moreover, in counterbalance to Moreno's cases—and demonstrating that it is each state's individual approach to this question that matters—several jurisdictions have declined to hold that there is a self-defense exception to at-will employment. *See, e.g.*, *Potts v. City of Devils Lake*, 953 N.W.2d 648, 653 (N.D. 2021) (declining to follow *Ray* and *Feliciano* and collecting cases);

*Bagwell v. Peninsula Reg'l Med. Ctr.*, 665 A.2d 297, 312-13 (Md. Ct. Spec. App. 1995); *see also Hoven v. Walgreen Co.*, 751 F.3d 778, 782-87 (6th Cir. 2014) (applying Michigan law).[3]

Additionally, Circle K reiterates that the evidence shows Moreno was not, in fact, acting in self-defense. Contrary to Moreno's argument, Resp. 17, Circle K does not rely on its declarations for this point, but rather on the video evidence showing her aggressive actions toward Wimmer (grabbing his shirt and tugging him toward her for example), and Moreno's testimony that she was not verbally threatened or threatened with a knife. Mot. 6-7 ¶¶ 26-41.

## C.  Moreno's victims'-rights theory fails as a matter of law and for lack of evidence.

Moreno did not address Circle K's argument that there is not a public-policy exception at-will employment based on victims'-rights. *See* Mot. 17 (arguing that Colorado Revised Statutes § 18-8-706 is "too tenuously connected to employment to create an exception to at-will employment"); *see also* Resp. 18. Nor does the Response overcome the clear legislative statement in § 24-4.1-303 that no one is entitled to damages or other financial redress for failure to comply with that article.

Moreover, there is no genuine issue of material fact that Moreno was ***not*** terminated for being a victim of a crime or for reporting that crime. The parts of the record on which Moreno relies ***at most*** establish that employees who make contact with individuals are terminated. *See* Resp. 9-11 ¶¶ 30-38, 18-19. This is completely distinct from evidence that Circle K ever

---

[3] The Court should decline to certify this question to the Colorado Supreme Court. "Federal courts have a duty to decide difficult or unsettled questions of state law and must do so if there is 'a reasonably clear and principled course.'" *France v. McLeish*, No. 21-cv-01736-MDB, 2022 WL 16924010, at *2 (D. Colo. Nov. 14, 2022) (quoting *Anderson Living Tr. v. Energen Res. Corp.*, 886 F.3d 826, 839 (10th Cir. 2018)). For the reasons set forth in the briefing, there is a reasonably clear and principled course for deciding this issue.

terminated any employee *because* the employee was a victim of a crime and even further away from evidence that Circle K terminated Moreno *because she* was a crime victim. This type of speculation is insufficient to survive summary judgment. *See Am Soc. of Home Inspectors, Inc. v. Int'l Assoc. of Certified Home Inspectors*, 36 F.4th 1238, 1243-44 (10th Cir. 2022).

**D.      Moreno's IIED/outrageous-conduct claim fails as a matter of law.**

Circle K stands by the arguments made in its Motion, as Moreno relies almost exclusively on the same caselaw. *See* Mot. 17-23; Resp. 21-23. As described in the Motion and as a matter of law, the conduct in this case falls short of cases finding extreme and outrageous conduct and it even falls short of the cases that found ***no*** extreme and outrageous conduct. The bar for this claim is extremely high and Moreno does not meet it.

One point from the Response bears mention. Moreno asserts that *Martensen v. Koch*, No. 13-cv-02411-REB-CBS, 2014 WL 3057172, at *3 (D. Colo. July 7, 2014), did not concern the termination of an employee after their physical safety was threatened. Resp. 23. But that's not true. In *Martensen*, the plaintiff alleged that the defendant invited him to the defendant's ranch located in a remote part of Colorado, where the defendant subjected the plaintiff to hours of interrogation, had the plaintiff searched, and had the plaintiff transported against his will—by guards the plaintiff believed were armed—in the defendant's private plane. 2014 WL 3057172, at *4.

*Martensen* is an example of a case falling short of extreme and outrageous conduct. If it was insufficient when the plaintiff was searched, interrogated, and basically held captive at a remote location, it cannot be extreme and outrageous to terminate Moreno's employment in accordance with a well-known and consistently enforced policy. Indeed, it is not enough even

when an employer fails to follow its own policies, Mot. 18-19, and it was not extreme and outrageous for Circle K to terminate Moreno's employment after she pushed and engaged the robber instead of allowing him to take the cigarettes.

**D.      Circle K is entitled to summary judgment on punitive damages.**

Moreno misstates and does not actually respond to Circle K's exemplary-damages argument with respect to Moreno's self-defense theory. Resp. 24. Circle K did not argue for summary judgment on exemplary damages because it was unaware of an existing self-defense exception to at-will employment. The Motion argued that Circle K cannot be liable for exemplary damages because Moreno's self-defense theory is novel or otherwise poorly recognized. Moreno did not respond to that argument and whether it was waived, conceded, or just right all along, summary judgment on punitive damages is warranted.

Respectfully submitted this 11th day of September, 2023.

> *s/ Thomas W. Carroll*
> Thomas W. Carroll
> Nicholas Hankins
> Littler Mendelson, P.C.
> 1900 Sixteenth Street, Suite 800
> Denver, CO  80202
> Telephone: 303.629.6200
> Facsimile: 303.629.0200
> Email: tcarroll@littler.com
>             nhankins@littler.com
>
> *Attorneys for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 11th day of September, 2023, I electronically filed the

foregoing **REPLY IN SUPPORT OF CIRCLE K'S MOTION FOR SUMMARY**

**JUDGMENT** using the CM/ECF system, which will send notification of such filing to the

following:

Iris Halpern
Virginia Hill Butler
RATHOD | MOHAMEDBHAI LLC
2701 Lawrence Street, Suite 100
Denver, CO  80205
Telephone: (303) 578-4400
Fax: (303) 578-4401
ih@rmlawyers.com
vb@rmlawyers.com

*Attorneys for Plaintiff*

s/ Patricia Perez
Patricia Perez

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Nina Y. Wang**

Civil Action No. 22-cv-02327-NYW-STV

MARY ANN MORENO,

      Plaintiff,

v.

CIRCLE K STORES, INC.,

      Defendant.

---

## MEMORANDUM OPINION AND ORDER

---

This matter is before the Court on Circle K's Motion for Summary Judgment ("Defendant's Motion for Summary Judgment") [Doc. 64] and Plaintiff's Motion for Partial Summary Judgment ("Plaintiff's Motion for Summary Judgment") [Doc. 65]. Upon review of the Motions and the related briefing, the applicable case law, and the record before the Court, the Court concludes that oral argument will not materially assist in the resolution of the Motions. For the following reasons, Defendant's Motion for Summary Judgment is **GRANTED** and Plaintiff's Motion for Summary Judgment is **DENIED as moot**.

## BACKGROUND

This case arises out of the termination of Plaintiff Mary Ann Moreno ("Plaintiff" or "Ms. Moreno") from her employment with Circle K Stores, Inc. ("Defendant" or "Circle K"). *See generally* [Doc. 56]. Ms. Moreno alleges generally that she was "wrongfully and outrageously terminated [from] her employment after she exercised her right to self-defense and self-preservation during an armed robbery while at work." [*Id.* at 1].

