Case No. 24-1058

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

Mary Ann Moreno,

      Plaintiff-Appellant,

v.

Circle K Stores, Inc.,

      Defendant-Appellee.

_____

On Appeal from the United States District Court for the District of Colorado
The Honorable Nina Y. Wang, U.S. District Judge
D.C. Case No. 1:22-cv-02327-NYW-STV

_____

## <u>APPENDIX – VOLUME I, PAGES 0001 - 0213</u>

Virginia Hill Butler
Iris Halpern
Matthew J. Cron
Rathod | Mohamedbhai LLC
2701 Lawrence Street, Suite 100
Denver, Colorado 80205
vb@rmlawyers.com
ih@rmlawyers.com
mc@rmlawyers.com
*Attorneys for Plaintiff-Appellant*

# TABLE OF CONTENTS

## VOLUME I

Docket Sheet.................................................................4

Doc. 1: Notice of Removal ...............................................13

Doc. 1-1: Complaint.......................................................20

Doc. 1-12: Civil Cover Sheet ........................................38

Doc. 16: Answer............................................................39

Doc. 49: Plaintiff's Renewed Motion for Leave to Amend Complaint to Seek Exemplary Damages Remedy................................53

Doc. 49-1: Declaration of Bonnie Moreno...................................69

Doc. 49-2: Declaration of Olivia Verela Roan............................76

Doc. 49-3: Circle K. Surveillance Video (Reg. 1) .......................81

Doc. 49-4: 911 Call Audio .............................................82

Doc. 49-5: Aamoud Deposition Transcript .................................83

Doc. 49-6: Circle K Surveillance Video (Office) .......................92

Doc. 49-7: Harvey Deposition Transcript ...............................93

Doc. 49-8: Confront & Chase ........................................103

Doc. 49-9: Redline Complaint ......................................105

Doc. 52: Repsonse to Plaintiff's Renewed Motion for Leave to Amend Complaint to Seek Exemplary Damages ...............123

Doc. 52-1: Exhibit A ................................................136

Doc. 52-2: Exhibit B ...............................................139

Doc. 52-3: Exhibit C ...............................................143

Doc. 53: Reply in Support of Plaintiff's Renewed Motion for Leave ........................................................150

Doc. 53-1: Exhibit 1 Harvey Depo ...............................162

Doc. 53-2: Exhibit 2 Aamoud Depo ..............................168

Doc. 53-3: Exhibit 3 DA Letter................................171

Doc.53-4: Exhibit 4 Moreno Errata ............................................ 172

Doc. 54: Courtroom Minutes Minute Order ..................................... 175

Doc. 56: First Amended Complaint and Jury Demand .................... 177

Doc. 57: Unopposed Motion for Leave to Restrict .......................... 195

Doc. 57-1: Exhibit 3 DA Client Letter ...................................... 198

Doc. 59: Answer to [56] Amended Complaint by Circle K Stores, Inc,. ...................................................................................... 200

# U.S. District Court – District of Colorado
## District of Colorado (Denver)
## CIVIL DOCKET FOR CASE #: 1:22–cv–02327–NYW–STV

Moreno v. Circle K Stores, Inc.
Assigned to: Judge Nina Y. Wang
Referred to: Magistrate Judge Scott T. Varholak
Case in other court:  Jefferson County District Court,
          2022CV30949
          U.S Court of Appeals, 10th Cir., 24–01058
Cause: 28:1332 Diversity – Employment

Date Filed: 09/09/2022
Date Terminated: 01/19/2024
Jury Demand: Plaintiff
Nature of Suit: 360 P.I.: Other
Jurisdiction: Diversity

**Plaintiff**

**Mary Ann Moreno**                           represented by    **Iris Halpern**
Rathod Mohamedbhai LLC
2701 Lawrence Street
Suite 100
Denver, CO 80205
303–578–4400
Fax: 303–578–4401
Email: ih@rmlawyers.com
*ATTORNEY TO BE NOTICED*

**Nicholas Alexander Lutz**
University of Denver
2255 East Evans Avenue
Denver, CO 80210
303–871–6753
Email: nlutz@law.du.edu
*TERMINATED: 04/14/2023*

**Virginia Hill Butler**
Rathod Mohamedbhai LLC
2701 Lawrence Street
Suite 100
Denver, CO 80205
303–578–4400
Email: vb@rmlawyers.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Circle K Stores, Inc.**                      represented by    **Nicholas Hankins**
Littler Mendelson P.C.
1900 Sixteenth Street
Suite 800
Denver, CO 80202
303–362–2856
Email: nhankins@littler.com
*ATTORNEY TO BE NOTICED*

**Thomas W. Carroll**
Littler Mendelson P.C.
1900 16th Street
Suite 800
Denver, CO 80202
303–629–6200
Fax: 303–629–0200
Email: tcarroll@littler.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/09/2022 | 1 | NOTICE OF REMOVAL by Circle K Stores, Inc. from Jefferson County District Court, Case Number 2022CV30949. (Filing fee $ 402, Receipt Number ACODC–8648936), filed by Circle K Stores, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Civil Cover Sheet)(Carroll, Thomas) (Entered: 09/09/2022) |
| 09/09/2022 | 2 | FIRST AND FINAL NOTICE TO ALL ATTORNEY(S) AND UNREPRESENTED PARTIES IN REMOVED, TRANSFERRED, OR OTHER CASES. To receive any further notice in a case removed or transferred to this court, or special matters including discovery disputes, bankruptcy appeals, or withdrawals of reference, Multi–district litigation (MDL), etc., all attorneys and unrepresented parties must enter an appearance under D.C.COLO.LAttyR 5(a). An attorney must be an active member of this court's bar and be in good standing in accordance with D.C.COLO.LAttyR 3. A waiver of the fee for bar admission may apply in limited situations. (Text Only Entry) (jtorr, ) (Entered: 09/09/2022) |
| 09/09/2022 | 3 | COMPLAINT and Jury Demand against Circle K Stores, Inc., filed by Mary Ann Moreno.(jtorr, ) (Entered: 09/09/2022) |
| 09/09/2022 | 4 | STATE COURT ORDER Granting Unopposed Motion for Enlargement of Time to Answer or Otherwise Respond by Jefferson County District Court Judge Laura A. Tighe on 09/06/2022. (jtorr, ) (Entered: 09/09/2022) |
| 09/09/2022 | 5 | Case assigned to Magistrate Judge Scott T. Varholak. Text Only Entry. (jtorr, ) (Entered: 09/09/2022) |
| 09/09/2022 | 6 | Magistrate Judge consent form issued pursuant to D.C.COLO.LCivR 40.1, direct assignment of civil actions to full time magistrate judges. (jtorr, ) (Entered: 09/09/2022) |
| 09/09/2022 | 7 | NOTICE of State Court Register of Actions by Defendant Circle K Stores, Inc. (Carroll, Thomas) (Entered: 09/09/2022) |
| 09/09/2022 | 8 | NOTICE of Entry of Appearance by Thomas W. Carroll on behalf of Circle K Stores, Inc. (Carroll, Thomas) (Entered: 09/09/2022) |
| 09/09/2022 | 9 | CORPORATE DISCLOSURE STATEMENT identifying Corporate Parent Alimentation Couche–Tard, Inc. for Circle K Stores, Inc.. (Carroll, Thomas) (Entered: 09/09/2022) |
| 09/09/2022 | 10 | NOTICE of Entry of Appearance by Nicholas Hankins on behalf of Circle K Stores, Inc.Attorney Nicholas Hankins added to party Circle K Stores, Inc.(pty:dft) (Hankins, Nicholas) (Entered: 09/09/2022) |
| 09/09/2022 | 11 | ORDER SETTING DEADLINE FOR FILING ELECTION CONCERNING CONSENT/NON–CONSENT TO MAGISTRATE JURISDICTION FORM AND SETTING SCHEDULING CONFERENCE by Magistrate Judge Scott T. Varholak on 9 September 2022. Consent Form due by 10/19/2022. Proposed Scheduling Order due 10/26/2022. Scheduling Conference set for 11/2/2022 09:15 AM in Courtroom A 402 before Magistrate Judge Scott T. Varholak. (cmadr, ) (Entered: 09/09/2022) |
| 09/12/2022 | 12 | NOTICE of D.C.COLO.LCivR 81.1 Filing by Defendant Circle K Stores, Inc. (Carroll, Thomas) (Entered: 09/12/2022) |
| 09/12/2022 | 13 | NOTICE re 12 Notice (Other) of Supplemental State Court Register of Actions by Defendant Circle K Stores, Inc. (Attachments: # 1 Waiver of Service of Summons and Complaint)(Carroll, Thomas) (Entered: 09/12/2022) |
| 09/12/2022 | 14 | NOTICE of Entry of Appearance by Nicholas Alexander Lutz on behalf of All Plaintiffs Attorney Nicholas Alexander Lutz added to party Mary Ann Moreno(pty:pla) (Lutz, Nicholas) (Entered: 09/12/2022) |
| 09/12/2022 | 15 | NOTICE of Entry of Appearance by Iris Halpern on behalf of All Plaintiffs Attorney Iris Halpern added to party Mary Ann Moreno(pty:pla) (Halpern, Iris) (Entered: |

| | | |
|---|---|---|
| | | 09/12/2022) |
| 09/16/2022 | 16 | ANSWER to 3 Complaint by Circle K Stores, Inc..(Carroll, Thomas) (Entered: 09/16/2022) |
| 10/18/2022 | 17 | CONSENT to Jurisdiction of Magistrate Judge by Plaintiff Mary Ann Moreno All parties do not consent.. (Lutz, Nicholas) (Entered: 10/18/2022) |
| 10/18/2022 | 18 | CASE REASSIGNED pursuant to 17 Consent to Jurisdiction of Magistrate Judge. All parties do not consent. This case is randomly reassigned to Judge Nina Y. Wang and drawn to Magistrate Judge Scott T. Varholak. All future pleadings should be designated as 22–cv–02327–NYW. (Text Only Entry) (cmadr, ) (Entered: 10/18/2022) |
| 10/19/2022 | 19 | ORDER REFERRING CASE: This case is referred to Magistrate Judge Scott T. Varholak for **non–dispositive matters**. Pursuant to 28 U.S.C. § 636(b)(1)(A) and (B) and Fed. R. Civ. P. 72(a) and (b), this case is referred to the assigned United States Magistrate Judge to (1) convene a scheduling conference under Fed. R. Civ. P. 16(b) and enter a scheduling order meeting the requirements of D.C.COLO.LCivR 16.2, (2) conduct such status conferences and issue such orders necessary for compliance with the scheduling order, including amendments or modifications of the scheduling order upon a showing of good cause, (3) hear and determine pretrial matters, including discovery and other non–dispositive motions, and (4) conduct a pretrial conference and enter a pretrial order. Court–sponsored alternative dispute resolution is governed by D.C.COLO.LCivR 16.6. On the recommendation or informal request of the Magistrate Judge or on the request of the parties by motion, this court may direct the parties to engage in an early neutral evaluation, a settlement conference, or another alternative dispute resolution proceeding. **Counsel for the Parties and all counsel who may later enter an appearance shall review and familiarize themselves with the undersigned's Practice Standards, as well as the Practice Standards of the assigned Magistrate Judge.** By Judge Nina Y. Wang on 10/19/2022. Text Only Entry (nywlc2, ) (Entered: 10/19/2022) |
| 10/26/2022 | 20 | Proposed Scheduling Order by Plaintiff Mary Ann Moreno. (Lutz, Nicholas) (Entered: 10/26/2022) |
| 10/26/2022 | 21 | Joint MOTION for Protective Order by Defendant Circle K Stores, Inc.. (Attachments: # 1 Proposed Stipulated Protective Order)(Carroll, Thomas) (Entered: 10/26/2022) |
| 10/26/2022 | 22 | MEMORANDUM regarding 21 Joint MOTION for Protective Order filed by Circle K Stores, Inc.. Motion referred to Magistrate Judge Scott T. Varholak. By Judge Nina Y. Wang on 10/26/2022. Text Only Entry (nywlc2, ) (Entered: 10/26/2022) |
| 10/26/2022 | 23 | ORDER granting 21 Motion for Protective Order. The Court will enter the protective order proposed by the parties. SO ORDERED, by Magistrate Judge Scott T. Varholak on 10/26/2022. Text Only Entry(stvlc4, ) (Entered: 10/26/2022) |
| 10/26/2022 | 24 | PROTECTIVE ORDER by Magistrate Judge Scott T. Varholak on 26 October 2022. (cmadr, ) (Entered: 10/26/2022) |
| 11/02/2022 | 25 | MINUTE ENTRY for Scheduling Conference held before Magistrate Judge Scott T. Varholak on 11/2/2022. Discovery due by 5/8/2023. Dispositive Motions due by 6/23/2023. Final Pretrial Conference set for 11/1/2023 10:30 AM in Courtroom A 502 before Judge Nina Y. Wang. FTR: A402. (morti, ) (Entered: 11/02/2022) |
| 11/02/2022 | 26 | SCHEDULING ORDER: by Magistrate Judge Scott T. Varholak on 11/2/2022. (morti, ) (Entered: 11/02/2022) |
| 11/30/2022 | 27 | Stipulated MOTION for Extension of Time to *Respond to Defendant's First Set of Written Discovery* by Plaintiff Mary Ann Moreno. (Halpern, Iris) (Entered: 11/30/2022) |
| 11/30/2022 | 28 | MEMORANDUM regarding 27 Stipulated MOTION for Extension of Time to *Respond to Defendant's First Set of Written Discovery* filed by Mary Ann Moreno. Motion referred to Magistrate Judge Scott T. Varholak. By Judge Nina Y. Wang on 11/30/2022. Text Only Entry (nywlc2, ) (Entered: 11/30/2022) |
| 11/30/2022 | 29 | ORDER This matter is before the Court on 27 Stipulated Motion for Extension of Time, which the Court CONSTRUES as an unopposed motion due to it only being |

| | | |
|---|---|---|
| | | signed by counsel for one party. See D.C.COLO.LCivR 6.1 (requiring that the *parties* stipulate in writing to the extension and file "the [written] stipulation"). Accordingly, the Court GRANTS the Unopposed Motion for Extension of Time to Respond to Defendant's First Set of Written Discovery. The Court CONTRUES the request to be FOR a 14–day extension, up to and including December 14, 2022, despite a reference to December 22, 2022. Accordingly, Plaintiff's objections and responses to Defendant's first set of written discovery shall be due on or before 12/14/2022. SO ORDERED, by Magistrate Judge Scott T. Varholak on 11/30/2022. Text Only Entry(stvlc4, ) (Entered: 11/30/2022) |
| 03/15/2023 | 30 | **STRICKEN** Joint MOTION to Amend/Correct/Modify 26 Scheduling Order by Defendant Circle K Stores, Inc.. (Attachments: # 1 Proposed Order (PDF Only))(Carroll, Thomas) Modified on 3/16/2023 to strike pursuant to 32 Order (trvo, ). (Entered: 03/15/2023) |
| 03/15/2023 | 31 | MEMORANDUM regarding 30 Joint MOTION to Amend/Correct/Modify 26 Scheduling Order filed by Circle K Stores, Inc. Motion referred to Magistrate Judge Scott T. Varholak. By Judge Nina Y. Wang on 03/15/2023. Text Only Entry (nywlc2, ) (Entered: 03/15/2023) |
| 03/16/2023 | 32 | ORDER striking 30 Motion to Amend Scheduling Order (the "Motion"). Pursuant to Judge Wang's Civil Practice Standard 6.1A, motions for extensions of time must note service of such motion on the clients. No such information is provided in the Motion. In addition, the Court notes that the Motion only provides cause for extending the discovery cut–off date and the dispositive motions deadline. However, the Motion also seeks to extend the affirmative and rebuttal expert disclosure deadlines, both of which had already passed by the time the Motion was filed. See Civil Practice Standard 6.1A(b), (d). Accordingly, the Court STRIKES 30 Motion to Amend. SO ORDERED, by Magistrate Judge Scott T. Varholak on 3/16/2023. Text Only Entry(stvlc4, ) (Entered: 03/16/2023) |
| 03/22/2023 | 33 | Joint MOTION to Amend/Correct/Modify 26 Scheduling Order by Defendant Circle K Stores, Inc.. (Attachments: # 1 Proposed Order (PDF Only))(Carroll, Thomas) (Entered: 03/22/2023) |
| 03/22/2023 | 34 | MEMORANDUM regarding 33 Joint MOTION to Amend/Correct/Modify 26 Scheduling Order filed by Circle K Stores, Inc. Motion referred to Magistrate Judge Scott T. Varholak. By Judge Nina Y. Wang on 03/22/2023. Text Only Entry (nywlc2, ) (Entered: 03/22/2023) |
| 03/22/2023 | 35 | ORDER granting 33 Joint Motion to Amend Scheduling Order. Rebuttal Expert Disclosures due 4/24/2023. Discovery Cut–Off extended to 6/22/2023. Dispositive Motions due 8/7/2023. SO ORDERED, by Magistrate Judge Scott T. Varholak on 3/22/2023. Text Only Entry(stvlc4, ) (Entered: 03/22/2023) |
| 03/23/2023 | 36 | **STRICKEN** MOTION to Amend/Correct/Modify *Complaint to Seek Exemplary Damages* by Plaintiff Mary Ann Moreno. (Attachments: # 1 Exhibit Declaration of Bonnie Moreno, # 2 Exhibit Declaration of Olivia Roan)(Lutz, Nicholas) Modified pursuant to ECF 38 on 3/29/2023 (cmadr, ). (Entered: 03/23/2023) |
| 03/24/2023 | 37 | MEMORANDUM regarding 36 MOTION to Amend/Correct/Modify *Complaint to Seek Exemplary Damages* filed by Mary Ann Moreno. Motion referred to Magistrate Judge Scott T. Varholak. By Judge Nina Y. Wang on 3/24/2023. Text Only Entry (nywlc2, ) (Entered: 03/24/2023) |
| 03/28/2023 | 38 | ORDER striking 36 Motion to Amend Complaint (the "Motion"). Pursuant to D.C.COLO.LCivR 7.1(a): "Before filing a motion, counsel for the moving party or an unrepresented party shall confer or make reasonable, good faith efforts to confer with any opposing counsel or unrepresented party to resolve any disputed matter. The moving party shall describe in the motion, or in a certificate attached to the motion, the specific efforts to fulfill this duty." The Motion does not contain any description of conferral efforts undertaken before filing the Motion. Accordingly, the Court STRIKES the Motion for failure to comply with D.C.COLO.LCivR 7.1. United States v. Durango & Silverton Narrow Gauge R.R. Co., No. 19–CV–01913–REB–NRN, 2020 WL 9432882, at 2 (D. Colo. July 14, 2020) (striking a motion for failure to confer, and noting that "the court retains the discretion to strike a filing that is not allowed by local rule.") (citing In re Hopkins, 162 F.3d 1173, (10th Cir. 1998)). SO |

| | | ORDERED, by Magistrate Judge Scott T. Varholak on 3/28/2023. Text Only Entry(stvlc4, ) (Entered: 03/28/2023) |
|---|---|---|
| 03/30/2023 | 39 | MOTION for Leave to *Amend Complaint to Seek Exemplary Damages Remedy* by Plaintiff Mary Ann Moreno. (Attachments: # 1 Exhibit 1 – Declaration of Bonnie Moreno, # 2 Exhibit 2 – Declaration of Olivia Varela Roan, # 3 Conventionally Submitted 3 – Circle K Store Surveillance Video (Register 1), # 4 Conventionally Submitted 4 – 9–1–1 Call Audio, # 5 Exhibit 5 – Affidavit in Support of Warrantless Arrest, # 6 Conventionally Submitted 6 – Circle K Store Surveillance Video (Office), # 7 Exhibit 7 – Order Finding Defendant Incompetent to Proceed, # 8 Exhibit 8 – Crime Victim Compensation Application, # 9 Exhibit 9 – Crime Victim Compensation Notice, # 10 Exhibit 10 – Crime Victim Compensation Extension Acknowledgement, # 11 Exhibit 11– Redlined Amended Complaint)(Lutz, Nicholas) (Entered: 03/30/2023) |
| 03/31/2023 | 40 | MEMORANDUM regarding 39 MOTION for Leave to *Amend Complaint to Seek Exemplary Damages Remedy* filed by Mary Ann Moreno. Motion referred to Magistrate Judge Scott T. Varholak. By Judge Nina Y. Wang on 03/31/2023. Text Only Entry (nywlc2, ) (Entered: 03/31/2023) |
| 03/31/2023 | 41 | MINUTE ORDER This matter is before the Court on 39 Motion for Leave to Amend the Complaint. The Court sets the following briefing schedule: Defendant shall respond on or before 4/14/2023. Plaintiff may reply on or before 4/21/2023. A Motion Hearing is set for 4/26/2023 02:45 PM in Courtroom A 402 before Magistrate Judge Scott T. Varholak. SO ORDERED, by Magistrate Judge Scott T. Varholak on 3/31/2023. Text Only Entry (stvlc4, ) (Entered: 03/31/2023) |
| 03/31/2023 | 42 | Conventionally Submitted Material: 1 USB Drive – Exhibits 3, 4, and 6 to 39 MOTION for Leave to Amend Complaint to Seek Exemplary Damages Remedy by Plaintiff Mary Ann Moreno. Material placed in the Clerk's Office A–1–7. Text Only Entry. (trvo, ) (Entered: 04/04/2023) |
| 04/14/2023 | 43 | RESPONSE to 39 MOTION for Leave to *Amend Complaint to Seek Exemplary Damages Remedy* filed by Defendant Circle K Stores, Inc.. (Carroll, Thomas) (Entered: 04/14/2023) |
| 04/14/2023 | 44 | MOTION to Withdraw as Attorney – *Nicholas A. Lutz* by Plaintiff Mary Ann Moreno. (Lutz, Nicholas) (Entered: 04/14/2023) |
| 04/14/2023 | 45 | MINUTE ORDER: The Motion to Withdraw as Counsel 44 is **GRANTED.** Attorney Nicholas Alexander Lutz is hereby terminated as counsel of record for Plaintiff Mary Ann Moreno. The Court notes that Plaintiff continues to be represented by Attorney Iris Halpern. By Judge Nina Y. Wang on 4/14/2023. Text Only Entry (nywlc3, ) (Entered: 04/14/2023) |
| 04/18/2023 | 46 | NOTICE of Entry of Appearance *of Virginia Hill Butler* by Virginia Hill Butler on behalf of Mary Ann MorenoAttorney Virginia Hill Butler added to party Mary Ann Moreno(pty:pla) (Butler, Virginia) (Entered: 04/18/2023) |
| 04/21/2023 | 47 | REPLY to Response to 39 MOTION for Leave to *Amend Complaint to Seek Exemplary Damages Remedy* filed by Plaintiff Mary Ann Moreno. (Attachments: # 1 Exhibit 1 Plaintiff's Initial Disclosures, # 2 Exhibit 2 December 16, 2022 Emails, # 3 Exhibit 3 Records Requests)(Butler, Virginia) (Entered: 04/21/2023) |
| 04/26/2023 | 48 | MINUTE ENTRY for Motion Hearing held before Magistrate Judge Scott T. Varholak on 4/26/2023. ORDERED: 39 MOTION for Leave to Amend Complaint to Seek Exemplary Damages Remedy is DENIED without prejudice. Plaintiff shall have until May 31, 2023 to refile. the Motion. Response will be due June 14, 2023. Reply due June 21, 2023. Motion Hearing set for 7/6/2023 09:00 AM in Courtroom A 402 before Magistrate Judge Scott T. Varholak. Parties may participate by telephoneby calling the court at (888–808–6929) Access Code: 2805116# FTR: A402. (morti, ) (Entered: 04/26/2023) |
| 05/31/2023 | 49 | Renewed MOTION for Leave to *Amend Complaint to Seek Exemplary Damages* by Plaintiff Mary Ann Moreno. (Attachments: # 1 Exhibit Ex. 1 – Declaration of Bonnie Moreno, # 2 Exhibit Ex. 2 – Declaration of Olivia Varela Roan, # 3 Exhibit Ex. 3 – Circle K Surveillance Video (Register 1), # 4 Exhibit Ex. 4 – 9–1–1 Call Audio, # 5 |

| | | Exhibit Ex. 5 – Aamoud Deposition Transcript, # 6 Exhibit Ex. 6 – Circle K Surveillance Video (Office), # 7 Exhibit Ex. 7– Harvey Deposition Transcript, # 8 Exhibit Ex. 8 – Confront & Chase, # 9 Exhibit Ex. 9 – Readline Complaint)(Butler, Virginia) (Entered: 05/31/2023) |
|---|---|---|
| 05/31/2023 | 50 | MEMORANDUM regarding 49 Renewed MOTION for Leave to *Amend Complaint to Seek Exemplary Damages* filed by Mary Ann Moreno. Motion referred to Magistrate Judge Scott T. Varholak. By Judge Nina Y. Wang on 05/31/2023. Text Only Entry (nywlc2, ) (Entered: 05/31/2023) |
| 05/31/2023 | 51 | MINUTE ORDER This matter is before the Court on 49 Renewed Motion for Leave to Amend. The parties shall follow the briefing schedule as set forth in 48 Minute Entry. The Court will consider the Renewed Motion at the Motion Hearing set for 7/6/2023. SO ORDERED, by Magistrate Judge Scott T. Varholak on 5/31/2023. Text Only Entry (stvlc4, ) (Entered: 05/31/2023) |
| 06/14/2023 | 52 | RESPONSE to 49 Renewed MOTION for Leave to *Amend Complaint to Seek Exemplary Damages* filed by Defendant Circle K Stores, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Carroll, Thomas) (Entered: 06/14/2023) |
| 06/22/2023 | 53 | REPLY to Response to 49 Renewed MOTION for Leave to *Amend Complaint to Seek Exemplary Damages* filed by Plaintiff Mary Ann Moreno. (Attachments: # 1 Exhibit 1 – Harvey Dep., # 2 Exhibit 2 – Aamoud Dep., # 3 Exhibit 3 – DA Letter, # 4 Exhibit 4 – Moreno Errata)(Halpern, Iris) (Entered: 06/22/2023) |
| 07/06/2023 | 54 | MINUTE ENTRY for Motion Hearing held before Magistrate Judge Scott T. Varholak on 7/6/2023. ORDERED: Plaintiff's Renewed MOTION for Leave to Amend Complaint to Seek Exemplary Damages 49 is GRANTED. Plaintiff shall have till the close of business on July 7, 2023 to file a clean version of the Proposed Amended Complaint which the court will accept as the newly operative complaint. FTR: A402. (morti, ) (Entered: 07/06/2023) |
| 07/06/2023 | 55 | Joint STATUS REPORT *Regarding Settlement Discussions* by Defendant Circle K Stores, Inc.. (Carroll, Thomas) (Entered: 07/06/2023) |
| 07/06/2023 | 56 | AMENDED COMPLAINT *AND JURY DEMAND* against Circle K Stores, Inc., filed by Mary Ann Moreno.(Butler, Virginia) (Entered: 07/06/2023) |
| 07/13/2023 | 57 | Unopposed MOTION for Leave to Restrict by Plaintiff Mary Ann Moreno. (Attachments: # 1 Exhibit Exhibit 3. DA–Client Letter)(Butler, Virginia) (Entered: 07/13/2023) |
| 07/13/2023 | 58 | MEMORANDUM regarding 57 Unopposed MOTION for Leave to Restrict filed by Mary Ann Moreno. Motion referred to Magistrate Judge Scott T. Varholak. By Judge Nina Y. Wang on 07/13/2023. Text Only Entry (nywlc2, ) (Entered: 07/13/2023) |
| 07/18/2023 | 59 | ANSWER to 56 Amended Complaint by Circle K Stores, Inc..(Carroll, Thomas) (Entered: 07/18/2023) |
| 07/18/2023 | 60 | ORDER granting 57 Unopposed Motion for Leave to Restrict. Plaintiff requests restriction to protect Plaintiff's privacy interests and safety, and seeks to achieve this protection through limited redactions that will not significantly impact the interest in public access of court documents. ORDERED: The Clerk of Court is therefore instructed to maintain Docket Number 53–3 at Level One restriction. A publicly viewable version of the restricted exhibit with limited redactions is available at Docket Number 57–1. SO ORDERED, by Magistrate Judge Scott T. Varholak on 7/18/2023. Text Only Entry(stvlc4, ) (Entered: 07/18/2023) |
| 07/21/2023 | 61 | TRANSCRIPT of MOTION HEARING held on 07/06/2023 before Magistrate Judge Varholak. Pages: 1–21. Prepared by: AB Litigation Services.<br>**NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.**<br>Transcript may only be viewed at the court's public terminal or purchased through the |

| | | |
|---|---|---|
| | | Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (AB Court Reporting & Video, Inc., ) (Entered: 07/21/2023) |
| 07/31/2023 | 62 | Unopposed MOTION for Leave to File Excess Pages *for Motion for Summary Judgment* by Defendant Circle K Stores, Inc.. (Carroll, Thomas) (Entered: 07/31/2023) |
| 08/01/2023 | 63 | MINUTE ORDER: The 62 Motion to Extend Page Limit for Motion for Summary Judgment is **GRANTED**. Defendant may file a motion for summary judgment not to exceed 25 pages. By Judge Nina Y. Wang on 08/01/2023. Text Only Entry(nywlc2, ) (Entered: 08/01/2023) |
| 08/07/2023 | 64 | MOTION for Summary Judgment by Defendant Circle K Stores, Inc.. (Attachments: # 1 Exhibit A (Declaration of Craig Holmes), # 2 Exhibit B (Declaration of Nicholas Hankins), # 3 Exhibit 1 (Employee Guidebook), # 4 Exhibit 2 (5–Minute Rule), # 5 Exhibit 3 (Confront & Chase Policy), # 6 Exhibit 4 (Conventionally Filed), # 7 Exhibit 5 (Conventionally Filed), # 8 Exhibit 6 (Conventionally Filed), # 9 Exhibit 7 (Conventionally Filed), # 10 Exhibit 8 (Rule 30(b)(6) Deposition Excerpts), # 11 Exhibit 9 (Moreno Deposition Excerpts), # 12 Exhibit 10 (Aamoud Deposition Excerpts), # 13 Exhibit 11 (Holmes Deposition Excerpts), # 14 Exhibit 12 (Harvey Deposition Excerpts), # 15 Exhibit 14 (View Terminate Employee Event), # 16 Exhibit C (Declaration of Driss Aamoud), # 17 Exhibit D (Declaration of Amy Harvey))(Carroll, Thomas) (Entered: 08/07/2023) |
| 08/07/2023 | 65 | MOTION for Partial Summary Judgment by Plaintiff Mary Ann Moreno. (Attachments: # 1 Exhibit Ex. 1 – Rule 30(b)(6) Dep. Tr., # 2 Exhibit Ex. 2 – Jorgensen Dep. Tr., # 3 Exhibit Ex. 3 – Circle K Surveillance Video (Register 1) – Conventionally Submitted, # 4 Exhibit Ex. 4 – Police Report, Moreno 000315, # 5 Exhibit Ex. 5 – 911 Call – Conventionally Submitted, # 6 Exhibit Ex. 6 – Moreno Dep. Tr., # 7 Exhibit Ex. 7 – Aamoud Dep. Tr., # 8 Exhibit Ex. 8 – Holmes Dep. Tr., # 9 Exhibit Ex. 9 – RMBU Confront/Chase Terminations, # 10 Exhibit Ex. 10 – Harvey Dep. Tr., # 11 Exhibit Ex. 11 – Plaintiff's Third Supplemental Discovery Responses, # 12 Exhibit Ex. 12 – Circle K's Supplemental Discovery Responses, # 13 Exhibit Ex. 13 – Circle K's Discovery Responses, # 14 Exhibit Ex. 14 – Circle K's Initial Disclosures, # 15 Exhibit Ex. 15 – Circle K's Supplemental Disclosures)(Butler, Virginia) (Entered: 08/07/2023) |
| 08/07/2023 | 66 | Conventionally Submitted Material: 1 USB Drive – Exhibits 4, 5, and 6 to 64 MOTION for Summary Judgment by Defendant Circle K Stores, Inc. Material placed in the Clerk's Office A–1–6. Text Only Entry. (trvo, ) (Entered: 08/08/2023) |
| 08/08/2023 | 67 | Conventionally Submitted Material: 1 USB Drive – Exhibits 3 and 5 to 65 MOTION for Partial Summary Judgment by Plaintiff Mary Ann Moreno. Material placed in the Clerk's Office A–1–6. Text Only Entry. (trvo, ) (Entered: 08/09/2023) |
| 08/10/2023 | 68 | MINUTE ORDER: This matter is before the Court *sua sponte*. Going forward, for purposes of efficiency, the Court intends to hold one joint Final Pretrial/Trial Preparation Conference in all civil cases, to be held after resolution of dispositive motions. Accordingly, and in light of the Parties' Motions for Summary Judgment [Doc. 64 ; Doc. 65 ], the Final Pretrial Conference set for November 1, 2023 is **VACATED**, to be reset after resolution of the dispositive motions, if appropriate. By Judge Nina Y. Wang on 08/10/2023. Text Only Entry (nywlc2, ) (Entered: 08/10/2023) |
| 08/24/2023 | 69 | Unopposed MOTION for Leave to File Excess Pages *for Her Response to Defendant's Motion for Summary Judgement* by Plaintiff Mary Ann Moreno. (Butler, Virginia) (Entered: 08/24/2023) |
| 08/25/2023 | 70 | RESPONSE to 65 MOTION for Partial Summary Judgment filed by Defendant Circle K Stores, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4)(Carroll, Thomas) (Entered: 08/25/2023) |
| 08/25/2023 | 71 | MINUTE ORDER: Plaintiff's 69 Unopposed Motion for Leave to File Excess Pages is **GRANTED**. Plaintiff may file a response to Defendant's Motion for Summary Judgment not to exceed 25 pages. By Judge Nina Y. Wang on 08/25/2023. Text Only Entry(nywlc2, ) (Entered: 08/25/2023) |

| | | |
|---|---|---|
| 08/28/2023 | <u>72</u> | RESPONSE to <u>64</u> MOTION for Summary Judgment *Plaintiff's Response to Circle K's Motion for Summary Judgement* filed by Plaintiff Mary Ann Moreno. (Attachments: # <u>1</u> Exhibit Ex. 1 – Rule 30(b)(6) Dep. Tr., # <u>2</u> Exhibit Ex. 2 – Jorgensen Dep. Tr., # <u>3</u> Exhibit Ex. 3 – Register 1, # <u>4</u> Exhibit Ex. 4 – Moreno Dep. Tr., # <u>5</u> Exhibit Ex. 5 – Harvey Dep. Tr., # <u>6</u> Exhibit Ex. 6 – Aamoud Dep. Tr., # <u>7</u> Exhibit Ex. 7 – Circle K's Written Discovery Requests, # <u>8</u> Exhibit Ex. 8 – Moreno Errata, # <u>9</u> Exhibit Ex. 9 – Police Report, Moreno000315, # <u>10</u> Exhibit Ex. 10 – 911 Call, # <u>11</u> Exhibit Ex. 11 – Declaration of Bonnie Moreno, # <u>12</u> Exhibit Ex. 12 – Declaration of Olivia Roan, # <u>13</u> Exhibit Ex. 13 – Holmes Dep. Tr., # <u>14</u> Exhibit Ex. 14 – RMBU Confront–Chase Terminations)(Butler, Virginia) (Entered: 08/28/2023) |
| 09/06/2023 | <u>73</u> | Unopposed MOTION for Leave to File Excess Pages by Defendant Circle K Stores, Inc.. (Attachments: # <u>1</u> Proposed Order (PDF Only))(Carroll, Thomas) (Entered: 09/06/2023) |
| 09/06/2023 | 74 | MINUTE ORDER: The <u>73</u> Unopposed Motion to Extend Page Limits is **GRANTED**. Defendant may file a reply not to exceed 12 pages. By Judge Nina Y. Wang on 09/06/2023. Text Only Entry(nywlc2, ) (Entered: 09/06/2023) |
| 09/08/2023 | <u>75</u> | Unopposed MOTION for Leave to File Excess Pages *for her Reply in Support of her Motion for Partial Summary Judgement* by Plaintiff Mary Ann Moreno. (Butler, Virginia) (Entered: 09/08/2023) |
| 09/08/2023 | 76 | MINUTE ORDER: Plaintiff's <u>75</u> Unopposed Motion for Excess Pages for Her Reply in Support of her Motion for Partial Summary Judgment is **GRANTED**. Plaintiff may file a reply brief not to exceed 12 pages. By Judge Nina Y. Wang on 09/08/2023. Text Only Entry(nywlc2, ) (Entered: 09/08/2023) |
| 09/08/2023 | <u>77</u> | REPLY to Response to <u>65</u> MOTION for Partial Summary Judgment filed by Plaintiff Mary Ann Moreno. (Attachments: # <u>1</u> Exhibit Ex. 1 – Moreno Dep. Tr., # <u>2</u> Exhibit Ex. 2 – Wand Notes (Placeholder))(Butler, Virginia) (Entered: 09/08/2023) |
| 09/08/2023 | <u>78</u> | RESTRICTED DOCUMENT – Level 1: Exhibit 2 to <u>77</u> Reply by Plaintiff Mary Ann Moreno.. (Butler, Virginia) Modified on 9/11/2023 to add title (trvo, ). (Entered: 09/08/2023) |
| 09/11/2023 | <u>79</u> | REPLY to Response to <u>64</u> MOTION for Summary Judgment filed by Defendant Circle K Stores, Inc.. (Carroll, Thomas) (Entered: 09/11/2023) |
| 09/19/2023 | <u>80</u> | Unopposed MOTION for Leave to Restrict by Plaintiff Mary Ann Moreno. (Butler, Virginia) (Entered: 09/19/2023) |
| 09/19/2023 | 81 | MEMORANDUM regarding <u>80</u> Unopposed MOTION for Leave to Restrict filed by Mary Ann Moreno. Motion referred to Magistrate Judge Scott T. Varholak. By Judge Nina Y. Wang on 09/19/2023. Text Only Entry (nywlc2, ) (Entered: 09/19/2023) |
| 09/25/2023 | 82 | ORDER granting <u>80</u> Unopposed MOTION for Leave to Restrict. Balancing the public right of access with the needs of confidentiality as to the specific document listed, the Court finds good cause to GRANT the motion. The Clerk of Court is instructed to maintain Dkt. No. 78 under Level 1 Restriction. SO ORDERED, by Magistrate Judge Scott T. Varholak on 9/25/2023. Text Only Entry(stvlc4, ) (Entered: 09/25/2023) |
| 01/19/2024 | <u>83</u> | MEMORANDUM OPINION AND ORDER granting <u>64</u> Circle K's Motion for Summary Judgment. Denying as moot <u>65</u> Plaintiff's Motion for Partial Summary Judgment. Judgment is entered in favor of Circle K on each of Plaintiff's claims, by Judge Nina Y. Wang on 1/19/2024. (ebuch) (Entered: 01/19/2024) |
| 01/19/2024 | <u>84</u> | FINAL JUDGMENT in favor of Defendant Circle K Stores, Inc. and against Plaintiff Mary Ann Moreno pursuant to <u>83</u> Memorandum Opinion and Order, by Clerk on 1/19/2024. (ebuch) (Entered: 01/19/2024) |
| 02/02/2024 | <u>85</u> | Proposed Bill of Costs by Defendant Circle K Stores, Inc.. (Attachments: # <u>1</u> Exhibit A, # <u>2</u> Exhibit A–1, # <u>3</u> Exhibit A–2, # <u>4</u> Exhibit A–3, # <u>5</u> Exhibit A–4, # <u>6</u> Exhibit A–5, # <u>7</u> Exhibit A––6, # <u>8</u> Exhibit A–7, # <u>9</u> Exhibit A–8, # <u>10</u> Exhibit A–9)(Hankins, Nicholas) (Entered: 02/02/2024) |
| 02/14/2024 | <u>86</u> | NOTICE OF APPEAL as to <u>83</u> Order on Motion for Summary Judgment,, Order on Motion for Partial Summary Judgment, by Plaintiff Mary Ann Moreno (Filing fee $ 605, Receipt Number ACODC–9541185) (Halpern, Iris) (Entered: 02/14/2024) |

| 02/15/2024 | 87 | LETTER Transmitting Notice of Appeal to all counsel advising of the transmittal of the 86 Notice of Appeal filed by Mary Ann Moreno to the U.S. Court of Appeals. ( Retained Counsel, Fee paid,) (Attachments: # 1 Preliminary Record)(sphil, ) (Entered: 02/15/2024) |
|---|---|---|
| 02/15/2024 | 88 | STIPULATED Proposed Bill of Costs by Defendant Circle K Stores, Inc.. Parties conferred on 2/12/2024.. (Attachments: # 1 Exhibit A, # 2 Exhibit A–1, # 3 Exhibit A–2, # 4 Exhibit A–3, # 5 Exhibit A–4, # 6 Exhibit A–5, # 7 Exhibit A–6, # 8 Exhibit A–7, # 9 Exhibit A–8, # 10 Exhibit A–9, # 11 Written Statement of Conferral)(Hankins, Nicholas) (Entered: 02/15/2024) |
| 02/15/2024 | 89 | STIPULATION re 88 Bill of Costs(Proposed), by Defendant Circle K Stores, Inc.. (Carroll, Thomas) (Entered: 02/15/2024) |
| 02/15/2024 | 90 | USCA Case Number 24–1058 for 86 Notice of Appeal filed by Mary Ann Moreno. (sphil, ) (Entered: 02/15/2024) |
| 02/20/2024 | 91 | NOTICE by Clerk re 89 Stipulation, 88 Bill of Costs(Proposed). As agreed by the parties, the hearing for this matter will be stayed pending the resolution of the appeal of this case. At that time, the parties must either re–file the Proposed Bill of Costs or file a new bill, depending on the outcome, within 14 days. If appellate costs are incurred, the parties are reminded to review Fed. R. App. P. Rule 39 and 10th Cir. R. 39 Text Only Entry (ashee) (Entered: 02/20/2024) |
| 02/29/2024 | 92 | TRANSCRIPT ORDER FORM re 86 Notice of Appeal by Plaintiff Mary Ann Moreno (Butler, Virginia) (Entered: 02/29/2024) |
| 02/29/2024 | 93 | LETTER TO USCA and all counsel certifying the record is complete as to 86 Notice of Appeal filed by Mary Ann Moreno. A transcript order form was filed stating that the necessary transcript is already on file. ( Appeal No. 24–1058) Text Only Entry, (norlin, ) (Entered: 03/07/2024) |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Case No. 22-cv-02327

MARY ANN MORENO,

                Plaintiff,

v.