Ms. Moreno initiated this lawsuit in the District Court for Jefferson County, Colorado on August 12, 2022.  *See* [Doc. 3 at 2].  Defendant removed the case to federal court on September 9, 2022.  [Doc. 1].  On July 6, 2023, Ms. Moreno filed her First Amended Complaint and Jury Demand, which asserts two claims arising under Colorado law:  one claim for wrongful discharge in violation of public policy, and another claim for intentional infliction of emotional distress and/or outrageous conduct ("IIED").  [Doc. 56 at ¶¶ 90–124].  Ms. Moreno seeks compensatory damages, punitive damages, and other appropriate relief.  [*Id.* at 16–17].  Defendant answered the First Amended Complaint on July 18, 2023, raising, inter alia, the affirmative defense of failure to mitigate damages. [Doc. 59 at 13].

Both Parties have filed motions under Rule 56.  Defendant seeks summary judgment in its favor on both of Plaintiff's claims "and her prayer for punitive damages," [Doc. 64 at 1], while Ms. Moreno seeks summary judgment in her favor only on Circle K's affirmative defense of failure to mitigate damages, [Doc. 65 at 1].  The Court discusses the Parties' requests below.

**LEGAL STANDARD**

Under Rule 56 of the Federal Rule of Civil Procedure, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve the issue either way.  A fact is material if under the substantive law it is essential to the proper disposition of the claim."  *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (citation and quotations omitted).

"Cross-motions for summary judgment are treated as two individual motions for summary judgment and held to the same standard." *Banner Bank v. First Am. Title Ins. Co.*, 916 F.3d 1323, 1326 (10th Cir. 2019); *see also Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979) ("Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another."). However, the summary-judgment burden slightly differs depending on which party bears the ultimate burden at trial. A movant that does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claim; rather, the movant must only point the Court to a lack of evidence for the other party on an essential element of that party's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once this movant has met its initial burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). But "if the moving party has the burden of proof [at trial], a more stringent summary judgment standard applies." *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008). A moving party who bears the burden at trial "must establish, as a matter of law, all essential elements of the issue before the nonmoving party can be obligated to bring forward any specific facts alleged to rebut the movant's case." *Id.*

When considering the evidence in the record, the Court cannot and does not weigh the evidence or determine the credibility of witnesses. *See Fogarty v. Gallegos*, 523 F.3d 1147, 1165 (10th Cir. 2008). At all times, the Court views each Motion in the light most favorable to the nonmoving party. *Banner Bank*, 916 F.3d at 1326.

## UNDISPUTED MATERIAL FACTS

The below material facts are drawn from the record before the Court and are undisputed unless otherwise noted.

1.      Ms. Moreno worked as an at-will employee for Circle K from October 2004 until October 2020.  [Doc. 64 at ¶¶ 3–4, 61; Doc. 72 at 2, 6; Doc. 64-1 at ¶¶ 9, 12; Doc. 64-10 at 99:10–12].[1]

2.      Circle K maintains a "Confront & Chase Policy" that instructs employees, in pertinent part:  "Do not confront follow, pursue, track, chase, fight or follow [inside and/or outside] any person[s] suspected of shoplifting products and/or cash from the site, beer runs or any other confrontational situation."  [Doc. 64 at ¶ 6; Doc. 72 at 2;[2] Doc. 64-5 at 2 (brackets in original)].  It also states that the "failure to follow" the Policy "will result in immediate termination."  [Doc. 64 at ¶ 6; Doc. 72 at 2; Doc. 64-5 at 2 (emphasis omitted)].

3.      The Confront & Chase Policy was applicable to Ms. Moreno during her employment.  [Doc. 64 at ¶ 5; Doc. 72 at 2; Doc. 64-1 at ¶ 6].

4.      On October 4, 2020, an individual named Tyler Wimmer ("Mr. Wimmer") committed a robbery at Circle K while Ms. Moreno was working.  [Doc. 64 at ¶ 27; Doc. 72 at 3; Doc. 64-11 at 60:10–24].

5.      Mr. Wimmer entered the Circle K store holding two knives.  [Doc. 64 at ¶ 28; Doc. 72 at 3; Doc. 64-11 at 66:22–67:1].  Mr. Wimmer approached the counter and asked

---

[1] When citing to transcripts, the Court cites to the page and line numbers appearing on the original transcript.  In all other instances, the Court cites to the page numbers generated by the CM/ECF system.

[2] Plaintiff attempts to dispute Defendant's assertion that the Confront & Chase Policy contains this language by reproducing the Policy in full.  *See* [Doc. 72 at 2].  However, Plaintiff does not dispute that these pertinent provisions are contained in the Confront & Chase Policy.  *See* [*id.*].  The Court deems this fact undisputed.  Fed. R. Civ. P. 56(e)(2).

for a pack of cigarettes, which Ms. Moreno retrieved; Mr. Wimmer then asked to have the cigarettes for free, and Ms. Moreno declined. [Doc. 64 at ¶¶ 30–32; Doc. 72 at 3; Doc. 64-11 at 68:2–20]. Thereafter, Mr. Wimmer moved behind the counter and physical contact between Ms. Moreno and Mr. Wimmer was made. [Doc. 64 at ¶¶ 33–38; Doc. 72 at 3–4; Doc. 64-6 at 6:56:05–20].[3]

6.     Mr. Wimmer then left the store and Ms. Moreno called the police. [Doc. 64 at ¶ 42; Doc. 72 at 4; Doc. 64-11 at 73:5–12].

7.     Ms. Moreno later advised store manager Love Jorgensen ("Ms. Jorgensen") and market manager Driss Aamoud ("Mr. Aamoud") of the robbery. [Doc. 64 at ¶¶ 44, 47; Doc. 72 at 4; Doc. 64-11 at 74:12–20, 76:18–25]. Ms. Jorgensen and Mr. Aamoud arrived at the store and reviewed surveillance footage. [Doc. 64 at ¶¶ 49, 51; Doc. 72 at 4; Doc. 64-12 at 113:11–21].

8.     The next day, on October 5, 2020, Mr. Aamoud, operations director Craig Holmes ("Mr. Holmes"), and human resources manager Amy Harvey ("Ms. Harvey") each reviewed the surveillance video. [Doc. 64 at ¶ 53; Doc. 72 at 4; Doc. 64-12 at 117:20–25; Doc. 64-13 at 41:12–16, 44:1–8; Doc. 64-14 at 73:10–18].

9.     Mr. Aamoud, Mr. Holmes, and Ms. Harvey all agreed that Ms. Moreno violated Circle K's Confront & Chase Policy during her interaction with Mr. Wimmer and jointly decided to terminate Ms. Moreno's employment for allegedly violating the Confront

---

[3] The Parties largely dispute the events of the robbery. *See, e.g.*, [Doc. 64 at ¶¶ 33–41; Doc. 72 at 3–4]. These disputes are not material for purposes of this Order. The Parties do not dispute that Mr. Wimmer came behind the counter and that physical contact between Ms. Moreno and Mr. Wimmer occurred, *see* [Doc. 64 at ¶¶ 33, 36–38; Doc. 72 at 3–4], which is confirmed by the video surveillance footage, *see* [Doc. 64-6 at 6:56:05–20].

& Chase Policy.  [Doc. 64 at ¶¶ 54–55; Doc. 65 at ¶ 31; Doc. 65-8 at 44:1–5; Doc. 72 at 4; Doc. 64-13 at 42:11–44:5, 49:13–50:5; Doc. 70 at ¶ 31].

10.     On October 6 or 7, 2020, Mr. Aamoud called Ms. Moreno to inform her that her employment with Circle K was terminated.  [Doc. 64 at ¶ 61; Doc. 72 at 6; Doc. 64-11 at 58:2–16; Doc. 64-1 at ¶ 12].[4]

11.     After Mr. Aamoud informed Ms. Moreno of Circle K's decision to terminate her, neither Ms. Moreno nor Mr. Aamoud "said anything else after that."  [Doc. 64 at ¶ 62; Doc. 72 at 6; Doc. 64-11 at 90:11–91:5].