CIRCLE K STORES, INC.,

                Defendant.

---

## NOTICE OF REMOVAL

---

PLEASE TAKE NOTICE that Defendant Circle K Stores, Inc. ("Circle K") removes the state-court action captioned *Mary Ann Moreno v. Circle K Stores, Inc.*, Case No. 2022CV30949, filed in the District Court of Jefferson County, Colorado to the United States District Court for the District of Colorado according to 28 U.S.C. §§ 1332, 1441, and 1446, and as grounds therefore states as follows:

## I.      OVERVIEW

Plaintiff Mary Ann Moreno commenced this action against Circle K in the District Court of Jefferson County, Colorado by service of a summons and Complaint and Jury Demand ("Complaint") dated August 12, 2022. The Complaint asserts a claim for wrongful discharge in violation of public policy and a claim for intentional infliction of emotion distress/outrageous conduct under Colorado common law. *See* Ex. A. Circle K first received a copy of the Complaint on August 12, 2022 and waived service of the summons.

This is a proper case for removal to this Court under 28 U.S.C. § 1441 because it is a civil action wherein the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and it is between citizens of different states. As set forth more fully below, this case meets all the requirements for removal and is timely and properly removed by the filing of this notice.

## II.    REMOVAL IS PROPER BECAUSE THIS COURT HAS DIVERSITY JURISDICTION.

As the party seeking removal, Circle K bears the burden of proving by a preponderance of evidence that the requirements for diversity jurisdiction are satisfied. *Martin v. Franklin Cap. Corp.*, 251 F.3d 1284, 1290 (10th Cir. 2001). Circle K has met that burden.

28 U.S.C. § 1332(a) provides: "The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . (1) citizens of different States[.]" The Court has original jurisdiction over this action based on diversity of citizenship under § 1332(a), and it may be removed to this Court according to 28 U.S.C. § 1441(b) because it is a civil action between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs, as set forth below.

### 1.    Complete diversity of citizenship exists in this case.

Moreno was and is a resident of Colorado and is therefore a citizen of Colorado for purposes of diversity jurisdiction. *See* Compl. ¶ 1.

Circle K is a Texas corporation and its principal place of business is in Tempe, Arizona.[1] Thus, Circle K is a citizen of Texas and Arizona for purposes of diversity jurisdiction. 28 U.S.C. § 1332(c)(1) (for diversity-jurisdiction purposes, a corporation is deemed a citizen of its state of incorporation and the state where it has its principal place of business).

Therefore, complete diversity exists for purposes of 28 U.S.C. § 1332.

**2.      The amount in controversy exceeds $75,000, exclusive of costs and interest.**

Moreno certified on the state-court Civil Case Cover Sheet that she seeks a monetary judgment of more than $100,000, excluding interest and costs. *See* Ex. C at 2; *see also* Ex. D (certifying that Moreno "seeks a monetary judgment over $100,000" against Circle K).

Importantly, once it is shown that the amount in controversy may be greater than $75,000, the case belongs in federal court "unless it is legally certain that less than $75,000 is at stake." *Chen v. Dillard Store Servs.*, 579 F. App'x 618, 621–22 (10th Cir. 2014) (citation omitted). Further, the United States Supreme Court has held under 28 U.S.C. § 1446(a) that a defendant seeking to remove a case to federal court need only file "a notice of removal 'containing a short and plain statement of the grounds for removal.'" *Dart Cherokee Basin Operating Co., LLC v. Owens*, 135 S. Ct. 547, 553 (2014). The Supreme Court further held this

---

[1]  Plaintiff erroneously alleges that Circle K is "a business entity incorporated under the laws of the State of Colorado[.]" Compl. ¶ 2. In fact, Circle K is incorporated in Texas and maintains its principal office in Tempe, Arizona. *See* Colorado Secretary of State, https://www.coloradosos.gov/biz/BusinessEntityDetail.do?quitButtonDestination=BusinessEntityResults&nameTyp=ENT&masterFileId=19871038658&entityId2=19871038658&fileId=19871038658&srchTyp=ENTITY (last visited Sept. 9, 2022); *see also Budnella v. USAA Gen. Indem. Co.*, No. 20-CV-00944-KMT, 2020 WL 2847627, at *3 n.1 (D. Colo. June 2, 2020) (finding that a "document from the Colorado Secretary of State" was sufficient evidence for determining a corporation's citizenship). A copy of the Colorado Secretary of State's corporate summary of Circle K is attached as Exhibit K.

language tracks the general pleading requirement stated in Federal Rule of Civil Procedure 8(a), and that "[a] statement 'short and plain' need not contain evidentiary submissions." *Id.* at 551, 553.

Here, the Court can reasonably ascertain from the state-court Civil Case Cover Sheet that the amount in controversy exceeds $75,000. Although Circle K denies that Moreno's claims have merit, based on the above information, it is certain that the amount in controversy exceeds the $75,000 jurisdictional requirement, exclusive of interest and costs. Thus, this Court has original jurisdiction over the claims asserted by Moreno in the state-court action based on diversity jurisdiction under 28 U.S.C. §§ 1332(a)(1) and 1441(a).

## II.     THIS NOTICE OF REMOVAL IS TIMELY.

In general, "[t]he notice of removal of a civil action or proceeding shall be filed within 30 days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based, or within 30 days after the service of summons upon the defendant if such initial pleading has then been filed in court and is not required to be served on the defendant, whichever period is shorter." 28 U.S.C. § 1446(b).

Because Circle K was first notified of the Complaint on August 12, 2022, and because Circle K filed this Notice of Removal on September 9, 2022, this Notice of Removal is timely.

## III.     THE OTHER PREREQUISITES FOR REMOVAL HAVE BEEN SATISFIED

In addition to satisfying the jurisdictional and timing requirements, Circle K has also satisfied all other procedural requirements for removal:

1.      The District Court of the County of Jefferson, Colorado is located within the District of Colorado. *See* 28 U.S.C. § 1441(a).

2.      No previous application has been made for the relief requested in this notice.

3.      As required by 28 U.S.C. § 1446(a), a copy of all pleadings, process, and orders received by Circle K (or filed in the state-court case) are identified as follows:

> Exhibit A: Complaint
>
> Exhibit B: Summons
>
> Exhibit C: District Court Civil Case Cover Sheet
>
> Exhibit D: Notice that C.R.C.P. 16.1 Simplified Procedure Does Not Apply
>
> Exhibit E: Civil Procedure Order
>
> Exhibit F: Entry of Appearance – Thomas W. Carroll
>
> Exhibit G: Unopposed Motion for Enlargement of Time to Answer or Otherwise Respond
>
> Exhibit H: Proposed Order Granting Unopposed Motion for Enlargement of Time to Answer or Otherwise Respond
>
> Exhibit I: Order Granting Unopposed Motion for Enlargement of Time to Answer or Otherwise Respond

4.      As required by D.C.COLO.LCivR 81.1(b), a copy of the current docket sheet from the state court is attached as Exhibit J. There are no pending hearings, motions, petitions, or related responses, replies, or briefs before the state court.

Vol. I - 0017

5.      As required by 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being served upon counsel for Plaintiff and a copy is being filed with the Clerk of the District Court of Jefferson County, Colorado.

WHEREFORE, Circle K removes this action from the District Court of Jefferson County, Colorado, bearing Civil Action No. 2022CV30949, to the United States District Court for the District of Colorado.

Respectfully submitted this 9th day of September, 2022.

s/ Thomas W. Carroll
Thomas W. Carroll
Nicholas Hankins
LITTLER MENDELSON, P.C.
1900 Sixteenth Street, Suite 800
Denver, CO 80202
Telephone: 303.629.6200
Fax: 303.629.0200
Email: tcarroll@littler.com
          nhakins@littler.com

Attorneys for Defendant Circle K Stores, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on the 9th day of September, 2022, I electronically filed the

foregoing **NOTICE OF REMOVAL** with the Clerk of Court using the CM/ECF system, and

served it by email and U.S. Mail to the following:

Nicholas A. Lutz
Iris Halpern
RATHOD | MOHAMEDBHAI LLC
2701 Lawrence Street, Suite 100
Denver, CO  80205
Telephone: (303) 578-4400
Fax: (303) 578-4401
nl@rmlawyers.com
ih@rmlawyers.com

*Attorneys for Plaintiff*

*s/ Joanna Fox*
Joanna Fox, Legal Secretary

4859-2254-4689.4

# EXHIBIT A TO
# NOTICE OF REMOVAL

# MARY ANN MORENO v.
# CIRCLE K STORES, INC.
# (State Court Case No. 2022CV30949)

| | |
|---|---|
| DISTRICT COURT, JEFFERSON COUNTY<br>STATE OF COLORADO<br>100 JEFFERSON COUNTY PARKWAY<br>GOLDEN, CO 80401 | DATE FILED: August 12, 2022 3:10 PM<br>FILING ID: 45F598C53C15F<br>CASE NUMBER: 2022CV30949 |
| **MARY ANN MORENO**,<br><br>Plaintiff,<br><br>v.<br><br>**CIRCLE K STORES, INC.**,<br><br>Defendant. | ▲ COURT USE ONLY ▲ |
| *Attorneys for Plaintiff:*<br><br>Nicholas A. Lutz, #51299<br>Iris Halpern, #53112<br>RATHOD \| MOHAMEDBHAI LLC<br>2701 Lawrence Street, Suite 100<br>Denver, CO 80205<br>(303) 578-4400 (t) / (303) 578-4401 (f)<br>nl@rmlawyers.com<br>ih@rmlawyers.com | Case No:<br>Division: |
| **COMPLAINT AND JURY DEMAND** | |

Plaintiff Mary Ann Moreno, by and through her attorneys Nicholas A. Lutz and Iris

Halpern of RATHOD | MOHAMEDBHAI LLC, respectfully alleges for her Complaint and Jury

Demand as follows:

1

## I.     NATURE OF THE CLAIMS

Plaintiff Mary Ann Moreno ("Ms. Moreno") alleges that Defendant Circle K, Inc. ("Defendant") wrongfully and outrageously terminated her employment after she exercised her right to self-defense and self-preservation during an armed robbery while at work.

## II.     PARTIES, JURISDICTION, AND VENUE

1.     Plaintiff Mary Ann Moreno was and is a resident of the State of Colorado and is domiciled in Adams County.

2.     At all relevant times, Defendant Circle K, Inc., was and is a business entity incorporated under the laws of the State of Colorado, doing business in the Adams County, Colorado.

3.     This Court has jurisdiction over this matter pursuant to C.R.S. § 13-1-124.

4.     Venue is proper pursuant to C.R.C.P. 98(c), as the allegations contained herein occurred within Adams County.

## III.     FACTUAL ALLEGATIONS

5.     Plaintiff Mary Ann Moreno is the mother of two children, a son, Brandon Moreno, and a daughter, Olivia Roan. She is currently 74 years of age.

6.     Ms. Moreno raised her children in a loving home in the suburbs of Denver, where, by all accounts, they enjoyed an ordinary and happy childhood.  Both Brandon and Olivia remain close to Ms. Moreno and continue to live in Colorado to this day.

7.     Ms. Moreno maintains an especially close relationship with her daughter-in-law, Bonnie Moreno, whom she often refers to as her "bonus child," as she grew up with Ms. Moreno's children, passing the time on the same playgrounds and streets.

8.      Ms. Moreno has worked hard to support her family throughout her entire life. At just sixteen years old, Ms. Moreno started her first job as a retail cashier in a local shop.

### *Ms. Moreno's Employment with Defendant Circle K, Inc.*

9.      For most of sixteen years, Ms. Moreno was employed as a cashier for Circle K Sheridan, located at 9489 Sheridan Boulevard in Westminster, Colorado.

10.     In her time with Circle K, Ms. Moreno was perpetually hard working and dedicated to her job.

11.     As an employee, Ms. Moreno was timely, efficient, and attentive to her customers and the store.

12.     Though her official title was that of "cashier," Ms. Moreno attended to almost all of the day-to-day duties required to operate the store.

13.     Among these, she operated the register, restocked products, cleaned and sanitized the store area and restrooms, assisted customers with operating the fuel pumps, and generally maintained the premises.

14.     Ms. Moreno rarely hesitated to cover shifts for other employees, and she was asked to do so on a regular basis.

15.     In fact, it was not uncommon for Ms. Moreno to miss family events such as holidays and birthdays in order to cover shifts at Circle K Sheridan.

16.     Ms. Moreno also acted as a de facto store manager, though she retained the title and hourly pay of a cashier.  By all accounts, she frequently ran the store single-handedly.

Vol. I - 0023

17.     Despite the fact that Circle K's Sheridan store was located in a relatively high-crime area, Ms. Moreno was often called upon by Circle K to work the store alone, without the assistance of another employee or manager, including during night shifts.

18.     Throughout her incredibly long tenure – nearly sixteen years – with Circle K, Ms. Moreno was never disciplined nor given a negative performance review.

19.     Ms. Moreno's dedication to her job and to Circle K was never merely financial. At the time Circle K terminated her, the company was paying her $14.05 per hour.

### *Ms. Moreno was Attacked by a Knife-Wielding Assailant During an Armed Robbery*

20.     On October 4, 2020, Ms. Moreno worked her usual evening shift at Circle K Sheridan. She was 72 years old at the time.

21.     As was often the case, Ms. Moreno was the only employee scheduled to work that evening.

22.     Ms. Moreno acted as the cashier and otherwise supervised the store. She restocked products, cleaned and sanitized where needed, and assisted her customers with their business.

23.     At approximately 7:00 p.m., while Ms. Moreno stood alone behind the front counter, a man walked through the front door of the store.

24.     Ms. Moreno immediately noticed that the man appeared disheveled and was not behaving normally.

25.     The man advanced towards the front of the counter as Ms. Moreno stood behind it.

26.     Ms. Moreno immediately noticed that the man was carrying two large hunting knives in his hands.

27.     Ms. Moreno called out to the man that he could not bring knives into the store.

28.     The man ignored Ms. Moreno and approached the counter.

29.     The man then demanded a pack of cigarettes.  Ms. Moreno asked the man which brand he would like, and then retrieved the cigarettes from the display case behind her.

30.     As Ms. Moreno began to ring up the man's apparent purchase, the man told Ms. Moreno words to the effect of, "just give them to me for free."

31.     Ms. Moreno replied that she could not give the man the cigarettes for free because she did not own the store and could lose her job.

32.     The man then became visibly upset and began to leave the store.

33.     As he left, however, he abruptly changed directions and came back toward Ms. Moreno from the side and rear of the counter.

34.     Ms. Moreno exclaimed to the man, "Don't come back here!" referring to the closed area behind the counter in which she was standing.

35.     However, the man proceeded towards Ms. Moreno and the display case containing the store's tobacco products.

36.     As the man was blocking Ms. Moreno's only avenue of escape from the closed area behind the counter, she was unable to flee.

37.     The man moved towards Ms. Moreno and well within reaching distance of her, still holding the knives.

38.     Nearing closer to Ms. Moreno, the man then suddenly reached his arm out past her for a pack of cigarettes in the display case the two were standing directly adjacent to.

39.     Ms. Moreno instinctively reached out towards the man to protect herself and prevent the man from coming closer toward her and the merchandise.

40.     Ms. Moreno was terrified for her life as she genuinely believed that the man was going to attempt to stab or otherwise harm her.

41.     She had no means of escape from the area.  Nor did she have any idea what the man intended to do after invading the small area that she was trapped in.

42.     Fortunately, after grabbing the cigarettes from the display case, the man rushed out of the store.

43.     At least one customer witnessed the robbery and called the Westminster Police Department.  Several more customers entered the store in the moments immediately following the robbery.

### *Police Arrived at the Scene Shortly After the Assailant's Departure*

44.     After the assailant had fled the store, Ms. Moreno picked up the phone and began calling other Circle K employees to notify them about the robbery and ask for help.

45.     Several customers remained at the store and tried to comfort Ms. Moreno.

46.     Officers from the Westminster Police Department arrived a short time after the assailant had fled the store.

47.     The officers contacted Ms. Moreno immediately after they arrived and asked her to provide a statement.

48.     Ms. Moreno was incredibly distraught while speaking with the officers.

49.     Ms. Moreno was crying and struggling to concentrate when giving her account of the incident.

50.     Ms. Moreno was obviously and apparently in extreme distress.

51.     Ms. Moreno told officers what had happened and how scared she was when the assailant started walking towards her with the knives.

52.     Despite the fact that Ms. Moreno had reached out to multiple Circle K employees so that she could be relieved of her shift, none immediately responded.  Ms. Moreno was forced to continue working.

53.     Indeed, Ms. Moreno called at least three Circle K Sheridan managers for assistance, none of whom agreed to provide immediate help nor demonstrated any genuine concern for Ms. Moreno's well-being.

54.     Ms. Moreno called her daughter-in-law, Bonnie Moreno, to tell her the news of the robbery. Bonnie Moreno arrived at the store shortly after to comfort Ms. Moreno while she waited for another Circle K employee to arrive.

55.     Store Manager Love Jorgensen and Circle K District Manager Dris Armand arrived at the store later in the evening.

56.     Mr. Armand immediately began interrogating Ms. Moreno about the armed robbery.

57.     Mr. Armand then went to the back office in Circle K Sheridan.

58.     Mr. Armand turned his attention to the security module to watch surveillance from the time of the robbery.

59.     The surveillance footage captured the armed robbery from many different angles.

60.     Mr. Armand became upset with Ms. Moreno and insisted to her that the surveillance footage did not depict a robbery and that the apparent thief had not actually been armed.

61.     Mr. Armand told Ms. Moreno that Circle K Sheridan would be investigating the incident due to her "push[ing] [the assailant]" away when the assailant approached her in a threatening manner while armed with a knife.

62.     Mr. Armand also demanded that Ms. Moreno's daughter-in-law leave the store "for [her] own safety."

63.     Ms. Moreno's daughter-in-law was forced to exit the store.

### *Ms. Moreno was Fired Two Days After Being Robbed at Knifepoint*

64.     The day after the robbery, Ms. Moreno called Ms. Jorgensen to inquire about her schedule for the following week.

65.     Ms. Jorgensen informed Ms. Moreno she needed to call Mr. Armand to discuss her schedule.

66.     Ms. Moreno then called Mr. Armand.  However, Mr. Armand refused to discuss Ms. Moreno's schedule, citing the fact Ms. Moreno was purportedly still under investigation as a result of the robbery.

67.     Ms. Moreno asked why she was under investigation and Mr. Armand responded with words to the effect of, "You know what you did wrong."

68.     Mr. Armand continued to dismiss Ms. Moreno's confusion and place blame on her for being attacked at work.

69.     Mr. Armand relentlessly insisted that Ms. Moreno apologize for "her behavior."

70.     However, Ms. Moreno refused to apologize for having been the victim of a crime.

71.     Mr. Armand abruptly ended the conversation after becoming frustrated and told Ms. Moreno to call him the following day.

72.     As instructed, Ms. Moreno called Mr. Armand the next day.

73.     Mr. Armand told Ms. Moreno that Circle K Sheridan was terminating her employment, effective immediately.

### *The Assailant Was Identified and Arrested by the Westminster Police Department*

74.     The Westminster Police Department identified and arrested Tyler Darren Wimmer as Ms. Moreno's assailant.

75.     Mr. Wimmer was charged with multiple felonies, including aggravated robbery and menacing with a deadly weapon.

76.     While his criminal case was pending, Mr. Wimmer was deemed incompetent to participate in the proceedings or assist with his own defense.  As such, he was sent to a medical treatment facility to be rehabilitated.

77.     Mr. Wimmer's mental state provides evidence for why Ms. Moreno reasonably believed he would attempt to stab her based on his erratic behavior.

### *The Robbery and Termination from Circle K Caused Ms. Moreno Emotional Distress*

78.      Ms. Moreno has experienced devastating effects as a result of being terminated through no fault of her own after nearly two decades of work at Circle K.

79.      Ms. Moreno is experiencing symptoms of anxiety such as inability to focus and forgetfulness, and she is often unable to sit still.

80.      Since her termination, Ms. Moreno has become isolated from her friends and family.

81.      Ms. Moreno's grandchildren have noticed that Ms. Moreno has begun swiftly and severely deteriorating, both mentally and emotionally, since Circle K terminated her employment.

82.      When Circle K terminated Ms. Moreno, if effectively severed her closest ties to her community, her most significant social sphere, and ultimately, her sense of purpose and direction.

83.      Since Circle K terminated her employment, Ms. Moreno has been forced to seek regular psychological counseling for the first time in her life.

84.      Though she has since found another cashier position with a different company, Ms. Moreno still panics while working at her new cashier position.

85.      She also fears for the security of her job and primary income, which she feels could be jeopardized at any time through no fault of her own.

86.      Ms. Moreno is also fearful of conversations and ordinary interactions with her supervisors, as she feels she might be terminated at any time.

*__Circle K's Termination of Ms. Moreno Caused Her Substantial Economic Loss__*

87.     Though Ms. Moreno is now successfully reemployed, she is earning far less than she earned in her position with Circle K.

88.     Ms. Moreno's new position also offers far less generous benefits than she was entitled to while employed with Circle K, causing her to incur substantial out-of-pocket costs for services that were previously covered by insurance.

89.     Ms. Moreno's new position does not offer her a pension, which was a significant financial benefit attending her position at Circle K.

## IV.     CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### Wrongful Discharge in Violation of Public Policy

90.     Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

91.     Defendant terminated Ms. Moreno in violation of public policy as set forth under Colorado common law.

92.     The essence of the public-policy exception to at-will employment status is that an employee has a cognizable claim for wrongful discharge if the employee contravenes a clear mandate of public policy. *Martin Marietta Corp. v. Lorenz*, 823 P.2d 100, 107 (Colo. 1992).

93.     Claims for wrongful discharge under Colorado's public-policy exception have included termination of employee for (1) refusal to participate in illegal activity; (2) the employee's refusal to forsake the performance of an important public duty or obligation; (3) the employee's refusal to forego the exercise of a job-related legal right or privilege; (4) the employee's whistle

blowing activity or other conduct exposing the employer's wrongdoing; and (5) the employee's performance of an act that public policy would encourage under circumstances where retaliatory discharge is supported by evidence of employer's bad faith, malice, or retaliation. *Lorenz*, 823 P.2d at 107.

94.     The public policy at issue must be clearly mandated such that the acceptable behavior is concrete and discernible, as opposed to a broad hortatory statement of policy that gives little direction as to the bounds of proper behavior. *Rocky Mountain Hosp. and Medical Service v. Mariani*, 916 P.2d 519, 525 (Colo.1996).  Colorado courts have held that expressions of public policy are readily found in statutes, common law, and the state constitution. *Id.*; *Slaughter v. John Elway Dodge Sw./AutoNation*, 107 P.3d 1165, 1169 (Colo. App. 2005) (considering Colorado constitution as a source of public policy).  From such sources, it is clear that Colorado has long recognized the right of self-defense and self-preservation as an essential public policy.

95.     It is also equally clear that Colorado has recognized the rights of victims and witnesses to report and testify about crimes. Hence, in C.R.S. § 18-8-706, state statute makes it unlawful for an individual to commit retaliation or anticipatory retaliation a victim or witness of crime. Likewise, C.R.S. §24-4.1-303 requires "all reasonable attempts shall be made to protect any victim…from harm, harassment, intimidation, or retaliation arising from cooperating in the reporting, investigation, and prosecution of a crime." Such law further states that "[a]n employer may not discharge or discipline any victim…for participating in the preparation of a criminal proceeding." From such sources, a victim's right to report a crime and participate in its investigation and prosecution are recognized as an essential public policy.

**Examples of Sources of Public Policy**

96.      According to Article II, § 3 of the Colorado Constitution, "All persons have certain natural, essential and inalienable rights, among which may be reckoned the right of enjoying and defending their lives . . . and of seeking and obtaining their safety and happiness."

97.      Similarly, the Colorado Constitution also recognizes self-defense as one of the bases for Colorado's right to bear arms.  Colo. Const. Art. II § 13 ("The right of no person to keep and bear arms in defense of his home, person and property . . . shall be called in question."). Following the ratification of the state constitution, the common law right of self-defense was recognized by Colorado courts as early as 1886.  *See Kent v. People*, 8 Colo. 563 (1886); *Ritchey v. People*, 23 Colo. 314 (1896) (recognizing the common law right to self-defense and its limitation via the "retreat to the wall" doctrine).

98.      Today, the right to self-defense is also codified in Colorado's criminal code.  *See* C.R.S. § 18-1-704.  According to the self-defense statute, a person shall not be held criminally liable for using physical force against another person "in order to defend himself or a third person from what he reasonably believes to be the use or imminent use of unlawful physical force by that other person."  *Id.*

99.      Because the right to self-defense is enshrined in the Colorado constitution, has been long recognized in Colorado's common law, and is written into the Colorado Criminal Code, it is a source of public policy sufficient to support Ms. Moreno's wrongful discharge claim.

100.     Ms. Moreno's wrongful discharge claim is also simultaneously grounded in her rights as a victim and witness of a crime, including her rights to report a crime and to participate in the investigation and prosecution of the crime, free from retaliation by her employer or anyone

else, in accordance with C.R.S. § 18-8-706, C.R.S. §24-4.1-303, and other statutes, common law, and other sources of public policy as recognized by the courts.

101.    Ms. Moreno was the only employee working during the incident which reasonably resulted in her fear of harm with no aid nearby.

102.    Ms. Moreno raised up her arm to defend and protect herself from the attacker who had two knives and had aggressively approached and reached toward her.

103.    In raising up her arm, Ms. Moreno made contact with the attacker.

104.    After making contact with the attacker in attempt to move him away from her and the merchandise, Ms. Moreno immediately moved backwards away from the attacker.

105.    The attacker left the Circle K store unharmed and with the cigarettes he intended to steal.

106.    All of the above events were visible and apparent from Circle K's surveillance camera footage.

107.    Circle K was aware that Ms. Moreno was acting in self-defense and/or self-preservation at the time she reached toward her assailant.

108.    By terminating Ms. Moreno for reporting the fact that she was a victim of a violent crime to her managers and for instinctively defending herself against an armed attacker while working alone in a closed space, Circle K violated the public-policy exception to Colorado's at-will employment doctrine.

109.    As a direct result of Defendant's actions, Ms. Moreno has suffered significant injuries, damages, and losses to be determined at trial.

110.     Defendant's conduct described herein was attended by circumstances of fraud, malice, or willful and wanton conduct, such that Ms. Moreno notifies Defendant now that she intends to move for exemplary damages pursuant to C.R.S. § 13-21-102.

## SECOND CLAIM FOR RELIEF

### Intentional Infliction of Emotional Distress and/or Outrageous Conduct

111.     Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

112.     In Colorado, the elements of outrageous conduct are: (1) the defendant engaged in extreme and outrageous conduct, (2) recklessly or with the intent of causing the plaintiff severe emotional distress, and (3) causing the plaintiff severe emotional distress.  *See Archer v. Farmer Bros. Co.*, 70 P.3d 495, 499 (Colo. App. 2022), *aff'd*, 90 P.3d 228 (Colo. 2004).

113.     Defendant Circle K engaged in extreme and outrageous conduct by terminating Ms. Moreno because she was the victim of multiple felonies in the workplace and because she engaged in protected activity by defending herself from potentially severe bodily harm in the workplace.

114.     Ms. Moreno did not provoke the violence against her in any way.  Rather, she reacted to an armed robber in an instinctual manner to protect her safety.

115.     Defendant Circle K engaged in extreme and outrageous conduct by terminating Ms. Moreno for exercising her right to self-defense.

116.     Defendant Circle K engaged in extreme and outrageous conduct by terminating Ms. Moreno for reporting the act of criminal violence perpetuated against her on the job to her managers, and for reporting the attack to the police.

117.    Defendant Circle K further engaged in extreme and outrageous conduct by refusing to timely come to her aid following the armed robbery or assign additional employees to the store, forcing Ms. Moreno to remain at the scene of the crime, alone, for a substantial period of time.

118.    Defendant terminated Ms. Moreno two days after she was the victim of the armed robbery.

119.    Defendant Circle K further engaged in extreme and outrageous conduct when it ordered Ms. Moreno's daughter to leave the store following the armed robbery, depriving Ms. Moreno of her only company and source of comfort.

120.    Through all of the above conduct, Defendant acted recklessly or with the intent of causing Ms. Moreno emotional distress.

121.    Defendant was aware of Ms. Moreno being the victim of an emotionally and psychologically damaging event prior to terminating her for exercising her constitutional right to self-defense.

122.    As a result of her termination following a nearly sixteen-year career with Defendant, Ms. Moreno has since experienced severe anxiety, depression, and isolation.

123.    As a direct result of Defendant's actions, Ms. Moreno has suffered significant injuries, damages, and losses to be determined at trial.

124.    Defendant's conduct described herein was attended by circumstances of fraud, malice, or willful and wanton conduct, such that Ms. Moreno notifies Defendant now that she intends to move for exemplary damages pursuant to C.R.S. § 13-21-102.

## V.    __PRAYER FOR RELIEF__

WHEREFORE, Plaintiff Mary Ann Moreno respectfully requests that the Court enter judgment for the following relief:

a.  Actual economic damages as established at trial;

b.  Compensatory damages, including, but not limited to those for future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

c.  Pre-judgment and post-judgment interest at the highest lawful rate;

d.  Appropriate tax-offset, as allowed by law;

e.  Attorneys' fees and costs, as allowed by law;

f.  Any other appropriate remedy available under law; and

g.  Such further relief as justice requires.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE**

DATED: August 12, 2022

RATHOD ǀ MOHAMEDBHAI LLC

_s/ Nicholas A. Lutz_
Nicholas A. Lutz, #51299
Iris Halpern, #53112
2701 Lawrence Street, Suite 100
Denver, CO 80205
(303) 578-4400
nl@rmlawyers.com
ih@rmlawyers.com

ATTORNEYS FOR PLAINTIFF

JS 44   (Rev. 10/20)    District of Colorado

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Mary Ann Moreno

## DEFENDANTS

Circle K Stores, Inc.

**(b)** County of Residence of First Listed Plaintiff __Adams, Colorado__
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Nicholas A. Lutz, Iris Halpern, RATHOD | MOHAMEDBHAI LLC, 2701 Lawrence Street, Suite 100 Denver, CO  80205 (303) 578-4400

Attorneys *(If Known)*
Thomas W. Carroll and Nicholas Hankins, Littler Mendelson, P.C., 1900 16th Street, Suite 800, Denver, CO 80202, 303-629-6200

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☐ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 U.S. Government Defendant | ☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | | | ☐ 751 Family and Medical Leave Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☒ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1 Original Proceeding | ☒ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. §§ 1332, 1441, 1446     ☐ AP Docket

Brief description of cause: Wrongful discharge

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:

JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*     JUDGE _____     DOCKET NUMBER _____

DATE
September 9, 2022

SIGNATURE OF ATTORNEY OF RECORD
*s/ Thomas W. Carroll*

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Case No. 22-cv-02327-STV

MARY ANN MORENO,

        Plaintiff,

v.

CIRCLE K STORES, INC.,

        Defendant.

---

**ANSWER**

---

      Defendant Circle K Stores, Inc. ("Circle K") answers Plaintiff Mary Ann Moreno's Complaint and Jury Demand [Dkt. 3] ("Complaint") as follows:

      Responding to the unnumbered "Nature of the Claims" section of the Complaint, Circle K admits that Moreno purports to bring claims for wrongful termination and intentional infliction of emotional distress/outrageous conduct. Circle K denies Moreno's allegations and denies she is entitled to any relief whatsoever.

      1.      Responding to the allegations in Paragraph 1, Circle K admits upon information and belief that Plaintiff was and is a resident of Colorado. Circle K is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 1.

      2.      Circle K admits that it does business in Adams County, Colorado. Circle K denies the remaining allegations in Paragraph 2. Circle K affirmatively states it is a Texas corporation and its principal place of business is in Tempe, Arizona.

3.      Circle K admits that this Court has subject-matter jurisdiction under 28 U.S.C.

§ 1332(a). Circle K denies the remaining allegations in Paragraph 3.

4.      Circle K admits that the allegations in the Complaint occurred in Adams County,

Colorado. Circle K admits that venue is proper in this Court under 28 U.S.C. § 1391(b)(2). Circle

K denies the remaining allegations in Paragraph 4.

5.      Responding to the allegations in Paragraph 5, Circle K admits upon information

and belief that Moreno is 74 years old at the time of filing her Complaint. Circle K is without

knowledge or information sufficient to form a belief as to the truth of the remaining allegations

in Paragraph 5.

6.      Circle K is without knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 6

7.      Circle K is without knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 7.

8.      Circle K is without knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 8.

9.      Responding to the allegations in Paragraph 9, Circle K admits that it hired

Moreno on October 26, 2018 and prior to that she had been employed by a predecessor company

since October 29, 2004, and Circle K admits she worked at its 9489 Sheridan Boulevard store.

Circle K denies any remaining allegations in Paragraph 9.

10.     Responding to the allegations in Paragraph 10, Circle K admits that Moreno was

meeting the performance expectations of her position prior to her termination, with the exception

of the policy violation that resulted in her termination. Circle K denies any remaining allegations in Paragraph 10.

11.      Responding to the allegations in Paragraph 11, Circle K admits that Moreno was meeting the performance expectations of her position prior to her termination, with the exception of the policy violation that resulted in her termination. Circle K denies any remaining allegations in Paragraph 11.

12.      Circle K denies the allegations in Paragraph 12.

13.      Responding to the allegations in Paragraph 13, Circle K admits that Moreno's job duties included, but were not limited to operating the register, restocking products, cleaning and sanitizing the store area and restrooms, assisting customers with operating the fuel pumps, and generally maintaining the premises, as further described in the job description for a Customer Service Representative.

14.      Circle K is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 14.

15.      Circle K is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 15.

16.      Circle K denies the allegations in Paragraph 16.

17.      Circle K is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 17.

18.      Circle K denies the allegations in Paragraph 18.

19.      Responding to the allegations in Paragraph 19, Circle K admits that at the time of her separation from employment Moreno was earning $14.05 per hour. Circle K is without

knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 19.

20.     Responding to the allegations in Paragraph 20, Circle K admits that Moreno worked on October 4, 2020 at the Circle K location on Sheridan Boulevard, and admits upon information and belief that she was 72 years old at the time. Circle K is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 20.

21.     Circle K admits that Moreno was the only employee working on the evening of October 4, 2020. Circle K is without knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 21.

22.     Circle K admits the allegations in Paragraph 22.

23.     Circle K denies the allegations in Paragraph 23.

24.     Circle K is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 24.

25.     Responding to the allegations in Paragraph 25, Circle K states they are vague with respect to the man to whom they refer, the time, and the sequence of events. Therefore Circle K is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 25. Circle K affirmatively states the video-surveillance footage exists.

26.     Circle K is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 26.

27.     Circle K is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 27.

4

28.     Circle K is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 28.

29.     Circle K admits that Moreno retrieved cigarettes from the display case behind her. Circle K denies the remaining allegations in Paragraph 29.

30.     Circle K admits the allegations in Paragraph 30.

31.     Circle K admits the allegations in Paragraph 31.

32.     Circle K denies the allegations in Paragraph 32.

33.     Circle K denies the allegations in Paragraph 33.

34.     Responding to the allegations in Paragraph 34, Circle K admits that Moreno said, "Don't come back here." Circle K is without knowledge or information sufficient to form a belief as to what she was referring to. Circle K denies the remaining allegations in Paragraph 34.

35.     Circle K denies the allegations in Paragraph 35.

36.     Circle K denies the allegations in Paragraph 36.

37.     Circle K denies the allegations in Paragraph 37.

38.     Circle K denies the allegations in Paragraph 38.

39.     Circle K denies the allegations in Paragraph 39.

40.     Circle K is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 40.

41.     Circle K denies the allegations in Paragraph 41.

42.     Circle K admits that after grabbing a pack of cigarettes the man left the store. Circle K denies the remaining allegations in Paragraph 42.

43.     Circle K admits that someone called law enforcement. Circle K denies the remaining allegations in Paragraph 43.

44.     Circle K is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 44.

45.     Circle K denies the allegations in Paragraph 45.

46.     Responding to the allegations in Paragraph 46, Circle K admits that police officers from the Westminster Police Department arrived at the store after the man left the store. Circle K states that the allegations are vague with respect to the meaning of "a short time after" and therefore Circle K is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 46.

47.     Circle K admits that a police officer asked Moreno to provide a statement. Circle K denies the remaining allegations in Paragraph 47.

48.     Circle K denies the allegations in Paragraph 48.

49.     Circle K denies the allegations in Paragraph 49.

50.     Circle K denies the allegations in Paragraph 50.

51.     Responding to the allegations in Paragraph 51, Circle K admits Moreno gave a statement to police and denies anything inconsistent with her statement.