12.     Ms. Moreno did not talk to anyone else at Circle K about her termination, her employment, or the robbery.  [Doc. 64 at ¶ 66; Doc. 72 at 6; Doc. 64-11 at 93:9–22].

13.     Neither Mr. Aamoud nor anyone else at Circle K told Ms. Moreno that she should not have called the police or should not have cooperated with the police.  [Doc. 64 at ¶ 67; Doc. 72 at 6; Doc. 64-11 at 93:25–94:9].  In addition, no one at Circle K told Ms. Moreno that she should not cooperate in the criminal prosecution of Mr. Wimmer.  [Doc. 64 at ¶ 68; Doc. 72 at 6; Doc. 64-11 at 94:10–20].

---

[4] The Court notes that, in Plaintiff's Motion for Summary Judgment, Ms. Moreno asserts that she was terminated on October 8, 2020.  *See* [Doc. 65 at ¶ 2].  Circle K disputes this assertion, arguing that Ms. Moreno was terminated on October 6 or 7, 2020.  [Doc. 70 at ¶ 2].  Plaintiff did not reply to this asserted dispute.  *See generally* [Doc. 77].  Accordingly, given that Ms. Moreno elsewhere admitted that she was terminated on October 6 or 7, 2020, *see* [Doc. 72 at 6], the Court will assume that she was terminated on one of those dates.  However, the Court does not find that the exact date on which Ms. Moreno was terminated is material for purposes of this Order.

## ANALYSIS

### I.      Wrongful Discharge in Violation of Public Policy

Under the doctrine of at-will employment, employees hired for an indefinite period of time may be terminated at any time, without cause and without notice, and any such termination typically does not give rise to a cause of action.  *Cont'l Air Lines, Inc. v. Keenan*, 731 P.2d 708, 711 (Colo. 1987).  However, an exception to this general rule exists that "allows at-will employees to pursue claims for wrongful discharge if they allege that they were discharged because they engaged in conduct that is protected or encouraged as a matter of public policy."  *Kearl v. Portage Env't, Inc.*, 205 P.3d 496, 498–99 (Colo. App. 2008).  To establish a prima facie case of wrongful termination in violation of public policy, the plaintiff must demonstrate that:

(1)      the employer directed the employee to perform an illegal act as part of the employee's work-related duties or prohibited the employee from performing a public duty or exercising an important job-related right or privilege;

(2)      the action directed by the employer would violate a specific statute relating to the public health, safety, or welfare, or would undermine a clearly expressed public policy relating to the employee's basic responsibility as a citizen or the employee's right or privilege as a worker;

(3)      the employee was terminated as the result of refusing to perform the act directed by the employer, or because she performed a public duty or exercised an important job-related right or privilege; and

(4)      the employer was aware, or reasonably should have been aware, that its conduct was violative of the employee's legal right or privilege as a worker.

*Martin Marietta Corp. v. Lorenz*, 823 P.2d 100, 109 (Colo. 1992); *Donez v. Leprino Foods, Inc.*, No. 19-cv-00285-CMA-NRN, 2020 WL 1914958, at *4 (D. Colo. Apr. 20, 2020), *aff'd*, No. 21-1212, 2022 WL 500549, at *3 (10th Cir. Feb. 18, 2022).

The public policy at issue must be "widely accepted and substantial," must "concern behavior that truly impacts the public," *Crawford Rehab. Servs., Inc. v. Weissman*, 938 P.2d 540, 552 (Colo. 1997) (quotation omitted), and must be "sufficiently concrete to notify employers and employees of the behavior it requires," *Rocky Mountain Hosp. & Med. Serv. v. Mariani*, 916 P.2d 519, 525 (Colo. 1996). Whether there exists a "sufficiently clear expression of public policy" is a question of law for the Court. *Kearl*, 205 P.3d at 498. The plaintiff bears the burden of demonstrating that the public-policy exception applies. *Jaynes v. Centura Health Corp.*, 148 P.3d 241, 243 (Colo. App. 2006).

Ms. Moreno contends that Circle K's termination of her employment violated public policy because she was terminated for (1) exercising her right of self-defense and (2) being the victim of a crime. [Doc. 56 at ¶¶ 99–100, 108; Doc. 72 at 12–19]. Circle K contends in its Motion for Summary Judgment that Ms. Moreno cannot succeed on either theory, and thus, it is entitled to summary judgment on her first claim. [Doc. 64 at 12–14]. The Court addresses each theory separately below.

## A.    Self Defense

Ms. Moreno first argues that Circle K wrongfully terminated her in violation of public policy because it terminated her for engaging in her right of self-defense. [Doc. 72 at 12]. Circle K asserts that any such claim is not legally viable because "[s]elf-defense is not a clearly expressed public policy sufficient to support a wrongful-discharge claim." [Doc. 64 at 14]. The Court notes that Ms. Moreno does not assert that Circle K required her to perform an illegal act or prohibited her from performing a public duty (such as jury duty),

Case No. 1:22-cv-02327-NYW-STV   Document 83   filed 01/19/24   USDC Colorado   pg 9 of 29

*see generally* [Doc. 72];[5] therefore, her claim necessarily involves a contention that Circle K prohibited her from exercising an important job-related right or privilege, *Martin Marietta*, 823 P.2d at 109. "Under this rationale, the employee must prove that the employer's action 'would violate a *specific statute* relating to the public health, safety, or welfare, or would undermine a *clearly expressed public policy* relating to the employee's rights as a worker.'" *Donez*, 2020 WL 1914958, at *5 (quoting *Mariani*, 916 P.2d at 524 (emphasis in original)).

Ms. Moreno contends that "Colorado public policy recognizes the essential right to self-defense," directing the Court to three sources of law: a Colorado statute, the Colorado Constitution, and Colorado case law. [Doc. 72 at 12–13]. First, Ms. Moreno notes that the right to self-defense is "codified at Colo. Rev. Stat. § 18-1-704." [*Id.* at 12]. This statute provides that

> a person is justified in using physical force upon another person in order to defend [her]self or a third person from what [s]he reasonably believes to be the use or imminent use of unlawful physical force by that other person, and [s]he may use a degree of force which [s]he reasonably believes to be necessary for that purpose.

Colo. Rev. Stat. § 18-1-704(1). In addition, she highlights that the Colorado Constitution states that "[a]ll persons have certain natural, essential and inalienable rights, among which may be reckoned the right of enjoying and **defending** their lives and liberties . . . and of seeking and obtaining their safety and happiness." [Doc. 72 at 13 (quoting Colo. Const. art. II, § 3 (emphasis in original))]. And third, she relies on the fact that, under Colorado law, Coloradans have the right to "use force in defending [themselves] without

---

[5] *See Martin Marietta*, 823 P.2d at 109 (using jury duty as an example of a public duty or obligation).

Vol. IV - 0779

first retreating, or seeking safety by means of escape," if they "reasonably perceive[] an imminent use of unlawful physical force."  [*Id.* (quoting *People v. Monroe*, 474 P.3d 113, 116 (Colo. App. 2018))].  Ms. Moreno acknowledges that the Colorado Supreme Court has never ruled that the right to self-defense is a job-related public policy right that, if violated, could form the basis of a wrongful termination claim, but argues that "[i]n light of the clear public policy favoring self-defense[,] . . . the Colorado Supreme Court is likely to recognize such an exception."  [*Id.*].