52.     Circle K denies the allegations in Paragraph 52.

53.     Circle K is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 53.

54.     Circle K is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 54.

55.     Responding to the allegations in Paragraph 55 of the Complaint, Circle K admits that Market Manager Driss Aamoud and Store Manager Love Jorgensen arrived at the store later in the evening. Circle K denies any remaining allegations in Paragraph 55.

56.     Circle K denies the allegations in Paragraph 56.

57.     Responding to the allegations in Paragraph 57, Circle K admits that Aamoud went to the store's office during his visit. Circle K denies any remaining allegations in Paragraph 57.

58.     Responding to the allegations in Paragraph 58 Circle K admits that Aamoud watched security footage during his visit. Circle K denies any remaining allegations in Paragraph 58.

59.     Responding to the allegations in Paragraph 59 Circle K admits that the security footage shows the store from many different angles and captured Wimmer's robbery. Circle K denies the remaining allegations in Paragraph 59.

60.     Circle K denies the allegations in Paragraph 60.

61.     Circle K denies the allegations in Paragraph 61.

62.     Circle K denies the allegations in Paragraph 62.

63.     Circle K denies the allegations in Paragraph 63.

64.     Circle K denies the allegations in Paragraph 64.

65.     Circle K denies the allegations in Paragraph 65.

66.     Circle K is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 66.

67.     Circle K denies the allegations in Paragraph 67.

68.     Circle K denies the allegations in Paragraph 68.

69.     Circle K denies the allegations in Paragraph 69.

70.     Responding to the allegations of Paragraph 70, Circle K admits that Moreno did not apologize for violating Circle K policy. Circle K denies the remaining allegations in Paragraph 70.

71.     Circle K admits that Aamoud asked Moreno to call him the following day. Circle K denies any remaining allegations in Paragraph 71.

72.     Circle K denies the allegations in Paragraph 72.

73.     Circle K admits the allegations in Paragraph 73.

74.     Responding to the allegations in Paragraph 74, Circle K admits upon information and belief that police arrested Tyler Darren Wimmer and that Wimmer was identified as the man who stole the pack of cigarettes from Circle K. Circle K denies the remaining allegations in Paragraph 74.

75.     Circle K is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 75.

76.     Circle K is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 76.

77.     Circle K denies the allegations in Paragraph 77.

78.     Circle K denies the allegations in Paragraph 78.

79.     Circle K is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 79.

80.     Circle K is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 80.

81.     Circle K is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 81.

82.     Circle K denies the allegations in Paragraph 82.

83.     Circle K is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 83.

84.     Circle K is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 84.

85.     Circle K is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 85.

86.     Circle K is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 86.

87.     Circle K is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 87.

88.     Circle K is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 88.

89.     Circle K is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 89.

### FIRST CLAIM FOR RELIEF
### (Wrongful Discharge in Violation of Public Policy)

90.     Circle K incorporates its above answers as though fully set forth herein.

91.     Circle K denies the allegations in Paragraph 91.

92.     Responding to the statements in Paragraph 92, Circle K states they are a characterization of prevailing law, not an allegation of fact that Circle K can admit or deny.

93.      Responding to the statements in Paragraph 93, Circle K states they are a characterization of prevailing law, not an allegation of fact that Circle K can admit or deny.

94.      Responding to the statements in Paragraph 94, Circle K states they are a characterization of prevailing law, not an allegation of fact that Circle K can admit or deny.

95.      Responding to the statements in Paragraph 95, Circle K states they are a characterization of prevailing law, not an allegation of fact that Circle K can admit or deny.

96.      Responding to the statements in Paragraph 96, Circle K states they are a characterization of prevailing law, not an allegation of fact that Circle K can admit or deny.

97.      Responding to the statements in Paragraph 97, Circle K states they are a characterization of prevailing law, not an allegation of fact that Circle K can admit or deny.

98.      Responding to the statements in Paragraph 98, Circle K states they are a characterization of prevailing law, not an allegation of fact that Circle K can admit or deny.

99.      Circle K denies the allegations in Paragraph 99.

100.      Circle K denies the allegations in Paragraph 100.

101.      Responding to the allegations in Paragraph 101, Circle K admits that Moreno was the only employee working during the incident. Circle K denies the remaining allegations in Paragraph 101.

102.      Circle K denies the allegations in Paragraph 102.

103.      Responding to the allegations in Paragraph 103, Circle K admits that Moreno made contact with Wimmer. Circle K denies the remaining allegations in Paragraph 103.

104.      Circle K denies the allegations in Paragraph 104.

105.     Circle K is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 105.

106.     Circle K admits that admits that the security footage shows the store from many different angles and captured Wimmer's robbery. Circle K denies the remaining allegations in Paragraph 106.

107.     Circle K denies the allegations in Paragraph 107.

108.     Circle K denies the allegations in Paragraph 108.

109.     Circle K denies the allegations in Paragraph 109.

110.     Circle K denies the allegations in Paragraph 110.

**SECOND CLAIM FOR RELIEF**
**(Intentional Infliction of Emotional Distress and/or Outrageous Conduct)**

111.     Circle K incorporates its above answers as though fully set forth herein.

112.     Responding to the statements in Paragraph 112, Circle K states they are a characterization of prevailing law, not an allegation of fact that Circle K can admit or deny.

113.     Circle K denies the allegations in Paragraph 113.

114.     Circle K denies the allegations in Paragraph 114.

115.     Circle K denies the allegations in Paragraph 115.

116.     Circle K denies the allegations in Paragraph 116.

117.     Circle K denies the allegations in Paragraph 117.

118.     Responding to the allegations in Paragraph 118, Circle K admits that it terminated Moreno's employment, effective October 5, 2020. Circle K denies any remaining allegations in Paragraph 118.

119.     Circle K denies the allegations in Paragraph 119.

120.     Circle K denies the allegations in Paragraph 120.

121.     Circle K denies the allegations in Paragraph 121.

122.     Circle K denies the allegations in Paragraph 122.

123.     Circle K denies the allegations in Paragraph 123.

124.     Circle K denies the allegations in Paragraph 124.

Responding to the paragraph beginning "WHEREFORE," and subparagraphs (a)-(g), Circle K denies Moreno's claims and denies that she is entitled to any relief whatsoever.

***To the extent that any allegations in the Complaint are not specifically admitted in the paragraphs above, Circle K denies them.***

## DEFENSES AND AFFIRMATIVE DEFENSES

1.     Circle K's actions regarding Moreno's terms and conditions of employment were based on legitimate business reasons and were taken in accordance with applicable law.

2.     Moreno was an at-will employee whose employment could be terminated at any time for any reason.

3.     Circle K's actions regarding Moreno's terms and conditions of employment were made in good faith and without malice, deliberate indifference, bad faith, or reckless disregard of any of Moreno's legal rights.

4.     Circle K has complied with all applicable laws.

5.     Any damages Moreno sustained were caused or contributed to by her own actions or the actions of others over whom Circle K had no control.

6.     Moreno's alleged damages, if any, are limited or restricted, in whole or in part, by statute and applicable law.

7.      If Moreno was damaged in any amount, she has failed to mitigate her damages and, therefore, is barred from recovery, or any award of damages must be proportionately diminished.

8.      Any damages alleged by Moreno may be subject to offset by subsequent income she received.

9.      There is no basis upon which Moreno is entitled to recovery of punitive or exemplary damages against Circle K.

10.     There is no basis upon which Moreno is entitled to recovery of attorneys' fees against Circle K.

11.     Circle K cannot fully anticipate all additional and affirmative defense that may be applicable to this action and, therefore, reserves the right to assert any and all additional or affirmative defense that may become applicable based on information learned during the course of this litigation, including discovery, trial, or otherwise.

WHEREFORE, Circle K requests that Moreno take nothing by her Complaint and that it recover its attorneys' fees, costs, and disbursements in this action.

Respectfully submitted this 16th day of September, 2022.

*s/ Thomas W. Carroll*
Thomas W. Carroll
Nicholas Hankins
LITTLER MENDELSON, P.C.
1900 Sixteenth Street, Suite 800
Denver, CO 80202
Telephone: 303.629.6200
Fax: 303.629.0200
Email: tcarroll@littler.com
          nhakins@littler.com

*Attorneys for Defendant Circle K Stores, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of September, 2022, a true and correct copy of the

foregoing **ANSWER** was filed and served via CM/ECF, which will send notice to the following:

Nicholas A. Lutz
Iris Halpern
RATHOD | MOHAMEDBHAI LLC
2701 Lawrence Street, Suite 100
Denver, CO  80205
Telephone: (303) 578-4400
Fax: (303) 578-4401
nl@rmlawyers.com
ih@rmlawyers.com

*Attorneys for Plaintiff*

s/ Joanna Fox
Joanna Fox, Legal Secretary

4891-2731-0130.5

14

Vol. I - 0052

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-02327-NYW-STV

MARY ANN MORENO,

     Plaintiff,

v.

CIRCLE K STORES, INC.,

     Defendant.

---

## PLAINTIFF'S RENEWED MOTION FOR LEAVE TO AMEND COMPLAINT TO SEEK EXEMPLARY DAMAGES REMEDY

Plaintiff Mary Ann Moreno renews her motion for leave to amend her operative Complaint and Jury Demand to allow her to pursue exemplary damages against Defendant Circle K. Circle K terminated Ms. Moreno, then 72-years-old and working alone on the night shift, immediately after she was the victim of an armed robbery at work. Following the robbery, and after Ms. Moreno reported it to the police, Circle K placed Ms. Moreno under an "investigation" and demanded that she acknowledge that she did something wrong. Circle K terminated Ms. Moreno due to her physical contact with an attacker, without taking into account her right to self-defense and her rights under Colorado's victim's rights statutes. Circle K has made no effort to comply with Colorado's legal scheme and systematically terminates employees without regard to their rights. Ms. Moreno's case is particularly egregious due to the harm caused by her termination, and she is entitled to pursue exemplary damages under Colorado law.

# I. BACKGROUND[1]

## A. Ms. Moreno's Employment with Circle K

For most of the past 16 years, Ms. Moreno was employed as a cashier for Circle K. *See* Compl., ECF No. 3, at 3, ¶ 9; Answer, ECF No. 16, at 2, ¶ 9. During her employment with Circle K, Ms. Moreno was perpetually hard working and dedicated to her job. *See* **Ex. 1**, *Decl. of B. Moreno* at ¶¶ 6-7. Ms. Moreno rarely hesitated to cover shifts for other employees, and she was asked to do so on a regular basis. *Id.* at ¶ 7; **Ex. 2**, *Decl. of O. Verela Roan* at ¶ 7. As an employee, Ms. Moreno was timely, efficient, and attentive to her customers and the store. *See id.* In fact, Circle K admits that Ms. Moreno was meeting her performance expectations prior to terminating her. Compl., ECF No. 3, at 3, ¶ 11; Answer, ECF No. 16, at 3, ¶ 11.

## B. Ms. Moreno was Attacked by a Knife-Wielding Assailant During an Armed Robbery

On October 4, 2020, Ms. Moreno worked an evening shift at the Circle K Sheridan store. She was 72 years old at the time. Compl., ECF No. 3, at 4, ¶ 20; Answer, ECF No. 16, at 4, ¶ 20. Ms. Moreno was the only employee scheduled to work that evening. Compl., ECF No. 3, at 4, ¶ 21; Answer, ECF No. 16, at 4, ¶ 21. At approximately 7:00 p.m., while Ms. Moreno stood alone behind the front counter, a man (now known to be Tyler Darren Wimmer) walked into the store.

---

[1] Ms. Moreno filed a motion for leave to amend the complaint to add exemplary damages on March 30, 2023. ECF No. 39. Circle K opposed the motion on the grounds that it was untimely and did not make out a *prima facie* case of a triable issue of exemplary damages. *See generally* ECF No. 43. On April 26, 2023, the Court held a hearing on the motion. ECF No. 48. At the hearing, the Court denied the motion without prejudice and set May 31, 2023 as the deadline for Ms. Moreno to file a renewed motion to amend to add exemplary damages. *Id.* The Court rejected Circle K's argument that the motion was untimely and set a later deadline for Ms. Moreno to re-file her motion to amend so that she could obtain more evidence through discovery. Since the April 26, 2023 hearing, Ms. Moreno has conducted further discovery that bolsters her arguments from her original motion.

**Ex. 3**, *Circle K Store Surveillance Video* (Register 1) at 6:54:52-6:54:58.[2] Ms. Moreno noticed that Wimmer was carrying two large hunting knives in his hands (one of which may have been contained in packaging). *Id.*

Wimmer set his things down on the counter and asked Ms. Moreno for a pack of cigarettes. Ms. Moreno asked Wimmer which brand he would like, and then retrieved the cigarettes from the display case behind her. *Id.* at 6:55:18-6:55:56. As Ms. Moreno began to ring up Wimmer's purchase, he told Ms. Moreno words to the effect of, "just give them to me for free." *Id.* at 6:55:30. Ms. Moreno replied that she could not give him the cigarettes for free because she did not own the store and could lose her job. *Id.* at 6:55:35.

Wimmer then became visibly upset and began to leave the store. *Id.* at 6:55:56-6:56:09. As he left, however, he abruptly changed directions and lurched back towards Ms. Moreno from the side and rear of the counter. *Id.* at 6:56:09-6:56:10. Ms. Moreno exclaimed to Wimmer, "Don't come back here!" *Id.* at 6:55:08. Still, Wimmer proceeded towards Ms. Moreno and the display case containing the store's tobacco products. *Id.* at 6:56:10-.6:56:13. Ms. Moreno was unable to flee because Wimmer was blocking her only avenue of escape from the closed area behind the counter. *See id.* Wimmer moved towards Ms. Moreno and well within reaching distance of her, still holding the knives. *Id.* Nearing closer to Ms. Moreno, Wimmer then suddenly reached his arm out past her for a pack of cigarettes in the display case the two were standing directly adjacent to. *Id.* Ms. Moreno flinched and reached out towards Wimmer to protect herself and prevent him from coming closer toward her and the merchandise, pushing him back. *Id.* at 6:56:13-6:56:16. Fortunately, after grabbing the cigarettes from the display case, Wimmer left the store. *Id.* at

---

[2] The video and audio exhibits referenced herein have been conventionally submitted to the Court. *See* ECF No. 42. Ms. Moreno maintains the same exhibit numbers for these videos and audio exhibits as when they were filed with her original motion, ECF No. 39.

6:56:16-6:56:22. Just after Wimmer fled the store, a customer who had witnessed the robbery and Ms. Moreno called the police. *See* **Ex. 4**, *9-1-1 Call Recording (Witness & Mary Moreno)*.

After contacting the police, Ms. Moreno returned to her post behind the counter. **Ex. 3**, *Circle K Store Surveillance Video* (Register 1) at 7:02:08. At approximately 7:03 p.m., Ms. Moreno called her supervisor, Love Jorgensen. *Id.* at 7:04:05. Ms. Moreno explained to Ms. Jorgensen that she was robbed by a man with a knife. *Id.* at 7:04:00-7:04:10.

Officer Rebecca Hansen of the Westminster Police Department reported to the store and spoke with Ms. Moreno. *Id.* at 7:05:28-7:06:40. Police officers remained in the area of the store until approximately 7:42 p.m. *Id.* at 7:36:43-7:42:33. Ms. Moreno continued working her shift and Bonnie Moreno, her daughter-in-law, arrived at the store at approximately 8:05 p.m. *Id.* at 8:05:10 (Bonnie Moreno appears in a grey/blue shirt, glasses, and a mask).

As Ms. Moreno still had not been relieved from the cash register at that time, Ms. Moreno called Driss Aamoud. *Id.* at 8:10:05-8:11:26. Mr. Aamoud is a Circle K "market manager" who manages 10-14 stores, one of which is the store where Ms. Moreno worked. **Ex. 5**, *Aamoud Dep. Tr.* at 11:11-12:19; 34:14-22.

Mr. Aamoud arrived at the store just past 8:24 p.m. and approached Ms. Moreno and Bonnie Moreno at the counter. **Ex. 3**, *Circle K Store Surveillance Video* (Register 1) at 8:24:37-8:24:50 (Mr. Aamoud appears dressed in a blue t-shirt, blue jeans, dark sandals, and a mask). Mr. Aamoud asked Ms. Moreno what had happened, and she described the robbery to him. *Id.* at 8:24:52-8:25:56. Mr. Aamoud interjected, "But **it's not a robbery**." *Id.* at 8:25:56 (emphasis added). Mr. Aamoud reviewed the security footage in the office and then returned to the counter where Ms. Moreno was working, to question her account of what happened and criticize her response to being robbed. *Id.* at 8:25:56-8:26:18; 8:37:34-8:40:07.

Mr. Aamoud then turned to Bonnie Moreno and insisted that she leave, even though she was there to comfort Ms. Moreno. *Id.* at 8:41:13-8:43:13. At virtually the same time, Love Jorgensen arrived and approached Mr. Aamoud. *Id.* (Ms. Jorgenson appears at the top left of frame, dressed in all black, with a black mask). Mr. Aamoud continued to question 72-year-old Ms. Moreno about her recollection of the armed robbery, and eventually Ms. Moreno went to the office to view the footage with Mr. Aamoud. **Ex. 6**, *Circle K Surveillance Video* (Office) at 8:49:50.[3]

Following their conversation, Mr. Aamoud finally sent Mr. Moreno home and told her to call him the next day. **Ex. 3**, *Circle K Store Surveillance Video* (Register 1) at 8:54:05-8:54:28. Ms. Moreno expressed concern that she was going to fired, asking Mr. Aamoud, "am I going to lose my job because of this?" *Id.*

### C. Circle K Fired Ms. Moreno Days After She was Robbed at Knifepoint

The next day, Ms. Moreno called Ms. Jorgensen to inquire about her schedule for the following week. Ms. Jorgensen informed Ms. Moreno that she needed to call Mr. Aamoud to discuss her schedule. Ms. Moreno then called Mr. Aamoud. However, Mr. Aamoud refused to discuss Ms. Moreno's schedule, citing the fact Ms. Moreno was purportedly still under investigation. Mr. Aamoud then told Ms. Moreno to call him the following day. Compl., ECF No. 3, at 8, ¶ 71; Answer, ECF No. 16, at 8, ¶ 71. As instructed, Ms. Moreno called Mr. Aamoud the next day. Circle K admits Mr. Aamoud told Ms. Moreno that Circle K Sheridan was terminating her employment, effective immediately. Compl., ECF No. 3, at 8, ¶ 73; Answer, ECF No. 16, at 8, ¶ 73.

---

[3] This view from Circle K's surveillance system (as produced by Defendant Circle K) does not contain audio.

In a typical termination, a store manager who has an issue with a Customer Service Representative ("CSR") raises the issue with Mr. Aamoud. **Ex. 5**, *Aamoud Dep. Tr.* at 24:1-4. Mr. Aamoud reviews video footage of the incident and determines whether he thinks the CSR should be terminated. *Id.* at 24:9-20. If Mr. Aamoud does not think termination is warranted, then there is no recommendation to terminate, and the issue is closed. *Id.* at 24:9-20; 25:21-26:4. If he does think there is a violation of company policy and termination is warranted, Mr. Aamoud reports it to his supervisor, Craig Holmes. *Id.* at 24:9-20. At this point, either Mr. Holmes or Mr. Aamoud communicates the information to human resources ("HR"). *Id.* These individuals discuss the termination and then HR approves of the termination. *Id.*

Amy Harvey, an HR manager, approved Ms. Moreno's termination. **Ex. 7**, *Harvey Dep. Tr.* at 70:14-17. Ms. Harvey reviewed the video footage of the robbery with her director, Robert Sway, and a loss prevention officer, and all three individuals agreed that Ms. Moreno should be terminated for a policy violation. *Id.* at 76:9-77:23. Ms. Harvey and Mr. Aamoud discussed the reasons for the termination – a violation of Circle K's "Don't Confront or Chase Policy" – and then Ms. Harvey approved the termination. *Id.* at 70:12-71:19. Mr. Aamoud communicated the termination to Ms. Moreno and instructed Ms. Jorgensen to initiate the termination in the HR software. **Ex. 5**, *Aamoud Dep. Tr.* at 135:9-17. After Ms. Jorgensen input the termination into the software, Mr. Aamoud and Ms. Harvey approved it. *Id.*

## II. ANALYSIS[4]

### B. Legal Standard

Colorado Revised Statute § 13-21-102 states:

(1)(a) In all civil actions in which damages are assessed by a jury for a wrong done to the person or to personal or real property, and **the injury complained of is attended by circumstances of fraud, malice, or willful and wanton conduct, the jury, in addition to the actual damages sustained by such party, may award him reasonable exemplary damages**. . . .

(b) As used in this section, "willful and wanton conduct" means conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff.

A court may grant a request for leave to pursue exemplary damages when a plaintiff establishes that there is *prima facie* proof of a triable issue that the acts or omissions complained of are "attended by circumstances of fraud, malice, or willful and wanton conduct." Colo. Rev. Stat. § 13-21-102(1)(a), (1.5)(a). "*Prima facie* proof of a triable issue of exemplary damages is established by 'a showing of a reasonable likelihood that the issue will ultimately be submitted to the jury for resolution.'" *Stamp v. Vail Corp.*,172 P.3d 437, 449 (Colo. 2007) (quoting *Leidholt v. Dist. Court In & For City & Cnty. of Denver*, 619 P.2d 768, 771 n.3 (Colo. 1980)). At this stage, the plaintiff must only submit "evidence that, unless rebutted, is sufficient to establish a fact." *Stamp*, 172 P.3d at 449.

"At the pleading stage, the liberal standard of C.R.C.P. 15 applies." *Schneiderman v. Barry*, No. 2011CV7101, 2013 WL 5508525, at *2 (Colo. Dist. Ct. Jan 7, 2013). Furthermore, "[t]his is a lenient standard. A plaintiff should have an opportunity to test the merit[]s of any claim for relief that is supported by the underlying facts of the case." *Id.* (quoting *Stamp*, 172 P.3d at 450).

---

[4] At the April 26, 2023 hearing, the Court instructed the parties to focus on the requirements of *prima facie* proof of a triable issue of exemplary damages in subsequent briefing. *See* ECF No. 48. Accordingly, Ms. Moreno does not present argument on the timeliness of this motion.

Importantly, the court is only concerned with "whether the evidence, when viewed in the light most favorable to [the plaintiff, is] sufficient to make out a *prima facie* case of willful and wanton behavior for the purpose of allowing [plaintiff] to amend [her] complaint to include exemplary damages, not whether such evidence is sufficient to defeat a motion for summary judgment or to result in a jury verdict in Plaintiffs' favor." *RCHFU, LLC v. Marriott Vacations Worldwide Corp.*, No. 16-cv-01301-PAB-GPG, 2018 WL 3055772, at *4 (D. Colo. May 10, 2018).

The Colorado Supreme Court has defined "willful and wanton conduct" to mean "conduct purposefully committed which the actor must have realized was done heedlessly and recklessly without regard to consequences or the rights of the plaintiff." *Coors v. Sec. Life of Denver Ins. Co.*, 112 P.3d 59, 66 (Colo. 2005) (citing *Frick v. Abell*, 602 P.2d 852, 854 (Colo. 1979)). Stated differently, "[w]here the defendant is conscious of his conduct and the existing conditions and knew or should have known that injury would result, the statutory requirements of C.R.S. § 13-21-102 are met." *Id.* (citing *Pizza v. Wolf Creek Ski Dev. Corp.*, 711 P.2d 671 (Colo. 1985)).

## B. Argument

### 1. Circle K Acted Willfully and Wantonly by Ignoring Ms. Moreno's Rights Under Colorado Law

#### i.   Ms. Moreno's Rights Under Colorado Law

Ms. Moreno's complaint brings claims for wrongful discharge in violation of public policy and intentional infliction of emotion distress and/or outrageous conduct. Compl., ECF No. 3 at 11-16, ¶¶ 90-124. The complaint identifies the right to self-defense, codified at Colo. Rev. Stat. § 18-1-704, and the rights of crime victims to be free of retaliation and to participate in the criminal process, codified at Colo. Rev. Stat. § 18-8-706 and § 24-4.1-303, as rights that Circle K violated

by terminating Ms. Moreno after she was robbed at knifepoint.[5] *Id.* Circle K recklessly disregarded these rights when it terminated Ms. Moreno under its "Don't Chase or Confront Policy."

Under Colorado law, a person shall not be held criminally liable for using physical force against another person "in order to defend himself or a third person from what he reasonably believes to be the use or imminent use of unlawful physical force by that other person." Colo. Rev. Stat. § 18-1-704. Further, "[a] person who reasonably perceives an imminent use of unlawful physical force is entitled to use force in defending himself or herself 'without first retreating, or seeking safety by means of escape.'" *People v. Monroe*, 474 P.3d 113, 116 (Colo. App. 2018) (quoting *Cassels v. People*, 92 P.3d 951, 956 (Colo. 2004)). Such a person "does not have to consider whether a reasonable person in the situation would opt to retreat to safety rather than resorting to physical force to defend against unlawful force." *People v. Toler*, 9 P.3d 341, 347 (Colo. 2000). Colo. Rev. Stat. § 18-8-706 makes it unlawful for an individual to commit retaliation or anticipatory retaliation toward a victim or witness of crime. Colo. Rev. Stat. § 24-4.1-303 states that "[a]n employer may not discharge or discipline any victim . . . for participating in the preparation of a criminal proceeding."

### ii.     The Policy Does Not Consider Employee's Rights

Circle K's "Don't Chase or Confront Policy," (the "Policy"), **Ex. 8**, *Don't Chase or Confront Policy*, as promulgated and enforced, recklessly violates these rights. The policy states:

> Do not confront[,] follow, pursue, track, chase, fight, or follow (inside and/or outside) any person(s) suspected of shoplifting products and/or cash from the site, beer runs or any other confrontation situation. . . . At no time do you stop, question or accuse a person(s) of theft. At no time do you get into a verbal altercation with any customer and/or person(s) you suspect of theft. . . . **Never talk to the media** or answer any questions on the immediate situation or any others. **FAILURE TO**

---

[5] Ms. Moreno includes these rights as a non-exhaustive list of examples of public policy that Circle K contravened. Ms. Moreno reserves the right to argue that Circle K's termination of her violated public policy in other respects.

**FOLLOW THE "DON'T CHASE or CONFRONT POLICY" WILL RESULT IN IMMEDIATE TERMINATION**[.]

**Ex. 8**, *Don't Chase or Confront Policy*.

Amy Harvey, the HR manager who approved Ms. Moreno's termination, supported approximately 423 stores in six states – Colorado, New Mexico, Texas, Oklahoma, Kansas, and Missouri. **Ex. 7**, *Harvey Dep. Tr.* at 17:7-11. During the four years Ms. Harvey supported this region, 2017-2021, there were hundreds of robberies, hundreds of armed robberies, and approximately 30 employee deaths. *Id.* at 33:2-34:7. Despite the high number of stores and employees she supported, Ms. Harvey has no recollection of ever denying a termination. *Id.* at 21:7-15. Ms. Harvey never disagreed with the termination of an employee who experienced an armed robbery. *Id.* at 35:3-7. ("Q. So in your role approving terminations, was there ever a time where you disagreed with a termination of an employee who experienced an armed robbery? A. I don't believe so.").

When she was a multi-unit store manager, Ms. Harvey never received any training on what self-defense was permissible under the policy. *Id.* at 39:13-17. Nor did she know if employees were trained as to when self-defense was appropriate under the policy. *Id.* at 39:1-40:1. Ms. Harvey testified that, as an HR manager she would have considered it appropriate for an employee to physically defend him or herself if the robber touched the employee first. *Id.* at 40:7-16. Ms. Harvey did not know if the policy permitted an employee to act in self-defense if the employee thought a robber was about to physically touch the employee. *Id.* at 40:17-19. However, Colorado law permits a person who perceives an imminent use of force to defend him or herself. *See Monroe*, 474 P.3d at 116.

Mr. Aamoud similarly had no knowledge of whether or not the Policy complies with Colorado self defense and victim's rights laws. **Ex. 5**, *Aamoud Dep. Tr.* at 101:17-102:7 ("Q. So

it's fair to say that you don't know how this chase and confront policy complies with state law then? A. Correct. Q. So that's the case even though you recommended people for termination for violating this policy; is that right? A. Yes. Q. So you don't know if Circle K tried to comply with Colorado state laws about the chase and confront policy? A. I don't know. Q. So you don't know if you were in compliance with state law then when you fired people pursuant to this policy? A. I don't know.").

The policy does not vary within the six states Ms. Harvey supported as local laws change. **Ex. 7**, *Harvey Dep. Tr.* at 40:25-41:7. Ms. Harvey was unaware of state laws on self-defense and did not know if the policy complied with state laws about self-defense. *Id*. at 41:4-7. Similarly, Mr. Aamoud was unaware if the policy complied with state self-defense laws. **Ex. 5**, *Aamoud Dep. Tr.* at 101:17-102:17. Ms. Harvey did not know Colorado's self-defense laws when she was an HR manager making termination decisions at Circle K. **Ex. 7**, *Harvey Dep. Tr.* at 41:8-22. Ms. Harvey was also unaware of Colorado's victim's rights laws and whether the policy complied with them. *Id.* at 80:22-81:3.

On the whole, Circle K is willfully ignorant of whether it is in compliance with Colorado self-defense and victim's rights laws. Neither Ms. Harvey nor Mr. Aamoud, who both played integral roles in Ms. Moreno's termination, have any knowledge of whether the Policy complies with state laws. The Policy is the same in each of the six states Ms. Harvey supported, not taking into account any variation in state laws. Circle K terminates every employee who has physical contact with an attacker, no matter the circumstances. *See* **Ex. 5**, *Aamoud Dep. Tr.* at 103:3-7 ("Q. Has there ever been an employee at Circle K that you're aware of who had physical contact with an attacker who was not fired? Mr. Hankins: Object to form. A. No."). By terminating Ms.

Moreno pursuant to a policy that prohibits her from exercising her rights to self-defense and rights as a crime victim, Circle K recklessly violated Ms. Moreno's rights.

### iii.      Ignorance of Ms. Moreno's Rights is Not a Defense

The Supreme Court has "long recognized the 'common maxim, familiar to all minds, that ignorance of the law will not excuse any person, either civilly or criminally.'" *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 581 (2010) (quoting *Barlow v. United States,* 7 Pet. 404, 411 (1833)). Ms. Moreno has been unable to identify caselaw discussing ignorance of the law with respect to Colo. Rev. Stat § 13-21-102 on exemplary damages. However, this concept surfaces in many aspects of employment law.

For instance, the Fair Labor Standards Act ("FLSA") provides that an employer owes liquidated damages unless the employer shows that "the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation" of the FLSA. 29 U.S.C. § 260. "An employer's ignorance of the requirements of the Act does not constitute reasonable grounds for believing that his actions complied with the Act." *Doty v. Elias*, 733 F.2d 720, 726 (10th Cir. 1984) (citing *Marshall v. Brunner*, 668 F.2d 748, 753 (3d Cir. 1982)). Further, an employer's misunderstanding of the FLSA's requirements is not a reasonable ground for non-compliance. *Crenshaw v. Quarles Drilling Corp.*, 798 F.2d 1345, 1351 (10th Cir. 1986), *disapproved of on other grounds by McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 108 (1988). Circle K's ignorance of Colorado self-defense and victim's rights law is unreasonable and not a valid reason for not complying with them.

In *Creekmore v. Pomeroy IT Solutions, Inc.*, 2010 WL 3702543, at *1 (N.D. Okla. Sept. 16, 2010), an employer terminated an employee for testing positive for phenobarbital. However, under Oklahoma Statute Title 40, §§ 551-565, the "Testing Act," this was not a substance an

employer could test for. *Id.* The employer argued that it was unaware it was prohibited from terminating the employee for testing positive for phenobarbital. *Id.* Under Oklahoma law, a "willful" violation of the Testing Act "contemplates not only conscious, purposeful violations of the Testing Act, but also deliberate disregard of the law by those who know, or should have known, of the requirements of the Testing Act." The court noted that, "allowing an employer to claim ignorance of the law would virtually eliminate the civil remedy created by the Testing Act and would permit employers to ignore the requirements of the Testing Act."

Additionally, in *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 408 F. Supp. 1219, 1233 (D. Colo. 1973), the court found that where the defendant "elected to ignore completely the property rights" of the plaintiffs, it was "difficult to characterize such conduct in any manner more favorable than as a wanton and reckless disregard of the plaintiff's rights."

All these cases support the conclusion that Circle K's complete ignorance of Ms. Moreno's rights under Colorado law was a reckless disregard of her rights, which supports an award of exemplary damages. Two of the primary decision makers in her termination – Ms. Harvey and Mr. Aamoud – were entirely unaware of whether they were acting in compliance with state law when they recommended and approved the termination. The Policy does not vary by state within Ms. Harvey's region and neither Ms. Harvey nor Mr. Aamoud were aware of a situation where an employee who made physical contact with an attacker was not fired. Circle K terminates every employee who makes contact with an attacker, no matter the circumstances. This unwavering policy that does not consider individual circumstances and state laws shows an utter disregard for the rights of individual employees, including Ms. Moreno.

**2.  Circle K's Conduct is Particularly Egregious Given the Details of Ms. Moreno's Situation**

While Circle K has a problematic policy that violates many employee's rights, its conduct with respect to Ms. Moreno is particularly egregious. Ms. Moreno had been a Circle K employee for many years; she was regarded as a dependable and competent employee. She was 72-years old at the time she was robbed at knife point, qualifying her as an at-risk adult under the Colorado Criminal Code. *See* Colo. Rev. Stat. § 18-6.5-102(2). Circle K scheduled Ms. Moreno to work alone on the night shift on the evening she was robbed. Circle K employees reviewed the surveillance footage of the robbery after it occurred, and after Ms. Moreno reported the crime to the police. That footage clearly shows that Ms. Moreno was the victim of an armed robbery and did not engage in any wrongful conduct. Rather, Ms. Moreno, upon being cornered by Wimmer and with nowhere to flee, flinched and reached out to ward off Mr. Wimmer, pushing against his arm when she thought he was lunging towards her where she was trapped behind the counter. Ms. Moreno – at age 72 – did not chase, or otherwise attempt to restrain Wimmer or otherwise physically engage with him. She merely instinctively tried to protect herself against a deranged assailant in a sudden, unpredictable, and potentially physically threatening or fatal series of evolving events.

By terminating Ms. Moreno for attempting to protect herself from an armed robber after she had been a dependable long-time employee, Circle K acted with reckless disregard to her rights and the injury the termination would cause her. *See Coors*, 112 P.3d at 66 ("Where the defendant is conscious of his conduct and the existing conditions and knew or should have known that injury would result, the statutory requirements of C.R.S. § 13-21-102 are met.").

14

**III. CONCLUSION**

As described above, there is ample evidence to support a *prima facie* case of willful and wanton misconduct on the part of Circle K to warrant an exemplary damages instruction. Accordingly, Ms. Moreno respectfully asks that this Court grant her leave to seek exemplary and punitive damages at trial.  Her redlined First Amended Complaint is attached hereto as **Exhibit 9**.

Respectfully Submitted: May 31, 2023

RATHOD | MOHAMEDBHAI LLC

*s/ Virginia Hill Butler*
Virginia Hill Butler
Iris Halpern
2701 Lawrence Street, Suite 100
Denver, CO 80205
T: (303) 578-4400
E: vb@rmlawyers.com
    ih@rmlawyers.com

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of May, 2023, I electronically filed and served the

foregoing **PLAINTIFF'S RENEWED MOTION FOR LEAVE TO AMEND COMPLAINT**

**TO SEEK EXEMPLARY DAMAGES REMEDY** using the CM/ECF system, which will send

notification of such filing to the following:


       Thomas W. Caroll
       Nicholas Hankins
       LITLER MENDELSON, P.C.
       1900 Sixteenth Street, Suite 800
       Denver, CO 80202
       Telephone: 303.629.6200
       Fax: 303.629.6200
       Email: tcarroll@littler.com
              nhankins@littler.com

       *Attorneys for Defendant Circle K Stores, Inc.*


                             s/ *Virginia Hill Butler*
                             Virginia Hill Butler

# Exhibit 1

DocuSign Envelope ID: C6EA1E9F-7B0F-4940-97D5-09ECDF38C603

### DECLARATION OF BONNIE MORENO

I, Bonnie Moreno, swear that the following is true and correct to the best of my knowledge and information:

1.      I am over the age of 18 and am otherwise competent to testify.  I make the following statements based upon my personal knowledge, and if called upon to testify as to them, I could and would do so truthfully and competently.

2.      This declaration is made voluntarily. I understand that it may be used in a lawsuit.  I have not been promised any benefit, coerced, or threatened in any way that would change my testimony.

3.      Before signing this declaration, I was provided an opportunity to change and correct it.  I have made all changes necessary to make this declaration a true statement describing my own experiences.

4.      I am Mary Ann Moreno's daughter-in-law and I'm married to her son, Brandon Moreno. I lived across the street from the Moreno family growing up and have known Ms. Moreno and my husband for most of my life.

5.      For as long as I can remember, Mary Ann has worked in retail. Even as a child, I recognized that she was a notoriously hard worker. I have always admired my mother-in-law for her drive, strength, and confidence. She never allowed others to push her around.

6.      Throughout the time she worked at Circle K, Mary Ann was loved by her customers and always went the extra mile. Whenever I stopped by the Circle K while Mary Ann was working, it was obvious that she was adored by her customers. Many of her regular customers only came into the store when they knew that she was working.

DocuSign Envelope ID: C6EA1E9F-7B0F-4940-97D5-09ECDF38C603

7.      My mother-in-law made a lot of sacrifices for Circle K and often missed family events like holidays and birthdays to go to work. She was extremely dependable and was there for Circle K every time they needed her. Anytime a co-worker didn't show up for work, management knew they could call on Mary Ann to cover the shift.

8.      She essentially had all the responsibilities of a manager; however, she did not benefit from any additional respect or perks. Despite this, I never heard her whine or complain about her job the entire time she worked there.

9.      Notably, despite the significant length of time that she worked for Circle K, my mother-in-law was never written up or disciplined.

10.     Before the incident on October 4, 2020, I had never witnessed an instance of my mother-in-law being fearful or exhibiting signs of mental illness. Rather, she had always been admirably confident and emotionally stable. She was our family's rock. Since the attack occurred, she is not the same person. It is as though all her strength and confidence evaporated into thin air.

11.     On the night of the incident, my mother-in-law called me to tell me that the Circle K had just been robbed. She said that after the assailant threatened her with a knife, she pushed him and the knife away in self-defense.

12.     I could tell right away that she was very upset and shaken up from the attack, so I immediately left my home to be with her at the Circle K and provide comfort because it was clear that none of her managers or coworkers were going to show up.

13.     When I arrived at Circle K just after the police had departed, my mother-in-law was in an unrecognizable state of shock. She was crying, shaking profusely, and was very fearful and anxious. I could tell that she was disoriented and struggling to concentrate because she wasn't making sense and she kept repeating herself to me and the customers.

DocuSign Envelope ID: C6EA1E9F-7B0F-4940-97D5-09ECDF38C603

14.     Despite being traumatized and terrified, with nobody from Circle K there to support her or cover her shift, my mother-in-law had no choice but to continue assisting customers with their purchases and fulfilling her other responsibilities.

15.     She was so visibly distraught and affected that even the customers were concerned for her well-being and kept asking if she was alright. Some patrons even insisted on helping her with bagging customers' purchases and her other duties. It was obvious to everyone at the store that Mary Ann was not in a state where she should be working.