Where there is no definitive direction from a state's high court on an issue of state law, federal courts applying state law must predict how the state court would rule. *Vanover v. Cook*, 260 F.3d 1182, 1186 (10th Cir. 2001).  As a preliminary matter, the Court notes that while there is limited Colorado case law discussing the public-policy exception to the at-will employment doctrine, the Colorado Supreme Court has expressed reluctance to expand the public-policy exception in the past.  For example, in *Crawford*, the plaintiff alleged that she was terminated in violation of public policy for taking rest breaks according to a Colorado minimum wage order.  *See Crawford*, 938 P.2d at 543, 553.  The wage order dictated that certain employees were eligible to take 10-minute breaks for each four-hour work period.  *Id.* at 553.  The Colorado Supreme Court concluded that the claim was not supported by any "clearly expressed public policy relating to an employee's basic rights or duties," as the wage order "[did] not rise to the level of a public-policy mandate susceptible to private enforcement."  *Id.*  In so ruling, the Colorado Supreme Court emphasized that "[t]he [Colorado] General Assembly is the branch of government charged with creating public policies, and the courts may only

recognize and enforce such policies," and instructed that courts "must develop the common law in this area with care." *Id.*

The public-policy exception applies only where an employee's termination "contravenes a *clear mandate* of public policy." *Martin Marietta*, 823 P.2d at 107 (quotation omitted and emphasis added). The Court cannot conclude that the sources cited by Plaintiff, separately or collectively, reflect the sort of *clear* public-policy mandate that "expresse[s] public policy relating to . . . the employee's rights *as a worker*" and is "sufficiently concrete to notify employers and employees of the behavior it requires." *Mariani*, 916 P.2d at 524–25 (quotation omitted and emphasis altered).

Section 18-1-704, found in the Colorado Criminal Code, creates a defense against *criminal* liability where a person acts in self-defense. *See People v. Mosely*, 488 P.3d 1074, 1079 (Colo. 2021). This affirmative defense is available whether or not the person retreated or attempted to seek safety by escape. *Monroe*, 474 P.3d at 116. But the availability of an affirmative defense to a *criminal* charge does not "provide a clear mandate" to employees and employers "to act or not to act in a particular way." *Mariani*, 916 P.2d at 525; *cf. Crawford*, 938 P.2d at 552 (finding the statute the plaintiff relied on to demonstrate a public policy was "factually inapplicable" to the plaintiff's case). Moreover, beyond mentioning that "Colorado has unfortunately experienced a tremendous amount of workplace violence," Ms. Moreno does not explain why her statutory or common-law right to assert self-defense in the criminal context is related to her *job-related* duties at Circle K. *See* [Doc. 72 at 16]; *see also Martin Marietta*, 823 P.2d at 109 (the employee must demonstrate that she was prohibited from "exercising an important *job-related* right or privilege" (emphasis added)). The Court concludes that the

right to self-defense recognized in criminal law lacks a sufficient nexus to Ms. Moreno's job-related rights or privileges, and the generally applicable criminal statute or cases are, at best, only "tenuously connected to [Ms. Moreno's] employment." *See Donez*, 2020 WL 1914958, at *7; *compare id.*, *with Hoyt v. Target Stores, Div. of Dayton Hudson Corp.*, 981 P.2d 188, 191 (Colo. App. 1998) (recognizing a job-related right to be compensated for work performed under the Colorado Wage Claim Act).

The Court reaches the same conclusion with respect to the constitutional provision cited by Plaintiff. The Colorado Constitution recognizes that all persons have "certain natural, essential and inalienable rights," including the right to "defend[] their lives and liberties." Colo. Const. art. II, § 3. But again, this "broad constitutional right[]" is not "'sufficiently concrete to notify employers and employees of the behavior it requires' and do[es] not 'provide a clear mandate to act or not to act in a particular way.'" *Donez*, 2020 WL 1914958, at *7 (quoting *Mariani*, 916 P.2d at 525). Nor does this constitutional provision clearly set forth a *job-related* right or privilege. *See* Colo. Const. art. II, § 3.

"Not all potential sources of public policy are of sufficient gravity to outweigh the precepts of at-will employment." *Crawford*, 938 P.2d at 553. As mentioned above, "[t]he [Colorado] General Assembly is the branch of government charged with creating public policies, and the courts may only recognize and enforce such policies." *Id.* This is particularly true when *federal* courts are asked to recognize a new facet of state law, as it is not the federal judiciary's role to "define the parameters of state public policy." *Brown v. Premier Roofing, LLC*, 173 F. Supp. 3d 1181, 1186 (D. Colo. 2016); *see also Mares v. Conagra Poultry Co.*, 773 F. Supp. 248, 252 (D. Colo. 1991) (recognizing that the role of federal courts "does not include effecting a dramatic shift in the forum state's common

law" and declining to "create a new category within this narrow [public-policy] exception for plaintiff to maintain her cause of action"), *aff'd*, 971 F.2d 492 (10th Cir. 1992). Indeed, the out-of-state authorities cited by Plaintiff in support of her argument are cases in which *state* high courts recognized a state-law public-policy exception for self-defense acts. *See Ray v. Wal-Mart Stores, Inc.*, 359 P.3d 614, 636 (Utah 2015); *Feliciano v. 7-Eleven, Inc.*, 559 S.E.2d 713, 722–23 (W. Va. 2001); *cf. Gardner v. Loomis Armored Inc.*, 913 P.2d 377, 386 (Wash. 1996) (recognizing public-policy exception where employee was terminated for defending the safety *of another*); *but see Danny v. Laidlaw Transit Servs., Inc.*, 193 P.3d 128, 144 n.16 (Wash. 2008) (Madsen, J., concurring in part and dissenting in part) ("Specialists in the field point to *Gardner* as an anomaly in that the sources of law relied upon for the public policy impose no duty on either the employer or the employee to engage in, or refrain from, the conduct at issue."). This Court is simply not in the position to recognize, in the first instance, a new type of public-policy exception to Colorado's at-will employment doctrine.[6]

---

[6] The Court recognizes that Ms. Moreno originally filed her action in state court, where this issue would arguably be better addressed, and the case was removed to federal court by Defendant. [Doc. 1; Doc. 3]. And although Ms. Moreno asserts in her Response that the Court should "certify this question to the Colorado Supreme Court to decide this important question of Colorado law," [Doc. 72 at 17], this request is not properly before the Court, *see* D.C.COLO.LCivR 7.1(d) ("A motion shall not be included in a response or reply to the original motion. A motion shall be filed as a separate document."); *see also* NYW Civ. Practice Standard 7.1A(a)(6) ("A request for the Court to take action shall NOT be included in a response or reply to the original motion."). While the Court may sua sponte certify a question of law, *see* Colo. App. R. 21.1(b), it declines to do so, given the lack of argument supporting Ms. Moreno's certification request, *see* [Doc. 72 at 17, 25]; *see also Armijo v. Ex Cam, Inc.*, 843 F.2d 406, 407 (10th Cir. 1988) ("Certification is not to be routinely invoked whenever a federal court is presented with an unsettled question of state law."); *Ormsbee Dev. Co. v. Grace*, 668 F.2d 1140, 1149 (10th Cir. 1982) (certification "is to be utilized with restraint and distinction").