16.     Even though my mother-in-law was always there when Circle K managers needed her help, they were not there for her when her life was threatened at work. When she called at least three Circle K managers for assistance, they refused to provide her immediate help and did not even demonstrate any concern for her wellbeing. The first manager she called said they were "too far away to come help" and told her to call someone else. The next manager she called didn't answer.  This pattern continued until the main store manager, whose name I do not know, finally agreed to help.

17.     Well aware that the situation was urgent, this manager still took a very long time to get to the store. When he finally arrived wearing plain clothes, he did not even bother to ask if Mary Ann was okay. Instead, he aggressively beelined toward her and started demanding that she answer questions about the robbery.

18.     From the moment he arrived, I could tell that the manager was angry. He did not show any concern or empathy toward Mary Ann; rather, his concern was entirely regarding the sanctity of the store. Immediately he wanted to know, "What did he take?" with respect to any inventory being stolen by the assailant.

DocuSign Envelope ID: C6EA1E9F-7B0F-4940-97D5-09ECDF38C603

19.     The manager went to the back of the store to look at the security footage and stated that he did not see anything that showed a robbery occurred. My mother-in-law clarified with him what time the robbery had happened at, because she thought he may have been looking at the wrong part of the footage. He then went back to review the footage again and returned to tell Mary Ann that he did not see a knife on the surveillance footage. This really upset her because she had just defended herself from the knife, and it triggered her anxiety further.

20.     When he saw me, the manager aggressively asked, "Who are you?" When I told him that I was my mother-in-law's daughter, he insisted that I leave the store because Circle K "couldn't protect me" if another robbery were to occur.

21.     I explained to the manager that my mother-in-law was traumatized, and I did not want to leave her alone. If I was not safe being in the store, she surely was not safe being alone there either.

22.     Even when I told him I did not care if Circle K protected me, the manager continued to rudely insist that I leave the store.

23.     After another female manager showed up to accompany my mother for the rest of her shift, I agreed to leave. However, given how shaken up and disoriented she was, I did not think it would be safe for Mary Ann to drive herself home, so I went to a nearby Walmart parking lot and waited for her shift to be done.

24.     My mother-in-law's trauma was worsened when she was terminated from her job a week later. It was as if she was robbed for a second time, but this time Circle K was the assailant. She was cut off from her the income, health insurance, and the pension she had been adamantly contributing to for 16 years. Circle K stole her community, routine, and sense of self by firing her.

DocuSign Envelope ID: C6EA1E9F-7B0F-4940-97D5-09ECDF38C603

25.     My mother-in-law explained to me that according to Circle K, she was fired for pushing the attacker away. I was shocked to hear that Circle K was penalizing my mother-in-law for protecting herself and other customers in such a life-threatening situation.

26.     After she was fired, my mother-in-law became a shell of her past self.  She immediately became very depressed and anxious and isolated herself from others. To this day, she still has not recovered.

27.     My mother-in-law was once lively and bright but is now overcome with constant fear. She is no longer confident and bold and is afraid of going out in public. When she does leave the house, she is always looking over her shoulder and is extremely apprehensive of strangers.

28.     Our whole family has noticed this change in my mother-in-law, and it has been very difficult for us to witness. My son has asked me multiple times what is wrong with my mother-in-law and checks in with her to see if she is okay constantly when he is around her.

29.     Mary Ann has had to seek therapy because the incident and termination of her employment at Circle K has affected her mental health so severely. I believe my mother-in-law will need to receive counseling for the rest of her life as a result.

30.     It took Mary Ann a long time to feel like she could return to work. She now works at the Dollar Tree part-time because she is not able to work a full-time position while dealing with the ongoing effects of her trauma. She is only able to work when another person is in the building with her. Being back in a retail environment is very uncomfortable and triggering for her.

31.     The developing criminal justice process has caused Mary Ann to spiral every time she receives an update about the case or is asked to retell the story of what happened to her. When the assailant was released from jail, she was extremely upset and had a panic attack.

DocuSign Envelope ID: C6EA1E9F-7B0F-4940-97D5-09ECDF38C603

32.      It has been more than a year since the attack occurred, and the trauma continues to debilitate my mother-in-law today. I fear that she may never recover.

33.      I, Bonnie Moreno, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 and the laws of the State of Colorado that the preceding is true and correct, based on my personal knowledge.

Executed on the _22nd_ day of November 2021.

DocuSigned by:

Bonnie Montoya

9DF27EACCD684FA...

Bonnie Moreno

# Exhibit 2

DocuSign Envelope ID: 604883DB-7711-441E-9457-6B9FA663F5BC

## DECLARATION OF OLIVIA VERELA ROAN

I, Olivia Verela Roan, swear that the following is true and correct to the best of my knowledge and information:

1. I am over the age of 18 and am otherwise competent to testify. I make the following statements based upon my personal knowledge, and if called upon to testify as to them, I could and would do so truthfully and competently.

2. This declaration is made voluntarily. I understand that it may be used in a lawsuit. I have not been promised any benefit, coerced, or threatened in any way that would change my testimony.

3. Before signing this declaration, I was provided an opportunity to change and correct it. I have made all changes necessary to make this declaration a true statement describing my own experiences.

4. I am Mary Ann Moreno's daughter. My mother and I have lived together the majority of my life, and have lived in the same house for the last ten years of her time as an employee of Circle K.

5. My mother has worked as a cashier in retail most of her life and is without a doubt the hardest worker I know. Since I was a child, I have admired my mother for her resilience, confidence, and unparalleled work ethic.

6. Throughout the time she worked for Circle K, my mother was dependable and went above and beyond to ensure that every customer received the best possible quality service.

7. On a regular basis, she removed all of the merchandise from the store's fixtures in order to clean the shelves, checked for missing labels, and removed damaged or expired goods. When

DocuSign Envelope ID: 604883DB-7711-441E-9457-6B9FA663F5BC

it snowed, my 72-year-old mother shoveled the sidewalks around the store, and when an employee didn't show up for work, even on holidays or her birthday, she covered the shift without question. Even when circumstances were difficult for her, my mother would still put supporting Circle K first. After my father died, my mother came back to work full-time very shortly after his death.

8.  However, when my mother would request time off because she was sick, the managers of Circle K would give her a hard time. Because Circle K made their employees feel guilty for taking time off, she often went to work while sick. One time she went to work while she had walking pneumonia.

9.  Even though her extra efforts were rarely acknowledged, my mother never complained. When I asked her why she worked so hard, she told me, "If I don't do it, nobody else will."

10. My mother was steadfast and remained energetic and outgoing toward customers. Whenever I stopped by the Circle K while my mother was working, the customers knew her by name and praised her for being good at her job.

11. I never saw my mom show any fear or sign of mental illness until October 4, 2020, when she was robbed at knife point while working at Circle K.

12. I was in Granby, Colorado with my children on October 4, 2020, when my mother called and told me that she had just been held at knife point and robbed while working at the Circle K.

13. Fearing for her life, she said that she had pushed the man away to protect herself when he came towards her with the knife.

14. From the tone of her voice, it was obvious that my mother was scared and shaken up; however, she continued to comfort and assist customers while she waited for the police to arrive.

DocuSign Envelope ID: 604883DB-7711-441E-9457-6B9FA663F5BC

15. Even though she had just been traumatized and threatened, my mother was required to wait several more hours until a manager showed up to relieve her. I was shocked that she was expected to keep the store open and finish her shift while the person who had attempted to stab her was still at large.

16. My mother insisted that my family and I stay in Granby when I stated that we would drive to Denver that night to be with her. She feared for our safety while driving in the mountains at night.

17. When we made it back to Denver, my mom was extremely distraught. She had a look of fear in her eyes, was visibly nervous, and shaking.

18. When Circle K terminated my mother a week after the robbery, she was further traumatized by the abrupt loss of the income, community, and routine she had established during her 16-year career.

19. After she was fired, my mother became isolated and depressed. Over a year later, she is still deeply depressed. She is no longer the same person she was before the robbery and her termination from Circle K.

20. My once energetic and optimistic mother is now paralyzed by anxiety and depression. She used to be confident and fearless but now she rarely leaves the house and is afraid of strangers, especially men.

21. Everyone in my family has had to change the way they behave when my mother is around because she is triggered by loud noises and sudden movements.

22. She has completely lost her sense of personal safety and was unable to return to work for several months. She now works at the Dollar Tree but can only go to work so long as another employee is in the building with her.

DocuSign Envelope ID: 604883DB-7711-441E-9457-6B9FA663F5BC

23. The ongoing criminal justice process has been a nightmare. She is triggered each time she receives an update from the District Attorney, and she had an anxiety attack when her assailant was released from custody.

24. My mother has had to seek counseling because her mental health has been affected so severely by the attack and termination of her employment at Circle K.

25. Even though more than a year has passed, the psychological effects of the robbery and her sudden termination have not yet begun to fade.

I, Olivia Verela Roan, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 and the laws of the State of Colorado that the preceding is true and correct, based on my personal knowledge.

Executed on the ___9___ of November 2021.

DocuSigned by:

*Olivia Verela Roan*

1350AFC3BC1A4CA...

Olivia Verela Roan

# Exhibit 3
# Circle K Surveillance Video (Register 1)

# Conventionally Submitted as ECF. No 42 on 03/31/2023

# Exhibit 4
# 9-1-1 Call Audio

# Conventionally Submitted as ECF. No 42 on 03/31/2023

# Exhibit 5

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 1:22-cv-02327-NYW-STV

_____

MARY ANN MORENO,

Plaintiff,

v.

CIRCLE K STORES, INC.,

Defendant.

_____

DEPOSITION OF DRISS AAMOUD
May 18, 2023

_____


        PURSUANT TO NOTICE, the above-entitled

deposition was taken on behalf of the Plaintiff at

2701 Lawrence Street, Denver, Colorado 80205, on

May 18, 2023, at 10:00 a.m., before Karen S. Fogle,

Registered Professional Reporter and Notary Public

within Colorado.




                MAGNA LEGAL SERVICES
                   (866) 624-6221
                    magnals.com



Page 10

1    Q.  What does CST stand for?
2    A.  It's a spinoff from Valero in 2012,
3  somewhere around there.  CST spun off from Valero.
4  Retail was CST and Valero was a refinery.  And then
5  NuStar was pipelines.  So there was -- three companies
6  spun off from each other independent.  So CST was
7  stand-alone retail/convenience.
8    Q.  So roughly around 1999 you started working
9  for Diamond Shamrock.  Roughly around 2004 they were
10  acquired by Valero, at which point you were an area
11  manager and stayed an area manager until around 2012
12  for Valero; is that correct?
13    A.  Until -- I was still an area manager but
14  with transitions to CST I kept the area manager.
15    Q.  Were you in the same -- managing the same
16  geographic area this whole time?
17    A.  Yeah.  It's not -- I have done south Texas;
18  I have done San Antonio, different geographic -- I just
19  don't know which one was next.
20    Q.  At what point did you move to Colorado?
21    A.  Late 2014, probably September/October.
22    Q.  So going back to 2012 when CST spins off of
23  Valero, how long did you then stay with CST?
24    A.  Can you explain?
25    Q.  At what point -- let me rephrase.  Valero

Page 11

1  spins off of CST in 2012.  At a certain point you start
2  working for Circle K.  What happens in those
3  intervening years?
4    A.  CST spun off of Valero, and I stayed
5  with -- obviously, I'm retail.  I stayed with retail
6  which is CST stand-alone company.  And it stayed that
7  way all the way until I moved up to Colorado in late
8  2014.  In 2016 is when Circle K acquired CST.
9    Q.  Your position -- when Circle K acquired
10  CST, what was your position?
11    A.  Basically, the same, just changed the name
12  from area manager to market manager.
13    Q.  Similar duties?
14    A.  Yes.
15    Q.  Has that been your same position since
16  2016?
17    A.  Yes.
18    Q.  To currently -- you're in the same market
19  manager position?
20    A.  Correct.
21    Q.  So starting from -- let's start with your
22  Colorado employment in 2014.  Have you been the market
23  manager or area manager of the same geographic area
24  that whole time or have you moved areas within
25  Colorado?

Page 12

1    A.  It's slightly different.  I would say a few
2  miles but that's about it.
3    Q.  But generally in Westminster?
4    A.  Yes.  Denver/Westminster/Thornton area.
5    Q.  I assume at certain points the zones have
6  changed somewhat or something like that.  Is that what
7  you're referring to?
8    A.  Right.  Sometimes you're in charge of 14;
9  sometimes they go 12.
10    Q.  We can -- let's talk about that.  So within
11  your position about how many stores are you managing?
12    A.  Can you explain?
13    Q.  I'd like to get an understanding what your
14  position as a market manager entails.  Could you just
15  explain it a little bit and then we can go from there.
16    A.  So I pretty much manage anywhere from
17  10 stores to 14, 16, maybe sometimes.  It's basically
18  ensure the operation of the whole market -- in the
19  store in that market.  And meet the company goals.
20    Q.  How would you -- how would you describe
21  your management style?
22    A.  Can you explain a little bit more?  What do
23  you mean by management style?
24    Q.  So you're managing between 10 and 14
25  stores.  What do you see your position relative to the

Page 13

1  people working under you?  Are you talking to them on a
2  daily basis or how does this work so I can get an
3  understanding of really how a day-to-day goes?
4    A.  So it's definitely communication with all
5  store managers and assistant managers and employees, in
6  general, throughout the day.
7    Q.  So when you're managing these 10 to 14
8  stores, each store has a store manager, I presume.
9    A.  Correct.
10    Q.  For any of these store managers how
11  frequently do you talk to them?
12    A.  It depends on the complexity of the store,
13  issues of the store.  It really depends.  Sometimes
14  once or twice a week, sometimes every day.
15    Q.  I'm asking for ballpark.  Anywhere between
16  once a day and once a week?
17    A.  Yes.
18    Q.  For the employees -- I'm assuming that
19  contact is with the store manager?
20    A.  Correct.
21    Q.  What sort of contact do you have with the
22  CSRs in the stores?
23    A.  I don't really have any contact as far as
24  communication except if I have issues -- because we
25  have an open door policy.  So the CSR -- if they don't



Page 22

1  and I had to interfere and review the facts and discuss
2  it with HR because we manage by committee.  So I
3  discuss it with my own boss and discuss with the HR
4  department and came to a conclusion and then we make
5  the call.
6      Q.  Thank you; that's helpful.  So we can get
7  into the next thing talking about how a termination
8  decision is made.  You said this is by a committee.
9  Can you sort of talk about the process in a little bit
10  more depth?
11      A.  When it comes to employee counseling or
12  coaching or terminations, we do that by committee,
13  meaning more than one person involved.  This has been
14  for as long as I can remember.  There is a five-minute
15  rule.  I call my boss and he has a say --
16      Q.  Can you just describe the five-minute rule
17  a little bit?  I think I have a basic understanding but
18  just an overview understanding.
19      A.  Circle K has a five-minute rule that any
20  incident that happens work related I need to report it
21  to my boss within five minutes, give or take, when you
22  get a chance.  Report it whether it's some customer got
23  hurt in a parking lot or an employee hurt or --
24  anything like that is a five-minute rule.
25      So when there is a termination that I

Page 23

1  reviewed with the manager, that the manager thinks is
2  in violation of the company policy, that's part of the
3  five-minute rule, so I tell my boss.  I let HR know or
4  he does and we make a decision all together.
5      Q.  So let's break that down a little bit.  So,
6  let's say there is some kind of violation, a manager
7  thinks a CSR is stealing money from the cash register;
8  would that be a somewhat typical type situation or a
9  reason that a manager would bring --
10      A.  What do you mean typical?
11      Q.  What is one of any typical reasons that a
12  manager would bring to you that they think a CSR should
13  get terminated?
14      A.  I want to know what you mean by the word
15  typical?
16      Q.  I'm just trying to make sure we are
17  painting a realistic -- I want to go through what that
18  process would look like and I don't want to be plucking
19  a hypothetical that is totally crazy and not at all
20  what you would see on a daily basis.  I'm not saying
21  daily; I understand it's more rare.  What is sort of a
22  general reason that this happened for you in the past
23  that a manager has brought an issue to you?
24      A.  It could be from taking cash from the
25  register to --

Page 24

1      Q.  We'll just use that then.  A manager
2  suspects a CSR is taking cash from the register.  Then
3  the manager will talk to you about it; is that right?
4      A.  Correct.
5      Q.  And then under the five-minute rule you
6  will tell your supervisor, who is Mr. Craig Holmes?
7      A.  Not yet.
8      Q.  What happens next?
9      A.  When the manager tells me, I'm involved.  I
10  go in to review the video to confirm what the manager
11  is claiming.  Because I don't want to report something
12  to my boss that is inaccurate.  Once I do that, I
13  review extensively the video with the employee, and
14  that's when I think if this person should be
15  terminated.
16      If I think they shouldn't, then we don't do
17  anything.  If I think they should be terminated and
18  there is a violation, then I report it to my boss.
19  Either him or I will get HR involved.  Then a decision
20  is made by the whole group.
21      Q.  What does that look like?  The manager
22  tells you, you look at the video, you think, yes, this
23  looks like the CSR is stealing cash from the register,
24  and then you tell Mr. Holmes and either he tells HR or
25  you tell HR.  What happens next?  Can we break down the

Page 25

1  whole committee aspect a little bit?
2      A.  We discuss it.
3      Q.  Does someone like -- do you all hop on a
4  conference call or what does that look like?
5      A.  Could be through a call or just a phone
6  call.
7      Q.  So just a phone call between you and
8  Mr. Holmes or between you and HR?
9      A.  Between me and Mr. Holmes.  And he'll
10  confirm that he did have the feedback from HR or it
11  could be me talking to HR and talking to Mr. Holmes.
12  It really depends; it could be all three.
13      Q.  How quickly does that usually happen?
14      A.  We don't put any time frame on it.  We want
15  to make sure that a proper investigation has taken
16  place.  Remember this is an employee; we owe it to
17  them.  So I personally owe it to every employee that
18  works for me.  Every person that comes work for us are
19  coming to do a good job.  The least I can do is make
20  sure I go through the proper investigation.
21      Q.  So you said if you look at the video and
22  you don't think there has been a violation it ends
23  there; you don't tell Mr. Holmes or HR; that's the end
24  of the conversation?
25      A.  Yes.  It's a mistake by the manager or --



Page 26

1     Q. If there is no recommendation by you to
2  terminate, there is no termination of any employees in
3  your zone; is that correct?
4     A. I would say yes.
5     Q. I want to talk a little bit about when you
6  were working at CST and Valero and Diamond Shamrock.
7  Did you have any hiring or firing authority at any of
8  those stores?
9     A. Yes.
10    Q. Was it similar to what you have with
11 Circle K?
12    A. Correct.
13    Q. Were the processes similar?
14    A. Pretty much the same.
15    Q. Did any of these stores have a chase and
16 confront policy or don't chase and confront policy?
17    A. Absolutely.
18    Q. And are those policies similar to Circle K?
19    A. Yes.
20    Q. Are there any differences between them?
21    A. I'm not sure. I don't think so.
22    Q. For the purposes of you as an employee from
23 Diamond Shamrock to Valero to CST to Circle K, the
24 policy was the same?
25    A. Absolutely.

Page 27

1     Q. Maybe now is a good time to say what is
2  that policy?
3     A. What policy?
4     Q. The chase and confront policy.
5     A. Employees are prohibited from confronting,
6  chasing, pushing, pulling, or trying to interfere in
7  the case of a robbery for the safety of the employee.
8     Q. That's been the case at all of these
9  convenience stores you have worked at through different
10 corporate --
11    A. If I remember back then, Valero hired the
12 police chief of San Antonio to make sure we are well
13 informed and our policies are in line to prevent
14 robberies and to make sure our employees are safe.
15    Q. I appreciate that. We are going to jump
16 back to your position at Circle K now. What was your
17 interaction with HR? Let's go back to our hypothetical
18 with a CSR taking cash from the cash register. Would
19 the person you spoke to at HR -- would that be Amy
20 Harvey or would that be someone different?
21    A. For what time frame?
22    Q. Your time at Circle K.
23    A. Currently? Right now?
24    Q. Yes, let's say 2016 to current. When you
25 went to HR, who would you speak with?

Page 28

1     A. I'm not sure if I understood the question,
2  the time frame --
3     Q. It's a little convoluted. In 2016 as a
4  market manager, if you had an issue and wanted to
5  recommend a termination, Mr. Holmes was your
6  supervisor. You told him. Who at HR would you be
7  speaking with?
8     A. Amy.
9     Q. How long was it the case that Amy would be
10 the person you would go to?
11    A. I'm not quite sure but it has changed after
12 that. So I'm not sure how long it was so --
13    Q. Do you have any -- was it in the past
14 couple years she left or do you know?
15    A. I really don't know.
16    Q. Who is the current person that you speak
17 with?
18    A. Raj.
19    Q. What is his last name?
20    A. Adhikari.
21    Q. Whenever you have an HR issue, you go to
22 Raj?
23    A. Correct.
24    Q. Does Raj have the same position that Amy
25 had?

Page 29

1     A. Correct.
2     Q. Is there anyone else at HR that you would
3  talk to or was it just Amy?
4     A. It's pretty open. I will talk to Sue
5  Fernandez, which is the director.
6     Q. Sue Fernandez would be Amy's supervisor?
7     A. Not at the time, no. She is the supervisor
8  for Raj right now.
9     Q. You would have gone to the equivalent
10 person when Amy was there?
11    A. Correct.
12    Q. Is there -- what were the circumstances
13 when you wanted to go to Amy versus going to Amy's
14 supervisor?
15    A. I'm not really sure. But it's open so --
16    Q. But it happened?
17    A. Right.
18    Q. I want to ask some questions about Ms. Mary
19 Ann Moreno. Do you know who she is?
20    A. Yes, I do.
21    Q. How do you know her?
22    A. She was an employee.
23    Q. How long was she an employee of yours?
24    A. Working in my group?
25    Q. How long was she working under you?



Page 34

1    Q.  Whenever she became a CSR in your zone was
2  after 2016; is that --
3    A.  Can you say that again?
4    Q.  She became a CSR in your zone at some point
5  after 2016, is that what you're saying?
6    A.  Yes.
7    Q.  You're just not sure --
8    A.  Way past 2016.  If I have to guess -- don't
9  quote me on this -- probably after 2018 or 2019.
10    Q.  She came into your zone in the late 2010s
11  and she was coming in as an experienced CSR at that
12  point?
13    A.  I'm not sure what you mean by she came in.
14    Q.  Let me rephrase.  She stayed in the same
15  store and the zone changed around her.  Is that more
16  accurate?
17    A.  When there's a market realignment, I lose
18  some stores and their employees and I gain some stores
19  with their employees.  That's what happened.
20  Ms. Moreno's store was one of those stores I gained,
21  and she was already an employee.  Nothing changed for
22  her, just the market changed.
23    Q.  That's what I'm getting at.  You think that
24  happened around 2018?
25    A.  It had to be after 2018.

Page 35

1    Q.  Is that the store then that you recruited
2  Love Jorgensen to be the manager in training for?
3    MR. HANKINS:  Object to form.
4    Q.  (BY MS. BUTLER)  I will rephrase.  When
5  Ms. Moreno's store entered your zone, do you know who
6  the manager for that store was?
7    A.  I know it's not Love, but it was somebody
8  else.  I don't remember the name.
9    Q.  At some point did you recruit Love
10  Jorgensen to be the manager at that store?
11    A.  Love Jorgensen -- I did not recruit her.
12  It was a promotion from another store.  She was an
13  assistant manager and we have a pipeline.  So just like
14  I did from a CSR, it's the same thing; I always put
15  people on the path to success.  That's one of the
16  things I put Love on.  She was assistant manager at
17  another store, so I gave her an opportunity to a
18  promotion to become manager in training.
19    Q.  When she was an assistant manager in this
20  other store, was that store in your zone?
21    A.  Yes.
22    Q.  She got a promotion within your zone?
23    A.  Correct.
24    Q.  Do you have a general idea when you think
25  that happened?

Page 36

1    A.  I really don't.
2    Q.  So when Ms. Moreno's store joined your
3  zone -- for lack of a better term -- she had been a CSR
4  for a long time; is that correct?
5    A.  Correct.
6    Q.  And is that typical for CSRs?  Did she have
7  more experience as a CSR than many others?
8    A.  Could you rephrase.
9    Q.  How long do most employees -- I understand
10  this is a general answer I'm asking for -- how long
11  would an employee stay as a CSR?
12    A.  It really just depends on that person.
13  Some people just don't want to go anywhere.  They just
14  want to be a CSR.  She was one of them.
15    Q.  Do you have many other employees who were
16  CSRs for as long as Ms. Moreno?
17    A.  In my entire career?  Yes.
18    Q.  What was the average tenure of a CSR?
19    A.  Again, it's really not a specific time.
20  Some people get promoted within three months.  Some
21  people get promoted -- it depends on that person.  I
22  have had an attorney who -- true -- I have had an
23  attorney when I was with Valero.  He would do attorney
24  during the day and he wanted to work part-time for me.
25  He did it for a long time.  He didn't want a promotion.

Page 37

1  Some people, they want a career, there is
2  opportunities -- some people are satisfied where they
3  are.
4    Q.  Would you say the CSR position has high
5  turnover?
6    MR. HANKINS:  Object to form.
7    A.  What do you mean by high turnover?
8    Q.  (BY MS. BUTLER)  Sometimes there are jobs
9  that people stay at for many years.  It seems like you
10  have been in your position for a number of years.
11  Sometimes there are jobs that it's frankly difficult to
12  fill that you will have an employee come in, they will
13  work for three months and they will quit or they get
14  fired for any number of reasons, and some jobs are more
15  difficult to fill and keep the employee.  Is the CSR
16  position difficult to fill and keep people in?
17    A.  I get that but what is the threshold of
18  turnover that it becomes high?  I don't understand what
19  you mean by high turnover or how to fill?  What is the
20  threshold?
21    Q.  I'm just asking for a general perspective,
22  basically.  I don't have this XYZ counts as high and
23  below it is low.  That's not what I'm saying.  So if I
24  said that around 200 percent turnover is what Amy
25  Harvey said, would that sound correct to you?



Page 98

1    laws that --
2        MR. HANKINS:  Object to form.
3        A.  I'm not sure.
4        Q.  (BY MS. BUTLER)  Do you know of any person
5    who was not terminated when they made physical contact
6    with an attacker when you were at Circle K?
7        A.  That's a little bit vague.  Again, I go
8    back to it earlier, what kind of physical contact?
9        Q.  I'm talking any physical contact.
10       A.  Did the robber initiate physical contact or
11   did the employee initiate physical contact?
12       Q.  That's why I'm grouping them together, any
13   physical contact.  I don't care who initiated it.
14       A.  Can you say the question again?
15       Q.  Are you aware of any person at Circle K who
16   was not fired when -- any employee who was not fired
17   when they had physical contact with an attacker?
18       MR. HANKINS:  Object to form.
19       A.  I still can't answer that one because there
20   is two different -- you're asking me to give you a lump
21   sum answer on two different scenarios.  Physical
22   contact -- if it was actually initiated with the
23   employee, it warrants termination.  If physical contact
24   is initiated by the robber, that's a whole different
25   story.

Page 99

1        Q.  (BY MS. BUTLER)  I understand they are
2    different, but as you say, I need a lump sum answer,
3    and I need you to answer the question that I'm asking,
4    which is -- I don't care who started it or who
5    initiated it.  I want to know if there was physical
6    contact between an employee and attacker regardless of
7    who initiated it -- has there ever been a scenario at
8    Circle K where a person was not fired --
9        MR. HANKINS:  Object to form.
10       Q.  (BY MS. BUTLER) -- that you're aware of?
11       A.  I'm going to say probably, but I'm going to
12   qualify it to where the robber initiated the physical
13   contact.
14       Q.  I'm asking for what you're aware of though.
15   So you're saying I'm probably aware of a situation?
16       A.  Probably a situation to where an
17   employee --
18       Q.  I'm not asking about a probable situation;
19   I'm asking of your knowledge.
20       A.  I'm not sure.
21       Q.  So you're not sure if there ever has been a
22   situation where an employee and attacker had physical
23   contact and the employee was not terminated?
24       A.  What I'm saying is I'm sure there has been
25   an employee who wasn't terminated because they didn't

Page 100

1    initiate physical contact with the attacker -- actually
2    physically touched them.
3        Q.  How are you sure of that?
4        A.  Through video.
5        Q.  Can you point to a situation where this has
6    occurred?  Do you remember this?
7        A.  I just told you an example, a manager --
8    robber --
9        Q.  I'm talking at Circle K; that was at
10   Diamond Shamrock.
11       A.  I don't think so, no.  I don't know.
12       MS. BUTLER:  I think now is a good stopping
13   point for lunch.  Off the record.
14       (Recess taken, 12:35 p.m. to 1:21 p.m.)
15       MS. BUTLER:  We are back on the record.
16       Q.  (BY MS. BUTLER)  Do you understand that
17   you're still under oath, Mr. Aamoud?
18       A.  Yes.
19       Q.  I want to circle back to a couple things we
20   were talking about towards the end.  Specifically, we
21   were talking about the Circle K chase and confront
22   policy and the state laws of Colorado about self
23   defense and victim's rights.  Do you remember that?
24       A.  Yes.
25       Q.  So I asked you about trainings you received

Page 101

1    on the chase or confront policy and how it complied
2    with state law.  I want to ask you that question again
3    and I want to know specifically what trainings you
4    received and what they said about how that policy
5    complies with state law.  Can you answer that for me?
6        A.  I don't remember.  I don't really know.
7        Q.  Before you had said there were all of these
8    trainings and all of these things, and I kept asking
9    for specifics and you said I had trainings but now
10   you're saying you don't know?
11       A.  I guess from your answer I assume you mean
12   by all laws.  For example, age-restricted laws --
13       Q.  I was asking specifics.  And I was asking
14   specifics about chase and confront policy and self
15   defense laws and victim's rights laws?
16       A.  I don't remember.
17       Q.  So it's fair to say that you don't know how
18   this chase and confront policy complies with state law
19   then?
20       A.  Correct.
21       Q.  So that's the case even though you
22   recommended people for termination for violating this
23   policy; is that right?
24       A.  Yes.
25       Q.  So you don't know if Circle K tried to

Page 102

1   comply with Colorado state laws about the chase and
2   confront policy?
3       A.  I don't know.
4       Q.  So you don't know if you were in compliance
5   with state law then when you fired people pursuant to
6   this policy?
7       A.  I don't know.
8       Q.  And you never tried to find out?
9           MR. HANKINS:  Object to form.
10      A.  What do you mean?
11      Q.  (BY MS. BUTLER)  You never tried to find
12  out if you were in compliance with state law when you
13  fired someone under this policy?
14      A.  When you say when you fired --
15      Q.  Recommended for termination.
16      A.  Recommended, yes; fired, it goes through a
17  lot of people.
18      Q.  I understand.  The other thing I want to
19  talk about is -- we were talking about terminations
20  related to physical contact between an employee and an
21  attacker.  I had asked you whether you recall at
22  Circle K any employee having physical contact with an
23  attacker and not being terminated.  Do you remember
24  that?
25      A.  Do I remember the question?

Page 103

1       Q.  Correct.
2       A.  You can repeat it.
3       Q.  Has there ever been an employee at Circle K
4   that you're aware of who had physical contact with an
5   attacker who was not fired?
6           MR. HANKINS:  Object to form.
7       A.  No.
8       Q.  (BY MS. BUTLER)  I also want to talk about
9   these videos you talked about reviewing where the
10  employee was -- robberies where the employee was
11  screaming or crying and backing away from the attacker.
12  Do you remember that?
13      A.  Yes.
14      Q.  When you were talking about that, that
15  didn't refer to any videos you reviewed at Circle K;
16  correct?
17      A.  Can you ask the question again?
18      Q.  I asked you how many armed robberies there
19  were at Circle K and you said there had been two.
20  Before that you had talked about watching videos where
21  employees had been upset and crying and screaming
22  and -- not beer run robberies, just robberies -- and so
23  I'm trying to see -- those videos you're talking about,
24  those aren't videos while you were working as a manager
25  at Circle K?

Page 104

1       A.  No.
2       Q.  What did those videos refer to?  When you
3   talked about reviewing those videos, when was that?
4       A.  CST, Valero.
5       Q.  How many of those types of videos did you
6   see?
7       A.  I don't remember.
8       Q.  This never happened in the nine years you
9   have been at Circle K?
10      A.  I don't remember, no.
11      Q.  I want to move on to October 4, 2020.
12  That's the night of the robbery.  Just initially can
13  you tell me everything you remember about that night?
14      A.  It's been 2 1/2 years.  What I remember is
15  getting a phone call from Mary telling me that she just
16  got robbed.  First thing I did was ask her if she was
17  okay.  She said no, she is shaken up.  And I apologized
18  for that happening to her.  She said that she contacted
19  her manager and that she's 45 minutes away.  And she
20  told the assistant manager -- she didn't answer so I
21  told her that I will be there shortly because I was at
22  home.  And I put clothes on and -- I don't live that
23  far from the store so I went out there.
24      Q.  Were you done working for the day when you
25  got this phone call?

Page 105

1       A.  Yes.
2       Q.  It sounds like you were able to get there
3   quite quickly.
4       A.  Yes.
5       Q.  Like 5 or 10 minutes?
6       A.  Probably like 15.
7       Q.  So when Mary called you, was that the first
8   time you heard about the robbery?
9       A.  Yes.
10      Q.  What did she tell you happened?  I know you
11  said there was a robbery.  Did she say anything more?
12      A.  She told me she got robbed.  First thing I
13  asked was are you okay?  Was a gun or weapon used?  She
14  told me no.  And that was it.
15      Q.  So you asked if there was a gun or a weapon
16  involved?
17      A.  I think so, yeah.
18      Q.  You're not totally true?
19      A.  Right.
20      Q.  Did she say anything about a knife?
21      A.  I don't remember.
22      Q.  So when you heard this news, what was your
23  reaction?
24      A.  The news of the robbery?
25      Q.  Yes.

Page 134

1  recommendation. When was that recommendation accepted?
2      A. I don't remember the exact time or date.
3  It was within that week.
4      Q. Did you talk to Ms. Moreno between the
5  night of October 4 and when you told her that she was
6  fired?
7      A. Before or during or --
8      Q. In that time period.
9      A. She probably called me and I told her that
10 I don't have an answer for her yet. I will get back to
11 her when things are finalized.
12     Q. Did you need HR approval for Ms. Moreno's
13 termination?
14     A. Yes.
15     Q. Had you ever had issues with HR not
16 accepting any of your recommendations?
17     A. Yes.
18     Q. What were the reasons for that?
19     A. They saw it differently.
20     Q. Had that ever happened with a chase and
21 confront policy violation?
22     A. I don't think so.
23     Q. Did you talk to anyone besides Mr. Holmes
24 about terminating Ms. Moreno?
25     A. I'm sorry. Repeat the question.

Page 135

1      Q. Did you talk to anyone besides Craig Holmes
2  about firing Ms. Moreno?
3      A. I don't think so.
4      Q. I'm talking bigger picture here. I'm
5  talking at any point in time either before or after her
6  termination -- both Circle K and not Circle K
7  employees -- did you talk to anyone about Ms. Moreno's
8  firing or the robbery?
9      A. Probably told the manager to go ahead and
10 issue the termination. Love, her manager.
11     Q. Can you talk me through that process? How
12 does that work?
13     A. When a decision is made, I communicate that
14 to the employee, in this case, Ms. Moreno. Then I
15 instruct the manager to go ahead and initiate
16 termination on the HR software that we use and I will
17 approve it.
18     Q. If you didn't have the approval of
19 Mr. Holmes and Ms. Harvey, would you be able to approve
20 that on Workday?
21     A. I will approve it. But it goes through the
22 whole process and Amy has to sign off on it. If she is
23 not familiar with the case, she'll say, wait a minute,
24 what are we doing here.
25     Q. So I want to talk about this entire

Page 136

1  incident. We have all the conversations we talked
2  about on October 4. You talked to Ms. Moreno at some
3  point to tell her not to report for work. You talked
4  to Mr. Holmes at some point about the termination and
5  he approved the termination. And then you told
6  Ms. Moreno that she was terminated. Are there any
7  other conversations that took place about the
8  termination or the robbery that we haven't covered?
9          MR. HANKINS: Object to form.
10     A. I don't remember.
11     Q. (BY MS. BUTLER) Take your time. Please
12 think about it. Any other conversations?
13     A. I don't remember. I really don't.
14         (Deposition Exhibit 14 was marked.)
15     Q. I have a document here. This will be
16 Exhibit 14. Do you see at the bottom right where it
17 says Circle K 000158?
18     A. First page? Yes.
19     Q. The next page says 159?
20     A. Yes.
21     Q. Do you recognize this document?
22     A. Yes.
23     Q. What is it?
24     A. Termination.
25     Q. Is this what your Workday software

Page 137

1  generates when an employee is terminated?
2      A. Yes.
3      Q. I'd like a little bit of help understanding
4  some of these dates on it. If you see on the first
5  page, the very first entry is termination, and it says
6  "Status, step, completed on 10/8/2020." And the person
7  is Love Jorgensen. Do you see that?
8      A. Yes.
9      Q. If you go further up the page, it says
10 "Termination date." Under termination date it says
11 "10/5/2020." Do you know why there would be a
12 difference between those two dates?
13     A. With the termination date and what's the
14 other date?
15     Q. The very first line of the termination
16 matrix -- for lack of a better word -- it says
17 completed on October 8, 2020. Do you know what would
18 account for the difference between those two dates?
19     A. Again, this is what I think is sometimes we
20 tell the employees don't report to work until we get
21 back to you so it gives us time to investigate and all
22 that. If that investigation leads to nontermination,
23 we'll go back and pay the employee for that time that
24 they were off. We will pay them for that. In this
25 case we proceeded with the termination at a later date

# Exhibit 6
# Circle K Surveillance Video (Office)

# Conventionally Submitted as ECF. No 42 on 03/31/2023

# Exhibit 7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-02327-NYW-STV

_____

VIDEOCONFERENCE DEPOSITION OF          May 5, 2023
AMY HARVEY

_____

MARY ANN MORENO,

          Plaintiff,

vs.

CIRCLE K. STORES, INC.,

          Defendant.

_____


        The deposition of AMY HARVEY, taken before

Leeann Stellor, a Registered Merit Reporter,

Certified Realtime Reporter, and a Notary Public in

and for the County of Summit and the State of

Colorado, via Zoom videoconference, on Friday,

May 5, 2023, at the hour of 10:04 a.m.



Page 14

1 that, you can go ahead and answer. Thanks.
2    A.  Robert Sway was promoted to a different
3 position in Florida, so he ended up leaving the
4 HR director role, and then they brought in someone
5 else to take that place.
6    Q.  And that was Sue Martinez?
7    A.  Yes.
8    Q.  Okay. And, I mean, did you contact or
9 obtain attorneys at any point in time with respect
10 to this case?
11    A.  I don't understand your question.
12    Q.  Sure. Let me rephrase it.
13         Are you represented, are you
14 currently represented by any attorneys with respect
15 to this case?
16    A.  Yes.
17    Q.  And who is that?
18    A.  That is Tom and Nick.
19    Q.  Okay. Did you sign any agreements to be
20 represented by them?
21    A.  No.
22    Q.  And whose idea was it for you to be
23 represented?
24    A.  Well, they contacted me and asked me if I
25 would like them to represent them -- or represent

Page 15

1 me.
2    Q.  Who is paying their attorneys' fees? Are
3 you doing that?
4    A.  That would be Circle K.
5    Q.  And let me ask about your highest level
6 of education before we go back to talking about kind
7 of your time at Circle K.
8         What's your highest level of
9 education?
10    A.  I completed a bachelor's degree, but I am
11 currently enrolled for my master's.
12    Q.  Master's in what?
13    A.  Human resource management.
14    Q.  Congratulations.
15    A.  Uh-huh.
16    Q.  Always good to get a little extra, couple
17 more degrees under the belt.
18         And when did you begin working at
19 Circle K?
20    A.  2016.
21    Q.  And can I just briefly ask what your
22 position before Circle K was?
23    A.  Before Circle K or when I started with
24 Circle K?
25    Q.  Before Circle K.