As a result, the Court concludes that Plaintiff has not met her burden of demonstrating that a public-policy exception to the at-will employment doctrine applies, so as to overcome the presumption of at-will employment in Colorado. *See Donez*, 2020 WL 1914958, at *7 (concluding there was no public-policy exception under Colorado law with respect to the right of self-defense). Accordingly, Ms. Moreno's wrongful termination claim is not viable to the extent it is based on a self-defense theory, and the Court need not address the Parties' remaining arguments as to whether there are genuine disputes of fact on this portion of the claim. Defendant's Motion for Summary Judgment is, therefore, **GRANTED** with respect to this portion of the claim. *See id.*

## B.   Retaliation Against Crime Victims or Reporters of Crime

In the alternative, Ms. Moreno argues that she was wrongfully terminated because her "rights as a victim of a crime were violated." [Doc. 72 at 17]; *see also* [Doc. 56 at ¶ 100 ("Ms. Moreno's wrongful discharge claim is also simultaneously grounded in her rights as a victim and witness of a crime, including her rights to report a crime and to participate in the investigation and prosecution of the crime, free from retaliation by her employer or anyone else.")]. Circle K contends that it is entitled to summary judgment on this portion of the claim for three reasons: (1) the claim is unavailable because Colo. Rev. Stat. § 24-4.1-303 provides a statutory remedy, [Doc. 64 at 16]; (2) the statutes cited by Plaintiff do not create a clearly defined public-policy exception to at-will employment, [*id.* at 16–17]; and (3) Ms. Moreno has failed to adduce any evidence demonstrating that she was terminated because she was the victim of a crime or reported a crime, [*id.* at 17]. Because the first two arguments require novel determinations of Colorado state law, and because Defendant's third argument is dispositive, the Court limits its analysis to

Defendant's third argument.  Even assuming that Ms. Moreno has articulated a public-policy violation that could give rise to a wrongful discharge claim, she has not put forth sufficient evidence from which a reasonable jury could conclude that she was terminated because she was the victim of a crime or because she reported a crime, and has not established a genuine dispute of fact that precludes summary judgment.

As mentioned above, to prevail on a wrongful discharge claim based on a public-policy violation, the plaintiff must show that she was "terminated . . . *as the result of* performing a public duty or exercising an important job-related right or privilege." *Donez*, 2020 WL 1914958, at *4 (emphasis added) (citing *Martin Marietta*, 823 P.2d at 102).  This means that the plaintiff must "present evidence that her termination was causally connected to her" exercise of a job-related right or privilege or exercise of a public duty. *Jackson v. Dillard's Dep't Stores, Inc.*, 92 F. App'x 583, 588 (10th Cir. 2003) (applying Colorado law); *see also Wehrley v. Am. Fam. Mut. Ins. Co.*, 513 F. App'x 733, 744 (10th Cir. 2013) (recognizing that a claim alleging wrongful termination in violation of public policy "*at the very least* requires evidence of a causal connection between the exercise of [the employee's] rights and the firing." (emphasis added)).

Ms. Moreno appears to assert two separate theories:  first, she was terminated because she reported a crime, and second, she was terminated because she was the victim of a crime.  *See* [Doc. 72 at 17–19].  As for the first theory, Ms. Moreno argues that "there is ample evidence that Defendant terminated Ms. Moreno for reporting being a victim of a crime to her employer and the police."  [*Id.* at 18].  She points to evidence that,

between 2018 and 2021, Circle K terminated 43 employees across six states[7] for violating the Confront & Chase Policy and argues that this evidence demonstrates that Defendant "systematically fires employees who report crimes." [*Id.* (emphasis omitted)]; *see also* [Doc. 72-14]. She notes that there was "only one confirmed case of an employee" who made physical contact with a robber "who was not terminated as a result of that contact," and that Mr. Holmes did not know of any employees who were not terminated after they made physical contact with a robber. [*Id.*]; *see also* [Doc. 72-13 at 37:20–23, 57:21–58:12].[8]

The Court is respectfully unpersuaded by Ms. Moreno's argument, which ignores one of the required elements of a public-policy wrongful discharge claim: that the employee was fired *because* she exercised a protected job-related right or public duty. *Donez*, 2020 WL 1914958, at *4; *Martin Marietta*, 823 P.2d at 102. The Court notes that the cited evidence does not directly concern or demonstrate any basis for *Ms. Moreno's* termination; on this point, Ms. Moreno relies solely on the fact that *other* employees were terminated for violating the Confront & Chase Policy. *See* [Doc. 72 at 18]. But Ms. Moreno does not explain why any evidence showing that Circle K has terminated other employees for violating the Confront & Chase Policy demonstrates that Circle K terminated those employees for reporting crimes, or terminated Ms. Moreno for reporting a crime. In fact, Ms. Moreno does not direct the Court to any evidence demonstrating

---

[7] The states mentioned are Colorado, New Mexico, Texas, Oklahoma, Kansas, and Missouri, [Doc. 72 at 18], which are the states that Ms. Harvey supported as Circle K's HR manager, *see* [Doc. 65-1 at 77:19–78:12].

[8] Ms. Moreno also asserts that Ms. Harvey stated that she could not remember any employee who made physical contact with an assailant and was not terminated, *see* [Doc. 72 at 10, 18], but the cited evidence does not support this assertion, *see* [Doc. 72-5 at 21:7–15, 35:3–7].

that any of those 43 terminated employees *actually reported* any crime, so as to support her assumption that these employees were really terminated for that reason. *See generally* [*id.*]; *see also* [Doc. 72-1 at 79:9–12 ("Q.   Okay.   And do you know the circumstances of each of these terminations?   A.  I know they were all chase and confront. But each individual, I do not.")].

To avoid summary judgment, Ms. Moreno must put furth evidence that is "more than mere speculation, conjecture, or surmise." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).  Even construing the evidence in the light most favorable to Plaintiff, evidence that other employees were terminated for violating the Confront & Chase Policy, or that Mr. Holmes knew of no employees who were retained after they made physical contact with a robber, does not demonstrate that Ms. Moreno was terminated for reporting a crime.   Absent any evidence demonstrating that Circle K actually possessed this purportedly unlawful motivation, Ms. Moreno has not established a genuine dispute of fact sufficient to defeat summary judgment with respect to causation. *Cf. Roemer v. Pub. Serv. Co. of Colo.*, 911 F. Supp. 464, 469 (D. Colo. 1996) (in Title VII discrimination context, granting summary judgment in favor of employer where there was no "evidence that [the employer] *actually possessed* this [unlawful] motive").[9]

_____

[9] Ms. Moreno states in her Response that the Honorable Scott T. Varholak, in a hearing on Plaintiff's motion to amend her complaint to add a request for exemplary damages, "stated that, considering that anytime an[] employee makes contact[] with an attacker, even in self-defense, they are terminated, a jury could infer that Circle K terminated employees to keep them from reporting crimes and that there is a chilling effect on reporting crimes."  [Doc. 72 at 19].  For several reasons, this argument does not change the Court's conclusion.  First, Plaintiff does not explain why whether the Confront & Chase Policy has a chilling effect on reporting crime is relevant to whether she has presented evidence that she was terminated for reporting a crime. *See* [*id.*].  Here, it is undisputed that Ms. Moreno did report the robbery to police.  [Doc. 64 at ¶ 42; Doc. 72 at 4].  Second, at the hearing, Plaintiff argued that she should be permitted to add a claim for exemplary

Ms. Moreno also contends that she was terminated for being a crime victim.  [Doc. 72 at 18–19].  She appears to suggest that the mere fact that those 43 employees were terminated for violating the Confront & Chase Policy necessitates a corresponding conclusion that these employees were inherently terminated because they were crime victims, presumably based on the idea that any employee who violates the Confront & Chase Policy, which applies in situations of workplace theft or shoplifting, *see* [Doc. 64-5 at 2], is necessarily the victim of a crime.  *See, e.g.*, [Doc. 72 at 19 ("Defendant submits that its agents did not intend to fire [Ms. Moreno] because she was a victim of a crime, but that is not the issue.  Circle K is a company with a policy that inherently does this by how the policy is constructed and implemented across the company, and as applied to Ms. Moreno.  This is separate and apart from the state of mind of any individual supervisor or manager when implementing the company's directives." (citation omitted))].