Page 16

1    A.  I was a multi-unit manager.
2    Q.  At?
3    A.  At Stripes Convenient Stores in Texas.
4    Q.  And if you could walk me through your job
5 history at Circle K, your job progression, that
6 would be much appreciated.
7    A.  I started as a multi-unit manager in west
8 Kansas. I was there for a year before promoted into
9 HR manager of August of '17.
10    Q.  And what happened when you were promoted
11 to HR manager? Did you get relocated?
12    A.  Yes.
13    Q.  Where?
14    A.  To Colorado.
15    Q.  And why is that?
16    A.  Because I lived in Kansas before that.
17    Q.  Right. So you didn't want to be in
18 Kansas?
19    A.  Well, it would have been a long drive to
20 the corporate office every day.
21    Q.  So they moved you because the corporate
22 office is here in Colorado?
23    A.  Correct.
24    Q.  Okay. And so you became an HR manager in
25 approximately 2017?

Page 17

1    A.  Yes.
2    Q.  Were there any other job titles that
3 you've held at Circle K?
4    A.  Just the two.
5    Q.  And what was the -- what were your
6 primary job duties as an HR manager at Circle K?
7    A.  I supported, roughly, 423 stores in six
8 states.
9    Q.  Which six states?
10    A.  Colorado, New Mexico, Texas, Oklahoma,
11 Kansas, and Missouri.
12    Q.  And what do you mean by support? What
13 kind of support did you provide?
14    A.  Answered questions regarding HRIS
15 systems, did investigations, did approvals as far as
16 corrective actions, terminations, helped with
17 on-boarding, helped with training. I pretty much
18 did everything.
19    Q.  Sounds like a busy job. What was your
20 salary when you were an HR manager, and did that
21 change over time?
22    A.  I believe $92,000, roughly.
23    Q.  And did that remain the same from 2017
24 through roughly 2021?
25    A.  Usually a 3 percent increase every year.



Page 18

1    Q.   Were you making over six figures by the
2 time you left Circle K?
3    A.   No.
4    Q.   And you said you were in charge of, like,
5 training.  What types of trainings were you in
6 charge of when you were HR manager at Circle K?
7    A.   I launched our new HRIS system and
8 Workday and trained everyone from store managers,
9 market managers, regional directors, CEO, and
10 everybody at the business office on how to use it,
11 clocking in and out, doing corrective actions,
12 position management.  Anything that had to do with
13 that new HRIS system I trained on.
14    Q.   Just to clarify for the record.  HRIS is
15 Human Resources Information System?
16    A.   Yes.
17    Q.   Did you ever do any training for hourly
18 employees?
19    A.   No.
20    Q.   So just, like, store managers, et cetera?
21    A.   Correct.
22    Q.   Did you have any role in developing or
23 revising any employment policies at Circle K while
24 you were the HR manager?
25    A.   A little.

Page 19

1    Q.   Okay.  Can you describe that for me,
2 please?
3    A.   Such as Colorado's termination time for
4 payment is different than Texas, Oklahoma,
5 everywhere because you have to pay them within
6 24 hours if we terminate them.  The same as
7 New Mexico, it had to be within seven days.  I was
8 implementing some of that into our policy because it
9 was not a Circle K policy.  It was a state specific.
10 So some of those types of policies I helped revise.
11    Q.   Okay.  So some of Circle K's policies
12 took into account, you know, local state laws?
13    A.   Correct.
14    Q.   And varied from state to state?
15    A.   Yes.
16    Q.   And you said you had a -- did you have --
17 you said you had a role in, I believe you said,
18 approving terminations.  Could you tell me about
19 that?
20    A.   When an employee would be terminated, the
21 store manager or district manager would input that
22 into the HRIS system, and it would actually come to
23 my inbox for approval or denial, depending on if I
24 knew any information regarding that or not.
25    Q.   What do you mean if you knew any

Page 20

1 information regarding that or not?  Did you
2 sometimes withhold approval or denial because you
3 didn't have information?
4    A.   I would --
5       MR. CARROLL:  Object to the form of
6 the question.
7    Q.   Go ahead.
8    A.   I would pick up a phone and make a phone
9 call to either the store manager or district manager
10 to find out why we're terminating someone, whether
11 it was no call, call shows, and they didn't put in
12 all the proper information into the system.  I would
13 tell them to go back in and revise it before I would
14 approve it so we would have a good base of
15 information.
16    Q.   Did you ever deny a termination?  I guess
17 a termination -- what would you call them?  Let me
18 step back a little bit.
19       When you got one of these
20 recommendations, did you just call them a
21 recommendation?  What were they?
22    A.   They were terminations.  I mean, even if
23 it was someone that wanted to leave the company
24 themselves, they could write their own termination
25 and then I could approve it.  Or they could ask for

Page 21

1 HR guidance, meaning can you give me a call because
2 I'm quitting because of this or this or this.  You
3 know, whatever that may be.
4    Q.   Okay.  So your role was more about making
5 sure that there was proper documentation?
6    A.   Yes.
7    Q.   Did you ever override a termination?
8    A.   I don't recall.
9    Q.   Would that be something you could have
10 done --
11    A.   I could have.
12    Q.   -- in your role as HR manager?
13    A.   I could have if it was appropriate.
14    Q.   But you don't recall ever doing so?
15    A.   I don't recall.
16    Q.   Any other kind of role in terminations,
17 other than making sure that there was, you know,
18 sufficient documentation in the system?
19    A.   When I -- I could do investigations and
20 direct the store manager or market manager before a
21 termination due to the outcome of the investigation.
22    Q.   Do you recall ever doing that?
23    A.   Yes.
24    Q.   Can you tell me about that a little bit?
25    A.   A lot of them were, whether it was a

**MAGNA** ▶
LEGAL SERVICES

Page 30

1  back away, hide, run, secure yourself, lock the door
2  after they leave kind of thing so that they can't
3  re-enter the store, and just make sure that they
4  stay safe.  That was pretty much their biggest step
5  in that, was staying safe for our employees and our
6  customers.
7      Q.   And was this one training or more than
8  one training?
9      A.   I believe it was a yearly training.
10     Q.   And who provided that training when you
11 were a multi-unit manager, multi-staff manager?
12     A.   I believe at the time it was my regional
13 director, because we did not have a training
14 department in our division yet.
15     Q.   And who -- what was the name of your
16 regional director?
17     A.   Steve Meadia.
18     Q.   And was this training in person or
19 online?
20     A.   Mine was in person.
21     Q.   Where did it take place, in corporate
22 headquarters?
23     A.   Yes.
24     Q.   Do you recall how long these trainings
25 were, these annual trainings?

Page 31

1      A.   Like an hour, I think.
2      Q.   And were you involved in any way -- and
3  you didn't receive any additional training as an
4  HR manager on the robbery policy?
5      A.   No.
6      Q.   What about the confront and chase policy,
7  do you recall any specific trainings on that policy?
8      A.   Only in conversation with my director.
9      Q.   I'm sorry, what does that mean?  Can you
10 explain?
11     A.   Meaning Robert Sway and I would have a
12 conversation regarding the policy before we posted
13 it every year, because we posted it near the labor
14 law posters which I was -- that was one of my tasks
15 to update yearly in every store.  So we would have a
16 conversation about what it means, any changes that
17 came across on the policy from our corporate office,
18 and then we would -- I would make sure that they all
19 get posted.
20     Q.   Do you recall any changes to the confront
21 and chase policy while you were the HR manager or a
22 multi-store, multi-unit store manager?
23     A.   I do not recall any.
24     Q.   So it stayed pretty consistent and the
25 same throughout your tenure at Circle K?

Page 32

1      A.   Yes.
2          MR. CARROLL:  Objection.  Form.
3      Q.   Did you provide any training yourself to
4  employees on either the robbery policy or confront
5  and chase policy?
6      A.   Confront and chase was brought up during
7  conference calls that I had monthly -- or I'm sorry,
8  weekly, and then turned into biweekly with regional
9  directors and multi-unit managers.
10     Q.   So you spoke about the confront and chase
11 policy every other week to managers?
12     A.   I would say it was probably a few times a
13 year when it really became a relevant time, when
14 there were a lot of robberies or issues going on.  I
15 would reiterate what that policy was so that when
16 market managers had their meetings, they should talk
17 about it too with their store managers and then have
18 it trickle down.
19     Q.   Was there a time that you recall there
20 being an uptick in robberies?
21     A.   Usually, yes.  Summertime seems to be a
22 big time for robberies.
23     Q.   And how many -- I mean, as the HR manager
24 at Circle K, how frequently were you confronted with
25 the robberies in the, I think you said, in the 430

Page 33

1  some stores that you oversaw?
2      A.   Yeah, I would say a couple times a week.
3      Q.   So there were robberies somewhere in your
4  six-state region a couple times a week?
5      A.   Yeah, and sometimes more.
6      Q.   That's quite a bit.
7      A.   Absolutely.
8      Q.   Yeah.  So would you say there was -- I
9  mean, ballpark figure, I guess you were there from
10 2017 to 2021.  How many robberies do you think took
11 place in the territory that you supported?
12     A.   Hundreds.
13     Q.   And how many of those would you say were
14 armed robberies?
15     A.   Maybe half.
16     Q.   So hundreds of armed robberies as well?
17     A.   Yeah.
18     Q.   It's probably a little bit sensitive, but
19 has anybody been injured, while you were the HR
20 manager, on your territory due to an arm robbery?
21     A.   Yes.
22     Q.   Has anyone died?
23     A.   Yes.
24     Q.   How often would you say there were
25 injuries due to armed robberies in your territory



Page 34

1  while you were an HR manager at Circle K?
2      A.  Maybe a couple hundred.
3      Q.  And while I -- I don't need names and I
4  don't want to pry, how many deaths occurred when you
5  were the HR manager at Circle K due to armed
6  robberies in your territory?
7      A.  Maybe 30.
8      Q.  Wow.  Okay.  So this is a pretty
9  dangerous job, it seems like.
10     A.  Sure.
11     Q.  And how many employees have you
12 terminated -- or did you approve the terminations of
13 at Circle K for violating either the robbery policy
14 or confront and chase policy?
15     A.  Probably close to a hundred.
16     Q.  Was there ever a time while you were HR
17 manager at Circle K when an armed robbery -- well,
18 scratch that.  I'm trying to think of a way to
19 phrase this.
20         Was there ever a time where you
21 found that a termination of an employee who had
22 experienced an armed robbery was not sufficiently
23 documented?
24         MR. CARROLL:  I object to the form of
25 the question.

Page 35

1         MS. HALPERN:  That probably wasn't
2  amazing.  I can try a third time.
3      Q.  Okay.  So in your role approving
4  terminations, was there ever a time where you
5  disagreed with a termination of an employee who
6  experienced an armed robbery?
7      A.  I don't believe so.
8      Q.  And did you review video footage in each
9  and every single one of those hundred or so
10 terminations?
11     A.  Not every one, no.
12     Q.  So in your mind, do you distinguish
13 between the robbery policy and the confront and
14 chase policy?
15     A.  Yes.
16     Q.  Okay.  Could you tell me about, you know,
17 what distinguishes them?
18     A.  Because the robbery policy doesn't
19 necessarily have to include a confront and chase if
20 the employee does not confront or chase the person.
21 So if they comply with the robber and, you know,
22 follow the policy of, you know, contacting the
23 police when it happens and then following the
24 five-minute rule, not having too much money in their
25 cash register, and they just do everything that the

Page 36

1  robber wants, it doesn't have to include a confront
2  and chase.
3      Q.  Okay.  What does the confront and chase
4  policy prohibit?
5      A.  I don't understand what "prohibit" means
6  in that sentence.
7      Q.  Okay.  I'll rephrase that.  Sorry.  I'm
8  turning off my Teams, which has started going off.
9         What conduct does the confront and
10 chase policy prohibit an employee from engaging in
11 when there's a robbery?
12     A.  Basically touching the robbery -- the
13 robber, going around the counter to confront or
14 stand up next to, fight them in any way.  Follow the
15 robber, whether it's within the building or outside
16 the store.  Grabbing them in any way, any physical
17 contact, unless of course it's defend.  I think
18 that's it.
19     Q.  You say defend.  What do you mean by
20 that?
21     A.  Meaning if -- if they -- I mean I saw
22 videos where a person would jump over the counter to
23 try to attack someone.  They were obviously allowed
24 to defend themselves.  But I guess that, you know, a
25 defend if they get attacked.

Page 37

1      Q.  And you said you saw video.  In what
2  circumstances was this that you witnessed video
3  where someone defended themselves?
4      A.  If I remember correctly, someone had
5  jumped over the counter because they wanted money or
6  whatever.  So that the robber jumped over the
7  counter and physically started pushing our employee,
8  so he defended himself against being pushed.
9      Q.  How did he defend himself?
10     A.  Placed his arms above his face, was
11 backing up, trying to get away from the robber.  In
12 that instance, he backed up enough to where the
13 robber opened up the register and took the money and
14 left.
15     Q.  So what was the -- what was the defense
16 in that video footage?
17     A.  What do you mean defense?
18     Q.  I think you said defense, like he -- how
19 did he defend himself?
20     A.  By placing his arms up and moving back
21 away from the robber.
22     Q.  Okay.  So let me clarify.  You didn't --
23 you don't recall any footage where somebody actually
24 pushed an attacker?
25     A.  Not clear in my mind, no.  It was mainly



Page 38

1   a -- I mean, there may have been once where they
2   defended back after being pushed, but I don't recall
3   specifics. You know, it was a while ago.
4       Q.   Sure. And so then let me go back a
5   little bit to the confront and chase policy.
6           You said defend. What conduct can
7   an employee engage in to defend themselves under the
8   confront and chase policy?
9       A.   They could try to be safe, so defend
10  themselves by running, hiding, going to the office
11  and locking them self in the office. You know, if
12  there were physical contact, then they could defend
13  themselves from against any physical contact to
14  break away, to get away from the robber.
15      Q.   Could an employee, if there was physical
16  contact, push the robber away?
17      A.   If there was -- if it was the robber came
18  after them first, absolutely, that's defense.
19      Q.   How about could the employee shout at the
20  robber and tell them to go away or leave them alone?
21      A.   Yes, to a point. If it was a where the
22  robber had confronted them, shouting at them first,
23  they could tell them, you know, stay away from me,
24  put their arms up, back up, but not put their hands
25  on that robber, or just step away.

Page 39

1       Q.   Were employees -- were you trained at all
2   in your role as HR manager on kind of when
3   self-defense is appropriate under the confront and
4   chase policy?
5       A.   I don't recall.
6       Q.   You don't recall being trained on that?
7       A.   No.
8       Q.   Do you know if employees were trained at
9   all on when self-defense was acceptable under the
10  confront and chase policy?
11      A.   I don't know. That wasn't my area to
12  train for that.
13      Q.   Did you receive any training when you
14  were a multi-unit store manager on when it was
15  appropriate to engage in self-defense under the
16  confront and chase policy?
17      A.   No.
18      Q.   Do you know if employees were ever told
19  that they were not -- that they were prohibited from
20  telling a robber to leave them alone if they were
21  being robbed?
22      A.   No.
23      Q.   Do you know if employees were trained at
24  all as to when physical self-defense was appropriate
25  or not under the confront and chase policy?

Page 40

1       A.   No.
2       Q.   Are there any circumstances where you
3   think physical self-defense would have been
4   appropriate under the confront and chase policy?
5       A.   I don't know. It would depend on the
6   particular situation.
7       Q.   Yeah, I think that's what I'm asking. Is
8   there any situation where you, as the HR manager,
9   would have thought it was appropriate for there to
10  be physical self-defense under the confront and
11  chase policy?
12      A.   In my head, yes.
13      Q.   Could you describe that for us, please?
14      A.   If the robber or attacker actually
15  physically touched them first, they can, you know,
16  push back to get away from that robber or person.
17      Q.   What if they thought the robber was about
18  to physically touch or attack them?
19      A.   I don't know. I mean, I don't know.
20      Q.   What if like the attacker lunged at them
21  and they thought they were about to be attacked,
22  could they push back under the confront and chase
23  policy?
24      A.   I believe so.
25      Q.   Does the confront and chase policy, in

Page 41

1   terms of what self-defense is allowed, vary from
2   state to state?
3       A.   No.
4       Q.   Does it take into account any state laws
5   on self-defense, rights to self-defense?
6       A.   I'm unaware of each of those state laws
7   anymore, so I don't know.
8       Q.   But when you were there as the HR
9   manager, do you know if the confront and chase
10  policy attempted to comply with state laws about
11  self-defense?
12      A.   I don't know if they did or not.
13      Q.   Was there any variation at all in the
14  policy by state --
15      A.   No.
16      Q.   -- that you oversaw?
17      A.   No.
18      Q.   Were you at all, you know, made aware,
19  for example, of Colorado's laws with respect to
20  rights to self-defense when you were the HR manager
21  at Circle K?
22      A.   No.
23      Q.   And so you didn't have that information
24  before reviewing any of the video footage or
25  approving any terminations?



Page 70

1  want to ask you, do you know who Mary Ann Moreno is?
2      A.   I know of the name, not of the individual
3  person.
4      Q.   Okay.  Have you ever met Mary Ann Moreno
5  in person?
6      A.   No.
7      Q.   How do you know Mary Ann Moreno's name?
8      A.   From the video and just from being that
9  employee.
10     Q.   Do you recall Ms. Moreno's termination?
11     A.   Bits and pieces.
12     Q.   Okay.  Tell me what you recall about her
13  termination.
14     A.   I just remember the reviewing of the
15  video and having a conversation with Driss
16  regarding her termination and why we're terminating
17  and then approving that termination.
18     Q.   So let me get the order right.  So you
19  remember reviewing video before you talked to -- let
20  me back up.  Scratch that.
21          Who's Driss?
22     A.   Who's Driss?  Is that the question?
23     Q.   Yes.
24     A.   He was the market manager that was one of
25  the supervisors for Ms. Moreno.

Page 71

1      Q.   And did you review the video before you
2  spoke to Driss or after?
3      A.   I don't recall.
4      Q.   And you recall approving Ms. Moreno's
5  termination?
6      A.   Yes.
7      Q.   And I think you testified earlier that
8  you have approved every termination.  Your role is
9  mostly to make sure there's proper documentation?
10     A.   Correct.
11     Q.   All right.  Why was Ms. Moreno
12  terminated?
13     A.   Are you asking why was she terminated or
14  why --
15     Q.   Yes.  Why?
16     A.   For the confront and chase policy.
17     Q.   For a violation of the confront and chase
18  policy?
19     A.   Yes.
20     Q.   Did you have any other information about
21  Ms. Moreno's career at Circle K at the time you
22  approved her termination?
23     A.   I had access to prior counselings and her
24  bio as far as her profile in the HRIS system, but it
25  did not -- it didn't matter in the one instance that

Page 72

1  we were looking at at that time.
2      Q.   So were any -- was any other -- was any
3  other facts of her employment considered by you at
4  the time you approved the termination?
5      A.   No.
6      Q.   The sole and only reason Ms. Moreno was
7  terminated is for allegedly violating the confront
8  and chase policy?
9      A.   Correct.
10     Q.   And do you recall that Ms. Moreno was a
11  long-term employee at Circle K?
12     A.   I don't recall.
13     Q.   Was there a lot of turnover for store
14  employees at Circle K?
15     A.   Yes.
16     Q.   How would you describe the turnover
17  rates?
18     A.   The turnover rate was over 200 while I
19  was there.
20     Q.   Over 200 employees left?
21     A.   Every year.
22     Q.   Every year?
23     A.   It was a -- the turnover percent was over
24  200 percent turnover.
25     Q.   And that's in your whole region?

Page 73

1      A.   Yes.
2      Q.   And what do you recall -- well, I think I
3  asked you this, but now I can't remember.
4          Do you remember seeing the video
5  footage first or speaking with Mr. Aamoud first,
6  Driss Aamoud --
7      A.   I don't recall.
8      Q.   -- the order?
9      A.   Which one, which order it was in.
10     Q.   Okay.  So tell me all the conversations
11  you recall having with Mr. Aamoud about Ms. Moreno's
12  termination.
13     A.   It would have been that time anyway,
14  after I had reviewed the call and every -- or the
15  video and had a conversation, I would have told him,
16  you know, based on the video review, we have come to
17  a consensus that we need to terminate based on the
18  confront and chase.
19     Q.   Can I just ask, because you used the word
20  "would."
21          Do you remember the actual
22  conversation, or you're assuming that's what you
23  would have said?
24     A.   It is the conversation that I always had
25  with market managers when there -- when it was these



---

Page 74

1  kind of circumstances.
2  Q.   But you don't recall the specific
3  conversation with Mr. Aamoud?  You just think --
4  A.   Yeah.
5  Q.   -- it was the same template as it usually
6  was in these situations?
7  A.   Yeah.  It's the same verbiage I use, but
8  I don't remember him specifically.
9  Q.   Yeah.  You beat me to the punch there.
10      Do you recall anything he said to
11  you from this conversation?  And how many
12  conversations were there -- let me back up -- that
13  you recall?
14  A.   I don't know how many conversations.  But
15  one poignant one was the termination.  There could
16  have been others, but I don't recall.
17  Q.   Okay.  So do you remember anything at all
18  that Mr. Aamoud told you when you were discussing
19  Ms. Moreno's termination?
20  A.   No.
21  Q.   Do you recall anything you said to him
22  specifically, not generally what you said in these
23  situations?
24  A.   Not specifically.
25  Q.   Did Mr. Aamoud tell you that he did not

Page 75

1  think that the individual who attacked Ms. Moreno
2  had a knife?
3  A.   I -- I knew nothing about a knife.
4  Q.   You knew nothing about a knife?
5  A.   No.
6  Q.   Okay.  What do you recall when you saw
7  the video footage?
8  A.   I recalled that the guy was asking for
9  cigarettes and he ended up coming around the
10  counter, and she grabbed him instead of backing up
11  out of the way.  And as soon as she touched him,
12  that was violation of the policy.
13  Q.   Do you remember where she was standing in
14  the video footage?
15  A.   In front of the register.
16  Q.   Do you recall how much space she had to
17  maneuver behind -- behind the counter?
18  A.   Yeah.  The whole other register area for
19  register 1 or 2, whichever one it was, she had that
20  whole other area to be able to step back into.
21  Q.   What else do you recall about the video
22  footage?
23  A.   That the guy, after he went to go and
24  grab the cigarettes -- whether or not he got them or
25  not, I don't recall at this time -- ended up just

Page 76

1  walking out the door.  That's what I recalled at the
2  time.
3  Q.   And you were not made aware of the fact
4  that the individual who attacked Ms. Moreno had a --
5  had a knife or more than one knife?
6  A.   No.
7  Q.   Mr. Aamoud did not tell you that?
8  A.   No, not that I recall.
9  Q.   All right.  What else do you remember
10  about Ms. Moreno's termination?
11  A.   Nothing.
12  Q.   Did you do an investigation?
13  A.   I reviewed video as my investigation,
14  along with my director and our loss prevention
15  manager.
16  Q.   Who is the director?  Who was -- what's
17  the name of the director?
18  A.   Robert Sway.
19  Q.   Okay.  And who was the loss prevention
20  individual?
21  A.   Patrick Bresnahan.
22  Q.   What do you recall discussing with them?
23  A.   The video and what we saw individually.
24  Q.   And what did Robert -- I'm sorry, I know
25  you mentioned him a number of times -- Meadia?  What

Page 77

1  was his last name?
2  A.   Robert Sway?
3  Q.   Sway.  Sorry.
4      What did Mr. Sway say?
5  A.   I believe we -- I believe, I don't know
6  for sure.  I believe that we just talked about our
7  vision of what we saw during the video, which we did
8  for all of the videos that all of us would talk
9  about, to come up with the right direction and if
10  any policies had been violated.  So I don't know
11  directly what he had said during our conversation,
12  but the outcome of that conversation was that we
13  agreed that she should be terminated due to the code
14  of conduct -- or not code of conduct, but the
15  confront and chase policy.
16  Q.   And what role did Patrick Bresnahan, I
17  believe you said his name was, for loss prevention,
18  what role did he have?
19  A.   He also watched the video, and he was a
20  third party to that conversation.
21  Q.   Do you recall what he said?
22  A.   Not individually.  Just the outcome from
23  that conversation was to terminate.
24  Q.   Did anyone at all in this conversation
25  talk about the possibility of self-defense?  Did

MAGNA
LEGAL SERVICES

Page 78

1 that phrase ever come up?
2    A. I don't know.
3    Q. It may have? It may not have?
4    A. It may have. It may not have. I don't
5 know. We had many conversations regarding videos
6 that we had watched on instances like this, so I
7 don't remember this specific instance.
8    Q. So is this a situation where you're
9 assuming that that's the conversation you would have
10 had because that's the one you typically had, but
11 you don't have a specific memory?
12    A. Correct.
13    Q. Did you discuss the video footage with
14 anyone else?
15    A. Not that I recall.
16    Q. Did you interview any store employees at
17 the Circle K store where Mary Ann Moreno worked?
18    A. No, not that I recall.
19    Q. Did you do anything else to investigate,
20 other than review the video footage?
21    A. Every time there was a robbery, I would
22 get notified if any money was taken, what
23 merchandise was taken, so that it could be added to
24 whatever report was out there that I would report to
25 my director.

Page 79

1    Q. Anything else you specifically
2 remember -- well, let me scratch of that.
3        Anyone else you remember you might
4 have spoken to about Ms. Moreno's termination?
5    A. Our executive director VP maybe, because
6 it would all depend on the circumstances. Sometimes
7 he was notified not necessarily by me, but by my
8 director, Robert Sway.
9    Q. But you don't know if you did or didn't
10 in this situation?
11    A. I do not know.
12    Q. And did you make any effort to contact
13 Ms. Moreno?
14    A. I don't recall, but usually no.
15    Q. Anything else you remember about
16 Ms. Moreno's termination?
17    A. No.
18    Q. Were you made aware at any point in time
19 of the fact that the individual who attacked
20 Ms. Moreno that night at the Circle K store was
21 prosecuted?
22    A. I was not aware.
23    Q. Is this the first time you're hearing
24 that?
25    A. Yes.

Page 80

1    Q. So you'd be surprised to know that he's
2 in prison?
3    A. Yes.
4    Q. Would that have changed your assessment
5 at all of whether Ms. Moreno deserved to be
6 terminated for what happened?
7    A. No.
8    Q. Why not?
9    A. Because it's an individual,
10 one-moment-in-time situation. And during that
11 situation, I wouldn't change my mind as to the
12 outcome, regardless of the past history of either of
13 them. Longevity in the job or -- you know, I don't
14 know who that robber is, so we take the snapshot in
15 time, and this is what happened for that situation.
16    Q. Sure. But sitting here today, knowing
17 that he had two knives and was prosecuted for that,
18 would that have changed your opinion back then on
19 whether Ms. Moreno violated the confront and chase
20 policy?
21    A. No.
22    Q. Were you ever provided any training at
23 all on, like, victims' rights statutes?
24    A. No.
25    Q. Do you know if the confront and chase

Page 81

1 policy conformed with any state laws regarding
2 victims' rights?
3    A. I do not know.
4    Q. Did you speak to Love Jorgensen at all
5 about the armed attack on Ms. Moreno?
6    A. Not that I'm aware of.
7    Q. Any of the other store employees that she
8 worked with?
9    A. Not that I'm aware.
10    Q. Just Mr. Aamoud.
11    A. Correct.
12    Q. And is he the one who initiated
13 communication with you about terminating Ms. Moreno,
14 or is it the other way around?
15    A. I don't recall the certain circumstance.
16    Q. This is the only chance I have to ask
17 you, but is there anything else that you remember
18 about Ms. Moreno's termination?
19    A. No. I think it was pretty common, as far
20 as when that termination came through, as a normal
21 termination with that result.
22    Q. And you've -- well, while you were HR
23 manager, you approved every termination that came to
24 you for any reason?
25    A. From our stores.

MAGNA
LEGAL SERVICES

# Exhibit 8

# *CONFRONT & CHASE POLICY*
## We want you to always have a safe and enjoyable working experience with Circle K and especially during any special events and holiday weekends.

### So please remember the
## "<u>Don't Chase or Confront Policy</u>"

**Do not confront follow, pursue, track, chase, fight or follow [inside and/or outside] any person[s] suspected of shoplifting products and/or cash from the site, beer runs or any other confrontational situation.**

If you observe theft at the site, wait until the person(s) leave the site and call the police immediately. Remember to try to obtain as much information about the person(s) as possible while maintaining a safe position behind the sales counter. Do not go outside after the person(s), if there is any reason you need to go outside for you are to wait at least 5 minutes and have called the police department and verbally spoke to the Store Manager or Market Manager.

At no time do you come from behind the counter, go to or out the doors to attempt to get additional information. If you can safely obtain information from where you are standing that will be sufficient. Stay where you are or go to a safer area in the back of the store. Do not approach the front doors or go out them. Call 9-1-1 immediately.

At no time do you stop, question or accuse a person(s) of theft.

At no time do you get into a verbal altercation with any customer and/or person(s) you suspect of theft. At no time are you to go outside after dark! Sun down to sun up!

## <u>*This policy is for your protection and for the safety of everyone!*</u>

If you have any questions or issues, please refer to the 5-Minute Rule of communication or your MM. **<u>Never talk to the media</u>** or answer any questions on the immediate situation or any others.
## <u>FAILURE TO FOLLOW THE "DON'T CHASE or CONFRONT POLICY" WILL RESULT IN IMMEDIATE TERMINATION</u>



Confidential

# Exhibit 9

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:22-cv-02327-NYW-STV

MARY ANN MORENO,

        Plaintiff,

v.

CIRCLE K STORES, INC.,

        Defendant.

---

**FIRST AMENDED COMPLAINT AND JURY DEMAND**

---

Plaintiff Mary Ann Moreno, by and through her attorneys ~~Nicholas A. Lutz~~Virginia Hill Butler and Iris Halpern of RATHOD | MOHAMEDBHAI LLC, respectfully alleges for her First Amended Complaint and Jury Demand as follows:

### I.      NATURE OF THE CLAIMS

Plaintiff Mary Ann Moreno ("Ms. Moreno") alleges that Defendant Circle K, Inc. ("Defendant") wrongfully and outrageously terminated her employment after she exercised her right to self-defense and self-preservation during an armed robbery while at work.

### II.      PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff Mary Ann Moreno was and is a resident of the State of Colorado and is domiciled in Adams County.

1

2.      At all relevant times, Defendant Circle K, Inc., was and is a business entity incorporated under the laws of the State of Colorado, doing business in the Adams County, Colorado.

3.      This Court has jurisdiction over this matter pursuant to C.R.S. § 13-1-124.

4.      Venue is proper pursuant to C.R.C.P. 98(c), as the allegations contained herein occurred within Adams County.

### III.      **FACTUAL ALLEGATIONS**

5.      Plaintiff Mary Ann Moreno is the mother of two children, a son, Brandon Moreno, and a daughter, Olivia Roan. She is currently 74 years of age.

6.      Ms. Moreno raised her children in a loving home in the suburbs of Denver, where, by all accounts, they enjoyed an ordinary and happy childhood.  Both Brandon and Olivia remain close to Ms. Moreno and continue to live in Colorado to this day.

7.      Ms. Moreno maintains an especially close relationship with her daughter-in-law, Bonnie Moreno, whom she often refers to as her "bonus child," as she grew up with Ms. Moreno's children, passing the time on the same playgrounds and streets.

8.      Ms. Moreno has worked hard to support her family throughout her entire life. At just sixteen years old, Ms. Moreno started her first job as a retail cashier in a local shop.

#### _**Ms. Moreno's Employment with Defendant Circle K, Inc.**_

9.      For most of sixteen years, Ms. Moreno was employed as a cashier for Circle K Sheridan, located at 9489 Sheridan Boulevard in Westminster, Colorado.

10.      In her time with Circle K, Ms. Moreno was perpetually hard working and dedicated to her job.

11.     As an employee, Ms. Moreno was timely, efficient, and attentive to her customers and the store.

12.     Though her official title was that of "cashier," Ms. Moreno attended to almost all of the day-to-day duties required to operate the store.

13.     Among these, she operated the register, restocked products, cleaned and sanitized the store area and restrooms, assisted customers with operating the fuel pumps, and generally maintained the premises.

14.     Ms. Moreno rarely hesitated to cover shifts for other employees, and she was asked to do so on a regular basis.

15.     In fact, it was not uncommon for Ms. Moreno to miss family events such as holidays and birthdays in order to cover shifts at Circle K Sheridan.

16.     Ms. Moreno also acted as a de facto store manager, though she retained the title and hourly pay of a cashier.  By all accounts, she frequently ran the store single-handedly.

17.     Despite the fact that Circle K's Sheridan store was located in a relatively high-crime area, Ms. Moreno was often called upon by Circle K to work the store alone, without the assistance of another employee or manager, including during night shifts.

18.     Throughout her incredibly long tenure – nearly sixteen years – with Circle K, Ms. Moreno was never disciplined nor given a negative performance review.

19.     Ms. Moreno's dedication to her job and to Circle K was never merely financial. At the time Circle K terminated her, the company was paying her $14.05 per hour.

### ***Ms. Moreno was Attacked by a Knife-Wielding Assailant During an Armed Robbery***

20.        On October 4, 2020, Ms. Moreno worked her usual evening shift at Circle K Sheridan. She was 72 years old at the time.

21.        As was often the case, Ms. Moreno was the only employee scheduled to work that evening.

22.        Ms. Moreno acted as the cashier and otherwise supervised the store. She restocked products, cleaned and sanitized where needed, and assisted her customers with their business.

23.        At approximately 7:00 p.m., while Ms. Moreno stood alone behind the front counter, a man walked through the front door of the store.

24.        Ms. Moreno immediately noticed that the man appeared disheveled and was not behaving normally.

25.        The man advanced towards the front of the counter as Ms. Moreno stood behind it.

26.        Ms. Moreno immediately noticed that the man was carrying two large hunting knives in his hands.

27.        Ms. Moreno called out to the man that he could not bring knives into the store.

28.        The man ignored Ms. Moreno and approached the counter.

29.        The man then demanded a pack of cigarettes.  Ms. Moreno asked the man which brand he would like, and then retrieved the cigarettes from the display case behind her.

30.        As Ms. Moreno began to ring up the man's apparent purchase, the man told Ms. Moreno words to the effect of, "just give them to me for free."

31.     Ms. Moreno replied that she could not give the man the cigarettes for free because she did not own the store and could lose her job.

32.     The man then became visibly upset and began to leave the store.

33.     As he left, however, he abruptly changed directions and came back toward Ms. Moreno from the side and rear of the counter.

34.     Ms. Moreno exclaimed to the man, "Don't come back here!" referring to the closed area behind the counter in which she was standing.

35.     However, the man proceeded towards Ms. Moreno and the display case containing the store's tobacco products.

36.     As the man was blocking Ms. Moreno's only avenue of escape from the closed area behind the counter, she was unable to flee.

37.     The man moved towards Ms. Moreno and well within reaching distance of her, still holding the knives.

38.     Nearing closer to Ms. Moreno, the man then suddenly reached his arm out past her for a pack of cigarettes in the display case the two were standing directly adjacent to.

39.     Ms. Moreno instinctively reached out towards the man to protect herself and prevent the man from coming closer toward her and the merchandise.

40.     Ms. Moreno was terrified for her life as she genuinely believed that the man was going to attempt to stab or otherwise harm her.

41.     She had no means of escape from the area.  Nor did she have any idea what the man intended to do after invading the small area that she was trapped in.

42.     Fortunately, after grabbing the cigarettes from the display case, the man rushed out of the store.

43.     At least one customer witnessed the robbery and called the Westminster Police Department.  Several more customers entered the store in the moments immediately following the robbery.

### *Police Arrived at the Scene Shortly After the Assailant's Departure*

44.     After the assailant had fled the store, Ms. Moreno picked up the phone and began calling other Circle K employees to notify them about the robbery and ask for help.

45.     Several customers remained at the store and tried to comfort Ms. Moreno.

46.     Officers from the Westminster Police Department arrived a short time after the assailant had fled the store.

47.     The officers contacted Ms. Moreno immediately after they arrived and asked her to provide a statement.

48.     Ms. Moreno was incredibly distraught while speaking with the officers.

49.     Ms. Moreno was crying and struggling to concentrate when giving her account of the incident.

50.     Ms. Moreno was obviously and apparently in extreme distress.

51.     Ms. Moreno told officers what had happened and how scared she was when the assailant started walking towards her with the knives.

52.     Despite the fact that Ms. Moreno had reached out to multiple Circle K employees so that she could be relieved of her shift, none immediately responded.  Ms. Moreno was forced to continue working.

53.      Indeed, Ms. Moreno called at least three Circle K Sheridan managers for assistance, none of whom agreed to provide immediate help nor demonstrated any genuine concern for Ms. Moreno's well-being.

54.      Ms. Moreno called her daughter-in-law, Bonnie Moreno, to tell her the news of the robbery. Bonnie Moreno arrived at the store shortly after to comfort Ms. Moreno while she waited for another Circle K employee to arrive.

55.      Store Manager Love Jorgensen and Circle K District Manager Dris Armand arrived at the store later in the evening.

56.      Mr. Armand immediately began interrogating Ms. Moreno about the armed robbery.

57.      Mr. Armand then went to the back office in Circle K Sheridan.

58.      Mr. Armand turned his attention to the security module to watch surveillance from the time of the robbery.

59.      The surveillance footage captured the armed robbery from many different angles.

60.      Mr. Armand became upset with Ms. Moreno and insisted to her that the surveillance footage did not depict a robbery and that the apparent thief had not actually been armed.

61.      Mr. Armand told Ms. Moreno that Circle K Sheridan would be investigating the incident due to her "push[ing] [the assailant]" away when the assailant approached her in a threatening manner while armed with a knife.

62.     Mr. Armand also demanded that Ms. Moreno's daughter-in-law leave the store "for [her] own safety."

63.     Ms. Moreno's daughter-in-law was forced to exit the store.

### *Ms. Moreno was Fired Two Days After Being Robbed at Knifepoint*

64.     The day after the robbery, Ms. Moreno called Ms. Jorgensen to inquire about her schedule for the following week.

65.     Ms. Jorgensen informed Ms. Moreno she needed to call Mr. Armand to discuss her schedule.

66.     Ms. Moreno then called Mr. Armand.  However, Mr. Armand refused to discuss Ms. Moreno's schedule, citing the fact Ms. Moreno was purportedly still under investigation as a result of the robbery.

67.     Ms. Moreno asked why she was under investigation and Mr. Armand responded with words to the effect of, "You know what you did wrong."

68.     Mr. Armand continued to dismiss Ms. Moreno's confusion and place blame on her for being attacked at work.

69.     Mr. Armand relentlessly insisted that Ms. Moreno apologize for "her behavior."

70.     However, Ms. Moreno refused to apologize for having been the victim of a crime.

71.     Mr. Armand abruptly ended the conversation after becoming frustrated and told Ms. Moreno to call him the following day.