Ms. Moreno has not directed the Court to any Colorado wrongful-discharge authority approving a theory of causation that relies not on the employer's actual motive,

---

damages (i.e., that Circle K acted willfully or wantonly) because, inter alia, "Circle K systematically terminates employees who report these attacks, and that has a chilling effect on the employees."  [Doc. 61 at 8:9–11].  But whether there is prima facie evidence that Circle K acted willfully or wantonly is an entirely different issue from whether Plaintiff has put forth evidence from which a reasonable jury could conclude that she was terminated for reporting a crime.  Furthermore, Judge Varholak concluded at the hearing that a reasonable jury, "*at least at the plausibility of pleading stage, and at least considering* [*Stamp v. Vail Corp.*, 172 P.3d 437, 450 (Colo. 2007)]*'s lenient standard*," could find that Circle K "doesn't want [crimes] reported to the police" or "that there's a chilling effect" against reporting crimes.  [Doc. 61 at 19:16–20:2 (emphasis added)].  But he also stated that he "[didn't] think Plaintiff ha[d] presented clear facts at this point that the mere statement or the mere fact that Plaintiff reported the crime led to [her] termination," [*id.* at 18:25–19:2], and that, with respect to whether Circle K terminates employees for reporting crimes, he "[didn't] have good facts on that," [*id.* at 19:16–17].  And finally, again, speculation is insufficient to defeat summary judgment.  *Bones*, 366 F.3d at 875.

but on the purported incidental impact of a workplace policy.  Even assuming that all of the employees who violated the Confront & Chase Policy are appropriately considered crime victims, this alone is insufficient to demonstrate, beyond speculation or conjecture, that these employees were terminated *because* they were crime victims, rather than for Policy violations.  *See Bones*, 366 F.3d at 875.  Indeed, despite her assertion that between 2017 and 2021, there were "hundreds of robberies, including armed robberies," at Circle K locations, [Doc. 72 at 10]; *see also* [Doc. 72-5 at 33:8–17], Ms. Moreno has not directed the Court to any evidence that Circle K terminates *all* employees who are victims of a robbery at work—even those employees who do not physically engage the robber and therefore do not violate the Confront & Chase Policy—or any other evidence which might have supported her crime-victims theory of relief.  Simply put, this evidence shows—at most—incidental correlation, not causation, and does not support Ms. Moreno's theory that she was terminated *because* she was a crime victim.  Accordingly, no reasonable jury could conclude, based on this evidence, that Ms. Moreno was terminated because she was the victim of a crime.  Defendant's Motion for Summary Judgment is therefore **GRANTED** with respect to the entirety of Plaintiff's wrongful discharge claim.

## II.    Intentional Infliction of Emotional Distress

Circle K also seeks summary judgment on Plaintiff's IIED claim.  [Doc. 64 at 17–18].  It contends that it is entitled to judgment in its favor because Plaintiff cannot show that her termination was extreme or outrageous as a matter of law.  [*Id.* at 19–23].

To prevail on an IIED claim under Colorado law, Ms. Moreno must demonstrate that (1) Circle K engaged in "extreme and outrageous conduct"; (2) Circle K acted

recklessly or with the intent to cause Ms. Moreno severe emotional distress; and (3) Circle K did cause Ms. Moreno severe emotional distress.  *Green v. Qwest Servs. Corp.*, 155 P.3d 383, 385 (Colo. App. 2006).

"The level of outrageousness required to constitute extreme and outrageous conduct is extremely high."  *Reigel v. SavaSeniorCare L.L.C.*, 292 P.3d 977, 990 (Colo. App. 2011).  The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Coors Brewing Co. v. Floyd*, 978 P.2d 663, 666 (Colo. 1999) (quoting Restatement (Second) of Torts § 46 (1965)).  "Proof of the tort of outrageous conduct must consist of either an extreme act, both in character and degree, or a pattern of conduct from which the ineluctable conclusion is the infliction of severe mental suffering was calculated or recklessly and callously inflicted."  *Gard v. Teletronics Pacing Sys., Inc.*, 859 F. Supp. 1349, 1354 (D. Colo. 1994).  Whether the defendant's conduct meets this level of outrageousness is generally a question of fact reserved for the jury, but "it is the initial responsibility of a court to determine whether reasonable persons could differ on the question."  *McCarty v. Kaiser-Hill Co.*, 15 P.3d 1122, 1126 (Colo. App. 2000); *see also Coors Brewing Co.*, 978 P.2d at 665 ("Before permitting a plaintiff to present a claim for outrageous conduct to the jury, the trial court must initially rule on the threshold issue of whether the plaintiff's allegations of outrageous conduct are sufficiently outrageous as a matter of law.").

"It is well-settled under Colorado law that discharge from employment, without more, is not outrageous conduct."  *Morales v. L. Firm of Michael W. McDivitt, P.C.*, 641 F. Supp. 3d 1035, 1039 (D. Colo. 2022) (citing *Grandchamp v. United Air Lines, Inc.*, 854

F.2d 381, 384 (10th Cir. 1988)).  This does not mean, however, that an employer can never be held liable for claims of outrageous conduct arising from the termination of a person's employment.  *See Grandchamp*, 854 F.2d at 385 (applying Colorado law) (collecting cases).  For example, in *Christen-Loper v. Bret's Electric, LLC*, the court concluded that the plaintiff stated a plausible IIED claim where she alleged that her employer knowingly terminated her while she was "lying in a hospital bed after suffering a severe bi-polar episode and under a suicide watch" because the employer "was upset with her for taking time off from work to visit her doctor."  175 F. Supp. 3d 1213, 1226 (D. Colo. 2016).  Or, in *Archer v. Farmer Brothers Co.*, the court concluded that reasonable people could find the defendant's conduct—showing up at the employee's bedside unannounced and terminating the employee five days after the employee had a heart attack, while the employee was lying in bed, partially clothed—was extreme and outrageous.  70 P.3d 495, 500 (Colo. App. 2002), *aff'd*, 90 P.3d 228 (Colo. 2004).  And in *Kirk v. Smith*, the court determined that the plaintiff's IIED claim would survive dismissal where she alleged that one of her supervisors physically assaulted her during the termination.  674 F. Supp. 803, 811 (D. Colo. 1987).

These cases demonstrate that it is not termination itself that amounts to extreme and outrageous conduct, but the manner of the discharge and the employer's related actions.  *Grandchamp*, 854 F.2d at 385; *see also, e.g.*, *LaBrecque v. L3 Commc'n Titan Corp.*, No. 05-cv-00642-REB-MJW, 2007 WL 1455850, at *5 (D. Colo. May 16, 2007) ("[A] termination must be combined with other wrongful behavior, such as a physical assault, or extreme harassment, ridicule, and humiliation to constitute an[] arguable claim of outrageous conduct."), *aff'd sub nom. Sydnes v. United States*, 523 F.3d 1179 (10th

Cir. 2008).  "[I]n order to be liable for the intentional infliction of emotional distress, the defendant's conduct must be more than unreasonable, unkind or unfair; it must truly offend community notions of acceptable conduct."  *Grandchamp*, 854 F.2d at 383.

Circle K contends that it is entitled to summary judgment on Ms. Moreno's IIED claim because its conduct in terminating her employment was not extreme or outrageous. [Doc. 64 at 19].  According to Circle K, its conduct falls well short of the conduct that other courts, such as the courts in *Archer*, *Christen-Loper*, and *Kirk*, have deemed extreme or outrageous.  [*Id.* at 20].  It contends that Ms. Moreno was terminated after its decisionmakers reviewed security footage and determined that Ms. Moreno violated the Confront & Chase Policy, and that Mr. Aamoud "conveyed the termination decision [to Plaintiff] over the phone in a short and unremarkable conversation."  [*Id.* at 22].  It concludes that "[t]he facts here simply do not rise to the necessary level to survive summary judgment."  [*Id.* at 23].