72.     As instructed, Ms. Moreno called Mr. Armand the next day.

73.      Mr. Armand told Ms. Moreno that Circle K Sheridan was terminating her employment, effective immediately.

### *The Assailant Was Identified and Arrested by the Westminster Police Department*

74.      The Westminster Police Department identified and arrested Tyler Darren Wimmer as Ms. Moreno's assailant.

75.      Mr. Wimmer was charged with multiple felonies, including aggravated robbery and menacing with a deadly weapon.

76.      While his criminal case was pending, Mr. Wimmer was deemed incompetent to participate in the proceedings or assist with his own defense.  As such, he was sent to a medical treatment facility to be rehabilitated.

77.      Mr. Wimmer's mental state provides evidence for why Ms. Moreno reasonably believed he would attempt to stab her based on his erratic behavior.

### *The Robbery and Termination from Circle K Caused Ms. Moreno Emotional Distress*

78.      Ms. Moreno has experienced devastating effects as a result of being terminated through no fault of her own after nearly two decades of work at Circle K.

79.      Ms. Moreno is experiencing symptoms of anxiety such as inability to focus and forgetfulness, and she is often unable to sit still.

80.      Since her termination, Ms. Moreno has become isolated from her friends and family.

81.     Ms. Moreno's grandchildren have noticed that Ms. Moreno has begun swiftly and severely deteriorating, both mentally and emotionally, since Circle K terminated her employment.

82.     When Circle K terminated Ms. Moreno, if effectively severed her closest ties to her community, her most significant social sphere, and ultimately, her sense of purpose and direction.

83.     Since Circle K terminated her employment, Ms. Moreno has been forced to seek regular psychological counseling for the first time in her life.

84.     Though she has since found another cashier position with a different company, Ms. Moreno still panics while working at her new cashier position.

85.     She also fears for the security of her job and primary income, which she feels could be jeopardized at any time through no fault of her own.

86.     Ms. Moreno is also fearful of conversations and ordinary interactions with her supervisors, as she feels she might be terminated at any time.

### *Circle K's Termination of Ms. Moreno Caused Her Substantial Economic Loss*

87.     Though Ms. Moreno is now successfully reemployed, she is earning far less than she earned in her position with Circle K.

88.     Ms. Moreno's new position also offers far less generous benefits than she was entitled to while employed with Circle K, causing her to incur substantial out-of-pocket costs for services that were previously covered by insurance.

89.     Ms. Moreno's new position does not offer her a pension, which was a significant financial benefit attending her position at Circle K.

## IV.     <u>CLAIMS FOR RELIEF</u>

### FIRST CLAIM FOR RELIEF

#### Wrongful Discharge in Violation of Public Policy

90.     Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

91.     Defendant terminated Ms. Moreno in violation of public policy as set forth under Colorado common law.

92.     The essence of the public-policy exception to at-will employment status is that an employee has a cognizable claim for wrongful discharge if the employee contravenes a clear mandate of public policy. *Martin Marietta Corp. v. Lorenz*, 823 P.2d 100, 107 (Colo. 1992).

93.     Claims for wrongful discharge under Colorado's public-policy exception have included termination of employee for (1) refusal to participate in illegal activity; (2) the employee's refusal to forsake the performance of an important public duty or obligation; (3) the employee's refusal to forego the exercise of a job-related legal right or privilege; (4) the employee's whistle blowing activity or other conduct exposing the employer's wrongdoing; and (5) the employee's performance of an act that public policy would encourage under circumstances where retaliatory discharge is supported by evidence of employer's bad faith, malice, or retaliation. *Lorenz*, 823 P.2d at 107.

94.     The public policy at issue must be clearly mandated such that the acceptable behavior is concrete and discernible, as opposed to a broad hortatory statement of policy that gives

little direction as to the bounds of proper behavior. *Rocky Mountain Hosp. and Medical Service v. Mariani*, 916 P.2d 519, 525 (Colo.1996). Colorado courts have held that expressions of public policy are readily found in statutes, common law, and the state constitution. *Id.*; *Slaughter v. John Elway Dodge Sw./AutoNation*, 107 P.3d 1165, 1169 (Colo. App. 2005) (considering Colorado constitution as a source of public policy). From such sources, it is clear that Colorado has long recognized the right of self-defense and self-preservation as an essential public policy.

95.     It is also equally clear that Colorado has recognized the rights of victims and witnesses to report and testify about crimes. Hence, in C.R.S. § 18-8-706, state statute makes it unlawful for an individual to commit retaliation or anticipatory retaliation a victim or witness of crime. Likewise, C.R.S. §24-4.1-303 requires "all reasonable attempts shall be made to protect any victim...from harm, harassment, intimidation, or retaliation arising from cooperating in the reporting, investigation, and prosecution of a crime." Such law further states that "[a]n employer may not discharge or discipline any victim...for participating in the preparation of a criminal proceeding." From such sources, a victim's right to report a crime and participate in its investigation and prosecution are recognized as an essential public policy.

**Examples of Sources of Public Policy**

96.     According to Article II, § 3 of the Colorado Constitution, "All persons have certain natural, essential and inalienable rights, among which may be reckoned the right of enjoying and defending their lives . . . and of seeking and obtaining their safety and happiness."

97.     Similarly, the Colorado Constitution also recognizes self-defense as one of the bases for Colorado's right to bear arms. Colo. Const. Art. II § 13 ("The right of no person to keep

12

and bear arms in defense of his home, person and property . . . shall be called in question."). Following the ratification of the state constitution, the common law right of self-defense was recognized by Colorado courts as early as 1886. *See Kent v. People*, 8 Colo. 563 (1886); *Ritchey v. People*, 23 Colo. 314 (1896) (recognizing the common law right to self-defense and its limitation via the "retreat to the wall" doctrine).

98.     Today, the right to self-defense is also codified in Colorado's criminal code. *See* C.R.S. § 18-1-704. According to the self-defense statute, a person shall not be held criminally liable for using physical force against another person "in order to defend himself or a third person from what he reasonably believes to be the use or imminent use of unlawful physical force by that other person." *Id.*

99.     Because the right to self-defense is enshrined in the Colorado constitution, has been long recognized in Colorado's common law, and is written into the Colorado Criminal Code, it is a source of public policy sufficient to support Ms. Moreno's wrongful discharge claim.

100.    Ms. Moreno's wrongful discharge claim is also simultaneously grounded in her rights as a victim and witness of a crime, including her rights to report a crime and to participate in the investigation and prosecution of the crime, free from retaliation by her employer or anyone else, in accordance with C.R.S. § 18-8-706, C.R.S. §24-4.1-303, and other statutes, common law, and other sources of public policy as recognized by the courts.

101.    Ms. Moreno was the only employee working during the incident which reasonably resulted in her fear of harm with no aid nearby.

102.    Ms. Moreno raised up her arm to defend and protect herself from the attacker who had two knives and had aggressively approached and reached toward her.

103.    In raising up her arm, Ms. Moreno made contact with the attacker.

104.    After making contact with the attacker in attempt to move him away from her and the merchandise, Ms. Moreno immediately moved backwards away from the attacker.

105.    The attacker left the Circle K store unharmed and with the cigarettes he intended to steal.

106.    All of the above events were visible and apparent from Circle K's surveillance camera footage.

107.    Circle K was aware that Ms. Moreno was acting in self-defense and/or self-preservation at the time she reached toward her assailant.

108.    By terminating Ms. Moreno for reporting the fact that she was a victim of a violent crime to her managers and for instinctively defending herself against an armed attacker while working alone in a closed space, Circle K violated the public-policy exception to Colorado's at-will employment doctrine.

109.    As a direct result of Defendant's actions, Ms. Moreno has suffered significant injuries, damages, and losses to be determined at trial.

110.    Defendant's conduct described herein was attended by circumstances of fraud, malice, or willful and wanton conduct, such that Ms. Moreno notifies Defendant now that she intends to move for exemplary damages pursuant to C.R.S. § 13-21-102.

### SECOND CLAIM FOR RELIEF

### Intentional Infliction of Emotional Distress and/or Outrageous Conduct

111.    Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

112.     In Colorado, the elements of outrageous conduct are: (1) the defendant engaged in extreme and outrageous conduct, (2) recklessly or with the intent of causing the plaintiff severe emotional distress, and (3) causing the plaintiff severe emotional distress.  *See Archer v. Farmer Bros. Co.*, 70 P.3d 495, 499 (Colo. App. 2022), *aff'd*, 90 P.3d 228 (Colo. 2004).

113.     Defendant Circle K engaged in extreme and outrageous conduct by terminating Ms. Moreno because she was the victim of multiple felonies in the workplace and because she engaged in protected activity by defending herself from potentially severe bodily harm in the workplace.

114.     Ms. Moreno did not provoke the violence against her in any way.  Rather, she reacted to an armed robber in an instinctual manner to protect her safety.

115.     Defendant Circle K engaged in extreme and outrageous conduct by terminating Ms. Moreno for exercising her right to self-defense.

116.     Defendant Circle K engaged in extreme and outrageous conduct by terminating Ms. Moreno for reporting the act of criminal violence perpetuated against her on the job to her managers, and for reporting the attack to the police.

117.     Defendant Circle K further engaged in extreme and outrageous conduct by refusing to timely come to her aid following the armed robbery or assign additional employees to the store, forcing Ms. Moreno to remain at the scene of the crime, alone, for a substantial period of time.

118.     Defendant terminated Ms. Moreno two days after she was the victim of the armed robbery.

119.     Defendant Circle K further engaged in extreme and outrageous conduct when it ordered Ms. Moreno's daughter to leave the store following the armed robbery, depriving Ms. Moreno of her only company and source of comfort.

120.    Through all of the above conduct, Defendant acted recklessly or with the intent of causing Ms. Moreno emotional distress.

121.    Defendant was aware of Ms. Moreno being the victim of an emotionally and psychologically damaging event prior to terminating her for exercising her constitutional right to self-defense.

122.    As a result of her termination following a nearly sixteen-year career with Defendant, Ms. Moreno has since experienced severe anxiety, depression, and isolation.

123.    As a direct result of Defendant's actions, Ms. Moreno has suffered significant injuries, damages, and losses to be determined at trial.

124.    Defendant's conduct described herein was attended by circumstances of fraud, malice, or willful and wanton conduct, such that Ms. Moreno notifies Defendant now that she intends to move for exemplary damages pursuant to C.R.S. § 13-21-102.

### V.      **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Mary Ann Moreno respectfully requests that the Court enter judgment for the following relief:

a.   Actual economic damages as established at trial;

b.   Compensatory damages, including, but not limited to those for future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

b.c. Exemplary and/or punitive damages as established at trial;

16

c.d. Pre-judgment and post-judgment interest at the highest lawful rate;

d.e. Appropriate tax-offset, as allowed by law;

e.f. Attorneys' fees and costs, as allowed by law;

f.g. Any other appropriate remedy available under law; and

g.h. Such further relief as justice requires.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE**

DATED: August 12, 2022May 31, 2023

RATHOD | MOHAMEDBHAI LLC

*s/ Nicholas A. LutzVirginia Hill Butler*
Nicholas A. Lutz, #51299Virginia Hill
Butler, #55187
Iris Halpern, #53112
2701 Lawrence Street, Suite 100
Denver, CO 80205
(303) 578-4400
vbnl@rmlawyers.com
ih@rmlawyers.com

ATTORNEYS FOR PLAINTIFF

17

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Case No. 1:22-cv-02327-NYW-STV

MARY ANN MORENO,

    Plaintiff,

v.

CIRCLE K STORES, INC.,

    Defendant.

---

**RESPONSE TO PLAINTIFF'S RENEWED MOTION FOR LEAVE TO AMEND
COMPLAINT TO SEEK EXEMPLARY DAMAGES**

---

Defendant Circle K Stores, Inc. ("Circle K") submits this response to Plaintiff's May 31, 2023 Renewed Motion for Leave to Amend Complaint to Seek Exemplary Damages Remedy [Dkt. 49] ("Motion").

## I.  INTRODUCTION

Moreno's renewed Motion differs significantly from the original. In the first, Moreno argued that she had presented prima facie proof of a triable issue that her termination was attended by circumstances of malice or willful and wanton conduct based on her unique circumstances and Circle K's actions toward her, going so far as to argue that Circle K maliciously terminated her employment. *See* [Dkt. 39] 12–13. In contrast, Moreno now seeks to add punitive damages by omission, arguing that Circle K willfully and wantonly (but not maliciously) ignored her right to self-defense and her rights as a victim when it terminated her employment. *E.g.*, Mot. 1.

Although this is not a motion for summary judgment and the standards are different, Moreno's renewed Motion inevitably implicates both the law and the facts underlying her claims. First, Moreno cannot meet her prima facie burden as to the self-defense theory of the Motion because it fails as a matter of law. As Judge Arguello held in *Donez v. Leprino Foods, Inc.*, No. 19-cv-00285-CMA-NRN, 2020 WL 1914958, at *6-7 (D. Colo. Apr. 20, 2020), Moreno's self-defense sources of authority are insufficient—as a matter of law—to support a public-policy exception to at-will employment in Colorado. There can be no punitive damages without an underlying claim and there certainly is no evidence of willful and wanton conduct when the only authority on the question is the *Donez* case.

Second, the facts do not support Moreno's victims'-rights theory of punitive damages. There is no evidence in the record or before the Court that Moreno was terminated because she was the victim of a crime. For the purposes of this Motion, that necessarily means there is no evidence that Circle K acted willfully and wantonly in doing so. On the contrary, the evidence shows she was terminated for violating Confront and Chase Policy. Or as she put it, "because she pushed the assailant."

Section 13-21-102 requires Moreno to present evidence showing a reasonable likelihood that the issue will ultimately be submitted to the jury for resolution. She fails to carry her prima facie burden as a matter of law and a matter of fact and the renewed Motion should be denied.

## II.   BACKGROUND

Moreno worked at the Circle K convenience store located at 9489 Sheridan Boulevard in Westminster, Colorado. Compl. [Dkt. 3] ¶ 9. Moreno asserts that she was the victim of a robbery, committed by an individual named Tyler Wimmer, while she was working on October 4, 2020.

*Id.* at ¶¶ 20–43, 74. Moreno was terminated shortly after. *Id.* at ¶¶ 64–73. Moreno asserts two

claim claims: (1) wrongful discharge in violation of public policy; and (2) outrageous conduct.

*Id.* at ¶¶ 90–124. Moreno's claim for wrongful discharge in violation of public policy is asserted

under two theories: that Circle K violated Moreno's alleged right to self-defense, and that Circle

K violated Moreno's alleged rights as a victim. *See Id.* at ¶¶ 90–110

Circle K denies Moreno's claims. *See generally* Answer [Dkt. 16]. Plaintiff was

terminated for violating Circle K's Confront and Chase Policy. **Ex. A** – Dep. of Amy Harvey

71:11-19; **Ex. B** – Dep. of Driss Aamoud 139:10-24. Under Circle K's Confront and Chase

Policy, employees are prohibited from following, pursuing, tracking, chasing, fighting, or

following any person suspected of shoplifting products or any other confrontational situation.

Circle K strictly enforces its Confront and Chase Policy and violations of the policy result in

immediate termination. *See* Mot. Ex. 8; Ex. B 103:3–7. The video evidence Moreno submitted

with her Motion demonstrates her pushing and grabbing the robber in violation of the Confront

and Chase policy. *See* Mot. Ex. 3 (6:54:30 to 6:56:30);[1] *accord* Ex. A 75:6–12 ("I recalled that

the guy was asking for cigarettes and he ended up coming around the counter, and she grabbed

him instead of backing up out of the way. And as soon she touched him, that was a violation of

the policy."); Ex. B 86:4–22.

---

[1] Throughout her Motion, Moreno takes several liberties with the facts of the robbery depicted in her Exhibit 3. *See, e.g.*, Mot 2–5. For instance, Moreno states that "Wimmer then became visibly upset," Wimmer "lurched" towards Moreno, and "Ms. Moreno flinched and reached out towards Wimmer to protect herself and prevent him from coming closer toward her and the merchandise, pushing him back." *Id.* at 2–3. That is not what the video shows. In addition, Moreno asserts facts that are not supported by the video, such as that "Ms. Moreno noticed that Wimmer was carrying two large hunting knives in his hands." Of course the video shows nothing of what Moreno did or did not notice. Such color commentary by Moreno should be disregarded.

Moreno acknowledges that Circle K terminated her because she "pushed the assailant." **Ex. C** – Dep. of Mary Ann Moreno 109:14–20. Nevertheless, she believes she was fired for exercising her purported right to self-defense because she did not violate Circle K's policy. *See id.* at 110:17–111:1. Moreno does not believe that she was fired because she called the police, nor does Moreno have any evidence that she was fired for calling the police. *Id.* at 109:21–110:3. Similarly, Moreno testified that she does not believe that she was fired because she was the victim of a crime and that she does not have any evidence that she was fired because she was the victim of a crime. *Id.* at 110:4–12.[2] Regardless of Moreno's substantive errata changes to the contrary, one thing is certain: the record before the Court contains ***no evidence*** that Moreno was terminated because she was the victim of a crime or called the police.

### III.    ARGUMENT

The Motion should be denied because Moreno has failed submit prima facie proof that Circle K willfully and wantonly terminated her employment in violation of a public-policy exception to at-will employment. First, she has not established prima facie proof that she is entitled to punitive damages under her self-defense theory because Colorado law does not recognize self-defense as a public-policy exception to at-will employment. Second, she fails to

---

[2] In her errata sheet, Moreno substantively changed her responses to testify that she does believe she was fired for being a victim of a crime and that she did have evidence she was fired for being a victim of a crime. Ex. C at Errata Sheet. Moreno explained the reason for her change was that she misunderstood the question being asked of her. *Id.* Circle K has not moved to strike the errata sheet because Moreno is not relying on it, but the Court should nevertheless disregard these substantive changes to Moreno's deposition testimony. *Cf.*, *Nyborg v. State Farm Mut. Automobile Ins. Co.*, Civil Action No. 20-cv-01918-RM-KLM, 2021 WL 5014498, at *3–4 (D. Colo. Oct. 28, 2021) (granting motion to strike errata sheet changes to deposition testimony where the only reason provided for the changes was that the deponent misunderstood the question).

set forth prima facie proof under her victim-rights theory because there is no evidence that Circle K terminated her for being the victim of a crime or reporting a crime to the police, much less willfully and wantonly.

**A.     Legal standards.**

A party may seek exemplary damages under § 13-21-102 if the injury complained of is attended by circumstances of fraud, malice, or willful and wanton conduct. Colo. Rev. Stat. § 13-21-102(1)(a). A claim for exemplary damages may not be included in an initial claim for relief; instead, a party seeking exemplary damages must seek to amend their pleading by establishing prima facie proof of a triable issue. Colo. Rev. Stat. § 13-21-102(1.5)(a).

Here, Moreno contends that Circle K willfully and wantonly ignored Moreno's rights under Colorado law. *See* Mot. 1, 8. "Willful and wanton" conduct refers to conduct that is "purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff." Colo. Rev. Stat. § 13-21-102(b).

A plaintiff's prima facie proof of a triable issue, concerning whether a defendant's actions were willful and wanton, must show "a reasonable likelihood that the issue will ultimately be submitted to the jury for resolution." *Graham v. State Farm Mut. Auto. Ins. Co.*, No. 19-CV-00920-REB-NYW, 2020 WL 9720368, at *3 (D. Colo. June 30, 2020), *report and recommendation adopted*, 2021 WL 2092813 (D. Colo. Mar. 31, 2021). While a plaintiff need not submit evidence sufficient to overcome a motion for summary judgment, ***conclusory allegations will not suffice***. *Easton v. Encompass Indemnity Co.*, No. 1:18-cv-02563-STV, 2019 WL 13153692, at *9 (D. Colo. Nov. 8, 2019). Indeed, a prima facie case under § 13-21-102

"requires more than the same accumulation of bad acts that underlie" the plaintiff's claims. *Graham*, 2020 WL 9720368 at *7. Importantly, Moreno must submit evidence establishing Circle K's scienter. See *id.* at *6 ("Plaintiff fails to point to facts that establish a prima facie case of scienter as required for exemplary damages.").

**B.      There is no self-defense exception to at-will employment as a matter of law.**

Moreno cannot possibly present a triable issue of exemplary damages under her self-defense theory because there is no self-defense exception to at-will employment in Colorado to support her public-policy claim. *See* Mot. at 8–9.

"If a claim for punitive damages is based on circumstances for which the law does not impose a duty, there is no cognizable claim." *Hines v. Denver & Rio Grande W. R. Co.*, 829 P.2d 419, 422 (Colo. App. 1991) (citing *Univ. of Denver v. Whitlock*, 744 P.2d 54 (Colo. 1987)). Thus, "punitive damages cannot be awarded without some form of liability having been established against the defendant." *Mince v. Butters*, 616 P.2d 127, 130 n.2 (Colo. 1980) (citations omitted).

The Colorado Supreme Court, has recognized a narrow public-policy exception to at-will employment where:

> 1. … the employer directed the employee to perform an illegal act as part of the employee's work[-]related duties ***or prohibited the employee from performing a public duty or exercising an important job-related right or privilege***;

> 2. … the action directed by the employer would violate a specific statute relating to the public health, safety, or welfare, or would undermine a clearly expressed public policy relating to the employee's basic responsibility as a citizen or the employee's right or privilege as a worker;

> 3. … that the employee was terminated as the result of refusing to perform the act directed by the employer [or as the result of performing a public duty or exercising an important job-related right or privilege]; and

> 4. … the employer was aware, or reasonably should have been aware, that the employee's refusal to comply with the employer's order or directive was based on the employee's reasonable belief that the action ordered by the employer was illegal, contrary to clearly expressed statutory policy relating to the employee's duty as a citizen, or violative of the employee's legal right or privilege as a worker.

*Marietta Corp. v. Lorenz*, 823 P.2d 100, 102 (Colo. 1992) (emphasis added).

To warrant an exception to at-will employment, the statutory, constitutional, or other provision giving rise to the public policy must "be sufficiently concrete to notify employers and employees of the behavior it requires." *Rocky Mountain Hosp. & Med. Serv. v. Mariani*, 916 P.2d 519, 525 (Colo. 1996). The Colorado Supreme Court has cautioned that "[n]ot all potential sources of public policy are of sufficient gravity to outweigh the precepts of at-will employment." *Id.* at 553. It is Moreno's burden to establish that the public-policy exception applies. *Jaynes v. Centura Health Corp.*, 148 P.3d 241, 243 (Colo. App. 2006).

The *Donez* case is instructive and applying the same result here is determinative. In that case, the plaintiff and one of his coworkers got into an altercation that caused the plaintiff to be hospitalized. 2020 WL 1914958 *1. The defendant-employer terminated the plaintiff under its zero-tolerance workplace-violence policy. *Id.* The plaintiff sued, alleging termination in violation of public policy under the theory that the employer "terminated him for acting in self-defense." *Id.* The defendant moved for summary judgment, which Judge Arguello granted as to the plaintiff's claim for wrongful discharge in violation of public policy. *Id.* at *7.

In its analysis, the *Donez* decision began by observing, at the time, "[w]hether a plaintiff may state a public-policy claim for self-defense is a matter of first impression in Colorado." *Id.* at *6. The plaintiff argued, like Moreno does here, the Colorado Constitution and various ***criminal*** statutes established a public policy in favor of self-defense that is strong enough to

create an exception to at-will employment. *Id.* & n.6. Judge Arguello held that the plaintiff's authorities were insufficiently specific to "produce a public policy exception." *Id.* at *7.

What was a matter of first impression in *Donez* now has that decision itself as authority. And like that case, Moreno's claim for wrongful termination premised on self-defense fails as a matter of law. Recognizing that the present Motion is not intended to adjudicate the merits of the claim itself, this merits determination is inevitable because Moreno cannot possibly present a prima facie case of willful and wanton conduct based on a claim that does not exist. Moreover, *Donez* was decided in April 2020, before Moreno's October 2020 termination. Circle K could not have willfully and wantonly ignored Moreno's rights when the only authority about self-defense as an exception to at-will employment found it was ***not*** a sufficient basis for a claim.

Because self-defense is not a sufficient basis for a wrongful-discharge claim, Moreno's argument that "ignorance is not a defense" is irrelevant. Mot. 12-13. And the cases Moreno cites in support of the argument are distinguishable because those cases involved clearly defined statutory violations, which is not the case here. *See Crenshaw v. Quarles Drilling Corp.*, 798 F.2d 1345, 1351 (10th Cir. 1986) (holding that an employer's misunderstanding of whether certain employment agreements fell under a statutory exception to overtime requirements under the Fair Labor Standards Act was not a defense to the FLSA's liquidated-damages provision applicable to unpaid overtime compensation); *Doty v. Elias*, 733 F.2d 720, 726 (10th Cir. 1984) (holding that employer's ignorance of the requirement under the FLSA to pay wages as provided by 29 U.S.C. § 203 was not a defense); *Creekmore v. Pomeroy IT Sols., Inc.*, No. No. 10–CV–0091–CVE–PJC, 2010 WL 3702543, at *1 (N.D. Okla. Sept. 16, 2010) (holding that employer's ignorance that an Oklahoma statute specifically prohibited the testing of a drug for which the employer

tested for was not a defense). Moreover, *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 408 F. Supp. 1219 (D. Colo. 1976), is completely inapplicable because it is a trademark case which involved repeated "intentional and deliberate infringement of the plaintiff's trademark." That is not the case here because the alleged right Moreno claims Circle K violated—a self-defense exception to at-will employment—does not exist, unlike trademark rights.

Moreno cannot assert a claim for punitive damages based on her self-defense theory because Circle K cannot be held liable under the theory and it could not have acted willfully and wantonly when the only authority is the *Donez* case.

**C.    There is no evidence that Circle K willfully and wantonly terminated Moreno for being the victim of a crime.**

There is no evidence in the record that Moreno was terminated for being the victim of a crime, much less that Circle K willfully and wantonly terminated her on that basis. To establish prima facie proof that she is entitled to punitive damages on the theory that Circle K violated her rights as a victim of a crime, Moreno must submit ***some evidence*** supporting this claim; conclusory allegations will not suffice. *See Easton*, 2019 WL 13153692 at *9.

Moreno has not and cannot carry that burden. Indeed, in her deposition, Moreno specifically denied that she believed she was terminated for being a victim of a crime or for calling the police and that she had no evidence she had been terminated for either of those reasons. Ex. C 109:21–110:12. Again, Moreno acknowledges that Circle K terminated her because she "pushed the assailant," *id.* at 109:16–20, and Circle K's witnesses testified the reason for her termination was violation of the Confront and Chase Policy. Ex. A 71:11-19; Ex. B 139:10-24. Tellingly, Moreno makes almost no argument that Circle K willfully and wantonly

terminated her for being a victim of a crime and she most certainly does not present evidence showing that was the reason for her termination. *See* Mot. at 8-15.

The evidence before the Court simply does not support this theory. To begin, the declarations of Plaintiff's daughter and daughter-in-law are irrelevant. Her daughter, Olivia Roan, was not present for any of the events that are the subject of Moreno's claims, and her declaration does nothing for Moreno's prima facie burden. [Dkt. 49-2] ¶ 12. Bonnie Moreno's declaration is similarly irrelevant as Plaintiff Moreno's claims relate to the reasons for her termination; Bonnie Moreno does not know, does not profess to know, and would have no way of knowing the reasons or circumstances of the termination. [Dkt. 49-1].

Next, Moreno submits video evidence that she says establishes that she was in fact a victim of a crime. *See* Mot. 2–5; [Dkt. 49–3 & 49-4]. There is no dispute that Moreno was a victim of Wimmer's crime, but this case is about Circle K and the Motion requires more than the same accumulation of bad acts that underlie the claims themselves. *Graham*, 2020 WL 9720368 at *6. And—importantly—the video evidence of the underlying crime says nothing whatsoever about Circle K or its reason for terminating her employment. It does nothing to carry her prima facie burden.

Moreno also submits evidence related to how Circle K enforces its Confront and Chase Policy. Specifically, that Amy Harvey, the Human Resources Manager who approved Moreno's termination, had never denied approval for a termination, and that Driss Aamoud, Moreno's Market Manager, [3] was unaware of any Circle K employee who had physical contact with an

---

[3] At the time she was terminated, Moreno was directly managed by Love Jorgensen, her store manager. Market Manager Driss Aamoud managed Ms. Jorgensen.

individual in a Circle K store that was not terminated. Mot. at 10–11; [Dkt. 49-7] 35:3–7; [Dkt. 49-5] 103:3-7.[4] Whether Harvey and Aamoud applied a zero-tolerance policy to Circle K's Confront and Chase policy is completely irrelevant to whether Moreno was terminated for being a victim of a crime or for calling the police.

Moreno also contends that because there is evidence that Aamoud and Harvey were unaware of whether Circle K's Confront and Chase policy was drafted in compliance with Colorado law on self-defense and victims' rights, Circle K acted willfully and wantonly when it terminated Moreno under its Confront and Chase Policy. *See* Mot at 9–12. But Moreno submits no evidence that either Aamoud or Harvey were ever responsible for drafting or revising Circle K's Confront and Chase policy.

Finally, even if the Court credits the substantive changes of Moreno's errata sheet, the Motion still should be denied. Claiming confusion, Moreno now testifies she believes she was fired because she was the victim of a crime based on, "The way I was fired and what they said to me." But the record before the Court is devoid of any evidence about how Moreno was fired or what anyone said to her. There is nothing even suggesting that the termination was ***because*** she was the victim of a crime.

Without some evidence that she was actually terminated because she was the victim of a crime, Moreno cannot possibly make a prima facie showing that Circle K willfully and wantonly disregarded her rights as a victim.

---

[4] Circle K notes that Moreno's statement that "Circle K terminates every employee who had physical contact with an attacker, no matter the circumstances" is another example of Moreno overstating the facts. Aamoud only testified that he, personally, was unaware of any Circle K employee who had physical contact with an individual who was not fired. [Dkt. 49-5] 103:3–7.

## IV.    CONCLUSION

Amendment under § 13-21-102 may be lenient but is not automatic. Moreno seeks to add exemplary damages based on her "right" to self-defense and her status as the victim of a crime. But Moreno's self-defense theory fails as a matter of law and therefore exemplary damages cannot attach. And Moreno submits no evidence supporting that she was terminated for being a victim of a crime. Section 13-21-102 requires prima facie *evidence* that Circle K's decision in terminating her employment was accompanied by circumstances of fraud, malice, or willful and wanton conduct. Moreno has not carried her burden. The Court should therefore deny Moreno's Motion.

Respectfully submitted this 14th day of June, 2023.

*s/ Thomas W. Carroll*

Thomas W. Carroll
Nicholas Hankins
Littler Mendelson, P.C.
1900 Sixteenth Street, Suite 800
Denver, CO  80202
Telephone: 303.629.6200
Facsimile: 303.629.0200
Email: tcarroll@littler.com
       nhankins@littler.com

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of June, 2023, I electronically filed the foregoing

**RESPONSE TO PLAINTIFF'S RENEWED MOTION FOR LEAVE TO AMEND**

**COMPLAINT TO SEEK EXEMPLARY DAMAGES** using the CM/ECF system, which will

send notification of such filing to the following:

Virginia Butler
Iris Halpern
RATHOD | MOHAMEDBHAI LLC
2701 Lawrence Street, Suite 100
Denver, CO  80205
Telephone: (303) 578-4400
Fax: (303) 578-4401
vb@rmlawyers.com
ih@rmlawyers.com

*Attorneys for Plaintiff*

*s/ Joanna Fox*
Joanna Fox, Legal Secretary

4880-7581-4248.3

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO


Civil Action No. 1:22-cv-02327-NYW-STV

_____

VIDEOCONFERENCE DEPOSITION OF          May 5, 2023

AMY HARVEY

_____

MARY ANN MORENO,

          Plaintiff,

vs.

CIRCLE K. STORES, INC.,

          Defendant.

_____


        The deposition of AMY HARVEY, taken before

Leeann Stellor, a Registered Merit Reporter,

Certified Realtime Reporter, and a Notary Public in

and for the County of Summit and the State of

Colorado, via Zoom videoconference, on Friday,

May 5, 2023, at the hour of 10:04 a.m.



Vol. I - 0136

**EXHIBIT A**

Page 71

1      Q.    And did you review the video before you

2   spoke to Driss or after?

3      A.    I don't recall.

4      Q.    And you recall approving Ms. Moreno's

5   termination?

6      A.    Yes.

7      Q.    And I think you testified earlier that

8   you have approved every termination.  Your role is

9   mostly to make sure there's proper documentation?

10     A.    Correct.

11     Q.    All right.  Why was Ms. Moreno

12  terminated?

13     A.    Are you asking why was she terminated or

14  why --

15     Q.    Yes.  Why?

16     A.    For the confront and chase policy.

17     Q.    For a violation of the confront and chase

18  policy?

19     A.    Yes.

20     Q.    Did you have any other information about

21  Ms. Moreno's career at Circle K at the time you

22  approved her termination?

23     A.    I had access to prior counselings and her

24  bio as far as her profile in the HRIS system, but it

25  did not -- it didn't matter in the one instance that



Page 75

1    think that the individual who attacked Ms. Moreno

2    had a knife?

3         A.    I -- I knew nothing about a knife.

4         Q.    You knew nothing about a knife?

5         A.    No.

6         Q.    Okay.  What do you recall when you saw

7    the video footage?

8         A.    I recalled that the guy was asking for

9    cigarettes and he ended up coming around the

10   counter, and she grabbed him instead of backing up

11   out of the way.  And as soon as she touched him,

12   that was violation of the policy.

13        Q.    Do you remember where she was standing in

14   the video footage?

15        A.    In front of the register.

16        Q.    Do you recall how much space she had to

17   maneuver behind -- behind the counter?

18        A.    Yeah.  The whole other register area for

19   register 1 or 2, whichever one it was, she had that

20   whole other area to be able to step back into.

21        Q.    What else do you recall about the video

22   footage?

23        A.    That the guy, after he went to go and

24   grab the cigarettes -- whether or not he got them or

25   not, I don't recall at this time -- ended up just



Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Case No. 1:22-cv-02327-NYW-STV

_____

MARY ANN MORENO,

Plaintiff,

v.

CIRCLE K STORES, INC.,

Defendant.

_____

DEPOSITION OF DRISS AAMOUD

May 18, 2023

_____

PURSUANT TO NOTICE, the above-entitled deposition was taken on behalf of the Plaintiff at 2701 Lawrence Street, Denver, Colorado 80205, on May 18, 2023, at 10:00 a.m., before Karen S. Fogle, Registered Professional Reporter and Notary Public within Colorado.

MAGNA LEGAL SERVICES

(866) 624-6221

magnals.com



Vol. I - 0139

**EXHIBIT B**

Page 86

1    retreat first?

2              MR. HANKINS:  Object to form.

3         A.  I don't know.

4         Q.  (BY MS. BUTLER)  You think Mary needed to

5    back away from the attacker; is that right?

6              MR. HANKINS:  Object to form.

7         A.  Mary, I think, should not confront, block,

8    obstruct, deny, threaten the robber.  That's what Mary

9    did and that's what she shouldn't have done.

10        Q.  (BY MS. BUTLER)  I'm asking about where she

11   was standing.  You were saying before she should have

12   retreated away from the attacker; is that right?

13        A.  No.  She shouldn't have proceeded to

14   obstruct.  Mary did not stand her ground.  Mary

15   proceeded with the interest to block a robber's path to

16   reach the cigarettes.  In fact, she went as far as

17   pulling him away from grabbing the cigarettes.

18             That's all he wanted.  Mary put herself in

19   danger by actually proceeding away from where she was

20   into the robber's path, blocking him, obstructing him

21   from proceeding to grab cigarettes.  In fact, she even

22   pulled him to do so.

23        Q.  So do you know if Circle K through its

24   policies made any attempt to comply with Colorado laws

25   that say you don't have to retreat?



Page 103

1      Q.   Correct.

2      A.   You can repeat it.

3      Q.   Has there ever been an employee at Circle K

4    that you're aware of who had physical contact with an

5    attacker who was not fired?

6          MR. HANKINS:   Object to form.

7      A.   No.

8      Q.   (BY MS. BUTLER)   I also want to talk about

9    these videos you talked about reviewing where the

10   employee was -- robberies where the employee was

11   screaming or crying and backing away from the attacker.

12   Do you remember that?

13     A.   Yes.

14     Q.   When you were talking about that, that

15   didn't refer to any videos you reviewed at Circle K;

16   correct?

17     A.   Can you ask the question again?

18     Q.   I asked you how many armed robberies there

19   were at Circle K and you said there had been two.

20   Before that you had talked about watching videos where

21   employees had been upset and crying and screaming

22   and -- not beer run robberies, just robberies -- and so

23   I'm trying to see -- those videos you're talking about,

24   those aren't videos while you were working as a manager

25   at Circle K?



Page 139

1          A.   That's when we submitted the paperwork.

2          Q.   Do you remember -- did you tell Ms. Moreno

3     she was fired on the 5th or the 8th?

4          A.   I think before the 8th I told her.  I don't

5     remember.  It was after the 5th but not on the 8th.

6     Before that.

7          Q.   The 8th is the day the paperwork got

8     finalized?

9          A.   Yes.

10         Q.   Do you see a column that says comment?

11         A.   Yes.

12         Q.   It says "Driss Aamoud: Employee was

13    engaging and pulling a burglar from his back, putting

14    her safety at risk.  It is a violation of the company

15    policy."

16         A.   Correct.

17         Q.   Is that an accurate representation of why

18    you recommended her termination?

19         A.   Yes.

20         Q.   Is this what you told your supervisors?

21         A.   Yes.  Along with other things.

22         Q.   Is this -- do you believe this is why

23    Ms. Moreno was terminated?

24         A.   Correct.

25         Q.   What are these other things that you told



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-02327-NYW-STV
_____

DEPOSITION OF:  MARY ANN MORENO - April 12, 2023
_____

MARY ANN MORENO,

Plaintiff,

v.

CIRCLE K STORES, INC.,

Defendant.

_____

PURSUANT TO NOTICE, the deposition of
MARY ANN MORENO was taken on behalf of the Defendant at
1900 16th Street, Suite 800, Denver, Colorado 80202, on
April 12, 2023, at 9:16 a.m., before Carin C. Geist,
Registered Diplomate Reporter and Notary Public within
Colorado.

**EXHIBIT C**

Mary Ann Moreno
April 12, 2023

1          A.   Yes.

2          Q.   (BY MR. CARROLL)   Okay.   Now, it's your

3    position that that's not the real reason you were

4    fired; is that right?

5          A.   No.

6          Q.   Okay.   Well, so let's make sure we've got

7    this right.   So you said you don't think you violated

8    the policy, correct?

9          A.   No.

10         Q.   You don't think that.   But do you agree

11   with me that that was the reason you were fired?

12              MS. HALPERN:   Object to form.

13         A.   I don't really know.

14         Q.   (BY MR. CARROLL)   I can ask it a different

15   way.   Why do you think your employment ended?

16         A.   Why do I think I was --

17         Q.   Fired.

18         A.   -- fired?   Because I pushed --

19              MS. HALPERN:   Object to form.

20         A.   -- the assailant.

21         Q.   (BY MR. CARROLL)   Okay.   Do you think that

22   you were fired because you called the police?

23         A.   No.

24              MS. HALPERN:   Object to form.

25         Q.   (BY MR. CARROLL)   Do you have any evidence

Mary Ann Moreno
April 12, 2023

1   that you were fired because you called the police?

2             MS. HALPERN:  Object to form.

3        A.   No.

4        Q.   (BY MR. CARROLL)  Do you think that you

5   were fired because you were the victim of a crime?