Ms. Moreno disagrees.  She argues that "Circle K's conduct in terminating Ms. Moreno from her nearly 16-year position after she was robbed at knifepoint was outrageous."  [Doc. 72 at 21]; *see also* [*id.* at 23 (Plaintiff arguing that she has adduced sufficient evidence from which a reasonable jury could conclude that "terminating a long-time employee, especially a 72-year-old woman, for having been the victim of a violent crime while on the job is plainly outrageous.")].[10]  She emphasizes the fact that she was

---

[10] The Court notes that Ms. Moreno also alleges in her Amended Complaint that Circle K acted outrageously by "refusing to timely come to her aid following the armed robbery or assign additional employees to the store" and by "order[ing] Ms. Moreno's daughter[-in-law] to leave the store following the armed robbery."  [Doc. 56 at ¶¶ 117, 119].  However, although Defendant put these allegations at issue in its Motion for Summary Judgment and argued that these allegations do not amount to outrageous conduct, *see* [Doc. 64 at 22], Ms. Moreno raises no argument in her Response with respect to these theories of

terminated just days after she was the victim of an armed robbery, arguing that the robbery "left [her] in a state of heightened vulnerability of which her Circle K managers were aware," [*id.* at 22], and analogizing her case to *Archer*, *Christen-Loper*, and *Kirk*, asserting that these cases and her case all "concern the termination of an employee after their physical safety was threatened," [*id.* at 23].  She also asserts that "the evidence shows that Circle K terminated [her] pursuant to a systematic policy of terminating employees who are victims of workplace violence."  [*Id.* at 22].

It is undisputed that Ms. Moreno was terminated over the phone by Mr. Aamoud on October 6 or 7, 2020, just days after she was the victim of the robbery during her shift. [Doc. 64 at ¶ 61; Doc. 72 at 6].  It is also undisputed that Mr. Aamoud "told [Ms.] Moreno she was terminated and neither [Ms.] Moreno nor [Mr.] Aamoud said anything else after that," and that Ms. Moreno did not discuss her termination, her employment, or the robbery with anyone else at Circle K.  [Doc. 64 at ¶¶ 62, 66; Doc. 72 at 6].  It is undisputed that Ms. Moreno sought therapy after the robbery, [Doc. 72 at 11; Doc. 79 at 7], and Ms. Moreno has submitted evidence that she feared for her life during the robbery, *see* [Doc. 72-4 at 124:9–18].

Even construing all disputed facts and evidence in Ms. Moreno's favor, the Court cannot conclude that Ms. Moreno has shown that reasonable jurors could find that Defendant's conduct in terminating Ms. Moreno meets the *extremely high* bar of extreme and outrageous conduct.  The termination of a person's employment—even if the

---

relief and does not argue that Circle K is not entitled to summary judgment on any of these theories of relief, *see* [Doc. 72 at 21–23].  Accordingly, the Court deems these theories of relief abandoned.  *See Hinsdale v. City of Liberal*, 19 F. App'x 749, 769 (10th Cir. 2001).

termination is unfair or based in impropriety—does not automatically constitute extreme and outrageous conduct.  For example, in *Coors Brewing Co.*, an employee was allegedly fired to cover up the company's pattern of surreptitiously conducting narcotics investigations of its employees and money laundering.  978 P.2d at 664–65.  The Colorado Supreme Court, focusing on the allegations about the employer's behavior toward the employee—and not the employer's alleged criminal conduct—concluded that the employer's "alleged scapegoating of" the employee did not arise "to the high level of outrageousness required by [Colorado] case law."  *Id*. at 666.  And in *Cronk v. Intermountain Rural Electric Association*, one plaintiff alleged that he was terminated for giving truthful testimony to the Public Utilities Commission, while another alleged that he was terminated because he asked for a transfer after his supervisor asked him to engage in illegal activities.  765 P.2d 619, 621 (Colo. App. 1988).  The Colorado Court of Appeals agreed with the trial court that these allegations failed to describe conduct that was so outrageous as to go beyond all bounds of human decency.  *Id.* at 624.

Much of Plaintiff's argument focuses on the fact that she was fired shortly after the robbery.  *See* [Doc. 72 at 21–23].  To be sure, Defendant's termination of Ms. Moreno just days after the robbery renders this case *somewhat* analogous to *Archer*, where the plaintiff was terminated five days after suffering a heart attack.  *Archer*, 70 P.3d at 499.  However, the *Archer* court did not find extreme and outrageous conduct based solely on the short period of time between the plaintiff's heart attack and his termination; rather, it was the *entirety* of the surrounding circumstances—that the employer was aware the employee was out on indefinite sick leave; that the employer's agents went searching for the employee and ended up at his mother-in-law's house, uninvited; that they entered the

home uninvited; that they found the employee lying in bed, partially clothed; and that they did not ask the employee whether he was able to discuss work matters, but instead presented him with termination papers for his initials.  *Id.* at 500.  Indeed, the court concluded that

> a reasonable person could find that defendants' conduct—barging into a relative's home and, without any prior notice or other consideration, abruptly firing a twenty-two-year employee while he lay in bed, partially undressed, recuperating from what five days earlier had appeared to be a heart attack, and was, in any event, a serious heart condition—so far exceeded the bounds of decency as to be atrocious and utterly intolerable in a civilized community.

*Id.*  Even construing all evidence and making reasonable inferences in Plaintiff's favor, *Archer* is distinguishable; Plaintiff has not directed the Court to any evidence of Defendant's conduct during the termination conversation that is analogous to the *Archer* employer's conduct.  Rather, it is undisputed that the termination in this case was relayed to Ms. Moreno over the phone and that the conversation ended thereafter.  *Cf. Morales*, 641 F. Supp. 3d at 1040 (finding it relevant that the plaintiff was allegedly terminated over the phone, as "[t]here is far less risk of emotional distress occurring over the phone than in person"); *cf. Widdifield v. Robertshaw Controls Co.*, 671 P.2d 989, 991 (Colo. App. 1983) (finding error in submitting the issue of outrageous conduct to the jury where the plaintiff was terminated but "there [was] nothing in the record to indicate that [his] hiring and firing was accompanied by any malice" and instead, the record established that "he was treated with courtesy").

Similarly, the Court is respectfully unpersuaded by Ms. Moreno's reliance on *Kirk*, wherein the plaintiff alleged that one of her supervisors "physically assaulted her and threw her to the ground" when he discovered that she was recording the termination

conversation.  *Kirk*, 674 F. Supp. at 804.  Ms. Moreno insists that this case is analogous to *Kirk* because her physical safety was similarly threatened during the robbery.  [Doc. 72 at 23].  But as Plaintiff acknowledges, *see* [*id.*], unlike *Kirk*, any physical assault in this case is not alleged to be attributable to Defendant.[11]  And finally, the Court cannot conclude that *Christen-Loper* provides much support for Plaintiff's case here.  Plaintiff argues that this case is analogous because "Circle K terminated Ms. Moreno days after she was the victim of a distressing armed robbery, knowing that she was worried about losing her job."  [Doc. 72 at 22].  It is true that "[t]he outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress by reason of some physical or mental condition or peculiarity."  *Zalnis v. Thoroughbred Datsun Car Co.*, 645 P.2d 292, 294 (Colo. App. 1982).  However, Ms. Moreno has not directed the Court to any evidence demonstrating that Circle K, when it terminated Ms. Moreno, knew that Ms. Moreno was "worried about losing her job" or knew that Ms. Moreno was in any sort of particularly vulnerable emotional state at the time of her termination (other than, of course, the fact that Circle K was aware of the robbery, coupled with the readily drawn inference that the victim of a robbery would likely be shaken up by the incident).  *Compare* [Doc. 72 at 21–23], *with Christen-Loper*, 175 F. Supp. 3d at 1226 (finding sufficient allegations of extreme and outrageous conduct where