6             MS. HALPERN:  Object to form.

7        A.   No.

8        Q.   (BY MR. CARROLL)  Do you have any evidence

9   that you were fired because you're the victim of a

10  crime?

11            MS. HALPERN:  Object to form.

12       A.   No.

13       Q.   (BY MR. CARROLL)  Do you believe that you

14  were fired for exercising your right to self-defense?

15            MS. HALPERN:  Object to form.

16       A.   I'm sorry, repeat that?

17       Q.   (BY MR. CARROLL)  Sure.  Do you believe

18  that you were terminated for exercising your right to

19  self-defense?

20       A.   Yes.

21       Q.   What makes you believe that?

22       A.   Because I don't think I violated the

23  rules.

24       Q.   Anything else?

25            MS. HALPERN:  Object to form.

Mary Ann Moreno
April 12, 2023

```
 1              A.   No.

 2              Q.   (BY MR. CARROLL)  Did anyone ever tell you

 3      that you were being terminated because you engaged in

 4      self-defense?

 5                   MS. HALPERN:  Object to form.

 6              A.   Yes.  I'm going to say yes to that

 7      question.

 8              Q.   (BY MR. CARROLL)  Who?

 9              A.   Driss.

10              Q.   What did he say?

11              A.   Do you know what you did, Mary?

12      Repeatedly and repeatedly and repeatedly, when I didn't

13      do anything wrong.  I was defending myself.  I had no

14      idea what this gentleman or this kid was going to do

15      when he came around.  Somebody comes at you, you're

16      going to react.

17              Q.   Did Driss Aamoud say to you, you are being

18      terminated for self-defense?

19              A.   He didn't say in those words, no.

20              Q.   Did he ever say the words "self-defense"?

21              A.   Not that I can recall, no.

22              Q.   In fact, if I recall your testimony

23      correctly, from your perspective, he never told you at

24      all why you were being terminated, right?

25              A.   No.
```

Mary Ann Moreno
April 12, 2023

1    Errata Sheet

2        See attached typed changes included herewith.

3    NAME OF CASE: MARY ANN MORENO vs CIRCLE K STORES

4    DATE OF DEPOSITION: 04/12/2023

5    NAME OF WITNESS: Mary Ann Moreno

6    Reason Codes:

7        1. To clarify the record.

8        2. To conform to the facts.

9        3. To correct transcription errors.

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   Page _____ Line _____ Reason _____

23   From _____ to _____

24

25                           *Mary Ann Moreno*

Errata Sheet

Page 97          Line 2          Reason Clarification. I was confused by the question. If the word "revenge" means "retaliation" than the answer is "Yes," however if it means general animosity than the answer remains "No."

From No. to Yes.

Page 98          Line 17                    Reason Clarification. The question before states Olivia, it was Bonnie. The red handwriting is Bonnie's except the corrections I made in blue.

Page 99          Line 2-4                   Reason Clarification. The question before states Olivia, it was Bonnie. The red handwriting is Bonnie's except the corrections I made in blue.

Page 110         Line 7           Reason Correction. I was confused by the question. I do believe I was fired because I was a victim of a crime and acted in self-defense. They prosecuted my attacker.

From No. to Yes.

Page 110         Line 12                    Reason Correction. I was confused by the question. I do believe I was fired because I was a victim of a crime and acted in self-defense. They prosecuted my attacker.

From No. to Yes. The way I was fired and what they said to me.

Page 119         Line 7          Reason Clarification. I was not paralyzed by depression of fear, but I was worried.

From No. to No. But I was angry at Circle K for terminating me and treating me this way and I was very scared and worried about how I was going to make it without a job. I was scared I'd lose my house. I cried often, and my daughters tried to comfort me by promising me that they would make things work so I shouldn't worry and I would not lose my house. I also missed my customers, and I felt lost, because I'd been more or less working since 16. It was like my whole life suddenly changed. It felt empty. It is really important to me to work. I am still working at 75.

Page 119         Line 24                    Reason Clarification. I did not have an anxiety attack. I was originally concerned I'd see him in the stores around me, because he had a girlfriend and baby living not far from my house.

From No. to No. I did not suffer an anxiety attack. But initially, after I heard he had been released, I was worried I might bump into him in a store like the Walmart near us. I was worried because he has a girlfriend and baby living in the neighborhood. I was just worried that I might see him at a store, though I wasn't generally nervous just being in my home because I had a restraining order. And when I started working at Family Dollar, I also asked to be put in the cash-registers farther away from the door because I didn't like being so close to the door.

Page 120         Line 17                    Reason Clarification. See above explanation.

From <u>No.</u> to <u>I was not afraid to be out in public generally. But initially, after I heard he had been released, I was worried I might bump into him in a store like the Walmart near us. I double checked with the D.A. to make sure I still had the restraining order in place. I was just anxious and worried that I might see him at a store.</u>

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:22-cv-02327-NYW-STV

MARY ANN MORENO,

     Plaintiff,

v.

CIRCLE K STORES, INC.,

     Defendant.

---

**REPLY IN SUPPORT OF PLAINTIFF'S RENEWED MOTION FOR LEAVE TO
AMEND COMPLAINT TO SEEK EXEMPLARY DAMAGES REMEDY**

---

Defendant Circle K asks this Court, in essence, to rule that under no circumstances, anywhere in Colorado, can an employee defend themselves even minimally in the face of a violent attack, without a right to keep his or her job. Similarly, Defendant seeks to win a stamp of approval for a corporate practice that dissuades employees who are victims of crimes from reporting those crimes given the inevitability of their termination when they do so.

This state has sadly witnessed more than its fair share of horrific violence in the workplace. Recent examples include a mass shooting in a grocery store in Boulder, an LGBTQ+ club in Colorado Springs, and a movie theater in Aurora – all of which are locations where people work. Employees should no more be terminated for protecting themselves from serious bodily injury or death than a young student expelled from school for attempting to disarm a shooter. Colorado law establishes the rights of victims of crimes in the workplace. The Colorado Constitution and other statutes protect citizens' rights to life and bodily integrity. Given the widespread and systemic

nature of Defendant Circle K's corporate practices, Plaintiff Mary Ann Moreno should be permitted to amend her Complaint to add a request for exemplary damages.

## FURTHER LEGAL ANALYSIS

In its Response, Defendant argues that the Court must necessarily weigh in on a dispositive issue, one that will be fully briefed and addressed on summary judgment at the close of discovery by Judge Wang. However, in the event that the Court feels the need to weigh in at this early stage, Plaintiff has considerable legal bases for her unlawful discharge in violation of public policy claim. Importantly, Colorado's courts have long recognized a "public policy exception" to the at-will employment doctrine. *Martin Marietta Corp. v. Lorenz*, 823 P.2d 100, 107 (Colo. 1992). The underlying rationale for the public policy exception is to "prohibit an employer from placing an employee in the position of keeping a job only by performing an illegal act, forsaking a public duty, or foregoing a job-related right or privilege." *Id.* Claims that fall within the public policy exception are those that "involv[e] . . . actions which strike at the heart of a citizen's social rights, duties, and responsibilities; and actions by an employer which lead to an outrageous result clearly inconsistent with a stated public policy." *Hoyt v. Target Stores*, 981 P.2d 188, 191 (Colo. App. 1998). Expressions of public policy may be found in statutes, common law, and state constitutions. *Rocky Mountain Hosp. and Medical Service v. Mariani*, 916 P.2d 519, 525 (Colo. 1996) (canvassing sources of public policy including ethical codes, statutes, and administrative regulations); *Slaughter v. John Elway Dodge Sw./AutoNation*, 107 P.3d 1165, 1169 (Colo. App. 2005) (considering Colorado's Constitution as a source of public policy); *Bonidy v. Vail Valley Ctr. for Aesthetic Dentistry, P.C.*, 186 P.3d 80, 84 (Colo. App. 2008) (Wage Orders sufficient to form basis of public policy exemption, the violation thereof  of which may support exemplary damages in wrongful discharge claim). An at-will employee may establish a *prima facie* case for

wrongful discharge under the public-policy exception if the employee: (1) presents evidence that the employer prohibited the employee from performing a public duty or exercising an important job-related right or privilege; (2) that the action directed by the employer would violate a specific statute relating to the public health, safety, or welfare, or would undermine a clearly expressed public policy relating to the employee's basic responsibility as a citizen or the employee's right or privilege as a worker; and, (3) that the employee was terminated as the result of not heeding the employer. *Martin Marietta Corp.*, 823 P.2d at 109. Plaintiff can do so on multiple grounds here.

**A. The Right to Defend Oneself from Lethal Force is Well-Documented Under Colorado Law, the Violation of Which Warrants an Exemplary Damages Jury Instruction.**

Not only is Defendant's written policy ambiguous and implemented in a way that puts employees at risk and runs contrary to the state laws discussed by Plaintiff in her Renewed Motion for Leave to Amend, [ECF No. 49], but Circle K's policy and its implementation run contrary to best practices formulated by law enforcement experts, including the Federal Bureau of Investigations and other creditable sources. The FBI has produced and disseminated a training video entitled "Run, Hide, Fight" which encourages victims to try to disarm or struggle with assailant if no other options are reasonably available. *See* https://www.fbi.gov/video-repository/run-hide-fight-092120.mp4/view.  It is the same advice that Human Resources Manager Amy Harvey gives employees for the City and County of Denver where she currently works. Ex. 1, *Harvey Dep.* 62:12-63:11.

In arguing against the viability of Plaintiff's discharge in violation of public policy tort claim in the first place, Circle K relies heavily on a single unpublished federal court decision, *Donez v. Leprino Foods, Inc.*, Civ. No. 19-cv-000285, 2020 WL 1914958 (D. Colo. April 20, 2020). *See Response*, ECF No. 52, at 7-9. However, *Donez* was later affirmed by the Tenth Circuit on wholly unrelated grounds in a decision which observed the Tenth Circuit defer to the Colorado

Supreme Court about the existence of a public policy exemption to the at-will doctrine for self-defense. Explaining its decision, the Tenth Circuit noted that "[t]he Colorado Supreme Court has not recognized a job-related right to self-defense. We need not predict whether it would do so here because Mr. Donez has not established that Leprino knew he claimed self-defense when it decided to fire him. His wrongful termination claim therefore fails." *Donez v. Leprino Foods, Inc.*, No. 21-1212, 2022 WL 500549, at *5 (10th Cir. Feb. 18, 2022).

Moreover, the facts in *Leprino* are easily distinguishable from the instant matter. Generally speaking, courts have been loath to recognize a public policy exception when employees have engaged in mutually escalating tensions with coworkers, but then attempt to excuse their own misconduct as a matter of self-defense. *See, e.g., Escalante v. Wilson's Art Studio, Inc.*, 135 Cal. Rptr. 2d 187, *191-92 (Cal. App. 2003) (although California law includes the right not to retreat, employee did not enjoy a public policy exception to the at-will doctrine when he chose to "turn and rush back towards [his coworker] rather than continuing his retreat… [although]…if an employee were backed into a corner by his attacker, with no means of escape, we might agree that the general policy favoring the preservation of human life would prevent his employer from firing him for fighting back in self-defense. Public policy might not allow an employee to bargain away his right to self-protection in those circumstances.").

Indeed, that is exactly what happened in *Donez*. The plaintiff in that case fought with a coworker, ultimately pushing him and sending him to the hospital unconscious. 2020 WL 1914958, *1 (D. Colo. April 20, 2020). The employer contended, after an investigation, that the plaintiff "escalated the altercation by pushing" his colleague, and then terminated him for violating the company's "zero tolerance for workplace violence." *Id.* The facts of *Donez* are substantially different than those found in the in this case. Indeed, courts have expressed far more concern and

support for innocent employees who are attacked by no fault of their own. In such cases, courts have often recognized a limited right to self-defense as an exception to the at-will employment doctrine. *See, e.g., Feliciano v. 7-Eleven, Inc.*, 210 W. Va. 740, 749-50 (W. Va. Sup. Ct. 2001) ("[W]e hold that when an at will employee has been discharged from his/her employment based upon his/ her exercise of self-defense in response to lethal imminent danger, such right of self-defense constitutes a substantial public policy exception to the at will employment doctrine and will sustain a cause of action for wrongful discharge."); *see also Gardner v. Loomis Armored Inc.*, 128 Wash. 2d 931, 944 (Wash. 1996) ("Society places the highest priority on the protection of human life. This fundamental public policy is clearly evidenced by countless statutes and judicial decisions.").

The case *Ray v. Wal-Mart Stores, Inc.*, which landed before the Utah Supreme Court a few years back, is highly instructive here. Initially, at the federal district court level, the employer requested summary judgment on the claims of several employees that they were fired in violation of their rights to self-defense after they wrested a gun from a shoplifting customer. Civ. No. 1:11-CV-104, 2013 WL 5572731, at *1 (D. Utah Oct. 9, 2013). The employer argued, as Circle K does here, that Utah courts did not recognize a public policy exception to the at-will employment doctrine based on a right to self-defense, and that one court, in fact, had explicitly declined to recognize such an exception, albeit in a coworker violence situation. *Id.* at *7-8. Notwithstanding the earlier state court decision, the federal district court in *Ray* declined to dismiss the lawsuit, instead distinguishing the factual circumstances and certifying the question to the Utah Supreme Court. In so doing, the court opined on differences between a voluntary dispute between coworkers and a random, potentially lethal assault by a stranger:

> The court declines Wal–Mart's invitation because there are factual differences that distinguish the facts in this case from the *Davis* case. Most

importantly, the plaintiff in *Davis* was fired after she threw a piece of PVC pipe and injured a co-worker during an altercation…Here, the court is squarely faced with the self-defense question. If the court were to follow Judge Stewart's ruling in *Davis,* all of the Plaintiffs' remaining claims would necessarily be dismissed. While this result may be correct, the court is disinclined to bar the Plaintiffs from any relief without conducting a searching inquiry to determine whether the right to self-defense constitutes a clear and substantial public policy under Utah law that could serve as an exception to the at-will employment doctrine. The court does not interpret the Plaintiffs' argument as a request to create a new exception to the presumption of at-will employment in Utah. Instead, the Plaintiffs have asked the court to decide whether the right to self-defense is the type of policy that would fit into the narrow public policy exception that the Utah Supreme Court has already created. As a result, the test the court must apply is not whether there is a Utah case that has recognized self-defense as the type of public policy that deserves protection in the employment context. Rather, the court must predict how Utah courts would rule if presented with this question.

*Id.* at *8. After certifying the question, the Utah Supreme Court did indeed recognize a narrow exception to the at-will employment doctrine for "pure" self-defense cases, explaining that,

> We conclude that an individual's right of self-defense outweighs an employer's interest in regulating its workforce and property through de-escalation and non-confrontation policies. Thus, this factor weighs in favor of recognizing the state policy supporting this important right as the kind of clear and substantial public policy that qualifies as an exception to the at-will employment doctrine. And because the other two factors also support recognition of such an exception, we answer the certified question in the affirmative—an employee may maintain a wrongful termination claim against an employer where the employee is fired for engaging in self-defense, but only if the employee faced an imminent threat of serious bodily harm under circumstances where he or she was unable to safely withdraw.

*Ray v. Wal-Mart Stores, Inc.,* 359 P.3d 614, 635-36 (Utah 2015).

A vast majority of cases are like *Donez* - involving disfavored disputes between mutually-hostile coworkers. Understandably, these are not the situations where courts have been quick to recognize self-defense exceptions to the at-will in employment doctrine. But those are not the circumstances here. Ms. Moreno played no role in the violence that was visited upon her by a random stranger; she was completely innocent of any wrongdoing. The District Attorney prosecuted her assailant, Tyler Wimmer, for his attack on Ms. Moreno. Ex. 3, *DA Letter with*

*Charges*. Ms. Moreno neither confronted nor chased Wimmer around or outside of the store. *See Circle K Surveillance Video (Register 1)*, ECF No. 49-3 (conventionally submitted). When Wimmer lunged towards her, she was trapped behind the cashier counter and had a good faith belief he was attacking her with a knife. *See id.* All that Ms. Moreno did was try to move Wimmer away from her by pushing his arm with her bare hands and instructing him to leave the area she was occupying. *Id.* Such instinctual, non-lethal, and trivial contact in the face of violent force is not an act for which an employee should be terminated, nor does Colorado public policy sanction such conduct by an employer. Mary Ann Moreno should be allowed leave to amend her Complaint to request exemplary damages from the jury, and the ultimate dispositive question decided by Judge Wang on whether such a right exists on summary judgment. In the alternative, this Court should certify the question to the Colorado Supreme Court.

### B.  The Violation of Plaintiff's Rights as a Victim of a Crime Additionally Warrants Leave to Amend.

Defendant also minimizes the other grounds upon which Plaintiff supports her discharge in violation of public policy tort claim. Not only has Plaintiff cited the state Constitution and criminal statutes, but she also identified statutes expressly encompassing the rights of victims vis-à-vis third parties including their employers. *See Response*, ECF No. 52, at 7 (simply stating that there is little proof that Plaintiff was fired for being victim of a crime). Specifically, Plaintiff also enumerated C.R.S. § 18-8-706 and § 24-4.1-303 as possible bases for her discharge in violation of public policy claim. Notably, C.R.S. § 24-8-706 makes it a class three felony for an individual to "**retaliate**" against "**a victim of any crime**," and C.R.S. § 24-4.1-303 commands "**judicial agencies**" to "ensure that victims of crimes are afforded the rights described" including ensuring that "**[a]ll reasonable attempts shall be made to protect any victim or the victim's immediate family from harm, harassment, intimidation, or retaliation arising from cooperating in the**

**reporting, investigation, and prosecution of a crime**," and that, "**[a]n employer may not discharge or discipline any victim or a member of a victim's immediate family for honoring a subpoena to testify in a criminal proceeding or for participating in the preparation of a criminal proceeding.**" C.R.S. § 24-4.1-303(5), (8) (emphasis added).

Contrary to Defendant's arguments about Plaintiff's lack of evidence, Ms. Moreno has adduced ample evidence before the close of discovery that Circle K has engaged in a widespread practice of immediately discharging employees who report crimes to law enforcement and the company of which they were victims, hence strongly dissuading employees from doing so in the first place. Plaintiff has pointed at testimony from Human Resources Manager Amy Harvey and Manager Driss Aamoud confirming that every single individual who reported a crime to police and the company who made even the slightest contact with their assailant, regardless of circumstances, has been immediately terminated by Circle K. *Motion for Leave to Amend*, ECF No. 49 at 10-12. Likewise, such management, including Ms. Harvey, received no training on how the Circle K's "Chase & Confront Policy" was to be implemented in compliance with different state laws, and there appears to have been no difference in implementation nationwide, or at least in the six-state region Ms. Harvey supervised, regardless of differences in state or local laws. Ex. 1, *Harvey Dep.* 40:25-42:1; Ex. 2, *Aamoud Dep.* 101:13-102:7. This is more than likely to include states like Utah where the state Supreme Court has already recognized the right to self-defense in similar circumstances, not to mention Colorado.

Although unfavorable decisions have focused on wrongfully reporting suspected crimes, none in this state have been published on the subject of an employee accurately reporting a crime committed against herself or the violation of her rights derived as a result thereof. However, several out-of-state courts have answered the question in the affirmative. In *Wholey v. Sears Roebuck*, for

example, the Court of Appeals in Maryland explained that, where the legislature has created a "cognizable statutory interest in the ability to report crimes or testify at an official proceeding without fear of retaliation in terms of personal or property damage…the tort of wrongful discharge provides a civil remedy." 370 Md. 38, 59-60 (Md. App. 2002). The statute in Maryland is similar to Colorado's C.R.S. § 24-8-706 and C.R.S. § 24-4.1-303(5), but in enacting C.R.S. § 24-4.1-303(8) which addresses an employer's conduct, Colorado law arguably reaches even further. Moreover, the Colorado Court of Appeals has confirmed that "the Victims' Rights Act represents a decision on a matter of public policy…" *People v. Lopez*, 401 P.3d 103, 106 (Colo. App. 2016).

Defendant has given short shrift to Ms. Moreno's other arguments. But the rights of a victim to report a crime to the police and her employer (as required by company policy) should not be downplayed. These are important rights, the violation thereof which warrant a decision by the jury if exemplary damages are warranted.

## C. Defendant Cites Improper Testimony in Support of its Arguments.

Defendant's final argument is that Mr. Moreno cites no evidence of the fact that she was terminated for being a victim of crime. Firstly, Ms. Moreno's subjective beliefs, as someone unaware of legal standards and who heard nothing about her termination from Circle K other than that she was terminated for violating the "Chase & Confront Policy" is not the only evidence in this case. As indicated above, early depositions have unearthed evidence that Circle K has serially violated the rights of crime victims by terminating them immediately if they made any contact, no matter how minor or whether done in self-defense, with their assailant. Defendant admits as much in its Response, stating that "Moreno acknowledges that Circle K terminated her because she 'pushed the assailant' away from her." *Response*, ECF No. 52, at 9. But more importantly, Ms. Moreno is a lay person who was questioned for multiple hours by Circle K's attorneys, who, albeit

pleasant and respectful during the deposition, nevertheless asked her hours and hours of questions loaded with legal meaning above her education level, and she corrected her deposition testimony. She did so and such corrections were produced to defense counsel long before this briefing was submitted. Ms. Moreno firmly stated that her subjective belief is that she was terminated for being the victim of a crime:

> Page 110 Line 7
>
> Reason Correction. I was confused by the question. I do believe I was fired because I was a victim of a crime and acted in self-defense. They prosecuted my attacker.
>
> From No. to Yes.
>
> Page 110 Line 12
>
> Reason Correction. I was confused by the question. I do believe I was fired because I was a victim of a crime and acted in self-defense. They prosecuted my attacker.
>
> From No. to Yes. The way I was fired and what they said to me.

Ex. 4, *Signed Errata* at 1. Coupled with the evidence of a systematic practice of penalizing victims of crimes for reporting, there is more than enough evidence at this stage to support Ms. Moreno's leave to file an amended Complaint to add a request for punitive damages.

## CONCLUSION

Defendant invites this Court, tacitly, to make a dispositive decision now. But that is not the question before the Court. Although the Plaintiff welcomes such a decision, this is neither the time nor place for it. The question before the Court is whether Plaintiff, if her claims are true, may seek exemplary damages based on the evidence submitted. Her claims have sufficient basis to make out a *prima facie* showing of triable fact, and that is the only question before the Court now. As such, and given the nuanced facts of this case, Plaintiff should be allowed leave to amend her Complaint.

Respectfully Submitted: June 22, 2023

RATHOD | MOHAMEDBHAI LLC


/s/ Iris Halpern
Iris Halpern
Virginia Hill Butler
2701 Lawrence Street, Suite 100
Denver, CO 80205
Tel: (303) 578-4400
Email: ih@rmlawyers.com
        vb@rmlawyers.com

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed and served the foregoing reply using the CM/ECF system, which will send notification of such filing on all registered attorneys for all parties.

*/s/ Iris Halpern*
Iris Halpern

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO


Civil Action No. 1:22-cv-02327-NYW-STV

_____

VIDEOCONFERENCE DEPOSITION OF             May 5, 2023

AMY HARVEY

_____

MARY ANN MORENO,

          Plaintiff,

vs.

CIRCLE K. STORES, INC.,

          Defendant.

_____


        The deposition of AMY HARVEY, taken before

Leeann Stellor, a Registered Merit Reporter,

Certified Realtime Reporter, and a Notary Public in

and for the County of Summit and the State of

Colorado, via Zoom videoconference, on Friday,

May 5, 2023, at the hour of 10:04 a.m.



Page 40

1       A.      No.

2       Q.      Are there any circumstances where you

3  think physical self-defense would have been

4  appropriate under the confront and chase policy?

5       A.      I don't know.  It would depend on the

6  particular situation.

7       Q.      Yeah, I think that's what I'm asking.  Is

8  there any situation where you, as the HR manager,

9  would have thought it was appropriate for there to

10 be physical self-defense under the confront and

11 chase policy?

12      A.      In my head, yes.

13      Q.      Could you describe that for us, please?

14      A.      If the robber or attacker actually

15 physically touched them first, they can, you know,

16 push back to get away from that robber or person.

17      Q.      What if they thought the robber was about

18 to physically touch or attack them?

19      A.      I don't know.  I mean, I don't know.

20      Q.      What if like the attacker lunged at them

21 and they thought they were about to be attacked,

22 could they push back under the confront and chase

23 policy?

24      A.      I believe so.

25      Q.      Does the confront and chase policy, in



Page 41

1   terms of what self-defense is allowed, vary from

2   state to state?

3        A.    No.

4        Q.    Does it take into account any state laws

5   on self-defense, rights to self-defense?

6        A.    I'm unaware of each of those state laws

7   anymore, so I don't know.

8        Q.    But when you were there as the HR

9   manager, do you know if the confront and chase

10  policy attempted to comply with state laws about

11  self-defense?

12       A.    I don't know if they did or not.

13       Q.    Was there any variation at all in the

14  policy by state --

15       A.    No.

16       Q.    -- that you oversaw?

17       A.    No.

18       Q.    Were you at all, you know, made aware,

19  for example, of Colorado's laws with respect to

20  rights to self-defense when you were the HR manager

21  at Circle K?

22       A.    No.

23       Q.    And so you didn't have that information

24  before reviewing any of the video footage or

25  approving any terminations?



Page 42

1      A.    No.

2      Q.    Do you think that Circle K's confront and

3  chase policy had the right to conflict with the

4  state laws?

5            MR. CARROLL:  Object to the form of

6  the question.

7      A.    I would say yes.

8      Q.    What do you mean by that?

9      A.    Can you repeat the question again?

10     Q.    Sure.

11     A.    It kind of went out of my mind.

12     Q.    No problem.

13            Do you think that the Circle K's

14  confront and chase policy -- or let me rephrase it

15  then.

16            Do you think Circle K's confront

17  and chase policy overrides state law?

18     A.    Yes, when it is within the law and

19  tighter than what the law is.

20     Q.    What do you mean by that?  Like, do you

21  have an example in mind?

22     A.    Not really.  But if the law states you

23  can only work from the hours of 4:00 to 6:00 and we

24  say, well, you can only work the hours of 5:00 to

25  5:00, then we're within the law, but tighter than



Page 62

1  into the confront and chase policy, and you said you

2  didn't know, right?

3      A.    I don't know.

4      Q.    Any kind of experts or any advice from

5  law enforcement experts go into formulating that

6  confront and chase policy?

7      A.    I don't know.

8      Q.    Has anyone ever discussed with you if,

9  you know, any input was sought from law enforcement

10 on the confront and chase policy?

11     A.    No.

12     Q.    Have you ever heard of run, hide, fight?

13     A.    Not while I was at Circle K, but

14 currently, yes.

15     Q.    What is run, hide, fight?

16     A.    I heard it in the context of schools

17 teach that when there is an active shooter, and I've

18 heard it also in the business sense.  I saw a --

19 when I'm here with the State, one of my videos I

20 watched was regarding being in the office, and run,

21 hide, and fight was their stance.

22     Q.    So what is run, hide, and fight?

23     A.    For active shooters, first and foremost

24 you run away from the situation.  If you can safely,

25 you hide, if you can hide somewhere safely to



Page 63

1   protect yourself.  Or if there's no other way, you

2   prepare to fight.  You know, an active shooter

3   outside your door and you can't hide or run, so you

4   arm yourself both with what you need to to try and

5   keep yourself safe if they come through that door.

6        Q.    And you said you saw a video of run,

7   hide, fight in your current position?

8        A.    Correct.

9        Q.    And in the school shooter, you've heard

10  it in the context of school active shooter drills?

11       A.    Yes.

12       Q.    And do you know who formulated the -- oh,

13  I don't know what a good word is -- the strategy of

14  run, hide, fight?

15       A.    No.

16       Q.    Are you aware that it's kind of an FBI

17  has put out guidance called run, hide, fight for

18  active shooter drills?

19       A.    I was not aware.

20             MR. CARROLL:  Objection.  Form and

21  foundation.

22       Q.    I'm just asking.

23       A.    I was not aware of it.

24       Q.    Okay.  What video did you see the

25  instructions run, hide, fight in?



Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Case No. 1:22-cv-02327-NYW-STV

------------------------------------------------------------
MARY ANN MORENO,

Plaintiff,

v.

CIRCLE K STORES, INC.,

Defendant.

------------------------------------------------------------

DEPOSITION OF DRISS AAMOUD

May 18, 2023

------------------------------------------------------------

PURSUANT TO NOTICE, the above-entitled
deposition was taken on behalf of the Plaintiff at
2701 Lawrence Street, Denver, Colorado 80205, on
May 18, 2023, at 10:00 a.m., before Karen S. Fogle,
Registered Professional Reporter and Notary Public
within Colorado.

MAGNA LEGAL SERVICES

(866) 624-6221

magnals.com



Page 101

1    on the chase or confront policy and how it complied

2    with state law.  I want to ask you that question again

3    and I want to know specifically what trainings you

4    received and what they said about how that policy

5    complies with state law.  Can you answer that for me?

6            A.  I don't remember.  I don't really know.

7            Q.  Before you had said there were all of these

8    trainings and all of these things, and I kept asking

9    for specifics and you said I had trainings but now

10   you're saying you don't know?

11           A.  I guess from your answer I assume you mean

12   by all laws.  For example, age-restricted laws --

13           Q.  I was asking specifics.  And I was asking

14   specifics about chase and confront policy and self

15   defense laws and victim's rights laws?

16           A.  I don't remember.

17           Q.  So it's fair to say that you don't know how

18   this chase and confront policy complies with state law

19   then?

20           A.  Correct.

21           Q.  So that's the case even though you

22   recommended people for termination for violating this

23   policy; is that right?

24           A.  Yes.

25           Q.  So you don't know if Circle K tried to



Page 102

1    comply with Colorado state laws about the chase and

2    confront policy?

3           A.   I don't know.

4           Q.   So you don't know if you were in compliance

5    with state law then when you fired people pursuant to

6    this policy?

7           A.   I don't know.

8           Q.   And you never tried to find out?

9                MR. HANKINS:   Object to form.

10          A.   What do you mean?

11          Q.   (BY MS. BUTLER)   You never tried to find

12   out if you were in compliance with state law when you

13   fired someone under this policy?

14          A.   When you say when you fired --

15          Q.   Recommended for termination.

16          A.   Recommended, yes; fired, it goes through a

17   lot of people.

18          Q.   I understand.   The other thing I want to

19   talk about is -- we were talking about terminations

20   related to physical contact between an employee and an

21   attacker.   I had asked you whether you recall at

22   Circle K any employee having physical contact with an

23   attacker and not being terminated.   Do you remember

24   that?

25          A.   Do I remember the question?



**ECF No. 53-3**
**FILED UNDER SEAL**
**IN VOLUME V**

Mary Ann Moreno
April 12, 2023

```
 1   Errata Sheet

 2      See attached typed changes included herewith.

 3   NAME OF CASE: MARY ANN MORENO vs CIRCLE K STORES

 4   DATE OF DEPOSITION: 04/12/2023

 5   NAME OF WITNESS: Mary Ann Moreno

 6   Reason Codes:

 7        1. To clarify the record.

 8        2. To conform to the facts.

 9        3. To correct transcription errors.

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   Page _____ Line _____ Reason _____

23   From _____ to _____

24

25                          Mary Ann Moreno
```

Errata Sheet

Page 97          Line 2          Reason Clarification. I was confused by the question. If the word "revenge" means "retaliation" than the answer is "Yes," however if it means general animosity than the answer remains "No."

From No. to Yes.

Page 98          Line 17          Reason Clarification. The question before states Olivia, it was Bonnie. The red handwriting is Bonnie's except the corrections I made in blue.

Page 99          Line 2-4          Reason Clarification. The question before states Olivia, it was Bonnie. The red handwriting is Bonnie's except the corrections I made in blue.

Page 110          Line 7          Reason Correction. I was confused by the question. I do believe I was fired because I was a victim of a crime and acted in self-defense. They prosecuted my attacker.

From No. to Yes.

Page 110          Line 12          Reason Correction. I was confused by the question. I do believe I was fired because I was a victim of a crime and acted in self-defense. They prosecuted my attacker.

From No. to Yes. The way I was fired and what they said to me.

Page 119          Line 7          Reason Clarification. I was not paralyzed by depression of fear, but I was worried.

From No. to No. But I was angry at Circle K for terminating me and treating me this way and I was very scared and worried about how I was going to make it without a job. I was scared I'd lose my house. I cried often, and my daughters tried to comfort me by promising me that they would make things work so I shouldn't worry and I would not lose my house. I also missed my customers, and I felt lost, because I'd been more or less working since 16. It was like my whole life suddenly changed. It felt empty. It is really important to me to work. I am still working at 75.

Page 119          Line 24          Reason Clarification. I did not have an anxiety attack. I was originally concerned I'd see him in the stores around me, because he had a girlfriend and baby living not far from my house.

From No. to No. I did not suffer an anxiety attack. But initially, after I heard he had been released, I was worried I might bump into him in a store like the Walmart near us. I was worried because he has a girlfriend and baby living in the neighborhood. I was just worried that I might see him at a store, though I wasn't generally nervous just being in my home because I had a restraining order. And when I started working at Family Dollar, I also asked to be put in the cash-registers farther away from the door because I didn't like being so close to the door.

Page 120          Line 17          Reason Clarification. See above explanation.

From <u>No.</u> to <u>I was not afraid to be out in public generally. But initially, after I heard he had been</u> <u>released, I was worried I might bump into him in a store like the Walmart near us. I double</u> <u>checked with the D.A. to make sure I still had the restraining order in place. I was just anxious</u> <u>and worried that I might see him at a store.</u>

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Scott T. Varholak**

Civil Action: 22-cv-2327-NYW-STV               Date: July 6, 2023
Courtroom Deputy: Monique Ortiz                FTR – Reporter Deck-Courtroom A402

*Parties:*                                      *Counsel:*

MARY ANN MORENO                                 Virginia Butler
                                                Iris Halpern

    Plaintiff,

v.

CIRCLE K STORES, INC.                           Nicholas Hankins
                                                Thomas Carroll (by phone)

    Defendant.

---

### COURTROOM MINUTES/MINUTE ORDER

---

**MOTION HEARING**
**Court in session:   9:06 a.m.**
Court calls case.  Appearances of counsel.

This matter is before the court regarding Plaintiff's Renewed Motion for Leave to Amend Complaint to Seek Exemplary Damages Remedy [ECF Doc. No. 49, filed 5/31/2023].

Arguments by counsel.

For the reasons stated on the record, it is:

**ORDERED:**        Plaintiff's Renewed Motion for Leave to Amend Complaint to Seek Exemplary Damages Remedy [ECF Doc. No. 49] is **GRANTED**. Plaintiff shall have till the close of business on July 7, 2023 to file a clean version of the Proposed Amended Complaint which the court will accept as the newly operative complaint.

HEARING CONCLUDED.

**Court in recess:     9:36 a.m.**
Total time in court: 00:30

To order transcripts of hearings, please contact either Patterson Transcription Company at (303) 755-4536 or AB Litigation Services at (303) 629-8534.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-02327-NYW-STV

MARY ANN MORENO,

     Plaintiff,

v.

CIRCLE K STORES, INC.,

     Defendant.

---

### FIRST AMENDED COMPLAINT AND JURY DEMAND

---

Plaintiff Mary Ann Moreno, by and through her attorneys Virginia Hill Butler and Iris Halpern of RATHOD | MOHAMEDBHAI LLC, respectfully alleges for her First Amended Complaint and Jury Demand as follows:

### I.  NATURE OF THE CLAIMS

Plaintiff Mary Ann Moreno ("Ms. Moreno") alleges that Defendant Circle K, Inc. ("Defendant") wrongfully and outrageously terminated her employment after she exercised her right to self-defense and self-preservation during an armed robbery while at work.

### II.  PARTIES, JURISDICTION, AND VENUE

1.    Plaintiff Mary Ann Moreno was and is a resident of the State of Colorado and is domiciled in Adams County.

2.      At all relevant times, Defendant Circle K, Inc., was and is a business entity incorporated under the laws of the State of Colorado, doing business in the Adams County, Colorado.

3.      This Court has jurisdiction over this matter pursuant to C.R.S. § 13-1-124.

4.      Venue is proper pursuant to C.R.C.P. 98(c), as the allegations contained herein occurred within Adams County.

### III.    FACTUAL ALLEGATIONS

5.      Plaintiff Mary Ann Moreno is the mother of two children, a son, Brandon Moreno, and a daughter, Olivia Roan. She is currently 74 years of age.

6.      Ms. Moreno raised her children in a loving home in the suburbs of Denver, where, by all accounts, they enjoyed an ordinary and happy childhood.  Both Brandon and Olivia remain close to Ms. Moreno and continue to live in Colorado to this day.

7.      Ms. Moreno maintains an especially close relationship with her daughter-in-law, Bonnie Moreno, whom she often refers to as her "bonus child," as she grew up with Ms. Moreno's children, passing the time on the same playgrounds and streets.

8.      Ms. Moreno has worked hard to support her family throughout her entire life. At just sixteen years old, Ms. Moreno started her first job as a retail cashier in a local shop.

### *Ms. Moreno's Employment with Defendant Circle K, Inc.*

9.      For most of sixteen years, Ms. Moreno was employed as a cashier for Circle K Sheridan, located at 9489 Sheridan Boulevard in Westminster, Colorado.

10.      In her time with Circle K, Ms. Moreno was perpetually hard working and dedicated to her job.

11.     As an employee, Ms. Moreno was timely, efficient, and attentive to her customers and the store.

12.     Though her official title was that of "cashier," Ms. Moreno attended to almost all of the day-to-day duties required to operate the store.

13.     Among these, she operated the register, restocked products, cleaned and sanitized the store area and restrooms, assisted customers with operating the fuel pumps, and generally maintained the premises.

14.     Ms. Moreno rarely hesitated to cover shifts for other employees, and she was asked to do so on a regular basis.

15.     In fact, it was not uncommon for Ms. Moreno to miss family events such as holidays and birthdays in order to cover shifts at Circle K Sheridan.

16.     Ms. Moreno also acted as a de facto store manager, though she retained the title and hourly pay of a cashier.  By all accounts, she frequently ran the store single-handedly.

17.     Despite the fact that Circle K's Sheridan store was located in a relatively high-crime area, Ms. Moreno was often called upon by Circle K to work the store alone, without the assistance of another employee or manager, including during night shifts.

18.     Throughout her incredibly long tenure – nearly sixteen years – with Circle K, Ms. Moreno was never disciplined nor given a negative performance review.

19.     Ms. Moreno's dedication to her job and to Circle K was never merely financial. At the time Circle K terminated her, the company was paying her $14.05 per hour.

### ***Ms. Moreno was Attacked by a Knife-Wielding Assailant During an Armed Robbery***

20.     On October 4, 2020, Ms. Moreno worked her usual evening shift at Circle K Sheridan. She was 72 years old at the time.

21.     As was often the case, Ms. Moreno was the only employee scheduled to work that evening.

22.     Ms. Moreno acted as the cashier and otherwise supervised the store. She restocked products, cleaned and sanitized where needed, and assisted her customers with their business.

23.     At approximately 7:00 p.m., while Ms. Moreno stood alone behind the front counter, a man walked through the front door of the store.

24.     Ms. Moreno immediately noticed that the man appeared disheveled and was not behaving normally.

25.     The man advanced towards the front of the counter as Ms. Moreno stood behind it.

26.     Ms. Moreno immediately noticed that the man was carrying two large hunting knives in his hands.

27.     Ms. Moreno called out to the man that he could not bring knives into the store.

28.     The man ignored Ms. Moreno and approached the counter.

29.     The man then demanded a pack of cigarettes.  Ms. Moreno asked the man which brand he would like, and then retrieved the cigarettes from the display case behind her.