---

[11] While Plaintiff highlights that the *Kirk* court denied summary judgment *both* to the alleged assailant and to another defendant, *see* [Doc. 72 at 22–23], the Court remains unpersuaded of *Kirk*'s similarity.  The *Kirk* decision is light on detail, but the court stated that both *Kirk* defendants had allegedly "unfairly reprimand[ed]," harassed, and demoted the plaintiff in retaliation for her advocacy of changing the employer's practices and had "engaged in activities designed for the purposes of retaliation and harassment."  *Kirk*, 674 F. Supp. at 804, 811.  The *Kirk* decision does not alter this Court's analysis that Circle K's behavior does not amount to extreme and outrageous conduct.

the plaintiff alleged that the defendant *knew* she was in the hospital after suffering a "severe bi-polar episode and [was] under a suicide watch" when it terminated her for taking medical leave).  And any evidence that Ms. Moreno sought therapy *after* the robbery does not show what Defendant knew at the time it fired Plaintiff.  *See* [Doc. 72-4 at 118:2–4 (Ms. Moreno stating that she had "some therapy sessions" but not stating when these sessions occurred)].

That Ms. Moreno was terminated so soon after the robbery is undoubtedly regrettable, but the Court cannot conclude that losing one's job in the midst of or immediately after a difficult or traumatic event necessarily renders the termination "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Coors Brewing Co.*, 978 P.2d at 666 (quotation omitted); *cf. Mahl v. Nokia, Inc.*, 212 F. App'x 279, 280–81 (5th Cir. 2006) (applying Louisiana law) (where the plaintiff was terminated "only days after Hurricane Katrina," concluding that "the precise timing [was] unfortunate" but that the termination did not rise to the level of extreme and outrageous conduct); *Varney v. Dustin Harris Novant Health, Inc.*, No. 3:18-cv-00090-GCM, 2019 WL 377795, at *2 (W.D.N.C. Jan. 30, 2019) (applying North Carolina law) (dismissing IIED claim where the plaintiff alleged that she was "a cancer survivor [who was terminated] less than a week after her discharge from the hospital" (quotation omitted)); *Maclin v. A.M. Bus Co.*, No. 04-cv-04176, 2006 WL 463370, at *18 (N.D. Ill. Feb. 22, 2006) (applying Illinois law) ("While Defendants might not have had the best timing with respect to Plaintiff's termination, there simply is nothing extreme and outrageous, in and of itself, about an employer terminating an employee . . . when the employee is . . . going through a difficult time.").  Based on the record before the Court,

while a reasonable person could likely conclude that Circle K's decision to terminate Ms. Moreno's employment days after the robbery was "unkind or unfair," *Grandchamp*, 854 F.2d at 383, the Court cannot conclude that a reasonable juror could find that the termination decision was "beyond all possible bounds of decency," "atrocious," or "utterly intolerable in a civilized community," *Coors Brewing Co.*, 978 P.2d at 666 (quotation omitted).  Ms. Moreno has thus not put forth sufficient evidence that Circle K engaged in extreme and outrageous conduct, a necessary element of her IIED claim.  Defendant's Motion for Summary Judgment is respectfully **GRANTED** with respect to Plaintiff's IIED claim.[12]

## III.    Plaintiff's Motion for Partial Summary Judgment

Ms. Moreno seeks summary judgment in this case insofar as Defendant has raised an affirmative defense of failure to mitigate damages.  *See generally* [Doc. 65].  However, because the Court has granted Defendant's Motion for Summary Judgment, no claims (or affirmative defenses) remain in this case.  Accordingly, Plaintiff's Motion for Partial Summary Judgment is respectfully **DENIED as moot**.

## CONCLUSION

For the reasons set forth herein, **IT IS ORDERED** that:

(1)    Circle K's Motion for Summary Judgment [Doc. 64] is **GRANTED**;

---

[12] Having found that summary judgment in Defendant's favor is appropriate for both causes of action, this Court need not address Defendant's argument that it is entitled to summary judgment as to Plaintiff's claim for punitive damages, as punitive damages are a form of relief that is part and parcel of a liability determination, rather than an independent cause of action.  *See Mason v. Texaco, Inc.*, 948 F.2d 1546, 1554 (10th Cir. 1991).

(2)   Plaintiff's Motion for Partial Summary Judgment [Doc. 65] is **DENIED as moot**;

(3)   Judgment is entered in favor of Circle K on each of Plaintiff's claims;

(4)   Circle K is entitled to its costs pursuant to Federal Rule 54(d) and Local Rule 54.1; and

(5)   The Clerk of Court is directed to close this case.


DATED:  January 19, 2024                    BY THE COURT:

                                            _____
                                            Nina Y. Wang
                                            United States District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 22-cv-02327-NYW-STV

MARY ANN MORENO,

      Plaintiff,

v.

CIRCLE K STORES, INC.,

      Defendant.

---

## FINAL JUDGMENT

---

      In accordance with the orders filed during the pendency of this case, and pursuant to Fed. R. Civ. P. 58(a), the following Final Judgment is hereby entered.

      Pursuant to the Memorandum Opinion and Order entered by United States District Judge Nina Y. Wang on January 19, 2024 [Doc. 83], it is

      ORDERED that Circle K's Motion for Summary Judgment [Doc. 64] is GRANTED.  It is

      FURTHER ORDERED that Plaintiff's Motion for Partial Summary Judgment [Doc. 65] is DENIED as moot.  It is

      FURTHER ORDERED that final judgment is hereby entered in favor of Defendant Circle K Stores, Inc. and against Plaintiff Mary Ann Moreno on each of Plaintiff's claims.  It is

      FURTHER ORDERED that Defendant shall have its costs by the filing of a Bill of Costs with the Clerk of this Court within fourteen days of the entry of judgment, pursuant to Fed. R. Civ. P. 54(d)(1) and D.C.COLO.LCivR 54.1.  It is

      FURTHER ORDERED that this case is closed.

Dated at Denver, Colorado this 19th day of January, 2024.

FOR THE COURT:
JEFFREY P. COLWELL, CLERK

By: s/Emily Buchanan
Emily Buchanan, Deputy Clerk

### Notice of Appeal to a Court of Appeals From a Judgment of a District Court

United States District Court for the
District of Colorado
Civil Action No. 22-cv-02327-NYW-STV

| | |
|---|---|
| Mary Ann Moreno, Plaintiff<br><br>v.<br><br>Circle K Stores, Inc., Defendant | Notice of Appeal |

Plaintiff Mary Ann Moreno appeals to the United States Court of Appeals for the Tenth Circuit from the final judgment entered on January 19, 2024.

RATHOD | MOHAMEDBHAI LLC

s/ *Iris Halpern*
Iris Halpern
Virginia Hill Butler
2701 Lawrence Street, Suite 100
Denver, CO 80205
T: (303) 578-4400
E: ih@rmlawyers.com
   vb@rmlawyers.com

Attorneys for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on February 14, 2024, the foregoing Notice of Appeal was filed with the Clerk of the Court using CM/ECF system, which serve the following:

Thomas W. Carroll, tcarroll@littler.com
Nicholas Hankins, nhankins@littler.com

Attorneys for Defendant

*/s/ Iris Halpern*
Iris Halpern