30.     As Ms. Moreno began to ring up the man's apparent purchase, the man told Ms. Moreno words to the effect of, "just give them to me for free."

4

31.     Ms. Moreno replied that she could not give the man the cigarettes for free because she did not own the store and could lose her job.

32.     The man then became visibly upset and began to leave the store.

33.     As he left, however, he abruptly changed directions and came back toward Ms. Moreno from the side and rear of the counter.

34.     Ms. Moreno exclaimed to the man, "Don't come back here!" referring to the closed area behind the counter in which she was standing.

35.     However, the man proceeded towards Ms. Moreno and the display case containing the store's tobacco products.

36.     As the man was blocking Ms. Moreno's only avenue of escape from the closed area behind the counter, she was unable to flee.

37.     The man moved towards Ms. Moreno and well within reaching distance of her, still holding the knives.

38.     Nearing closer to Ms. Moreno, the man then suddenly reached his arm out past her for a pack of cigarettes in the display case the two were standing directly adjacent to.

39.     Ms. Moreno instinctively reached out towards the man to protect herself and prevent the man from coming closer toward her and the merchandise.

40.     Ms. Moreno was terrified for her life as she genuinely believed that the man was going to attempt to stab or otherwise harm her.

41.     She had no means of escape from the area.  Nor did she have any idea what the man intended to do after invading the small area that she was trapped in.

42.      Fortunately, after grabbing the cigarettes from the display case, the man rushed out of the store.

43.      At least one customer witnessed the robbery and called the Westminster Police Department.  Several more customers entered the store in the moments immediately following the robbery.

### *Police Arrived at the Scene Shortly After the Assailant's Departure*

44.      After the assailant had fled the store, Ms. Moreno picked up the phone and began calling other Circle K employees to notify them about the robbery and ask for help.

45.      Several customers remained at the store and tried to comfort Ms. Moreno.

46.      Officers from the Westminster Police Department arrived a short time after the assailant had fled the store.

47.      The officers contacted Ms. Moreno immediately after they arrived and asked her to provide a statement.

48.      Ms. Moreno was incredibly distraught while speaking with the officers.

49.      Ms. Moreno was crying and struggling to concentrate when giving her account of the incident.

50.      Ms. Moreno was obviously and apparently in extreme distress.

51.      Ms. Moreno told officers what had happened and how scared she was when the assailant started walking towards her with the knives.

52.      Despite the fact that Ms. Moreno had reached out to multiple Circle K employees so that she could be relieved of her shift, none immediately responded.  Ms. Moreno was forced to continue working.

53.     Indeed, Ms. Moreno called at least three Circle K Sheridan managers for assistance, none of whom agreed to provide immediate help nor demonstrated any genuine concern for Ms. Moreno's well-being.

54.     Ms. Moreno called her daughter-in-law, Bonnie Moreno, to tell her the news of the robbery. Bonnie Moreno arrived at the store shortly after to comfort Ms. Moreno while she waited for another Circle K employee to arrive.

55.     Store Manager Love Jorgensen and Circle K District Manager Dris Armand arrived at the store later in the evening.

56.     Mr. Armand immediately began interrogating Ms. Moreno about the armed robbery.

57.     Mr. Armand then went to the back office in Circle K Sheridan.

58.     Mr. Armand turned his attention to the security module to watch surveillance from the time of the robbery.

59.     The surveillance footage captured the armed robbery from many different angles.

60.     Mr. Armand became upset with Ms. Moreno and insisted to her that the surveillance footage did not depict a robbery and that the apparent thief had not actually been armed.

61.     Mr. Armand told Ms. Moreno that Circle K Sheridan would be investigating the incident due to her "push[ing] [the assailant]" away when the assailant approached her in a threatening manner while armed with a knife.

7

62.     Mr. Armand also demanded that Ms. Moreno's daughter-in-law leave the store "for [her] own safety."

63.     Ms. Moreno's daughter-in-law was forced to exit the store.

### *Ms. Moreno was Fired Two Days After Being Robbed at Knifepoint*

64.     The day after the robbery, Ms. Moreno called Ms. Jorgensen to inquire about her schedule for the following week.

65.     Ms. Jorgensen informed Ms. Moreno she needed to call Mr. Armand to discuss her schedule.

66.     Ms. Moreno then called Mr. Armand.  However, Mr. Armand refused to discuss Ms. Moreno's schedule, citing the fact Ms. Moreno was purportedly still under investigation as a result of the robbery.

67.     Ms. Moreno asked why she was under investigation and Mr. Armand responded with words to the effect of, "You know what you did wrong."

68.     Mr. Armand continued to dismiss Ms. Moreno's confusion and place blame on her for being attacked at work.

69.     Mr. Armand relentlessly insisted that Ms. Moreno apologize for "her behavior."

70.     However, Ms. Moreno refused to apologize for having been the victim of a crime.

71.     Mr. Armand abruptly ended the conversation after becoming frustrated and told Ms. Moreno to call him the following day.

72.     As instructed, Ms. Moreno called Mr. Armand the next day.

73.      Mr. Armand told Ms. Moreno that Circle K Sheridan was terminating her employment, effective immediately.

### *The Assailant Was Identified and Arrested by the Westminster Police Department*

74.      The Westminster Police Department identified and arrested Tyler Darren Wimmer as Ms. Moreno's assailant.

75.      Mr. Wimmer was charged with multiple felonies, including aggravated robbery and menacing with a deadly weapon.

76.      While his criminal case was pending, Mr. Wimmer was deemed incompetent to participate in the proceedings or assist with his own defense.  As such, he was sent to a medical treatment facility to be rehabilitated.

77.      Mr. Wimmer's mental state provides evidence for why Ms. Moreno reasonably believed he would attempt to stab her based on his erratic behavior.

### *The Robbery and Termination from Circle K Caused Ms. Moreno Emotional Distress*

78.      Ms. Moreno has experienced devastating effects as a result of being terminated through no fault of her own after nearly two decades of work at Circle K.

79.      Ms. Moreno is experiencing symptoms of anxiety such as inability to focus and forgetfulness, and she is often unable to sit still.

80.      Since her termination, Ms. Moreno has become isolated from her friends and family.

81.     Ms. Moreno's grandchildren have noticed that Ms. Moreno has begun swiftly and severely deteriorating, both mentally and emotionally, since Circle K terminated her employment.

82.     When Circle K terminated Ms. Moreno, if effectively severed her closest ties to her community, her most significant social sphere, and ultimately, her sense of purpose and direction.

83.     Since Circle K terminated her employment, Ms. Moreno has been forced to seek regular psychological counseling for the first time in her life.

84.     Though she has since found another cashier position with a different company, Ms. Moreno still panics while working at her new cashier position.

85.     She also fears for the security of her job and primary income, which she feels could be jeopardized at any time through no fault of her own.

86.     Ms. Moreno is also fearful of conversations and ordinary interactions with her supervisors, as she feels she might be terminated at any time.

### *Circle K's Termination of Ms. Moreno Caused Her Substantial Economic Loss*

87.     Though Ms. Moreno is now successfully reemployed, she is earning far less than she earned in her position with Circle K.

88.     Ms. Moreno's new position also offers far less generous benefits than she was entitled to while employed with Circle K, causing her to incur substantial out-of-pocket costs for services that were previously covered by insurance.

89.     Ms. Moreno's new position does not offer her a pension, which was a significant financial benefit attending her position at Circle K.

## IV.     CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Wrongful Discharge in Violation of Public Policy**

90.     Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

91.     Defendant terminated Ms. Moreno in violation of public policy as set forth under Colorado common law.

92.     The essence of the public-policy exception to at-will employment status is that an employee has a cognizable claim for wrongful discharge if the employee contravenes a clear mandate of public policy.  *Martin Marietta Corp. v. Lorenz*, 823 P.2d 100, 107 (Colo. 1992).

93.     Claims for wrongful discharge under Colorado's public-policy exception have included termination of employee for (1) refusal to participate in illegal activity; (2) the employee's refusal to forsake the performance of an important public duty or obligation; (3) the employee's refusal to forego the exercise of a job-related legal right or privilege; (4) the employee's whistle blowing activity or other conduct exposing the employer's wrongdoing; and (5) the employee's performance of an act that public policy would encourage under circumstances where retaliatory discharge is supported by evidence of employer's bad faith, malice, or retaliation.  *Lorenz*, 823 P.2d at 107.

94.     The public policy at issue must be clearly mandated such that the acceptable behavior is concrete and discernible, as opposed to a broad hortatory statement of policy that gives

little direction as to the bounds of proper behavior. *Rocky Mountain Hosp. and Medical Service v. Mariani*, 916 P.2d 519, 525 (Colo.1996). Colorado courts have held that expressions of public policy are readily found in statutes, common law, and the state constitution. *Id.*; *Slaughter v. John Elway Dodge Sw./AutoNation*, 107 P.3d 1165, 1169 (Colo. App. 2005) (considering Colorado constitution as a source of public policy). From such sources, it is clear that Colorado has long recognized the right of self-defense and self-preservation as an essential public policy.

95.     It is also equally clear that Colorado has recognized the rights of victims and witnesses to report and testify about crimes. Hence, in C.R.S. § 18-8-706, state statute makes it unlawful for an individual to commit retaliation or anticipatory retaliation a victim or witness of crime. Likewise, C.R.S. §24-4.1-303 requires "all reasonable attempts shall be made to protect any victim…from harm, harassment, intimidation, or retaliation arising from cooperating in the reporting, investigation, and prosecution of a crime." Such law further states that "[a]n employer may not discharge or discipline any victim…for participating in the preparation of a criminal proceeding." From such sources, a victim's right to report a crime and participate in its investigation and prosecution are recognized as an essential public policy.

### Examples of Sources of Public Policy

96.     According to Article II, § 3 of the Colorado Constitution, "All persons have certain natural, essential and inalienable rights, among which may be reckoned the right of enjoying and defending their lives . . . and of seeking and obtaining their safety and happiness."

97.     Similarly, the Colorado Constitution also recognizes self-defense as one of the bases for Colorado's right to bear arms. Colo. Const. Art. II § 13 ("The right of no person to keep

and bear arms in defense of his home, person and property . . . shall be called in question."). Following the ratification of the state constitution, the common law right of self-defense was recognized by Colorado courts as early as 1886. *See Kent v. People*, 8 Colo. 563 (1886); *Ritchey v. People*, 23 Colo. 314 (1896) (recognizing the common law right to self-defense and its limitation via the "retreat to the wall" doctrine).

98.     Today, the right to self-defense is also codified in Colorado's criminal code. *See* C.R.S. § 18-1-704.  According to the self-defense statute, a person shall not be held criminally liable for using physical force against another person "in order to defend himself or a third person from what he reasonably believes to be the use or imminent use of unlawful physical force by that other person." *Id.*

99.     Because the right to self-defense is enshrined in the Colorado constitution, has been long recognized in Colorado's common law, and is written into the Colorado Criminal Code, it is a source of public policy sufficient to support Ms. Moreno's wrongful discharge claim.

100.     Ms. Moreno's wrongful discharge claim is also simultaneously grounded in her rights as a victim and witness of a crime, including her rights to report a crime and to participate in the investigation and prosecution of the crime, free from retaliation by her employer or anyone else, in accordance with C.R.S. § 18-8-706, C.R.S. §24-4.1-303, and other statutes, common law, and other sources of public policy as recognized by the courts.

101.     Ms. Moreno was the only employee working during the incident which reasonably resulted in her fear of harm with no aid nearby.

102.     Ms. Moreno raised up her arm to defend and protect herself from the attacker who had two knives and had aggressively approached and reached toward her.

103.    In raising up her arm, Ms. Moreno made contact with the attacker.

104.    After making contact with the attacker in attempt to move him away from her and the merchandise, Ms. Moreno immediately moved backwards away from the attacker.

105.    The attacker left the Circle K store unharmed and with the cigarettes he intended to steal.

106.    All of the above events were visible and apparent from Circle K's surveillance camera footage.

107.    Circle K was aware that Ms. Moreno was acting in self-defense and/or self-preservation at the time she reached toward her assailant.

108.    By terminating Ms. Moreno for reporting the fact that she was a victim of a violent crime to her managers and for instinctively defending herself against an armed attacker while working alone in a closed space, Circle K violated the public-policy exception to Colorado's at-will employment doctrine.

109.    As a direct result of Defendant's actions, Ms. Moreno has suffered significant injuries, damages, and losses to be determined at trial.

110.    Defendant's conduct described herein was attended by circumstances of fraud, malice, or willful and wanton conduct, such that Ms. Moreno notifies Defendant now that she intends to move for exemplary damages pursuant to C.R.S. § 13-21-102.

## SECOND CLAIM FOR RELIEF

### Intentional Infliction of Emotional Distress and/or Outrageous Conduct

111.    Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

112.    In Colorado, the elements of outrageous conduct are: (1) the defendant engaged in extreme and outrageous conduct, (2) recklessly or with the intent of causing the plaintiff severe emotional distress, and (3) causing the plaintiff severe emotional distress. *See Archer v. Farmer Bros. Co.*, 70 P.3d 495, 499 (Colo. App. 2022), *aff'd*, 90 P.3d 228 (Colo. 2004).

113.    Defendant Circle K engaged in extreme and outrageous conduct by terminating Ms. Moreno because she was the victim of multiple felonies in the workplace and because she engaged in protected activity by defending herself from potentially severe bodily harm in the workplace.

114.    Ms. Moreno did not provoke the violence against her in any way.  Rather, she reacted to an armed robber in an instinctual manner to protect her safety.

115.    Defendant Circle K engaged in extreme and outrageous conduct by terminating Ms. Moreno for exercising her right to self-defense.

116.    Defendant Circle K engaged in extreme and outrageous conduct by terminating Ms. Moreno for reporting the act of criminal violence perpetuated against her on the job to her managers, and for reporting the attack to the police.

117.    Defendant Circle K further engaged in extreme and outrageous conduct by refusing to timely come to her aid following the armed robbery or assign additional employees to the store, forcing Ms. Moreno to remain at the scene of the crime, alone, for a substantial period of time.

118.    Defendant terminated Ms. Moreno two days after she was the victim of the armed robbery.

119.    Defendant Circle K further engaged in extreme and outrageous conduct when it ordered Ms. Moreno's daughter to leave the store following the armed robbery, depriving Ms. Moreno of her only company and source of comfort.

120.     Through all of the above conduct, Defendant acted recklessly or with the intent of causing Ms. Moreno emotional distress.

121.     Defendant was aware of Ms. Moreno being the victim of an emotionally and psychologically damaging event prior to terminating her for exercising her constitutional right to self-defense.

122.     As a result of her termination following a nearly sixteen-year career with Defendant, Ms. Moreno has since experienced severe anxiety, depression, and isolation.

123.     As a direct result of Defendant's actions, Ms. Moreno has suffered significant injuries, damages, and losses to be determined at trial.

124.     Defendant's conduct described herein was attended by circumstances of fraud, malice, or willful and wanton conduct, such that Ms. Moreno notifies Defendant now that she intends to move for exemplary damages pursuant to C.R.S. § 13-21-102.

## V.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff Mary Ann Moreno respectfully requests that the Court enter judgment for the following relief:

a.  Actual economic damages as established at trial;

b.  Compensatory damages, including, but not limited to those for future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

c.  Exemplary and/or punitive damages as established at trial;

d.  Pre-judgment and post-judgment interest at the highest lawful rate;

e.  Appropriate tax-offset, as allowed by law;

f.  Attorneys' fees and costs, as allowed by law;

g.  Any other appropriate remedy available under law; and

h.  Such further relief as justice requires.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE**

DATED: July 6, 2023

RATHOD | MOHAMEDBHAI LLC

*s/ Virginia Hill Butler*
Virginia Hill Butler, #55187
Iris Halpern, #53112
2701 Lawrence Street, Suite 100
Denver, CO 80205
(303) 578-4400
vb@rmlawyers.com
ih@rmlawyers.com

ATTORNEYS FOR PLAINTIFF

**CERTIFICATE OF SERVICE**

I hereby certify that on the 6th day of July 2023, I electronically filed the foregoing **FIRST AMENDED COMPLAINT AND JURY DEMAND** with the Clerk of Court using the CM/ECF system, and served it by email and U.S. Mail to the following:


Thomas W. Carroll
Nicholas Hankins
LITTLER MENDELSON, P.C.
1900 Sixteenth Street, Suite 800
Denver, CO 80202
Telephone: 303.629.6200
Fax: 303.629.0200
Email: tcarroll@littler.com
        nhankins@littler.com


*Attorneys for Defendant*


_s/ Virginia Hill Butler_

Virginia Hill Butler

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:22-cv-02327-NYW- STV

MARY ANN MORENO,

     Plaintiff,

v.

CIRCLE K STORES, INC.,

     Defendant.

---

**PLAINTIFF'S MOTION FOR LEVEL 1 RESTRICTED ACCESS TO ECF NO. 53-3**

---

Pursuant to D.C.COLO.LCivR 7.2, Plaintiff files this Motion for Level 1 Restricted Access to ECF No. 53-3. Pursuant to D.C.COLO.LCivR 7.1(a), counsel for Plaintiff conferred with counsel for Defendant regarding this Motion and Defendant does not oppose this motion.

D.C.COLO.LCivR 7.2(c) allows a party to file a motion to restrict public access to documents filed with the Court. The motion must: (1) identify the document to be restricted; (2) state the interest to be protected and explain why that interest outweighs the presumption of public access; (3) identify a clearly defined and serious injury that will result without restriction; (4) explain why no alternative to restricted access is available or why only restricted access will adequately protect the relevant interest; and (5) state the level of restriction for the document. D.C.COLO.LCivR 7.2(c)(1)-(5).

Plaintiff requests Level 1 Restriction of the Jefferson County District Attorney's Office letter to Plaintiff informing her of the criminal charges filed against Tyler Wimmer, the man who robbed the Circle K where Plaintiff was working. ECF No. 53-3.

The letter from the District Attorney's Office contains Plaintiff's personal address on both pages. *See* ECF No. 53-3. In filing the exhibit, Plaintiff redacted her address on the first page but inadvertently failed to redact her address on the second page. *See id.* Restricting ECF No. 53-3 safeguards Plaintiff's privacy interest and her safety.

Plaintiff's motion for exemplary damages cited this exhibit for the proposition that the District Attorney prosecuted Mr. Wimmer. *See* ECF No. 53 at 6-7. Ms. Moreno's address is unrelated to the reason she supplied ECF No. 53-3 to the Court. Attached to this motion is a copy of ECF No. 53-3 with Plaintiff's address redacted on the second page as well. Restricting ECF No. 53-3 will not diminish the public's right to access ECF No. 53-3, because the public will be able to view the contents of the document, just with Plaintiff's address redacted.

Plaintiff therefore respectfully requests that the Court maintain Level 1 restriction over ECF No. 53-3 and permit Plaintiff to file the redacted version of the District Attorney's letter attached to this motion as the operative publicly filed exhibit.

Respectfully Submitted: July 13, 2023

RATHOD | MOHAMEDBHAI LLC

*s/ Virginia Hill Butler*
Virginia Hill Butler
Iris Halpern
2701 Lawrence Street, Suite 100
Denver, CO 80205
T: (303) 578-4400
E: vb@rmlawyers.com
    ih@rmlawyers.com

ATTORNEYS FOR PLAINTIFF

**CERTIFICATE OF SERVICE**

I hereby certify that on this 13th day of July 2023, I electronically filed and served the

foregoing **PLAINTIFF'S MOTION FOR LEVEL 1 RESTRICTED ACCESS TO ECF NO.**

**53-3** using the CM/ECF system, which will send notification of such filing to the following:

      Thomas W. Carroll
      Nicholas Hankins
      LITLER MENDELSON, P.C.
      1900 Sixteenth Street, Suite 800
      Denver, CO 80202
      Telephone: 303.629.6200
      Fax: 303.629.6200
      Email: tcarroll@littler.com
             nhankins@littler.com

      *Attorneys for Defendant Circle K Stores, Inc.*

                        s/ *Virginia Hill Butler*
                        Virginia Hill Butler



## OFFICE OF THE DISTRICT ATTORNEY
### Jefferson and Gilpin Counties
### Peter A. Weir, District Attorney

October 14, 2020



RE:     DA Case #:          D0302020CR003359
        Agency Case #:      202009985
        Defendant:          Tyler Darren Wimmer
        Victim Advocate:    Bev Hollis V W Specialist Advocate Phone: (303) 271-6946
        Prosecutor:         Padraic Emerine
        Courtroom:          3F

Dear Mary Moreno

Our Victim/Witness Assistance Program was established to help crime victims and witnesses with support and assistance during the court process. We hope to make the criminal justice system easier for you to understand and more responsive to your needs.

Our office has filed a criminal case charging the above-named Defendant with the following:

18-4-302(1)(b) F3 ROBBERY/AGG-MENACE VICTIM W/DEADLY WEAPN

18-6.5-103(4);18-4-301(1) F3 AT-RISK-ROBBERY

18-3-206(1)(a)/(b) F5 FELONY MENACING-REAL/SIMULATED WEAPON

18-8-103 M2 RESISTING ARREST

18-8-104(1)(a) M2 OBSTRUCTING A PEACE OFFICER

18-1.3-406(2)(a)(I)(A) SE VIOLENT CRIME-USED WEAPON

- The enclosed Victim Impact Statement is an opportunity for you to provide input to the Court about the injuries and emotional trauma that you have suffered as a result of this crime. This form also requests information regarding any financial losses you have sustained because of the crime. It is important that you document your losses with receipts or estimates. **Please be aware that the Defendant and/or the attorney will see your Victim Impact Statement.** Please submit this Victim Impact Statement to the District Attorney's Office as soon as possible.

- As a victim of a Victim Rights Act (VRA) crime, you have rights under the constitution of the state of Colorado. The enclosed Victim Rights brochure provides information about these rights and who to contact if you feel you have not been provided your rights.

Moreno 000113

COUNTY COURT, JEFFERSON COUNTY, COLORADO
CASE NO: D03    020CR003359    DIVISION: 4D
CHARGE: RO    ERY/AGG-MENACE VICTIM W/DEADLY WEAPN
OFFENSE DA    : 10/4/2020
AGENCY CR#: 202009985

# SUBPOENA
# TO TESTIFY
**012103250489    M**

THE PEOPLE OF THE STATE OF COLORADO
vs.
TYLER DARREN WIMMER, DEFENDANT

| | |
|---|---|
| EVENT: | Jury Trial |
| PROSECUTOR: | Padraic Emerine |
| ADVOCATE: | Lori Clark |
| JUDGE: | Russell Klein |

TO:  Mary Moreno



You are hereby commanded to appear on:
 **from 07/06/2021 to 07/09/2021 at 8:00 am**
In Division 4D, at the
100 Jefferson County Parkway
Golden, CO   80401
To testify on behalf of the People of the State of Colorado.

Subpoena issued on: 3/25/2021
**Pursuant to C.R. Crim. P. Rule 17**

**IMPORTANT:**
**When you are served with a subpoena, either personally or by waiver, you are required to attend unless the case is vacated.**

__Please Return The Attached Waiver Immediately__

**District Specific:**
Please check in at the Victim/Witness Center (room 1070).
Victim Witness (303) 271-6840

**OFFICE OF THE**
**DISTRICT ATTORNEY**
**FIRST JUDICIAL DISTRICT,**
**COLORADO**
**Alexis King**
**DISTRICT ATTORNEY**

**Special Instructions:**

**Notes:** This is a 4-day Trial

## WAIVER OF PERSONAL SERVICE

Event Date: 07/06/21 to 07/09/21 8:00 am
Case No: D0302020CR003359
Witness: Mary Moreno
Defn: Tyler Darren Wimmer

Event: Jury Trial
Division: 4D
Prosecutor: Padraic Emerine
Offense Date: 10/4/2020

If you agree to WAIVE PERSONAL SERVICE of this subpoena, __please sign, date and return this postcard to confirm your attendance.__ If you sign this waiver, you are required to appear unless otherwise notified.

**I acknowledge receipt of this subpoena, waive personal service, and will appear as directed.**

Witness Signature _____   Date _____
[ ] Place "ON CALL" at phone number _____   Travel Time: _____
Make Address Correction Here _____
_____
Home Phone: _____ Work Phone: _____ Cell Phone: _____
Email: _____

This trial may be scheduled for several days. To minimize your inconvenience, you may be placed "on call" by checking the box. "On-call" means you will not be required to appear at the time specified above, but instead will be called when needed. You must be available by phone at all times. Please indicate day, evening, pager and cell phone numbers.

Moreno  000114



M

Vol. I - 0199

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Case No. 22-cv-02327-NYW-STV

MARY ANN MORENO,

         Plaintiff,

v.

CIRCLE K STORES, INC.,

         Defendant.

---

**ANSWER TO FIRST AMENDED COMPLAINT**

---

Defendant Circle K Stores, Inc. ("Circle K") answers Plaintiff Mary Ann Moreno's First Amended Complaint and Jury Demand [Dkt. 56] ("Complaint") as follows:

Responding to the unnumbered "Nature of the Claims" section of the Complaint, Circle K admits that Moreno purports to bring claims for wrongful termination and intentional infliction of emotional distress/outrageous conduct. Circle K denies Moreno's allegations and denies she is entitled to any relief whatsoever.

1.      Responding to the allegations in Paragraph 1, Circle K admits upon information and belief that Plaintiff was and is a resident of Colorado. Circle K is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 1.

2.      Circle K admits that it does business in Adams County, Colorado. Circle K denies the remaining allegations in Paragraph 2. Circle K affirmatively states it is a Texas corporation and its principal place of business is in Tempe, Arizona.

3.      Circle K admits that this Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a). Circle K denies the remaining allegations in Paragraph 3.

4.      Circle K admits that the allegations in the Complaint occurred in Adams County, Colorado. Circle K admits that venue is proper in this Court under 28 U.S.C. § 1391(b)(2). Circle K denies the remaining allegations in Paragraph 4.

5.      Responding to the allegations in Paragraph 5, Circle K admits upon information and belief that Moreno is 74 years old at the time of filing her Complaint. Circle K is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 5.

6.      Circle K is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 6

7.      Circle K is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 7.

8.      Circle K is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 8.

9.      Responding to the allegations in Paragraph 9, Circle K admits that it hired Moreno on October 26, 2018 and prior to that she had been employed by a predecessor company since October 29, 2004, and Circle K admits she worked at its 9489 Sheridan Boulevard store. Circle K denies any remaining allegations in Paragraph 9.

10.     Responding to the allegations in Paragraph 10, Circle K admits that Moreno was meeting the performance expectations of her position prior to her termination, with the exception

of the policy violation that resulted in her termination. Circle K denies any remaining allegations in Paragraph 10.

11.     Responding to the allegations in Paragraph 11, Circle K admits that Moreno was meeting the performance expectations of her position prior to her termination, with the exception of the policy violation that resulted in her termination. Circle K denies any remaining allegations in Paragraph 11.

12.     Circle K denies the allegations in Paragraph 12.

13.     Responding to the allegations in Paragraph 13, Circle K admits that Moreno's job duties included, but were not limited to operating the register, restocking products, cleaning and sanitizing the store area and restrooms, assisting customers with operating the fuel pumps, and generally maintaining the premises, as further described in the job description for a Customer Service Representative.

14.     Circle K is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 14.

15.     Circle K is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 15.

16.     Circle K denies the allegations in Paragraph 16.

17.     Circle K denies the allegations in Paragraph 17.

18.     Circle K denies the allegations in Paragraph 18.

19.     Responding to the allegations in Paragraph 19, Circle K admits that at the time of her separation from employment Moreno was earning $14.05 per hour. Circle K is without

knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 19.

20.     Responding to the allegations in Paragraph 20, Circle K admits that Moreno worked on October 4, 2020 at the Circle K location on Sheridan Boulevard, and admits upon information and belief that she was 72 years old at the time. Circle K is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 20.

21.     Circle K admits that Moreno was the only employee working on the evening of October 4, 2020. Circle K is without knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 21.

22.     Circle K admits the allegations in Paragraph 22.

23.     Circle K denies the allegations in Paragraph 23.

24.     Circle K is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 24.

25.     Responding to the allegations in Paragraph 25, Circle K states they are vague with respect to the man to whom they refer, the time, and the sequence of events. Therefore Circle K is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 25. Circle K affirmatively states the video-surveillance footage exists.

26.     Circle K is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 26.

27.     Circle K is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 27.

28.     Circle K is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 28.

29.     Circle K admits that Moreno retrieved cigarettes from the display case behind her. Circle K denies the remaining allegations in Paragraph 29.

30.     Circle K admits the allegations in Paragraph 30.

31.     Circle K admits the allegations in Paragraph 31.

32.     Circle K denies the allegations in Paragraph 32.

33.     Circle K denies the allegations in Paragraph 33.

34.     Responding to the allegations in Paragraph 34, Circle K admits that Moreno said, "Don't come back here." Circle K is without knowledge or information sufficient to form a belief as to what she was referring to. Circle K denies the remaining allegations in Paragraph 34.

35.     Circle K denies the allegations in Paragraph 35.

36.     Circle K denies the allegations in Paragraph 36.

37.     Circle K denies the allegations in Paragraph 37.

38.     Circle K denies the allegations in Paragraph 38.

39.     Circle K denies the allegations in Paragraph 39.

40.     Circle K is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 40.

41.     Circle K denies the allegations in Paragraph 41.

42.     Circle K admits that after grabbing a pack of cigarettes the man left the store. Circle K denies the remaining allegations in Paragraph 42.

43.      Circle K admits that a Circle K customer called law enforcement. Circle K denies the remaining allegations in Paragraph 43.

44.      Circle K admits that Moreno called other Circle K employees to notify them of the robbery. Circle K is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 44.

45.      Circle K denies the allegations in Paragraph 45.

46.      Responding to the allegations in Paragraph 46, Circle K admits that police officers from the Westminster Police Department arrived at the store after the man left the store. Circle K states that the allegations are vague with respect to the meaning of "a short time after" and therefore Circle K is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 46.

47.      Circle K admits that a police officer asked Moreno to provide a statement. Circle K denies the remaining allegations in Paragraph 47.

48.      Circle K denies the allegations in Paragraph 48.

49.      Circle K denies the allegations in Paragraph 49.

50.      Circle K denies the allegations in Paragraph 50.

51.      Responding to the allegations in Paragraph 51, Circle K admits Moreno gave a statement to police and denies anything inconsistent with her statement.

52.      Circle K denies the allegations in Paragraph 52.

53.      Circle K denies the allegations in Paragraph 53.

54.      Responding to the allegations in Paragraph 54, Circle K admits that Moreno's daughter-in-law arrived at the store later in the evening. Circle K is without knowledge or

information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 54.

55.     Responding to the allegations in Paragraph 55 of the Complaint, Circle K admits that Market Manager Driss Aamoud and Store Manager Love Jorgensen arrived at the store later in the evening. Circle K denies any remaining allegations in Paragraph 55.

56.     Circle K denies the allegations in Paragraph 56.

57.     Responding to the allegations in Paragraph 57, Circle K admits that Aamoud went to the store's office during his visit. Circle K denies any remaining allegations in Paragraph 57.

58.     Responding to the allegations in Paragraph 58 Circle K admits that Aamoud watched security footage during his visit. Circle K denies any remaining allegations in Paragraph 58.

59.     Responding to the allegations in Paragraph 59 Circle K admits that the security footage shows the store from many different angles and captured Wimmer's robbery. Circle K denies the remaining allegations in Paragraph 59.

60.     Circle K denies the allegations in Paragraph 60.

61.     Circle K denies the allegations in Paragraph 61.

62.     Circle K denies the allegations in Paragraph 62.

63.     Circle K denies the allegations in Paragraph 63.

64.     Circle K admits the allegations in Paragraph 64.

65.     Circle K admits the allegations in Paragraph 65.

66.     Responding to the allegations in Paragraph 66, Circle K admits that Moreno called Aamoud to ask about her schedule, and that Aamoud told Moreno that an investigation

Vol. I - 0206

was ongoing and that he would call her back following the conclusion of the investigation. Circle K denies any remaining allegations in Paragraph 66.

67.     Circle K denies the allegations in Paragraph 67.

68.     Circle K denies the allegations in Paragraph 68.

69.     Circle K denies the allegations in Paragraph 69.

70.     Responding to the allegations of Paragraph 70, Circle K admits that Moreno did not apologize for violating Circle K policy. Circle K denies the remaining allegations in Paragraph 70.

71.     Circle K admits that Aamoud asked Moreno to call him the following day. Circle K denies any remaining allegations in Paragraph 71.

72.     Circle K denies the allegations in Paragraph 72.

73.     Circle K admits the allegations in Paragraph 73.

74.     Responding to the allegations in Paragraph 74, Circle K admits upon information and belief that police arrested Tyler Darren Wimmer and that Wimmer was identified as the man who stole the pack of cigarettes from Circle K. Circle K denies the remaining allegations in Paragraph 74.

75.     Circle K is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 75.

76.     Circle K is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 76.

77.     Circle K denies the allegations in Paragraph 77.

78.     Circle K denies the allegations in Paragraph 78.

79.      Circle K denies the allegations in Paragraph 79.

80.      Circle K denies the allegations in Paragraph 80.

81.      Circle K is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 81.

82.      Circle K denies the allegations in Paragraph 82.

83.      Circle K denies the allegations in Paragraph 83.

84.      Responding to the allegations in Paragraph 84, Circle K admits that Moreno has obtained employment with a different company since her employment with Circle K was terminated. Circle K is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 84.

85.      Circle K is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 85.

86.      Circle K is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 86.

87.      Circle K is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 87.

88.      Circle K is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 88.

89.      Circle K is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 89.

**FIRST CLAIM FOR RELIEF**
**(Wrongful Discharge in Violation of Public Policy)**

90.     Circle K incorporates its above answers as though fully set forth herein.

91.     Circle K denies the allegations in Paragraph 91.

92.     Responding to the statements in Paragraph 92, Circle K states they are a characterization of prevailing law, not an allegation of fact that Circle K can admit or deny.

93.     Responding to the statements in Paragraph 93, Circle K states they are a characterization of prevailing law, not an allegation of fact that Circle K can admit or deny.

94.     Responding to the statements in Paragraph 94, Circle K states they are a characterization of prevailing law, not an allegation of fact that Circle K can admit or deny.

95.     Responding to the statements in Paragraph 95, Circle K states they are a characterization of prevailing law, not an allegation of fact that Circle K can admit or deny.

96.     Responding to the statements in Paragraph 96, Circle K states they are a characterization of prevailing law, not an allegation of fact that Circle K can admit or deny.

97.     Responding to the statements in Paragraph 97, Circle K states they are a characterization of prevailing law, not an allegation of fact that Circle K can admit or deny.

98.     Responding to the statements in Paragraph 98, Circle K states they are a characterization of prevailing law, not an allegation of fact that Circle K can admit or deny.

99.     Circle K denies the allegations in Paragraph 99.

100.    Circle K denies the allegations in Paragraph 100.

101.    Responding to the allegations in Paragraph 101, Circle K admits that Moreno was the only employee working during the incident. Circle K denies the remaining allegations in Paragraph 101.

102.    Circle K denies the allegations in Paragraph 102.

103.    Responding to the allegations in Paragraph 103, Circle K admits that Moreno made contact with Wimmer. Circle K denies the remaining allegations in Paragraph 103.

104.    Circle K denies the allegations in Paragraph 104.

105.    Circle K is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 105.

106.    Circle K admits that admits that the security footage shows the store from many different angles and captured Wimmer's robbery. Circle K denies the remaining allegations in Paragraph 106.

107.    Circle K denies the allegations in Paragraph 107.

108.    Circle K denies the allegations in Paragraph 108.

109.    Circle K denies the allegations in Paragraph 109.

110.    Circle K denies the allegations in Paragraph 110.

## SECOND CLAIM FOR RELIEF
### (Intentional Infliction of Emotional Distress and/or Outrageous Conduct)

111.    Circle K incorporates its above answers as though fully set forth herein.

112.    Responding to the statements in Paragraph 112, Circle K states they are a characterization of prevailing law, not an allegation of fact that Circle K can admit or deny.

113.    Circle K denies the allegations in Paragraph 113.

114.    Circle K denies the allegations in Paragraph 114.

115.    Circle K denies the allegations in Paragraph 115.

116.    Circle K denies the allegations in Paragraph 116.

117.    Circle K denies the allegations in Paragraph 117.

118.     Responding to the allegations in Paragraph 118, Circle K admits that it terminated Moreno's employment, effective October 5, 2020. Circle K denies any remaining allegations in Paragraph 118.

119.     Circle K denies the allegations in Paragraph 119.

120.     Circle K denies the allegations in Paragraph 120.

121.     Circle K denies the allegations in Paragraph 121.

122.     Circle K denies the allegations in Paragraph 122.

123.     Circle K denies the allegations in Paragraph 123.

124.     Circle K denies the allegations in Paragraph 124.

Responding to the paragraph beginning "WHEREFORE," and subparagraphs (a)-(h), Circle K denies Moreno's claims and denies that she is entitled to any relief whatsoever.

***To the extent that any allegations in the Complaint are not specifically admitted in the paragraphs above, Circle K denies them.***

## DEFENSES AND AFFIRMATIVE DEFENSES

1.     Circle K's actions regarding Moreno's terms and conditions of employment were based on legitimate business reasons and were taken in accordance with applicable law.

2.     Moreno was an at-will employee whose employment could be terminated at any time for any reason.

3.     Circle K's actions regarding Moreno's terms and conditions of employment were made in good faith and without malice, deliberate indifference, bad faith, or reckless disregard of any of Moreno's legal rights.

4.     Circle K has complied with all applicable laws.

5.      Any damages Moreno sustained were caused or contributed to by her own actions or the actions of others over whom Circle K had no control.

6.      Moreno's alleged damages, if any, are limited or restricted, in whole or in part, by statute and applicable law.

7.      If Moreno was damaged in any amount, she has failed to mitigate her damages and, therefore, is barred from recovery, or any award of damages must be proportionately diminished.

8.      Any damages alleged by Moreno may be subject to offset by subsequent income she received.

9.      There is no basis upon which Moreno is entitled to recovery of punitive or exemplary damages against Circle K.

10.     There is no basis upon which Moreno is entitled to recovery of attorneys' fees against Circle K.

11.     Circle K cannot fully anticipate all additional and affirmative defense that may be applicable to this action and, therefore, reserves the right to assert any and all additional or affirmative defense that may become applicable based on information learned during the course of this litigation, including discovery, trial, or otherwise.

WHEREFORE, Circle K requests that Moreno take nothing by her Complaint and that it recover its attorneys' fees, costs, and disbursements in this action.

Respectfully submitted this 18th day of July, 2023.

*s/ Thomas W. Carroll*
Thomas W. Carroll
Nicholas Hankins
LITTLER MENDELSON, P.C.
1900 Sixteenth Street, Suite 800
Denver, CO 80202
Telephone: 303.629.6200
Fax: 303.629.0200
Email: tcarroll@littler.com
nhakins@littler.com

*Attorneys for Defendant*
*Circle K Stores, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of  July, 2023, a true and correct copy of the

foregoing **ANSWER TO FIRST AMENDED COMPLAINT** was filed and served via

CM/ECF, which will send notice to the following:

Virginia Hill Butler
Iris Halpern
RATHOD | MOHAMEDBHAI LLC
2701 Lawrence Street, Suite 100
Denver, CO  80205
Telephone: (303) 578-4400
Fax: (303) 578-4401
vh@rmlawyers.com
ih@rmlawyers.com

*Attorneys for Plaintiff*

*s/ Joanna Fox*
Joanna Fox, Legal Secretary

4885-0161-7008.3